# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM RICHTER,

               Plaintiff,

v.

DUQUESNE UNIVERSITY OF THE HOLY
SPIRIT, and JAMES MILLER, as an aider
and abettor of discrimination,

               Defendants.

Civil Action No. 2:23-cv-00550-CCW

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS

Defendants Duquesne University of the Holy Spirit ("Duquesne" or the "University") and

James Miller, by and through their undersigned counsel, file this Concise Statement of Material

Facts in support of their Motion for Summary Judgment, filed in conjunction herewith. The below

facts are undisputed and material.[1]

## I.    Duquesne's Advancement Division and Defendant James Miller

1.      Duquesne is a private Catholic institution of higher education. *Exhibit ("Ex.") 1,*

*Declaration of James Miller ("Miller Decl.") ¶ 6.*

---

[1] All referenced Exhibits are included in Defendants' Appendix of Materials in Support of Summary Judgment ("Defendants' Appendix") filed herewith. The Exhibits contain redactions to protect the names and other confidential information of donors, including financial figures and estate plans. Where the Exhibits refer to donors referenced in Defendants' filings in support of their Motion for Summary Judgment, Defendants have assigned defined references to the donors (including Donors A through E and a "Donor Couple"). Where the Exhibits make stray references to donors not directly relevant to the Motion for Summary Judgment, Defendants did not assign a specific identifier. Concurrent with filing their Motion for Summary Judgment, counsel for Defendants provided Plaintiff's counsel a key that identifies the defined donor references and lists the donors who were redacted without reference. Defendants are happy to provide the Court with the key should the Court need it to adjudicate Defendants' Motion.

2.      As a private institution, Duquesne relies on donations, in addition to other funding sources, to fund its mission, allowing the University to provide an exemplary education for current and future students and to strengthen and serve its local and global community. *Ex. 1, Miller Decl. ¶ 7.*

3.      Duquesne's Advancement Division supports the University by supporting its mission, building relationships with its various supporters, and securing critical private philanthropic support. *Ex. 1, Miller Decl. ¶ 8; Ex. 2, Major Gifts Officer Position Summary, Duquesne_00101-03, at Duquesne_00101*

4.      Among the ways that the Advancement Division secures philanthropic support are efforts to raise funds through donations, including, planned gifts (such as those bequeathed in a donor's will) and major gifts (gifts that are $25,000 and above), including gifts to name major programs, facilities and centers. *Ex. 1, Miller Decl. ¶ 9; see also Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101 (noting major gift threshold and responsibilities for major gifts).*

5.      Since July 2021, Defendant James Miller has led the Advancement Division as its Senior Vice President (initially on an interim basis). *Ex. 1, Miller Decl. ¶ 3.*

6.      Miller is currently 59 years old and was 57 years old at the time of Plaintiff's termination from employment. *Ex. 1, Miller Decl. ¶ 5; Ex. 3, Transcript of Deposition of James Miller ("Miller Tr.") 15:6-7.[2]*

## II.      Brief Overview of Plaintiff's Employment

7.      In September 2015, Duquesne hired Plaintiff William Richter ("Plaintiff" or "Richter") as a Major Gift Officer in the Advancement Division. *Ex. 4, Transcript of Deposition of Plaintiff William Richter ("Plaintiff Tr.") 36:13-21.*

---

[2]      Ex. 3 and all exhibits attaching deposition transcripts include only the cover page and referenced pages.

8.      At the time of his hire, Plaintiff was 55 years old. *See Ex. 4, Plaintiff Tr. 36:22-25; see also Ex. 4, Plaintiff Tr. 10:2-3 (noting date of birth in 1959 that made him 55 years old when hired).*

9.      In January 2020, when he was 60 years old, Duquesne promoted Plaintiff to Senior Major Gifts Officer. *Ex. 5, Scheduled Payroll Authorizations, Duquesne_00077-78, at Duquesne_00077 (reflecting promotion); Ex. 6, Aug. 30, 2019 Letter from J. Plante to W. Richter, Duquesne_00105 (prescribing delayed promotion until Jan. 2020); see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

10.     In November 2021, when he was 61 years old, Duquesne created a title for Plaintiff, Senior Major and Gift Planning Officer, and switched his supervisor to Mary Frances Dean at his request. *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations (reflecting "title and supervisor change"); Ex. 60, Excerpts of Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories, Requests for Production of Documents, and Request for Admissions ("Defendants' Discovery Responses"), at p. 4; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

11.     As a gift officer, Plaintiff was responsible for identifying, qualifying, cultivating, soliciting, and stewarding donor relationships to secure major gifts and planned gifts for the University. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

12.     Senior gift officers hold important roles at the University, acting as ambassadors with many prominent internal and external constituents. *Ex. 7, Aug. 17, 2022 Letter from J. Miller to W. Richter ("Termination Letter"), Duquesne_00013-14, at Duquesne_00014.*

13.     Plaintiff acted on the University's behalf to communicate and otherwise maintain the University's relationships with its most prominent alumni and other prospective donors. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

14.     After discovering and investigating Plaintiff's actions in 2022 resulting violations of policies relating to naming University assets, and considering Plaintiff's past performance, the University terminated Plaintiff on August 17, 2022. *See Ex. 7, Termination Letter, at Duquesne_00013-14.*

### III.     Plaintiff's Conduct and Performance Issues before the 2022 Intervening Event.

15.     As set forth more fully below, prior to the 2022 policy violations, Plaintiff's conduct on more than one occasion, caused internal constituents, specifically senior university leaders, to raise serious concerns with his performance and professional judgment. *See Ex. 7, Termination Letter, at Duquesne_00013.*

16.     In August 2019, Plaintiff took a fundraising trip to California with Provost and Vice President of Academic Affairs David Dausey. *Ex. 8, Aug. 26, 2019 Letter from J. Plante to W. Richter, Duquesne_00104.*

17.     Following the trip, Plaintiff messaged Dausey a picture of a woman in a bikini with text that neither Dausey nor Plaintiff can now remember. *Ex. 4, Plaintiff Tr. 72:20-73:10; Transcript of Deposition of Dr. David Dausey ("Dausey Tr.") 85:23-24.*

18.     Dausey reported the message to Duquesne because he was concerned and thought the messages "looked inappropriate." *Ex. 9, Dausey Tr. 85:22-86:5.*

19.     When confronted about these messages to Dausey at the time, Richter admitted to the behavior being "completely inappropriate," "had no justification for his actions, and expressed

extreme regret for, and understanding of, the uncomfortable position in which [he] had placed" Dausey. *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

20.     To this day, Plaintiff admits that his actions showed "poor judgment" and were inappropriate. *Ex. 4, Plaintiff Tr. 73:13-16 (stating "[i]t was poor judgment" that he sent the message); 73:25-74:12 (acknowledging that "poor judgment" is synonymous with "inappropriate" in this context); see also Ex. 10, Transcript of Deposition of Cecilia Hughes ("Hughes Tr.") 30:1-7.*

21.     After investigating the matter, Plaintiff's then-supervisor, John Plante, issued a "formal written warning" to Plaintiff for "exhibiting fundamentally poor judgement" and acting "in direct violation of the University's policy on sexual misconduct prevention, [The Administrative Policies ("TAP")] No. 31." *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

22.     The formal written warning quoted the relevant parts of TAP No. 31 as it stood at that time, which provided that "[h]ostile work environment sexual harassment is unwelcome conduct of a sexual nature, including transmitting of graphic [images] of a sexual nature" and that "[d]isciplinary sanctions for employee violations of this policy may range from a disciplinary warning to termination from the University." *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

23.     The formal written warning required certain actions, including Plaintiff apologizing to Dausey and undergoing retraining on sexual misconduct prevention and delaying Plaintiff's planned promotion from September 2019 to January 2020. *See Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104 (prescribing the apology and retraining); Ex. 6, Aug. 30, 2019 Letter, at Duquesne_00105 (follow-up letter prescribing delayed promotion).*

24.     Plaintiff, who was 59 years old at the time, admits that the delayed promotion had nothing to do with his age and was not taken in retaliation for any action. *Ex. 4, Plaintiff Tr. 76:12-17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

25.     In early 2019, School of Nursing ("SON") Dean Mary Ellen Glasgow and Plaintiff were working together on a gift from prominent donors to the SON ("Donor B" and "Donor C"). *Ex. 11, June 2, 2019 Memo from M. Glasgow to D. Dausey and Attached Email Compilation, Duquesne_00670-78, at Duquesne_00671.*

26.     Plaintiff and Dean Glasgow exchanged several emails regarding their efforts to obtain a commitment from the Donors B and C. *See Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673-78 (reflecting several emails from January through April 2019 regarding Donors B & C).*

27.     On February 18, 2019, Plaintiff emailed Dean Glasgow and Rick Creehan (former Assistant VP of Advancement) to state that he had been communicating with Donor B "regarding a gift to the SON to honor [Donor C]." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

28.     In that email, Plaintiff stated, "I will certainly keep you both in the loop." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

29.     Plaintiff later noted to Dean Glasgow that he would meet with Donor B on May 13, 2019 and to "[s]tay tuned." *Ex. 11, June 2, 2019 Memo, at Duquesne_00672; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673.*

30.     In May 2019, Plaintiff and Dausey met with Donors B and C to discuss a donation to the University's fledgling College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

31.     Plaintiff did not inform Glasgow about the discussion with the donors regarding the College of Medicine either before or after the meeting. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

32.     Dean Glasgow learned about Plaintiff's discussions with the donors for the first time when Donors B and C called her and told her they were concerned she was "out of the loop" regarding the intention to divert the donation from the SON to its new College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

33.     Dean Glasgow felt it was "abundantly clear that the relationship with the donor could be in jeopardy." *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

34.     In August 2021, Plaintiff contributed to a mathematical error in a gift agreement for Donors B and C that left a scholarship fund for SON students tens of thousands of dollars short of full funding. *Ex. 3, Miller Tr. 50:12-21; Ex. 1, Miller Decl. ¶¶ 10-11; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, Duquesne_00679-86 (email compilation related to error).*

35.     Plaintiff was made aware of the error and told to correct it with the donors. *Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00682 (Aug. 20, 2021 email from M. Glasgow to J. Miller and D. Dausey stating that it would be "appropriate for [Plaintiff] and/or his supervisor to advise" the donors about the error).*

36. Miller discussed remedying the error with Plaintiff in November 2021, at which time they agreed that telling Donors B and C in person would be best, but, if an in-person meeting could not be secured, they would "default to a Zoom or conference call engagement." *Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from J. Miller to M. Glasgow).*

37. In the November 2021 communication, Miller noted that Plaintiff "intend[ed] to take full responsibility for the error and seek resolution to [the donors'] satisfaction." *Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from J. Miller to M. Glasgow).*

38. Miller again discussed remedying the error with Plaintiff in January 2022, during which Plaintiff stated that he wants to have the communication in person and that "building a trip around this discussion shouldn't be too difficult."

39. Miller recalls instructing Plaintiff to resolve the error on at least one other occasion. *See Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00684 (Mar. 18, 2022 email from J. Miller to M. Glasgow stating Miller was scheduled to speak with Plaintiff about this the following Wednesday).*

40. Plaintiff did not correct the error prior to the scholarship account's funds being insufficient for the next expense. *Ex. 3, Miller Tr. 50:12-21; Ex. 12, Details related to Donors B & C Gift Agreement Error, Duquesne_00685 (April 6, 2022 email from M. Glasgow to J. Miller that notes Donors B & C "will be expecting to award two more scholarships for fall since they are unaware of the error since there has been no communication from [Plaintiff] about the issue" and "there are insufficient funds in the account" for the scholarship).*

41.     The error and failure to correct it required the University to reallocate $40,000 in University funds to cover the shortfall in scholarship funds. *Ex. 3, Miller Tr. 51:9-25; Ex. 1, Miller Decl. ¶ 11.*

42.     Separately, Plaintiff referred to prospective University donors as "my" (his) donors and demanded that his supervisor "ABSOLUTELY forbid any contact with my prospect pool or donor base without my permission." *Ex. 13, W. Richter 2020-21 Performance Review, Duquesne_00092-100, at Duquesne_00094.*

43.     In mid-2021, Plaintiff argued with two coworkers, Cal Pifer and Adam Viers, escalating to the point of the Plaintiff and Pifer "yell[ing] at each other." *Ex. 4, Plaintiff Tr. 59:25-60:6.*

44.     The argument related to Pifer contacting one of the University's donors who had been assigned to Plaintiff. *Ex. 4, Plaintiff Tr. 58:9-59:24.*

45.     Plaintiff – who was 61 years old at the time – admits that Pifer did not contact his donor due to Plaintiff's age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 58:2-8; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

46.     Plaintiff "felt he had been too forceful" and "could have handled [the disagreement] better." *Ex. 4, Plaintiff Tr. 64:25-65:8.*

**IV.     Miller's Promotion and Reorganization of the Advancement Division.**

47.     After the departure of Duquesne's former Vice President of Advancement John Plante due to dissatisfaction by the Administration and the Board with respect to his leadership and the performance of the Advancement Division, Miller was selected to lead the Advancement Division on an interim basis in July 2021. *Ex. 1, Miller Decl. ¶ 3.*

48.     In October 2021, Miller was promoted to the role of Senior Vice President on a permanent basis. *Ex. 1, Miller Decl. ¶ 4.*

49.     In the fall of 2021, Plaintiff met with Miller to discuss his "dissatisfaction with having to report to Adam Viers." *See Ex. 14, May 25, 2022 W. Richter Letter to J. Dedrick, PL 0064-73, at PL 0064 (noting meeting with Miller).*

50.     At this meeting, Plaintiff offered to retire if Miller "wanted [him] out." *Ex. 14, May 25, 2022 Letter, at PL 0064; see also Ex. 4, Plaintiff Tr. 183:11-19 ("Q: . . . [D]o you recall offering to retire?" "A: Yes.").*

51.     Roughly 11 months prior to Plaintiff's termination and while Plaintiff was 61 years old, Miller rejected Plaintiff's retirement offer, as Miller "did not want [Plaintiff] to leave the University." *Ex. 4, Plaintiff Tr. 184:14-24; 186:17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

52.     During this discussion, Plaintiff asked to be assigned to a supervisor other than Viers, and Miller chose to reassign Plaintiff from Viers to Dean, creating a new position for Plaintiff. *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations at Duquesne_00078 (reflecting "title and supervisor change"); Ex. 60, Defendants' Discovery Responses at p. 4.*

53.     Prior to selecting Miller for his new role, University President Ken Gormley directed Miller to restructure the Advancement Division, including a review and rebalancing gift officers' donor portfolios. *Ex. 15, Apr. 1, 2022 Email Exchange Between J. Miller & W. Richter, Duquesne_00020-23, at Duquesne_00020; see also Ex. 4, Plaintiff Tr. 159:16-160:10.*

54.     Plaintiff does not claim that the decision to move "certain donors from [his] portfolio" to other gift officers was due to his age or due to prior complaints he made. *Ex. 4, Plaintiff Tr. 167:12-19.*

55.     At the time of the rebalancing, Plaintiff's portfolio had 431 donors. *Ex. 16, Gift Officer Assignment Summary, Duquesne_00694 (produced in native Excel format but filed as a PDF)*; *see also Ex. 4, Plaintiff Tr. 146:21-147:3.*

56.     Plaintiff agreed that 431 prospects is not a reasonable number for a gift officer and that his portfolio was too big. *Ex. 4, Plaintiff Tr. 146:21-147:24.*

**V.     Krebs' Outreach to a Donor Formerly Assigned to Plaintiff.**

57.     In March 2022, Melissa Krebs, another gift officer in Advancement, met with a donor who was reassigned to her portfolio from Plaintiff's portfolio ("Donor A"). *Ex. 17, Mar. 7, 2022 Email Exchange Between M. Krebs, C. Hughes, and M. Dean, Duquesne_00622 (highlighting in original).*

58.     Krebs secured a $50,000 planned gift commitment from Donor A, which was confirmation of a bequest already in his will. *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622; see also Ex. 18, Mar. 10-11, 2022 Email Exchange Between J. Miller and W. Richter, Duquesne_00049-52, at Duquesne_00051 (Plaintiff confirming same).*

59.     On March 7, 2022, Krebs informed Cecilia Hughes and Dean of the commitment and asked to have a statement of charitable intent drawn up. *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622.*

60.     Hughes was responsible for drafting donor statements of charitable intent. *Ex. 1, Miller Decl. ¶ 12.*

61.     Dean was responsible for overseeing the process and signing the agreements. *Ex. 1, Miller Decl. ¶ 13.*

62.     Even where other team members are involved in the process and drafting of agreements, gift officers remain responsible for ensuring that the content of a donor statement of

charitable intent ("DSCI") "reflects what [the gift officer] ha[s] discussed with the donor." *Ex. 19, Transcript of Deposition of Ken Gormley ("Gormley Tr.") 38:12-39:1.*

63.    Dean replied to Krebs that she thought that Donor A was assigned to Plaintiff and later noted that there were issues of "communicat[ion]" regarding reassignments of donors. *Ex. 17, Mar. 7, 2022 Emails, at Duquesne_00622.*

64.    Miller had not communicated the results of the rebalancing to Plaintiff (either through Plaintiff's supervisor, Dean, or to Plaintiff directly) prior to Plaintiff learning about Krebs' contact with Donor A. *Ex. 20, Transcript of Mary Frances Dean ("Dean Tr.") 91:16-19.*

65.    Dean believed that Miller did not communicate the results of the rebalancing with her "[b]ecause he chose not to," but she did not believe that it was because of her age or the ages of Plaintiff or Hughes. *Ex. 20, Dean Tr. 91:20-92:11.*

66.    After learning of the confusion, Krebs reached out to Plaintiff to see if he would meet to discuss. *Ex. 21, Mar. 15 2022 Emails including M. Krebs, W. Richter & M. Dean, Duquesne_00323-24, at Duquesne_00323-24.*

67.    Plaintiff did not reply to Krebs' outreach. *See Ex. 21, March 15 2022 Emails, at Duquesne_00323-24; see also Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11 (indicating he never spoke with Krebs about Donor A).*

68.    Plaintiff never spoke to Krebs about Donor A. *Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11.*

69.    Plaintiff also never spoke to Donor A about Krebs' outreach. *See Ex. 4, Plaintiff Tr. at 170:23-171:6.*

70.    Plaintiff forwarded Krebs' email to Dean and indicated that he had "no intention whatsoever of communicating with Melissa on ANY subject," which Plaintiff admitted did not

reflect teamwork. *Ex. 21, March 15 2022 Emails, at Duquesne_00323; see also Ex. 4, Plaintiff Tr. 84:19-21.*

## VI. Plaintiff's Complaints Regarding Krebs' Contact with a Donor and the Rebalancing as a Whole

### A. Plaintiff's Discussions with Miller

71.     On March 10, 2022, Plaintiff reached out to Miller to complain about Krebs' actions with respect to Donor A. *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051-52.*

72.     Plaintiff complained that Krebs' introductory email to Donor A (as evidenced in her contact report) contained a "lie" when she said that Plaintiff "has shared some of your thoughts . . . with her." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

73.     Plaintiff asserted that Donor A had asked that "what [Plaintiff and Donor A] discussed [be] completely confidential in the preliminary stages." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

74.     When pressed at his deposition, Plaintiff could only identify as completely confidential that Donor A "was considering at the time selling or donating a parcel of land." *Ex. 4, Plaintiff Tr. 116:21-117:7; see also Ex. 4, Plaintiff Tr. 118:12-14 (noting he did not recall Donor A sharing "other thoughts . . .on what he intended to do").*

75.     Plaintiff stated he did not recall whether Donor A asked him to keep the information confidential. *Ex. 4, Plaintiff Tr. 118:21-23.*

76.     He stated in his March 10, 2022 email that information was "completely confidential in the preliminary stages" because "[i]t usually is." *Ex. 4, Plaintiff Tr. 118:24-119:3.*

77.     That "usual[]" confidentiality would not preclude Plaintiff from sharing the details with others in the Advancement Division. *Ex. 4, Plaintiff Tr. 119:4-17.*

78.     When she said Plaintiff had "shared some of [Donor A's] thoughts," Krebs asserts that she was referring to her reading of Plaintiff's notes in contact reports about Donor A. *Ex. 22, Transcript of Deposition of Melissa Krebs ("Krebs Tr.") 29:25-30:8.*

79.     Krebs' practice was to contact the prior-assigned gift officer for more information about a donor "[i]f something wasn't clear in the Contact Management System" (*i.e.*, from the contact reports on the donor). *Ex. 22*, *Krebs Tr. 17:9-12.*

80.     Plaintiff does not believe that Krebs told Donor A that Plaintiff "has shared some of your thoughts . . . with her" due to his age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 111:7-15.*

81.     Miller and Plaintiff scheduled a lunch to discuss Plaintiff's concerns about Krebs. *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00049-50; Ex. 4, Plaintiff Tr. 122:10-21.*

82.     At the March 23, 2022 lunch, Miller informed Plaintiff of the Donor A reassignment and stated that Krebs had done nothing wrong. *Ex. 4, Plaintiff Tr. 133:22-134:15; Ex. 23, Plaintiff's Mar. 23, 2022 notes of meeting with J. Miller, Duquesne_00321-22, at Duquesne_00321.*

83.     Plaintiff stated his disagreement but noted that as the "boss," Miller had the right to take the course of action he chose. *Ex. 4, Plaintiff Tr. 138:21-139:2; see also Ex. 23, Mar. 23, 2022 notes, at Duquesne_00321.*

84.     Plaintiff sent Miller an email on April 1, 2022 that stated his concerns regarding the situation regarding Krebs and Donor A. *See Ex. 15, Apr. 1, 2022 Email Exchange at Duquesne_00021-23.*

85.     There is no reference to Plaintiff's age or age discrimination in the email. *See Ex. 4, Plaintiff Tr. 159:4-12 (admitting same).*

**B. Plaintiff's First Complaint to Human Resources**

86. In April 2022, Plaintiff reached out to Human Resources to file a complaint regarding Krebs' conduct with respect to Donor A. *Ex. 24, Apr. 1, 2022 Email Exchange between W. Richter, R. Dawson, & J. Dedrick, Duquesne_00167.*

87. In his email to Human Resources, Plaintiff does not reference his age or age discrimination. *Ex. 4, Plaintiff Tr. 188:15-24.*

88. Plaintiff filed a complaint with Jefferson Dedrick, Human Resources Director of Employee and Labor Relations, alleging violations of "TAP 55 and ancillary issues." *Ex. 25, Plaintiff's Employee Complaint Procedure Form, Duquesne_00177.*

89. This is the first Human Resources complaint Plaintiff filed of any type. *Ex. 4, Plaintiff Tr. 187:24-188:2.*

90. Plaintiff notes that the "ancillary issues" are "probably" the "portfolio rebalancing issues." *Ex. 4, Plaintiff Tr. 194:18-21.*

91. Plaintiff asserted that Krebs' actions "prevent[ed] [him] from securing a major gift and has resulted in the decimation of [his] portfolio which renders it impossible for [him] to succeed." *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

92. Plaintiff stated that the only actions Krebs took with respect to decimating his portfolio were her interactions with Donor A. *Ex. 4, Plaintiff Tr. 196:13-197:2.*

93. Plaintiff stated that those interactions and the resultant $50,000 gift prevented him from soliciting a larger $250,000 gift on which he claimed he was working. *Ex. 4, Plaintiff Tr. 197:8-23.*

94. Plaintiff does not believe that Krebs' actions in booking the $50,000 gift were due to Plaintiff's age. *Ex. 4, Plaintiff Tr. 121:4-6.*

95.     Plaintiff asserts he was unable to attempt to cultivate a larger gift because Donor A was reassigned to Krebs but "assume[s]" that it would be possible for someone from the University to reach out to Donor A to attempt to solicit the remaining $200,000. *Ex. 4, Plaintiff Tr. 197:8-23.*

96.     Plaintiff also faulted Viers for supervising Krebs' actions and Miller for condoning Krebs' actions. *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

97.     Plaintiff's complaint does not mention his age or discrimination related to his age. *See Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

98.     Dedrick, a trained investigator with a law degree, was responsible for investigating the complaint. *Ex. 24, Apr. 1 Email Exchange, at Duquesne_00167 (forwarding Plaintiff to Dedrick to handle complaint); Ex. 26, Transcript of Deposition of Jefferson Dedrick ("Dedrick Tr.") 14:12-15:21 (stating he worked three jobs prior to Duquesne and did human resources functions and investigations "of the type we're talking about" in this case at all three); 19:14-23 (stating he is a lawyer with a law degree from Syracuse University).*

99.     Because Miller was referenced in the complaint, Dedrick chose Dausey as the decisionmaker regarding the investigation pursuant to Human Resources policy. *Ex. 27, Apr. 11, 2022 Email Exchange Between J. Dedrick & W. Richter, Duquesne_00170-71, at Duquesne_00171.*

**C.     Krebs' Follow-Up and Plaintiff's Second Complaint to Human Resources**

100.    On March 30, 2022, Krebs followed up with Hughes and Dean to have the paperwork drawn up for the Donor A commitment and again followed up on April 8, 2022 and April 27, 2022. *Ex. 28, Email Exchange Between M. Krebs, C. Hughes, and M. Dean dated Mar. 7, 2022 to Apr. 27, 2022, Duquesne_00614-17, at Duquesne_00615-16.*

101.    Hughes responded for the first time on April 27, 2022 stating the gift would not be processed while it was "under dispute with HR." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at Duquesne_00615.*

102.    Krebs replied that the internal HR issue did not "preclude us from servicing the donor's wishes or doing what is best for the [U]niversity." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at Duquesne_00615.*

103.    Dean agreed that it is not in a donor's best interest to delay memorializing the donor's wishes due to an internal dispute and that it could cause issues. *Ex. 20, Dean Tr. 119:10-120:2.*

104.    Dean responded that she would "not move forward until this matter is resolved." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at Duquesne_00615-16.*

105.    Dean and Hughes did not have instructions or authority from Human Resources, Miller, or anyone at the University to hold up the memorialization of Donor A's gift. *Ex. 20, Dean Tr. 118:14-119:9, 120:6-18.*

106.    Hughes did not speak with Miller, Human Resources or anyone other than Dean about holding up the memorialization of Donor A's gift. *Ex. 10, Hughes Tr. 118:13-120:10.*

107.    After learning Krebs sought to memorialize the gift, Plaintiff emailed Dedrick to convey, using bold language in all capital letters, that he was upset that Donor A's gift was moving forward, as he "assum[ed] that it would be put on hold and reviewed." *Ex. 4, Plaintiff Tr. 204:2-205:19; Ex. 29, May 13, 2022 Email Exchange Between W. Richter & J. Dedrick, Duquesne_00189-90, at Duquesne_00190 ("It's come to my attention that Melissa is insisting that the University 'book the gift of $50k from [Donor A]'. . . **__ARE YOU KIDDING ME?__** . . .UNTIL SHE STOLE HIM, **AND LIED ABOUT IT**, [Donor A] was my prospect – any 'gift credit' should go to me! I WISH TO FILE AN IMMEDIATE COMPLAINT REGARDING THIS – OR AMEND MY ORIGINAL COMPLAINT TO INCLUDE THIS!" . . . (emphasis in original)).*

108.    Plaintiff stated that "credit should go to [him]" for the Donor A gift, because Krebs "stole him and lied about him." *Ex. 4, Plaintiff Tr. 205:20-206:2; Ex. 29, May 13,2022 Email Exchange, at Duquesne_00190*

109.    Dedrick explained that there was a difference between moving forward with memorializing the gift to service the donor and determining who received credit for the gift. *Ex. 29, May 13,2022 Email Exchange, at Duquesne_189.*

110.    Plaintiff filed a second complaint with respect to the issue of Krebs seeking to book the gift. *See Ex. 30, May 15, 2022 Email from W. Richter to J. Dedrick and A. Berestecky, Duquesne_00163-66.*

## VII.    Dedrick's Thorough Investigation of Both Complaints

111.    Dedrick interviewed eight employees as part of his investigation from April 5, 2022 through May 24, 2022. *Ex. 31, HR Complaint Procedure Investigative Report dated July 11, 2022, Duquesne_00213-28, at Duquesne_00214.*

112.     Dedrick engaged in "[a]dditional follow-up communications" between May 24, 2022 and June 15, 2022. *Ex. 31, Report dated July 11, 2022, at Duquesne_00214.*

113.     He obtained rebuttal statements from Krebs, Viers, and Miller, including a second rebuttal from Miller regarding the second complaint. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28*

114.     Dedrick considered numerous documents and communications provided by Plaintiff and Dean. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28.*

115.     He recommended to Dausey that there be a finding of no policy violation as to Krebs, Viers, or Miller. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-27.*

116.     Specifically, he found that Krebs' statement to Donor A that Plaintiff had "shared his thoughts" was misleading but did not rise to the level of a TAP 55 violation for unethical conduct. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

117.     He found that, because Donor A was assigned to Krebs at the time of her outreach and gift solicitation, and Krebs had reviewed Plaintiff's contact report notes, she was not in violation of any policy. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-23.*

118.     He noted that Plaintiff made no specific allegation as to Viers and, as a result, Viers committed no policy violation. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

119.     He found that Miller was within his authority to reorganize portfolios and to allow Krebs to book a gift she solicited from Donor A, who was at that time assigned to her portfolio. *Ex. 31, Report dated July 11, 2022, at Duquesne_00224-26.*

120.     Dausey agreed with Dedrick's conclusions and recommendations. *Ex. 9, Dausey Tr. 41:12-42:15.*

**VIII. Plaintiff Appeals the Complaint Findings.**

121. Dedrick explained to Plaintiff the procedure to appeal the decision as to his complaint. *Ex. 32, July 20, 2022 Email Exchange Between W. Richter and J. Dedrick, Duquesne_00204-05, at Duquesne_00204.*

122. Plaintiff submitted an appeal, claiming material procedural error in the form of Dedrick not focusing on the specific fact that Krebs had "lied" to a donor. *Ex. 33, Aug. 2, 2022 Email from W. Richter to J. Dedrick, Duquesne_00206-07.*

123. Plaintiff's appeal does not reference his age or age discrimination at all. *See Ex. 33, Aug. 2, 2022 Email, at Duquesne_00206-07; see also Ex. 4, Plaintiff Tr. 284:21-24 (admitting same).*

124. Daniel Gilman, Chief of Staff to the University President, reviewed the appeal and found no material procedural error. *Ex. 34, Aug. 23, 2022 Letter from D. Gilman to W. Richter, PL 0027-28.*

**IX. The Intervening Event:  Plaintiff's Solicitation of a Deferred, Revocable Gift in Exchange for Immediate Naming Rights of a University-Wide Center**

    **A. Cultivation of the Gift**

125. Starting in mid-2021, Plaintiff began to cultivate a gift from a married couple (the "Donor Couple" or, individually, "Donor D" and "Donor E"). *Ex. 35, Contact Reports Regarding Donor Couple, Duquesne_00259-75, at Duquesne_00263-64 (June 15, 2021 contact), Duquesne_00267-68 (Aug. 10, 2021 contact); see Ex. 4, Plaintiff Tr. 316:14-21 (stipulating that contact reports were made by him).*

126. A gift officer cannot make representations to a donor that they can name an entity without it going to the Gift Acceptance Committee and the President. *Ex. 19, Gormley Tr. 20:14-17; see infra Section IX.B (describing policies gift officers must follow for gifts to name an entity which require approvals prior to any promise to a donor).*

127. In March and April 2022, Plaintiff secured an agreement for a deferred, revocable gift in exchange for naming rights to the Center for Emerging and Innovative Media ("CEIM"). *Ex. 36, Mar. 8, 2022 Email from W. Richter to C. Hughes and M. Dean, Duquesne_00340; Ex. 37, Apr. 12, 2022 Email Exchange between Donor D and W. Richter, Duquesne_00333-35.*

128. President Ken Gormley created the CEIM and was "deeply involved in every facet" of the CEIM. *Ex. 19, Gormley Tr. 20:18-21:5.*

129. CEIM is University-wide center. *See Ex. 38, Centers and Institutes, Duquesne.Edu, Duquesne_00353-59, also available at [https://www.duq.edu/research/centers-and-institutes/index.php](https://www.duq.edu/research/centers-and-institutes/index.php) (listing CEIM as an "Interdisciplinary Center"); Ex. 39, Center for Emerging and Innovative Media, Duquesne.Edu, Duquesne_00360-71, also available at [https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php](https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php) (noting "[a]ny student from any program across campus can take advantage of these convenient, cutting edge studios"); see also Ex. 4, Plaintiff Tr. 296:20-25 (stating he cannot "speak directly to what [CEIM's] broad intent" was and that he has no reason to dispute that the CEIM is a university-wide center).*

### B. Policies on Gift Acceptance and Naming Rights

130. Naming agreements are of critical importance to the University as naming rights celebrate and recognize and celebrate donors in a highly visible way. *Ex. 7, Termination Letter, at Duquesne_00013.*

131. The University President must approve naming rights because they are "very valuable" rights and there are many factors that contribute to the decision as to whether to grant naming rights. *Ex. 19, Gormley Tr. 78:4-11.*

132.    Duquesne has policies related to the acceptance of large gifts and the issuance of naming rights to donors.  *See Ex. 40, Gift Acceptance Policies, Duquesne_00137-59; Ex. 41, Policy on Gift Related Naming Opportunities ("Naming Policy," and, collectively with Ex. 40, the "Gift Policies"), Duquesne_00160-62.*

133.    Duquesne has these policies to ensure the University President has the ultimate decision-making authority when it comes to entering into certain gift agreements to protect these "very valuable naming rights."  *Ex. 19, Gormley Tr. 77:24-78:15; see also Ex. 40, Gift Acceptance Policies, at Duquesne_00153 (stating that "[v]ariations from these fulfillment guidelines [regarding timing of funding for agreements involving naming rights] may be considered . . . upon . . . approval by the Gift Committee and the President"); Ex. 41, Naming Policy, at Duquesne_00161 (stating "[t]he President . . . will have final approval in any decision to name a college, school, department, institute, or university-wide center").*

134.    The Gift Acceptance Policies provide that a "naming will generally not be recognized as official and final until at least sixty percent (60%) of the total commitment has been paid, with an irrevocable agreement and time frame executed in writing for the remainder."  *Ex. 40, Gift Acceptance Policies, at Duquesne_00152-53.*

135.    The Gift Acceptance Policies further provide that, "[i]f a deferred gift is part of the naming commitment, it is recommended that its maximum value be no more than forty percent (40%) of the total package (as calculated based on the donor's age at the time of the commitment). *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

136.    Ensuring a significant portion of a gift is paid up front is important to serve the goal of funding, developing, and growing the University center or other recipient. *Ex. 1, Miller Decl. ¶ 14.*

137.     The Gift Acceptance Policies provide for "[v]ariations from these fulfillment guidelines[,]" which "may be considered on a case-by-case basis upon referral by the Vice President for University Advancement and approval by the Gift Committee and the President." *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

138.     Gifts that involve naming university programs, facilities, and university-wide centers raise unique issues that, per University Policy, require the direct involvement and final approval of the Gift Acceptance Committee and the President. *Ex. 41, Naming Policy, at Duquesne_00161.*

139.     Plaintiff could not identify any instance during his time at Duquesne where the Gift Acceptance Policies were not followed or where he saw a gift agreement that violated the policies other than claiming that the Gift Policies were not followed in a scenario this Court has already ruled is not relevant to Plaintiff's claims.[3] *Ex. 4, Plaintiff Tr. 324:20-325:10, 325:23-20.*

140.     Plaintiff has never seen the agreement related to the irrelevant commitment. *Ex. 4, Plaintiff Tr. 325:11-12.*

141.     The Policy on Gift Related Naming Opportunities described above (the "Naming Policy") states that the President's approval is required for naming-rights opportunities for university-wide centers. *Ex. 41, Naming Policy, at Duquesne_00161.*

142.     The Naming Policy generally requires that the funding requirement to name a university-wide center is $3.5 million. *Ex. 41, Naming Policy, at Duquesne_00162.*

---

[3]     The Court determined the commitment identified to be irrelevant and not subject to discovery at the parties' March 13, 2024 conference. For the avoidance of doubt, Defendants continue to assert that the commitment identified is not relevant for the reasons stated in their submission to the Court.

143.    The Naming Policy provides that, "in special situations, with approval of the Vice President for University Advancement and the President, unrestricted gifts or irrevocable deferred gifts may be recognized with a naming opportunity." *Ex. 41, Naming Policy, at Duquesne_00162.*

## C.    Entry into a Donor Statement of Charitable Intent

144.    On May 13, 2022, at Plaintiff's request, Hughes provided Plaintiff a draft DSCI but noted that she needed a "detail for the Gift Acceptance Committee." *Ex. 42, May 13, 2022 Email from C. Hughes to W. Richter, Duquesne_00513.*

145.    In an email to Donor D, Plaintiff noted he needed a statement of the Donor Couple's finances to take to Duquesne's "naming committee." *Ex. 43, June 19, 2022 Email from Plaintiff to Donor D, Duquesne_00406.*

146.    Plaintiff never brought the gift and naming rights before the Gift Acceptance Committee or any committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

147.    Plaintiff is not aware of whether anyone brought the gift and naming rights before the Gift Acceptance Committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

148.    Plaintiff did not have any discussions with President Gormley about the gift and naming rights, nor did he ask Vice President Miller to do so. *Ex. 4, Plaintiff Tr. 311:15-20*; *Ex. 1, Miller Decl. ¶16.*

149.    On June 22, 2022, the Donor Couple signed the DSCI. *Ex. 44, Paperwork regarding DSCI and Executed DSCI, Duquesne_00558-60.*

150.    On July 7, 2022, Dean signed the DSCI. *Ex. 44, Executed DSCI, Duquesne_00560.*

151.    The DSCI provided that the gift was revocable at any time by the donors but did not provide the University revocation rights. *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 3).*

152.    Revocable meant that the donors could withdraw their commitment at any time during their lifetimes. *Ex. 1, Miller Decl. ¶ 15; see also Ex. 44, Executed DSCI, Duquesne_00559 (¶ 3).*

153.    The DSCI did not require any payment up front and provided only for a "revocable bequest" of 20% of the Donor Couple's Trust estate. *Ex. 44, Executed DSCI, Duquesne_00558-59.*

154.    The fact that it was a "revocable bequest" meant that that the gift was entirely deferred until the death of the Donor Couple. *Ex. 1, Miller Decl. ¶ 15.*

155.    The DSCI provided the donors with the right to name the CEIM in perpetuity. *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 5).*

156.    The CEIM would be renamed "[u]pon receipt of documentation of the proposed gift." *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 5).*

157.    The Donor Couple provided that documentation the same day they signed the DSCI. *See Ex. 35, Donor Couple Contact Report by W. Richter (dated June 26, 2022), Duquesne_00265-66 (noting the Donor Couple provided their financial information "to substantiate the gift"); see also Ex. 44, Paperwork Submitted with DSCI, at Duquesne_00561 (donor 401(k) Information with annotations).*

158.    The DSCI does not provide that the naming rights are revoked in the event of a revocation of the Donor Couple's commitment or for any circumstance. *See generally Ex. 44, Executed DSCI, Duquesne_00559-60.*

### D.    Investigation into the Purported Naming Agreement

159.    After the DCSI was executed without the University President's knowledge or approval, President Gormley was shocked to learn of the agreement. *Ex. 19, Gormley Tr. 20:18-21:5.*

160.     On July 28, 2022, Heather Clay, Dean's then-supervisor and Richter's and Hughes' second-level manager, informed Dean that Plaintiff, Hughes, and she were in "serious trouble" for the Donor Couple's DSCI, after which Dean stated to Hughes that "[t]his one just got by us," meaning that they bore responsibility for the errors made with respect to the gift. *Ex. 20, Dean Tr. 164:16-165:17.*

161.     Dedrick investigated the gift and circumstances surrounding it. *See Ex. 45, Aug. 10, 2022 Report on CEIM Naming Investigation, Duquesne_00001-11.*

162.     Dedrick interviewed five individuals as part of his investigation. *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00003-4.*

163.     Dedrick and Plaintiff initially agreed to meet regarding the investigation on August 3, 2022 at 3:30 p.m. *Ex. 46, Aug. 2, 2022 Email from J. Dedrick to W. Richter, PL 0049.*

164.     Plaintiff canceled the August 3 meeting, stating he was not available to meet until August 8, 2022. *Ex. 47, Aug. 2, 2022 Email from W. Richter to J. Dedrick, PL 0056.*

165.     After multiple calls, emails, and voicemails from Dedrick to Plaintiff with no response, Dedrick informed Plaintiff via email that, if he did not show up for an interview on August 4, 2022, he may be placed on unpaid leave due to insubordination. *Ex. 48, Aug. 3, 2022 Email from J. Dedrick to W. Richter, PL 0048.*

166.     Plaintiff canceled an August 4, 2022 meeting due to being "advised not to attend" by counsel. *Ex. 49, Aug. 4, 2022 Email Exchange between W. Richter and J. Dedrick, Duquesne_00475-76, at Duquesne_00476.*

167.     Dedrick replied that Plaintiff's attorney should contact the general counsel's office but noted that the investigation must move forward and, per his prior email, he would be placed on unpaid suspension. *Ex. 49, Aug. 4, 2022 Email Exchange, at Duquesne_00475.*

168.     On August 5, 2022, Richter met with Dedrick. *Ex. 50, Aug. 5, 2022 Email from J. Dedrick to W. Richter, Duquesne_00336-39.*

169.     Following the meeting, Dedrick emailed Plaintiff and noted that Plaintiff "refused to answer several of [his] questions" and, "only a few minutes into the interview, [Plaintiff] stated [he was] excusing [him]self and abruptly left prior to fully discussing the issues." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

170.     Dedrick informed Plaintiff that the investigation would be "completed without [Plaintiff's] full input." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

171.     Plaintiff was placed on paid administrative leave pending the outcome of the investigation. *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

172.     On August 10, 2022, Dedrick found violations of the Gift Acceptance Policies and the Naming Policy because the gift was a 100% deferred, revocable gift that promised naming rights to a university-wide center in perpetuity without obtaining the necessary approvals from the Gift Acceptance Committee and the President. *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00009.*

173.     Donor D was "absolutely devastated" by the news that the CEIM would not be named after the Donor Couple and that the gift could not proceed as Richter had erroneously represented. *Ex. 51, Oct. 20, 2022 Letter from D. Dausey to J. Miller, Duquesne_00252-53 (summarizing meeting with Donor Couple).*

## X.     Miller's Termination of Plaintiff due to a Loss of Faith in Plaintiff's Abilities

174.     On August 17, 2022, Miller informed Plaintiff via letter that he was terminated effective immediately. *See Ex 7, Termination Letter, at Duquesne_00013-14.*

175.     The letter states that Plaintiff was being terminated because Miller "lost faith in [Plaintiff's] professional judgment and effective internal and external engagement abilities" and

that violations of policy related to the Donor Couple were the final straw in a "pattern of performance" that caused the loss of faith and warranted termination. *Ex 7, Termination Letter, Duquesne_00013-14. Donors B & C*

176.     Duquesne did not fill Plaintiff's role with another employee or hire anyone to fill the role. *Ex. 60, Defendants' Discovery Responses at p. 10; see also Ex. 61, Excerpts of Defendants' Supplemental Responses to Plaintiff's First Set of Interrogatories, at pp. 6-7 (listing positions added in year prior to and after Plaintiff's termination, none of which replace his role).*

177.     Plaintiff has never heard Miller make comments related to his age. *Ex. 4, Plaintiff Tr. 345:23-25.*

178.     Dean has never heard Miller, Gormley, or anyone in University Advancement make negative comments related to anyone's age. *Ex. 20, Dean Tr. 115:22-116:12.*

179.     Dean, who filed an internal age discrimination complaint (which did not include Richter) and her own, independent lawsuit against the University alleging age discrimination, has no reason to believe that Plaintiff was terminated due to his age. *Ex. 20, Dean Tr. 177:1-3; see also Dean Tr. 184:3-8 (noting Hughes and she made a complaint in July 2921 that was internally mediated); Complaint, Dkt. No. 1,* Mary Frances Dean v. Duquesne University of the Holy Spirit, et al., *No. 2:23-cv-1265-CB (July 11, 2023) (alleging age discrimination,* inter alia).

180.     Plaintiff has never heard Miller make comments about his TAP 55 complaint. *Ex. 4, Plaintiff Tr. 346:7-16.*

181.     Dean was also disciplined for her role in the Donor Couple's DSCI, but due to her lesser involvement in the donor cultivation and lack of prior issues, she was issued only a formal written warning. *Ex. 1, Miller Decl. ¶ 17; see Ex. 20, Dean Tr. 175:24-176:22 (noting her*

*discipline and that she had not been subject to discipline or writeup before the Donor Couple DSCI incident).*

182.    Dean was 62 years old at the time of her discipline. *See Ex. 20, Dean Tr. 9:16-17 (noting her date of birth is 1960, making her 62 in August 2022).*

## XI.    Richter Confidentiality Violations and Discovery

183.    As part of his job responsibilities, Plaintiff was required to maintain records of his contacts with University donors in "contact reports" in the University's contact management system. *Ex. 4, Plaintiff Tr. 39:7-9.*

184.    Gift officers have access to contact reports for all Duquesne donors, not just those assigned to them. *Ex. 20, Dean Tr. 77:23-78:4.*

185.    Contact reports are supposed to be entered into the system when a gift officer meets with a donor or discusses "something of significance" with them. *Ex. 4, Plaintiff Tr. 39:10-16.*

186.    Examples of "something of significance" include "an important phone conversation," making a "call[] to say thank you" or note the gift officer will meet the donor to play golf, or receiving or presenting something that impacts a gift the donor may or has made to the University. *Ex. 4, Plaintiff Tr. 40:4-24; see also Ex. 20, Dean Tr. 78:15-19 (stating information helpful to include in a contact report is "[e]verything that you could possibly learn about a donor").*

187.    Plaintiff and his supervisor at the time of his termination, Mary Frances Dean, view the University's relationship with donors as "sacrosanct." *Ex. 4, Plaintiff Tr. 77:21-78:4; Ex. 20, Dean Tr. 33:24-34:14.*

188.    A key part of maintaining donor relationships is maintaining the confidentiality of donor information. *Ex. 4, Plaintiff Tr. 77:3-20.*

189. Third-party organizations have codes of ethics for fundraising professionals, highlighting the importance of, among other things, "safeguard[ing] privacy rights and confidential information," "protect[ing] the confidentiality of all privileged information relating to the provider/client relationships," and "not disclos[ing] privileged or confidential information to unauthorized parties." *Ex. 52, CASE Statement of Ethics (published Mar. 12, 2020), Duquesne_00632; Ex. 53 Association of Fundraising Professionals Code of Ethical Standards (adopted 1964 and amended Oct. 2014), Duquesne_00633.*

190. Plaintiff agrees that the Ethics Standards accurately reflect their duties with respect to confidentiality. *Ex. 4, Plaintiff Tr. 82:14-23; see also Ex. 20, Dean Tr. 35:5-7 (stating she takes the Ethics Standards seriously).*

191. In addition to the general expectation of confidentiality, Advancement Division employees are expected to comply with TAP No. 55, which requires that employees "must[] . . . [m]aintain and respect the privacy and/or confidentiality of information entrusted to them." *Ex. 54, TAP 55, Duquesne_00135-36.*

192. During discovery, Defendants discovered emails that Plaintiff forwarded to individuals named Jack Gaylord, Rocky Bleier, and Rick Creehan, after Creehan's separation from Duquesne employment. *See Ex. 55, Compilation of W. Richter Emails Sharing Confidential Information, Duquesne_00254-55, 296-99, 323-28.*

193. The emails forwarded confidential donor information regarding Donor A and the Donor Couple. *See Ex. 55, Compilation of Emails, Duquesne_00254-55, 296-99, 323-28.*

194. On or about February 24, 2024, Defendants discovered the emails forwarding confidential donor information. *See Ex. 56, Declaration of Mariah H. McGrogan ¶¶ 4-5.*

195.    Plaintiff admitted to the confidential nature of the donor information in these emails. *Ex. 4, Plaintiff Tr. 127:23-128:6; 133:3-6; see also Ex. 55, Compilation of Emails, at Duquesne_00296 (noting "CONFIDENTIAL" in forward to Creehan).*

196.    Dean believed that Plaintiff violated confidentiality obligations owed to donors through the sharing of these emails. *Ex. 20, Dean Tr. 41:14-17, 43:8-10.*

197.    The only other instance of Duquesne discovering an Advancement employee improperly disclosing confidential donor information during Miller's time as head of Advancement involved Hughes. *Ex. 1, Miller Decl. ¶ 18; see Ex. 57, October 3, 2022 Letter from H. Clay to C. Hughes, Duquesne_00788-89.*

198.    In October 2022, Duquesne terminated Hughes for breaching her confidentiality obligations to and speaking negatively about a donor by posting donor information (albeit incorrect) on social media. *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89 (terminating Hughes' employment for violations of TAP 55, TAP 57 (on Social Media use), and basic expectations and standards for confidentiality required in [her] field as an Advancement team member).*

199.    Duquesne promptly terminated Hughes upon the conclusion of the investigation. *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89.*

200.    Duquesne would have terminated Plaintiff if Plaintiff were still employed when these emails were discovered. *Ex. 1, Miller Decl. ¶ 19.*

## XII.    Plaintiff's Limited Allegations Related to Age Discrimination

201.    Miller is the only person Plaintiff claims terminated his employment due to his age. *Ex. 4, Plaintiff Tr. 345:17-22.*

202.    Plaintiff asserts only that Viers and Krebs were given better treatment than him due to their respective ages. *Ex. 4, Plaintiff Tr. 265:16-266:1; Ex. 58, Excerpts of Plaintiff's Response to Defendant's First Set of Interrogatories and Requests for Production of Documents ("Plaintiff's Discovery Responses") at pp. 17-18.*

203.    Plaintiff asserts that the "entire environment was toxic" in the Advancement Division. *Ex. 4, Plaintiff Tr. 350:1-2.*

204.    This was due to "[e]mployees . . . leaving in droves and [being] frustrated with the management policies." *Ex. 4, Plaintiff Tr. 235:23-236:5.*

205.    David Jakielo, Lisa Sciullo, Natalie Taylor, Lauren Wiater, Rick Creehan, and John Plante were the employees that Plaintiff recalled "leaving in droves."

206.    The individuals named were the following ages when they left the University (date of separation from employment in parentheses):

    a.  Natalie Taylor – 39 years old (May 14, 2019) – 23 years younger than Plaintiff at separation from employment;

    b.  Lisa Sciullo –  53 years old (Dec. 2, 2019) – 9 years younger than Plaintiff;

    c.  Rick Creehan – 66 years old (Dec. 31, 2020) – 4 years older than Plaintiff;

    d.  John Plante – 59 years old (Apr. 26, 2021) – 3 years younger than Plaintiff;

    e.  Lauren Wiater – 31 years old (May 13, 2022) – 31 years younger than Plaintiff;

    f.  David Jakielo – 39 years old (June 7, 2022) – 23 years younger than Plaintiff.

*Ex. 59, Declaration of Ryan Dawson ("Dawson Decl.") ¶¶ 3-4.*

207.    Taylor, Sciullo, Creehan, and Plante left the University before Miller's appointment to the Vice President role and did not report to him. *See Ex. 1, Miller Decl. ¶ 3 (noting interim appointment in July 2021); Ex. 59, Dawson Decl. ¶ 4 (noting dates of separation from employment prior to Miller's interim appointment in July 2021).*

208.     Krebs, who Plaintiff asserts is a younger employee who received better treatment, has also left the University, stating that she was looking for "additional responsibilities" elsewhere. *Ex. 22, Krebs Tr. 9:2-11:1; see also Ex. 58, Plaintiff's Discovery Responses at pp. 17-18.*

Respectfully submitted,

*/s/ Mariah H. McGrogan*
Mariah H. McGrogan (PA 318488)
Joshua R. Sallmen (PA 325948)
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Phone:  (412) 288-3131
Email:   mmcgrogan@reedsmith.com
              jsallmen@reedsmith.com

Dated:  April 23, 2024                                    *Attorney for Defendants*