IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM RICHTER , | ) | CIVIL ACTION NO. 2:23-cv-0550 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTY CRISWELL WEIGAND |
| | ) | |
| v. | ) | |
| | ) | |
| DUQUESENE UNIVERSITY OF THE | ) | |
| HOLY SPIRIT and JAMES MILLER, | ) | |
| as an aider and abettor of discrimination, | ) | |
| | ) | |
| Defendants. | ) | Electronically Filed. |

PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### *Introduction*

It is axiomatic that a defendant's motion for summary judgment must be denied if there are disputed issues of material fact that must be decided by the fact finder.  It is also well settled that the Court must view all facts in a light most favorable to the Plaintiff as the non-moving party.  Judged against these standards, it is respectfully suggested that the Defendants' motion for summary judgment must fail.

The Plaintiff's brief will analyze the record evidence against the now well-established test for proving discrimination by indirect means first articulated by the United State Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973).  That analysis demonstrates that, on these facts, a jury must decide this case.

With respect to the *prima facie* case, the evidence, viewed in the light most favorable to the Plaintiff, shows that the Plaintiff was in the protected class, was qualified for and performing his job in a satisfactory manner, was terminated, and was treated less favorably than two similarly situated employees of the Defendant University.  The Defendant claims that the

Plaintiff's termination came as a result of four separate instances of performance that either violated the University's policies or otherwise demonstrated a pattern of misconduct. None of those claims is supported by the record facts.

By contrast, Mellissa Krebs suffered no disciplinary action whatsoever for lying to a donor and falsifying University records.

One of the reasons for the Plaintiff's termination involved a three-plus-year-old incident in which he sent a relatively harmless text to one of his colleague with a picture of a woman wearing a bikini. The Plaintiff was mildly disciplined for the incident, with no repeat of such conduct. By stark contrast, Defendant Miller has committed sexual assault and sexual harassment of multiple female employees, and has never been disciplined or even investigated for any of the incidents detailed herein. Since Defendant Miller is subject to the same rules and punishments as all other employees of the University for violation of the policy against sexual harassment and sexual assault, it is clear that he is similarly situated to the Plaintiff, and clearly treated more favorably.

Examining the reasons given for the Plaintiff's termination, the record facts, viewed in any light, show that the Plaintiff is not guilty of any policy violations or misconduct, with the exception of the three-year-old bikini picture incident, and the four (4) reasons for the termination do not demonstrate any rational reason for any discipline, much less termination, particularly in light of the fact that the Plaintiff was arguably the best gift officer the University had, and was consistently achieving outstanding results. In short, the facts clearly show that the reasons offered for the termination of the Plaintiff are not worthy of belief. A jury should decide the question of pretext.

Regarding the claim of retaliation, the Plaintiff was fired twenty-seven (27) days after complaining of age discrimination. The question of whether or not Defendant Miller knew that he was accused of age discrimination is a fact question for the jury.

Finally, the Defendants have not met their burden to show that they would have fired the Plaintiff for forwarding confidential information to non-university employees, and there is a factual question related to this claim that requires resolution by the fact finder. Even if the Defendants had met this burden, the issue would not result in the grant of summary judgment, but rather would affect the damages available to the Defendant.

The sheer volume of disputed facts set forth in the parties' respective submissions illustrates the need for intervention in this matter by the fact finder in order to resolve those factual disputes.

### Argument

*The McDonnell Douglas Prima Facie Case.*

The Defendants cite *Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3rd Cir. 1998) for the proper proofs necessary to make out a prima facie case of discrimination. Because there is no dispute that the Plaintiff was in the protected class at the time of termination, and the Defendants do not suggest that the Plaintiff was unqualified for the position he held,[1] the factual dispute here

---

[1] To the extent that the second prong of *the prima facie* case requires a showing that the Plaintiff was performing his job in a satisfactory manner, the record abounds with evidence of the Plaintiff's spectacular performance. The Plaintiff was named as Gift Officer of the Year not long before his termination, and has been described as "exceptionally talented, hard-working, honest, highly skilled and successful, with a strong command of the issues related to his job. (See Counter Statement of Facts ("CSF") paras. 209-213).

turns on whether or not the Plaintiff was treated less favorably than similarly situated younger employees of the Defendant University.[2]

Melissa Krebs is the first similarly situated comparator to the Plaintiff.  Both individuals were gift officers, subject to the same rules and policies. The evidence here, viewed in the light most favorable to the Plaintiff, is that Ms. Krebs violated the policies of the University by make false claims to a donor, and falsifying University records by making false claims in her contact reports related to Donor A.  The serious concern raised by the Plaintiff on this issue is that Ms. Krebs was given one of the Plaintiff's prized donor (without the Plaintiff's knowledge) who had made it very clear to the Plaintiff that he wanted certain of his private information kept confidential.  Because Ms. Krebs falsely claimed that she had spoken to the Plaintiff about this donor, the implication was that the confidential information entrusted to the Plaintiff had been divulged to Ms. Krebs without the donor's permission.  The inexplicable reassignment of this long term donor prospect of the Plaintiff cost the Defendant University at least $200,000 in donations.  Ms. Krebs was not disciplined in any way for her actions, but rather was credited with a $50,000 donation that she did not earn. By contrast, the Plaintiff was fired for reasons that were not true, and the evidence shows that the Plaintiff acted properly in each instance where the

---

[2] There is no bright line test for when an employee is considered sufficiently younger than the Plaintiff to support a claim of age discrimination.  Although some courts in this circuit have found an age difference of four years to be sufficient (*See,e.g. Carter v. Mid-Atlantic Healthcare,* 228 F.Supp 3d 495, 504 (E.D.Pa. 2017); *Robinson v. Matthews Int'l,* 2009 U.S. Dist LEXIS 735876 *34 (W.D.Pa. 2009)(Conti, J.), most courts in this circuit require at least a five year age difference. (*See, e.g., Knox v. FifthThird Bank,* 2014 U.S. Dist. LEXIS 12732 *40 (W.D.Pa. 2014)(McVerry, J.); *Martin v. Healthcare Bus. Resources,* 2002 WL 467749 *5, n.7 (E.D.Pa. 2002).  It is undisputed that Ms. Krebs is 15 years younger than the Plaintiff (CSF, p. 27, n.6) and Defendant Miller is 6 years younger than the Plaintiff. (CSF, p. 29, n. 7)

University sought to justify his termination.  The jury should decide whether or not Ms. Krebs was treated more favorably than the Plaintiff.[3]

Defendant Miller is also similarly situated to the Plaintiff, and has been treated much more favorably than the Plaintiff.  Defendant Miller has admitted that the University has policies against sexual assault and misconduct that are strictly enforced, and all employees are subject to those policies and their enforcement. One of the alleged reasons for the Plaintiff's termination was the claim that he engaged in "egregious sexual misconduct" by sending a picture of a woman in a bikini to another male employee of the University over three years before he was terminated.  The Plaintiff was "punished" by experiencing a brief delay in his promotion and pay increase, and there has been no repeat of any such conduct.  The evidence shows that the claim that the Plaintiff's actions constituted "egregious sexual misconduct" have been described as "absurd" and "ridiculous."   Defendant Miller stands accused of the sexual assault of a University employee, and with numerous acts of actual egregious sexual misconduct against numerous female employees of the University without facing any consequences of any kind. The fact finder should decide whether or not Defendant Miller has received more favorable treatment than the Plaintiff under these circumstances.[4]

The Plaintiff respectfully argues that he has made out his prima facie case with evidence of record in this case.

*Pretext*

In *Fuentes v. Perskie,* 32 F.3d 759, 762 (3rd Cir. 1994), our Circuit held that a plaintiff may prove that the reason(s) offered by the Defendant for the termination are a pretext for

---

[3] The facts supporting this portion of the argument can be found at CSF paras. 58, 74, 99, 202, 214-228.

[4] The facts supporting this portion of the argument can be found at CSF paras. 229 to 251.

discrimination by producing evidence from which a fact finder could reasonably conclude that each reason was a fabrication.  In order to make that analysis, each of the four alleged reasons for this termination must be evaluated to determine if they were merely fabrications used to justify an otherwise unlawful termination.  The Plaintiff respectfully asserts that he has produced sufficient evidence from which a fact finder could conclude that all four reasons are pure fabrications.

***The Plaintiff did not Violate the Naming Rights Policy.[5]***

In Defendant Miller's letter of termination, he claims that the principle reason for the Plaintiff's termination was that the Plaintiff violated the naming rights policy by promising the Donor Couple that, in exchange for a large seven figure donation, they would receive naming rights to a university-wide technology center called the CEIM.

First, it is clear that all of the Plaintiff's actions in regard to this gift were done with the permission and specific direction of his supervisors.  The Plaintiff alerted both Ms. Hughes and Ms. Dean that he was cultivating a large donation which was revocable, and which did not meet the minimum threshold under the policy for granting naming rights.  Notwithstanding those points, the Plaintiff was directed to proceed with the cultivation, and to secure the gift if possible. In addition, the record facts show that the Plaintiff informed Defendant Miller of the solicitation for the CEIM center using language which indicated that the gift was revocable.  Defendant Miller never asked the Plaintiff about the gift, nor did he direct the Plaintiff to stop pursuing this large donation.

---

[5] The facts supporting this section of the argument can be found at CSF paras. 126, 127, 131-133, 138, 139, 144, 146-148, 155, 158, 160, 169, 181, 256-280.

The record evidence also shows that, contrary to the unsupported claims of the Defendants, the Plaintiff played no role in the preparation of the Donor Statement of Charitable Intent (DSCI) other than to provide Ms. Hughes with the documentation necessary to prepare the document, which the Plaintiff did in fulfillment of his duty.  Furthermore, the Plaintiff was directed by his supervisor, Ms. Hughes, to show the DSCI to the Donor Couple when he traveled to see them, even though the proposed donation had not been presented to the gift committee for approval.  Nothing in the policy would prevent the Plaintiff from doing so.  Furthermore, the evidence from Dr. Creehan, who oversaw these donations for the Defendant University, was that it was perfectly proper for the Plaintiff to explore the possibility of naming rights with a prospective donor before the donation is placed before the committee.[6]

Defendant Miller also claimed that the Plaintiff violated the naming policy by promising the Donor Couple that they would receive these naming rights before the gift committee approved the naming rights for this donation.  This claim is specifically refuted by the email which the Plaintiff sent to the Donor Couple before traveling to see them which specifically indicated that the proposed naming rights had to be approved by the gift committee.  The Defendants have no answer for this fact, yet still maintain that the Plaintiff made this promise to the donors.  This fact question should be answered by the jury after review of the email that specifically refutes that allegation.

As to the claim that the Plaintiff improperly obtained the signatures of the donors on the DSCI prior to approval, there is nothing in the naming policy that prohibits obtaining that

---

[6] In fact, although the Defendants claim that the failure to present this proposal to the gift committee constituted a terminable offense, the jury should be allowed to determine whether or not that claim is a total fabrication since Dr. Creehan, who managed the gift officers and their donations, ***never took a single donation to the gift committee, and <u>didn't even know there was such a committee or who served on it.</u>***

signature, and the DSCI has specific language in it that indicates that the DSCI is not binding on the donors. In addition, the Plaintiff obtained those signatures at the specific direction of his supervisor, Ms. Dean.

The claim that the Plaintiff prevailed on his supervisor to sign the DSCI on behalf of the Defendant University is completely contrived.[7]  The citations offered by the defense on this point do not show in any way that the Plaintiff took any action to have Ms. Dean sign the DSCI.  Ms. Dean's signature was not on the DSCI when the Plaintiff presented it to the Donor Couple for signature.

The record facts show that the Plaintiff did not even know that Ms. Dean had signed the DSCI until long after he presented the document to the donors for their signature.

Viewing the evidence in a light favorable to the Plaintiff, it is clear that Defendant Miller had been kept fully apprised about the details of this gift by Ms. Dean on multiple occasions. The information that Ms. Dean provided to Defendant Miller about the gift included:

- that it was for a significant seven (7) figure amount;

- that it included naming rights to the CEIM;

- that it was under the amount required by the policy; and

- that it was revocable

All of this evidence is even more significant considering the fact that Defendant Miller is a member of the gift committee.  Had Defendant Miller, either personally or on behalf of the gift committee objected to any aspect of this highly desirable, large dollar gift, the evidence of record should reflect that objection.  There is no such evidence in this record.  Accordingly, the jury

---

[7] There is no dispute in this record that Ms. Dean signed the DSCI on behalf of the University. Whether or not this action violated University policy is not before the Court, but the claim by the Defendants that Ms. Dean's actions were somehow less egregious than the Plaintiff's related to this donation should be presented to the jury.

should decide whether the failure to have approval of the gift committee played any role in the termination of the Plaintiff, or rather, whether or not this claim is a contrivance by the Defendants to justify an unlawful termination.

The claim that this naming rights donation had to be approved by the Defendant University's President has no real support in the record.  Set against Mr. Gormley's bald, unsupported claim that all such donations had to "funnel" through him is directly contradicted by significant competent evidence from both Ms. Hughes and Dr. Creehan.  In any event, the record evidence makes it clear that the Plaintiff had no responsibility to take this gift to the gift committee or the president, to whom the Plaintiff had no access whatsoever.

Dr. Creehan, who oversaw many of these types of gifts, and managed all of the gift officers, was provided with a hypothetical which precisely tracked the record evidence viewed in the light most favorable to the Plaintiff.  He was asked to comment on whether or not the gift officer in the hypothetical (*i.e.,* the Plaintiff here) violated any University policy or acted improperly in any way related to the donation from the Donor Couple, Dr. Creehan came to the following conclusions:

- ***The gift officer's actions did not violate any practice or procedure of the University;***

- The gift officer's conduct in securing such a significant gift is precisely the kind of action encouraged by the Defendant University;

- The gift officer following the directions of his supervisors was entirely proper;

- The fact that the gift officer advised the donors that the gift could not be finalized until it was approved by the committee  was entirely proper;

- The fact that the gift officer kept his supervisors advised about the details of the gift as the cultivation proceeded was entirely proper;

- ***NOTHING IN THE HYPOTHETICAL THAT TRACKED THE FACTS IN THIS CASE SHOULD HAVE SUBJECTED THE PLAINTIFF TO ANY DISCIPLINE WHATSOEVER.***

(Emphasis supplied.)

Because the record facts, viewed in the light most favorable to the Plaintiff, support the Plaintiff's contention that this reason for termination is pretextual, the issue should be submitted to the jury for resolution.

***The Plaintiff did not Engage in Egregious Sexual Misconduct Three Years Before He was Fired, Even Though Defendant Miller did so on Multiple Occasions without Any Consequences in a Sexually Hostile Work Environment Created by Mr. Gormley[8]***

Three years before he was fired, the Plaintiff sent a text to a colleague that showed a woman in a bikini along with a light hearted salutation.  Neither the recipient, nor Dr. Creehan, nor Ms. Dean thought that the text was particularly offensive.  Neither the recipient, nor Dr. Creehan believed that the action of sending the text was deserving of any discipline, and the recipient was sorry that the matter had escalated to the point that it did.  As punishment for this "egregious" misconduct, the Plaintiff's promotion and raise were briefly delayed, which both the recipient and Dr. Creehan believed was unnecessary.

By stark contrast, Defendant committed multiple acts of sexual assault and sexual harassment which resulted in no consequence to him whatsoever.  Ms. Maurer reported to the Defendant's lawyer that Defendant Miller sexually assaulted her by fondling her breast.  Nothing was done about it as Defendant Miller claimed that he knew nothing about Ms. Maurer's claim.  Circumstantial evidence in this record suggests that Defendant Miller was well aware of Ms. Maurer's claims of sexual assault, having been informed by Ms. Connelly or someone in her

---

[8] The facts supporting this section of the argument can be found at CSF paras. 281 to 305.

office.  A jury should decide whether or not Defendant Miller's attempted contact with Ms. Maurer within twenty-four (24) hours of Ms. Maurer's insistent call to Ms. Connelly's office to demand action.  Coincidence is hard enough to swallow when you are faced with a single act. When on top of Defendant Miller's "coincidental" contact with his accuser's social media after thirteen (13) years of silence, within 24 hours of her contact with the University's general counsel was followed by a second "coincidence" of social media contact by a high-placed official of the University after thirteen (13) years of no contact, within twenty-four (24) hours of her contact with the Defendant University's lawyer, a jury just might be inclined to reject the claim of coincidence and find that the Defendant University's general counsel reached out to Defendant Miller shortly after Ms. Maurer contacted her demanding answers.  If the jury were to conclude that Defendant Miller lied about knowing nothing about Ms. Maurer's claims, and that the Defendant University was aware of Miller's sexual assault and did nothing, the jury might believe that the Plaintiff's termination was not motivated at all by "egregious sexual misconduct," since Defendant's Miller's sexual assault (*i.e.*, actual egregious sexual misconduct) was covered up, ignored and lied about by University officials.  The conclusion that the Defendant University did not care at all about sexual misconduct by its employees is underscored by the fact that the other multiple acts of egregious sexual misconduct by Defendant Miller were not investigated or addressed in any way by the Defendant University.

If the jury were to require further convincing, it might be persuaded by evidence that the person in charge of the Defendant University, President Kenneth Gormley was himself the subject of multiple claims of sexual harassment.  The record evidence shows that a University investigation found that Mr. Gormley had sexually harassed a female employee of the University, who then filed a federal lawsuit making public claims that Mr. Gormley sexually

harassed her.  The record also shows that the case was settled out of court for an undisclosed

amount.  All of this evidence, taken together, would likely convince a jury that the Defendants

did not take claims of sexual harassment and assault seriously, so that the claim that the

Plaintiff's bikini picture contributed to his firing could be disbelieved by the jury, leading to the

conclusion that the claim that the Plaintiff was fired in part for the bikini picture was "absurd"

and "ridiculous."

### *Plaintiff did not Make the Math Error, was not Held Responsible for it, and Faced No Consequences Whatsoever for the Mistake Made by Someone Else.[9]*

As a result of the fact that the Plaintiff negotiated yet another highly desirable seven (7)

figure gift to the University which was very complex.  Because of that fact, Ms. Hughes made an

understandable math error that the Plaintiff had nothing to do with.  While it is true that the

Plaintiff missed the error, so did Ms. Hughes, Ms. Dean, Dr. Creehan and Defendant Miller.

Once the error was discovered, Defendant Miller dispatched the Plaintiff to a meeting

with the donors in California to explain the error and the corrections proposed by the Defendant

University.  The Plaintiff's assignment was to smooth over the donors and explain how the

University was going to correct the error.

The Plaintiff was not blamed for the error.  The Plaintiff was not reprimanded for the

error.  The Plaintiff suffered no discipline or consequence as a result of someone else's error.  No

mention of this incident appeared in the Plaintiff's performance review, which was prepared

shortly after this large donation was confirmed.  The donors were not upset.  The Plaintiff's

supervisor was not upset at all. The incident did not affect the Plaintiff's relationship to the

donor, nor the donor's intention to make the gift at issue.

---

[9] The facts supporting this section of the argument can be found at CSF paras. 33-40, 306-316.

A jury should decide whether this reason for the Plaintiff's termination was unbelievable nonsense.  Because that is true, the Plaintiff respectfully asserts that summary judgment should be denied on this claim.

***The Parking Lot Incident Being One of the Reasons for the Plaintiff's Termination is Utterly Ridiculous.[10]***

The record evidence on this claim is extremely thin.  That is because this is a pretextual, unsupported reason to terminate the Plaintiff.

While on a cultivation visit in Texas, the Plaintiff went to meet his prospective donors at a strip mall.  While exiting his rental car, the Plaintiff may have inadvertently bumped the attacker's car door with the door of Plaintiff's rental car.  This resulted in an unprovoked physical attack on the Plaintiff by the occupant of the adjoining vehicle.  This resulted in an altercation that was immediately initiated by the occupant.

The prospective donors did not witness the altercation.

The police did not charge the Plaintiff as a result of the altercation.

The Plaintiff did not receive any discipline for any aspect of this incident.

Even though the University President did not know the details of the Plaintiff's claim, he asserted without basis, that the Plaintiff's actions were a part of a pattern of misconduct. He made this statement prior to his termination.

The jury should be asked to decide whether or not this issue played any legitimate role in the Plaintiff's termination.

---

[10] The facts supporting this section of the argument can be found at CSF paras. 317-320.

***Whether or Not Defendant Miller Knew of Plaintiff's Accusation of Age Discrimination is a Question for the Jury.[11]***

The Defendants have claimed that the firing of the Plaintiff could not have been in retaliation for the Plaintiff's claim of age discrimination.  The record is clear that the Plaintiff told the Defendant University's human resources representative that he believed that Defendant Miller's actions in investigating and punishing the Plaintiff came as a direct result of the Plaintiff's claim that Defendant Miller's actions were in retaliation for the Plaintiff's claim of age discrimination.  The record evidence is very clear that the Defendant University's human resources representative met with Defendant Miller after the Plaintiff claimed age discrimination against Defendant Miller.  The record shows that the Plaintiff's termination came within 30 days of the Plaintiff's claim of discrimination.  The jury should be asked to decide whether or not Defendant Miller's actions against the Plaintiff came as a result of the Plaintiff's claim of age discrimination, and whether or not the Defendant University's representative informed Defendant Miller of the outstanding claim of age discrimination leveled against him by the Plaintiff.

***The Only Proof that the Plaintiff Would have been Terminated Because of His Disclosure of Information to Individuals Outside of the University is the Termination of an Employee Who Claimed that the Actual Reason for Her Termination was Age Discrimination, not Because of Her Accidental Disclosure of Confidential Information.[12]***

The Defendant's duty under the current state of the law regarding after acquired evidence is to prove that it would have terminated the Plaintiff had it known of Plaintiff's disclosure of confidential information to individuals outside of the Defendant University. *See, McKennon v. Nashville Banner Publ. Co.,* 513 U.S. 352, 354 (1995). The only evidence offered by the

---

[11] The facts supporting this section of the argument can be found at CSF paras. 85, 321-324.

[12] The facts supporting this section of the argument can be found at CSF paras.198-200, 325.

Defendants that it would have done so is the fact that the Defendant University terminated Ms.

Hughes from her employment because of an accidental social media post made by Ms. Hughes.

Ms. Hughes filed suit in federal court claiming that the reason offered for her termination was

pretextual to hide the fact that her termination was due to her age.  Because Ms. Hughes' case

was settled out of court, the jury should be asked to decide whether or not the Hughes

termination satisfies the Defendants' obligation to prove that it would have fired the Plaintiff for

the subject disclosures.  Because this is a question of fact for the jury, it is respectfully suggested

that the Court must submit this question to the jury.[13]

### Conclusion

For all of the reasons set forth above, the Plaintiff respectfully urges this Court to deny

the Defendants' motion for summary judgment in its entirety.

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

s/Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Massimo A. Terzigni, Esquire
PA ID No. 317165
Elizabeth A. Tuttle, Esquire
PA ID No. 322888

Two Gateway Center, Suite 1290
603 Stanwix Street
Pittsburgh, Pennsylvania 15222
412.281.9194

Dated: May 17, 2024

---

[13] Even if the jury were to find that the Plaintiff's disclosures were sufficient to warrant termination, under the *McKennon* ruling, the Plaintiff's damage recovery would be affected, but the issue would not be appropriate for summary judgment.

15