IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM RICHTER , | ) | Civil Action No. 2:23-cv-0550 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTY CRISWELL WEIGAND |
| | ) | |
| v. | ) | |
| | ) | |
| DUQUESENE UNIVERSITY OF THE | ) | |
| HOLY SPIRIT and JAMES MILLER, | ) | |
| as an aider and abettor of discrimination, | ) | |
| | ) | |
| Defendants. | ) | Electronically Filed. |

PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

    *A.    Plaintiff's Response to Defendants' Concise Statement of Material Facts*

1.    Duquesne is a private Catholic institution of higher education. Exhibit ("Ex.") 1, Declaration of James Miller ("Miller Decl.") ¶ 6.

RESPONSE:

    **Admitted.**

2.    As a private institution, Duquesne relies on donations, in addition to other funding sources, to fund its mission, allowing the University to provide an exemplary education for current and future students and to strengthen and serve its local and global community. *Ex. 1, Miller Decl. ¶ 7.*

RESPONSE:

    **Admitted.**

3.    Duquesne's Advancement Division supports the University by supporting its mission, building relationships with its various supporters, and securing critical private philanthropic support. Ex. 1, Miller Decl. ¶ 8; Ex. 2, Major Gifts Officer Position Summary,

1

Duquesne_00101-03, at Duquesne_00101

RESPONSE:

**Admitted.**

4.      Among the ways that the Advancement Division secures philanthropic support are efforts to raise funds through donations, including, planned gifts (such as those bequeathed in a donor's will) and major gifts (gifts that are $25,000 and above), including gifts to name major programs, facilities and centers. Ex. 1, Miller Decl. ¶ 9; see also Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101 (noting major gift threshold and responsibilities for major gifts).

RESPONSE:

**Admitted.**

5.      Since July 2021, Defendant James Miller has led the Advancement Division as its Senior Vice President (initially on an interim basis).  *Ex. 1, Miller Decl. ¶ 3.*

RESPONSE:

**Admitted.**

6.      Miller is currently 59 years old and was 57 years old at the time of Plaintiff's termination from employment.  *Ex. 1, Miller Decl. ¶ 5; Ex. 3, Transcript of Deposition of James Miller ("Miller Tr.") 15:6-7.*[1]

RESPONSE:

**Admitted.**

---

[1] Ex. 3 and all exhibits attaching deposition transcripts include only the cover page and referenced pages.

7.      In September 2015, Duquesne hired Plaintiff William Richter ("Plaintiff" or "Richter") as a Major Gift Officer in the Advancement Division.  *Ex. 4, Transcript of Deposition of Plaintiff William Richter ("Plaintiff Tr.") 36:13-21.*

RESPONSE:

**Admitted.**

8.      At the time of his hire, Plaintiff was 55 years old.  *See Ex. 4, Plaintiff Tr. 36:22-25; see also Ex. 4, Plaintiff Tr. 10:2-3 (noting date of birth in 1959 that made him 55 years old when hired).*

RESPONSE:

**Admitted.**

9.      In January 2020, when he was 60 years old, Duquesne promoted Plaintiff to Senior Major Gifts Officer.   *Ex. 5, Scheduled Payroll Authorizations, Duquesne_00077-78, at Duquesne_00077 (reflecting promotion); Ex. 6, Aug. 30, 2019 Letter from J. Plante to W. Richter, Duquesne_00105 (prescribing delayed promotion until Jan. 2020); see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

RESPONSE:

**Admitted.**

10.     In November 2021, when he was 61 years old, Duquesne created a title for Plaintiff, Senior Major and Gift Planning Officer, and switched his supervisor to Mary Frances Dean at his request.   *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations (reflecting "title and supervisor change"); Ex. 60, Excerpts of Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories, Requests for Production of*

*Documents, and Request for Admissions ("Defendants' Discovery Responses"), at p. 4;  see also*

*Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that, in November of 2021 the Plaintiff was given a new title.  To the extent that Paragraph 10 suggests that this action was taken for the Plaintiff's benefit, and that it resulted in a benefit to the Plaintiff, the same is denied.  The action taken by Defendant Miller to give the Plaintiff a new title was not to provide the Plaintiff with any benefit, but rather to quell the widespread dissatisfaction within the Advancement Division after Defendant Miller secretly changed the donor lists of many donor officers to provide certain employees favored by Defendant Miller with significant advantages.  The Plaintiff's "new title" came with no new responsibilities or performance metrics, and no raise in pay, and, therefore, provided no benefit to the Plaintiff. (Plaintiff's Affidavit ("Plaintiff Aff"), para. 25, Appx139).**

11.    As a gift officer, Plaintiff was responsible for identifying, qualifying, cultivating, soliciting, and stewarding donor relationships to secure major gifts and planned gifts for the University. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

RESPONSE:

**Admitted.**

12.    Senior gift officers hold important roles at the University, acting as ambassadors with many prominent internal and external constituents. *Ex. 7, Aug. 17, 2022 Letter from J. Miller to W. Richter ("Termination Letter"), Duquesne_00013-14, at Duquesne_00014.*

RESPONSE:

**Admitted.**

13.     Plaintiff acted on the University's behalf to communicate and otherwise maintain the University's relationships with its most prominent alumni and other prospective donors. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

RESPONSE:

**Admitted.**

14.     After discovering and investigating Plaintiff's actions in 2022 resulting violations of policies relating to naming University assets, and considering Plaintiff's past performance, the University terminated Plaintiff on August 17, 2022. *See Ex. 7, Termination Letter, at Duquesne_00013-14.*

RESPONSE:

**Denied.  It is specifically denied that the Plaintiff committed any violation of the Defendant University's policies with respect to the donation from the "Donor Couple."  It is further specifically denied that any of the "past performance" issues played any role whatsoever in the decision to terminate the Plaintiff.  By way of further answer,** *see* **Plaintiff's factual allegations at Paragraphs 281-320** *infra***.**

15.     As set forth more fully below, prior to the 2022 policy violations, Plaintiff's conduct on more than one occasion, caused internal constituents, specifically senior university leaders, to raise serious concerns with his performance and professional judgment. *See Ex. 7, Termination Letter, at Duquesne_00013.*

RESPONSE:

**Denied.  *See* Plaintiff's response to Paragraph 14 *supra*, and Paragraphs 281-320 *infra*.**

16.    In August 2019, Plaintiff took a fundraising trip to California with Provost and Vice President of Academic Affairs David Dausey. *Ex. 8, Aug. 26, 2019 Letter from J. Plante to W. Richter, Duquesne_00104.*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that, in August of 2019, the Plaintiff and Dr. Dausey worked together in California on fundraising efforts for the Defendant University.  It is denied that the Plaintiff and Dr. Dausey made that trip together.  In August of 2019, Plaintiff was in California for various fundraising efforts.  At that same time, Dr. Dausey was in California for an unrelated function on behalf of the Defendant University. (Plaintiff Aff, para. 26, Appx139).**

17.    Following the trip, Plaintiff messaged Dausey a picture of a woman in a bikini with text that neither Dausey nor Plaintiff can now remember.  *Ex. 4, Plaintiff Tr. 72:20-73:10; Transcript of Deposition of Dr. David Dausey ("Dausey Tr.") 85:23-24.*

RESPONSE:

**Admitted.**

18.    Dausey reported the message to Duquesne because he was concerned and thought the messages "looked inappropriate." *Ex. 9, Dausey Tr. 85:22-86:5.*

RESPONSE:

**Admitted.**

19.    When confronted about these messages to Dausey at the time, Richter admitted to the behavior being "completely inappropriate," "had no justification for his actions, and expressed

extreme regret for, and understanding of, the uncomfortable position in which [he] had placed" Dausey.  *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

RESPONSE:

**Admitted.**

20.     To this day, Plaintiff admits that his actions showed "poor judgment" and were inappropriate.  *Ex. 4, Plaintiff Tr. 73:13-16 (stating "[i]t was poor judgment" that he sent the message); 73:25-74:12 (acknowledging that "poor judgment" is synonymous with "inappropriate" in this context); see also Ex. 10, Transcript of Deposition of Cecilia Hughes ("Hughes Tr.") 30:1-7.*

RESPONSE:

**Admitted.**

21.     After investigating the matter, Plaintiff's then-supervisor, John Plante, issued a "formal written warning" to Plaintiff for "exhibiting fundamentally poor judgment" and acting "in direct violation of the University's policy on sexual misconduct prevention, [The Administrative Policies ("TAP")] No. 31."  *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

RESPONSE:

**Admitted.**

22.     The formal written warning quoted the relevant parts of TAP No. 31 as it stood at that time, which provided that "[h]ostile work environment sexual harassment is unwelcome conduct of a sexual nature, including transmitting of graphic [images] of a sexual nature" and that "[d]isciplinary sanctions for employee violations of this policy may range from a disciplinary warning to termination from the University."  *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

RESPONSE:

**Admitted.**

23.    The formal written warning required certain actions, including Plaintiff apologizing to Dausey and undergoing retraining on sexual misconduct prevention and delaying Plaintiff's planned promotion from September 2019 to January 2020. *See Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104 (prescribing the apology and retraining); Ex. 6, Aug. 30, 2019 Letter, at Duquesne_00105 (follow-up letter prescribing delayed promotion).*

RESPONSE:

**Admitted.**

24.    Plaintiff, who was 59 years old at the time, admits that the delayed promotion had nothing to do with his age and was not taken in retaliation for any action. *Ex. 4, Plaintiff Tr. 76:12-17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

RESPONSE:

**Admitted.**

25.    In early 2019, School of Nursing ("SON") Dean Mary Ellen Glasgow and Plaintiff were working together on a gift from prominent donors to the SON ("Donor B" and "Donor C"). *Ex. 11, June 2, 2019 Memo from M. Glasgow to D. Dausey and Attached Email Compilation, Duquesne_00670-78, at Duquesne_00671.*

RESPONSE:

**Admitted.**

26.    Plaintiff and Dean Glasgow exchanged several emails regarding their efforts to obtain a commitment from the Donors B and C. *See Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673-78 (reflecting several emails from January through April 2019 regarding Donors B & C).*

RESPONSE:

   **Admitted.**

27.   On February 18, 2019, Plaintiff emailed Dean Glasgow and Rick Creehan (former Assistant VP of Advancement) to state that he had been communicating with Donor B "regarding a gift to the SON to honor [Donor C]." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

RESPONSE:

   **Admitted.**

28.   In that email, Plaintiff stated, "I will certainly keep you both in the loop." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

RESPOSE:

   **Admitted.**

29.   Plaintiff later noted to Dean Glasgow that he would meet with Donor B on May 13, 2019 and to "[s]tay tuned." *Ex. 11, June 2, 2019 Memo, at Duquesne_00672; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673.*

RESPONSE:

   **Admitted.**

30.   In May 2019, Plaintiff and Dausey met with Donors B and C to discuss a donation to the University's fledgling College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

RESPONSE:

**Admitted in part and denied in part. It is admitted that the Plaintiff and Dr. Dausey had a meeting with the donors in May of 2019. To the extent that Paragraph 30 implies that the Plaintiff played any role in setting up that meeting, or in deciding what approach would be taken by the University with respect to allocation of this donation to the school of nursing or the school medicine, the same is denied. The Plaintiff was asked to attend the meeting by Dr. Dausey, who indicated his intent to convince the donors to make some or all of their donation a gift to the medical school. The Plaintiff was unconcerned as to which school of the University received the donation since he was credited with the entire amount of the donation regardless of its destination. (Plaintiff Aff, para. 17, Appx136).**

31.     Plaintiff did not inform Glasgow about the discussion with the donors regarding the College of Medicine either before or after the meeting. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

RESPONSE:

**Admitted. By way of further response, see the Plaintiff's response to Paragraph 30 above.**

32.     Dean Glasgow learned about Plaintiff's discussions with the donors for the first time when Donors B and C called her and told her they were concerned she was "out of the loop" regarding the intention to divert the donation from the SON to its new College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

RESPONSE:

**Denied. During the period January through May, 2019, on multiple occasions, the Plaintiff made Dean Glasgow aware of the specifics of the planned donation by Donors B**

**and C, including that the gift was likely to exceed $1,000,000, and that the donors would be visiting the University's campus to finalize the gift.  (Plaintiff Aff, para. 16, Appx135).**

33.     Dean Glasgow felt it was "abundantly clear that the relationship with the donor could be in jeopardy." *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that Dean Glasgow claimed as much in her memorandum to Dr. Dausey. (Defendants' Ex. 11 Duq. 00670).  It is denied that this claim accurately reflected the feelings of the donors.  The Plaintiff met with the donors and reviewed the donation, the math error and the solution.  The donors did not express any dissatisfaction regarding any aspect of the donation.  The donor relationship suffered no apparent damage.  (Plaintiff Aff, para. 19, Appx137).**

34.     August 2021, Plaintiff contributed to a mathematical error in a gift agreement for Donors B and C that left a scholarship fund for SON students tens of thousands of dollars short of full funding.  *Ex. 3, Miller Tr. 50:12-21; Ex. 1, Miller Decl. ¶¶ 10-11; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, Duquesne_00679-86 (email compilation related to error).*

RESPONSE:

**Admitted in part and denied in part.  It is specifically denied that the Plaintiff committed the mathematical error involved, which error was committed by Cecelia Hughes.  The Plaintiff admits that he, and four other executives, missed the mistake. (Plaintiff Aff, para. 18, Appx136).  To the extent that Paragraph 34 implies that the Defendant University suffered any financial hardship or loss from this incident, the same is denied.  Prior to the Plaintiff's visit with Donors B and C in California, the Plaintiff had a**

**conversation with Heather Clay, his then second level supervisor. Ms. Clay informed the Plaintiff that the University had not suffered any financial loss as a result of the aforementioned error, as the shortfall for the subject scholarships was covered through an internal transfer of funds accrued from the $1,500,000 gift from Donors B and C.[2] During that conversation, Ms. Clay did not reprimand the Plaintiff in any way for this error, nor did she seem upset with the Plaintiff and his role in this matter in any way. Rather, Ms. Clay instructed the Plaintiff to go to California and "have a nice dinner with (Donors B and C)" and continue to strengthen the relationship. (Plaintiff Aff, para. 21, Appx138).**

35.    Plaintiff was made aware of the error and told to correct it with the donors. *Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00682 (Aug. 20, 2021 email from M. Glasgow to J. Miller and D. Dausey stating that it would be "appropriate for [Plaintiff] and/or his supervisor to advise" the donors about the error).*

RESPONSE:

   **Admitted in part and denied in part. It is admitted that the Plaintiff met with Donors B and C and explained to the donors the steps being taken to correct the error. Plaintiff was dispatched to smooth over this issue because of his strong relationship with the donor, not because he was seen as responsible for this error. (Plaintiff Aff, para. 20, Appx138).**

36.    Miller discussed remedying the error with Plaintiff in November 2021, at which time they agreed that telling Donors B and C in person would be best, but, if an in-person meeting could not be secured, they would "default to a Zoom or conference call engagement." *Ex. 12, Details*

---

[2] **This directly disputes the deposition testimony of Defendant Miller, who claimed that this error cost the university $40,000 (Miller depo, pp. 50-52, Appx001).**

*related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from*
*J. Miller to M. Glasgow).*

RESPONSE:

**Admitted in part and denied in part. It is admitted that Plaintiff and Defendant**
**Miller discussed meeting with Donors B and C by Zoom if an in-person meeting could not**
**be arranged. Ultimately, Plaintiff and Defendant Miller decided to abandon the Zoom**
**option, and Plaintiff was directed to meet with the donors in person as soon as possible.**
**Because the donors were out of the country and, therefore, unavailable for a direct meeting**
**for quite some time, it took the Plaintiff multiple efforts to ultimately have a face-to-face**
**meeting with the donors. (Plaintiff Aff, para. 19, Appx137).**

37.    In the November 2021 communication, Miller noted that Plaintiff "intend[ed] to take full
responsibility for the error and seek resolution to [the donors'] satisfaction." *Ex. 12, Details*
*related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from*
*J. Miller to M. Glasgow).*

RESPONSE:

**Admitted.**

38.    Miller again discussed remedying the error with Plaintiff in January 2022, during which
Plaintiff stated that he wants to have the communication in person and that "building a trip
around this discussion shouldn't be too difficult."

RESPONSE:

**Admitted. By way of further response, see Plaintiff's response to Paragraph 36**
**above.**

39.     Miller recalls instructing Plaintiff to resolve the error on at least one other occasion. *See Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00684 (Mar. 18, 2022 email from J. Miller to M. Glasgow stating Miller was scheduled to speak with Plaintiff about this the following Wednesday).*

RESPONSE:

**Denied.  Defendant Miller testified that he directed the Plaintiff to speak to the donors.  (Defendants' Exhibit 3, pp. 50-51).  There is no evidence in the record that the Plaintiff was directed to remedy the error.  By way of further response,** see **the Plaintiff's response to Paragraph 36 above.**

40.     Plaintiff did not correct the error prior to the scholarship account's funds being insufficient for the next expense. *Ex. 3, Miller Tr. 50:12-21; Ex. 12, Details related to Donors B & C Gift Agreement Error, Duquesne_00685 (April 6, 2022 email from M. Glasgow to J. Miller that notes Donors B & C "will be expecting to award two more scholarships for fall since they are unaware of the error since there has been no communication from [Plaintiff] about the issue" and "there are insufficient funds in the account" for the scholarship).*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that the Plaintiff did not "resolve the error."  By way of further response,** see **the Plaintiff's responses to Paragraphs 36 and 39 above.  To the extent that Paragraph 40 implies that the Defendant University suffered a financial loss as a result of this error, the same is denied.** See **the Plaintiff's response to Paragraph 34 above.**

41.     The error and failure to correct it required the University to reallocate $40,000 in University funds to cover the shortfall in scholarship funds. *Ex. 3, Miller Tr. 51:9-25; Ex. 1, Miller Decl. ¶ 11.*

RESPONSE:

**Admitted in part and denied in part.  By way of further response, *see* the Plaintiff's responses to Paragraphs 36, 39 and 40 above.  To the extent that Paragraph 41 implies that the Defendant University suffered a financial loss as a result of this error, the same is denied.  *See* the Plaintiff's response to Paragraphs 34 and 41 above.**

42.     Separately, Plaintiff referred to prospective University donors as "my" (his) donors and demanded that his supervisor "ABSOLUTELY forbid any contact with my prospect pool or donor base without my permission." *Ex. 13, W. Richter 2020-21 Performance Review, Duquesne_00092-100, at Duquesne_00094.*

**Admitted.**

43.     In mid-2021, Plaintiff argued with two coworkers, Cal Pifer and Adam Viers, escalating to the point of the Plaintiff and Pifer "yell[ing] at each other." *Ex. 4, Plaintiff Tr. 59:25-60:6.*

RESPONSE:

**Admitted.  By way of further response, this factual allegation appears to be irrelevant since nowhere in this record is there any evidence that this incident played any role in the Plaintiff's termination. (*See*, *e.g.*, Defendants' brief, p. 14).**

44.     The argument related to Pifer contacting one of the University's donors who had been assigned to Plaintiff. *Ex. 4, Plaintiff Tr. 58:9-59:24.*

RESPONSE:

**Admitted.  By way of further response, see Plaintiff's response to Paragraph 43 above.**

45.    Plaintiff – who was 61 years old at the time – admits that Pifer did not contact his donor due to Plaintiff's age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 58:2-8; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

RESPONSE:

**Admitted.  By way of further response, *see* Plaintiff's response to Paragraph 43 above.**

46.    Plaintiff "felt he had been too forceful" and "could have handled [the disagreement] better." *Ex. 4, Plaintiff Tr. 64:25-65:8.*

RESPONSE:

**Admitted.  By way of further response, *see* Plaintiff's response to Paragraph 43 above.**

47.    After the departure of Duquesne's former Vice President of Advancement John Plante due to dissatisfaction by the Administration and the Board with respect to his leadership and the performance of the Advancement Division, Miller was selected to lead the Advancement Division on an interim basis in July 2021. *Ex. 1, Miller Decl. ¶ 3.*

RESPONSE:

**Admitted.  By way of further response, there does not appear to be any relevance to this factual assertion as there is no record evidence that Mr. Plante played any role in the events of this case.**

48.    In October 2021, Miller was promoted to the role of Senior Vice President on a permanent basis. *Ex. 1, Miller Decl. ¶ 4.*

RESPONSE:

**Admitted.**

49.     In the fall of 2021, Plaintiff met with Miller to discuss his "dissatisfaction with having to report to Adam Viers." *See Ex. 14, May 25, 2022 W. Richter Letter to J. Dedrick, PL 0064-73, at PL 0064 (noting meeting with Miller).*

RESPONSE:

**Admitted.**

50.     At this meeting, Plaintiff offered to retire if Miller "wanted [him] out." *Ex. 14, May 25, 2022 Letter, at PL 0064; see also Ex. 4, Plaintiff Tr. 183:11-19 ("Q: . . . [D]o you recall offering to retire?" "A: Yes.").*

RESPONSE:

**Admitted.**

51.     Roughly 11 months prior to Plaintiff's termination and while Plaintiff was 61 years old, Miller rejected Plaintiff's retirement offer, as Miller "did not want [Plaintiff] to leave the University." *Ex. 4, Plaintiff Tr. 184:14-24; 186:17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

RESPONSE:

**Admitted.**

52.     During this discussion, Plaintiff asked to be assigned to a supervisor other than Viers, and Miller chose to reassign Plaintiff from Viers to Dean, creating a new position for Plaintiff. *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations at Duquesne_00078 (reflecting "title and supervisor change"); Ex. 60, Defendants' Discovery Responses at p. 4.*

RESPONSE:

   **Admitted.  By way of further response, *see* Plaintiff's response to Paragraph 10 above.**

53.   Prior to selecting Miller for his new role, University President Ken Gormley directed Miller to restructure the Advancement Division, including a review and rebalancing gift officers' donor portfolios. *Ex. 15, Apr. 1, 2022 Email Exchange Between J. Miller & W. Richter, Duquesne_00020-23, at Duquesne_00020; see also Ex. 4, Plaintiff Tr. 159:16-160:10.*

RESPONSE:

   **Admitted.**

54.   Plaintiff does not claim that the decision to move "certain donors from [his] portfolio" to other gift officers was due to his age or due to prior complaints he made. *Ex. 4, Plaintiff Tr. 167:12-19.*

RESPONSE:

   **Denied.  Plaintiff, who is a layperson and not a lawyer, was asked whether or not there was anything discriminatory about the reassignment of donors.  The following is the actual exchange with counsel:**

**Q:     So, you're not alleging that there was anything discriminatory or retaliatory related to the reassignment?**

**A:     Proper protocol was not followed in this instance and other instances as well. Whether that's discriminatory or not, I don't know the definition of "discriminatory."**

**Q:     What is your understanding of what the definition of "discriminatory" is?**

**A:     Favoring one person over another.**

**Q:     And do you believe that that happened with respect to the reallocation?**

**A:     Yes**

**Q:    Who was favored?**

**A:    Well, Melissa (Krebs) was given one of my top prospects, as just one example of that.  There are others . . .**

**(Deposition of William Richter ("Richter depo"), pp. 167-168,  Appx002).**

55.    At the time of the rebalancing, Plaintiff's portfolio had 431 donors. *Ex. 16, Gift Officer Assignment Summary, Duquesne_00694 (produced in native Excel format but filed as a PDF); see also Ex. 4, Plaintiff Tr. 146:21-147:3.*

RESPONSE:

    **Admitted.**

56.    Plaintiff agreed that 431 prospects is not a reasonable number for a gift officer and that his portfolio was too big. *Ex. 4, Plaintiff Tr. 146:21-147:24.*

RESPONSE:

    **Admitted.**

57.    In March 2022, Melissa Krebs, another gift officer in Advancement, met with a donor who was reassigned to her portfolio from Plaintiff's portfolio ("Donor A"). *Ex. 17, Mar. 7, 2022 Email Exchange Between M. Krebs, C. Hughes, and M. Dean, Duquesne_00622 (highlighting in original).*

RESPONSE:

    **Admitted.**

58.    Krebs secured a $50,000 planned gift commitment from Donor A, which was confirmation of a bequest already in his will. *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622; see also Ex. 18, Mar. 10-11, 2022 Email Exchange Between J. Miller and W. Richter, Duquesne_00049-52, at Duquesne_00051 (Plaintiff confirming same).*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that Donor A made a $50,000 donation to the Defendant University.  It is denied that Ms. Krebs "secured" this donation. The Plaintiff had been cultivating this donor for many years, and had determined that Donor A's will contained the $50,000 donation before Plaintiff began that cultivation.  The reason that Plaintiff did not book the $50,000 donation when he learned about it was because he was working on expanding that donation to an amount of $250,000 or more. Instead, without notice or explanation, and without the Plaintiff having the ability to protest the reassignment, Defendant Miller took this donor away from the Plaintiff and gave it to Ms. Krebs.  (Plaintiff Aff, para. 27, Appx 139, Plaintiff depo, pp. 167-168, Appx302-303).**

59.     On March 7, 2022, Krebs informed Cecilia Hughes and Dean of the commitment and asked to have a statement of charitable intent drawn up.  *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622.*

RESPONSE:

**Admitted.**

60.     Hughes was responsible for drafting donor statements of charitable intent.  *Ex. 1, Miller Decl. ¶ 12.*

RESPONSE:

**Admitted.**

61.     Dean was responsible for overseeing the process and signing the agreements.  *Ex. 1, Miller Decl. ¶ 13.*

RESPONSE:

**Admitted.**

62.     Even where other team members are involved in the process and drafting of agreements, gift officers remain responsible for ensuring that the content of a donor statement of charitable intent ("DSCI") "reflects what [the gift officer] ha[s] discussed with the donor." *Ex. 19, Transcript of Deposition of Ken Gormley ("Gormley Tr.") 38:12-39:1.*

RESPONSE:

**Admitted.**

63.     Dean replied to Krebs that she thought that Donor A was assigned to Plaintiff and later noted that there were issues of "communicat[ion]" regarding reassignments of donors. *Ex. 17, Mar. 7, 2022 Emails, at Duquesne_00622.*

RESPONSE:

**Admitted.**

64.     Miller had not communicated the results of the rebalancing to Plaintiff (either through Plaintiff's supervisor, Dean, or to Plaintiff directly) prior to Plaintiff learning about Krebs' contact with Donor A. *Ex. 20, Transcript of Mary Frances Dean ("Dean Tr.") 91:16-19.*

RESPONSE:

**Admitted.**

65.     Dean believed that Miller did not communicate the results of the rebalancing with her "[b]ecause he chose not to," but she did not believe that it was because of her age or the ages of Plaintiff or Hughes. *Ex. 20, Dean Tr. 91:20-92:11.*

RESPONSE:

**Admitted.**

66.     After learning of the confusion, Krebs reached out to Plaintiff to see if he would meet to discuss.   *Ex. 21, Mar. 15 2022 Emails including M. Krebs, W. Richter & M. Dean, Duquesne_00323-24, at Duquesne_00323-24.*

RESPONSE:

   **Admitted in part and denied in part.  It is admitted that Ms. Krebs reached out to the Plaintiff on or about March 15, 2022.  With respect to the claim that Ms. Krebs was motivated to do so after learning of "the confusion," the Defendants' statement in Paragraph 66 does not explain what is meant by the quoted phrase.  Furthermore, there is no evidence in the record, including the evidence cited by the Defendants, to support the claim the "confusion" motivated Ms. Krebs actions.  Therefore, that claim is denied and strict proof thereof is demanded.**

67.     Plaintiff did not reply to Krebs' outreach. *See Ex. 21, March 15 2022 Emails, at Duquesne_00323-24; see also Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11 (indicating he never spoke with Krebs about Donor A).*

RESPONSE:

   **Admitted.**

68.     Plaintiff never spoke to Krebs about Donor A.  *Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11.*

RESPONSE:

   **Admitted.**

69.     Plaintiff also never spoke to Donor A about Krebs' outreach. *See Ex. 4, Plaintiff Tr. at 170:23-171:6.*

RESPONSE:

   **Admitted.**

70.     Plaintiff forwarded Krebs' email to Dean and indicated that he had "no intention whatsoever of communicating with Melissa on ANY subject," which Plaintiff admitted did not reflect teamwork. *Ex. 21, March 15 2022 Emails, at Duquesne_00323; see also Ex. 4, Plaintiff Tr. 84:19-21.*

RESONSE:

   **Admitted.**

71.     On March 10, 2022, Plaintiff reached out to Miller to complain about Krebs' actions with respect to Donor A. *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051-52.*

RESPONSE:

   **Admitted.**

72.     Plaintiff complained that Krebs' introductory email to Donor A (as evidenced in her contact report) contained a "lie" when she said that Plaintiff "has shared some of your thoughts . . . with her." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

RESPONSE:

   **Admitted.**

73.     Plaintiff asserted that Donor A had asked that "what [Plaintiff and Donor A] discussed [be] completely confidential in the preliminary stages." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

RESPONSE:

   **Admitted.**

74.     When pressed at his deposition, Plaintiff could only identify as completely confidential that Donor A "was considering at the time selling or donating a parcel of land." *Ex. 4, Plaintiff Tr. 116:21-117:7; see also Ex. 4, Plaintiff Tr. 118:12-14 (noting he did not recall Donor A sharing "other thoughts . . .on what he intended to do").*

RESPONSE:

**Admitted.  By way of further response, the Plaintiff's deposition testimony demonstrates that the Plaintiff did not have a clear recollection of all of the issues that Donor A requested be kept confidential. (*See*, *e.g*., Richter depo, pp.117-118, Appx 3-4).[3] However, the Defendants make no mention of the fact that defense counsel introduced into the record of the Plaintiff's deposition a document prepared by the Plaintiff and submitted to the Defendant University's human resources department which gives a clearer picture of the information that Donor A asked to be kept confidential.  In the Plaintiff's submission, dated May 25, 2022, he states the following:**

> **In this instance, (Donor A) discussed matters related to his estate plan including personal assets and retirement portfolios which he requested remain CONFIDENTIAL . . . Following (Donor A)'s direction, I did not enter this information in a contact report . . . Please note that (Donor A) was consistent with Melissa Krebs – he chose not to reveal the information that he asked me to keep in confidence . . .**

**(Defendants' Exhibit 14, p. 3, Pl. Bates number PL0066).**

---

[3] **A:     (Donor A) was considering at the time the selling or donating a parcel of land . . .**
            **. . .**
   **Q:     Is there anything else that you were referring to that was completely confidential?**
   **A:     Not that I can recall at this moment . . .**
            **. . .**
   **Q:     Had (Donor A) shared other thoughts with you on what he intended to do?**
   **A:     I don't recall at that time, at the time.**

**(Richter depo, pp. 117-118, Appx003-004).**

75.   Plaintiff stated he did not recall whether Donor A asked him to keep the information confidential.  *Ex. 4, Plaintiff Tr. 118:21-23.*

RESPONSE:

**Admitted.  By way of further response,** *see* **Plaintiff's response to Paragraph 74 above.**

76.   He stated in his March 10, 2022 email that information was "completely confidential in the preliminary stages" because "[i]t usually is." *Ex. 4, Plaintiff Tr. 118:24-119:3.*

RESPONSE:

**Admitted.  By way of further response,** *see* **Plaintiff's response to Paragraph 74 above.**

77.   That "usual[]" confidentiality would not preclude Plaintiff from sharing the details with others in the Advancement Division. *Ex. 4, Plaintiff Tr. 119:4-17.*

RESPONSE:

**Admitted.  By way of further response,** *see* **Plaintiff's response to Paragraph 74 above.**

78.   When she said Plaintiff had "shared some of [Donor A's] thoughts," Krebs asserts that she was referring to her reading of Plaintiff's notes in contact reports about Donor A.  *Ex. 22, Transcript of Deposition of Melissa Krebs ("Krebs Tr.") 29:25-30:8.*

RESPONSE:

**Admitted.  It is admitted that Ms. Krebs testified as indicated.**

79.   Krebs' practice was to contact the prior-assigned gift officer for more information about a donor "[i]f something wasn't clear in the Contact Management System" (*i.e.*, from the contact reports on the donor).  *Ex. 22, Krebs Tr. 17:9-12.*

RESPONSE:

**It is admitted that Ms. Krebs testified as indicated.**

80.     Plaintiff does not believe that Krebs told Donor A that Plaintiff "has shared some of your

thoughts . . . with her" due to his age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 111:7-15.*

RESPONSE:

**Admitted.**

81.     Miller and Plaintiff scheduled a lunch to discuss Plaintiff's concerns about Krebs. *Ex. 18,*

*Mar. 10-11, 2022 Email Exchange, at Duquesne_00049-50; Ex. 4, Plaintiff Tr. 122:10-21.*

RESPONSE:

**Admitted.**

82.     At the March 23, 2022 lunch, Miller informed Plaintiff of the Donor A reassignment and

stated that Krebs had done nothing wrong. *Ex. 4, Plaintiff Tr. 133:22-134:15; Ex. 23, Plaintiff's*

*Mar. 23, 2022 notes of meeting with J. Miller, Duquesne_00321-22, at Duquesne_00321.*

RESPONSE:

**Admitted.**

83.     Plaintiff stated his disagreement but noted that as the "boss," Miller had the right to take

the course of action he chose. *Ex. 4, Plaintiff Tr. 138:21-139:2; see also Ex. 23, Mar. 23, 2022*

*notes, at Duquesne_00321.*

RESPONSE:

**Admitted.**

84.     Plaintiff sent Miller an email on April 1, 2022 that stated his concerns regarding the

situation regarding Krebs and Donor A. *See Ex. 15, Apr. 1, 2022 Email Exchange at*

*Duquesne_00021-23.*

RESPONSE:

**Admitted.**

85.    There is no reference to Plaintiff's age or age discrimination in the email. *See Ex. 4, Plaintiff Tr. 159:4-12 (admitting same).*

RESPONSE:

**Admitted.  By way of further response, Plaintiff's email to Defendant University's human resources representative does, however, make the allegation that Defendant Miller's actions in "blatantly favoring a much younger underperforming employee" constituted age discrimination.  (Richter depo, Exhibit 20, at Defendants' Bates number 00164, Appx006).**

86.    In April 2022, Plaintiff reached out to Human Resources to file a complaint regarding Krebs' conduct with respect to Donor A. *Ex. 24, Apr. 1, 2022 Email Exchange between W. Richter, R. Dawson, & J. Dedrick, Duquesne_00167.*

RESPONSE:

**Admitted.  Plaintiff's April 1, 2022, initial email does not mention age discrimination.  Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later.  *See* Plaintiff's response to Paragraph 85 above.**

87.    In his email to Human Resources, Plaintiff does not reference his age or age discrimination. *Ex. 4, Plaintiff Tr. 188:15-24.*

RESPONSE:

**Admitted.  Plaintiff's April 1, 2022, initial email does not mention age discrimination.  Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later.  *See* Plaintiff's response to Paragraph 85 above.**

88.     Plaintiff filed a complaint with Jefferson Dedrick, Human Resources Director of Employee and Labor Relations, alleging violations of "TAP 55 and ancillary issues." *Ex. 25, Plaintiff's Employee Complaint Procedure Form, Duquesne_00177.*

RESPONSE:

   **Admitted.**

89.     This is the first Human Resources complaint Plaintiff filed of any type. *Ex. 4, Plaintiff Tr. 187:24-188:2.*

RESPONSE:

   **Admitted.**

90.     Plaintiff notes that the "ancillary issues" are "probably" the "portfolio rebalancing issues." *Ex. 4, Plaintiff Tr. 194:18-21.*

RESPONSE:

   **Admitted.**

91.     Plaintiff asserted that Krebs' actions "prevent[ed] [him] from securing a major gift and has resulted in the decimation of [his] portfolio which renders it impossible for [him] to succeed." *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

RESPONSE:

   **Admitted.**

92.     Plaintiff stated that the only actions Krebs took with respect to decimating his portfolio were her interactions with Donor A. *Ex. 4, Plaintiff Tr. 196:13-197:2.*

RESPONSE:

   **Admitted.**

93.    Plaintiff stated that those interactions and the resultant $50,000 gift prevented him from soliciting a larger $250,000 gift on which he claimed he was working. *Ex. 4, Plaintiff Tr. 197:8-23.*

RESPONSE:

**Admitted.**

94.    Plaintiff does not believe that Krebs' actions in booking the $50,000 gift were due to Plaintiff's age. *Ex. 4, Plaintiff Tr. 121:4-6.*

RESPONSE:

**Admitted.  By way of further response, Plaintiff alleges that the act by Defendant Miller of reassigning major donors like Donor A to younger, less experienced, less qualified gift officers without following the proper protocols and existing procedures, was part of a plan by Defendant Miller to discriminate against the Plaintiff because of his age.  (*See* Complaint, paras. 12 through 17).**

95.    Plaintiff asserts he was unable to attempt to cultivate a larger gift because Donor A was reassigned to Krebs but "assume[s]" that it would be possible for someone from the University to reach out to Donor A to attempt to solicit the remaining $200,000. *Ex. 4, Plaintiff Tr. 197:8-23.*

RESPONSE:

**Admitted.**

96.    Plaintiff also faulted Viers for supervising Krebs' actions and Miller for condoning Krebs' actions. *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

RESPONSE:

**Admitted.**

97.   Plaintiff's complaint does not mention his age or discrimination related to his age. *See Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

RESPONSE:

**Admitted.  Plaintiff's April 1, 2022 initial email does not mention age discrimination.  Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later.  *See* Plaintiff's response to Paragraph 85 above.**

98.   Dedrick, a trained investigator with a law degree, was responsible for investigating the complaint. *Ex. 24, Apr. 1 Email Exchange, at Duquesne_00167 (forwarding Plaintiff to Dedrick to handle complaint); Ex. 26, Transcript of Deposition of Jefferson Dedrick ("Dedrick Tr.") 14:12-15:21 (stating he worked three jobs prior to Duquesne and did human resources functions and investigations "of the type we're talking about" in this case at all three); 19:14-23 (stating he is a lawyer with a law degree from Syracuse University).*

RESPONSE:

**Admitted.**

99.   Because Miller was referenced in the complaint, Dedrick chose Dausey as the decisionmaker regarding the investigation pursuant to Human Resources policy. *Ex. 27, Apr. 11, 2022 Email Exchange Between J. Dedrick & W. Richter, Duquesne_00170-71, at Duquesne_00171.*

RESPONSE:

**Admitted.  By way of further response, the record does not contain any evidence that a junior human resources representative had the authority to dictate to the Provost of the Defendant University, an executive vice-president who is "first among equals," what the Provost's role would be in an important investigation such as this one.  The record is clear,**

**however, that whether or not this subaltern did or did not direct the actions of the person**

**second to the top of the organization chart, Provost Dausey had no responsibility with**

**respect to the Advancement Division, and was not familiar with the procedures related to**

**the Krebs issues. (Deposition of David Dausey ("Dausey depo"), pp. 6, 14, 31-32, Appx008-**

**010).**

100.    On March 30, 2022, Krebs followed up with Hughes and Dean to have the paperwork

drawn up for the Donor A commitment and again followed up on April 8, 2022 and April 27,

2022. *Ex. 28, Email Exchange Between M. Krebs, C. Hughes, and M. Dean dated Mar. 7, 2022*

*to Apr. 27, 2022, Duquesne_00614-17, at Duquesne_00615-16.*

RESPONSE:

    **Admitted.**

101.    Hughes responded for the first time on April 27, 2022 stating the gift would not be

processed while it was "under dispute with HR." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at*

*Duquesne_00615.*

RESPONSE:

    **Admitted.  By way of further response, this factual offering appears to be irrelevant,**

**as it does not pertain in any way to the Plaintiff or his actions.**

102.    Krebs replied that the internal HR issue did not "preclude us from servicing the donor's

wishes or doing what is best for the [U]niversity." *Ex. 28, Mar.-Apr. 2022 Email Exchange*, *at*

*Duquesne_00615.*

RESPONSE:

    **Admitted.  By way of further response, this factual offering appears to be irrelevant,**

**as it does not pertain in any way to the Plaintiff or his actions.**

103.   Dean agreed that it is not in a donor's best interest to delay memorializing the donor's wishes due to an internal dispute and that it could cause issues. *Ex. 20, Dean Tr. 119:10-120:2.*

RESPONSE:

**Admitted.  By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

104.   Dean responded that she would "not move forward until this matter is resolved." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at Duquesne_00615-16.*

RESPONSE:

**Admitted.  By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

105.   Dean and Hughes did not have instructions or authority from Human Resources, Miller, or anyone at the University to hold up the memorialization of Donor A's gift. *Ex. 20, Dean Tr. 118:14-119:9, 120:6-18.*

RESPONSE:

**Admitted.  By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

106.   Hughes did not speak with Miller, Human Resources or anyone other than Dean about holding up the memorialization of Donor A's gift. *Ex. 10, Hughes Tr. 118:13-120:10.*

RESPONSE:

**Admitted.  By way of further response, this factual offering appears to be irrelevant as it does not pertain in any way to the Plaintiff or his actions.**

107.     After learning Krebs sought to memorialize the gift, Plaintiff emailed Dedrick to convey, using bold language in all capital letters, that he was upset that Donor A's gift was moving forward, as he "assum[ed] that it would be put on hold and reviewed." *Ex. 4, Plaintiff Tr. 204:2-205:19; Ex. 29, May 13, 2022 Email Exchange Between W. Richter & J. Dedrick, Duquesne_00189-90, at Duquesne_00190 ("It's come to my attention that Melissa is insisting that the University 'book the gift of $50k from [Donor A]'. . . **ARE YOU KIDDING ME?** . . .UNTIL SHE STOLE HIM, **AND LIED ABOUT IT**, [Donor A] was my prospect – any 'gift credit' should go to me! I WISH TO FILE AN IMMEDIATE COMPLAINT REGARDING THIS – OR AMEND MY ORIGINAL COMPLAINT TO INCLUDE THIS!" . . . (emphasis in original)).*

RESPONSE:

      **Admitted.**

108.     Plaintiff stated that "credit should go to [him]" for the Donor A gift, because Krebs "stole him and lied about him." *Ex. 4, Plaintiff Tr. 205:20-206:2; Ex. 29, May 13,2022 Email Exchange, at Duquesne_00190*

RESPONSE:

      **Admitted.**

109.     Dedrick explained that there was a difference between moving forward with memorializing the gift to service the donor and determining who received credit for the gift. *Ex. 29, May 13,2022 Email Exchange, at Duquesne_189.*

RESPONSE:

      **Admitted.**

110.    Plaintiff filed a second complaint with respect to the issue of Krebs seeking to book the gift. *See Ex. 30, May 15, 2022 Email from W. Richter to J. Dedrick and A. Berestecky, Duquesne_00163-66.*

RESPONSE:

**Admitted.  By way of further response, the Defendant's factual offering regarding the Plaintiff's second Complaint makes no mention of the fact that the Plaintiff's second complaint specifically accuses Defendant Miller of age discrimination.  (Richter depo, Exhibit 20, Defendant's Bates number 00164, Appx006).**

111.    Dedrick interviewed eight employees as part of his investigation from April 5, 2022 through May 24, 2022. *Ex. 31, HR Complaint Procedure Investigative Report dated July 11, 2022, Duquesne_00213-28, at Duquesne_00214.*

RESPONSE:

**Admitted.**

112.    Dedrick engaged in "[a]dditional follow-up communications" between May 24, 2022 and June 15, 2022. *Ex. 31, Report dated July 11, 2022, at Duquesne_00214.*

RESPONSE:

**Admitted.**

113.    He obtained rebuttal statements from Krebs, Viers, and Miller, including a second rebuttal from Miller regarding the second complaint. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28*

RESPONSE:

**Admitted.**

114.    Dedrick considered numerous documents and communications provided by Plaintiff and Dean. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28.*

RESPONSE:

    **Admitted.**

115.    He recommended to Dausey that there be a finding of no policy violation as to Krebs, Viers, or Miller. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-27.*

RESPONSE:

    **Admitted.**

116.    Specifically, he found that Krebs' statement to Donor A that Plaintiff had "shared his thoughts" was misleading but did not rise to the level of a TAP 55 violation for unethical conduct. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

RESPONSE:

    **Admitted.**

117.    He found that, because Donor A was assigned to Krebs at the time of her outreach and gift solicitation, and Krebs had reviewed Plaintiff's contact report notes, she was not in violation of any policy. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-23.*

RESPONSE:

    **Admitted.**

118.    He noted that Plaintiff made no specific allegation as to Viers and, as a result, Viers committed no policy violation. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

RESPONSE:

    **Admitted.**

119.   He found that Miller was within his authority to reorganize portfolios and to allow Krebs to book a gift she solicited from Donor A, who was at that time assigned to her portfolio. *Ex. 31, Report dated July 11, 2022, at Duquesne_00224-26.*

RESPONSE:

**Admitted.**

120.   Dausey agreed with Dedrick's conclusions and recommendations. *Ex. 9, Dausey Tr. 41:12-42:15.*

RESPONSE:

**Admitted.**

121.   Dedrick explained to Plaintiff the procedure to appeal the decision as to his complaint. *Ex. 32, July 20, 2022 Email Exchange Between W. Richter and J. Dedrick, Duquesne_00204-05, at Duquesne_00204.*

RESPONSE:

**Admitted.**

122.   Plaintiff submitted an appeal, claiming material procedural error in the form of Dedrick not focusing on the specific fact that Krebs had "lied" to a donor. *Ex. 33, Aug. 2, 2022 Email from W. Richter to J. Dedrick, Duquesne_00206-07.*

RESPONSE:

**Admitted.**

123.   Plaintiff's appeal does not reference his age or age discrimination at all. *See Ex. 33, Aug. 2, 2022 Email, at Duquesne_00206-07; see also Ex. 4, Plaintiff Tr. 284:21-24 (admitting same).*

RESPONSE:

**Admitted.  Plaintiff's August 2, 2022, email does not mention age discrimination. Plaintiff's direct, specific claim of age discrimination is contained in his email to the Defendant's human resources representative dated May 15, 2022.  *See* Plaintiff's response to Paragraph 85 above.  (Richter depo, Exhibit 20, Defendant's Bates number 164, Appx006).**

124.   Daniel Gilman, Chief of Staff to the University President, reviewed the appeal and found no material procedural error. *Ex. 34, Aug. 23, 2022 Letter from D. Gilman to W. Richter*, PL *0027-28.*

RESPONSE:

**Admitted.  It is admitted that Mr. Gilman's letter to the Plaintiff says the same.**

125.   Starting in mid-2021, Plaintiff began to cultivate a gift from a married couple (the "Donor Couple" or, individually, "Donor D" and "Donor E").   *Ex. 35, Contact Reports Regarding Donor Couple, Duquesne_00259-75, at Duquesne_00263-64 (June 15, 2021 contact), Duquesne_00267-68 (Aug. 10, 2021 contact); see Ex. 4, Plaintiff Tr. 316:14-21 (stipulating that contact reports were made by him).*

RESPONSE:

**Admitted.**

126.   A gift officer cannot make representations to a donor that they can name an entity without it going to the Gift Acceptance Committee and the President. *Ex. 19, Gormley Tr. 20:14-17; see infra Section IX.B (describing policies gift officers must follow for gifts to name an entity which require approvals prior to any promise to a donor).*

RESPONSE:

**Admitted. By way of further response, the practice applicable to gift officers of the Defendant University at the time of the incident in question permitted the gift officers to discuss with a potential donor the possibility of the donor receiving naming rights in connection with a donor as long as the gift officer informed the donor that naming rights for a donation can only be granted after approval of the donation and naming rights by the Defendant's Gift Acceptance Committee, and so long as the gift officer has kept his immediate supervisor(s) informed of the potential gift and the details of that gift during the course of the cultivation.[4]**

127.    In March and April 2022, Plaintiff secured an agreement for a deferred, revocable gift in exchange for naming rights to the Center for Emerging and Innovative Media ("CEIM"). *Ex. 36, Mar. 8, 2022 Email from W. Richter to C. Hughes and M. Dean, Duquesne_00340; Ex. 37, Apr. 12, 2022 Email Exchange between Donor D and W. Richter, Duquesne_00333-35.*

RESPONSE:

**Denied as stated.  It is admitted that, in the March/April 2022 timeframe, Plaintiff secured a commitment from the Donor Couple for a significant seven figure donation for which the couple requested naming rights to the CEIM.  Plaintiff indicated that the donors would receive those naming rights, but only if the donation with that stipulation was**

---

[4] **During the subject period, the practice of requiring approval from the gift acceptance committee for all gifts involving naming rights was not absolute.  As part of the investigation into the donation by the Donor Couple, Ms. Hughes provided Defendant University's human resources representative with multiple examples of recent instances in which the grant of naming rights for a donation did not require, and did not obtain approval from the gift acceptance committee.  At that time, Ms. Hughes had the responsibility to prepare and review all new gift and fund agreements, to act as a liaison between her Development Office and the Gift Acceptance Committee, and to submit donation proposals to the Gift Acceptance Committee as necessary.  (Email from Cecelia Hughes to Jefferson Dedrick dated August 4, 2022, Appx011-012).  These facts do not appear anywhere in the Defendants' fact offering.**

accepted by the gift acceptance committee. "the next step is for me to go before DU's naming committee and present a formal request to name the media center." (See Email from the Plaintiff to Donor D dated June 19, 2022, Appx013).[5]  At no time did Plaintiff promise the donors that they would enjoy these naming rights without the approval of the Defendant University's gift acceptance committee.  To the contrary, the Plaintiff specifically advised the Donor couple, both in writing and orally, that the naming rights for this donation had to be accepted by the naming committee. (Plaintiff Aff, para. 12, Appx134; Plaintiff's Fact para. 262).  Therefore, the Plaintiff did not "secure an agreement" for these naming rights that would bind the Defendant University.

The Defendants cite as authority to the Court to support these claims their Exhibits 36 and 37.  Whether by cursory or searching review of these two documents, it is clear that neither of these documents, taken separately or together, supports in any way the claim of the Defendants that the Plaintiff's actions were improper in any way, or that the Plaintiff somehow acted to bind the Defendant University in contract with the Donor Couple.

128.  President Ken Gormley created the CEIM and was "deeply involved in every facet" of the CEIM. *Ex. 19, Gormley Tr. 20:18-21:5.*

RESPONSE:

**Admitted.**

129.  CEIM is University-wide center. *See Ex. 38, Centers and Institutes, Duquesne.Edu, Duquesne_00353-59, also available at* [https://www.duq.edu/research/centers-and-institutes/index.php](https://www.duq.edu/research/centers-and-institutes/index.php) *(listing CEIM as an "Interdisciplinary Center"); Ex. 39, Center for*

---

[5] **As the record reflects, the Donor Couple signed off on the statement of charitable intent three (3) days after being advised of the restriction on their naming rights.**

*Emerging and Innovative Media, Duquesne.Edu, Duquesne_00360-71, also available at* [https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php](https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php) *(noting "[a]ny student from any program across campus can take advantage of these convenient, cutting edge studios"); see also Ex. 4, Plaintiff Tr. 296:20-25 (stating he cannot "speak directly to what [CEIM's] broad intent" was and that he has no reason to dispute that the CEIM is a university-wide center).*

RESPONSE:

> **Admitted.**

130.   Naming agreements are of critical importance to the University as naming rights celebrate and recognize and celebrate donors in a highly visible way.  *Ex. 7, Termination Letter, at Duquesne_00013.*

RESPONSE:

> **Admitted.**

131.   The University President must approve naming rights because they are "very valuable" rights and there are many factors that contribute to the decision as to whether to grant naming rights.  *Ex. 19, Gormley Tr. 78:4-11.*

RESPONSE:

> **Denied.  Multiple examples exist in the record showing that the President of the Defendant University does not necessarily approve every donation involving naming rights. (*See* email dated August 4, 2022, from Cecelia Hughes to Jefferson Dedrick at Appx011-012, and Plaintiff's response to Paragraph 126 above).**

132.   Duquesne has policies related to the acceptance of large gifts and the issuance of naming rights to donors.  *See Ex. 40, Gift Acceptance Policies, Duquesne_00137-59; Ex. 41, Policy on*

Gift Related Naming Opportunities ("Naming Policy," and, collectively with Ex. 40, the "Gift Policies"), Duquesne_00160-62.

RESPONSE:

**Admitted.  By way of further response, the policy at issue here that governs naming rights for significant donations was not strictly adhered to.  Most of the large, seven (7) figure donations were approved without the knowledge of, or even the participation of, the University President.  (Affidavit of Richard Creehan ("Creehan Aff"), paras.  8-9, Appx0126-0127).**

133.   Duquesne has these policies to ensure the University President has the ultimate decision-making authority when it comes to entering into certain gift agreements to protect these "very valuable naming rights." *Ex. 19, Gormley Tr. 77:24-78:15; see also Ex. 40, Gift Acceptance Policies, at Duquesne_00153 (stating that "[v]ariations from these fulfillment guidelines [regarding timing of funding for agreements involving naming rights] may be considered . . . upon . . . approval by the Gift Committee and the President"); Ex. 41, Naming Policy, at Duquesne_00161 (stating "[t]he President . . . will have final approval in any decision to name a college, school, department, institute, or university-wide center").*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that the University President is given ultimate decision making authority with respect to naming rights for donation.  It is denied that the University President participates in and/or approves every donation that involves naming rights.  *See* Plaintiff's response to Paragraph 132 above.**

134.   The Gift Acceptance Policies provide that a "naming will generally not be recognized as official and final until at least sixty percent (60%) of the total commitment has been paid, with an

irrevocable agreement and time frame executed in writing for the remainder." *Ex. 40, Gift Acceptance Policies, at Duquesne_00152-53.*

RESPONSE:

**Admitted.**

135.   The Gift Acceptance Policies further provide that, "[i]f a deferred gift is part of the naming commitment, it is recommended that its maximum value be no more than forty percent (40%) of the total package (as calculated based on the donor's age at the time of the commitment). *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

RESPONSE:

**Admitted.**

136.   Ensuring a significant portion of a gift is paid up front is important to serve the goal of funding, developing, and growing the University center or other recipient. *Ex. 1, Miller Decl. ¶ 14.*

RESPONSE:

**Admitted.**

137.   The Gift Acceptance Policies provide for "[v]ariations from these fulfillment guidelines[,]" which "may be considered on a case-by-case basis upon referral by the Vice President for University Advancement and approval by the Gift Committee and the President." *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

RESPONSE:

**Admitted.  By way of further response,** *see* **Plaintiff's response to Paragraphs 132 and 133 above.**

138.    Gifts that involve naming university programs, facilities, and university-wide centers raise unique issues that, per University Policy, require the direct involvement and final approval of the Gift Acceptance Committee and the President. *Ex. 41, Naming Policy, at Duquesne_00161.*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that the naming rights policy provides for direct participation of the committee and the President.  It is denied that this participation occurs with every gift that involves naming.  *See* Plaintiff's response to Paragraphs 126, 131-133 above.**

139.    Plaintiff could not identify any instance during his time at Duquesne where the Gift Acceptance Policies were not followed or where he saw a gift agreement that violated the policies other than claiming that the Gift Policies were not followed in a scenario this Court has already ruled is not relevant to Plaintiff's claims.[6] *Ex. 4, Plaintiff Tr. 324:20-325:10, 325:23-20.*

RESPONSE:

**Admitted.  By way of further answer, because the Plaintiff's responsibility for the administrative aspects of the filing ended when he provided documentation to Ms. Hughes, Plaintiff does not necessarily know how various of his naming rights donations were handled relative to the naming rights policy.  For that reason, he would know even less about how naming rights donations obtained by other gift officers were handled. (Plaintiff Aff, para. 7, Appx132).  By way of further response, see the Plaintiff's response to Paragraphs 126 and 131 above.**

---

[6] The Court determined the commitment identified to be irrelevant and not subject to discovery at the parties' March 13, 2024 conference. For the avoidance of doubt, Defendants continue to assert that the commitment identified is not relevant for the reasons stated in their submission to the Court.

140.    Plaintiff has never seen the agreement related to the irrelevant commitment. *Ex. 4, Plaintiff Tr. 325:11-12.*

RESPONSE:

**Admitted.**

141.    The Policy on Gift Related Naming Opportunities described above (the "Naming Policy") states that the President's approval is required for naming-rights opportunities for university-wide centers. *Ex. 41, Naming Policy, at Duquesne_00161.*

RESPONSE:

**Admitted.  By way of further response, *see* the Plaintiff's response to Paragraphs 126, 131-133, 138 above.**

142.    The Naming Policy generally requires that the funding requirement to name a university-wide center is $3.5 million. *Ex. 41, Naming Policy, at Duquesne_00162.*

RESPONSE:

**Admitted.  By way of further response, *see* the Plaintiff's response to Paragraphs 126, 131-133 and 138 above.**

143.    The Naming Policy provides that, "in special situations, with approval of the Vice President for University Advancement and the President, unrestricted gifts or irrevocable deferred gifts may be recognized with a naming opportunity." *Ex. 41, Naming Policy, at Duquesne_00162.*

RESPONSE:

**Admitted.  By way of further response, *see* the Plaintiff's response to Paragraphs 126, 131-133 and 138 above.**

144.    On May 13, 2022, at Plaintiff's request, Hughes provided Plaintiff a draft DSCI but noted that she needed a "detail for the Gift Acceptance Committee." *Ex. 42, May 13, 2022 Email from C. Hughes to W. Richter, Duquesne_00513.*

RESPONSE:

**Denied emphatically.  There is no truth whatsoever to the claim that Ms. Hughes prepared the DSCI "at Plaintiff's request."  There is no support for this claim anywhere in the record.  The record reference offered by the Defendants does not support this claim in any way.  The email that is associated with the Defendants' false claim that Ms. Hughes acted at the Plaintiff's behest contains no language of any kind that would support the Defendants' factual claim here.  Because defense counsel chose not to question the Plaintiff on this claim, the Plaintiff's affidavit provides the Plaintiff's denial of this claim.  (Plaintiff Aff, para. 13,  Appx134).**

145.    In an email to Donor D, Plaintiff noted he needed a statement of the Donor Couple's finances to take to Duquesne's "naming committee." *Ex. 43, June 19, 2022 Email from Plaintiff to Donor D, Duquesne_00406.*

RESPONSE:

**Admitted.**

146.    Plaintiff never brought the gift and naming rights before the Gift Acceptance Committee or any committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

RESPONSE:

**Admitted.  By way of further response, it was not the Plaintiff's responsibility to take the proposed gift to the Gift Approval Committee.  That was the responsibility of Ms.**

**Hughes and Ms. Dean, not the Plaintiff.  (Creehan Aff, para. 6, Appx125, Plaintiff Aff,**

**para. 6,  Appx131-132).**

147.    Plaintiff is not aware of whether anyone brought the gift and naming rights before the

Gift Acceptance Committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

RESPONSE:

**Admitted.  By way of further response, the Plaintiff had no responsibility to take**

**any gift, including the donation from the Donor Couple, to the Gift Approval Committee.**

**(See the Plaintiff's response to Paragraphs 139 and 146 above.)**

148.    Plaintiff did not have any discussions with President Gormley about the gift and naming

rights, nor did he ask Vice President Miller to do so. *Ex. 4, Plaintiff Tr. 311:15-20*; *Ex. 1, Miller*

*Decl. ¶16.*

RESPONSE:

**Admitted.  The record is clear that the Plaintiff had no access to the Defendant**

**University's President.  Mr. Gormley testified that he had never met with a gift officer**

**about approval of a naming rights gift, and that he barely knows the Plaintiff, having only**

**met him once.  (Deposition of Kenneth Gormley ("Gormley depo"),  pp. 25-26, 80-81,**

**Appx014-016).**

149.    On June 22, 2022, the Donor Couple signed the DSCI. *Ex. 44, Paperwork regarding*

*DSCI and Executed DSCI, Duquesne_00558-60.*

RESPONSE:

**Admitted.**

150.    On July 7, 2022, Dean signed the DSCI. *Ex. 44, Executed DSCI, Duquesne_00560.*

RESPONSE:

**Admitted.**

151.    The DSCI provided that the gift was revocable at any time by the donors but did not provide the University revocation rights. *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 3).*

RESPONSE:

**Denied as stated.  To the extent that Paragraph 151 suggests that the Defendant University entered into a binding contract with the Donor Couple, and that the DSCI constituted that contract, the same is denied.  The DSCI serves as a statement of understanding only.  The agreement is not final until the parties execute a "fund agreement."  No fund agreement was executed by the Donor Couple for this gift, so no binding contract existed as a result of the DSCI.  (Creehan Aff, para 7, Appx126; Email from Ms. Hughes to Defendant's human resources representative dated August 4, 2022, Appx011-012).**

152.    Revocable meant that the donors could withdraw their commitment at any time during their lifetimes.  *Ex. 1, Miller Decl. ¶ 15; see also Ex. 44, Executed DSCI, Duquesne_00559 (¶ 3).*

RESPONSE:

**Admitted.**

153.    The DSCI did not require any payment up front and provided only for a "revocable bequest" of 20% of the Donor Couple's Trust estate. *Ex. 44, Executed DSCI, Duquesne_00558-59.*

RESPONSE:

**Admitted.**

154.    The fact that it was a "revocable bequest" meant that that the gift was entirely deferred until the death of the Donor Couple. *Ex. 1, Miller Decl. ¶ 15.*

RESPONSE:

**Admitted.**

155.    The DSCI provided the donors with the right to name the CEIM in perpetuity. *Ex. 44,*

*Executed DSCI, Duquesne_00559 (¶ 5).*

RESPONSE:

**Denied as stated.  The DSCI did not create a contract between the parties, and,**

**therefore, it did not provide the Donor Couple with anything but a statement of intent.**

**(*See* the Plaintiff's response to Paragraph 151 above.)**

156.    The CEIM would be renamed "[u]pon receipt of documentation of the proposed gift." *Ex.*

*44, Executed DSCI, Duquesne_00559 (¶ 5).*

RESPONSE:

**Denied.  (*See* the Plaintiff's responses to Paragraphs 151 and 155 above.)**

157.    The Donor Couple provided that documentation the same day they signed the DSCI. *See*

*Ex. 35, Donor Couple Contact Report by W. Richter (dated June 26, 2022), Duquesne_00265-66*

*(noting the Donor Couple provided their financial information "to substantiate the gift"); see*

*also Ex. 44, Paperwork Submitted with DSCI, at Duquesne_00561 (donor 401(k) Information*

*with annotations).*

RESPONSE:

**Admitted.**

158.    The DSCI does not provide that the naming rights are revoked in the event of a

revocation of the Donor Couple's commitment or for any circumstance. *See generally Ex. 44,*

*Executed DSCI, Duquesne_00559-60.*

RESPONSE:

**Admitted.  By way of further answer, the DSCI did not provide the Donor Couple with anything but a statement of intent.  (*See* Plaintiff's responses to Paragraphs 151, 155 and 156 above.)**

159.    After the DCSI was executed without the University President's knowledge or approval, President Gormley was shocked to learn of the agreement. *Ex. 19, Gormley Tr. 20:18-21:5.*

RESPONSE:

**Admitted.**

160.    On July 28, 2022, Heather Clay, Dean's then-supervisor and Richter's and Hughes' second-level manager, informed Dean that Plaintiff, Hughes, and she were in "serious trouble" for the Donor Couple's DSCI, after which Dean stated to Hughes that "[t]his one just got by us," meaning that they bore responsibility for the errors made with respect to the gift.  *Ex. 20, Dean Tr. 164:16-165:17.*

RESPONSE:

***Denied emphatically.  There is no truth whatsoever to the claim that Ms. Clay informed Ms. Dean that "Plaintiff . . (was) in 'serious trouble.'"  There is no support for this claim anywhere in the record.*  The record reference offered by the Defendants does not support this claim in any way.  The email that is associated with the Defendants' false claim that Ms. Clay indicated that the Plaintiff was in trouble for this gift *contains no language of any kind that would support the Defendants' factual claim here.***

161.    Dedrick investigated the gift and circumstances surrounding it.  *See Ex. 45, Aug. 10, 2022 Report on CEIM Naming Investigation, Duquesne_00001-11.*

RESPONSE:

**Admitted.**

162.    Dedrick interviewed five individuals as part of his investigation. *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00003-4.*

RESPONSE:

    **Admitted.**

163.    Dedrick and Plaintiff initially agreed to meet regarding the investigation on August 3, 2022 at 3:30 p.m. *Ex. 46, Aug. 2, 2022 Email from J. Dedrick to W. Richter, PL 0049.*

RESPONSE:

    **Admitted.**

164.    Plaintiff canceled the August 3 meeting, stating he was not available to meet until August 8, 2022. *Ex. 47, Aug. 2, 2022 Email from W. Richter to J. Dedrick, PL 0056.*

RESPONSE:

    **Admitted.**

165.    After multiple calls, emails, and voicemails from Dedrick to Plaintiff with no response, Dedrick informed Plaintiff via email that, if he did not show up for an interview on August 4, 2022, he may be placed on unpaid leave due to insubordination. *Ex. 48, Aug. 3, 2022 Email from J. Dedrick to W. Richter, PL 0048.*

RESPONSE:

    **Admitted.**

166.    Plaintiff canceled an August 4, 2022 meeting due to being "advised not to attend" by counsel. *Ex. 49, Aug. 4, 2022 Email Exchange between W. Richter and J. Dedrick, Duquesne_00475-76, at Duquesne_00476.*

RESPONSE:

    **Admitted.**

167.    Dedrick replied that Plaintiff's attorney should contact the general counsel's office but noted that the investigation must move forward and, per his prior email, he would be placed on unpaid suspension. *Ex. 49, Aug. 4, 2022 Email Exchange, at Duquesne_00475.*

RESPONSE:

   **Admitted.**

168.    On August 5, 2022, Richter met with Dedrick. *Ex. 50, Aug. 5, 2022 Email from J. Dedrick to W. Richter, Duquesne_00336-39.*

RESPONSE:

   **Admitted.**

169.    Following the meeting, Dedrick emailed Plaintiff and noted that Plaintiff "refused to answer several of [his] questions" and, "only a few minutes into the interview, [Plaintiff] stated [he was] excusing [him]self and abruptly left prior to fully discussing the issues." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

RESPONSE:

   **Admitted.  By way of further response, the Defendant University's human resources representative failed to include in the subject email that the Plaintiff was suddenly called away from the meeting because he got an urgent call from his wife, who had just received bad news related to a health condition from which she then suffered.  The Plaintiff briefly explained the situation to the representative, then hurriedly left the meeting and went directly to his wife, who was waiting for him at a local hospital.  (Plaintiff Aff, para. 28, Appx139-140).**

170.    Dedrick informed Plaintiff that the investigation would be "completed without [Plaintiff's] full input." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

RESPONSE:

**Admitted.**

171.    Plaintiff was placed on paid administrative leave pending the outcome of the investigation. *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

RESPONSE:

**Admitted.**

172.    On August 10, 2022, Dedrick found violations of the Gift Acceptance Policies and the Naming Policy because the gift was a 100% deferred, revocable gift that promised naming rights to a university-wide center in perpetuity without obtaining the necessary approvals from the Gift Acceptance Committee and the President. *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00009.*

RESPONSE:

**Admitted.  It is admitted that the findings of the human resources representative are accurately reflected in Paragraph 172.  For all of the reasons set forth herein, it is denied that the Plaintiff violated any policy of the Defendant University related to the Donor Couple's $1,500,000 gift to the University, or that he did anything improper or inappropriate related to that gift.**

173.    Donor D was "absolutely devastated" by the news that the CEIM would not be named after the Donor Couple and that the gift could not proceed as Richter had erroneously represented. *Ex. 51, Oct. 20, 2022 Letter from D. Dausey to J. Miller, Duquesne_00252-53 (summarizing meeting with Donor Couple).*

RESPONSE:

**It is admitted that the letter from Dr. Dausey makes the claims set forth in Paragraph 173 related to Donor D's reaction to the fact that the Defendant University was**

**withdrawing any possibility of naming rights to the CEIM.   However, there is nothing in the record from the Donor Couple, or Donor D, specifically, to substantiate Dr. Dausey's claim.**

174.    On August 17, 2022, Miller informed Plaintiff via letter that he was terminated effective immediately.  *See Ex 7, Termination Letter, at Duquesne_00013-14.*

RESPONSE:

      **Admitted.**

175.    The letter states that Plaintiff was being terminated because Miller "lost faith in [Plaintiff's] professional judgment and effective internal and external engagement abilities" and that violations of policy related to the Donor Couple were the final straw in a "pattern of performance" that caused the loss of faith and warranted termination.  *Ex 7, Termination Letter, Duquesne_00013-14. Donors B & C*

RESPONSE:

      **It is admitted that the letter reads as indicated.**

176.    Duquesne did not fill Plaintiff's role with another employee or hire anyone to fill the role. *Ex. 60, Defendants' Discovery Responses at p. 10; see also Ex. 61, Excerpts of Defendants' Supplemental Responses to Plaintiff's First Set of Interrogatories, at pp. 6-7 (listing positions added in year prior to and after Plaintiff's termination, none of which replace his role).*

RESPONSE:

      **Admitted.**

177.    Plaintiff has never heard Miller make comments related to his age. *Ex. 4, Plaintiff Tr. 345:23-25.*

RESPONSE:

**Admitted.**

178.   Dean has never heard Miller, Gormley, or anyone in University Advancement make negative comments related to anyone's age. *Ex. 20, Dean Tr. 115:22-116:12.*

RESPONSE:

**Admitted.**

179.   Dean, who filed an internal age discrimination complaint (which did not include Richter) and her own, independent lawsuit against the University alleging age discrimination, has no reason to believe that Plaintiff was terminated due to his age. *Ex. 20, Dean Tr. 177:1-3; see also Dean Tr. 184:3-8 (noting Hughes and she made a complaint in July 2921 that was internally mediated); Complaint, Dkt. No. 1,* Mary Frances Dean v. Duquesne University of the Holy Spirit, et al*., No. 2:23-cv-1265-CB (July 11, 2023) (alleging age discrimination,* inter alia).

RESPONSE:

**Admitted in part and denied in part.  It is admitted that Ms. Dean answered "No." to the question, "Do you have any reason to believe that (the Plaintiff) was terminated because of his age?"  The Defendants do not mention Ms. Dean's testimony immediately prior to the quoted exchange:**

**Q:     Do you believe that Mr. Richter was terminated because of his age?**

**A:      I don't know.**

**(Deposition of Mary Frances Dean ("Dean depo"), p. 176, Appx017).**

**Notably, there is no follow up questioning from defense counsel designed to elicit an explanation as to this apparent contradiction.  Furthermore, it does not appear that Ms. Dean's opinion on this question has any relevance since there is no dispute that she was not a decisionmaker in the Plaintiff's termination.**

180.    Plaintiff has never heard Miller make comments about his TAP 55 complaint. *Ex. 4, Plaintiff Tr. 346:7-16.*

RESPONSE:

   **Admitted.**

181.    Dean was also disciplined for her role in the Donor Couple's DSCI, but due to her lesser involvement in the donor cultivation and lack of prior issues, she was issued only a formal written warning. *Ex. 1, Miller Decl. ¶ 17; see Ex. 20, Dean Tr. 175:24-176:22 (noting her discipline and that she had not been subject to discipline or writeup before the Donor Couple DSCI incident).*

RESPONSE:

   **Admitted in part and denied in part.  It is admitted that Ms. Dean was disciplined for her role in the Donor Couple's donation.  It is specifically denied that Ms. Dean's role in the Donor Couple's donation was somehow "lesser" than that of the Plaintiff.  The Plaintiff violated no policy, took no action that was not specifically authorized by his supervisors, and did nothing wrong related to this donation.  It is undisputed between the parties that Ms. Dean executed the DSCI on behalf of the Defendant University.   To the extent that such action even arguably binds the University, it is a fact question as to whether or not her actions were less egregious than the completely proper conduct of the Plaintiff.**

182.    Dean was 62 years old at the time of her discipline.  *See Ex. 20, Dean Tr. 9:16-17 (noting her date of birth is 1960, making her 62 in August 2022).*

RESPONSE:

   **Admitted.**

183.    As part of his job responsibilities, Plaintiff was required to maintain records of his contacts with University donors in "contact reports" in the University's contact management system. *Ex. 4, Plaintiff Tr. 39:7-9.*

RESPONSE:

**Admitted.**

184.    Gift officers have access to contact reports for all Duquesne donors, not just those assigned to them. *Ex. 20, Dean Tr. 77:23-78:4.*

RESPONSE:

**Admitted.**

185.    Contact reports are supposed to be entered into the system when a gift officer meets with a donor or discusses "something of significance" with them. *Ex. 4, Plaintiff Tr. 39:10-16.*

RESPONSE:

**Admitted in part and denied in part.  It is admitted that, in most instances, the gift officer must report significant information in the contact report.  The exception to that rule is when a donor specifically requests that certain information be kept confidential.  Under those circumstances, a gift officer is permitted to exclude such information from a contact report.  (Plaintiff Aff, para. 30, Appx140).**

186.    Examples of "something of significance" include "an important phone conversation," making a "call[] to say thank you" or note the gift officer will meet the donor to play golf, or receiving or presenting something that impacts a gift the donor may or has made to the University. *Ex. 4, Plaintiff Tr. 40:4-24; see also Ex. 20, Dean Tr. 78:15-19 (stating information helpful to include in a contact report is "[e]verything that you could possibly learn about a donor").*

RESPONSE:

**Admitted.  By way of further response,** *see* **the Plaintiff's response to Paragraph 185 above.**

187.    Plaintiff and his supervisor at the time of his termination, Mary Frances Dean, view the University's relationship with donors as "sacrosanct." *Ex. 4, Plaintiff Tr. 77:21-78:4; Ex. 20, Dean Tr. 33:24-34:14.*

RESPONSE:

**Admitted.  It is admitted that, at the repeated urging of defense counsel in their depositions to agree to the use of the word "sacrosanct," both the Plaintiff and Ms. Dean ultimately agreed to use defense counsel's term.**

188.    A key part of maintaining donor relationships is maintaining the confidentiality of donor information. *Ex. 4, Plaintiff Tr. 77:3-20.*

RESPONSE:

**Admitted.**

189.    Third-party organizations have codes of ethics for fundraising professionals, highlighting the importance of, among other things, "safeguard[ing] privacy rights and confidential information," "protect[ing] the confidentiality of all privileged information relating to the provider/client relationships," and "not disclos[ing] privileged or confidential information to unauthorized parties." *Ex. 52, CASE Statement of Ethics (published Mar. 12, 2020), Duquesne_00632; Ex. 53 Association of Fundraising Professionals Code of Ethical Standards (adopted 1964 and amended Oct. 2014), Duquesne_00633.*

RESPONSE:

**Admitted.**

190.    Plaintiff agrees that the Ethics Standards accurately reflect their duties with respect to confidentiality. *Ex. 4, Plaintiff Tr. 82:14-23; see also Ex. 20, Dean Tr. 35:5-7 (stating she takes the Ethics Standards seriously).*

RESPONSE:

    **Admitted.**

191.    In addition to the general expectation of confidentiality, Advancement Division employees are expected to comply with TAP No. 55, which requires that employees "must[] . . . [m]aintain and respect the privacy and/or confidentiality of information entrusted to them."  *Ex. 54, TAP 55, Duquesne_00135-36.*

RESPONSE:

    **Admitted.**

192.    During discovery, Defendants discovered emails that Plaintiff forwarded to individuals named Jack Gaylord, Rocky Bleier, and Rick Creehan, after Creehan's separation from Duquesne employment.  *See Ex. 55, Compilation of W. Richter Emails Sharing Confidential Information, Duquesne_00254-55, 296-99, 323-28.*

RESPONSE:

    **Admitted.**

193.    The emails forwarded confidential donor information regarding Donor A and the Donor Couple. *See Ex. 55, Compilation of Emails, Duquesne_00254-55, 296-99, 323-28.*

RESPONSE:

    **Admitted.**

194.    On or about February 24, 2024, Defendants discovered the emails forwarding confidential donor information. *See Ex. 56, Declaration of Mariah H. McGrogan ¶¶ 4-5.*

RESPONSE:

> **Admitted.**

195.    Plaintiff admitted to the confidential nature of the donor information in these emails. *Ex. 4, Plaintiff Tr. 127:23-128:6; 133:3-6; see also Ex. 55, Compilation of Emails, at Duquesne_00296 (noting "CONFIDENTIAL" in forward to Creehan).*

RESPONSE:

> **Admitted.**

196.    Dean believed that Plaintiff violated confidentiality obligations owed to donors through the sharing of these emails. *Ex. 20, Dean Tr. 41:14-17, 43:8-10.*

RESPONSE:

> **Admitted.  By way of further response, it appears that the facts set forth in this paragraph are irrelevant to the issues in this case because Ms. Dean did not participate in the decision to terminate the Plaintiff's employment.**

197.    The only other instance of Duquesne discovering an Advancement employee improperly disclosing confidential donor information during Miller's time as head of Advancement involved Hughes. *Ex. 1, Miller Decl. ¶ 18; see Ex. 57, October 3, 2022 Letter from H. Clay to C. Hughes, Duquesne_00788-89.*

RESPONSE:

> **Admitted.**

198.    In October 2022, Duquesne terminated Hughes for breaching her confidentiality obligations to and speaking negatively about a donor by posting donor information (albeit incorrect) on social media. *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89 (terminating Hughes' employment for violations of TAP 55, TAP 57 (on Social Media use), and basic*

*expectations and standards for confidentiality required in [her] field as an Advancement team member).*

RESPONSE:

**Denied.  *See* Paragraph 325, *infra*.  By way of further response, the Defendants have not proffered any evidence of the termination of any employee for similar reasons to that alleged by the Defendant as the reason for the termination of Ms. Hughes.  It is noteworthy that the only two (2) examples of terminations of employees for policy violations related to the disclosure of donor information relate to two (2) individuals, the Plaintiff and Ms. Hughes, who have sued the Defendants for discrimination related to their unlawful termination from employment.  (*See* Cecilia Hughes' Complaint against the Defendants alleging age discrimination in her termination at Western District of Pennsylvania Civil Action Number 2:23-cv-01775-RJC at Appx018-031).**

199.    Duquesne promptly terminated Hughes upon the conclusion of the investigation.  *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89.*

RESPONSE:

**Admitted.  By way of further response, *see* the Plaintiff's response to Paragraph 198 above.**

200.    Duquesne would have terminated Plaintiff if Plaintiff were still employed when these emails were discovered.  *Ex. 1, Miller Decl. ¶ 19.*

RESPONSE:

**Denied.  By offering the only examples of termination for University policy violations by former employees alleging age discrimination in their termination, the Defendant has not met its burden to prove, by a preponderance of the evidence, that the**

**Defendant University would have terminated the Plaintiff upon discovery of the subject disclosures.**

201.    Miller is the only person Plaintiff claims terminated his employment due to his age.  *Ex. 4, Plaintiff Tr. 345:17-22.*

RESPONSE:

       **Admitted.  It is admitted that the Plaintiff, in the fifth or sixth hour of his testimony, agreed with counsel that Mr. Miller was the only person involved in the discrimination against him.  Plaintiff respectfully represents that the evidence put forth to this point in the record reveals evidence from which a jury could conclude that others, including Mr. Gormley, Ms. Connelly, and possibly others, played a role in the discrimination against the Plaintiff.**

202.    Plaintiff asserts only that Viers and Krebs were given better treatment than him due to their respective ages.  *Ex. 4, Plaintiff Tr. 265:16-266:1; Ex. 58, Excerpts of Plaintiff's Response to Defendant's First Set of Interrogatories and Requests for Production of Documents ("Plaintiff's Discovery Responses") at pp. 17-18.*

RESPONSE:

       **Admitted.  It is admitted that the Plaintiff's early responses to discovery indicated that only Viers and Krebs were given preferential treatment.  Since the revelations of discovery, it appears that Defendant Miller is a fair comparator to the Plaintiff.  Defendant Miller, who is six (6) years younger than the Plaintiff, stands accused directly of the sexual assault of a female employee of the Defendant University.  The evidence of record strongly suggests that the Defendant University sat on this claim, took no meaningful action about this claim for over five (5) months, and, then, upon the insistent call of former employee,**

**Patricia Maurer, alerted Defendant Miller and Mr. Plante about Ms. Maurer's claim that**

**Defendant Miller sexually assaulting Ms. Maurer, and then buried the issue.  Defendant**

**Miller testified that he has never been investigated by anyone at the Defendant University**

**for allegations of sexual harassment made by any current or former female Duquesne**

**University employee.  (Deposition of James Miller ("Miller depo"), p. 18, Appx032).**

203.    Plaintiff asserts that the "entire environment was toxic" in the Advancement Division. *Ex. 4, Plaintiff Tr. 350:1-2.*

RESPONSE:

    **Admitted.**

204.    This was due to "[e]mployees . . . leaving in droves and [being] frustrated with the management policies." *Ex. 4, Plaintiff Tr. 235:23-236:5.*

RESPONSE:

    **Admitted.**

205.    David Jakielo, Lisa Sciullo, Natalie Taylor, Lauren Wiater, Rick Creehan, and John Plante were the employees that Plaintiff recalled "leaving in droves."

RESPONSE:

    **Admitted.**

206.    The individuals named were the following ages when they left the University (date of separation from employment in parentheses):

a.    Natalie Taylor – 39 years old (May 14, 2019) – 23 years younger than Plaintiff at separation from employment;

b.    Lisa Sciullo – 53 years old (Dec. 2, 2019) – 9 years younger than Plaintiff;

c.    Rick Creehan – 66 years old (Dec. 31, 2020) – 4 years older than Plaintiff;

d.    John Plante – 59 years old (Apr. 26, 2021) – 3 years younger than Plaintiff;

e.      Lauren Wiater – 31 years old (May 13, 2022) – 31 years younger than Plaintiff;

f.      David Jakielo – 39 years old (June 7, 2022) – 23 years younger than Plaintiff.

*Ex. 59, Declaration of Ryan Dawson ("Dawson Decl.") ¶¶ 3-4.*

RESPONSE:

**Admitted.**

207.    Taylor, Sciullo, Creehan, and Plante left the University before Miller's appointment to the Vice President role and did not report to him. *See Ex. 1, Miller Decl. ¶ 3 (noting interim appointment in July 2021); Ex. 59, Dawson Decl. ¶ 4 (noting dates of separation from employment prior to Miller's interim appointment in July 2021).*

RESPONSE:

**Admitted.**

208.    Krebs, who Plaintiff asserts is a younger employee who received better treatment, has also left the University, stating that she was looking for "additional responsibilities" elsewhere. *Ex. 22, Krebs Tr. 9:2-11:1; see also Ex. 58, Plaintiff's Discovery Responses at pp. 17-18.*

RESPONSE:

**Admitted.  By way of further response, the Defendants have offered no evidence to suggest why Ms. Krebs' decision to leave her employment at the Defendant University is relevant to the any claims in this action.**

**B.      *Additional Facts that Do Not Appear in Defendants' Filing***

I.      The *McDonnell Douglas* Test

The following facts support the Plaintiff's contention that this case tracks the *McDonnell Douglas* test for indirect proof of discrimination and, therefore, should be submitted to a fact finder.

### A. The *Prima Facie* Case[7]

***The Plaintiff was Qualified for His Position, and was Performing His Job in a Satisfactory or Better Manner When Terminated***

209.    The Plaintiff was named Gift Officer of the Year in 2019/2020.  (Plaintiff depo, p. 68, Appx035).

210.    The Plaintiff received special training while employed by the Defendant University in order to work closely with planned giving prospects.  (Plaintiff depo, pp. 37-38, Appx033-034).

211.    The president of the Defendant University believed that the Plaintiff was a good, successful fundraiser.  (Gormley depo, pp. 26-27, Appx014).

212.    The provost of the Defendant University was very impressed with the Plaintiff's rapport with donors, and was well liked by them. (Dausey depo, p. 90, Appx314).

213.    The Plaintiff was a "exceptionally talented, hard-working, honest, highly skilled, successful gift officer" who was well liked by his donors.  He had a strong command of the issues that face a gift officer in pursuit of donations.  (Creehan Aff, para. 4, Appx124).

***The Plaintiff was Treated Less Favorably than Similarly Situated Younger Employees***

　　1.   Melissa Krebs[8]

214.    Donor A was a long-time cultivation prospect of the Plaintiff from whom the Plaintiff was attempting to cultivate a donation of $250,000 or more.  (Plaintiff depo, pp. 101-102, Appx037-038; Plaintiff Aff, para. 27, Appx139).

---

[7] There is no dispute in the record that the Plaintiff was involuntarily terminated from his position with the Defendant, and that he was in the protected class at that time.

[8] **It is undisputed that the Plaintiff is approximately fifteen (15) years older than Ms. Krebs. (*See* Defendant's Answer to Plaintiff's Interrogatory 19, Appx301-302).**

215.     Defendant Miller undertook a portfolio reorganization in 2022.  Defendant Miller failed to communicate the reassignments that resulted from the reorganization to the advancement team, including to the Plaintiff, Ms. Dean and Mr. Demilio, who was not consulted about the reassignments, despite the fact that he was routinely consulted about reassignments.  (Dean depo, pp. 74, 75, 91, 98-99, Appx054-056, Plaintiff depo, pp. 148-149, Appx046).

216.     The donors that Defendant Miller reassigned to the Plaintiff were mostly "dead, demented," or did not respond to multiple previous attempts at solicitation.  The Plaintiff did not gain any new, viable prospects as a result of the reassignments made by Defendant Miller. (Plaintiff depo, p. 146, Appx046, Dean depo, p. 54, Appx051).

217.     Plaintiff protested to Defendant Miller that Donor A was taken away from him after the Plaintiff was in the process of obtaining a large donation from him.  (Plaintiff depo, pp. 144-145. 223, Appx045).

218.     Ms. Dean believes that Ms. Krebs was treated more favorably than the Plaintiff through the reassignments made by Defendant Miller.  (Dean depo, p. 113, Appx058).

219.     Ms. Krebs made false, misleading statements to Donor A during her solicitation of him. Ms. Krebs told the donor that the Plaintiff had "shared some of Donor A's thoughts" on his donation intentions with Ms. Krebs.  This statement was untrue, and constituted a falsification of records of the Defendant University.  (Plaintiff depo, pp. 105-106, 110, 119, Appx038-040, 042).

220.     The Plaintiff filed a complaint with the Defendant University's human resources department regarding the false statements and falsification of records. (See Defendant's Exhibit 14).

221.     During his cultivation of Donor A, the Plaintiff was provided with confidential information from the donor regarding his personal assets, his retirement portfolios and his desire

to donate the proceeds of a real estate sale, which the donor asked the Plaintiff to keep confidential.  Because of the donor's request for confidentiality, the Plaintiff withheld that request for confidentiality from his contact reports.  Notably, the donor refused to share that confidential information with Ms. Krebs.  (*See* Defendant's Exhibit 14 at p. 3, Pl. Bates number PL 0066.  *See also*, Plaintiff's response to Defendant's factual allegations at Paragraph 74, *supra*, and Plaintiff depo, p. 117, Appx041, and Plaintiff Aff, para. 30, Appx140).

222.    Plaintiff asserted that Ms. Krebs claim that she and Plaintiff discussed Donor A's information violated the confidentiality that the Plaintiff had promised to Donor A.  (Plaintiff depo, p. 118, Appx042).

223.    The Plaintiff's immediate supervisor believed that Ms. Krebs' claims to Donor A were "misleading."  Ms. Dean had a "genuine concern" that Ms. Krebs' conduct deceived the donor. (Dean depo, pp. 51-52, 121, Appx050, 059).

224.    Defendant Miller became angry with the Plaintiff over the Plaintiff's concerns over Ms. Krebs' conduct with Donor A, and told the Plaintiff that Ms. Krebs had done nothing wrong. (Plaintiff depo, p. 134, Appx043).

225.    Ms. Krebs was credited with a $50,000 gift from this donor.  Her actions likely cost the Defendant University $200,000 or more.  (Plaintiff depo, pp. 101-102, 120, Appx037-038, 042).

226.    The Defendant University assigned the decision on the Plaintiff's grievance to a person who had no responsibility in the advancement division, and had no significant experience in advancement.  This decisionmaker was unaware of the procedures and best practices related to donor reassignments.  (Dausey depo, pp. 6, 13, 31, Appx008-010).

227.    This decisionmaker found that Ms. Krebs conduct toward the donor was "misleading." (Dausey depo, pp. 43, 58-59, Appx313).

228.     Notwithstanding that Ms. Dean and Provost Dausey found Ms. Krebs' actions to have

been misleading to the Donor, and notwithstanding that Ms. Krebs had likely left $200,000 or

more "on the table," and, therefore, not available to the Defendant University; Ms. Krebs

received no discipline whatsoever.  (Dausey depo, pp. 55-56, 62, Appx315-316).

      2.     Defendant James Miller.[9]

229.     On or about October 12, 2007, Defendant Miller sexually assaulted an employee of the

Defendant University, Patricia Maurer, at a University function, by rubbing his hand along her

breast, without Ms. Maurer's consent.  Defendant Miller's sexual assault of this employee

shocked and humiliated her.  (Affidavit of Patricia Maurer ("Maurer Aff"), paras. 1-3, Appx118-

119).

230.     Because of economic hardship, Ms. Maurer was unable to immediately resign her

position.  She did, however, begin attempting to secure another position within a short time after

she was sexually assaulted by Defendant Miller.  (Maurer Aff, para. 3, Appx118-119).

231.     While Ms. Maurer was attempting to obtain employment that would meet her economic

needs, Defendant Miller promoted a woman in the advancement division to a position that she

did not deserve.  (Maurer Aff, para. 4, Appx119).

232.     It was a common belief among employees of the advancement division that Defendant

Miller was having a sexual relationship with the woman that he promoted.  At the time that

Defendant Miller promoted the aforementioned female employee, Ms. Maurer and other female

employees of the Defendant University had made their donation goals, while the woman who

_____

[9] **It is undisputed that the Plaintiff is approximately six (6) years older than Defendant
Miller.  (See Defendants' Answer to Plaintiff's Interrogatory 19, Appx301-302).**

was rumored to be having the affair with Defendant Miller had not.  (Maurer Aff, para. 4, Appx119).

233.    Because Ms. Maurer suffered a sexual assault from Defendant Miller, and because she was passed over for a promotion given to a woman who was commonly believed to be having a sexual affair with Defendant Miller, Ms. Maurer resigned her employment with the Defendant University on or about April 2, 2008. (Maurer Aff, paras. 3-5, Appx118-119).

234.    On or about October 12, 2021, some thirteen (13) years after she left the employment of the Defendant University, Ms. Maurer learned that Defendant Miller was to be promoted to a senior position in the Defendant University's advancement division.  As a result, Ms. Maurer contacted the Defendant University's general counsel, Pamela Connelly, and reported Defendant Miller's sexual assault.  Ms. Connelly promised Ms. Maurer that she would take prompt action on her report.   (Maurer Aff, para. 6, Appx120).

235.    After almost five (5) months with no word from Ms. Connelly, Ms. Maurer attempted to contact her.  On or about March 2, 2022, Ms. Maurer spoke with Ms. Connelly's assistant and inquired about the progress of the investigation.  Ms. Maurer was promised a timely response to her inquiry.  (Maurer Aff, para. 7, Appx120).

236.    On the day after Ms. Maurer contacted Ms. Connelly's office, Defendant Miller reviewed Ms. Maurer's LinkedIn profile.  At that time, Ms. Maurer had had no contact with Mr. Miller for almost thirteen (13) years.  Defendant Miller claimed, untruthfully, that he was on Ms. Maurer's LinkedIn page because she visited his page first.  Defendant Miller also claimed, untruthfully, that he and Ms. Maurer had a connection related to Ms. Maurer's employment at Animal Friends, and that he was checking in to see what Ms. Maurer's career path was at that point.  Thus, Defendant Miller would maintain that it was a coincidence that he looked at her social media

within twenty-four (24) hours of Ms. Maurer calling Ms. Connelly.  (Maurer Aff, para. 8, Appx120, Miller depo, p. 9, Appx062).

237.  On the same day, March 3, 2022, by way of a second coincidence, John Plante, a former senior vice president for the Defendant University, requested to join Ms. Maurer's LinkedIn page.  At that time, Ms. Maurer had had no contact with either Mr. Plante or Defendant Miller for thirteen (13) years. (Maurer Aff, para. 8, Appx120).

238.    On March 3, 2022, after both men had sought her out through social media, and being fearful for her safety, Ms. Maurer again contacted Ms. Connelly's office to inform her of these contacts.  (Maurer Aff, para. 9, Appx120-121).

239.    On March 16, 2022, over twenty-two (22) weeks after Ms. Maurer reported Defendant Miller's sexual assault, Ms. Connelly finally contacted Ms. Maurer and told her that the matter involving Defendant Miller had been "taken care of."  Ms. Connelly was dismissive of Ms. Maurer's complaint that Defendant Miller and Mr. Plante had made contact with her through social media.  Ms. Connelly, like Defendant Miller, suggested that those two (2) contacts, occurring thirteen (13) years after the last contact between the three (3)  persons, and occurring within twenty-four (24) hours of Ms. Maurer's call to Ms. Connelly, were two (2) coincidences that happened to occur on the same day.  (Maurer Aff, para. 10, Appx121).

240.    On or about September 22, 2022, Ms. Maurer initiated a telephone conversation with Bernadette Krueger, to inquire of her about the numerous incidents of sexual misconduct by Defendant Miller about which Ms. Maurer had been informed as she investigated Defendant Miller.  Ms. Maurer turned to Ms. Krueger for information because Ms. Krueger was a long time employee of the Defendant University who was  universally respected at the Defendant University for her wisdom and compassion.  During that conversation, Ms. Krueger told Ms.

Maurer that, sometime in 2005 to 2008, Defendant Miller approached Ms. Krueger and told her that a female employee of the Defendant University, Ms. Y, had filed a claim of sexual harassment against him.  Defendant Miller told Ms. Krueger that, because Ms. Y had accused him of sexually harassing her, he was fearful of the impact that such a claim would have on him, both personally and professionally.  Ms. Krueger also told Ms. Maurer that Defendant Miller had sworn her to secrecy about Ms. Y's claim.  (Maurer Aff, para. 11, Appx121-122).

241.  During that same conversation, Ms. Krueger told Ms. Maurer that she had been approached by another female employee of the Defendant University, Ms. Z, who said that she was attending a University event with Defendant Miller, at which time he made an attempt to touch her breast, causing Ms. Z to jump up and loudly complain about Defendant Miller's attempted sexual assault.  (Maurer Aff, para. 12, Appx122).

242.  Defendant Miller testified that he never sexually assaulted Ms. Maurer.  (Miller depo, p. 6, Appx061).

243.  Defendant Miller testified that he does not know why Ms. Maurer resigned from employment with the Defendant University.  She was his direct report.  (Miller depo, p. 6, Appx061).

244.  Defendant Miller claims that he was never told about Ms. Maurer's complaint against him for sexual assault.  (Miller depo, p. 9, Appx062).

245.  Defendant Miller denied being charged with sexual harassment by Ms. Y.  He further denied discussing Ms. Y's charges against him with Ms. Krueger.  (Miller depo, pp. 11-12, Appx062).

246.    Defendant Miller testified that he has never been investigated by the Defendant University for any claims involving sexual harassment, including those of Ms. Maurer, Ms. Y or Ms. Z. (Miller depo, p. 18, Appx064).

247.    Defendant Miller testified that the Defendant University has a policy prohibiting sexual assault and sexual harassment which applies to all university employees.  (Miller depo, pp. 15-16, Appx063).

248.    Defendant Miller testified that the Defendant University's policy against assault and harassment calls for discipline up to and including termination.  (Miller depo, pp. 15-16, Appx063).

249.    Defendant Miller testified that the Defendant University has a zero tolerance policy for sexual assault and sexual harassment, and that the policy is strictly adhered to.  (Miller depo, pp. 18-19, Appx064).

250.    Defendant Miller testified that any university employee who engages in sexual assault should be terminated.  (Miller depo, pp. 16-17, Appx063-064).

251.    Defendant Miller testified that he has never been disciplined as a result of charges of sexual assault being made against him by Ms. Maurer. (Miller depo, p. 8, Appx061).

### B.  The Defendant University's "Legitimate" Reasons for Termination

252.    Plaintiff's termination letter, dated August 17, 2022, signed by Defendant Miller, indicated that the principle reason for Plaintiff's termination is the seven (7) figure donation that the Plaintiff obtained from the Donor Couple.[10]  The letter also alleged that "(the Plaintiff's) conduct on more than one occasion has caused internal constituents, senior University leaders, to

---

[10] It is undisputed that Defendant Miller made the decision to terminate the Plaintiff.  (Gormley depo, p. 22, Appx318).

raise serious concerns with (the Plaintiff's) performance and professional judgment" causing Defendant Miller to "(lose) faith in (the Plaintiff's) professional judgment and . . . abilities." Defendant Miller listed those incidents which were also considered in the decision to terminate the Plaintiff, and included:

    \*    "egregious" behavior underlying the Plaintiff's 2019 formal discipline; and

    \*    refusal to correct errors with "donors" in 2021 and 2022.

(Duquesne Bates numbers 00013-00014, Appx299-300).

253.    The above-described termination letter followed a memorandum prepared by the Defendant University's president, Kenneth Gormley regarding the Plaintiff's alleged failure to follow University policy, as well as general concerns that Mr. Gormley claimed to have regarding the Plaintiff's performance.[11]  In addition to commenting on the alleged policy violations by the Plaintiff involving the significant seven  (7) figure donation by the Donor Couple, Mr. Gormley mentioned the Plaintiff's 2019 discipline for what Mr. Gormley believed was a "terminable offense," as well the incident briefly mentioned in the termination letter related to "alleged" errors by the Plaintiff in 2021 and 2022.  Mr. Gormley also mentioned an incident which had occurred in early 2022 involving the Plaintiff being a victim of a random attack while cultivating a donation in Texas.  (Plaintiff's Bates numbers 0357-0363, Appx292-298).

### C.  Pretext

The following evidence demonstrates that the Defendant University's proffered reasons for the termination of the Plaintiff are not worthy of belief, and thus pretextual.

---

[11] Mr. Gormley admitted that he played a role in the decision to terminate the Plaintiff by preparing the memorandum described in this paragraph and delivering it to Ms. Clay, who presumably shared it with Defendant Miller.  (Gormley depo, pp. 22-23, Appx318).

254.     Dr. Richard Creehan is a former employee of the Defendant University, who, prior to his retirement, had the responsibility to manage gift officers of the Defendant University, including the Plaintiff.  In 2016[12], shortly after beginning his employment with the Defendant University, Dr. Creehan had a conversation with Defendant Miller about the Plaintiff.  At that time, Defendant Miller described the Plaintiff as a "moron" and a "buffoon."  Deciding to see for himself, Dr. Creehan began working directly with the Plaintiff.  Contrary to Defendant Miller's claims, Dr. Creehan determined that the Plaintiff was a "talented gift officer with a strong command of the issues that faced a gift officer" pursuing donations.  Dr. Creehan also found that the Plaintiff's donors liked and trusted the Plaintiff, and that the Plaintiff was "talented, hard-working, honest, highly skilled and successful."  For those reasons, Dr. Creehan named the Plaintiff Gift Officer of the Year for 2019/2020.  (Creehan Aff, paras. 1-4, Appx123-124).

255.     Heather Clay, who was two steps above the Plaintiff in his chain of command, told the Plaintiff that he was an outstanding gift officer.  She also told the Plaintiff that she would not personally agree to fire him, and that, if the Plaintiff were to be fired, he would have a legal claim against the Defendant University. (Plaintiff depo, p. 343, Appx078).

***The Alleged Policy Violations by the Plaintiff Related to the Seven Figure Donation from the Donor Couple***

*Plaintiff's Role*

256.     During the Plaintiff's employment with the Defendant University, the Plaintiff received training on his role in the donation acceptance process.  The Plaintiff received that training from Mr. Plante, Dr. Creehan, Defendant Miller, Ms. Dean and Ms. Hughes.  (Plaintiff Aff, para. 6, Appx131-132).

---

[12] *I.e.,* six (6) years before Defendant Miller fired the Plaintiff.

257.    The Plaintiff's duty in a planned gift donation was to:

    *  obtain a commitment from the donor;

    *  obtain documentation from the donor evidencing the ability to make the gift; and

    *  turn over all documentation to Ms. Hughes and Ms. Dean for further processing.

Once the Plaintiff had accomplished these tasks, he had no further duty whatsoever related to the processing of the donation or its submission for approval to the gift committee or the President. (Plaintiff Aff, para. 6, Appx131-132).  As the gift officer, Plaintiff had no duty to determine whether or when his supervisors would take the matter to the gift committee.  (Plaintiff depo, 308, Appx072).

258.    Plaintiff cultivated a seven (7) figure donation from the Donor Couple.  He began discussing possible naming rights with the Donor Couple by the second visit, because it was completely appropriate for him to discuss all possible options with the donors, including possible naming options.  (Plaintiff depo, pp. 293, 302, Appx070-071).

259.    The Plaintiff reported to his supervisors Ms. Hughes and Ms. Dean about the details of the proposed gift as the gift cultivation proceeded.  The Plaintiff told Ms. Dean about the proposed naming rights the first time he discussed the proposed donation with her.  (Plaintiff depo, pp. 312, 333, Appx075, Dean depo, p. 129, Appx082).   As the cultivation proceeded, the Plaintiff also reported to Defendant Miller that the Donor Couple was contemplating a "Pledge" which means a revocable gift.  The Plaintiff also informed Defendant Miller that the gift was a "planned gift," which tends to mean that the gift is revocable.  (Dean depo, pp. 145-146, Appx086-087).

260.   Once Ms. Hughes prepared the DSCI for this donation, Ms. Hughes indicated to the Plaintiff that he should show the DSCI to the Donor Couple.  (Dean depo Exhibit 19, Defendants' Bates number 00513, Appx288).

261.   After Ms. Hughes prepared the DSCI, Ms. Dean directed the Plaintiff  to meet with the Donor Couple, have a celebratory dinner, and have the Donor Couple sign the DSCI. (Plaintiff Aff, para. 29, Appx140).

262.   Prior to traveling to the Donor Couple to obtain their signature on the DSCI, the Plaintiff sent an email dated June 19, 2022, to the Donor Couple reminding them that their proposed gift had to be approved by gift committee. "***The next step is for me to go before DU's naming committee and present a formal request to name the media center.***"[13] (Defendants' Exhibit 43, Bates number 00406)(Emphasis supplied).  Notwithstanding this email, and its language, Defendant Miller contended that the Plaintiff offered naming rights for this donation without approval of the committee.  Defendant Miller claimed no knowledge of the above email. (Miller depo, pp. 27-28, Appx106).

263.   When the Plaintiff presented the DSCI to the Donor Couple, it did not bear Ms. Dean's signature or any other signature on behalf of the Defendant university. (Plaintiff Aff, para. 4, Appx131).

264.   Notwithstanding the Defendants' unsupported claim in their brief that the Donor's Couple's gift was "pushed through" without approval from the committee (Defendants' Brief at p. 4), the Plaintiff took no steps to push the donation through without proper approval.  The

---

[13] **While the Plaintiff does not have a specific recollection that he told the Donor Couple orally that the gift had to be approved by the committee, it would have been the Plaintiff's normal practice to do so, as he would never have introduced the approval requirement in an email without first having discussed it with them.  (Plaintiff Aff, para. 12, Appx134).**

Plaintiff had no motive to take any action that would endanger his receiving credit for this very large donation. (Plaintiff Aff, para. 15, Appx135).

265.    Notwithstanding the Defendants' unsupported claim at paragraph 160 that Ms. Clay said that the Plaintiff was in serious trouble, the Plaintiff was never told by anyone that he was in any trouble for this significant seven figure gift.  (Plaintiff Aff, para. 9, Appx133).

*Ms. Hughes' Role*

266.    For the purposes of administering the Donor Couples' gift, Ms. Hughes acted as the Plaintiff's supervisor. (Plaintiff depo, pp. 99, 200-201, 312, Appx065, 067, 073, Plaintiff Aff, para. 24, Appx139).

267.    The Plaintiff was trained that Ms. Hughes was responsible to prepare the documentation for submission to the gift committee (i.e. the DSCI), and, after approval by the committee, to prepare the final gift agreement for signature by the parties. The Plaintiff had no role in the preparation of the gift documentation.  (Plaintiff Aff, para. 6, Appx131-132, Plaintiff depo p. 99, Appx065, Miller Depo. p. 31, Appx107).

268.    Ms. Hughes prepared the DSCI.[14] (Dean Depo. pp. 136-137, 159-160, Appx084, 089). **The Plaintiff never requested Ms. Hughes to prepare the DSCI.[15]**  (Plaintiff Aff, paras. 5, 13, Appx131,134).  She also reminded the Plaintiff that the donation had to be approved by the committee.  (Dean depo, pp. 159-160, Appx089).

---

[14] **The University President erroneously believed that Plaintiff prepared the DSCI for this donor.  (Gormley Depo. p. 56, Appx319).**

[15] **Plaintiff was completely unaware that Ms. Hughes was preparing the DSCI until he received the email dated May 13, 2022. (*See* Defendants' Exhibit 42).**

*Ms. Dean's Role*

269.    The Plaintiff was trained that Ms. Dean had the responsibility to present the proposed

gift, including gifts involving naming rights, to the gift committee and, if necessary, to the

President of the Defendant University.  The Plaintiff had no role in presenting the proposed gift

to either the Gift Acceptance Committee or the President.  (Plaintiff Aff, para. 6, Appx131-132).

270.    The Plaintiff played no role in the decision by Ms. Dean to sign the DSCI.  ***The Plaintiff***

***certainly never "arranged" for Ms. Dean to sign the DSCI.***  In fact, the Plaintiff did not know

that the DSCI had been signed until long after Ms. Dean had done so.  (Plaintiff Aff, paras. 3, 14,

Appx130, 134-135).

271.    Ms. Dean informed Defendant Miller on numerous occasions between July and

November of 2021 about the proposed revocable naming rights gift by the Donor Couple.  (Dean

depo, pp. 129-130, Appx082-083).  Ms. Dean specifically told Defendant Miller that the Donor

Couple was seeking naming rights for the media center in exchange for a revocable seven (7)

figure donation.[16]  (Dean depo, p. 131-134, Appx084).

*The Naming Rights Policy and the Gift Committee*

272.    With respect to the donation by the Donor Couple, Defendant Miller was made fully

aware of all relevant aspects of the donation as the gift was being cultivated.  Defendant Miller

knew:

> *        That the gift involved at least a $1.5 million dollar donation;
>
> *        That the donors would likely increase their donation to more than three (3) times
>          the original amount;
>
> *        That the gift included naming rights for the CEIM; and
>
> *        That the gift was revocable.

---

[16] Ms. Dean testified that 90 percent of all gifts are revocable. (Dean depo, p. 132, Appx083).

(Plaintiff Aff, para. 8, Appx132-133).

273.    Defendant Miller was a member of the Gift Acceptance Committee when Ms. Dean

informed him about the nature of the donation from the Donor Couple.  (Miller depo, p. 26,

Appx106).

274.    At no time during the solicitation of this gift was the Plaintiff informed that he should

handle the donation any differently than he had been handling it.  (Plaintiff Aff, para. 8,

Appx132-133).

275.    Despite the existence of the naming rights policy, when a seven (7) figure donation is

contemplated, that level of donation is exceedingly rare, sought after and coveted.  (Plaintiff Aff,

paras. 10-11, Appx133-134).

276.    Dr. Creehan was highly experienced in the field of donation cultivation, and was highly

conversant with best practices in the cultivation field.  (Creehan Aff, para. 1, Appx123).

277.    In Dr. Creehan's experience at the Defendant university, Dr. Creehan observed that:

*    Although the naming rights policy requires that a naming rights gift is supposed
     to be submitted to the gift committee, Dr. Creehan has ***never presented a
     proposed gift to the gift committee.***  In fact, Dr. Creehan did not even know that
     the gift committee existed, or who was on it.  (Creehan Aff, para. 8, Appx126).

*    No gift officer has ever been called upon to present a proposed gift to gift
     committee or the President of the Defendant University.  (Miller depo, pp. 25-26,
     Appx106; Creehan Aff, para. 8, Appx126).

*    Many of the naming rights gifts that were approved were for significantly less
     than the policy called for.  (Miller depo, pp. 25-26, Appx106; Creehan Aff, para.
     8, Appx126).

*    Almost every donation obtained by a gift officer under him was revocable.  The
     revocability portion of the naming rights policy was not enforced at all.  (Creehan
     Aff, para. 8, Appx126).

278.    Dr. Creehan was presented with a hypothetical situation that exactly matched the facts related to the Donor Couple's donation.  (Creehan Aff, para. 10, Appx127-128).

279.    As a result of reviewing a hypothetical which is virtually identical to the facts of this case, with respect to the Plaintiff's conduct in this solicitation, Dr. Creehan reached the following conclusions:

> *        *The gift officer's actions did not violate any practice or procedure of the university;*
>
> *        *The gift officer's conduct in securing such a significant gift is precisely the kind of action encouraged by the Defendant University;*
>
> *        *The gift officer's following the directions of his supervisors was entirely proper;*
>
> *        *The fact that the gift officer advised the donors that the gift could not be finalized until it was approved by the committee was entirely proper; and*
>
> *        *The fact that the gift officer kept his supervisors advised about the details of the gift as the cultivation proceeded was entirely proper;*
>
> *        *Nothing in the hypothetical that tracked the facts in this case should have subjected the Plaintiff to any discipline whatsoever.*  (Creehan Aff, para. 10, Appx127-128).[17]

280.    The Plaintiff cooperated in the investigation into the Donor Couple's gift to the best of his ability.  In the interview that he gave to the Defendant University's human resources representative, the Plaintiff cooperated to the best of his ability.  During the interview, the Plaintiff's wife called him from the hospital with very difficult health news.  Because she was distraught and asked the Plaintiff to come to take her home, the Plaintiff hastily explained the

---

[17] The Plaintiff has indicated that, after reviewing the policies and procedures upon which Dr. Creehan relied in giving his opinion about the actions of the gift officer in the hypothetical, those policies and procedures remained the same after Dr. Creehan's departure from the Defendant university. (Plaintiff Aff, para. 31, Appx140-141).

situation and excused himself from the interview to hurry to be with his wife.  (Plaintiff Aff, para. 28, Appx139-140).

### *The Alleged "Egregious Sexual Misconduct" of the Plaintiff Compared to the Actual Sexual Misconduct of Defendant Miller*

281.    Three (3) years before the Plaintiff was fired, he was disciplined for sending an inappropriate text to the Defendant University's Provost showing a woman in a bikini accompanied by a light hearted salutation.  (Plaintiff depo, pp. 70-76, Appx097-098).

282.    Dr. Creehan did not consider the text to be offensive.  (Creehan Aff, para. 5, Appx124-125).

283.    Ms. Dean did not find the text offensive.  (Dean depo, pp. 21-24, Appx101-102).

284.    The Provost who received the text did not find it particularly offensive.  (Creehan Aff, para. 5, Appx124-125). In fact, the Provost would not have even reported the matter except that his administrative assistant, who is female, saw the text and was offended.  (Creehan Aff, para. 5, Appx124-125).

285.    The Provost felt terrible that the matter had gone as far as the Plaintiff being punished.  (Creehan Aff, para. 5, Appx124-125).

286.    Both the Provost and Dr. Creehan felt that there was no need to punish the Plaintiff over this incident.  (Creehan Aff, para. 5, Appx124-125).  Dr. Creehan described the allegation that this conduct was "egregious" as "absurd" and "ridiculous."  (Creehan Aff, para. 5, Appx124-125).

287.    By contrast, in his memorandum condemning the Plaintiff and his actions, the Defendant university's president described this incident as a "potentially terminable offense."  (Plaintiff's Bates numbers 0357-0363, Appx292-298).

288.    The President's memorandum went on to say that this incident "violated university policy, (was) contrary to personal and institutional values, and reflected exceedingly poor judgment. (Plaintiff's Bates number 0358, Appx293).

289.    There is nothing in the record of this case that demonstrates the University President decrying the sexual assault of Ms. Maurer by Defendant Miller.

290.    There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. W by Defendant Miller.

291.    There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. Y by Defendant Miller.

292.    There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. Z by Defendant Miller.

293.    In July of 2010, the Defendant University's President was the object of a civil lawsuit filed in the United States District Court for the Western District of Pennsylvania.  (See Complaint filed at CA no. 2:10-cv-00981-AJS. ("Stewart Complaint"), Appx265-286).

294.    In that action, the Defendant University's now President was accused of sexual harassment of a female employee.  (Stewart Complaint, Appx265-286).

295.    After an internal investigation, the finding was "that Professor Gormley had subjected (the Plaintiff) to sexual harassment and a hostile work environment."  (Stewart Complaint, p. 6, para. 37, Appx270).

296.    Shortly after the filing of a state agency claim of discrimination by the plaintiff in that case, Mr. Gormley was promoted to Vice President of Interdisciplinary Studies.  (Stewart Complaint, p. 7, para. 44, Appx271).

297.    The Stewart Complaint is replete with accusations against the Defendant University's president of retaliatory. (Stewart Complaint, paras. 44, 54, 115, Appx271, 272, 278).

298.    The docket in the *Stewart* case shows that the matter was resolved by an out-of-court settlement.  (Appx256-264).

299.    In late 2014, the Defendant University's President was again named in a lawsuit filed against the Defendant university and Mr. Gormley in a 100 page, 616 paragraph, 9 count complaint alleging that Mr. Gormley engaged in "systemic and vicious discrimination" against that plaintiff "on the basis of her age, ***gender*** and religious scholarship.  (See Complaint filed at CA 2:14-cv-01489-CB ("Haskell Complaint"), Appx158-255).

300.    While the *Haskell* case was still pending, Mr. Gormley was promoted to President of the Defendant University. (Gormley depo, p. 5, Appx317).

301.    Like the Stewart case, the Haskell Complaint was settled out-of-court in the year following Mr. Gormley's promotion to president of the Defendant University. (Haskell docket entries, Appx149-157).

302.    There is no record of discipline against Mr. Gormley for either of the above discrimination claims.

303.    There is no record of any investigation or discipline of Defendant Miller related to Ms. Maurer, Ms. W[18], Ms. Y or Ms. Z.  The only record of any investigation or discipline in this case is against the Plaintiff for his "egregious sexual misconduct," which Mr. Gormley said were "contrary to personal and institutional values."  Mr. Gormley did not say whose personal values he was referring to.  (Plaintiff's Bates numbers 0357-0363, Appx292-298).

---

[18] **In 2021, Plaintiff was on a Zoom meeting with various employees of the Defendant university, including Defendant Miller and Ms. W.  During that meeting, Defendant Miller** intimated that he had fathered children with Ms. W.  Both Ms. W and other participants in the meeting were shocked.  (Plaintiff Aff, para. 32, Appx140-141).  *See, also*, Footnote 11, *supra*.

***The Math Error that the Plaintiff Did Not Commit***

304.    In 2019, Plaintiff cultivated a significant seven (7) figure donation from Donors B and C. (Plaintiff Aff, para. 16, Appx135-136).

305.    Plaintiff kept the nursing school Dean apprised of the cultivation throughout  the period January to May, 2019.  (Plaintiff Aff, para. 16, Appx135-136).

306.    The donation was a hybrid gift, and was exceedingly complex, with funds coming from various sources on different dates, and with intricate tax considerations.  The complexity of the donation led to a math error being committed by Ms. Hughes.  (Plaintiff Aff, para. 18, Appx136-137).  The error was missed by Ms. Hughes, Ms. Dean, Dr. Creehan, Defendant Miller and Plaintiff.  (Plaintiff Aff, para. 18, Appx136-137).

307.    Plaintiff was tasked by Defendant Miller with traveling to California to meet face to face with the donors to explain the error, and to "smooth over" the donors, because of the Plaintiff's strong relationship with the donors.  (Plaintiff Aff, paras. 19-20, Appx137-138).

308.    The Plaintiff was never tasked with "correcting" the math error, but rather with explaining the error to the donors and discussing the solution to the problem.  (Plaintiff Aff, para. 20, Appx138).

309.    Prior to the Plaintiff's meeting with the donors, the Plaintiff met with Ms. Clay.  Ms. Clay told the Plaintiff that the University did not suffer any financial loss from the error, which was corrected by shifting various monies from one donation destination to another.  Ms. Clay did not reprimand the Plaintiff in any way for the error, and did not seem upset by it, nor by the Plaintiff's role in the error.  Ms. Clay instructed the Plaintiff to go to California and "have a nice dinner with Donors B and C," and continue to strengthen the relationship with the donors. (Plaintiff Aff, para. 21, Appx138).

310.    The Plaintiff made multiple attempts to schedule a face to face meeting with the donors[19], but was unable to for a considerable period of time due to the donors being out of the country for an extended period.  (Plaintiff Aff, para. 19, Appx137).

311.    When the Plaintiff was finally able to meet with the donors, neither donor showed any anger, frustration or other negative reaction to the error.  They did not express any problems with the donation, and seemed content with the solution to the error.  The donor relationship was not damaged in any way, and the gift proceeded without interruption.  (Plaintiff Aff, para. 19, Appx137).

312.    The Plaintiff did not receive any discipline for the error by Ms. Hughes, nor for the delay in obtaining a meeting with the donors.  In fact, no one, including Ms. Hughes, Ms. Dean, Dr. Creehan or Defendant Miller were disciplined in any way for any aspect of the donation from Donors B and C.  (Plaintiff Aff, paras. 18, 34, Appx136-137, 141).

313.    No mention of this donation appeared in any performance evaluation of the Plaintiff.  In the Plaintiff's performance review given to him shortly after the donation from Donors B and C closed, the following notations appear:

*    "Bill is well liked within the office, and ***well liked by the donors in his portfolio***"

*    "Handling the California geographical area has demanded someone with the ability to adapt.  ***Bill has filled that role <u>exceptionally well.</u>***"

(Defendants' Bates numbers 0080 to 0085, at pp. 0083 and 0084, Appx146-147) (Emphasis supplied).

---

[19] While the Plaintiff and Defendant Miller discussed the possibility of the Plaintiff meeting the donors in a Zoom meeting, they decided that an in-person meeting was best course of action. (Plaintiff Aff, para. 19, Appx137).

314.    Shortly after the donation from Donors B and C concluded, the Plaintiff was named Gift Officer of the Year.  (Creehan Aff, para. 4, Appx124).

***The Plaintiff was the Victim of Random Violence***

315.    At some point in 2022, while in Texas on a donor cultivation, the Plaintiff was the victim of random violence by an individual whose car the Plaintiff accidentally bumped with his car door in a parking lot where the Plaintiff was scheduled to meet a prospective donor couple.  The individual physically attacked the Plaintiff, who had no opportunity to deescalate the conflict. The police did not charge the Plaintiff with any wrongdoing, and the donors did not witness the altercation.  The Plaintiff reported these facts to Defendant Miller shortly after the incident. (Plaintiff Aff, para. 33, Appx141).

316.    The Plaintiff was not disciplined as a result of this incident.  (Miller depo, pp. 46-47, Appx111).

317.    Nevertheless, in his deposition, Defendant Miller claimed that the Plaintiff's being victimized by this violence somehow showed a "lack of judgment."  Defendant Miller also claimed that the Plaintiff should have "deescalated" the situation, but did not explain how the Plaintiff could have deescalated the situation.  (Miller depo, p. 44, App110).

318.    Mr. Gormley described the Plaintiff's conduct in the parking lot incident as part of a "pattern of misconduct" by the Plaintiff, although:

> \*    He did not know what happened in the incident, and did not know much about it. (Gormley depo, p. 98, Appx321);
>
> \*    He did not know that the Plaintiff was attacked. (*Id*.);
>
> \*    He had no information on whether or not the Plaintiff was at fault in the incident. (Gormley depo, p. 106, Appx322); and
>
> \*    He did not know that the Plaintiff was the victim in the incident. (Gormley depo, pp. 107-108, Appx322).

II.     Retaliation

319.    On May 15, 2022, the Plaintiff made a written claim to the Defendant University's human

resources representative that the actions of Defendant Miller in pursuing the claim that the

Plaintiff violated University policy in the Donor Couple gift constituted age discrimination.

(Richter depo, Exhibit 20, at Appx006).

320.    Defendant Miller denied knowing that he was accused of age discrimination, despite the

fact that the Plaintiff made that written complaint to the Defendant University's human resources

representative.  (Miller depo, pp. 58-59, Appx117).

321.    On July 20, 2022, the Defendant University's human resources representative had a

meeting with Defendant Miller regarding the Plaintiff's allegations after the Plaintiff accused

Defendant Miller of age discrimination.  According to the representative, Mr. Miller declined to

submit a formal rebuttal to the charges leveled by the Plaintiff on May 15, 2022.

(Correspondence from Jefferson Dedrick to the Plaintiff dated July 20, 2022, Defendants' Bates

numbers 00229 to 00237, Appx304-312).

322.    By letter dated August 17, 2022, the Plaintiff was fired twenty-seven (27) days after

Defendant Miller met with the Defendant University's human resources department.

(Defendants' Bates numbers 00013-00014, Appx299-300).

III.    After Acquired Evidence

323.    Ms. Hughes filed suit against these Defendants on October 13, 2023 alleging age

discrimination in her termination.  It is undisputed between the parties that that case is currently

in the process of resolution by out-of-court settlement. (See Hughes' Complaint at Appx018-

031).

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

s/Joel S. Sansone

Joel S. Sansone, Esquire
PA ID No. 41008
Massimo A. Terzigni, Esquire
PA ID No. 317165
Elizabeth A. Tuttle, Esquire
PA ID No. 322888

Two Gateway Center, Suite 1290
603 Stanwix Street
Pittsburgh, Pennsylvania 15222
412.281.9194

Dated:  May 17, 2024