A. I have no answer for that as I sit here.
Q. The [redacted] matter I understand played a role in my client's termination; is that right?
A. It did.
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. It did.
Q. And there was a math error involved in the donation; is that right?
A. Yes, sir.
Q. Who made the math error?
A. I think a shared complicity, if you will. Three folks would be involved in that. Mr. Richter who has no responsibility to provide all the salient details necessary for the person drafting the agreement.
Q. Did that happen?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
A. I would have no knowledge of what specifically Mr. Richter would have advised whoever had drafted that agreement.
Q. So you don't know if that was a mistake on his part or someone else's?

A. I don't know if it was his. I don't know if it's the person drafting. I don't know if it is Mary Frances Dean who drafted, Cecilia Hughes who drafted, and/or Mr. Creehan who signed the agreement, but it went before four sets of eyes and had gone unnoticed.
Q. Did anybody receive any type of discipline for this failure?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. We had ongoing conversations prior to termination and he defied directives to address the matter with the donor, specific conversations with Mr. Richter, at least on three occasions, to address the matter with the donors, to let them know the error had occurred and that the University would, unfortunately for us, would own the error costing the University a $40,000 hit, if you will.
Q. I asked you if anyone was disciplined as a result of this?
A. No.
Q. These types of math errors, like the one we

saw here, are they common errors that occur?
A. No.
Q. Uncommon?
A. Uncommon.
Q. What action did you take when you learned of this error to ensure that it didn't occur again?
A. None that I can recall.
Q. You said that this cost the University $40,000?
A. Yes, sir.
Q. So the University's out of pocket $40,000?
A. Yes.
Q. They weren't reimbursed by having the donation altered so that some of the donation was put into the scholarship involved?
A. Correct.
Q. That didn't happen?
A. That's correct.
Q. And your testimony is that the University had a net loss of $40,000 on that?
A. We had to transfer $40,000 from the general endowment fund into the term scholarship fund to cover the shortfall for that given academic year.

Q. And the number wasn't $70,000?
A. I recall it as $40,000. The math error may have been 70. $30,00 of that was to go to the endowment. $40,000 was fully expendable in that particular academic year on the term scholarship.
Q. And so I understand, you're saying the University was not reimbursed?
A. That's correct.
Q. For those monies?
A. That's correct.
Q. Do you have any idea why the president would say the University was in fact reimbursed for all of it?
MS. McGROGAN: Objection to form. Mischaracterizes testimony. You can respond.
BY MR. SANSONE:
A. I have no idea what his testimony was, so I can't answer that.
Q. Was he involved in this issue, Mr. Gormley?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Perhaps tangentially, he may have had awareness of it.

166

A. **No.**
Q. So, did you reach out to any of those 97 donors?
A. **I don't recall.**
Q. You don't recall meeting with any of the gift officers who had those assignments previously?
A. **No.**
Q. The criteria Mr. Miller lists here in the third paragraph, it starts with "While there were a number of considerations..."
Do you see that?
A. **Uh-huh.**
Q. Are any of these criteria that are listed here related to your age?
A. **No.**
Q. Are they related to any complaints that you had made in the past?
A. **I don't recall that I would have made a complaint about that.**
Q. Are you alleging that the reassignments of these donors was discriminatory?
A. **I don't know.**
Q. You don't know if you're claiming that it's discriminatory?
A. **I don't recall, no.**

167

Q. You don't recall the allegations you're making in this lawsuit?
A. **I guess I'm not understanding your question.**
Q. Let me try this again. You understand that donors were removed from your portfolio sometime prior to March of 2022, correct?
A. **Correct.**
Q. So, that's what I'm referring to as the reallocation. That's the one that's involved here, correct?
A. **Uh-huh.**
Q. Are you claiming that the decision to remove certain donors from your portfolio was made because of your age?
A. **No.**
Q. Are you alleging that the decision to remove certain donors from your portfolio was made because of any prior complaints you made?
A. **No.**
Q. So, you're not alleging that there was anything discriminatory or retaliatory related to the reassignment?
A. **Proper protocol was not followed in this instance and other instances as well. Whether that's discriminatory or not, I don't know the definition of**

168

**"discriminatory."**
Q. What is your understanding of what the definition of "discriminatory" is?
A. **Favoring one person over another.**
Q. And do you believe that that happened with respect to the reallocation?
A. **Yes.**
Q. Who was favored?
A. **Well, Melissa was given one of my top prospects, as just one example of that. There are others. I don't recall the numbers.**
Q. So, it's very important that we get all of that information, so do you recall any others?
A. **No. Not as I sit here, no.**
Q. Is there anything you could look to to help you identify any others?
A. **No.**
Q. So, as you sit here today in the deposition for your federal court lawsuit related to age discrimination, the only person that you believe was favored was Melissa Krebs?
MR. SANSONE: That's not what he said. You're mischaracterizing his testimony. He said he can't recall anyone else as he sits here.
BY MS. McGROGAN:

169

Q. Do you understand that today is the day that you get to tell me everything that you believe happened in this lawsuit?
MR. SANSONE: Today is the day he gets to testify from his memory. That's what you're entitled to and that's what he's giving.
MS. McGROGAN: Yeah, I understand.
BY MS. McGROGAN:
Q. So, you have no other individuals other than Melissa Krebs that you can point to?
A. **I'm sure there are others. I don't recall who they might be as I sit here.**
Q. What could you look at that would help you remember them?
A. **Nothing.**
Q. So, you're not going to come back in a couple days and say, oh, wait, here's another one, correct?
A. **I don't have any way to...**
Q. Do you believe that Melissa Krebs was favored because she is younger than you?
A. **I don't know why she was favored.**
Q. You don't know if it was because she was younger than you?
A. **I don't know.**
Q. Do you know if any of the donors from Melissa

114

**A. Oh, no.**
Q. How many times did that happen?
**A. I have no idea. They were shuffled around constantly.**
Q. So, in the seven years that you were at Duquesne, if my math is correct, was it more than 10, more than 20? What ballpark area are you thinking in terms of how many times --
**A. More than 10. I don't know if more than 20 would be accurate. More than 10, I would say.**
Q. So, this wasn't the first time you had gone through a realignment?
**A. No.**
Q. Each time that donors were added to your portfolio, is it your testimony that you met with the prior gift officer before reaching out to that donor?
**A. I don't recall every instance, but most likely, yes.**
Q. But you don't recall if you did it every time or if you just did it periodically?
**A. My recollection would be that I would have, because they have information on someone I'm trying to cultivate, so I would have -- what do you know of so and so.**
Q. Do you remember ever doing that before?

115

**A. Before when?**
Q. In any of these instances? In any instance, do you remember contacting the prior gift officer.
**A. Yes. I went to Washington.**
MR. SANSONE: I don't even know what she was going to ask.
THE WITNESS: Sorry.
Let me take a break a minute.
MS. McGROGAN: Sure. We're off the record at 1:31.
(Recess.)
BY MS. McGROGAN:
Q. Mr. Richter, is it your testimony that in every instance where donors were reallocated that you met with the prior gift officer before reaching out to the donor?
**A. Every instance would be incorrect. Most likely, yes. It could have happened and I just don't recall it.**
Q. So you don't know, one way or another, if you had or had not?
**A. I would likely have met with the gift officer, because I know my own business practices.**
Q. And other than Adam Novak, do you remember what other gift officers you met with after donors were

116

reallocated?
**A. Probably Butch Bryner, probably Lisa Sciullo, probably Natalie Taylor, possibly Lauren Wiater.**
Q. So, each of these individuals, Butch Bryner, Lisa Sciullo, Natalie Taylor, and Lauren Wiater, each of those individuals were people who donors had been reassigned from their portfolio to your portfolio?
**A. They were no longer at the school; they left, so their portfolio was divided up amongst the remaining gift officers. I would have got some of those people.**
Q. So, when they had left the University, those are the people that you met with? I'm sorry. Let me rephrase that.
When they left the University, that is when their portfolios were reallocated?
**A. Correct.**
Q. You met with them after they left the University or during the time period when they were wrapping things up and leaving?
**A. Wrapping things up.**
Q. So, then you talk about information that you discussed with [redacted] being, quote, unquote, "completely confidential in the preliminary stages."
What was the information that was completely confidential?

117

**A. Point me to that one again.**
Q. We're in the paragraph right below the paragraph we were just reviewing, and it's the first full sentence.
**A. Oh. He was considering at the time selling or donating a parcel of land that he had in the Baltimore area.**
Q. So, it was the information about him selling that land that you're referring to as completely confidential?
**A. Yeah.**
Q. Is there anything else that you were referring to that was completely confidential?
**A. Not that I can recall at this moment. That was the bulk of my discussion.**
Q. And, again, you do not have any notes that you'd be using to refresh your recollection on this?
**A. Huh-uh, no.**
Q. So, you then go on to say that in telling the lie that you allege that she told, "she completely violated the confidentiality of what he and I had discussed."
Do you see that sentence?
**A. I don't. I'm looking for it.**
Q. So, "Thus, when Melissa states 'He has shared

some of your thoughts on these matters with me,' not only is that a lie - but further in telling that lie she completely violated the confidentiality of what he and I had discussed."

**A. Okay.**

Q. Do you see that?

**A. Uh-huh.**

Q. At no time, however, did you actually speak to Melissa Krebs about what she and [redacted] had spoken about, correct?

**A. Correct.**

Q. Had he shared other thoughts with you on what he intended to do?

**A. I don't recall at that time, at the time.**

Q. So, you do not know what she was referring to when she says "on these subjects," correct?

**A. I'm assuming she discussed the sale of that land. I don't know.**

Q. But it's an assumption; you don't know?

**A. (Shaking head side to side.)**

Q. Had [redacted] asked you to keep this information confidential?

**A. I don't recall.**

Q. So, why did you say that it was "completely confidential in the preliminary stages"?

**A. Usually, it is. I don't recall if he specifically stated that. It usually is understood as confidential.**

Q. And is it confidential even within the University?

**A. No.**

Q. So, you could have shared it with other people within the University and it not be a violation of what you understood your confidentiality obligations to be?

**A. When you say "other people in the University...."**

Q. Within advancement.

**A. Within advancement, yes.**

Q. So, then you're saying that one of the ways that she falsified the University records, that refers to the contact report that we just reviewed, correct?

**A. Correct.**

Q. And then "mislead a major/planned giving donor," that refers to the statement that she made in that contact report that you have underlined and bolded; is that correct?

**A. Uh-huh.**

Q. No other statements?

**A. Other statements about what? What do you mean?**

Q. Let's start it this way: "Falsified University

records," that only refers to the contact report, correct?

**A. Yes.**

Q. The "misled a major/planned giving donor," does that only refer to the sentence we just referred to in the contact report?

**A. Yes.**

Q. And then "deceived her colleague," what did she do that deceived you?

**A. She saw one of my donors and lied to that donor about the fact that she had talked to me about it.**

Q. So, same instance?

**A. Uh-huh.**

Q. Same events?

**A. Yeah.**

Q. "...in doing so she shortchanged the University of at least $200,000."

Did I read that correctly?

**A. Yes.**

Q. And am I to understand that that's the difference between your $250,000 discussion with him and then the $50,000 that she got?

**A. Correct.**

Q. So, you call her behavior deliberate, unprofessional, and immoral in the next paragraph.

Do you still believe that her conduct was deliberate, unprofessional, and immoral?

**A. Yes.**

Q. And, again, you do not believe that she took those steps because of your age?

**A. Correct.**

Q. So, you state "This is so much more than just a 'realignment of portfolios.' It cannot be anything but a deliberate undermining of a colleague's efforts by lies and deceptions."

Why did you feel it was so much more than a realignment of portfolios?

**A. She lied to me, she deceived me, she misled me, shortchanged the University. I'm held accountable for fundraising goals. That would have gone in my pile of revenues received. I consider that immoral behavior.**

Q. So, when you are -- is your complaint that the portfolios were realigned or is your complaint that Melissa had reached out to [redacted]?

**A. The fact that she reached out to [redacted]. The portfolios were rearranged without consulting me and utilizing standard business practices to do so.**

Q. So, it's both?

**A. Yes.**

Q. At least in terms of this email to Jim that's

**From:** William Richter
**Sent:** Sunday, May 15, 2022 9:34 PM
**To:** Jefferson Dedrick; Andrea Berestecky
**Subject:** Richter 2nd Complaint Form

Dear Jefferson & Andrea

Attached is your completed complaint form.

Here is my compliant:

It has come to my attention that Melissa Krebs, as authorized by her supervisor (Adam Viers), and by Adam's supervisor (Jim Miller), has been permitted to book a gift from a donor with whom I was working for a number of years to secure a $250,000 Planned Gift. It is my understanding that Melissa has no knowledge of Planned Giving platforms; and at no time did anyone – Melissa, Adam, or Jim even bother to text, call, email or walk down the hall or across the campus to ask me the current status of this relationship. Nor did anyone bother to inform me that this donor was being "reassigned" to Melissa. Instead - as you well know as I have provided written proof of this - Melissa lied to the donor by stating that she had talked to me about the relationship, then lied to University about this by putting this information into a contact report and entered it into our database.

Standard protocol for this type of situation was completely disregarded – in fact, as you are well aware, I have already filed a complaint regarding this incident which is currently in process.

The fact that the University, evidently at the direction of Jim Miller, has insisted that this gift be booked by Melissa for $50,000 renders it all but impossible for me to re-approach the donor and attempt to secure the $250,000 gift we had been discussing – if that particular remedy would have been available to me as a result of the investigation of my previous complaint.

Further, I now understand that Jim sought the advice of other senior administrators regarding his insistence that this gift needed to be immediately booked. Evidently, after discussion with Jim, they sanctioned this action. Where was my voice on this issue? Who stood up for me and indicated that I stood to lose $250,000 worth of gift credit in this instance? And who indicated that the insistence that the gift be booked immediately is complete nonsense? Who looked out for the Universities interest and pointed out that $200,000 may have been lost because of this action? From whose perspective can this possibly be fair?

Is it really necessary to re-iterate how patently absurd it is to have the very person who is the subject of a formal complaint, still under review, be permitted to decide on a course of action directly concerning that complaint - such that the "decision" rendered completely prevents the complainant's ability to apply the years of effort invested to cultivate this gift for perhaps $200,000 more and apply it toward meeting required annual performance metrics?

In point of fact, the Human Resources Office indicated to me in writing that BECAUSE of the inherent conflict of interest, Jim would not be deciding this case! Then why wasn't this guideline followed?

Of additional concern to me is the reality that I now seem to have no recourse to prevent this type of situation from reoccurring; in fact, I understand it already has reoccurred as Melissa is currently contacting and soliciting other donors not currently assigned to her – which yet again completely disregards standard protocol. True to form, it appears she

EXHIBIT 20
Richter
3/4/2024
Lisa A. Bauer, RPR, CRR

lied again by stating that she had discussed this relationship – evidently with a gift officer who hasn't worked here since December of 2019.

I have sent you a copy of an email sent by Melissa that substantiates this act; you have indicated that you will review this. In the meantime, exactly what prevents Melissa from continuing to lie and steal prospects, then have this sanctioned by Jim, while I standby like a damned fool waiting for a process to unfold?

I'd like to have someone please explain to me how this doesn't this make a complete mockery of your complaint process.

I'd would also really appreciate someone at least attempting to explain to me why a "faith based institution" that prides itself on its "Spiritan mission and values" seems to go to great length to protect – even condone – an employee that consistently demonstrates this type of behavior – while under investigation, no less; and even worse, has a SVP go to extraordinary lengths to reward it.

Is it really necessary at a Spiritan institution to have to file 2 complaints (because obviously the first one is being ignored) with Human Resources to explain why it's unethical and unacceptable for employees to lie and steal? And further explain why at the very least, this behavior should be stopped while the matter is investigated?

Evidently so.

Thus I'm filing this complaint.

Additionally, I'd like to make it clear that once this gift is booked, I'm left with no alternative but to file an age discrimination complaint as clearly Jim, through these actions, is blatantly favoring a much younger underperforming employee - at my expense.

PS. Who at Duquesne University stands up for the employee that plays by the rules?

**Employee Complaint Procedure Form**

**To be completed by employee:**
*(*Discussion with immediate supervisor should take place prior to completing this form)*

Name: William Richter

Phone number and email address:X1910 richterw@duq.edu

Department: Advancement

Position Title: Senior Major and Gift Planning Officer_

Immediate Supervisor: Mary Frances Dean

The Administrative Policy (TAP) violated: ???

*Please attach your complaint to this form and send to Andrea Berestecky, Employee Relations Specialist, berestecky a@duq.edu, 412-396-4785, Office of Human Resources Management 600 Forbes Avenue Pittsburgh, PA 15282*

*Complaints submitted under this procedure must be within thirty (30) business days of the incident(s).

**This section to be completed by the Employee Relations Specialist:**

***Step 2:***

Date Appeal Received ____________

Sr. Dept Head Supervisor ____________________

Upheld or Overturned? ____________ Date Decision Sent to Employee ____________

***Step 3:***

Date Appeal Received ____________ Date of Review Meeting ____________

Vice President ____________________ Employee Relations Specialist ____________________

Upheld or Overturned? ____________ Date Decision Sent to Employee ____________

**Notes:**

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

William A. Richter

Senior Major & Planned Giving Officer
Duquesne University
Two Chatham Center – Suite 450
112 Washington Place
Pittsburgh, PA 15219
(412) 396-1910 (O)
(828) 507-9293 (M)
richterw@duq.edu

William A. Richter

Senior Major & Planned Giving Officer
Duquesne University
Two Chatham Center – Suite 450
112 Washington Place
Pittsburgh, PA 15219
(412) 396-1910 (O)
(828) 507-9293 (M)
richterw@duq.edu

Q. Executive vice president and provost. Okay. And how long have you held that position?
**A. About six years I think, five to six years.**
Q. Okay. Can you tell me your whole employment experience with Duquesne, please?
**A. My employment experience. So when I started?**
Q. What jobs did have you at Duquesne?
**A. Just executive vice -- or I started out as provost and vice president of academic affairs. And then my title, vice president of academic affairs was changed to be executive vice president in part to clarify that the provost is the first among equals in members of cabinet.**
Q. So your title was changed to reflect the fact that you were first among equals as provost?
**A. Correct, yes.**
Q. So who is your immediate supervisor?
**A. Ken Gormley, the president.**
Q. Can you tell me what your duties and responsibilities are with respect to your position?
**A. Sure. I oversee the academic unit at Duquesne, which includes all of the academic schools. So ten right now including the medical school. And that's inclusive of deans and faculty and**

**academic staff.**
Q. Did you say inclusive or exclusive?
**A. Inclusive.**
Q. Inclusive. And academic staff you said?
**A. Uh-huh.**
Q. The donor program at Duquesne, what is the name of the organization that handles those donations to Duquesne?
**A. The advancement office.**
Q. The advancement office?
**A. Uh-huh.**
Q. Do you have responsibility with respect to the advancement office?
**A. I do not.**
Q. None whatsoever?
**A. No.**
Q. Okay. And that's been true for your entire tenure at Duquesne?
**A. It has, yes.**
Q. So can you tell me whether or not -- well, let me ask it a different way. Are you familiar with the policies of Duquesne, the written policies that Duquesne has with respect to people that work there?
**A. Most of them, yes.**

Q. Okay. Do you have some familiarity with the naming policy when it comes to donations?
**A. I do, yeah.**
Q. You do. Can you tell me what the definition of the phrase university-wide center is, what does that mean?
**A. Sure, it's a center that crosscuts more than one school. It's not physically -- or it has nothing to do with its physicality. It is a program that is crosscutting in terms of themes that it covers and cuts across different units, usually has events that are university-wide and is something that is viewed as a university-wide asset.**
Q. It cuts across more than one academic unit is that what I heard you say?
**A. Right. So it's something where either topically or because of the way that it's situated it cuts across multiple areas.**
Q. Okay.
**A. And so in doing so it's university-wide.**
Q. So can you give me some examples of university-wide centers at Duquesne?
**A. Sure. We have a few. One of them is our Center for Integrative Health. It's a good example of**

**a center that cuts across multiple areas. So we have health programs like pharmacy, nursing, medicine now, health sciences. So, you know, that center really is reflective of a broader mission than just one school or one program, it cuts across many.**
Q. Okay. As you probably know in this case we have a situation involving the CEIM.
**A. Uh-huh.**
Q. Do you know what that stands for, an acronym?
**A. Entertainment and Media, something along those lines, yeah.**
Q. Well, in any event, is that a university-wide center?
**A. It is.**
Q. And why is that a university-wide center?
**A. It's university-wide because students across the University use the resources, it doesn't matter your program. You don't have to be, for example, a communications student to use the facilities. As a matter of fact, everybody's encouraged to develop podcasts and do things using those recording facilities. So it's considered, again, university-wide because it's used university-wide. It's a university asset.**

know what I'm referring to?
A. **I do.**
Q. And can you tell me in your own words what you understand the controversy to be about?
MS. McGROGAN: Objection to form.
You can respond.
BY MR. SANSONE:
A. **The way that I understand the complaint was it was about a redistribution of responsibilities in terms of the donors that individuals would be in charge of or sort of working with and how and when that was communicated to Bill and the work of one gift officer, Melissa Krebs, and her communications with one of those donors.**
Q. Now, what was your involvement in this controversy?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. **So my involvement was as the decision-maker at the end to sort of review objectively and to provide a decision on the matter.**
Q. Is that something that was part of your normal duties and responsibilities or was this unusual?
MS. McGROGAN: Objection to form.

You can answer.
BY MR. SANSONE:
A. **I frequently review complaints and grievances. It's a pretty regular occurrence.**
Q. Okay. Does Mr. Miller have any reporting structure that would cause him to report to you? Is he a direct report of yours?
A. **He does not report to me.**
Q. Okay. If you were looking at an org. chart, would he be above you, below you or at the same level as you?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. **Mr. Miller and I are both vice presidents to the organization. He, I believe, is a senior vice president, I am an executive vice president which would, again, put me in a position of a first among equals as I've described previously.**
Q. That's what I thought you were going to say, I'm first among equals so, therefore, I'd be higher on the org. chart --
A. **Sure.**
Q. -- right? Okay. So what was the process by which this complaint was dealt with?

MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. **Could you say that again?**
Q. Yeah, my guy made a complaint, what happened from there?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. **So typically when complaints are raised they are either shared by email or sometimes a paper copy will be delivered to me of the complaint and then that will start the process of review.**
Q. Can I ask you what, if any, documents you reviewed in preparation for your deposition today?
A. **Very few to be honest. I looked at the -- I reviewed the document that I received as a complaint basically.**
Q. You reviewed the complaint?
A. **Not the complaint, the --**
Q. Was it --
A. **It was the report from Jefferson.**
Q. From Mr. -- is it Dedrick, is that how we pronounce that?

A. **Dedrick.**
Q. Dedrick.
MS. McGROGAN: Dedrick.
BY MR. SANSONE:
Q. Mr. Dedrick, he sent you a report?
A. **He did, yes.**
Q. And that report contained, I take it, his recommendation?
A. **Correct, yeah.**
Q. Now, prior to receiving that report, had you received a copy of the complaint or were you aware at least of the nature of the complaint?
A. **I was aware of the nature of the complaint. I believe I received a copy of the report, but I just don't remember.**
Q. Well, you kind of conflated it there. There was an initial complaint by my client?
A. **Right.**
Q. Ultimately there was a report by Mr. Dedrick?
A. **Correct.**
Q. So my question was not did you see Mr. Dedrick's report. Did you see my client's complaint before you saw Mr. Dedrick's report?
A. **Again, I don't remember, but --**
Q. There's a lot of that going around.

MR. SANSONE: Let's go off the record a second.

- - - -

(Whereupon, there was a discussion held off the record, and there was a brief pause in the proceedings.)

- - - -

MR. SANSONE: In an off-the-record discussion with counsel I asked if I can inquire about whether or not the Kline gift or donation is included in the numbers that Dr. Dausey just gave me and would that violate an agreement we have about inquiring about those things.

And as I understand, Counsel, I can ask that question, but that's as far as I'm allowed to go?

MS. McGROGAN: I'm also going to just designate -- state what was already referred to in Mr. Richter's deposition, that anything that goes into communication with donors or donors in general, we're going to mark as confidential pursuant to the Protective Order and then I'm also going to just note an objection that the information that you're requesting is irrelevant to litigation, but I understand why you're

asking it.

MR. SANSONE: Okay.

MS. McGROGAN: I'm going to advise you to only answer Mr. Sansone's question to the extent you know.

THE WITNESS: Okay.

BY MR. SANSONE:

Q. That applies for the rest of this day.

A. **Sure.**

Q. If you don't know, don't answer.

A. **Okay.**

Q. Okay. All right. So you said that you think that IGNITE may have raised around 260 million at this point?

A. **Yeah.**

Q. Do you know if that amount includes the Kline donation?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **I don't know. I actually don't know how they tally the numbers for advancement for campaigns. So that's just not what I'm involved in.**

Q. Okay. So you don't know the answer to that question?

A. **No.**

Q. All right. So getting back to this situation with Ms. Krebs. Do you know whether or not -- first of all, the [redacted] donor was reassigned to Ms. Krebs, is that your understanding?

A. **From the document I read, yes.**

Q. I assume you don't have any other independent knowledge of what happened here except for what Mr. Dedrick gave to you; is that right?

A. **That's correct.**

Q. Okay. And so as you understand it Mr. Miller reassigned Allan Scott to Ms. Krebs; correct?

A. **Yes.**

Q. Okay. Do you know whether or not there was a procedure in place when reassignments like this were made to alert the prior donor person at Duquesne, who had this person first, that this is being reassigned?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **I don't. I'm not in advancement, so I don't know what the procedure is or if there's a procedure.**

Q. Well, okay. Do you remember that in this case there was a question as to whether or not my client had been told that this donor was reassigned?

A. **Yes.**

Q. Okay. And do you know whether or not Mr. Miller indicated that he did tell my client that this was reassigned prior to the complaint being made?

A. **I don't recall.**

Q. You don't recall, all right. Do you know whether or not it would be important to have that conversation with the prior donor official --

MS. McGROGAN: Objection.

BY MR. SANSONE:

Q. -- as to whether or not -- that this is being reassigned, do you know if that's an important thing to do?

MS. McGROGAN: Sorry, Joel, I didn't mean to interrupt you. Just objection to form.

BY MR. SANSONE:

A. **Could you say that one more time?**

Q. Yeah. Is it an important thing to do to go to the person that's been working with somebody and



: Jefferson Dedrick[dedrickj@duq.edu]
: Mary Frances Dean[deanm1@duq.edu]; Heather Clay[clayh@duq.edu]
om: Cecilia Hughes[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(DIBOHF23SPDLT)/CN=RECIPIENTS/CN=0299864ED6F04220BF4CFD829C654AA9-HUGHESC1350]
nt: Thur 8/4/2022 11:45:33 AM (UTC-04:00)
bject: Conversation Follow Up
llo Statement of Charitable Intent 10.20.doc
chum Fund Agreement 10-26-20.doc
scari Fund Agreement 11-11-19.pdf

Question → #139

ood morning Jefferson:

 response to your email discussion with Mary Frances, on which she copied me on the last response, please see the following formation:

our question was: You shared that you have been authorized in your capacity as Senior AVP and have in fact agreed to the naming f University programs previously without needing to seek the approval of the Senior Vice President for Advancement, Gift ommittee, or President. Would you please provide me some analogous examples from the last several years? To correct this atement, Mary Frances discussed the Gift Acceptance Committee only. On prior instruction from the Senior Vice President for dvancement, she is not permitted to speak directly with the President. Please be aware that we are addressing existing programs nly. A new program would need to be discussed with the Dean of the school that the donor wishes to support.

or your information, I have been an employee of the University since 2005 and I have been involved with the preparation, review nd execution of all new gift and fund agreements for the majority of these years. Please know that the Donor Statement of haritable Intent serves as a statement of understanding submitted by the donor with their intentions, but with the understanding hat the stated purpose may not exist and cannot be fulfilled at the time of their death. Please note that the [REDACTED] signed a SCI and not a fund agreement At the death of the survivor of the [REDACTED], the University will determine a purpose for their ift that most closely matches their charitable purpose. The [REDACTED] planned gift is most analogous to an endowed resource nd that provides unrestricted funding to an existing program, with allocation of such funding to be determined by the fund dministrator. In this case, the Media program/center is under the purview of the Dean of the McAnulty College and Graduate chool of Liberal Arts.

here are no fund agreements that are completely analogous to the [REDACTED] situation. Each donor cultivation is unique to that onor. With respect to the Jankowski gift, we secure very few gifts of this size that grant full discretion to the Dean to allocate the nds. Secondly, even with gifts at a lower level (scholarships, resource funds, research funds), the donor's name is used to name e fund in nearly every case. In rare instances, the donor wishes to remain anonymous.

 response to your question and after an exhaustive discussion and search with Mary Frances, we have attached the following:

1. [REDACTED] Donor Statement of Charitable Intent – this is an example of a complex cultivation of a high six-figure gift which includes a named award for excellence, a research grant fund and a scholarship. None of the above required approval from the Gift Acceptance Committee. Both the award for excellence and the research grant are purposes which di not exist at the time the document was signed. Like the [REDACTED] matter, this continues to be an on-going cultivation.
2. [REDACTED] Fund for the Genesius Theater – The donor, [REDACTED], has created a named fund to support the equipment in the Genesius Theater. We have included this example because the donor's support currently is for the purchase and maintenance of equipment only. This is an ongoing cultivation in which the donor has expressed desire to support at a much higher level.
3. [REDACTED] Education Innovation Endowed Resource Fund – Unlike the [REDACTED] fund, this fund represents a purpos that did not exist at the time the document was signed. The School of Education had agreed to build an education innovation laboratory within the Canevin building. [REDACTED], a prior major gift officer, and Mary Frances cultivated this low six-figure gift with the donor, Donna Muscari. Donna possesses substantial wealth and this was intended to be an ongoing cultivation with the goal to have her name the education innovation laboratory in the School of Education. Unfortunately, the University was not able to fulfill their obligation to this project. As far as we are aware, the donor's contributions have remained unspent to date. This can be distinguished from the [REDACTED]i gift because the Media program/center is already in existence.

ne final point that may be helpful for you to understand the complexity of these gifts and the documentation thereof is the ecent [REDACTED] gift that Mary Frances and I closed. Approval from the Gift Acceptance Committee was requested in this case ue to a need to verify valuation of the gift based on information from the donor's financial advisor. As part of the request for

pproval, we were told that the program could be named for the donor. After approval was received, we were informed that the aming approval had been granted in error. This necessitated us having to explain such error to the donor and her financial dvisor. Fortunately, the donor was gracious and accepted our apology. This is an example of the assertion that all of the planned ifts require ongoing communication, cultivations and stewardship on behalf of the assigned gift officer and other parties as eeded.

efferson, please know that part of my responsibilities is to be the liaison from the Development Office to the Gift Acceptance ommittee (GAC). I submit the memos and documentation to the GAC on behalf of the staff in my department. As such, I am ware of at least one situation in which proper approval of a seven-figure gift was not requested or granted by the GAC and is urrently being administered by the University.

astly, please know that I was present for the 7/11/22 and 7/18/22 meetings and have notes of the second meeting. If you feel my ecollections would be helpful, please let me know.

ecilia A. Hughes
ift Planning Officer/
rogram and Process Manager
uquesne University
12 Washington Place
wo Chatham Center, Suite 450
ittsburgh, PA 15219
12-396-4279
12-396-3003 (fax)

**Bcc:** William Richter[richterw@duq.edu]
**To:** [redacted]
**From:** William Richter[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4A91258B73C745AFAD40E1262EBFB45F-WILLIAM RIC]
**Sent:** Sun 6/19/2022 6:19:15 PM (UTC-04:00)
**Subject:** Re: [External] Your travel

That will be perfect !!!

Sent from my iPhone

> On Jun 19, 2022, at 3:38 PM, Jill Jankowski <jiljan8@gmail.com> wrote:
>
> Current document specifies 25per cent no $amount. How about a 401k statement?
>
> Itext, imail, Iphone
> [redacted]
>
>
>> On Jun 19, 2022, at 2:49 PM, William Richter <richterw@duq.edu> wrote:
>>
>> Hi [redacted]
>>
>> ...looking forward to dining with you and [redacted] on 6/22...
>>
>> One item of business to transact, if possible... I have the signed Letter of Charitable Intent for you ... the next step is for me to go before DU's naming committee and present a formal request to name the media center. Can you and [redacted] bring an old copy of your trust (even though you plan to modify it) so that I can use it to substantiate the approximate value of your gift?
>>
>> This allows me to move the project forward immediately when I return to campus...
>>
>> See you soon!
>>
>> Thanks
>>
>> Bill
>>
>>
>>
>> -----Original Message-----
>> From: [redacted]
>> Sent: Wednesday, June 8, 2022 9:14 AM
>> To: William Richter <richterw@duq.edu>
>> Subject: Re: [External] Your travel
>>
>> We will plan dinner 6/22. Any spots that you have been to that you would like to show your wife or something new?
>>
>> Los Alamos, Taos and Abiquiu/ghost ranch are all easy day trips from Santa Fe. In Santa Fe there's the Georgia okeefe museum, an Indian art museum and a folk art museum. Good city tour and enough galleries along canyon road to keep you busy for a day.
>>
>> Itext, imail, Iphone
>> [redacted]

that I had never approved the naming of by anyone.
Q. Did Mr. Miller tell you that night that he knew nothing about this naming rights gift?
A. Yeah, I think there was an email where he confirmed that night he -- he had told me that earlier in the day, and he confirmed -- when we were at that event for Mr. [redacted] as did Heather Clay confirm that, and then he confirmed that in an email that night when he told me it was a revocable gift which, frankly, floored me.
Q. Okay. Like I said we're going to get into that in a little more detail down the road.
A. Sure.
Q. What was your understanding of Mr. Richter's performance as a gift officer?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. I'd have to say, I didn't have any first-hand knowledge. I didn't interact with Bill that much. We had one occasion where we went and met with the [redacted], donors in California, but we didn't travel together. I met him at a

restaurant. I quite honestly didn't have a strong opinion one way or another. I had John Plante who I should say was my friend for many years and I had a close, fairly good relationship with him, thought highly of Bill. It really wasn't -- I didn't have any reason to not think favorably of him. There were a series of things that came to my attention of bad judgment and behavior that I had to confront before even this occurred, but other than that, I didn't know him. I had no reason to be seeking him out. It was only because these things were coming to my attention that I had to deal with them.
Presidents are happiest when they are not dealing with problems, I can assure you.
Q. So did you have any understanding of his success in raising donations for Duquesne?
A. I had a general sense that he was a good fundraiser, yeah. Again, let me just add, I didn't have specifics. I wasn't involved in any of those things with him. The [redacted] episode was the only time I worked with him directly, so that sense would have come primarily from John Plante.

Q. You were not aware of Mr. Richter's relative standing in terms of the amounts of money that were being raised?
A. No, I wasn't really privy to that but, again, he was not someone -- he was someone who was viewed generally, and I would say Jim Miller also shared that view, that he was out there trying to raise money and relatively successful compared to some others on the team.
Q. Can you name any other Duquesne employee who has been terminated either in whole or in part because of a violation of the naming policy?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. I don't know.
Q. Does that mean, you can't --
A. No, it doesn't mean no. You just asked me if I know of any other Duquesne employee, well, I've only been president since 2016, and Duquesne University is 145 years old, I have no idea.
Q. Let's focus on your time since 2016.
A. Okay.

Q. Are you familiar with or can you name anybody besides Mr. Richter who has been terminated either in whole or in part because of a violation of that policy?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. I'm not personally aware of that. Then again, it's a rare -- rare instance that anything is named at the University so this was a rare and egregious example in my view of someone trying to name something without permission of the gift committee, let alone the president who ultimately gets to make the decision.
Q. Can you tell me how the Ignite fundraising initiative is going?
A. How it's going?
Q. In other words, where are you -- what's the goal and how far toward the goal are you?
A. The goal is 333.33 and if you ever took math, I used to joke and say with a bar over it, meaning on through infinity, million dollars, that goal like any fundraising goal was just, you know, it's a nice number to say it's a third of a million dollars. I feel we're

Q. Has that ever occurred, a gift wasn't fulfilled by a person rated with a 99 EVI rating?

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

**A. I'm sure it has.**

Q. You are sure of that, what makes you sure of that?

**A. I say that anecdotally. I know from talking to people over the years with past presidents, there were a number of major, you know, figures in the orbit of the University who had made representations of making large gifts to the University that never came to pass.**

Q. Well, my question was, did that ever happen with someone with an EVI rating of 99?

**A. Well, I don't know -- I told you I don't know these EVI ratings.**

Q. So your answer is I don't know the answer to that question?

**A. That's correct. But I would not at all accept what you characterize it as Mary Dean's -- if that's what Mary Frances Dean says, then bring it to the president to approve and explain why because there's absolutely no basis for her or**

**anyone else making that judgment. That's exactly why we have these protocols and it's exactly why a president gets to make the decision because you're talking about very valuable naming rights, and there are other factors besides just the money that go into whether a University names something after someone, so I find that actually somewhat reckless to suggest that this was any potential donor is a, quote, slam dunk, without knowing far more details and without the president making that determination.**

Q. Well, your answer seems to be two-fold. You don't know what details go into the EVI ratings, so you don't know what exactly the basis for her saying that was, correct?

**A. Well, you just -- you just intimated, you just suggested that she was stating that this was a near certainty that it would be approved, and I am saying to you --**

Q. No, I didn't say that at all.

**A. Okay. Well --**

Q. I said with the near certainty that they would fulfill their commitment.

**A. Oh, well, yes, I don't -- I don't see how she**

**could possibly say that.**

Q. Of course you don't know what the basis of that 99 rating is?

**A. Well, I know -- I know enough about life to know you can never tell what's going to happen to someone and their money by the time -- between now and when they die, and I did do a little estates and gifts work, I mean Wills when I was in practice enough to know, that would be a fool's erring if you banked on that.**

Q. It would be a fool's erring to approve a revocable gift, give naming rights to a revocable gift; is that your testimony?

**A. Well, except -- that's why a president makes that decision. It would be a fool's erring to assume that that person will actually make the gift. That doesn't mean you can't make that decision for other reasons.**

Q. Who would be the person responsible to bring the Jankowski gift to your attention?

MS. McGROGAN: Objection to form. Asked and answered. You can answer it again.

BY MR. SANSONE:

**A. Who would be the person responsible?**

Q. Yes.

**A. Well --**

Q. Would you expect Mr. Richter to show up to your office and talk about it?

**A. If he was going to tell them to sign a document, I would expect him to talk to the gift committee, to the vice president and/or to me directly before he ever did that.**

Q. Okay. Do you routinely meet with gift officers to discuss these things?

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

Q. Or was it typically at a higher level that you'd meet with people?

MS. McGROGAN: Objection to form. You can answer.

BY MR. SANSONE:

**A. I deal with gift officer --**

Q. I'm asking a specific question, with respect to naming rights, have you ever -- have you ever interviewed a gift officer about the naming rights that they're intending to give a donation for.

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

A. No, because the only naming rights that I have been involved with have largely involved projects that I have worked on which includes CEIM, C-E-I-M, and so no gift officer would ever think to try to name it without talking to the president who created that Center.
Q. You mean talking directly to the president or through the chain of command?
A. Well, through the chain of command or directly to the president. It's not as if I haven't had conversations with gift officers if they're directly involved in naming something. They would still have to take it through the chain of command, but to suggest that I would never talk to a gift officer, that's not true.
Q. Did my client go through the chain of command with respect to this gift?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
A. To my knowledge, no.
Q. So is it your testimony that he did not report to Mary Frances Dean that this was a naming rights gift and that it was revocable; is that your testimony?
MS. McGROGAN: Objection to form.

BY MR. SANSONE:
A. I don't know the answer to that.
Q. Then why did you say no?
A. Well, I said to my knowledge, he did not.
Q. Well, actually, you didn't.
A. Can you read that back?
Q. No, listen, let's ask it again and you can make the record clear, is it your testimony --
MS. McGROGAN: And Ken, if you can take a pause so that I can voice the objection.
THE WITNESS: Okay.
BY MR. SANSONE:
Q. Is it your testimony that my client did not go to Mary Frances Dean and disclose the nature of this gift?
MS. McGROGAN: Objection to form. You can answer to the extent you know.
BY MR. SANSONE:
A. I don't know the answer to that.
Q. Is it your testimony that Mary Frances Dean did not take this information to Mr. Miller?
MS. McGROGAN: Objection to form. You can answer to the extent you know.
BY MR. SANSONE:

A. To my knowledge she did not.
Q. And your knowledge is based on what Mr. Miller said?
A. That's correct, and I have never seen a single document in writing where, that indicated that that was the case.
Q. Did you ever speak to Ms. Dean about this?
A. No, I did not.
Q. Why not?
A. Again, I left that to HR, and Heather Clay and Jim Miller to make that determination of who did what. That was the whole point of that process.
Q. I want to be clear, Mr. Miller on the night of the Rangos get-together.
A. Yeah.
Q. He denied knowing anything about this; is that right? Yes or no?
A. Even before the night of, at the afternoon of the [redacted] event, he seemed as shocked as I was as did Heather Clay.
Q. Okay. First of all, would this have been necessarily reported to Ms. Clay through the chain of command, would it necessarily go to her?

A. I don't know how they would do it. Again, as long as it gets to the gift committee, there are different routes that could take.
Q. Right. And if Mary Frances Dean did in fact inform Mr. Miller on a number of occasions as the gift proceeded, would that have been properly following the chain of command?
MS. McGROGAN: Objection to form. You can answer to the extent you understand the question.
BY MR. SANSONE:
A. Would that be properly following the chain of command? Again, I would need more facts. I mean what did she report. Was the gift already consummated, I just don't know --
Q. What do you mean by consummated?
A. Well, signed.
Q. What do you mean by signed, signed what?
A. I mean this document was signed and the Jankowskis believed that there had been a representation by the University that the Center would be named after them once they provided that documentation which they did.
Q. Did Ms. Dean sign this document after informing Mr. Miller about the details of

a confidential memo from Ken Gormley?
**A. No.**
Q. So if a confidential memo from Ken Gormley was produced as part of this litigation, you would have no idea where it came from?
**A. I do not know where it came from.**
Q. When did you first see that confidential memorandum?
**A. When it appeared on my seat in my office at Duquesne University.**
Q. It appeared in your office?
**A. Yes.**
Q. On your seat?
**A. Yes.**
Q. When was that?
**A. I don't know the date.**
Q. Can you give me an approximation?
**A. No.**
Q. Did you talk to anyone other than counsel about that memo?
**A. No.**
Q. You didn't tell Mr. Richter about that memo?
**A. No.**
Q. Didn't tell Ms. Hughes?
**A. No.**

Q. Didn't talk to Ms. Clay about it?
**A. Heather told me that a memo existed not long after Bill was suspended. I did not know the content.**
Q. Do you believe Ms. Clay put it on your chair?
**A. I don't know.**
Q. Do you know anyone else who would have had access to that memo?
**A. I don't know.**
Q. What's your understanding of why Mr. Richter was suspended?
**A. Because he cultivated a gift with naming rights.**
Q. Were you present for any of the meetings that Mr. Richter had with Jefferson Dedrick?
**A. I believe I was at one.**
Q. When was that meeting?
**A. That -- I don't know.**
Q. Are you sure that this occurred?
**A. I don't know.**
Q. Can you remember anything that happened during that meeting, that you believe happened during that meeting?
**A. No.**
Q. Were you in any way punished for your involvement for the Jankowski charitable statement of

intent?
**A. Yes.**
Q. What happened to you?
**A. Written reprimand placed in my file, no compensation of any sort from whatever the date was, August through December 31 of 2023.**
Q. To be clear, you mean no compensation increases or bonuses?
**A. Right.**
Q. So you still received your full salary during that period of time?
**A. Yes.**
Q. You weren't terminated?
**A. No.**
Q. Had you ever been subject to discipline before?
**A. No.**
Q. Had you ever received any kind of warning or writeup before?
**A. No.**
Q. So this was your first time that you had been subject to any form of discipline?
**A. Yes.**
Q. Do you believe that Mr. Richter was terminated because of his age?
**A. I don't know.**

Q. Do you have any reason to believe that he was terminated because of his age?
**A. No.**
Q. Do you know who made the decision to terminate Mr. Richter?
**A. I don't know.**
Q. I'm going to somewhat abruptly change subjects to talk about Cecilia Hughes.
Cecilia Hughes reported to you; is that correct?
**A. Yes.**
Q. Have you seen a copy of her lawsuit?
**A. No.**
Q. Did you review any complaint that she filed before it was filed?
**A. No.**
Q. Are you aware that she is claiming gender discrimination and age discrimination?
**A. Yes.**
Q. Were you involved in the events leading up to Ms. Hughes's termination?
**A. I don't know to what we're referring.**
Q. Do you know that Ms. Hughes was terminated?
**A. Yes.**
Q. Do you know why?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CECILIA HUGHES,<br><br>Plaintiff,<br><br>v.<br><br>DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, and JAMES MILLER, as an aider and abettor of discrimination,<br><br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:23-cv-1775<br><br><br><br><br><br><br><br><br><br><br>Electronically Filed. |

COMPLAINT IN A CIVIL ACTION

COMES NOW, the Plaintiff, CECILIA HUGHES, by and through her attorneys, LAW OFFICES OF JOEL SANSONE, JOEL S. SANSONE, ESQUIRE, MASSIMO A. TERZIGNI, ESQUIRE, and ELIZABETH A. TUTTLE, ESQUIRE, and files this Complaint in a Civil Action as follows:

JURISDICTION AND VENUE

1. This is an action to redress the deprivation by the Defendants of the Plaintiff's civil rights, and in particular, the right to be free from illegal, invidious and damaging discrimination in her employment, which rights are guaranteed by the Constitution of the United States and the laws and statutes enacted pursuant thereto, and in particular, the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. (as amended) ("Title VII") and the Civil Rights Act of 1991 (as amended). Declaratory relief is sought under, and by virtue of, Title 28 U.S.C. §§2201 and 2202.

2. Jurisdiction of this Honorable Court is founded upon Title 28 U.S.C. §§ 1331 and 1343(3), and by Title 42 U.S.C. §2000e.

3. Venue is proper under 28 U.S.C.A. § 1391(b). All claims set forth herein arose in the Western District of Pennsylvania and the Plaintiff resides in the Western District of Pennsylvania.

4. Plaintiff has satisfied all procedural and administrative requirements set forth in Section 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-5, and in particular:

a. On or about November 22, 2022, Plaintiff filed a charge alleging discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and said charge was cross-filed with the Pennsylvania Human Relations Commission ("PHRC");

b. Plaintiff received a Notice of the Right to Sue dated July 28, 2022 and;

c. Plaintiff's Complaint is timely filed within 90 days of Plaintiff's receipt of the Notice of Dismissal and Right to Sue.

PARTIES

5. Plaintiff, Cecilia Hughes, is an adult female individual who resides in Somerset County, Pennsylvania.

6. Defendant, Duquesne University of the Holy Spirit ("Duquesne"), is now, and was at all times relevant to Plaintiff's claims, a private institution of higher education with a registered principal address 600 Forbes Avenue, Pittsburgh, Pennsylvania, 15282.

7. Defendant, James Miller ("Miller"), is an adult individual who resides in Allegheny County, Pennsylvania, and, at all times relevant hereto, was employed by Duquesne as a Senior Vice President for Advancement. At all times relevant hereto, Defendant Miller purported to act within the full scope of his office and employment. At all times relevant hereto, Defendant

Miller was, and acted as, an aider and abettor to the unlawful discrimination described hereinafter below.

8. At all times relevant hereto, the Duquesne was acting through its agents, subsidiaries, officers, employees and assigns acting within the full scope of their agency, office, employment or assignment.

9. The actions of the Defendants, and each of them, as described herein, are part of an unlawful pattern and course of conduct intended to harm the Plaintiff. All of the acts described below were committed by the Defendants with reckless disregard and/or deliberate indifference to the rights of the Plaintiff. As a direct and proximate result thereof, Defendants violated the Plaintiff's federally protected rights, as described herein.

FACTUAL ALLEGATIONS

10. Plaintiff was employed by Defendant University from in or about July 2005 until her unlawful termination on or about October 3, 2022. At the time of the Plaintiff's termination, she held the position of Gift Planning Officer/Program and Process Manager.

11. Throughout the Plaintiff's more than 17-year employment with Defendant University, younger, less experienced, and/or less qualified employees and/or male employees have been treated more favorably than the Plaintiff by the Defendants.

12. In or about July of 2021, Defendant University restructured its Donor Relations department and Plaintiff was demoted from her position as Planned Giving Officer/Donor Fund Administrator.

13. At the time that the Plaintiff was demoted, as described hereinbefore above, Stacie Conto ("Conto"), a significantly younger employee, without any experience in Donor Relations, was promoted to Director of Donor Relations.

14. As Director of Donor Relations, Ms. Conto replaced the Plaintiff in her duties, despite Ms. Conto's lack of experience, and the Plaintiff was demoted from Donor Relations.

15. A significantly younger, male employee, Adam Viers ("Viers") was also promoted at the time that the Plaintiff was demoted.

16. Thereafter, Plaintiff made complaints to representatives of Defendant University of age and/or sex discrimination by Defendant University and/or Defendant Miller.

17. Other similarly situated employees also made complaints of age and/or sex discrimination, at that time.

18. Thereafter, on or about November 9, 2021, Plaintiff's job title was changed to Gift Planning Office/Program and Process Manager. That title change did not result in any raise in salary.

19. In or about September of 2022, a donor made a large commitment to Defendant University. Plaintiff was not involved in that commitment.

20. On or about September 9, 2022, Plaintiff received an Instagram message from a friend and graduate of Defendant University about the aforementioned commitment. Plaintiff believed that the message was private.

21. At that time, Plaintiff made a comment about the aforementioned commitment. Plaintiff believed that the comment was a private message.

22. Shortly thereafter, Plaintiff was contacted by her direct supervisor, Mary Frances Dean ("Dean"). Ms. Dean informed the Plaintiff that she received a voicemail from Defendant Miller in which Defendant Miller stated that the comment made by the Plaintiff regarding the commitment was a public comment and that the Plaintiff was to remove it immediately.

23. Plaintiff was unaware that her comment was publicly visible and removed the comment as soon as she was made aware by Ms. Dean and in accordance with her directive to delete the post.

24. About one (1) hour late, Plaintiff received a text message from Defendant Miller which stated that the comment was to be removed.

25. Plaintiff then verified that it had been removed, as directed by Ms. Dean.

26. Plaintiff's message was publicly visible approximately one (1) hour.

27. On or about September 12, 2022, Plaintiff notified Defendant University that she tested positive for COVID-19 and would not return to the office for a week, at minimum, per Defendant University's COVID-19 protocols.

28. Thereafter, Defendant University informed the Plaintiff that she was being placed on paid suspension for the aforementioned Instagram public post.

29. Defendant Miller made the decision to place the Plaintiff on administrative leave. Defendant Miller's actions were motivated not by any policy of Defendant Duquesne, but rather by the Plaintiff's age and/or sex and/or a desire to retaliate against the Plaintiff for complaining of discrimination.

30. On or about September 26, 2022, Plaintiff was instructed to participate in an investigative interview via Zoom with Senior Vice President of Associate of Advancement Operations, Heather Clay ("Clay"), and a representative of Defendant's Human Relations Department.

31. On or about October 3, 2022, Plaintiff was terminated from her position by Defendant University.

32. Defendant Miller made the decision to terminate the Plaintiff's employment. Defendant Miller's actions were motivated not by any policy of Defendant Duquesne, but rather by the

Plaintiff's age and/or sex and/or a desire to retaliate against the Plaintiff for complaining of discrimination.

33. The reason given for the Plaintiff's termination was the public Instagram comment, as more fully described hereinbefore above.

34. The reason provided by the Defendant for the Plaintiff's termination is pretextual and unworthy of belief.

35. Prior to the Plaintiff's termination, Plaintiff had never been disciplined or reprimanded by Defendant University and had received only positive performance reviews during her entire 17-year employment with Defendant University.

36. Moreover, younger, less experienced employees and/or male employees have engaged in wrongdoing and unethical conduct and routinely violate Defendant University's policies.

37. Defendants University and/or Miller are aware of those violations by less qualified, less experienced, younger employees and/or male employees, but do not discipline and/or formally reprimand those employees.

38. By way of example, Melissa Krebs ("Krebs") and Adam Viers ("Viers"), violated Defendant University's policies, including, but not limited to, deceiving a donor and falsifying University records. Ms. Krebs and Mr. Viers were not reprimanded in any way for that conduct, despite Defendant's actual knowledge of that conduct through various reports.

39. Plaintiff believes, and therefore avers, that she was terminated by Defendant University based on her age, 63, and/or sex, female.

40. Plaintiff also believes, and therefore avers, that she was terminated by Defendant University in retaliation for engaging in a protected activity, to wit, complaining of age and/or sex discrimination, as more fully described hereinbefore above.

41. As a direct and proximate result of the Defendants' actions, Plaintiff has been adversely affected, both financially and professionally.

42. Plaintiff believes, and therefore avers, that Defendants' conduct is part of a plan, pattern or practice of discrimination that may affect similarly situated employees.

COUNT I:

PLAINTIFF v. DEFENDANT UNIVERSITY

ADEA – AGE DISCRIMINATION

43. Plaintiff incorporates by reference Paragraphs 1 through 42 as though fully set forth at length herein.

44. As described hereinbefore above, Plaintiff was subjected to discrimination in that she was treated less favorably than younger and less experienced employees, in violation of the ADEA, 29 U.S.C. § 621, *et seq*., and terminated by Defendant University based on her age.

45. As a result of Defendant University's discriminatory actions, Plaintiff has been substantially and illegally harmed, suffered continuing financial losses, deprivation of employment, benefits, prerequisites, and fair treatment, and has suffered continuing emotional and physical distress and injury, embarrassment and humiliation caused by Defendant University, its managers, supervisors, employees, agents, attorneys and other officials.

46. Plaintiff has no other plain, adequate or complete remedy at law to redress the wrongs done to her by Defendant University and this suit for injunctive and other relief is her only means of securing just and adequate redress and relief. Moreover, Plaintiff is now suffering and will continue to suffer, irreparable injury from Defendant University's discriminatory policies, practices, customs and usages as set forth herein until and unless the same are enjoined by the Court.

47. Defendant University's actions as aforementioned were intentional, willful and deliberate and/or done with reckless disregard for the rights of the Plaintiff.

WHEREFORE, Plaintiff requests the following:

a. that the Court enter a judgment declaring Defendant University's actions to be unlawful and violative of the ADEA;

b. that the Court award the Plaintiff back pay, pay damages and other benefits lost due to the Defendant's unlawful conduct plus interest from the date of discrimination;

c. that in addition to the damages above, the Court award the Plaintiff liquidated damages in an amount equal to the pecuniary losses sustained as a result of the Defendant's willful violation of the ADEA;

d. that the Court order the Defendant to return the Plaintiff to the position she held before she was discriminated against and/or the position most appropriate for the Plaintiff under the circumstances, with the accumulated seniority, fringe benefits, and all other rights, or in the alternative, that the Court order the Defendant to pay the Plaintiff front pay equivalent to her lost salary, salary raises, fringe benefits and all other rights to which she would have been entitled but for the Defendant's discriminatory conduct;

e. that the Court award the Plaintiff pre-judgment and post-judgment interest from the date of the discrimination;

f. that the Court award the Plaintiff reasonable attorneys' fees and costs of this action; and

g. that the Court grant the Plaintiff such additional relief as may be just and proper.

JURY TRIAL DEMANDED

COUNT II:

TITLE VII - SEXUAL (GENDER) DISCRIMINATION

48. Plaintiff incorporates by reference Paragraphs 1 through 47 as though fully set forth at length herein.

49. Plaintiff was discriminated against based upon her sex in that she was treated in a manner which is different than and disparate to that of male employees, as described hereinbefore above, and terminated based on her sex, female, as more fully described hereinbefore above.

50. As a direct result of the Defendant University's discriminatory actions and violations of Title VII of the Civil Rights Act of 1964, and The Civil Rights Act of 1991, the Plaintiff has lost wages and other economic benefits of her employment with the Defendant. The Plaintiff has also incurred counsel fees and other costs in pursuing her legal rights.

51. Additionally, the Plaintiff has suffered emotional, psychological, and physical distress, inconvenience, suffering, loss of reputation, humiliation and embarrassment as a direct result of the Defendant's discriminatory conduct as described above.

52. The actions of the Defendant, through its employees, were intentional, willful and deliberate and/or done with reckless disregard for the rights of the Plaintiff.

53. The actions on part of the Defendant are part of a plan, practice or pattern of discrimination which may affect others who are similarly situated to the Plaintiff.

WHEREFORE, Plaintiff requests the following:

a. that the Court enter a judgment declaring the Defendant's actions to be unlawful and violative of the Title VII of the Civil Rights Acts of 1964 and 1991, as amended;

b. that the Court award the Plaintiff back pay damages and other benefits lost due to the Defendant's unlawful conduct plus interest from the date of discrimination;

c. that the Court award the Plaintiff compensatory and punitive damages as a result of the Defendant violation of the Civil Rights Act of 1991;

d. that the Court order the Defendant to return the Plaintiff to the position she held before she was discriminated against and/or the position most appropriate for the Plaintiff under the circumstances, with the accumulated seniority, fringe benefits, and all other rights, or in the alternative, that the Court order the Defendant to pay the Plaintiff front pay equivalent to her lost salary, salary raises, fringe benefits and all other rights to which she would have been entitled but for the Defendant's discriminatory conduct;

e. that the Court award the Plaintiff pre-judgment and post judgment interest from the date of the discrimination;

f. that the Court award the Plaintiff reasonable attorneys' fees and costs of this action; and

g. that the Court grant the Plaintiff such additional relief as may be just and proper.

JURY TRIAL DEMANDED

COUNT III:

PLAINTIFF v. DEFENDANT UNIVERSITY

RETALIATION

54. Plaintiff incorporates by reference Paragraphs 1 through 53 as though fully set forth at length herein.

55. As more fully described hereinbefore above, Plaintiff believes, and therefore avers, that she was terminated by Defendant University in retaliation for engaging in a protected activity, to wit, making formal complaints of age discrimination and/or sex discrimination, as more fully described hereinbefore above.

56. As a direct result of Defendants' discriminatory actions, and in violation of Title VII, Plaintiff has lost wages and other economic benefits of his employment with Defendant University. In addition, the Plaintiff has and/or will incur counsel fees and other costs in

pursuing her legal rights. Plaintiff has also suffered from emotional distress, inconvenience, humiliation, defamation of character and stress.

57. The actions on the part of Defendant University, through its employees, were intentional and willful and/or done with a reckless disregard of the Plaintiff.

WHEREFORE, Plaintiff requests the following:

a. that the Court enter a judgment declaring Defendant University actions to be unlawful and violative of the Title VII of the Civil Rights Acts of 1964 and 1991, as amended;

b. that the Court award the Plaintiff back pay damages and other benefits lost due to the Defendant's unlawful conduct plus interest from the date of discrimination;

c. that the Court award the Plaintiff compensatory and punitive damages as a result of Defendant University violation of the Civil Rights Act of 1991;

d. that the Court order Defendant University to return the Plaintiff to the position she held before she was discriminated against and/or the position most appropriate for the Plaintiff under the circumstances, with the accumulated seniority, fringe benefits, and all other rights, or in the alternative, that the Court order Defendant University to pay the Plaintiff front pay equivalent to her lost salary, salary raises, fringe benefits and all other rights to which she would have been entitled but for Defendant University's discriminatory conduct;

e. that the Court award the Plaintiff pre-judgment and post judgment interest from the date of the discrimination;

f. that the Court award the Plaintiff reasonable attorneys' fees and costs of this action; and

g. that the Court grant the Plaintiff such additional relief as may be just and proper.

JURY TRIAL DEMANDED

COUNT IV:

PLAINTIFF v. DEFENDANTS UNIVERSITY and MILLER

PENNSYLVANIA HUMAN RELATIONS ACT

58. Plaintiff incorporates Paragraphs 1 through 57 as though fully set forth at length herein.

59. This is an action arising under the provisions of Pennsylvania law, to wit, Title 43 P.S. Section 951, *et seq*. (The "Pennsylvania Human Relations Act") and this Court has, and should exercise, pendent jurisdiction over the same because the cause of action complained of in this Count arises out of the same facts, events and circumstances as the other counts and therefore judicial economy and fairness to the parties dictate that this count be brought in the same Complaint.

60. As described hereinbefore above, the Defendants discriminated against the Plaintiff and terminated the Plaintiff based on her age and/or sex.

61. As more fully described hereinbefore above, Plaintiff believes, and therefore avers, that she was terminated in retaliation for engaging in a protected activity, to wit, making formal complaints of age discrimination and/or sex discrimination, as more fully described hereinbefore above.

56. By discriminating against the Plaintiff without just cause or legal excuse and solely because of her sex and/or age and by permitting the discrimination against the Plaintiff as aforementioned, Defendant University has violated the provisions of Title 43 P.S. Section 955 which prohibits discrimination based upon sex and/or age with respect to compensation for, continuation in and tenure of, employment as well as prohibiting the aiding and abetting of such discrimination.

57. As a direct result of the Defendants' discriminatory actions and violations of the PHRA, the Plaintiff has lost wages and other economic benefits of her employment with the Defendants. In addition, the Plaintiff has incurred counsel fees and other costs in pursuing her legal rights. The Plaintiff has also suffered from and continues to suffer emotional distress, inconvenience, humiliation, defamation of character, loss of standing among her peers and stress.

58. As more fully set forth hereinabove, the Plaintiff has suffered, directly and solely as a result of the Defendants' discriminatory actions, great pecuniary loss and damage, as well as pain, suffering, inconvenience, damage to Plaintiff's reputation, and other damages which, together with the forgoing may be permanent in nature. Plaintiff now suffers these damages, and will continue to suffer the same for the indefinite future.

59. The actions on the part of the Defendants, through its employees, were intentional and willful and/or done with a reckless disregard of the Plaintiff.

WHEREFORE, Plaintiff requests the following:

a. that the Court enter a judgment declaring the Defendants' actions to be unlawful and violative the PHRA

b. that the Court award the Plaintiff back pay damages and other benefits lost due to the Defendants' unlawful conduct plus interest from the date of discrimination;

c. that the Court award the Plaintiff compensatory and punitive damages as a result of the Defendants' actions being unlawful and violative of the PHRA;

d. that the Court award the Plaintiff pre-judgement and post-judgement interest from the date of the discrimination;

e. that the Court award the Plaintiff reasonable attorney's fees and costs of this action; and

f. that the Court grant the Plaintiff such additional relief as may be just and proper.

JURY TRIAL DEMANDED

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

s/ Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Massimo A. Terzigni, Esquire
PA ID No. 317165
Elizabeth A. Tuttle, Esquire
PA ID No. 322888
*Counsel for Plaintiff*

Law Offices of Joel Sansone
Two Gateway Center, Suite 1290
603 Stanwix Street
Pittsburgh, Pennsylvania 15222
412.281.9194

Dated: October 12, 2023

MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. Up to and including termination depending on the circumstances.**
Q. And there is a policy at Duquesne against sexual discrimination, is there not?
**A. Yes, sir.**
Q. And if an employee of Duquesne commits sexual discrimination against another employee or employees, what should happen to that employee?
MS. McGROGAN: Objection to form.
You can answer to the extent you understand.
BY MR. SANSONE:
**A. They should be investigated.**
Q. And what penalty should apply?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. In my opinion up to and including termination.**
Q. Have you ever been investigated on charges of sexual assault against any Duquesne employee?
**A. No.**
Q. That includes Ms. Maurer?

**A. Correct.**
Q. Have you ever been investigated on charges of sexual harassment against any employee?
**A. No.**
Q. That includes Ms. Maurer?
**A. Correct.**
Q. Ms. Baldoni?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
**A. I don't know Ms. Baldoni.**
Q. Ms. Kelly?
**A. No.**
Q. Ms. Hines?
**A. No.**
Q. Have you ever been investigated on charges of sex discrimination related to your promotion of Gwyneth Gaul?
**A. No.**
Q. In your opinion, does Duquesne strictly adhere to its policies related to sexual assault and sexual harassment and sexual discrimination?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. From my perspective, yes.**

Q. What's the basis of your making that claim?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. Observation over time.**
Q. What have you observed?
**A. That it's not to be tolerated. We have ongoing education around it. Reminders to the team what the policy is and reminders that there are consequences associated with it.**
MR. SANSONE: Let me take a couple minutes. We'll be right back.
MS. McGROGAN: Okay.
\- - - -
(Whereupon, there was a recess in the proceedings.)
\- - - -
MR. SANSONE: All right. Let's go back on the record.
BY MR. SANSONE:
Q. Sir, did Mary Frances Dean inform you on several occasions about the details of the Jankowski gift?
MS. McGROGAN: Objection to form.
You can answer.

BY MR. SANSONE:
**A. No.**
Q. Your answer was no I heard?
**A. Correct.**
Q. So she never advised you that there was a revocable gift?
**A. Correct.**
Q. She never advised you that it involved naming rights?
**A. Correct.**
Q. She never advised you about the dollar amount of the donation?
**A. Correct.**
Q. Did anyone advise you about the dollar amount of the donation?
**A. No.**
MS. McGROGAN: Objection to form.
Can you be more specific in terms of time period?
BY MR. SANSONE:
Q. Ever, from leaving out any conversation with counsel?
**A. Well, certainly once the gift was processed, I saw the amount in the system.**
Q. But that was the first time you knew the

MS. McGROGAN: We can go back on the record. It is 10:54 a.m.
BY MS. McGROGAN:
Q. Mr. Richter, prior to the break, I asked you if there was anything in the complaint that you believe is inaccurate or if all of it is correct.
Did you review the complaint during break?
**A. Yes.**
Q. Is there anything in the document that you believe is inaccurate?
**A. No.**
Q. So all of the information contained in there is correct, to the best of your knowledge?
**A. Correct.**
Q. During the break, did you have conversations with your attorney?
MR. SANSONE: Let's make it clear on the record, I don't believe you have the right to ask that, but just so you know, because I don't want to delay this any further, we didn't.
MS. McGROGAN: Here are the cases.
MR. SANSONE: I was going to ask you about that.
MS. McGROGAN: I sensed that you would.
MR. SANSONE: Middle District of

Pennsylvania.
MS. McGROGAN: There is a Western and Eastern in there, too, for good measure.
BY MS. McGROGAN:
Q. Mr. Richter, during the break did you talk to your attorney?
**A. Yes.**
Q. What did you talk about?
MR. SANSONE: Don't answer that question. I said we didn't discuss the case at all. Just don't answer that question.
BY MS. McGROGAN:
Q. Are you going to follow your attorney's instruction and not answer the question?
**A. Of course.**
MS. McGROGAN: We will take a break, and, Joel, I'd like to call Judge Wiegand. Can we go into the other room, please? Would you like to take some time to review the case law?
MR. SANSONE: Yes, I would, actually. I've never heard the notion that you can ask about anything that I talk to my client about.
MS. McGROGAN: We will take a break again at 10:55 a.m.
(Recess.)

MS. McGROGAN: We can go back on the record at 11:01.
And can you read back my last question, please.
(Record read.)
**A. Golf.**
Q. What about golf?
**A. Had he played golf recently.**
Q. Anything else?
**A. Football injuries.**
Q. Anything else?
**A. No.**
Q. Mr. Richter, when were you hired at Duquesne?
**A. Labor Day weekend of 2015, I believe.**
Q. So, that would be -- I have it as September 1 of 2015. Does that sound right to you?
**A. That sounds right.**
Q. What was your first position when you were working for Duquesne?
**A. I think the title then was just Major Gifts Officer.**
Q. How old were you when you were hired?
**A. I'm 64. That was nine years ago, so that would make me, what, 55? Is that right?**
Q. That math works.

**A. Okay. I believe I was 55.**
MS. McGROGAN: Mr. Richter, I'm going to mark this as Exhibit 3.
(Richter Deposition Exhibit 3 was marked for identification.)
BY MS. McGROGAN:
Q. This is the job description that has been produced related to the position as Major Gifts Officer. It has been Bates labeled Duquesne 101 to Duquesne 103.
Do you recognize this document?
**A. (Witness reviews document.) Yes.**
Q. Does that accurately restate your job responsibilities and duties as a Major Gifts Officer?
**A. Yes.**
Q. Generally speaking, were your responsibilities the same throughout your employment with Duquesne?
**A. No.**
Q. When did that change?
**A. I don't recall the exact date.**
Q. What was the event?
**A. I don't recall a specific event.**
Q. In what way did they change?
**A. I was asked if I would consider going to the Palumbo School of Business and go through their**

**financial planning program.**
Q. So that was the certificate that you received?
A. **Correct.**
Q. And how did that impact your employment with Duquesne as a gift officer?
A. **It allowed me to work closely with planned giving prospects.**
Q. Did you start working with planned giving after you received your certificate from the Palumbo School?
A. **I don't recall the exact time.**
Q. Who asked you to get that certificate?
A. **I believe Rick Creehan did. Rick may have still been there. I can't recall. It was either Rick Creehan or Mary Frances.**
Q. You don't know whether it was Mary Frances or Rick Creehan?
A. **I don't recall. I think it was Rick, because I think -- I'll leave it at that. I don't recall.**
Q. Other than when you were asked to take on planned giving responsibilities, does this job description accurately reflect your position up until that point?
A. **Yes.**
Q. The second to last paragraph in here, it says "Drafts contemporaneous briefings; contact reports,

proposals, gift and fund agreements, and other correspondence for prospects; process gift commitments expeditiously."
Do you see that on page 101, second to last paragraph?
A. **Yes.**
Q. What are contact reports?
A. **It's a report that you produce that outlines the status of the relationship with a donor.**
Q. How often were you supposed to complete contact reports?
A. **One for each time you met with a person.**
Q. Only when you met in person?
A. **If something of significance was discussed on the phone, you might put that in. If you -- that would be one example.**
Q. What are the others?
A. **If you sent a donor a gift, a card type of thing.**
Q. Anything else?
A. **Not that I recall at the moment.**
Q. What do you describe as "something of significance"?
A. **I'm not sure what you mean by "something of significance."**

Q. You stated you would complete a contact report when something of significance was discussed on the phone.
What is "something of significance"?
A. **Something that -- I guess something of significance. Had an important phone conversation or called to say thank you for this or I'll meet you to play golf, you know, whatever.**
Q. Are those the only three examples of what would be something significant?
A. **Multitude type of examples. It would depend on the donor and what was going on.**
Q. Would something that impacted the gift they were considering making to the University be something of significance?
A. **Sure.**
Q. And so, every time that you would receive information from a donor related to something related to their gift, you would record it in a contact report; is that correct?
A. **Or present something. You might present something to them.**
Q. Present something to the donor?
A. **(Nodding head up and down.)**
Q. If you presented something to the donor, how

was that recorded for the University?
A. **In the contact report.**
Q. Other than that, any other way?
A. **It would depend on what it was.**
Q. What would you not record in a contact report?
A. **I guess I'm not understanding the question.**
Q. You said that there were things that you -- it depends on what it was, and you've identified what you might put in. You've said there were a multitude of others, and I believe now you said there were some things that you wouldn't put in.
What are examples of the things that you would not put in a contact report for?
A. **I guess if a donor called me and said, you know, how are you doing, go Steelers, just a conversation that had no bearing on moving the relationship forward.**
Q. So, anything that related to moving the relationship forward you would put in a contact report?
A. **Yes.**
Q. Do you agree that was an important aspect of your job?
A. **Sure.**
Q. Why did you believe that was an important aspect of your job?

66

support your case in this lawsuit?
A. **I don't know.**
Q. There is a reference, if you go to page 97 -- and I apologize to jump back on you, but there is a reference on page 97 under your comments. It says, "Recently I had the opportunity to discreetly point out a developing situation which would have exposed the University to significant legal action; as a result of this action, plans were changed to accomplish objectives without adverse legal ramifications."
Can you tell me what that was?
A. **To the best of my recollection, Adam was going to have a retreat for the new people that reported to him at that time, and as I recall it, he wanted to videotape a session where we called an actual donor and record it.**
Q. Without the donor's knowledge?
A. **Yes. Having gone through the program at Duquesne and learned about some legal aspects of business situations, it's against the law in Pennsylvania. You probably know better than I do. So, I pointed this out to him. I called him in my office and said, Adam, I don't know that you realize that if you do this, you will subject the University to legal action. Certainly, it will not reflect favorably on**

67

**your career. You can't do this. To which, to his credit, he was not aware of it and we did not videotape the calls. That's the situation.**
Q. So it didn't end up happening?
A. **No, no.**
Q. In Adam's response, one of the lines says "In resulting conflicts, he admitted emotions can sometimes get the best of him as exhibited in one such occasion; he did resolve the issue."
Did you ever tell Adam that your emotions can get the best of you?
A. **I don't recall that I would have said something like that to him. I apologized to him at that time when it happened, but I don't recall.**
Q. Do you believe that your emotions can get the best of you from time to time?
A. **No.**
Q. You don't believe that?
A. **No.**
Q. So, on the same page under this line, it says --
A. **I'm sorry. Where are we at again?**
Q. On the same page, 97. Under "Efficiency and Effectiveness," you say "I believe that over the past several years I have been very fortunate to have been

68

the most productive gift officer on staff."
Do you see that?
A. **Uh-huh.**
Q. In what way were you the most productive gift officer on staff?
A. **I don't know what year it was, but I was gift officer of the year that year. I don't know if it was after this. I don't know.**
Q. In some writings you say it was 2019 and I think in some you might have said 2020, but in any event, it was a couple years before that.
What was gift officer of the year?
A. **It was an award given to the gift officer of the year. It was a trophy.**
Q. Based on what?
A. **Based on dollars, visits, at the discretion of the...**
Q. So it related to gift commitments and donor visits?
A. **I'm sorry. What did you say?**
Q. Gift commitments and donor visits?
A. **Yes.**
Q. Anything else?
A. **Not that I recall.**
Q. Who selected you for that award?

69

A. **Rick Creehan. You know what? It may have been Mary Frances.**
Q. Who?
A. **Mary Frances. I think it was Rick. I don't know.**
Q. And so, you still believe you that you were the most productive gift officer on staff with respect to gift commitments and --
A. **I was an effective gift officer.**
Q. You call yourself the most productive.
A. **I call myself an effective gift officer.**
Q. So you're revising that statement?
A. **Uh-huh.**
Q. Did you believe that you were more effective as a gift officer than Mary Fran was?
A. **I'm sorry?**
Q. Did you believe that you were more effective as a gift officer than Mary Fran?
A. **No.**
Q. How about Jim Miller?
A. **No.**
Q. Adam Viers?
A. **I can't answer. I don't know what their numbers were. I don't know.**
Q. Do you take the position that your prior years'

BY MS. McGROGAN:
Q. Mr. Richter, did you review those text messages?
**A. I just did.**
Q. What is the date of the first text message that you have with Rick Creehan that you have on your phone? And while you're going back, do you see any text messages that relate to the University or Jim Miller, Melissa Krebs, Adam Viers?
**A. (Witness reviews document.)**
MR. SANSONE: While he's looking, can we just go off the record?
MS. McGROGAN: Yes.
(Discussion off the record.)
**A. I was back to 2022 and football games --**
MR. SANSONE: Stick with the questions you've been asked.
MS. McGROGAN: He was asked what date do they go back to.
BY MS. McGROGAN:
Q. So, when in 2022?
**A. I wasn't all the way through.**
Q. That's fine.
MS. McGROGAN: So, during the recess, there was a conversation between counsel. Counsel

represented that he will review -- that the text messages will be re-reviewed to determine if there are any text messages responsive to the discovery requests and will respond.
Is that a fair statement?
MR. SANSONE: Yes.
BY MS. McGROGAN:
Q. Mr. Richter, I'm going to mark as an exhibit -- actually, before I get there, what does Jim Miller do at UNC?
**A. I think he is retired.**
Q. What did he do at UNC?
**A. He was director of -- I don't know his correct title. He was a vice president for institutional advancement there, but I don't know the specific title.**
Q. Did you ever apply for a job with UNC?
**A. I worked for University of North Carolina.**
Q. When?
**A. Western Carolina is part of the system.**
Q. Western Carolina is part of the UNC system?
**A. (Nodding head up and down.)**
Q. During your employment with Duquesne, did you ever apply for a job at UNC?
**A. When I was working at Duquesne?**
Q. Yes.

**A. No.**
Q. While you were working at Duquesne, did you apply to any other positions outside of Duquesne?
**A. It seems to me I applied for a position at Notre Dame. I can't remember when. It was many years ago.**
Q. But you think it's sometime during your employment with Duquesne that you applied for a position --
**A. I think so.**
Q. Was that position related to university advancement?
**A. It was an athletic position.**
Q. It was in the athletics department. Do you remember what the position was, generally, if not the title?
**A. I think it was working with their former football players that went on to play professionally. Yeah.**
Q. In what manner, for fundraising?
**A. Liaison. Fundraising would be a component of it.**
Q. And did you ever receive an interview for that position at Notre Dame?
**A. No.**

Q. You weren't hired for that position at Notre Dame?
**A. No.**
**(Richter Deposition Exhibit 9 was marked for identification.)**
BY MS. McGROGAN:
Q. I just put in front of you a document that I have marked as Exhibit 9, but to the extent I haven't, this is Exhibit 9. For the record, this has been Bates labeled as Duquesne 325 to Duquesne 328.
Do you see this? Do you recognize this email?
**A. Say again.**
Q. Do you recognize this email? Why don't we start in components here so it goes by a little bit quicker.
There is an email that is March 10, 2022, at 1:52 a.m. Can you please go down to that email?
MR. SANSONE: At what time?
MS. McGROGAN: 1:52 a.m.
**A. (Witness complies.) Okay.**
Q. Then it goes on to the next page.
**A. Uh-huh.**
Q. So, this is an email that you sent to Jim Miller on March 10th of 2022, and it starts out "It is not possible to express how angry and disgusted I am

to learn of Melissa's actions with respect to the cultivation of [redacted]"
Did I read that correctly?
**A. Uh-huh.**
Q. And is this the first time you contacted Jim Miller about the issue related to [redacted] involving Melissa Krebs?
**A. I don't know.**
Q. This is the first email that I have seen related to that. Is there any reason to think that there are any prior emails?
**A. I don't know if there are prior emails or not.**
Q. Had you had prior discussions with anyone -- did you discuss the issues with Melissa Krebs with anyone prior to reaching out to Jim Miller?
**A. I don't recall.**
Q. Did you talk to Mary Frances Dean?
**A. I don't recall.**
Q. Did you talk to Heather Clay?
**A. Prior to -- repeat your question for me. What?**
Q. Did you talk to any other individuals about the issue related to Melissa Krebs before you reached out to Jim Miller?
**A. Yes.**
Q. Who?

**A. I can't remember if Rick Creehan was my supervisor at that time.**
Q. He was not.
**A. Mary Frances would have been, yes.**
Q. So, you spoke to Mary Frances?
**A. Uh-huh.**
Q. Did you speak to Heather Clay?
**A. I can't recall if Heather was at the University at that time or whether she came after.**
Q. Did you speak to Cecilia Hughes?
**A. Yes.**
Q. So, you had spoken to, you believe, Mary Fran and Cecilia Hughes prior to reaching out to Jim Miller?
**A. Yes, during this period.**
Q. Cecilia Hughes was your superior?
**A. In gift administration, yes.**
Q. How so?
**A. She prepares all the documents for the gifts.**
Q. So, that was her responsibility was to prepare those letters of intent?
**A. Uh-huh.**
Q. Do you remember discussing this issue with Melissa Krebs with anyone prior to reaching out to Jim Miller?
**A. Not that I recall here, no.**

Q. Is there anything that could refresh your recollection on who you would have reached out to?
**A. I don't know.**
Q. So, in this email you have, it says "I had been in a long-term cultivation process discussing a $250,000 planned gift with [redacted] when it was brought to my attention on March 7th that Melissa met with him and secured a commitment of only 50,000."
Did I read that correctly?
**A. Yes.**
Q. When you say "long-term cultivation," how many years had that been?
**A. I don't recall exactly when he was transferred to my portfolio. So, I don't know, but a while.**
Q. So, had it been more than one year?
**A. Yes.**
Q. More than two years?
**A. When is this happening?**
Q. 2022.
**A. So, more than two years would be before 2020. Yes.**
Q. Before 2019?
**A. Possibly.**
Q. You have no way of placing when you first interacted with [redacted]?

**A. I saw him on an elevator at a function at Duquesne. I don't recall when that was. I visited him several times. I don't recall the dates of those visits.**
Q. All of your visits with [redacted] were prior to COVID-19, so March of 2020, correct?
**A. Yes.**
Q. Did you ever have a visit with him after March of 2020?
**A. Not that I recall.**
Q. And it states that you were discussing a $250,000 planned gift with [redacted] and then it says that it was brought to your attention on March 7th that Melissa had met with him and secured a commitment of only $50,000.
Who brought it to your attention on March 7th?
**A. I don't recall. I don't recall.**
Q. And then in the next paragraph, the last sentence says "I return to campus next Thursday."
Where were you?
**A. I can't remember. Out on the West Coast. I don't remember where.**
Q. Then you say "What I propose is that I be permitted the opportunity to schedule a meeting with

Allan - as I was planning to do - with the goal of now to 'reset' the relationship and planned giving discussions in hopes of saving the funding that we had been discussing."

Do you remember why you felt that this was necessary?

A. **Yes, because apparently Melissa had got a gift of 50,000. I was working with him on a quarter-of-a-million-dollar gift.**

Q. You felt that you could have gotten more money from him?

A. **I was in the process of getting more money.**

Q. What steps did you take in that process?

A. **Several meetings with him.**

Q. None of those happened after 2020, correct?

A. **Yes.**

Q. Yes, that's correct?

A. **Repeat the question.**

MS. McGROGAN: Can you read it back, please.

(Question read.)

A. **When was COVID? It was a bit before COVID.**

Q. March of 2020.

A. **It would have been before COVID.**

MS. McGROGAN: Do you disagree with that,

Joel?

MR. SANSONE: I was just thinking that.

BY MS. McGROGAN:

Q. It says "...as I was planning to do."

What steps had you taken as part of that plan to meet with [redacted]?

A. **At the time, he was in his mid 80s, I believe, and was sensitive to COVID. We were going to meet when it was convenient for him to meet.**

Q. Did you have a date scheduled to meet with him?

A. **We didn't have a date scheduled, no.**

Q. So, you had no plans to meet with him --

A. **I had plans. They were going to take place after COVID when he was able to meet. We didn't have a date in mind.**

Q. Do you consider now to be after COVID?

A. **Yeah.**

Q. In your opinion, is COVID over?

A. **I've got some friends that have gotten it, so I guess I would say no.**

Q. So, when you say that you had a plan, it was more theoretical; is that correct?

A. **No. We had discussed meeting after he felt it safe with COVID.**

Q. But you had no sense of when that might be?

A. **Neither did he.**

Q. When was the last time that you had reached out to him to determine whether he felt safe?

A. **I have no idea.**

Q. But at some point, Melissa had reached out to him and he, to your understanding, was willing to meet, correct? Because you state that she met with him to secure the gift.

A. **She met with him, yeah. I wasn't aware of it.**

Q. So, at that point, he was comfortable. I think you testified about this earlier, but I think we were talking about a March 15th date.

At any point, did you speak to Melissa about what her interactions with [redacted] were?

A. **No.**

Q. You never interacted with Melissa about that?

A. **Not that I recall.**

Q. To this day, do you have any knowledge of what Melissa Krebs spoke to [redacted] about?

A. **No.**

Q. You have no information, you haven't heard through the grapevine, anything like that?

A. **No.**

Q. So, you were assuming that it was necessary to reset the relationship; is that fair to say?

A. **Yes.**

Q. And you were assuming that he still wanted to give at a level that was at that $250,000 level you had talked about?

A. **I didn't know if he would or not.**

Q. So, then you state that "in the interim, adding more fuel to the fire, is that I'm now also aware of a contact submitted by Melissa that I want to make certain is brought to your immediate attention. The contact report is reprinted below - I have underlined and bolded something that is not a 'misunderstanding or an oversight' - it's an outright lie."

If you go to the last page of this document, do you understand that this -- do you believe that this was the contact report that you were referring to copied and pasted into this email?

A. **Yes.**

Q. Did you have conversations with [redacted] that you did not list in contact reports?

A. **I don't recall that.**

Q. What portion of this email do you believe is the outright lie, as you stated?

MR. SANSONE: What portion of the email or the --

MS. McGROGAN: It's in an email.

A. **"He has shared some of your thoughts on these subjects with me."**
Q. Is there any other portion of that that you believe is an outright lie?
A. **No.**
Q. Do you know how she got information about his thoughts on these subjects?
A. **No.**
Q. Could she have read them in contact reports?
A. **Possibly.**
Q. Had you ever referred to contact reports before meeting with a donor?
A. **Had I ever referred to? Yes.**
Q. Contact reports that had been completed by other gift officers?
A. **Yes.**
Q And how did you introduce previously discussed topics to those donors?
A. **I wouldn't. I would go to the gift officer and say, I'm going to go see someone or I know someone that there was a contact report regarding this person.**
Q. What if the gift officer was no longer at the University?
A. **Repeat your question. If the gift officer was no longer what?**

Q. At the University.
MR. SANSONE: What is the question?
A. **I don't understand.**
Q. What would you have done if there was information in a contact report? To have a discussion about that information with the donor, you said that if the person was still at the University, my understanding of what you just testified to was you'd go and meet with that person. What if the person wasn't at the University? Had that ever happened to you before?
A. **Yes.**
Q. What did you do in that situation?
A. **The example I'm thinking of is Adam Novak. He left Duquesne and he had a portfolio of people in New Mexico. I drove to Washington to meet with him to discuss those.**
Q. Other than Adam Novak, had that ever previously happened to you?
A. **Where someone was no longer at the University, I read their contact report, and then contacted the donor?**
Q. Correct.
A. **Without notifying my supervisor? I would have notified my supervisor about that.**

Q. You would have notified your supervisor?
A. **(Nodding head up and down.)**
Q. So, you have never have made a statement that someone has shared information with you related to information that you learned from a contact report?
MR. SANSONE: I think I know what you're trying to ask, but I don't think that came out the way –
THE WITNESS: I didn't understand it.
MR. SANSONE: Shared with a person, meaning a potential donor?
MS. McGROGAN: Yes. So, let me clean that one up.
BY MS. McGROGAN:
Q. You have never shared information that you learned through a contact report with a potential donor saying that the prior gift officer had shared that information with you?
A. **Well, in the example I gave with Adam, he shared his entire portfolio with me, who was in that portfolio. I would have contacted people that were appropriate from that portfolio and they would have said, where's Adam Novak? Well, he is no longer here. I am taking over his portfolio. I'd like to talk with you on the University's behalf. That would be how the**

**procedure would generally go.**
Q. I'm going to try this one again: Did you ever do it differently and refer just to the information you learned in the contact report to that donor?
A. **I still don't understand what you're asking.**
MR. SANSONE: Are you trying to ask him if he did the same thing that he's saying Ms. Krebs did?
MS. McGROGAN: Yes.
MR. SANSONE: Basically, did you ever tell a donor you talked to the prior officer –
MS. McGROGAN: That misrepresents what she said, but...
THE WITNESS: Now you've got me confused.
MR. SANSONE: This is a little confusing. I think what she's trying to find out is did you ever do what she did there. Is that right?
MS. McGROGAN: Yes.
BY MS. McGROGAN:
Q. Have you ever said that someone has shared some of your thoughts on these subjects with her or with you when you actually hadn't spoken to the donor or hadn't spoken to the gift officer?
A. **Sorry. I'm confused. I have no idea what you're trying to ask me.**

Q. Had you ever, in your career as a fundraiser -- I think you say somewhere 25, 30 years, correct? Had you ever read information from a contact report and stated to a donor that you had learned some information about them from a colleague that you hadn't directly spoken to?

**A. Not that I recall.**

Q. Could it have happened?

**A. It's possible. I don't recall.**

Q. So, what was the issue with her doing so here?

**A. I guess I don't understand that question, either.**

Q. So, she says "He has shared some of your thoughts on these subjects with me."

Other than that she didn't directly talk to you, were there any other issues that you had with her saying that sentence?

**A. Yes. No. That was the -- you got the crux of it. She lied about talking to me about it. If that's what you're getting at, yes.**

Q. Yes, that's what I'm getting at. So, there is nothing other than she didn't speak to you that you are objecting to with respect to this statement that she made?

**A. She would have -- she should have told her**

**supervisor as well.**

Q. Supervisor, let's take the supervisor out. I'm just focusing on Melissa Krebs.

Is there any other issue you have with this statement other than she didn't speak directly to you?

**A. No.**

Q. So, do you believe that she included that sentence because of your age?

**A. Do I think she included that sentence because of my age?**

Q. Correct.

**A. No.**

Q. Do you believe that she did it because she was retaliating against you for any reason?

**A. No.**

Q. I apologize. I feel like I am yelling at you.

**A. At least I can hear you.**

MR. SANSONE: I can hear you better.

MS. McGROGAN: I feel very aggressive and I don't want to come off that way.

BY MS. McGROGAN:

Q. Now, going back to the body of your email, you state many ways that she could have reached out to you, including taking a 20-foot walk down the hallway.

**A. I'm sorry.**

Q. In the next paragraph.

**A. Thanks. I got it.**

Q. You say that she could have reached out to you in a number of ways, including taking a 20-foot walk down the hallway.

During this period of time during COVID-19, how often were you in the office?

**A. I have no idea.**

Q. You don't remember?

**A. No.**

Q. So, you state "I would certainly have asked that he continue to be assigned to me - or at the very least be given the opportunity to present why reassigning [redacted] to another gift officer was not in the best interest of this relationship or the goal to maximize support to the University. Even had I been denied this common courtesy, I would have been certain to inform the newly assigned gift officer of the substantial planned gift I had been cultivating with Allan so that the University did not lose this opportunity for substantial funding."

Did I read that correctly?

**A. Yes.**

Q. So, is your contention that the only way that she would have known about your efforts to cultivate

this gift with [redacted] was by communicating with you, not by seeing it in a contact report?

**A. You have to repeat that.**

MS. McGROGAN: Can you read it back.

(Question read.)

**A. She could have seen it in a contact report. She could have communicated with me, yes. She could have communicated with her supervisor, yes. Those are the ways she could have found out.**

Q. Do you know who her supervisor was?

**A. I don't. I don't know who she reported to at that time.**

Q. You do not?

**A. No.**

Q. You named Adam Viers as one of the individuals --

**A. He may have been hers at the time. It was switched around very quickly in a short period of time.**

Q. This realignment that gave rise to this complaint with Dr. Allan Scott, you understand that Dr. Allan Scott was removed from your portfolio as a result of a realignment?

**A. He was.**

Q. Was this the first time that donors had been realigned while you were at Duquesne?

114

A. Oh, no.
Q. How many times did that happen?
A. I have no idea. They were shuffled around constantly.
Q. So, in the seven years that you were at Duquesne, if my math is correct, was it more than 10, more than 20? What ballpark area are you thinking in terms of how many times --
A. More than 10. I don't know if more than 20 would be accurate. More than 10, I would say.
Q. So, this wasn't the first time you had gone through a realignment?
A. No.
Q. Each time that donors were added to your portfolio, is it your testimony that you met with the prior gift officer before reaching out to that donor?
A. I don't recall every instance, but most likely, yes.
Q. But you don't recall if you did it every time or if you just did it periodically?
A. My recollection would be that I would have, because they have information on someone I'm trying to cultivate, so I would have -- what do you know of so and so.
Q. Do you remember ever doing that before?

115

A. Before when?
Q. In any of these instances? In any instance, do you remember contacting the prior gift officer.
A. Yes. I went to Washington.
MR. SANSONE: I don't even know what she was going to ask.
THE WITNESS: Sorry.
Let me take a break a minute.
MS. McGROGAN: Sure. We're off the record at 1:31.
(Recess.)
BY MS. McGROGAN:
Q. Mr. Richter, is it your testimony that in every instance where donors were reallocated that you met with the prior gift officer before reaching out to the donor?
A. Every instance would be incorrect. Most likely, yes. It could have happened and I just don't recall it.
Q. So you don't know, one way or another, if you had or had not?
A. I would likely have met with the gift officer, because I know my own business practices.
Q. And other than Adam Novak, do you remember what other gift officers you met with after donors were

116

reallocated?
A. Probably Butch Bryner, probably Lisa Sciullo, probably Natalie Taylor, possibly Lauren Winter.
Q. So, each of these individuals, Butch Bryner, Lisa Sciullo, Natalie Taylor, and Lauren Winter, each of those individuals were people who donors had been reassigned from their portfolio to your portfolio?
A. They were no longer at the school; they left, so their portfolio was divided up amongst the remaining gift officers. I would have got some of those people.
Q. So, when they had left the University, those are the people that you met with? I'm sorry. Let me rephrase that.
When they left the University, that is when their portfolios were reallocated?
A. Correct.
Q. You met with them after they left the University or during the time period when they were wrapping things up and leaving?
A. Wrapping things up.
Q. So, then you talk about information that you discussed with [redacted] being, quote, unquote, "completely confidential in the preliminary stages."
What was the information that was completely confidential?

117

A. Point me to that one again.
Q. We're in the paragraph right below the paragraph we were just reviewing, and it's the first full sentence.
A. Oh. He was considering at the time selling or donating a parcel of land that he had in the Baltimore area.
Q. So, it was the information about him selling that land that you're referring to as completely confidential?
A. Yeah.
Q. Is there anything else that you were referring to that was completely confidential?
A. Not that I can recall at this moment. That was the bulk of my discussion.
Q. And, again, you do not have any notes that you'd be using to refresh your recollection on this?
A. Huh-uh, no.
Q. So, you then go on to say that in telling the lie that you allege that she told, "she completely violated the confidentiality of what he and I had discussed."
Do you see that sentence?
A. I don't. I'm looking for it.
Q. So, "Thus, when Melissa states 'He has shared

some of your thoughts on these matters with me,' not only is that a lie - but further in telling that lie she completely violated the confidentiality of what he and I had discussed."
A. **Okay.**
Q. Do you see that?
A. **Uh-huh.**
Q. At no time, however, did you actually speak to Melissa Krebs about what she and ██████ had spoken about, correct?
A. **Correct.**
Q. Had he shared other thoughts with you on what he intended to do?
A. **I don't recall at that time, at the time.**
Q. So, you do not know what she was referring to when she says "on these subjects," correct?
A. **I'm assuming she discussed the sale of that land. I don't know.**
Q. But it's an assumption; you don't know?
A. **(Shaking head side to side.)**
Q. Had ██████ asked you to keep this information confidential?
A. **I don't recall.**
Q. So, why did you say that it was "completely confidential in the preliminary stages"?

A. **Usually, it is. I don't recall if he specifically stated that. It usually is understood as confidential.**
Q. And is it confidential even within the University?
A. **No.**
Q. So, you could have shared it with other people within the University and it not be a violation of what you understood your confidentiality obligations to be?
A. **When you say "other people in the University...."**
Q. Within advancement.
A. **Within advancement, yes.**
Q. So, then you're saying that one of the ways that she falsified the University records, that refers to the contact report that we just reviewed, correct?
A. **Correct.**
Q. And then "mislead a major/planned giving donor," that refers to the statement that she made in that contact report that you have underlined and bolded; is that correct?
A. **Uh-huh.**
Q. No other statements?
A. **Other statements about what? What do you mean?**
Q. Let's start it this way: "Falsified University

records," that only refers to the contact report, correct?
A. **Yes.**
Q. The "misled a major/planned giving donor," does that only refer to the sentence we just referred to in the contact report?
A. **Yes.**
Q. And then "deceived her colleague," what did she do that deceived you?
A. **She saw one of my donors and lied to that donor about the fact that she had talked to me about it.**
Q. So, same instance?
A. **Uh-huh.**
Q. Same events?
A. **Yeah.**
Q. "...in doing so she shortchanged the University of at least $200,000."
Did I read that correctly?
A. **Yes.**
Q. And am I to understand that that's the difference between your $250,000 discussion with him and then the $50,000 that she got?
A. **Correct.**
Q. So, you call her behavior deliberate, unprofessional, and immoral in the next paragraph.

Do you still believe that her conduct was deliberate, unprofessional, and immoral?
A. **Yes.**
Q. And, again, you do not believe that she took those steps because of your age?
A. **Correct.**
Q. So, you state "This is so much more than just a 'realignment of portfolios.' It cannot be anything but a deliberate undermining of a colleague's efforts by lies and deceptions."
Why did you feel it was so much more than a realignment of portfolios?
A. **She lied to me, she deceived me, she misled me, shortchanged the University. I'm held accountable for fundraising goals. That would have gone in my pile of revenues received. I consider that immoral behavior.**
Q. So, when you are -- is your complaint that the portfolios were realigned or is your complaint that Melissa had reached out to ██████?
A. **The fact that she reached out to ██████. The portfolios were rearranged without consulting me and utilizing standard business practices to do so.**
Q. So, it's both?
A. **Yes.**
Q. At least in terms of this email to Jim that's

that meeting?

A. We met at the Chinese restaurant, hadn't seen each other in quite a while, as I recall it. I asked him, you know, what was going on with Melissa Krebs, some general form like that, and he responded that she's done nothing wrong, and that was that.

Q. That's all that you recall of that meeting?

A. Well, Jim became agitated. He didn't like being questioned by me, so I repeated it. I wanted to be sure I was understanding what he was saying that he felt she didn't do anything wrong, which he repeated. And then I said, well, unfortunately, I disagree, and I got up and left the restaurant.

Q. So, you got up and left the restaurant?

A. Uh-huh.

MS. McGROGAN: I'm going to mark as Exhibit 11 these notes that are titled "Recap of March 2023 meeting @ noon with Jim Miller at China Inn to discuss items of concern to me."

(Richter Deposition Exhibit 11 was marked for identification.)

BY MS. McGROGAN:

Q. Are these your notes?

A. Yes.

Q. In these notes, it says "He asked about my

being attacked in Houston."

What was that about?

A. What are you asking me?

Q. When you were attacked in Houston, what happened?

A. I was meeting a donor in Houston for an early breakfast and parked my rental car next to a fellow. It was a big SUV, and as I got out, my door hit his Audi very gently. And he got out of the car, screaming at me and put his hands on me, and I threw him to the ground. And we were spaced such that my door prevented him from getting at me again once we got up. I was threatened and I went into the coffee shop, which was behind us, and it was early morning and the manager said, what's going on? I said, please call the police.

As I said that, he came in just screaming at me, wanting to attack me. He was Mexican. He was screaming stuff in Spanish. I don't know what he was saying. It wasn't pleasant, I'm sure of that.

The manager -- another manager came around the corner and stopped him -- a woman, actually -- and she said, you sit down over there and you get to the back of the restaurant. People are looking at this like, what in the hell is going on here? And the police came and questioned me. I assume they questioned him.

I was outside at a picnic table.

What frightened me was one of the cops was behind me with his hand on his pistol and another cop was in front of me questioning me. I was scared. And the cops finally figured out what was happening, went out to look at his car, and said, I see no mark on your car. He calmed down, this other fellow. This took a few minutes.

People left the restaurant, because two or three cop cars came with sirens blaring. And one of the cops came up to me and said, you were very fortunate to be alive, get the hell out of here. That's what happened.

Q. Were charges pressed?

A. No.

Q. Did you ever get a copy of the police report?

A. There was no police report.

Q. There was no police report?

A. Huh-uh.

Q. Are you sure of that or you didn't receive it?

A. One cop told me to get the hell out of there, I was lucky to be alive.

Q. Who was the donor that you were meeting that morning?

A. I can't recall their name. They were new to

Duquesne, to my portfolio. Honest to God, I don't recall their names. They were panicked, because they came in in the middle of this. I said, I'm sorry to meet you under these conditions. This obviously is not going to work. I recall now that they had a home in Montana. I said, I'll come and see you in Montana soon, and I'm assuming that they left. I don't recall their names.

Q. So, you didn't end up meeting with them?

A. Yeah, I don't recall names.

Q. Did you ever reach out to them again?

A. I did.

Q. Were you injured?

A. No. I was just scared.

Q. So, you and Jim spoke about this incident when you were at this breakfast -- or at this lunch? I'm sorry.

A. I don't recall that, but it's what I wrote. I recall calling him when it happened. I mean, I called Mary Frances and I called Jim because of protocol.

Q. Was your memory of these events on March 23rd better when you took these notes than it is right now?

A. Sure, yeah, yeah.

Q. So, in this set of notes, it says you asked him why Melissa hadn't been fired for her recent meeting

with [redacted].
A. **Uh-huh.**
Q. Why were you asking why she hadn't been fired if you didn't want her to be fired.
A. **I didn't want her fired, but I knew from working at other universities, people will get fired for that.**
Q. What other university has fired someone for what Melissa Krebs did?
A. **I don't remember which ones at this point in time, but that's kind of an unwritten protocol. I don't recall.**
Q. So you were just questioning why she hadn't been, because it was your experience from other universities, but you can't remember which ones, that people would get fired for this?
A. **Correct.**
Q. And you don't remember anyone who, at those universities, was actually fired for this?
A. **Not at this moment, no.**
Q. So, he then tells you that she had done nothing wrong and that he is the boss and that's his purview to assign/reassign donors to whomever he sees fit.
You write "I agreed with him that he is the boss, and as such, can assign prospects as he sees

fit."
A. **Uh-huh.**
Q. "But these actions violated every development protocol that I was familiar with...particularly the deception of a colleague, lying to a donor who asked for confidentiality, falsifying official University records, et cetera."
And then he repeated that -- it goes to say that you repeated the conversation. Then it says "I told him that I was very sorry he felt this way - and given that, there wasn't anymore to discuss." And then you say "Note: I had a number of other items I wanted to present, but given his stance on this issue, there seemed no effective way to proceed..."
Do you see that?
A. **Uh-huh.**
Q. Do you remember what you were referring to there?
A. **Referring to what?**
Q. You said that there were a number of other issues that you wanted to present.
A. **I would imagine -- my recollection would be what I had other projects going on. We hadn't seen each other in quite some time, so it was a chance to update him on the current status.**

Q. Your memory is not that you had any other complaints you wanted to discuss with him?
A. **Not at that time, I don't recall.**
Q. So, I have seen some emails where you're referring to the fundraising relating to the College of Medicine.
Do you recall doing any fundraising related to the College of Medicine?
A. **Of course.**
Q. Did you have any issues with the way that the College of Medicine fundraising was going?
A. **Yes.**
Q. What issues did you have?
A. **Well, I was upset with Carol contacting [redacted] [redacted].**
Q. It think we've already talked about that in full, correct? Anything else to add to that?
A. **Not that I can think of. I was hoping that they would contact the [redacted] family.**
Q. So, you wanted them to contact the [redacted]?
A. **Yes.**
Q. Anything else?
A. **That would be the biggest thing I could think of at the moment.**
Q. And then you say, "I was very upset, almost to

the point of tears, (which I must admit, was a weird feeling for me), as I walked back to campus; I stopped in the office and shared this narrative with Cecilia while the dialogue and the experience was fresh in my mind."
Why were you almost to the point of tears?
A. **I was frustrated.**
Q. Did you feel emotional about it?
A. **Almost to the point of tears.**
Q. Did you leave the restaurant because you were emotional?
A. **I didn't storm out. I just said, unfortunately, there is nothing more to discuss.**
Q. And then it goes on to say "I was advised to write this recap and share it with Mary Frances to determine what next steps might be..."
Did you share this document with Mary Frances?
A. **I believe so.**
Q. And what did she tell you in terms of what the next steps should be?
A. **I don't recall.**
MS. McGROGAN: So, I'm going to mark as Exhibit 12 a document that has been Bates labeled Duquesne 20 to Duquesne 23.
(Richter Deposition Exhibit 12

was marked for identification.)

BY MS. McGROGAN:

Q. This is an email between you and Jim Miller. These emails are dated April 1st of 2022. If you go to the back of this email, this is an email that you sent to Jim that morning at 8:27 a.m., and you say -- in the second paragraph there, you said "Are you" -- let me restart this this way:

You referenced your lunch meeting on March 23rd. Had you spoken to Jim Miller about these subjects between March 23rd and April 1?

A. I don't recall.

Q. It says in that second paragraph, "Are you implementing a change in policy with respect to employee conduct and portfolio management?"

What did you believe were the changes in policy that he had been implementing?

A. During this time, as I recall, portfolios were being rebalanced/readjusted for everyone. There usually was a pretty strict guideline as to how that procedure was conducted, and I was wondering if he was changing that process. That's what that refers to.

Q. So, during your experience with the University, was this the first donor reallocation that had happened under Jim Miller --

A. No.

Q. -- as the VP?

A. Jim has had a bunch of different titles at different times. I don't know what his title was at that time.

Q. Do you understand that Jim Miller replaced John Plante as VP?

A. Yes.

Q. Do you know when Jim Miller was appointed interim VP?

A. No.

Q. I'll represent to you that it was in July of 2021.

Do you have any reason to believe that there was a realignment that happened between July of 2021 and April of 2022?

A. I have no idea.

Q. So, the prior policies, as you referred to them, with respect to what was followed in advancement, were those realignments that occurred under John Plante's leadership?

A. I would have to assume some of them were, depending on what time we're talking about.

Q. But you don't remember if any of them were related to Jim Miller's time as VP of advancement?

A. I'm sure that Jim Miller realigned portfolios during the time frame I was at Duquesne. Does that answer your question?

Q. How many times?

A. I couldn't recall. I don't know. We had -- oh, never mind.

Q. The first issue that you raise here is "Since I started at Duquesne in 2015, it was made clear to me that under no circumstances were gift officers to contact anyone outside of their respective portfolios without permission of a supervisor." And then it goes on to talk about a pre-visit and a meeting with your supervisor.

Is this a complaint related to the Melissa Krebs situation in reaching out to Allan Scott?

A. I would believe so.

Q. Now, if you go to the next page, page 22, Duquesne 22, it says "My second concern is the realignment of my portfolio. As you well know, years of effort and substantial University resources are directed to build meaningful relationships with donors," and it goes on with some ways of how.

Then you say "I would like to understand how the recent portfolio reassignments serve the best interests of the University. It does not appear that

these changes were made with the knowledge and understanding of the extraordinary efforts each gift officer had made with individual donors such as [redacted]. Never prior to this had we not been given an opportunity to request that we retain specific donor relationships. In fact, so long as we were trending toward securing support, we were always permitted to retain requested donors. This new portfolio realignment does not appear to have taken this long-standing practice into consideration thus denying a gift officer the ability to close pending gifts and receive credit vital to allowing the gift officer to remain employed at the University."

Did I read that correctly?

A. Uh-huh.

Q. Have you ever been told that you were going to be disciplined or let go from the University because you had not hit your required amount of charitable gift giving?

A. Not that I recall.

Q. And so, had you ever been -- let me take that back.

Were other gift officers impacted in this way?

A. In what way are we talking?

Q. That the assignment took donors who were in the

146

process of giving donations away from the gift officers that they had previously been speaking to.
A. **I wouldn't necessarily know what other officers had in their portfolios.**
Q. So you don't know, one way or another?
A. **Yeah, I guess not.**
Q. Did you speak to anyone that had experienced this as well?
A. **I don't recall.**
Q. So, it goes down in the next paragraph and then it says "Of the approximately 48 'new' prospects that I have been assigned, 13 of the 48 were already in my portfolio, leaving 35 prospects. Of these 35, approximately 20 of the remaining prospects include several whom are deceased; and one alum that has dementia. The remaining handful are listed as 'never responded' or 'unable to contact' by a series of gift officers over the past several decades."
Did I read that correctly?
A. **Uh-huh.**
Q. Going into spring of 2021, do you know how many donors were in your portfolio?
A. **I don't.**
Q. If the University's records reflect that you had 431 donors in your portfolio, would that sound

147

correct to you?
A. **There was a time when there was over 400. I recall that.**
Q. Did you believe that that was a manageable number of prospects?
A. **I can't recall what I believed at the time.**
Q. Do you believe it now?
A. **Do I think 431 prospects is a reasonable number for a gift officer?**
Q. Yes.
A. **No.**
Q. So you don't believe that a gift -- do you believe that a gift officer can appropriately contact, solicit, cultivate, and identify 430-plus donors?
A. **If they were all -- it would depend where they were in the cultivation matrix. If you got a portfolio that was in the final stages and all 400 -- it would depend on what's in it.**
Q. So, your portfolio, did you have 430-plus people that were in those final stages?
A. **No.**
Q. So, it was too big of a portfolio. Fair to say?
A. **I would say so.**
Q. So, after the realignment, do you know how many

148

donors you had in your portfolio?
A. **No idea.**
Q. The numbers reflect 372. Do you have any reason to dispute that?
A. **I can't disprove or prove it. I don't know.**
Q. And I have that it reflected 56 removals and 97 additions.
Do you know where you got the number 48 from?
A. **I don't, only that I would have -- see, what happened in this procedure, you get different spreadsheets, because they were updated, and I don't know if I got the last one that was updated. It was a confusing situation. I don't know if I wrote that based on the last spreadsheet that I had and then Paul Demilio would get involved and change it. I don't know.**
Q. Did you know whether Paul Demilio was involved?
A. **My understanding is that he was. I don't know. I don't know.**
Q. You don't know, one way or the other, whether Paul was involved?
A. **He usually was.**
Q. Whenever you say in various communications that he was not involved, that was an assumption that you were making?

149

A. **I'm sorry. I don't get that question.**
Q. So, in various emails throughout this period of time, you say that Paul was not involved. We'll review them, but is that an assumption that you were making when you wrote that?
A. **I don't recall.**
Q. Did you ever talk to Paul?
A. **Of course.**
Q. Did you say Paul, hey, were you involved in this reallocation?
A. **Yeah.**
Q. Did he ever tell you that he was not involved?
A. **Yes.**
Q. When did he tell you that he was not involved?
A. **I don't recall that.**
Q. Tell me everything he told you when he told you he was not involved.
A. **I don't recall, but Paul said how upset he was.**
Q. You're telling me that Paul Demilio's position was that he was never consulted on these portfolios?
A. **That's not what I said.**
Q. What did you say?
THE WITNESS: You have to repeat the first question she asked me.
(Question read.)

William Richter

222

department, right?
A. Yes, yes, yes.
Q. And there always had been throughout your employment. 2015 to 2022, there was pretty frequent turnover?
A. Duquesne was particularly egregious in that regard, as compared to other universities I worked for.
Q. Throughout the employment, 2015 to 2022, lots of turnover?
A. Much more than other places I worked.
Q. Correct. So, we're in agreement that it was not just a period of time; it was 2015 to 2022 there was a lot of turnover?
A. Yes. The whole staff was almost completely repopulated, I guess you could say.
Q. And then it says "I'd like to have" -- in the next page there is -- in the paragraph that says "I'd like to have someone please explain to me how this doesn't make a complete mockery of your complaint process."
Did I read that correctly?
A. You did.
Q. And you refer to yourself as a "damned fool" in the prior paragraph?
A. Many people refer to me as a damned fool, but,

223

yes.
Q. But you're adopting that moniker there?
A. Yes.
Q. And then it says -- in the last sentence, it insinuates that the SVP went to extraordinary lengths to reward it.
As I understand that paragraph -- and take a second to review it.
MR. SANSONE: Where are we?
MS. McGROGAN: In the next paragraph.
THE WITNESS: I missed that one, too.
MR. SANSONE: You said last paragraph.
BY MS. McGROGAN:
Q. It says that the SVP went to extraordinary lengths to reward it.
As I understand it, that refers to Melissa Krebs' conduct; is that correct?
A. Yes.
Q. Does that refer to Jim Miller?
A. I would believe so.
Q. What extraordinary lengths did you believe that he went to?
A. He allowed an employee to take a donor that another employee had cultivated all the way to the process of obtaining a gift, gave that to another

224

employee so that they could get credit for the gift and work that the other University employee had done. That employee was not disciplined for that and, in fact, repeated the behavior.
Q. And that's the extraordinary length?
A. Yes.
Q. Anything else?
A. Not that I recall at this point.
Q. Anything else that you believe he did that would have been an extraordinary length? Do you know if that's all you were referring to?
A. I believe so.
Q. And in this last -- going down, it says "Additionally, I'd like to make it clear that once this gift is booked, I'm left with no alternative but to file an age discrimination complaint as clearly Jim, through his actions, is blatantly favoring a much younger underperforming employee - at my expense."
Did I read that correctly?
A. You did.
Q. Is this the first time that you alleged to anyone at the University that this involved your age?
A. I don't know that for a fact.
Q. Do you believe that you spoke to anyone else about this being related to your age?

225

A. I don't know if this had been already communicated to Jefferson as part of the first complaint. I don't know. It may well have been. I don't know.
Q. We reviewed the first complaint, correct?
A. When?
Q. Earlier today. That was the one-page document that we reviewed related to Melissa Krebs and Adam Viers.
A. There were a multitude of emails back and forth to Jefferson regarding this over a several-month period.
Q. Do you recall if any of them said anything about age?
A. I don't know. It would be quite possible that I did, but I can't answer that. I don't know.
Q. Did you ever communicate with Jefferson on an email address other than your Duquesne email address?
A. I don't know.
Q. Did you check to see if you have any emails on your Gmail account with Jefferson Dedrick?
A. When?
Q. In the course of this litigation.
A. In the course of the complaint or the litigation that follows?

A. That's all I can think of at the moment.
Q. Okay. Do you believe that there were more individuals that you were referring to in that paragraph or do you think those were the only two you were referring to?
A. I don't know.
Q. On PL 69, you refer to Lauren Wiater's resignation and you have identified her as one of the individuals that had left the University. Am I correct that Lauren had accepted a position with Carnegie Mellon?
A. I'm sorry, I'm not seeing what you're referring to.
Q. Page 69, it's the first paragraph.
A. Repeat your question for me.
Q. Am I correct that she resigned for a position at CMU?
A. I believe she went there.
Q. Okay. Lauren Wiater, how old was she approximately?
A. I'm going to guess she's 30, I'm not a good judge of women's ages.
Q. Okay. But she was approximately 30 years old?
A. I would say between 30 and 35.
Q. Okay. And why did you believe that -- why did

you believe that Lauren's resignation involved Jim Miller?
A. She told me.
Q. What did she tell you?
A. That she was probably -- that she felt he was one of the worst managers that she had ever worked for.
Q. Okay. Other than that do you remember anything that Lauren Wiater said to you?
A. We had a number of conversations about this. We traveled to Philadelphia once together to meet with a donor and she shared during that trip how upset she was with how she was treated by Jim.
Q. Did you say the word upset?
A. Yes.
Q. Okay. And what did she say in terms of how she was treated by Jim?
A. She felt belittled, disrespected, intimidated.
Q. Anything else?
A. Not at the moment anything else.
Q. Okay. In this document you say that you were already aware of the $50,000 bequest that was made by ██████. You talk about how you are already aware that it was in his estate?
A. Where are you?

Q. Are you aware that you knew before about --
A. We had had some discussions and he indicated that he already had some funds from his estate. I don't remember if he said that exact number. His gift to Duquesne predated me. He had given money in memory of his wife who went to Duquesne many years ago before that.
Q. But you were aware of the estate gift?
A. I was aware that he -- he said that he had one, he wasn't sure exactly. He was an older man. He wasn't sure exactly what the number was, that there was something there. The purpose of our discussion was to talk about that.
Q. Okay. Do you agree that you could have documented that gift at that time?
A. That I could have documented that gift at that time?
Q. Yeah.
A. No.
Q. Why not?
A. Because when he indicated that to me, the ensuing discussion was let's investigate what you have, which he did not have in front of him, and he then talked about an island or property that he had in the Baltimore area that he was

looking to sell. And then the discussion went to would you be -- would you be willing to donate those proceeds from that sale to Duquesne as part of a larger gift from the estate?
Q. Okay.
A. So I didn't want to close a $50,000 gift if there was much larger money behind it.
Q. So you made a decision not to try to close that gift?
A. It wasn't possible to close it that day, that was not the purpose of the discussion.
Q. Okay. But you could have done so, you could have documented the $50,000 gift, you just chose not to?
A. No, he did not present evidence that he had it. He said he had it and I need a document that says that.
Q. Okay.
A. He didn't have that document.
Q. You could have followed up with him about that document though?
A. We had tried to get back together through subsequent phone conversations to meet in person. He's an older man. He does not hear well on the phone. A discussion of that

**magnitude is not a discussion you want to have on the phone anyway. You want to get back in front of that person in person. He liked to go to the Rusty Scupper to have lunch. That was a big deal to him.**

Q. The Rusty what?

A. **The Rusty Scupper. That's a restaurant in the Inner Harbor in Baltimore that he liked. It would have been inappropriate to take a gift -- there was further discussion that needed to be had.**

Q. Okay. But you could have had that further discussion?

A. **We tried to.**

Q. Okay. Are you aware that you received an investigation report from Jefferson Dedrick related to what his findings were?

A. **No.**

Q. Have you seen that report?

A. **No.**

Q. Okay.

MS. McGROGAN: I'm going to mark this as Exhibit 22.

\- - - -

(Deposition Exhibit No. 22 was marked for identification.)

\- - - -

BY MS. McGROGAN:

A. **Are we finished with this one (indicating)?**

Q. Yes.

\- - - -

(Whereupon, the witness reviewed the document.)

\- - - -

BY MS. McGROGAN:

Q. Do you have any reason to believe that you haven't seen this document before?

A. **When you said the title of it, that didn't make sense to me. I recall the document.**

Q. Okay. So you recall receiving this?

A. **Yes.**

Q. And do you recall sending Jefferson some emails after this document asking for his input on it?

A. **I don't recall doing that as I sit here.**

MS. McGROGAN: I'm going to mark as Exhibit 23 this email that has been Bates labeled Duquesne 276 through Duquesne 278.

\- - - -

(Deposition Exhibit No. 23 was marked for identification, and the witness reviewed the document.)

\- - - -

BY MS. McGROGAN:

Q. If you go to the last page of this document, do you see that this is representing that he's attaching a document that is titled HR Complaint Investigation Report? It's the title of the email.

A. **I'm not seeing where you're trying to get me to refer to.**

Q. The last page of the document. Do you see that he sends you, please see attached and the title of the mail is HR Complaint Investigation Report?

A. **Yes.**

Q. Do you have any reason to dispute that what I just showed you as Exhibit 22 is the exhibit that was provided to you with that email, the investigation report?

A. **Oh, no.**

Q. Okay. And in response to this you say, I'm back on campus Monday, the 25th and would welcome the opportunity to listen to your explanation of this decision. In the interim, please email me the procedure I must follow to appeal it.

Do you see that email?

A. **I don't.**

Q. It's at the bottom.

A. **Okay, second page --**

Q. Bottom of the page, July 20th, 2022 at 4:04 p.m.

A. **Gotcha, yep.**

Q. Okay. Did you ever have a conversation with Jefferson related to the appeal?

A. **In person?**

Q. Yes, or on the phone.

A. **I don't recall that. I don't know that I didn't, I don't know that I did. I don't recall the specifics at this moment.**

Q. Okay. You don't know one way or another whether you would have had a conversation with Jefferson?

A. **No.**

Q. And is it fair to say that you don't remember what you and Jefferson would have talked about then?

A. **Right.**

Q. Okay. And am I correct that you did ultimately file an appeal?

A. **Yes.**

MS. McGROGAN: I'm going to mark this

Mary Frances Dean

----

50

A. When I discovered that [redacted] was reassigned to her.

Q. Tell me everything you recall about that verbal discussion.

A. That I was concerned that Bill had been working with [redacted] for years and that I believed that the donor assignment should stay with Bill, as the best person to handle the cultivation.

Q. How did Ms. Krebs respond?

A. That she was simply following the assignment made by Jim Miller and that she would wait to hear if the assignment was going to be changed back to Bill.

Q. Anything else during that conversation?

A. At that time, no.

Q. And then there was a second conversation?

A. Yes.

Q. What do you recall of that second conversation?

A. Spring or late winter, I believe of 2023, Melissa was going to go visit [redacted] in person and wanted my input as to how to approach the conversation to try to maximize her ability to secure a substantial planned gift for the University.

Q. What did you tell her?

A. We discussed many different avenues of conversation that she could approach with [redacted]. I

51

told her to look at all of the prior contact reports, what he had shared about his deceased wife, see if he was willing to share any specifics about his estate plan, to ask what other philanthropic organizations he supported. The reason for that was to see if any of those missions of the other philanthropic organizations might trigger some thoughts on additional programs or purposes that [redacted] might consider supporting at Duquesne University.

Q. Those are the only two conversations that you had with her?

A. About [redacted]?

Q. Correct.

A. That's what I recall.

Q. In that second conversation, I believe you said it was either spring or late winter of 2023?

A. I believe so.

Q. In any event, was it after Mr. Richter had left the University?

A. Yes.

Q. Did you find anything inappropriate in either of your conversations with Ms. Krebs?

A. Yes.

Q. Which one?

A. The first one.

52

Q. What did Ms. Krebs do that you believed was inappropriate?

A. Ms. Krebs put in a contact report that she had spoken to Bill Richter about [redacted] estate plan.

Q. And your testimony is that you knew this during that phone call?

A. Yes.

Q. And what did you say to her about this?

A. That it was misleading to tell a donor that you had spoken to a gift officer when you had not actually spoken to the gift officer.

Q. How did Ms. Krebs respond?

A. Not concerned.

Q. She said "not concerned"?

A. No. You asked me --

Q. -- how did she respond, yes. What did she say?

A. I don't recall.

Q. Your impression was that she was not concerned?

A. Yes.

Q. Did she say anything that led you to that conclusion?

A. I told her that she should revise her contact report to indicate that she had not spoken to Bill Richter, and I told her that Bill had shared with me that [redacted] had shared some aspects of his estate

53

plan that he did want to keep confidential until he made a determination as to how he wanted to further support Duquesne University. I told her that it was problematic to say that she had spoken to Bill, because it might suggest or indicate or be surmised that Bill had shared something that [redacted] had asked him not to.

Q. And what information -- to your understanding, what information did [redacted] want to be kept confidential?

A. I don't know.

Q. Bill never told you?

A. No.

Q. Did you ever see anything in writing that [redacted] had asked Bill to keep information confidential?

A. No.

Q. And how did Ms. Krebs respond to your statements about telling her to revise the contact report?

A. There was no resolution to that, no response.

Q. Anything with respect to the second conversation that you believed was inappropriate?

A. No.

Q. Do you believe that Ms. Krebs contacted

Mary Frances Dean

54

[REDACTED] because of Mr. Richter's age?
A. No.
Q. Do you believe that [REDACTED] was reassigned to Ms. Krebs because of Mr. Richter's age?
A. No.
Q. Were donors removed from your portfolio, too?
A. Yes.
Q. Did you gain donors from other gift officers?
A. No.
Q. You didn't gain anyone?
A. No.
Q. Do you know if Mr. Richter gained anyone as part of the reassignment?
A. Not that I know of.
Q. So, in this email at the bottom of page 323, it states on March 15th of 2022 "As you are aware, I met with [REDACTED] while in Baltimore two weeks ago. My intention was always to touch base with you once I returned for my 'introductory' meeting. I am back in the office this week and have some" -- there is a blank there -- "if you are interested. Let me know!"
Do you see that email?
A. Uh-huh.
Q. And Bill apparently forwards this email to you and says, "FYI... Please understand that I have no

55

intention whatsoever of communicating with Melissa on ANY subject."
Do you see that?
A. Yes.
Q. Did you believe that Mr. Richter refusing to communicate with Ms. Krebs on any subject demonstrated teamwork?
A. No.
Q. Do you think that his refusal benefited the donor at issue here?
A. No.
Q. Did you support him not having any communication with Melissa on this subject?
A. Yes.
Q. Why?
A. Because it was a matter taken to Jim to be resolved.
Q. So, you did not believe that this was an issue that Mr. Richter and Ms. Krebs could work out on their own?
A. No.
Q. Do you believe that adults can resolve issues on their own without involving a manager?
A. Yes.
Q. And your belief is that by March 15th,

56

Mr. Richter had contacted Mr. Miller?
A. I don't know.
Q. What about this reference to any subject, did you support him not speaking to Melissa on any subject?
A. No.
Q. Why?
A. I don't have any context.
Q. The context is this email. It says "Please understand that I have no intention whatsoever of communicating with Melissa on ANY subject."
A. I did support Bill.
Q. And why did you support him not speaking to Melissa on any subject?
A. Because their relationship was contentious.
Q. As of when?
A. As of this matter.
Q. So, beginning in March of 2022, their relationship was contentious?
A. Yes.
Q. And why do you believe that their relationship was contentious?
A. Because of the way this matter was handled.
Q. Do you know if Ms. Krebs ever spoke to Mr. Richter about [REDACTED]?
A. I don't know.

57

Q. So, it was contentious -- your knowledge of it being contentious was only based on your communication with Mr. Richter; is that correct?
A. No.
Q. What else supported your knowledge of that?
A. When I suggested to Melissa that she reconsider the language that she used in her contact report, it was clear that she was not going to do that.
Q. Why does this make you think that her relationship with Mr. Richter is contentious? You were the one that told her to do that. Was it contentious with you or Mr. Richter?
A. Mr. Richter.
Q. Why do you believe that?
A. There is a course of dealing between gift officers. If a gift officer comes to you and says, I have an ongoing cultivation and relationship with a donor, I believe that I would best serve the donor by keeping the relationship, almost in every instance, the other gift officer, which would have been Melissa Krebs in this matter, would say, okay. Let's discuss this with our supervisor and see if we can have the assignment returned to you.
Q. Okay. Is there anything else?
A. No.

Q. So, you're assuming that a gift officer went to her and said, I want this assignment returned to me?
**A. No. No.**
Q. Your answer was if a gift officer comes to you and says, I want to keep this relationship that their response would be --
**A. I will rephrase that and I will start from the beginning.**
**In Melissa's capacity in which she received the reassignment, it would be her, in her capacity, who would have read the contact reports and gone to the prior officer, who was Mr. Richter in this instance, and say, you apparently have a long-term relationship with this donor and an ongoing cultivation. In that instance, the reassigned officer would look at the whole of the record and suggest let's discuss this. Perhaps it should remain with you. Then the two of them would go to their supervisor and ask for the reassignment or the assignment to be restored to the original officer.**
Q. This was not the first time that donors had been reassigned within Duquesne, right?
**A. Right.**
Q. In every instance when a donor had been reassigned to you, had you gone and had a conversation

with the prior gift officer?
**A. No.**
Q. In what instances had you not done that?
**A. I don't know how to answer that.**
Q. But in every instance where a new donor was added to your portfolio, you did not always go and have a conversation with the prior gift officer?
**A. No.**
Q. Do you remember ever having a conversation with a prior gift officer?
**A. I don't recall one.**
Q. So where are you getting this expectation for Ms. Krebs?
**A. It was a practice in development that prior to any reassignment, Paul Demilio, Director of Research, would send you a list of the donors that were assigned to you that were going to be reassigned. You are given a grace period in which you were permitted to make an argument as to why you should retain anybody who is marked to be reassigned.**
Q. Was that the practice under John Plante?
**A. Yes.**
Q. Had that been the practice under a prior reassignment by Jim Miller?
**A. Yes.**

Q. When was that reassignment?
**A. Reassignments are made periodically, all reassignments.**
Q. So, you talked about this conversation that you expected the new gift officer would have with the former gift officer, but now you're telling me that it was a practice in development for Paul Demilio to send these donor reassignments and give you a grace period?
**A. Uh-huh, yes.**
Q. So, had this practice of going and seeing the former gift officer ever actually occurred?
**A. Yes.**
Q. When did it occur?
**A. Whenever a gift officer felt he or she should do it.**
Q. So, it was within the gift officer's discretion?
**A. Yes.**
Q. By that, you mean within the new gift officer's discretion?
**A. Yes.**
Q. And you had spoken about your knowledge of Mr. Richter being in an ongoing communication with [REDACTED], correct?
**A. [REDACTED], yes.**

Q. [REDACTED] And when was your knowledge of the last time Mr. Richter had seen [REDACTED]?
**A. Could you state that again, please?**
MS. McGROGAN: You can reread it, Lisa.
(Question read.)
**A. I don't know.**
Q. If I told you that it was more than two and a half years before these interactions in March of 2022, would that surprise you?
**A. No.**
Q. Do you know what steps Mr. Richter had taken to secure the gift that he was discussing with [REDACTED]?
**A. Yes.**
Q. What steps had he taken?
**A. Telephone calls.**
Q. Other than telephone calls, what steps had he taken?
**A. It was the pandemic. I'm not aware of any others.**
Q. How many telephone calls?
**A. I don't know.**
Q. How do you know that telephone calls had happened?
**A. Because Bill would report to me and we had just received a $5,000 check from [REDACTED]**

Q. Does [redacted] give annually to the University?
A. No.
Q. Do you have any reason to believe that Mr. Richter was involved in that $5,000 gift?
A. Yes.
Q. Why?
A. Because he was the officer assigned.
Q. So, donors never give donations that have nothing to do with the gift officer assigned?
A. Occasionally.
Q. Other than Mr. Richter being the gift officer assigned, do you have any knowledge of what steps he took to secure that $5,000 gift from Dr. Scott?
A. Telephone conversations.
Q. Ms. Dean, were you part of any discussions with Ken Gormley related to how he wanted solicitations for gifts to occur post-pandemic?
A. Not that I recall.
Q. Were you present during the mandatory meeting where Mr. Gormley presented to gift officers?
A. I don't recall.
Q. You don't recall being there or not?
A. I don't know. I don't know the date, so I don't recall.
Q. It was in November of 2021. Do you remember

meeting with President Gormley in November of 2021?
A. I don't know.
Q. So, you don't recall?
A. I don't know if I attended the meeting.
Q. The question was, do you recall?
A. I don't recall.
Q. Thank you. So, are you aware that President Gormley had told gift officers -- and that the same had been repeated by Mr. Miller -- that the University was prioritizing face-to-face meetings with donors?
A. Yes.
Q. When do you recall being aware of that?
A. Post-pandemic.
Q. What is post-pandemic to you?
A. I don't know. After the pandemic. Whenever the University started traveling again.
Q. Was there a period of time in which the University forbade you from traveling?
A. Yes.
Q. How long was that period?
A. I don't know.
Q. Do you know that Mr. Miller started traveling five weeks after the pandemic started?
A. I don't know.
Q. Any reason to dispute that?

A. No.
Q. Are you aware that numerous employees cited you and Ms. Hughes as the reason for leaving the University because of the toxic work environment that they claim you created?
A. No.
Q. You were not aware of this?
A. No.
Q. Are you aware that numerous deans requested that you not work with their donors?
A. No.
Q. Are you aware that specific deans requested that you not enter their schools?
A. No.
Q. You worked in advancement during the onset of COVID-19, correct?
A. Yes.
Q. How did COVID-19 impact your ability to solicit major and planned gifts at that time?
A. It didn't.
Q. It did not impact your ability?
A. No.
Q. What is the fiscal year for the University?
A. June 30 to July 1.
MS. McGROGAN: I'm going to mark as an

exhibit this document.
(Dean Deposition Exhibit 5 was marked for identification.)
BY MS. McGROGAN:
Q. Do you recognize this document?
A. Yes.
Q. Is that your handwriting on the document?
A. Yes.
Q. Did you create this?
A. No.
Q. Who created it?
A. Cecilia Hughes.
Q. Do you know what she used to create this document?
A. Blackbaud.
Q. Is there a particular tool within Blackbaud or some specific information?
A. There is an executive summary.
Q. Just to clarify, the fiscal year would run from July 1 of 2020 to June 30th of 2021 for a particular year, correct?
A. Yes.
Q. I think we had switched those numbers previously. I just wanted to confirm.
Does this list all of the gift officers that

A. **Bill had many supervisors.**
Q. At the time of his termination, who was his supervisor?
A. **I was.**
Q. Anyone else?
A. **Ultimately, Heather Clay.**
Q. Did he report at any time to Cecilia Hughes?
A. **No.**
MS. McGROGAN: Ms. Dean, we've been going for about an hour and a half. Do you want to take a break?
(Recess.)
BY MS. McGROGAN:
Q. So, we have talked about the portfolio rebalancing that was done in 2022 previously.
Is your understanding that that was undertaken by Mr. Miller following his promotion to VP?
A. **Yes.**
Q. Were you at any point aware that the portfolio reorganization was a directive from Ken Gormley?
A. **Yes.**
Q. When did you become aware of that?
A. **Probably post July 2021.**
Q. And you're using July 2021 because that was the time that Mr. Miller was appointed interim VP?

A. **Yes.**
Q. Did you know that the portfolio reorganization was being done in an attempt to refresh advancement division efforts?
A. **Yes.**
Q. And you knew about it before the results were made public?
A. **No.**
Q. You didn't know that the portfolio realignment was happening before the results were made public?
A. **I did not.**
Q. So, the first you learned that any portfolio realignment was happening was sometime in the spring of 2022?
A. **It was actually when I discovered that Melissa was cultivating** [redacted]
Q. So that would be March of 2022?
A. **Right.**
Q. And that was the first time you heard about any portfolio rebalancing?
A. **Yes.**
Q. Did you ever speak to Mr. Miller about the portfolio rebalancing?
A. **Yes.**
Q. Do you know what the criteria were that he

used?
A. **No.**
Q. Do you believe that portfolio rebalancing is a good practice in advancement?
A. **Yes.**
Q. Why?
A. **To maximize the talent of your gift officers and make sure that planned giving donors are matched with gift officers who have planned giving expertise. Also, it can be helpful if a gift officer has expertise in a particular school, such as Business or the School of Osteopathic Medicine, in those instances.**
Q. Have you ever heard the phrase "changing a songbird"?
A. **No.**
Q. Were you aware that one of the criteria for reassigning donors is if they had received no contact for one or more years?
A. **Yes.**
Q. You were aware that?
A. **No. I'm not aware of the criteria. I was not aware of the criteria.**
Q. Were you thinking of something else when I asked you that question?
A. **No.**

Q. Do you have any reason to dispute that that was one of the criteria that was used?
A. **No.**
Q. Were any of the donors that had been removed from your portfolio individuals that you had contacted in the prior year?
A. **I don't know. No. There were donors removed from my portfolio with whom I had had recent contact.**
Q. Do you know how many?
A. **No.**
Q. Would that recent contact have been recorded in Blackbaud?
A. **No.**
Q. In contact reports?
A. **No.**
Q. Tell me about contact reports. When do you enter a contact report?
A. **What I do personally is when I meet with the donors face to face or there is something specific to a donor's cultivation that, were I no longer employed at Duquesne, would be helpful to the next gift officer assigned.**
Q. Who has access to the contact reports?
A. **I don't know.**
Q. Did you have access to contact reports for all

Page 90

**A. No.**
Q. Other than Ms. Maurer, are you aware of any other women that you allege that Mr. Miller sexually assaulted?
**A. No.**
Q. Do you allege that Mr. Miller sexually harassed any women?
**A. I don't know.**
Q. I'm asking what you allege.
**A. No.**
Q. So, the only woman that you were aware of that was either sexually assaulted or sexually harassed by Mr. Miller was Patty Maurer?
**A. Yes.**
Q. You have no details as to how she alleges she was sexually assaulted or when?
**A. No.**
Q. You have not spoken to her since fall of 2023?
**A. Yes.**
Q. Was that in relation to settlement discussions in these cases?
**A. No.**
Q. Is Ms. Maurer aware that you, Mr. Richter, and Ms. Hughes have raised that allegation as part of your lawsuits?

Page 91

**A. No. Not that I'm aware.**
Q. Have you asked Ms. Maurer for a statement relating to her alleged sexual assault?
**A. No.**
Q. Do you know if Ms. Hughes has?
**A. No.**
Q. Do you know if Mr. Richter has?
**A. No.**
Q. Has Mr. Richter ever spoken to Ms. Maurer, to your knowledge?
**A. No.**
Q. You previously spoke about your allegation that you first became aware of the portfolio rebalancing in response to Ms. Krebs; is that correct?
**A. Yes.**
Q. And you are claiming that Mr. Miller did not adequately communicate with you related to the donor rebalancing; is that correct?
**A. Yes.**
Q. Do you believe that Mr. Miller did not adequately communicate with you because of your age?
**A. No.**
Q. Did you believe that Mr. Miller did not adequately communicate with you because of Cecilia Hughes's age?

Page 92

**A. No.**
Q. Do you believe that Mr. Miller did not adequately communicate with you because of Mr. Richter's age?
**A. No.**
Q. Why do you believe that Mr. Miller did not adequately communicate with you?
**A. Because he chose not to.**
Q. So, it was just a decision that he made not to, not motivated by anything else?
**A. Not that I know of.**
Q. Did you raise any objections to specific donors that were reassigned away from you?
**A. I don't recall.**
Q. Did you ever speak to Mr. Miller or Mr. Demilio related to your request to retain certain donors?
**A. Could you state that again, please?**
**(Question read.)**
**A. Yes.**
Q. When was that?
**A. After it was made known that portfolio reassignments were made.**
Q. As a result of those conversations, did you keep any of the donors that you had requested?
**A. No.**

Page 93

Q. Did you speak to either of them about why the decision to remove them had been made?
**A. No.**
Q. Did you direct those conversations to Mr. Miller or to Mr. Demilio?
**A. Jim Miller.**
Q. Do you know whether Mr. Demilio was involved in the portfolio rebalancing process?
**A. No.**
Q. Do you have any reason to believe that he was not?
**A. No.**
Q. Were you reassigned any donor that led to large donations or planned gifts?
**A. No.**
Q. Did you ever reach out to the donors that had been reassigned to you?
**A. I don't know.**
Q. Do you know whether you were in the process of cultivating any of those donors?
**A. No.**
Q. Are you aware that you received several of Mr. Richter's reassignments?
**A. Yes.**
Q. Did you ever reach out to those donors?

alive at the time and Bill was working with the entire family.
Q. Was that while [REDACTED] was still in Mr. Richter's portfolio?
A. Yes.
Q. As part of the reassignment, she was reassigned to you, correct?
A. Yes.
Q. Did you have any conversations with Bill prior to reaching out to [REDACTED]?
A. No.
Q. When did you first learn that -- so, you first learned that [REDACTED] had been contacted by Melissa Krebs in March of 2022; is that correct?
A. Yes.
Q. And we just discussed that you communicated to her that you were concerned about the way that those reassignments had gone. Is that a fair statement?
A. Yes.
Q. Did you blame that communication issue on Melissa Krebs?
A. I don't blame anything, so I guess -- I don't know how to answer that.
Q. Who was responsible for the reassignments?
A. Jim Miller.

Q. Do you feel that he failed to communicate adequately with everyone in advancement?
A. Yes.
Q. In these documents, there is a reference to a woman named Cara?
A. Yes.
Q. Who was Cara?
A. I'm assuming it's Cara Kassabov.
Q. Who is that? That is the last name, by the way.
A. She was employed at Duquesne University and then left; Rick Creehan made an offer to her and she was to start and called and said that she was not coming to Duquesne; and she was hired for a third time in the last few months.
Q. So, Cara had been employed for one period of time, left, was going to come back, didn't, and now has rejoined?
A. Right.
Q. What was your relationship like with Ms. Krebs prior to March of 2022?
A. Cordial.
Q. How long had she been employed at that point?
A. I don't know.
Q. Was she a newer employee?

A. No.
(Dean Deposition Exhibit 7 was marked for identification.)
BY MS. McGROGAN:
Q. In this email -- I'm looking at your response to Ms. Krebs which is dated March 7th of 2022 at 8:48 a.m. -- you say "I just looked at my notes."
What notes would these have been?
A. A page of notes I may have kept on [REDACTED].
Q. Where would you have kept those notes?
A. A loose sheet of paper.
Q. Somewhere in your office?
A. Somewhere in my office.
Q. Did you maintain a binder?
A. No.
Q. Would it have been just a loose sheet of paper in a file?
A. A loose sheet of paper, a single sheet of paper.
Q. And then you say "Bill had just acknowledged a gift of $5,000 from [REDACTED] in January and was planning to meet with him."
Do you know if Mr. Richter had taken any steps to schedule a meeting with [REDACTED]?
A. I don't know.

Q. "There is a long history with this donor and the level of gift that Bill and I were seeking was far greater than $50,000."
What are you referring to with "long history with this donor"?
A. I had known of [REDACTED] when Cara Kassabov had worked at Duquesne. I had actually gone with her on a visit to meet [REDACTED]. I don't know if we were in Baltimore or where we were, but near his home, and that was the long history.
Q. What year was that?
A. I don't know.
Q. Would it have been within the past two years of receiving this email?
A. I don't know.
Q. Further back than that?
A. Somebody would have to look at Cara's employment records to know when she was employed at Duquesne. I do not know.
Q. You do not remember when Cara left employment with Duquesne the first time?
A. No.
Q. Did you ever meet with Mr. Richter and Ms. Krebs about this, as you suggested in your email?
A. No.

102

Q. Was it your initial intention to do so?
A. No.
Q. So, when you say "Could we chat about this with Bill when he returns," your intention was not to do that?
**A. I'm sure it was my intention. Yes, we could have met.**
Q. But that meeting did not occur?
**A. No.**
Q. Do you know why?
**A. I believe it escalated to Jim Miller's level at that point and we were waiting to get Jim's determination on this reassignment of donors.**
Q. Is it a gift officer's responsibility to keep up to date with their contact reports?
**A. Yes.**
Q. How often did you enter contact reports?
**A. I had had permission from Jim, because of my multiple responsibilities, to turn them in as I was able to. I believe for gift officers who had no other responsibilities, I believe that they had a week for local visits and perhaps longer when they traveled great distances across the United States.**
Q. And in here, she notes that she felt the information she received from the contact report was

103

adequate for her to have an introductory meeting, is that correct?
**A. Yes.**
Q. Have you ever made the determination that information you learned from the contact report was adequate to have an initial meeting?
**A. No.**
Q. No, you've never done that before?
**A. Not if the prior gift officer is still employed and available to speak with.**
Q. What prior gift officers have you reached out to to have these kind of conversations?
**A. Adam Viers, Cecilia Hughes, Adam Novak, Michele Geller, Carla Holmquist, Jim Miller.**
Q. Anyone else?
**A. That's all I can think of at the moment.**
Q. Did you consider it a policy violation for Ms. Krebs not to meet with Mr. Richter before meeting with Dr. Scott?
**A. No.**
Q. To your knowledge, did Dr. [redacted] ever complain about Ms. Krebs?
**A. I don't know.**
Q. So you have no knowledge, one way or the other?
**A. I have no knowledge.**

104

MS. McGROGAN: I'm going to mark as Exhibit 8 this email that you sent to Jim Miller and Adam Viers.
(Dean Deposition Exhibit 8 was marked for identification.)
BY MS. McGROGAN:
Q. It appears to me that you forwarded the communication that you were having with Melissa Krebs to Adam Viers, Jim Miller, Cecilia Hughes, Bill Richter, and Paul Demilio.
Am I reading that correctly?
**A. Yes.**
Q. Why did you not include Melissa Krebs on this email?
**A. Because of Melissa's contact report.**
Q. This email doesn't talk about her contact report.
**A. Okay.**
Q. So why did you not include her?
**A. I don't know.**
Q. Is it your testimony that between 8:36 a.m. and 9:09 a.m. on March 7th, you had reviewed Melissa Krebs' contact report?
**A. Yes.**
Q. You did not raise the issue of the contact

105

report in this email, though. Is there a reason you did not?
**A. No.**
Q. In this email in the second paragraph, it says "I was just speaking with Bill recently about next steps with [redacted] to secure a planned gift after receiving a $5,000 gift in January."
Do you recall those discussions?
**A. Yes.**
Q. What do you recall?
**A. That Bill was traveling extensively to California and that he had planned to contact [redacted] to see if he would meet, and the $5,000 gift was a good indication that [redacted] was still a viable planned giving opportunity for Duquesne.**
Q. Do you know if Mr. Richter had reached out to [redacted]?
**A. He was not permitted at this point.**
Q. Right, but you just said -- I'm talking about in response to the conversation you just testified to.
**A. I do not know if he reached out.**
Q. You say you were speaking to him recently. Do you recall how far before this email you had had that conversation with Mr. Richter?
**A. My practice would be when we receive a gift**

BY MS. McGROGAN:
Q. Ms. Dean, do you still have text messages with Bill Richter on your phone?
**A. I believe I do.**
Q. Can you check and confirm, please?
**A. Sure. Yes.**
Q. What is the earliest text message you have from Mr. Richter?
**A. I don't know if there is an easy way to get to the first text message.**
Q. What year are you in right now?
**A. 2022.**
Q. Are there text messages before that?
**A. Yes.**
Q. Keep going.
**A. (Witness complies.) There's got to be an easier way to do this. 2018. 2018.**
Q. What is the date of the first text message you have?
**A. Actually, February 16, 2016.**
Q. Are you aware that those text messages were requested of you in your lawsuit against the University and Mr. Miller?
**A. Yes.**
Q. Did you provide them to your attorney?

**A. I don't believe I did.**
Q. Is there a reason you didn't provide them to your attorney?
**A. The date on which Joel gave me a deadline I provided thousands of emails and did not have time prior to my mediation the following Tuesday.**
Q. Your memory is that you had produced thousands of emails?
**A. I thought I did. Perhaps I didn't. So, numerous, a number of emails is what I did.**
Q. Have you reviewed your document production?
**A. No.**
Q. So you don't know whether everything that you provided to Mr. Sansone was produced in your lawsuit?
**A. Joel told me to go back a certain number of years and I did my best.**
Q. But you did not provide your attorney with any text messages?
**A. No.**
MS. McGROGAN: We will get that subpoena prepared.
BY MS. McGROGAN:
Q. I'm going to instruct you not to delete any text messages that are currently on your phone. Any effort to do so will be considered spoliation.

Do you understand that?
**A. Yes.**
Q. Do you understand what spoliation is?
**A. No.**
Q. It's the intentional destruction of evidence. Now you have testified on the record that you have text messages from 2016 until present, so I'll expect when you respond to the subpoena that you will have those same text messages. If you don't, you'll be subject to civil and criminal liability.
Do you understand that?
**A. Yes.**
Q. When did you first become aware that Mr. Richter intended to allege age discrimination?
**A. I don't know.**
Q. Do you have any estimate in terms of when?
**A. After he was terminated.**
Q. You did not have any knowledge that he was alleging age discrimination during his employment?
**A. No.**
Q. Did he ever tell you that he was going to allege age discrimination?
**A. After his termination, yes.**
Q. During his employment, did he ever tell you that he was going to allege age discrimination?

**A. No.**
Q. What do you recall him telling you about his allegations of age discrimination following his termination?
**A. What I recall is that Bill was going to file a complaint for age discrimination. I did not -- that's what I recall.**
Q. Did you ask him who he believed was younger than him and being treated better?
**A. Adam Viers and Melissa Krebs.**
Q. Anyone else?
**A. No.**
Q. Do you believe that Adam Viers and Melissa Krebs were treated better than Mr. Richter?
**A. Yes.**
Q. How so?
**A. They received favorable treatment with respect to their portfolio assignments.**
Q. What does that mean?
**A. [redacted] would be an example of a donor that Bill had been working with, yet was reassigned to another gift officer. Bill lost the ability to take credit for the gift and Melissa gained the ability to take credit for the gift.**
Q. Other than the [redacted] gift and Ms. Krebs,

Q. And Cecilia ignored her for more than a week?
A. Okay.
Q. Do you believe that that exemplifies teamwork?
A. No.
Q. And then she has to follow up again with Cecilia after three weeks of not hearing back from Cecilia.
She is following up on the VP of Advancement's request to book this gift, correct?
A. Yes.
Q. Do you feel like Cecilia not responding for now approximately a month exemplifies teamwork?
A. No.
Q. And Cecilia responds and says "I was informed last week that this matter is currently under dispute with HR and will not be processed until that HR process has been completed."
Do you see that response?
A. Yes.
Q. Did Ms. Hughes discuss this with you before responding?
A. I don't recall.
Q. Did you give her the authority -- Ms. Hughes reported to you, correct?
A. Yes.

Q. Did you give her direction not to process until the HR process had been completed?
A. No.
Q. Did you have any authority to tell anyone to stop processing a gift?
A. No.
Q. Did she have authority to stop processing a gift?
A. No.
Q. And Ms. Krebs responds to you and says "While our office may have an internal HR issue, it does not preclude us from servicing the donor's wishes or doing what is the best for the university."
Do you agree with that?
A. Yes.
Q. "Thus, it appears to be most appropriate to follow up with the donor in a time (sic) manner."
Do you agree with that?
A. Yes.
Q. In your experience, would a two-month delay between someone expressing willingness to document a gift and follow up cause an issue with respect to that donation?
A. Could you please restate that?
MS. McGROGAN: Could you reread it.

(Question read.)
A. It could, so, yes.
Q. Do you remember having any conversations with Mr. Richter about this?
A. No.
Q. In response, you send an email saying "Melissa - I will not move forward until this matter is resolved. Do you want to schedule an appointment to meet with a representative from Human Resources?"
So, you are refusing to move forward in this email, correct?
A. Yes.
Q. And did you have authority from anyone to do that?
A. No.
Q. Had you spoken to human resources before that, before saying that you were not going to move forward?
A. No.
Q. Do you remember discussing this issue with human resources?
A. Not at that time.
Q. At what time do you remember having a conversation with human resources?
A. I don't recall.
Q. You state that you were going to contact HR to see how to proceed.
Did you ever do that?
A. I don't recall.
Q. Do you remember having a discussion with human resources at any point regarding this?
A. Yes.
Q. What do you recall from that conversation? Who was it with?
A. Just meeting with Jefferson Dedrick.
Q. Anyone else other than Jefferson Dedrick?
A. No, not that I recall.
Q. How many times do you remember meeting with Jefferson Dedrick about the Krebs gift dispute?
A. I recall twice.
Q. What do you recall of the first meeting?
A. I recall very little. I remember just simply describing what the facts were and why we were in dispute.
Q. When you say "we," do you mean Mr. Richter?
A. Mr. Richter and me.
Q. Why were you involved?
A. Because Bill reported to me and because I had genuine concern about deceiving donors.
Q. Anything else that you recall from that first meeting?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - -

WILLIAM RICHTER, Plaintiff, vs. DUQUESNE UNIVERSITY OF THE HOLY SPIRIT and JAMES MILLER, as an aider and abettor of discrimination, Defendants.

Civil Action No. 2:23-CV-0550
JUDGE CHRISTY CRISWELL WEIGAND

- - - -

DEPOSITION OF: JAMES MILLER

- - - -

DATE: March 18, 2024
Monday, 9:57 a.m.

LOCATION: LAW OFFICES OF JOEL SANSONE
Two Gateway Center
603 Stanwix Street
Suite 1290
Pittsburgh, PA 15222

TAKEN BY: Plaintiff

REPORTED BY: Mary S. Emanuele
Court Stenographer/
Notary Public
QCR Reference No. ME3931

- - - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

DEPOSITION OF JAMES MILLER, a Defendant, called by the Plaintiff, for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Mary S. Emanuele, a Court Stenographer and Notary Public in and for the Commonwealth of Pennsylvania at the LAW OFFICES OF JOEL SANSONE, Two Gateway Center, 603 Stanwix Street, Suite 1290, Pittsburgh, Pennsylvania on Monday, March 18, 2024, commencing at 9:57 a.m.

- - - -

APPEARANCES:

FOR THE PLAINTIFF:

Joel S. Sansone, Esquire
jsansone@joelsansonelaw.com
LAW OFFICES OF JOEL SANSONE
Two Gateway Center
603 Stanwix Street, Suite 1290
Pittsburgh, PA 15222
412.281.9194

FOR THE DEFENDANTS:

Mariah H. McGrogan, Esquire
mmcgrogan@reedsmith.com
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
412.288.3131

ALSO PRESENT:

William Richter, Plaintiff

Pamela L. Wilkins, Esquire
wilkinsp@duq.edu
Senior Vice President for Legal Affairs and General Counsel
OFFICE OF LEGAL AFFAIRS
505 Administration Building
600 Forbes Avenue
Pittsburgh, PA 15282
412.396.5181

* I N D E X *

Examination by Mr. Sansone. . . . . . . . . . . 4

Certificate of Court Stenographer . . . . . . 70
Errata Sheet . . . . . . . . . . . . . . . . . 71
Notice of Non-Waiver of Signature . . . . . . 72

* INDEX OF MARKED EXHIBITS *

Exhibit 1 . DUQ00406-408 Jankowski/Richter. . 28
Exhibit 2 . DUQ00524 Hughes/Richter/Dean. . . 30
Exhibit 3 . DUQ00163-165 Richter/Dedrick. . . 56
Exhibit 4 . PL0064-0073 Richter/Jefferson . . 59

JAMES MILLER,
having been duly sworn,
was examined and testified as follows:

- - - -

EXAMINATION

- - - -

BY MR. SANSONE:

Q. Mr. Miller, are you a married man?
A. I am indeed.
Q. And how long have you been married?
A. Five years -- coming up on five, about four and a half.
Q. Were you married in 2008?
A. 2008, no.
Q. You were not married. Had you been married before at that point?
A. Yes, I had.
Q. But in 2008, you were not married?
A. Correct.
Q. Bear with me here.
A. Sure.
Q. Do you recall attending a University event in April of 2008 given for Duquesne donors, I think it was called the Duquesne Society Annual Donors Celebration?

A. I don't recall that particular. That's an annual event. I do recall I attend all of them.
Q. I was going to say, there's no reason to believe you didn't go to that event; is that correct?
A. Correct.
Q. Do you recall that Patti Maurer was in attendance at that celebration?
A. I do not.
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
Q. You do not, is that what you said? Did you say I do not?
MS. McGROGAN: Yes, you can answer.
BY MR. SANSONE:
A. Okay. I do not recall who was in attendance back in 2008.
Q. Throughout the day, you're going to hear counsel say that same objection.
A. Okay.
Q. Whenever that happens, you can just -- unless she directs you not to answer, you can just continue to answer, okay?

A. Okay.
Q. So I take you don't remember speaking to Ms. Maurer prior to most of the donors arriving?
A. I do not.
Q. Ms. Maurer has claimed that in a conversation with you at that event, you took your right hand and stroked her left breast; is that true?
A. No.
Q. Do you recall Ms. Maurer?
A. Yes.
Q. Do you recall that she resigned shortly after that event?
A. I do not.
Q. Do you recall that she resigned?
A. I recall that she left the University, yes.
Q. Do you know why she left the University?
A. I do not.
Q. Did she work for you at the time?
A. I believe so.
Q. And did you ask her why she was resigning?
A. I don't recall whether or not I've asked or if I did ask what her response may have been.
Q. Are you aware that Ms. Maurer reported this

conduct, your conduct to Ms. Conley sometime in 2021 and again in 2022?
MS. McGROGAN: Objection to form. I'm going to instruct you not to answer.
THE WITNESS: I accept that guidance.
MR. SANSONE: On what grounds?
MS. McGROGAN: It's privileged.
MR. SANSONE: Ms. Maurer's report to Ms. Conley is privileged?
MS. McGROGAN: His knowledge of Ms. Maurer's report to Ms. Conley is privileged.
MR. SANSONE: Well, I believe that Ms. Conley would have been acting as an investigator under those circumstances.
MS. McGROGAN: You're incorrect.
MR. SANSONE: Let me just finish my comment and then I'll be welcomed to have yours. I believe if indeed she approached Mr. Miller about this issue, it would have been in a role as an investigator; therefore she would not be covered or protected by the privilege nor would the conversation, so you still direct him not to answer under the

circumstances?
MS. McGROGAN: I am.
MR. SANSONE: Okay. We're going to hold this deposition open until we have the opportunity to consult with the Court --
MS. McGROGAN: Today is the close of discovery. We're not going to agree to his deposition after the close of discovery --
MR. SANSONE: Okay. That's alright. We have plenty of discovery in another case. Okay.
BY MR. SANSONE:
Q. Were you ever questioned by anyone in regard to this interaction with Ms. Maurer?
MS. McGROGAN: Objection to form. I'm going to instruct you not to answer, James, because it involves a conversation with counsel.
THE WITNESS: I accept that.
BY MR. SANSONE:
Q. Were you disciplined in any way as a result of the allegations I've just told you about?
A. No, sir.
Q. On or about March 3, 2022, did you take any action to review the LinkedIn profile of Patti

Maurer?
A. **Patti Maurer visited my LinkedIn page. I clicked in on hers to review. We had remet via her current employment with Animal Friends after communicating over our participating in -- participation in a golf outing.**
Q. Your testimony is that you communicated with her about this golf outing, and that's why you were on LinkedIn?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
Q. Do I understand that right?
A. **Simply reconnecting, seeing what her career path was at that point, yes. Refreshing my recollection of who she is and what she was doing professionally.**
Q. Is it your testimony that you checked in on her LinkedIn page after she checked on yours first; is that how you remember it?
A. **That's how I remember it, yes.**
Q. On or prior to March 3, 2022, at about that time, did you receive any communication from anyone which indicated that Ms. Maurer was making these allegations against you?

A. **I don't believe so.**
Q. In or about 2008, did you promote a woman named Gwyneth Gaul to the position of senior major gift officer?
A. **I don't recall, but potentially, yes.**
Q. You don't recall whether you --
A. **I did promote her. I don't know the date, sir.**
Q. You don't know the date. Was that the right title for the position?
A. **I don't recall, but likely.**
Q. Was this a newly-created position?
A. **Don't recall.**
Q. Do you recall whether or not it's true that in the previous year Ms. Gall did not make her donation quota?
A. **I don't recall.**
Q. Is it true -- do you know who Melissa Malelestinic is?
A. **Yes.**
Q. Sometimes she goes by Missy?
A. **Yes.**
Q. Do you recall that in 2008 she was pregnant?
A. **I do not.**
Q. Do you recall that in 2007 she made and

exceeded her donation goals?
A. **I do not.**
Q. Do you recall that in 2007, Ms. Maurer also exceeded her donation goals?
A. **I do not.**
Q. Did you have a sexual affair with Ms. Gall?
A. **I did not.**
Q. So that's not why she was selected over the two other successful candidates for this promotion?
A. **No --**
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. **No.**
Q. Is it true that Adrenne Baldoni filed a claim against you with Duquesne for sexual harassment?
A. **I don't even know that name, Adrenne Baldoni?**
Q. You don't know that name?
A. **I do not know that name.**
Q. Have you ever had a claim of sexual harassment made against you?
A. **No, sir.**
Q. Has anyone at Duquesne ever interviewed you

about Mr. Baldoni's accusations?
A. **I don't know who she is and the answer is no.**
Q. So I take it that you were never disciplined in any way related to Ms. Baldoni?
A. **No.**
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
Q. Do you remember discussing a sexual harassment claim with Bernadette Krueger?
A. **No.**
Q. Do you know who Bernadette Krueger is?
A. **Yes.**
Q. So you did not admit to Ms. Krueger that Ms. Baldoni filed a sexual harassment lawsuit or claim against you, I should say?
A. **No, I don't know who Ms. Baldoni is.**
Q. And you've never told Ms. Krueger that you were afraid because of this filing?
A. **No.**
Q. Do you know who Ms. Krueger may have discussed this with?
A. **No.**
Q. In a Zoom meeting in or around '20 or '21, did you make a remark or remarks that suggested

that you had been intimate with Nicole Kelly?
A. No.
Q. And that as a result, you two had children together?
A. No.
Q. You never made a statement like, how are my kids?
A. No.
Q. I assume that you never were intimate with Ms. Kelly?
A. Correct.
Q. And you don't have children with her therefore?
A. Correct.
Q. Was there any investigation performed by Duquesne regarding these remarks?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. I'm not aware. I never made the remark so it makes no sense for an investigation to be had.
Q. Did anyone at Duquesne, including you, receive any disciplinary action related to Ms. Kelly's claims?
MS. McGROGAN: Objection to form.

You can answer to the extent you know.
BY MR. SANSONE:
A. I'm not aware of any claim.
Q. Do you know what the term motor boating means?
A. Yes, sir.
Q. Explain that to me, please.
A. It's an uncomfortable thing to explain but it's when somebody puts their face between breasts.
Q. And does what?
A. And wiggles their head.
Q. That's an uncomfortable thing to explain?
A. Yeah, I think so.
Q. I think it might be an uncomfortable thing to ask a woman to do that?
A. It certainly would be.
Q. Did you ask Ms. Hines, Teresa Hines if you could motor boat her?
A. No.
Q. Do you know whether any witnesses have indicated that they heard you and saw you do that?
A. No.
MS. McGROGAN: Objection to form.
BY MR. SANSONE:

Q. How long have you been employed by Duquesne?
A. 36 years.
Q. Have you ever held any other significant adult employment?
A. No.
Q. How old are you, sir?
A. Be 59 in April, so 58 currently.
Q. Does Duquesne have a policy related to sexual assault and/or sexual harassment?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. Yes.
Q. Do you know the policy?
A. Generally.
Q. Can you generally tell me what the policy says?
A. Prohibits those actions and they are to be reported immediately.
Q. What are the potential penalties under the policy for sexual assault?
A. Up to and including dismissal, termination.
Q. And the policy against sexual harassment, I assume Duquesne has a separate policy related to sexual harassment?

A. Yes.
Q. What are the penalties for engaging of sexual harassment?
A. Up to and including termination.
Q. If a Duquesne employee commits a sexual assault against another Duquesne employee, should that employee that committed the assault be automatically terminated?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Should the employee who committed the assault be automatically terminated?
Q. Yes.
A. It's a matter of opinion, but I believe so.
Q. If a Duquesne employee commits sexual harassment against another Duquesne employee, should the employee committing the harassment be disciplined?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Yes, sir.
Q. What level of discipline ought to apply to that employee in your opinion, sir?

MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. Up to and including termination depending on the circumstances.**
Q. And there is a policy at Duquesne against sexual discrimination, is there not?
**A. Yes, sir.**
Q. And if an employee of Duquesne commits sexual discrimination against another employee or employees, what should happen to that employee?
MS. McGROGAN: Objection to form.
You can answer to the extent you understand.
BY MR. SANSONE:
**A. They should be investigated.**
Q. And what penalty should apply?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. In my opinion up to and including termination.**
Q. Have you ever been investigated on charges of sexual assault against any Duquesne employee?
**A. No.**
Q. That includes Ms. Maurer?

**A. Correct.**
Q. Have you ever been investigated on charges of sexual harassment against any employee?
**A. No.**
Q. That includes Ms. Maurer?
**A. Correct.**
Q. Ms. Baldoni?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
**A. I don't know Ms. Baldoni.**
Q. Ms. Kelly?
**A. No.**
Q. Ms. Hines?
**A. No.**
Q. Have you ever been investigated on charges of sex discrimination related to your promotion of Gwyneth Gaul?
**A. No.**
Q. In your opinion, does Duquesne strictly adhere to its policies related to sexual assault and sexual harassment and sexual discrimination?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. From my perspective, yes.**

Q. What's the basis of your making that claim?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. Observation over time.**
Q. What have you observed?
**A. That it's not to be tolerated. We have ongoing education around it. Reminders to the team what the policy is and reminders that there are consequences associated with it.**
MR. SANSONE: Let me take a couple minutes. We'll be right back.
MS. McGROGAN: Okay.
\- - - -
(Whereupon, there was a recess in the proceedings.)
\- - - -
MR. SANSONE: All right. Let's go back on the record.
BY MR. SANSONE:
Q. Sir, did Mary Frances Dean inform you on several occasions about the details of the Jankowski gift?
MS. McGROGAN: Objection to form.
You can answer.

BY MR. SANSONE:
**A. No.**
Q. Your answer was no I heard?
**A. Correct.**
Q. So she never advised you that there was a revocable gift?
**A. Correct.**
Q. She never advised you that it involved naming rights?
**A. Correct.**
Q. She never advised you about the dollar amount of the donation?
**A. Correct.**
Q. Did anyone advise you about the dollar amount of the donation?
**A. No.**
MS. McGROGAN: Objection to form.
Can you be more specific in terms of time period?
BY MR. SANSONE:
Q. Ever, from leaving out any conversation with counsel?
**A. Well, certainly once the gift was processed, I saw the amount in the system.**
Q. But that was the first time you knew the

William Richter

98

to learn of Melissa's actions with respect to the cultivation of [REDACTED]."
Did I read that correctly?
**A. Uh-huh.**
Q. And is this the first time you contacted Jim Miller about the issue related to [REDACTED] involving Melissa Krebs?
**A. I don't know.**
Q. This is the first email that I have seen related to that. Is there any reason to think that there are any prior emails?
**A. I don't know if there are prior emails or not.**
Q. Had you had prior discussions with anyone -- did you discuss the issues with Melissa Krebs with anyone prior to reaching out to Jim Miller?
**A. I don't recall.**
Q. Did you talk to Mary Frances Dean?
**A. I don't recall.**
Q. Did you talk to Heather Clay?
**A. Prior to -- repeat your question for me. What?**
Q. Did you talk to any other individuals about the issue related to Melissa Krebs before you reached out to Jim Miller?
**A. Yes.**
Q. Who?

99

**A. I can't remember if Rick Creehan was my supervisor at that time.**
Q. He was not.
**A. Mary Frances would have been, yes.**
Q. So, you spoke to Mary Frances?
**A. Uh-huh.**
Q. Did you speak to Heather Clay?
**A. I can't recall if Heather was at the University at that time or whether she came after.**
Q. Did you speak to Cecilia Hughes?
**A. Yes.**
Q. So, you had spoken to, you believe, Mary Fran and Cecilia Hughes prior to reaching out to Jim Miller?
**A. Yes, during this period.**
Q. Cecilia Hughes was your superior?
**A. In gift administration, yes.**
Q. How so?
**A. She prepares all the documents for the gifts.**
Q. So, that was her responsibility was to prepare those letters of intent?
**A. Uh-huh.**
Q. Do you remember discussing this issue with Melissa Krebs with anyone prior to reaching out to Jim Miller?
**A. Not that I recall here, no.**

100

Q. Is there anything that could refresh your recollection on who you would have reached out to?
**A. I don't know.**
Q. So, in this email you have, it says "I had been in a long-term cultivation process discussing a $250,000 planned gift with [REDACTED] when it was brought to my attention on March 7th that Melissa met with him and secured a commitment of only 50,000."
Did I read that correctly?
**A. Yes.**
Q. When you say "long-term cultivation," how many years had that been?
**A. I don't recall exactly when he was transferred to my portfolio. So, I don't know, but a while.**
Q. So, had it been more than one year?
**A. Yes.**
Q. More than two years?
**A. When is this happening?**
Q. 2022.
**A. So, more than two years would be before 2020. Yes.**
Q. Before 2019?
**A. Possibly.**
Q. You have no way of placing when you first interacted with [REDACTED]?

101

**A. I saw him on an elevator at a function at Duquesne. I don't recall when that was. I visited him several times. I don't recall the dates of those visits.**
Q. All of your visits with [REDACTED] were prior to COVID-19, so March of 2020, correct?
**A. Yes.**
Q. Did you ever have a visit with him after March of 2020?
**A. Not that I recall.**
Q. And it states that you were discussing a $250,000 planned gift with [REDACTED], and then it says that it was brought to your attention on March 7th that Melissa had met with him and secured a commitment of only $50,000.
Who brought it to your attention on March 7th?
**A. I don't recall. I don't recall.**
Q. And then in the next paragraph, the last sentence says "I return to campus next Thursday."
Where were you?
**A. I can't remember. Out on the West Coast. I don't remember where.**
Q. Then you say "What I propose is that I be permitted the opportunity to schedule a meeting with

William Richter

130

revocable?
A. No.
Q. Prior to the gift involving the [redacted], had you ever been involved with naming rights for a physical space at Duquesne?
A. I don't recall if the [redacted]r gift had a component of it that named the -- there was a center for education in the nursing building that was named after [redacted], so I believe that's correct. So, that would be an example, yes.
Q. So you have been involved with a naming gift before? It was the [redacted] Education Center?
A. Yes, within the School of Nursing.
Q. What do you remember about the [redacted] Center, about that gift?
A. Can you be more specific?
Q. How much was it for?
A. I've got to think a minute. It was a hybrid gift. I believe initially, 1.5 million.
Q. Do you remember how that gift was structured?
A. It was a hybrid gift, as I recall it, for a ten-year period funded by several different sources.
Q. Was it revocable or irrevocable?
A. I don't recall.
Q. Josh just helped both of us out here by pulling

131

this up.
Is the room we are referring to the [redacted] [redacted] Simulation Room?
A. Yes.
Q. Any other physical spaces where you were involved in the naming agreement?
A. Not that I recall at the moment. You know, it's a while ago.
Q. So, just this [redacted] Center -- [redacted] Room? Sorry.
A. To the best of my recollection at this moment, yes.
Q. When you were negotiating the [redacted] Center, do you remember having to present that gift to the gift committee?
A. No.
Q. You don't remember having any involvement with that?
A. No.
Q. Who would your supervisor have been at that point?
A. I don't recall. I don't know what the date of that was. It would have been whoever was there at that date, whether Rick Creehan was still there. I can't remember. It would have been Mary Frances if she was

132

there. I don't think Adam Viers was involved at that time, so it was either Rick or Mary Frances.
Q. Did you have to get approval from the Vice President of Advancement to name that room?
A. Not that I recall.
Q. Did you have to get the approval of the President to name that room?
A. Not that I recall.
Q. So, you don't recall, one way or another?
A. No.
Q. This email, Jim responds "Thank you for keeping me in the loop." And then Mary Frances Dean sends this to Jefferson Dedrick, and I'll represent to you that this was during the course of his investigation related to the Jankowski gift. And it says "Jefferson - here is another communication about the Jankowski cultivation from Bill to Jim Miller."
And you forward this to Jack Gaylord. Why did you forward this to Jack Gaylord?
A. He's my AA sponsor.
Q. Does he work for Duquesne?
A. No.
Q. Has he ever worked for Duquesne?
A. No.
Q. Does he have any obligation to be bound by

133

confidentiality obligations to donors at Duquesne?
A. No.
Q. Do you agree with me that the reference to a $1 million planned gift to the Media Center would have been confidential information?
A. Yes.
Q. Did he respond to this?
A. Not to my knowledge.
Q. Did you discuss this with him?
A. No.
Q. You have never spoken to him about the content of this email?
A. I don't think so.
Q. Do you have text messages with Jack Gaylord?
A. Yeah.
MS. McGROGAN: I'm going to ask that you review those text messages as well.
MR. SANSONE: I don't think she means now.
MS. McGROGAN: Sorry. That is correct.
BY MS. McGROGAN:
Q. Do you remember your meeting with Jim Miller on March 23rd? I believe you went to the China Inn.
A. Yes.
Q. Can you tell me everything that you remember of

**A. If a pattern continues of taking prospects out of my portfolio which I have cultivated to the point where they're about to give a gift and are removed from my portfolio, that makes it difficult for me to achieve my metrics.**

Q. Anything else that made it impossible for you to succeed?

**A. I guess I don't understand that question.**

Q. Is there anything else you're referring to when you say they made it impossible for you to succeed?

**A. Not that I can think of at this time.**

Q. Do you know who Sean Weaver is?

**A. The name doesn't ring a bell to me.**

MS. McGROGAN: I'm going to mark as Exhibit 18 this document that is dated April 22nd of 2022 at 10:26 a.m.

(Richter Deposition Exhibit 18 was marked for identification.)

BY MS. McGROGAN:

Q. In this email, you say "Sean, I would welcome the opportunity to meet with you regarding some issues at work."

Does this exhibit refresh your recollection as to who Sean Weaver was?

**A. I don't recall what his title was. I don't**

**know what he did. I would imagine I was directed to talk to him. I see anti-discrimination compliance.**

Q. Director of Anti-Discrimination Compliance?

**A. I see that, yes.**

Q. Do you believe that to be his title?

**A. Yes.**

Q. Do you remember ever speaking to Mr. Weaver after these emails?

**A. I do.**

Q. When did you speak to Mr. Weaver?

**A. I don't recall when.**

Q. Tell me what you remember of the conversation you had with Mr. Weaver.

**A. He basically said that he couldn't be of any help, although I can't recall why. He suggested other things at the time, and I can't remember what he was suggesting, but he said he couldn't help me at that time.**

Q. So, you know you spoke to him and you know he said he could not be of any help, but you don't remember why?

**A. Yeah.**

Q. Do you remember telling Mr. Weaver anything related to discrimination or retaliation?

**A. I was asking about what was going on with my**

**case and what's the procedure, but I don't recall specific questions or what he said about that, other than he didn't think he could help.**

Q. What do you mean, you were asking him about what was going on with your case? I don't understand that comment.

**A. He was a person at the University that I was directed to go see as this case, this complaint, moved forward.**

Q. Who directed you to go see him?

**A. I don't recall.**

Q. Was it someone in human resources or Mary Fran?

**A. I don't recall. I don't know.**

Q. You have no idea who directed you to go see him?

**A. No.**

Q. Did you ever file a complaint with the anti-discrimination office?

**A. Not to my knowledge.**

Q. And you say up here -- you then forward this email to Sister Mary Frances Dean and Cecilia Hughes. Why did you send them this email?

**A. They were my supervisors.**

Q. You still believe that Cecilia Hughes was your supervisor?

**A. In some aspects, yes.**

Q. Then it says "I figure I'll see if I can meet with Sean early next week...I'd like to take the weekend and see if Jon stabilizes before responding."

Do you know who Jon is?

**A. My brother-in-law.**

Q. And that was related to -- I believe he was in a car accident?

**A. He was hit by a car riding his bicycle.**

Q. And that was around the same period of time?

**A. It must have been.**

Q. So, we've talked about Mr. Miller telling you that he disagreed with you that what Melissa Krebs had done in this situation was inappropriate, correct? He disagreed; you thought it was inappropriate he disagreed?

**A. Correct.**

Q. Do you believe that he disagreed with you because of your age?

**A. I don't know why he disagreed with me.**

Q. Do you believe that he disagreed with you because you had filed a complaint?

**A. I don't know.**

Q. And when you refer to "issues at work" in your email to Sean Weaver, are you referring to the

218

A. As I recall it -- it's been a while since I've done this work now. As I recall it, he would have had to provide a copy of his will that indicated exactly where the proceeds were going, how they would be paid, whether they would be distributed from stock sales or other assets that could have been applied to it. That would be a process that would go to Cecilia, who would make sure that, depending upon the gift, the proper paperwork has been submitted and verified.

At some point in this, you would have had a statement of charitable intent that the gift officer seeks greatly, because once you get a statement of charitable intent, as I recall it, you can go to Cecilia and say, here is their statement of charitable intent, which indicates that that donor intends to do something, and it verifies for Duquesne that they have the revenues to do so. It's still not a gift, but that allows the gift officer at that time, as I understand it, to get credit for the gift.

So, the gift officer, if you're following me, is really intent -- no pun intended -- on the statement of charitable intent. How that statement of charitable intent reflects how the gift is given is a wide spectrum. That could be cash.

So, your question was when does it constitute

219

a gift?

Q. When does it become booked?

A. Melissa could have booked that, using her example, once she had a copy of his will, in this instance, a signed statement of charitable intent. At that point, she'd give that to Cecilia, as I recall it. She basically can step out of the equation at that point in time, other than to follow up with the donor and say, [REDACTED], I'm still looking for a signed statement of charitable intent or we still need a copy of -- we don't need the whole will. We just need the part that references that. It's a nuance.

Q. So, when you say that you get credit for a gift, credit is received when the gift is booked. Am I following you?

A. Correct, in most instances. Most instances, yes.

Q. So, in the two that are involved here, so [REDACTED] [REDACTED] and [REDACTED], would the credit have been received when the gift was booked?

A. The credit would have been received -- I'm trying to remember the [REDACTED] agreement as we're speaking and the details of it. My best recollection at this moment in time is that the gift officer would have gotten credit for the gift upon demonstrating here

220

is the statement of charitable intent and some form of authorization that that donor could make that financial contribution.

Q. When you say the "statement of charitable intent," that's sometimes referred to as a DSCI?

A. Yes.

Q. Donor statement of charitable intent. I had to run through the acronym in my head, but I think I got it right.

A. It's complicated.

Q. So, did that have to be signed by both parties for you to get credit for that booking?

A. Statement of charitable intent. Yes.

Q. It had to be signed by both parties, meaning both the donor and the University had to sign it in order to get credit booked?

A. For the gift officer, yes. In most instances. Now, there are some exceptions that I, for the love of God, couldn't explain to you at this moment.

Q. For [REDACTED], though, we're within that general rule?

A. Yes.

Q. For the [REDACTED]s, do you understand --

A. The [REDACTED], that's a lot more complicated.

Q. We'll just put that aside for right now.

221

A. Got you.

Q. And then it says -- down at the very bottom of this page, it says "In fact, I understand it already has reoccurred as Melissa is currently contacting and soliciting other donors not currently assigned to her - which yet again completely disregards standard protocol."

Who did she contact that was not assigned to her?

A. I don't recall the name. I had a copy of an email where she contacted a donor and said basically the same thing.

Q. Was it related to Lisa Sciullo?

A. I don't know who it was related to. It was a man. The donor was male, I recall that, and, basically, she said it did the same thing. I can't remember if that guy was in my portfolio. I believe he was, because how else would I have noticed it? That's the best of my recollection.

Q. Do you remember when Lauren Wiater left the University?

A. Oh, God.

Q. Were you still there?

A. Yes. People came and went.

Q. There is frequent turnover within this

A. I believe it was David Dausey.
Q. Okay. You said earlier that that appeal was denied; is that correct?
A. I don't know the procedure. I don't know if David made that decision or if Jefferson made it and it kicked up to Dausey on appeal. I don't know the process.
Q. Okay, you don't know the process that was followed. Did you receive a denial of your appeal in the mail?
A. I'm sure I did. I don't recall at this moment what date it was or any of that. This process went on for months.
Q. Okay. In your Complaint you reference being placed on administrative leave for an alleged violation of a policy of Duquesne related to the naming rights of donors.
A. Say that again.
Q. In your Complaint you say that you were placed on administrative leave for the alleged violation of a policy of Duquesne related to naming rights for donors?
MR. SANSONE: You're now referring to the Complaint in this case --
MS. McGROGAN: In this case.

MR. SANSONE: -- not his complaint --
MS. McGROGAN: Right.
BY MS. McGROGAN:
A. You'll have to repeat it because I had the same confusion. What are you asking me?
Q. You filed a federal court Complaint. Are you aware of that?
A. Yes.
Q. And in that Complaint are you aware that you're alleging that you were put on administrative leave for an alleged violation of a policy of Duquesne related to naming rights for donors?
A. Yes.
Q. Okay. Who were the donors that were involved there?
A. The [REDACTED] are the only ones I can think of at the moment.
Q. Is there other people who you were put on administrative leave related to naming rights for?
A. I don't believe so.
Q. Okay. So who are [REDACTED]?
A. Two alums from Duquesne.
Q. Okay. And what did they name? What were they in the process of naming?

MR. SANSONE: Are you asking what did they want to have named after them?
MS. McGROGAN: Yes.
BY MS. McGROGAN:
A. Is that the question?
Q. Yes.
A. What did they want to have named after them? [REDACTED] was a journalist major as I recall in the late '70s. She wanted to name -- she was interested in exploring the possibility of naming something in the Center for Integrative Media Relations, something like that. That's what she was interested in finding out about.
Q. Okay. And how did that process go? What were the conversations that you had with [REDACTED] about that naming?
A. Well, I had to go to Washington to begin the process, to meet with Adam Novak to talk about [REDACTED], because that is a standard procedure when a prospect is handed off to another gift officer. Adam referenced the Jankowskis. As I recall, he had met with them a couple times in New Mexico. They also have a place in Arizona. He said that they were strong planned giving prospects, should be followed up

on, he does not -- he did not have planned giving experience. He thought this might be a great place to focus some efforts.
Q. Okay. Continue. What else did you do to discuss this gift?
A. Met with Rick -- I think Rick Creehan was still there at that point. I would have met with Rick if he was there, I believe he was, and also Mary Frances Dean because she is head of planned giving at Duquesne or was at that time to make sure she's aware of the potential of this being quite large and pretty lucrative for the University. That's just standard, to meet with the supervisor about the opportunity. From there I got [REDACTED] on the phone and I'm sure Stanley, one or the other. They were eager to meet me and I flew out and talked with them.
Q. Okay. And what did you discuss with them? Tell me everything you remember about your conversation with [REDACTED].
A. I went out there a couple times.
Q. Okay. What's the first time?
A. I can't remember if that was in New Mexico or Arizona. They liked fine dining. And that first meeting was primarily to let them get to

know me a little bit, find out a little bit about their capacity, their interests, more a general let's get to know each other type of conversation. I was really interested in -- Stanley who went to Pitt, as I recall it he had an extensive career in the oil industry, in oil refineries, something along those lines, they were from Michigan, that he had gone to Pitt and hated Pitt.

Q. I'm going to stop you. What do you remember about the conversation about this gift?

A. This is part of the conversation about that gift.

Q. Okay.

A. You don't just meet with someone and say, I'd like you to give a gift.

Q. I just want you to focus your answer on the gift.

A. I'm trying to focus on what you asked me.

Q. Okay.

A. There's a lot of preparatory work to get --

Q. I understand that, I just --

A. It's important to --

Q. -- want you to focus on -- I understand that it's important to you, it's not important for

this case. I just need you to focus on what was talked about related to the Center for --

A. I'm telling you about that.

Q. Okay.

A. We talked about his capacity, his career. [redacted] talked quite extensively about Duquesne, that she wrote for the Duke, the University magazine. She then got quite interested in could I obtain copies of the articles that she wrote at that time. And I think I -- I know I said to her, let me see if I can find them for you, which meant a lot to her at the time.

So as a result of that first conversation, I leave there understanding that [redacted] probably has assets north of 12 million. [redacted] has her own assets as well. A little bit about the process of what it would entail to make a gift to Duquesne. We had not gotten to which assets would be allocated, looked forward to another meeting, that was that.

Q. Okay. And you met with them again?

A. Yes. Again, probably several months later, I don't recall the exact dates. I don't recall if it was in New Mexico. That one might have been in Arizona. It's my recollection that at that

meeting that it was clear that they had expressed an interest in wanting to know what the procedure was to get involved at Duquesne. It was still unclear as to what assets they would allocate, at what level, what was possible. I said I needed as just part of the process a statement of [redacted] 401-K assets to indicate that she had resources that could be able to fund that process. At that second meeting I believe she had that document. It was from Fidelity which showed that -- I can't remember how much, one and a half million, something like that.

So now we're moving along pretty well, she's given a document to me, talking more about the gift. I can't remember the time frame, but she hadn't been back to campus for I'm going to guess 20 years maybe, some long time period. She expressed an interest in coming back to campus for homecoming and actually tour the facility and see what was there. That was the second conversation I believe.

Q. Okay. At what point did you begin talking about naming rights for the CEIM?

A. They talked about asking questions about what

would be possible, scholarships for journalism. She was interested in the radio station, did they need more equipment, all that. Could the room be named? Yes.

MR. SANSONE: Her question was when did you first discuss that.

BY MS. McGROGAN:

A. When did I -- I'm sorry, I lost my train of thought.

Q. When did you first discuss naming rights with respect to the CEIM?

A. Probably the second visit because then -- it would make sense because at that point she's producing documents that indicate she had the capacity to do that.

Q. Okay. And was this the first time that you had been involved with naming a school department, institution or -- institute or university-wide center?

A. No.

Q. When had you previously been involved in naming a school --

A. I believe --

Q. -- department, institute or university-wide center?

Q. Okay. So during that discussion you had told them that naming rights -- your memory is that you had told them that naming rights for the CEIM might be available to them?
A. I don't recall being that specific.
Q. Okay. So what do you recall, let's just --
A. That as part of any donor conversation with alums with assets of that magnitude, you would put out as a natural course of business, these are the opportunities that we might look to discuss, to see which ones they're interested in.
Q. So your memory is that you don't know if it did involve specifically naming the CEIM, but you think you spoke about naming rights generally, am I understanding you correctly?
A. Yeah, I probably --
Q. Okay. And so in this email you don't say anything to Mary Fran or Cecilia about naming rights though; correct?
MR. SANSONE: Let's just stipulate, it says what it says.
MS. McGROGAN: Okay.
BY MS. McGROGAN:
Q. Do you agree that it says what it says?

A. Yes.
Q. And that it doesn't say anything about naming rights?
A. Yes.
Q. Okay. Did you have a prior conversation with Cecilia or Mary Frances involving the gift to the media center being related to naming?
MR. SANSONE: Prior to this email?
BY MS. McGROGAN:
Q. Prior to this email?
A. I don't recall that.
Q. Okay.
A. It's likely I would have discussed things with them, yes.
Q. Ultimately the gift the [redacted] made was memorialized -- or the commitment was memorialized in writing; correct?
A. No.
Q. It was not?
A. No.
Q. So they never signed a Statement of Charitable Intent?
A. A Statement of Charitable Intent is not a gift agreement.
Q. Okay. Did they sign a Statement of Charitable

Intent?
A. I believe we have a copy of it somewhere, I believe I've seen it, yes.
Q. So yes. I'm going to mark as Exhibit 27 which is the [redacted] Statement of Charitable Intent.

- - - -

(Deposition Exhibit No. 27 was marked for identification, and the witness reviewed the document.)

- - - -

BY MS. McGROGAN:
Q. On this document is states that it was a revocable bequest. Do you see that under pledge?
A. Yes.
Q. What does that mean, a revocable bequest?
A. This means that they could revoke the gift as a bequest, meaning it would come from an estate gift of some type.
Q. Which means it would have been after their death; correct?
A. For this document, yes.
Q. Okay. So if you turn the page, who prepared this Donor Statement of Charitable Intent for

you?
A. Cecilia prepares this.
Q. Okay. Did you review it before you presented it to the [redacted]?
A. Yes.
Q. Did you meet with them in person related to their signing of this Statement of Charitable Intent?
A. I don't recall if we FedEx'd this to them at that point or if I met them in person, I don't recall.
Q. Okay. In Paragraph 1 it states, the approximate value of this commitment is 20 percent of the trust estate or 1 million, whichever is greater.
A. Correct.
Q. And then it says, we understand that this gift is revocable during our lifetimes. We may, at any time and in our sole discretion, revoke or modify this gift. Upon distribution of this gift, we understand that this commitment shall be -- I'm sorry, upon distribution of this gift, we understand that this commitment shall become an irrevocable gift to the University.
What did you understand that paragraph to mean?

306

A. At that time we were still discussing the modification of an extension of this type of gift, which --

MR. SANSONE: The question was, what did you understand that paragraph to mean?

BY MS. McGROGAN:

A. What it says.

Q. So you have no other understanding other than what is written here?

A. Right.

Q. Okay. And you said at that time you were discussing a modification. What were you referring to?

A. ████ still had not indicated what he was going to do with some of the remaining assets that he had. That was going to come, as I recall at the time, when he and she came to campus the following fall, subsequent fall.

Q. Okay. And then it states under Paragraph 5, our gift will be used to provide unrestricted funding to the Center for Emerging and Innovative Media within the McAnulty College and Graduate School of Liberal Arts. And then it's defined as the Center. Upon receipt of documentation of the proposed gift, the

307

University agrees that the name of the Center shall become the ████ ████ ████ Center for Emerging and Innovative Media and shall bear such name as long as the Center continues in existence.

Do you see that?

A. Uh-huh.

Q. What does it mean, upon receipt of documentation of the proposed gift?

A. It would mean that they would have to give you the Statement of Charitable Intent and you'd have to have transfer of assets, monies.

Q. Okay. So you understood that there was money that would be coming prior to the naming of this building?

A. Yes.

Q. Okay. And that's your understanding of upon receipt of the documentation of the proposed gift?

A. Yes.

Q. Okay. Where did the trust come from, what was the nexus of the trust?

A. I don't recall.

MR. SANSONE: What was the nexus of the trust?

308

MS. McGROGAN: Yes.

BY MS. McGROGAN:

Q. Do you know where it came from?

A. I don't recall that.

Q. Was it set up just for Duquesne?

A. I don't believe so.

Q. Okay. And then it says that this has and shall bear such name as long as the Center continues in existence. Do you see that?

A. Yes.

Q. Okay. Do you remember Cecilia providing you with a copy of this?

MR. SANSONE: Who? I didn't hear you.

BY MS. McGROGAN:

Q. Cecilia providing you with a copy of this?

A. Of this document here?

Q. Yes.

A. Yes.

Q. Do you remember what her email stated to you?

A. No.

Q. Did you ever speak to Cecilia and/or Mary Frances about needing to go to the gift committee?

A. No, I don't -- that's not the gift officer's responsibility.

309

Q. So you're saying they never brought up the gift committee to you?

MR. SANSONE: In this context?

BY MS. McGROGAN:

Q. In the context of the Jankowski gift. You don't have any memory of them doing that?

A. Cecilia may have mentioned that.

Q. Okay.

MS. McGROGAN: I'm going to mark this as Exhibit 28.

THE WITNESS: Do you mind if I take a break for just a minute?

MS. McGROGAN: Sure.

- - - -

(Whereupon, there was a brief pause in the proceedings from 10:57 a.m. until 10:59 a.m.)

- - - -

(Deposition Exhibit No. 28 was marked for identification, and the witness reviewed the document.)

- - - -

BY MS. McGROGAN:

Q. Ready when you are.

A. Fire away.

Q. All right. The document that I've just put in front of you which is marked as Exhibit 28, is this the email that Cecilia shared the gift agreement or the Statement of Charitable Intent with you?
A. Yes.
Q. Okay. And it says, once we are all in agreement with the draft, I will prepare a memo from you to the Gift Acceptance Committee for approval.
Do you know if there was ever a memo prepared?
A. No, I don't know that she did.
Q. And while we cannot officially approve the Donor Statement of Charitable Intent or sign it on behalf of the University until we get that approval, I don't see a problem with showing it to the [redacted] if you see them next week.
A. Okay.
Q. Do you see that?
A. I see it, yes.
Q. Do you know who is on the Gift Approval [sic] Committee?
A. No.
Q. I'm sorry, Gift Acceptance Committee, but same answer?

A. No.
Q. Do you know whether you ever got approval from the Gift Acceptance Committee?
A. No.
Q. You don't know whether or not you got it?
A. (Gesturing.)
Q. Okay. Do you know whether it was ever put in front of the Gift Acceptance Committee?
A. No.
Q. And therefore you do not know if when Mary Fran signed the Statement of Charitable Intent she had already gotten approval from the Gift Approval [sic] Committee?
A. No.
Q. Okay. Did you ever have any conversations with President Gormley about the gift for the Center for Emerging and Innovative Media?
A. I don't recall any.
Q. Okay. You don't recall any conversations?
A. No.
Q. You said yesterday that you had very few conversations with President Gormley; is that correct?
A. That's correct.
Q. Okay. We might come back to that exhibit, so

don't lose it.
Part of the allegations that you have made in your Complaint are that you had previously informed Jim Miller about this gift. Am I correct in stating that?
A. I would have reported to my supervisor, Cecilia who prepared the document and Mary Frances who reported to him, but she indicated -- she told me she talked to him.
Q. You referred to two women there and then said she. Which one are you referring to?
A. Mary Frances would have talked to Jim about it.
Q. Okay. Did you have any separate conversations with Jim?
A. No.
Q. And Mary Fran told you that she had; is that correct?
A. I believe so, yes.
Q. Okay. Do you remember ever sending him an email where you told him about this gift?
A. No.
Q. So we have several emails that have been produced in this case, one of them was produced by you.
MS. McGROGAN: This is going to be

Exhibit 29.

- - - -

(Deposition Exhibit No. 29 was marked for identification, and the witness reviewed the document.)

- - - -

BY MS. McGROGAN:
Q. It says, be advised that I have sent this invitation to [redacted] in New Mexico; she and her husband [redacted] have verbally committed to a PG of 1M to our media center; correct?
A. Yes.
Q. And it doesn't say anything in there about it being a revocable gift, does it?
A. No.
Q. And it doesn't say anything about naming rights?
A. No.
Q. Okay. You also produced this document which will be marked as Exhibit 29 [sic].
MR. SANSONE: I thought that was 29.
THE COURT STENOGRAPHER: It was. So this is 30.
MS. McGROGAN: This will be marked as Exhibit 30.

- - - -

consideration of a gift is initiated, reviewed, recommended or approved, a naming will generally not be recognized as official and final until at least 60 percent of the total commitment has been paid, with an irrevocable agreement and time period executed in writing for the remainder. Unless prior approval is granted by the Gift Committee, time periods for complete fulfillment of a name commitment should not exceed five years.

Do you see where I read that?

A. **I see where you read that.**

Q. Do you know of any gifts that did not follow that requirement, those requirements?

MR. SANSONE: I'm sorry, any gift --

MS. McGROGAN: That did not follow that requirement.

MR. SANSONE: Do you mean ever in the history?

BY MS. McGROGAN:

Q. Ever in the history of your employment with Duquesne?

A. **Yes.**

Q. Which one?

A. **Some of the buildings were named prior to my**

**arrival for -- from what I understand from conversations, very little money at all.**

Q. What buildings?

A. **I believe possibly [REDACTED]. I can't think of the name of the business building.**

Q. The Donahue Building?

A. **I don't recall specific names of the buildings on campus at this point.**

Q. Palumbo?

A. **It wouldn't have been Palumbo I don't believe.**

Q. Rockwell?

A. **Rockwell. I spent enough time in that building and I still didn't remember the name. I remember conversations with people that said, you know, before we named these buildings for a song and --**

Q. Do you know when those buildings were named?

A. **No.**

Q. Okay. And have you seen the gift agreements that relate to either [REDACTED]?

A. **No.**

Q. Are you aware of any other gifts that have not followed these requirements?

A. **Not as I recall sitting here, no.**

Q. Okay. Then it continues, if a deferred gift is

part of the naming commitment, it is recommended that its maximum value be no more than 40 percent of the total package, as calculated based on the donor's age at the time of the commitment; it is advisable, but not required, that the remaining 60 percent be paid in cash and/or appreciated securities.

Are you aware of any gifts that did not follow that requirement?

MR. SANSONE: Can we just take a moment to go off the record?

MS. McGROGAN: Yes.

- - - -

(Whereupon, there was a discussion held off the record.)

- - - -

BY MS. McGROGAN:

A. **You're going to have to repeat. What are you asking me?**

Q. I'm asking if you are aware of any gift agreements that did not follow these requirements. And I'll broaden it to the first paragraph and the second paragraph.

MR. SANSONE: As a matter of record I want it understood that if my client answers

about the [REDACTED] gift, it will not violate the agreement that you and I have about that subject.

MS. McGROGAN: Certainly, that's fine.

THE WITNESS: Now you've confused me about whether I should mention the Kline gift.

MR. SANSONE: Yes, you should mention the Kline gift.

BY MS. McGROGAN:

A. **The [REDACTED] gift.**

Q. Have you seen the [REDACTED] agreement?

A. **No.**

Q. Other than the [REDACTED] agreement, the [REDACTED] agreement and the [REDACTED] agreement, are there any other buildings or entities, naming gifts, that you are thinking of that do not --

A. **I think that there are, I just cannot recall the -- I was trying to remember conversations I had with other gift officers as to what they were working on, and at that point it gets -- I believe that there probably are, I can't tell you specifically what they might be.**

Q. Have you reviewed any gift agreements that do not follow the requirements set forth in these two paragraphs?

A. I don't review gift agreements.
Q. So you never see them after you secure the gift?
A. I'm sorry?
Q. You never see them after you secure the gift?
MR. SANSONE: You never see them after you secure -- what do you mean by secure the gift?
BY MS. McGROGAN:
A. I don't understand what you mean.
Q. Let's just take a step back. Because you don't review them, you have never seen one that does not follow these requirements?
A. I review a gift agreement when it is signed, the funds are transferred and it is put in my file as a completed gift.
Q. Okay.
A. I look at it.
Q. So you have not reviewed a gift agreement that does not follow these requirements?
A. Not to my recollection.
Q. Okay. And at the bottom it says, variations from these guidelines may be considered on a case-by-case basis upon referral by the --
A. Go ahead.
Q. By the vice president for University Advancement

and approval by the Gift Committee and the president.
Do you know with respect to the [redacted] gift whether this was referred by Jim Miller as the vice president for University Advancement for approval by the Gift Committee or the president?
A. I do not.
Q. Okay. All right. The other document that I handed to you, which is titled the Policy on Gift Related Naming Opportunities. Have you ever seen this document before?
MR. SANSONE: This is also part of Exhibit 32?
MS. McGROGAN: Correct.
BY MS. McGROGAN:
A. I would have seen this, I don't recall when. I don't recall who gave it to me.
Q. Do you know who wrote it?
A. No.
Q. Okay. Were you generally aware that there were minimum gift sizes necessary for various naming opportunities?
A. I was aware that it frequently was a number in flux based on a lot of other factors.

Q. Okay. What were -- why do you believe it was a number in flux based on a lot of other factors?
A. The [redacted] gift is an example, it was a ten-year gift. We usually do not approve ten-year gifts for a variety of reasons. The [redacted] gift was a hybrid which is very uncommon. The numbers there may not reflect exactly what's stipulated there. Some complex planned giving agreements may not exactly reflect everything per se that is probably itemized there. Some scholarship gifts may not as well.
Q. Are you aware of any that did not?
A. I just mentioned the [redacted] to you.
Q. Other than the [redacted]?
A. [redacted], I don't recall -- [redacted] initial gift was 50,000 from stock transfer. We later increased that I believe to 500,000. I don't know if that -- I think I had to go to Rick with that --
THE COURT STENOGRAPHER: I didn't hear you.
BY MS. McGROGAN:
A. I'm sorry. I went to see Tom with Rick. I don't know that that particular gift would have

complied with this. Rick was there and he would have been able to override that, if necessary.
Q. Okay.
A. That's the two examples I can think of at this moment.
Q. So what type of gift was [redacted] gift?
A. [redacted] gave us a scholarship to honor his father.
Q. Okay. So it was a scholarship gift?
A. Yes.
Q. Was it an endowed scholarship?
A. My recollection is that the 50,000 was an initial -- an initial contribution. We were planning on endowing it as time unfolded with [redacted].
Q. Okay.
A. The gift from the couple in San Diego -- damn it, I had their name too -- may not have followed exactly -- this wasn't -- this was a document that, from what I remember, was guidelines.
Q. Is that [redacted]?
A. Are they from San Diego?
Q. I believe so.
A. No, no, I think [redacted] are New Mexico.

Q. Okay.
A. That's not them. This other gift -- I can't recall their names.
Q. What was the type of gift, what did they name?
A. He went to Duquesne. I believe he was in the business school. I believe it was a scholarship to the business school, to the best of my recollection.
Q. Another scholarship?
A. Yes.
Q. Okay. Do you remember what the size of their gift was?
A. I believe it was half a million as I sit here. There may have been a front-load on that. I can't recall the details, it was years ago.
Q. Okay. In the instances where you believe that there were variations from this, I believe you said that you had spoken to Rick Creehan about those?
A. Yes.
Q. Okay. And you believed that Rick Creehan had the authority to change the minimum gift required for a particular --
A. Yes.
Q. Okay. And what was Rick's title at the time?

A. I don't know what his title was.
Q. Okay. Do you know any steps that Rick had to take in order to get that approval?
A. He didn't confide in me what his steps were to do anything.
Q. Do you know where the CEIM is?
A. I believe it's in the Student Union.
Q. Okay. Where is within the Student Union?
A. That, I don't recall.
Q. Okay.
A. It's an area in it.
Q. Okay. So if you go to the last page here, Page 162 on the document, the second document for 132 [sic], this one (indicating). At the bottom it says --
A. Wait a second. You said second document for 132?
Q. 162.
A. 162, okay.
Q. At the bottom it says exceptions and then it reads, the president of the University shall have the latitude to approve the establishment of named funds in amounts less than those stated above, or to determine minimum levels for naming of positions, programs or facilities not

outlined in this document. Similarly, the president retains the right to approve or disapprove any naming opportunity in serving the best interests of Duquesne University.
Did I read that correctly?
A. You did.
Q. What did you understand that to mean or what do you understand that to mean?
A. What it says. I mean, the president has a right to waive these agreements if necessary.
Q. Okay.
A. Are we finished with these two?
Q. Yes. All right.
MS. McGROGAN: This is going to be Exhibit 33.

- - - -

(Deposition Exhibit No. 33 was marked for identification, and the witness reviewed the document.)

- - - -

BY MS. McGROGAN:
Q. This is an email correspondence between you and [redacted]. I want to draw your attention to the communication that is from June 19th, 2022 at 2:49 p.m., it appears on the first page.

A. Uh-huh.
Q. Is says, one item of business to transact, if possible. I have the signed Letter of Charitable Intent for you. The next step is for me to go before the DU's naming committee and present a formal request to name the media center. Can [redacted] bring an old copy of your trust, even though you plan to modify it, so that I can use it to substantiate the value of your gift?
Do you see that?
A. Uh-huh.
Q. Did you ever go before the naming committee?
A. No.
Q. Okay. Did you take any steps to go before the naming committee?
A. I told my supervisor of the pending gift and that's as far as the gift officer would go in that circumstance.
Q. And your supervisor being?
A. Well, Cecilia for the documentation, Mary Frances for the execution.
Q. Okay. So Cecilia and Mary Fran?
A. Yes.
Q. You did not speak to Jim Richter [sic] about

Jefferson Dedrick?

A. I had many meetings with Jefferson Dedrick. What are you referring to?

Q. The one related to the [redacted]. How many meetings did you have with him related to his investigation involving the [redacted]?

A. Probably three at a minimum. There may have been more, I don't recall.

Q. You had three meetings with him?

A. To my recollection, yes.

Q. Tell me what you remember from the first meeting.

A. About the [redacted]?

Q. Yes.

A. He wanted to know information about the gift. He said it was being investigated. That's all I remember.

Q. Okay. And were you in person for this meeting?

A. Yes.

Q. Did you leave that meeting after --

A. After it concluded.

Q. So you believe that he concluded the meeting?

A. Yes.

Q. Are you aware that you were put on a leave of absence because he said that you did not

cooperate in the investigation?

A. Not after the first meeting I don't believe. I don't recall the sequence of them. I don't think he said that after the first meeting.

Q. Okay. So what happened during the second meeting?

A. He wanted further clarification. At this point I was very concerned about why they were probing it so hard. I asked if I should have my supervisors there, asked for permission for Heather Clay to be there, asked for Mary Frances to be there and Cecilia. He refused to allow them to participate, which I thought was odd. I asked him if I needed to retain counsel. He thought that was absurd apparently. I wasn't sure why this was taking such a --

Q. So your memory is that you had a second meeting with Jefferson where you asked for people to be present --

A. Yes.

Q. -- and that he told you no?

A. Yes.

Q. Did you leave that meeting?

MR. SANSONE: Do you mean before the meeting was over?

BY MS. McGROGAN:

Q. Before the conclusion?

A. No.

Q. Did you leave -- so tell me everything you remember of the third meeting.

A. The third meeting he was -- I recall that meeting, it was early in the morning. I had gotten my wife off at the hospital for testing. I went in to see him because hopefully we could resolve this before coming this far. He was hostile to me. He started tossing documents at me. I wanted to take notes. He would not let me take notes. He kept talking so fast I couldn't take the notes that I wanted. He was throwing document after document at me saying why did you do this.

At some point during that barrage my wife called me and said they want to retest my heart and she's crying. So I told Jefferson that, I said I am leaving. I went to -- I forget what hospital she was at.

Q. Did you ever --

A. He followed me down the hall as a matter of fact.

Q. He followed you down the hall?

A. (Nodding head up and down.)

Q. What did he say while he was --

A. Something threatening, you're leaving against -- this is insubordination. I don't know. I didn't hear him at that point because I was very concerned about my wife's health.

Q. Okay. So your memory is that you had three meetings with Jefferson?

A. I recall three meetings, yes.

Q. Okay.

A. It may have been more. Those are the ones you've asked me about. That's what I recall.

Q. And are you aware that you were put on administrative leave because of leaving that -- what you're saying is a third meeting?

A. I left the third meeting. When I was put on administrative leave, whether it was after that meeting or another, I don't recall what time.

Q. Okay.

A. It was a difficult day.

Q. In a communication -- you sent communication that Jefferson had sent to you to your therapist. Do you recall that?

A. Yes.

Q. And in your communication you said that you

intended to work until your full retirement age of 67. Do you recall telling her that?
A. **I said a lot of things to my --**
MR. SANSONE: Do you recall telling her that?
BY MS. McGROGAN:
A. **No.**
Q. Okay. And you told your therapist that Jim Miller was trying to get you -- both Mary Frances and you fired. Do you recall telling her that?
A. **No.**
Q. Do you believe that Jim Miller was trying to get you and Mary Frances fired?
A. **Yes.**
Q. Did Mary Frances get fired?
A. **I don't know what her latest status is.**
Q. You don't know whether or not she was fired?
A. **At that time?**
Q. Yes.
A. **At that time she was not fired.**
Q. Okay. And then you say ironically it's quite unlikely that I can be fired at this stage because it would be viewed as retaliation, but given this situation, who knows. Then it says,

it is Heather who would have to fire us. And then you say she told me such in an action, would certainly give me a case for settlement. Do you remember Heather Clay saying that to you.
A. **Yes.**
Q. Tell me everything you recall about that conversation.
A. **I recall that she said that she was not going to fire me personally, that she felt I was an outstanding gift officer, that she was not going to do it, that she felt it would violate what she understood to be labor laws at that time.**
Q. Okay. Anything else?
A. **No.**
Q. Did she share anything with you about conversations that she had had with the University's attorneys?
A. **No.**
Q. It then says she told me that it is likely that DU would offer me a very meager settlement and require me to send an -- sign an NDA. Do you recall her telling you that?
MR. SANSONE: Can we have that again? That was a little confusing.
BY MS. McGROGAN:

Q. It says that DU would require you to sign an NDA and give you a meager settlement in your terms. Do you recall Heather Clay saying that to you?
A. **Do I recall Heather Clay saying that to me?**
Q. Yes.
A. **No.**
Q. Okay. All right. Mr. Richter, what jobs have you applied to since your employment with Duquesne ended?
A. **I applied for a major gift position with the Wounded Warrior Foundation of Pittsburgh.**
Q. Anywhere else?
A. **I applied for some truck driving positions, part-time truck driving positions.**
Q. Who were the truck driving positions with?
A. **I don't recall the names of the companies.**
Q. I have them as UPMC and St. Barnabas. Were those the only two?
A. **Those were two of them.**
Q. There were more?
A. **(Nodding head up and down.)**
Q. Okay.
MS. McGROGAN: I'm going to ask for a full supplement of his discovery responses because you have only identified St. Barnabas,

UPMC and the position with Wounded Warrior.
MR. SANSONE: I believe he testified he can't remember any others.
MS. McGROGAN: Well, he probably has emails and so I would like you to look for those.
MR. SANSONE. By the way, you didn't send me an email asking for other stuff. I assume you're going to since we talked about that?
MS. McGROGAN: I am. I am going to, you are correct.
BY MS. McGROGAN:
Q. All right. Do you believe that the termination of your employment was based on your age?
A. **Yes.**
Q. Who do you believe discriminated against you on the basis of your age in terminating your employment?
A. **Jim Miller.**
Q. Anyone else?
A. **No.**
Q. Have you ever heard Jim Miller make any comments to you that related to your age?
A. **No.**

Mary Frances Dean

26

**A. Generally.**
Q. Did you delete that text message?
**A. I don't know.**
Q. Can you check your phone, please?
**A. (Witness complies.) I can't pull up John Plante.**
Q. What do you mean by you "can't pull up John Plante"?
**A. I don't have any messages.**
Q. So you deleted the messages?
**A. Yes.**
Q. Do you know why John Plante left the University?
**A. No.**
Q. Did he tell you anything about the reason for his departure?
**A. He was unhappy.**
Q. In what way?
**A. I don't know.**
Q. How did you know he was unhappy?
**A. He told me.**
Q. He just said I am unhappy and you didn't ask any follow-up questions?
**A. No.**
Q. Do you know if he signed a separation agreement

27

upon his departure?
**A. No.**
Q. Did he ever tell you that he signed a separation agreement?
**A. No.**
Q. In the conversations that you had with Mr. Plante before your settlement discussions, what did you discuss with Mr. Plante?
**A. Naming rights policy.**
Q. What did you talk about specifically related to the naming rights policy?
**A. Other situations in which buildings were named at Duquesne.**
Q. Tell me more.
**A. Specifically, whether or not policy had been followed in the past.**
Q. What did he tell you?
**A. That it did not.**
Q. What did not?
**A. That policy had not always been followed in the past.**
Q. Are you aware that he drafted that policy?
**A. No.**
Q. When did Mr. Plante leave the University?
**A. May of 2021.**

28

Q. And what role did he hold prior to his departure?
**A. Senior vice president – actually, I don't know. I don't know his title.**
Q. Was he the head of the advancement division?
**A. Yes.**
Q. Was it his responsibility for enforcing those policies?
**A. I don't know.**
Q. Do you have any reason to dispute that he was?
**A. Yes.**
Q. What reason do you have to dispute that he was?
**A. There is a gift acceptance committee.**
Q. What does the gift acceptance committee do?
**A. Review gifts to the University that are determined to need approval.**
Q. What's your understanding of what gifts are determined to need approval?
**A. Gifts of tangible property. That's it.**
Q. You're not aware of any other types of gifts that required the gift acceptance committee to be involved?
**A. No.**
Q. Do you know who sits on the gift acceptance committee?

29

**A. Dr. Dausey, Pam Connelly, Jim Miller. I'm not aware of the other members of the cabinet. Matt Frist. I'm sorry. Matt Frist and Father McCloskey. It's five individuals.**
Q. Can you spell McCloskey for the record?
**A. M-c-C-l-o-s-k-y (sic).**
Q. Have you ever requested a review of a particular gift from the gift acceptance committee?
**A. Yes.**
Q. When did you do that?
**A. The gift acceptance of a piano to the music school.**
Q. Do you remember who was donating the piano?
**A.** [redacted]
Q. [redacted]
**A. Yes.**
Q. Is that the only time you went to the gift acceptance committee?
**A.** [redacted]
MS. McGROGAN: I'm going to ask that we go off the record for a second. We did just get an order.
(Discussion off the record.)
BY MS. McGROGAN:
Q. You were saying [redacted]?

Mary Frances Dean

30

A. [REDACTED].
Q. And what did she donate to the University?
A. It was a complicated gift through a revocable trust to support -- I'll get there and I can't spell this for you -- the nurse anesthetist program at Duquesne in the nursing school.
Q. Why did you take that gift to the name committee -- gift acceptance committee? I'm sorry.
A. Because it was an unusual legal vehicle by which the University would not receive the principle at death, as is usually the case, but would receive income from the trust, which would become irrevocable at [REDACTED] death and provide income for a 25-year period.
Q. Were there naming rights associated with that gift?
A. No.
Q. Other than the gift of the piano and the gift to the nurse anesthetist program, any other gifts that you took to the gift acceptance committee?
A. [REDACTED] library and papers collection were donated to the Gumberg Library. I was consulted on this by Dean Sara Baron, University librarian, because it had not gone through the proper channels for the gift acceptance committee.

31

Q. Anything else?
A. [REDACTED] left his forensic collection to the Gumberg Library, and I took that to the gift acceptance committee with Dean Sara Baron.
Q. Anything else?
A. Not that I recall.
Q. And it's your testimony that those are the only four instances where you went to the gift acceptance committee during your employment at the University?
A. No. That is what I recall.
Q. Do you recall any others?
A. Not at this moment.
Q. When did you go with the piano?
A. Last January.
Q. So, that would be January 2023?
A. Yes.
Q. When did you go with the gift to the nurse anesthetist school?
A. April of '22.
Q. And when did you go with respect to Justice Diamond?
A. No recollection of the dates.
Q. How many years ago was it?
A. In the last year.
Q. So, in 2023 sometime?

32

A. Yes.
Q. And what about [REDACTED]
A. 2023.
Q. Do you know whether you went to the gift acceptance committee prior to 2023?
A. No.
Q. Do you know whether you went prior to April of 2022?
A. No.
Q. Is it possible that you did go and that you're not remembering it, or are you saying that you did not go?
A. I don't recall.
Q. Do you recall telling Jim Miller that you knew what everyone in the advancement division made?
A. No.
Q. Do you deny that you said that?
A. Yes.
Q. Do you know what everyone in the advancement division made?
A. No.
Q. Do you agree that donor information is confidential within the University?
A. Yes.
Q. Are gift officers required to keep donor

33

information confidential?
A. Yes.
Q. What information does this include?
A. I don't know.
Q. So you know that information is required to be confidential, but you don't know what that information is?
A. No.
Q. Would it include their personal information?
A. Yes.
Q. Would it include their biographical information?
A. Yes.
Q. Would it include their financial information?
A. Yes.
Q. Gift agreements that they entered into?
A. Yes.
Q. Would it include donor statements of charitable intent?
A. Yes.
Q. Would it include their philanthropic plans with respect to the University?
A. Yes.
Q. Do you believe that the relationship between a university and its donors is sacrosanct?

A. **Bill had many supervisors.**
Q. At the time of his termination, who was his supervisor?
A. **I was.**
Q. Anyone else?
A. **Ultimately, Heather Clay.**
Q. Did he report at any time to Cecilia Hughes?
A. **No.**
MS. McGROGAN: Ms. Dean, we've been going for about an hour and a half. Do you want to take a break?
(Recess.)
BY MS. McGROGAN:
Q. So, we have talked about the portfolio rebalancing that was done in 2022 previously.
Is your understanding that that was undertaken by Mr. Miller following his promotion to VP?
A. **Yes.**
Q. Were you at any point aware that the portfolio reorganization was a directive from Ken Gormley?
A. **Yes.**
Q. When did you become aware of that?
A. **Probably post July 2021.**
Q. And you're using July 2021 because that was the time that Mr. Miller was appointed interim VP?

A. **Yes.**
Q. Did you know that the portfolio reorganization was being done in an attempt to refresh advancement division efforts?
A. **Yes.**
Q. And you knew about it before the results were made public?
A. **No.**
Q. You didn't know that the portfolio realignment was happening before the results were made public?
A. **I did not.**
Q. So, the first you learned that any portfolio realignment was happening was sometime in the spring of 2022?
A. **It was actually when I discovered that Melissa was cultivating [redacted].**
Q. So that would be March of 2022?
A. **Right.**
Q. And that was the first time you heard about any portfolio rebalancing?
A. **Yes.**
Q. Did you ever speak to Mr. Miller about the portfolio rebalancing?
A. **Yes.**
Q. Do you know what the criteria were that he

used?
A. **No.**
Q. Do you believe that portfolio rebalancing is a good practice in advancement?
A. **Yes.**
Q. Why?
A. **To maximize the talent of your gift officers and make sure that planned giving donors are matched with gift officers who have planned giving expertise. Also, it can be helpful if a gift officer has expertise in a particular school, such as Business or the School of Osteopathic Medicine, in those instances.**
Q. Have you ever heard the phrase "changing a songbird"?
A. **No.**
Q. Were you aware that one of the criteria for reassigning donors is if they had received no contact for one or more years?
A. **Yes.**
Q. You were aware that?
A. **No. I'm not aware of the criteria. I was not aware of the criteria.**
Q. Were you thinking of something else when I asked you that question?
A. **No.**

Q. Do you have any reason to dispute that that was one of the criteria that was used?
A. **No.**
Q. Were any of the donors that had been removed from your portfolio individuals that you had contacted in the prior year?
A. **I don't know. No. There were donors removed from my portfolio with whom I had had recent contact.**
Q. Do you know how many?
A. **No.**
Q. Would that recent contact have been recorded in Blackbaud?
A. **No.**
Q. In contact reports?
A. **No.**
Q. Tell me about contact reports. When do you enter a contact report?
A. **What I do personally is when I meet with the donors face to face or there is something specific to a donor's cultivation that, were I no longer employed at Duquesne, would be helpful to the next gift officer assigned.**
Q. Who has access to the contact reports?
A. **I don't know.**
Q. Did you have access to contact reports for all

126

University publishes what University-wide centers are on their web side?
A. No.
Q. Are you aware of the [redacted] Center for Ethics in Science, Technology, and Law?
A. No.
Q. Are you aware of the Center for Catholic Faith and Culture?
A. Yes.
Q. Are you aware of the Center for Community-Engaged Teaching and Research?
A. Yes.
Q. The Center for Global Engagement?
A. No.
Q. The Center for Integrative Health?
**A. I do not know where that's located, no.**
Q. Do you know what it is?
**A. My understanding is that is a collective of all the health-related schools, but I'm not aware that it's a place.**
Q. Do you know what the Center for Spiritan Studies is?
A. Yes.
Q. The Center for Teaching Excellence?
A. No.

127

Q. The Aging Research and Teaching Consortium?
A. No.
Q. Chronic Pain Research Consortium?
A. No.
Q. The [redacted] Learning Skills Center?
A. Yes.
Q. Are you aware that the University classifies those as University-wide centers?
A. No.
Q. Do you have any reason to dispute that those are University-wide centers?
A. No.
Q. Who are the [redacted]?
**A. I do not know the J[redacted]. They are a donor that Bill Richter was working with. That's all I know.**
Q. You never met with them in person?
A. No.
Q. Did you ever speak to them?
A. No.
Q. Did you ever interact with them on email, text messages, or any media?
A. No.
Q. When did you first become aware that Mr. Richter was soliciting a gift from them?
**A. Many years ago.**

128

Q. How many?
**A. I don't know.**
Q. In 20- –
**A. Whenever Bill started to traveling to California, and I don't know the date.**
Q. What was your understanding of the gift that Mr. Richter was soliciting from them?
**A. That it was a large, seven-figure gift and that they would like to name the media center.**
Q. Do you know when the Center for Emerging and Innovative Media – which I understand is called is CEIM. Is that your understanding, too?
A. Yes.
Q. Do you know when that opened?
A. No.
Q. When they started talking about naming the media center, it had to be sometime after that center opened, correct?
**A. I don't know that. There may be many iterations of media centers at Duquesne that occurred or existed prior to this space.**
Q. Are you aware of any?
A. No.
Q. So, you're saying it could have been, but you just aren't aware of them?

129

**A. I believe that, yes, in the [redacted] School, there was. I'm happy to say, no, I'm not aware.**
Q. When did you first become aware that they wanted to name the media center?
**A. The first time that Bill relayed his meetings, of which I believe there were multiple, with the Jankowskis.**
Q. And he told you this verbally or in email?
**A. Verbally. He also provided itineraries when he would travel.**
Q. And those – your recollection of those itineraries is they included a reference to the naming rights?
**A. The itinerary would not include specific information is my recollection. My recollection is it is the name of the donor and possibly the school that they wish to support.**
Q. And not all donations that support a specific school are accompanied by naming rights; is that correct?
**A. Correct.**
Q. I understand that it's your contention that you informed Mr. Miller about the gift that the Jankowskis were anticipating making to the CEIM?

130

A. Yes.
Q. When did you first inform Mr. Miller about the gift that the [redacted] were making to the CEIM?
A. I do not have the date.
Q. Do you have a year?
A. When I started to meet with Jim every other week, which would have started after July of 2021, we would meet for an hour by telephone to discuss what I was working on and with whom we were working with.
Q. You didn't begin having Mr. Richter report to you until November of 2021, though, correct?
A. I don't know the date.
Q. I will represent to you that it was November of 2021.
A. Okay.
Q. Between July of 2021 and November 2021, would you have discussed the gift that was being contemplated to the CEIM with Mr. Miller?
A. Can you give me those dates again?
Q. July of 2021 to November of 2021.
A. Okay. This is important. What is the question?
Q. Did you discuss the CEIM and the gift that Mr. Richter was working on with Mr. Miller during that time period?

131

A. Yes.
Q. Why did you discuss it between July of 2021 and November of 2021 if Mr. Richter did not work with you?
A. Because I worked with all gift officers on planned gifts.
Q. What exactly did you tell Mr. Miller during this period of time with respect to that gift?
A. That the [redacted] were going to make a seven-figure gift and that it was my understanding that they would like some naming rights. That's all I have.
Q. Did you tell him that the Jankowskis wanted to name the CEIM?
A. I did not. I called it the media center.
Q. Did you tell him anything else about this gift during that period of time?
A. Other than it was seven figures and that the cultivation had slowed to some degree because of the pandemic, and my recollection is the [redacted] were not comfortable traveling or meeting during the pandemic or in the time after the pandemic people started to travel again. I understand that there were -- there was at least one campus visit scheduled that was canceled because of the pandemic and that they would be coming to the University in the fall of 2022.
Q. Do you know if the [redacted] did come to

132

campus in the fall of 2022?
A. I don't.
Q. During this period of time from July 2021 to November of 2021, were you aware that the gift was revocable?
A. Yes.
Q. Did you tell Mr. Miller that?
A. Yes.
Q. Why didn't you tell me that as something that you told Mr. Miller?
A. It didn't occur to me.
Q. Did you take notes during those meetings?
A. No.
Q. Is there anything else that you've forgotten to tell me with respect to this gift?
A. Well, what I can tell you is 90 percent of estate gifts are revocable, which is why I failed to tell you that. So, until the donor is dead, it's rare that they will set up an irrevocable situation or vehicle or planned giving option.
So, what I will tell you is every person who has supervised me knows that there is one thing that I do always. I provide a list of who we are working with in planned giving, who the gift officer is, what the amount is, what the purpose is, and most

133

importantly to Jim Miller was will it close by the end of whatever fiscal year we are in.
Q. How often did you provide those emails?
A. They were not emails. It was a list that I gave verbally as I met with Jim, which, for a period of time, it was every other week.
Q. How long was that?
A. Until Heather Clay was assigned to me.
Q. I thought you testified earlier that Mr. Miller canceled those meetings?
A. I can't rely on that calendar, so I don't know.
Q. So, you told him, but at canceled meetings, but you only told him verbally? I'm just trying to understand, because we're going back and forth. He canceled meetings but you talked to him and you told him all these thing?
A. This calendar I cannot rely on. Joy Hopkins put these meetings there. I can't cancel them myself, because I have no authority or permission through the software in Outlook, so I don't know what meetings we kept or didn't keep.
Q. So, your testimony is that at some point between July of 2021 and November of 2021 during the meeting that you claim that he did not cancel, you told him that the gift was a seven-figure gift with naming

rights attached to the media center that was revocable?
A. **Yes.**
Q. And you specifically told him that it was revocable?
A. **Yes.**
Q. And how did Mr. Miller respond?
A. **There was no response.**
Q. He just moved right on?
A. **Until it got to closure, yes. There was no conversation about it. I simply provide a list.**
Q. You simply provide a list verbally. You don't actually give him a copy?
A. **When requested, I do.**
Q. Other than your testimony, do you have any evidence that you told Mr. Richter that this gift was revocable and in exchange for naming rights?
MR. SANSONE: Mr. Miller.
A. **Say that again, please.**
Q. Other than your testimony, do you have any evidence that you told Jim Miller that this gift was revocable and in exchange for naming rights?
A. **I do not know what I might have provided to Jim by email when requested.**
Q. Let's review those emails.
MS. McGROGAN: We'll mark this

Exhibit 10.
(Dean Deposition Exhibit 10 was marked for identification.)
BY MS. McGROGAN:
Q. This is a March 2022 email from Bill Richter to you. Is there anywhere in this email where he references the gift being revocable or in exchange for naming rights?
A. **No.**
Q. Prior to John Plante and Rick Creehan departing the University, had you ever gone to the gift acceptance committee?
A. **The gift acceptance committee works by email and memorandum.**
Q. Had you ever submitted anything to the gift acceptance committee?
A. **Yes.**
Q. What had you submitted to the gift acceptance committee?
A. **What date are we discussing?**
Q. Prior to their departure.
A. **Prior to their departure. I did not.**
Q. Was that part of their responsibilities prior to their departure?
A. **Rick Creehan, yes. Rick was my supervisor.**

Q. So, Rick was between you and John Plante in the hierarchy?
A. **Yes.**
Q. So, Rick would have been the one that went to the gift acceptance committee and presented any kind of gift that had naming rights?
A. **Yes.**
MS. McGROGAN: I'm going to mark as Exhibit 11 another email.
(Dean Deposition Exhibit 11 was marked for identification.)
BY MS. McGROGAN:
Q. This one is from April of 2022. Is there anything in this email that states that this anticipated gift was revocable and in exchange for naming rights?
A. **(Witness reviews document.) No.**
Q. And for both this email and the last email, there is nothing in either of these emails that, based on your experience as a gift officer, you would understand to mean that it was revocable and in exchange for naming rights?
A. **No.**
Q. I understand that Ms. Hughes drafted the statement of charitable intent for the Jankowskis; is

that correct?
A. **Yes.**
Q. And you signed it?
A. **Yes.**
Q. At the time that you signed the Jankowski gift, which I have as July 7th of 2022, what was your title?
A. **My title as of November of 2021 was Senior Assistant Vice President.**
Q. Gift Planning?
A. **Gift Planning.**
MS. McGROGAN: I'm going to mark as Exhibit 12 the document that I just put in front of you, which is the statement of charitable intent that was provided to the Jankowskis.
(Dean Deposition Exhibit 12 was marked for identification.)
BY MS. McGROGAN:
Q. After Cecilia would do the initial draft, would you review these?
A. **Yes.**
Q. Would you review them before they went to the donors?
A. **Yes.**
Q. Did you view it as part of your responsibility

to ensure that the statements of charitable intent complied with the University's policies and procedures?

**A. Yes.**

Q. According to this gift agreement, when was the University supposed to receive the donation from the [REDACTED]?

**A. At the death of -- I can't answer this. At the death of the survivor of them or possibly at the death of one of them.**

Q. Why can't you answer that?

**A. Because it doesn't say. In order to answer that question, general law provides that a spouse would need to sign off on an account so that they would not receive it at the first of them to die date of death. I do not know what the Jankowskis did. I don't know if it's at the death of the survivor of them or at the death of one of them.**

Q. Is it fair to say that there is not a date certain by which the University would be receiving this gift?

**A. No, there is not.**

Q. And in paragraph 3, it states "We understand that this gift is revocable during our lifetimes. We may, at any time and in our sole discretion, revoke or modify this gift. Upon distribution of this gift, we

understand that this commitment shall become an irrevocable gift to the University."

Did I read that correctly?

**A. Yes.**

Q. Did you understand that language to mean that the gift that the [REDACTED] were making to the CEIM was going to be revocable during their lifetimes?

**A. Yes.**

Q. Do you understand that means the University might not receive anything?

**A. Yes.**

Q. In paragraph 5, it says "Our gift will be used to provide unrestricted funding to the Center for Emerging and Innovative Media within the McAnulty College and Graduate School of Liberal Arts ('Center'). Upon receipt of documentation of the proposed gift, the University agrees that the name for the Center shall become the [REDACTED] Center for Emerging and Innovative Media' and shall bear such name as long as the Center continues in existence."

Did I read that correctly?

**A. Yes.**

Q. What does it mean, "upon receipt of documentation of the proposed gift"?

**A. The attached, which shows the beneficiary designation.**

Q. So, according to this -- where does it show the beneficiary designation in this document?

**A. My understanding is that this is a Fidelity account, and my recollection is it was an IRA and that it would be coming to the University at the death of whomever.**

Q. So, as of receipt of this document from Fidelity, your understanding was that the gift had been completed and that the center should have been titled the [REDACTED] Center for Emerging and Innovative Media?

**A. Yes.**

Q. And it states that that name shall -- that the Center shall bear such name as long as the Center continues in existence?

**A. Yes.**

Q. Regardless of whether the gift that was revocable during their lifetime was ever received?

**A. Yes.**

Q. Did you ever draft a statement of charitable intent or had Cecilia ever drafted a statement of charitable intent that related to naming something that was a physical space where the gift was revocable

during the lifetime of the donor?

**A. I had not. I can't speak to Cecilia Hughes.**

Q. This document reflects that it was signed by [REDACTED] on June 22nd, 2022.

Do you see that?

**A. Yes.**

Q. And then you signed it on July 7th of 2022?

**A. Yes.**

Q. Why did you sign it?

**A. To complete the gift.**

Q. And in signing it, what was your understanding of what your signature meant?

**A. My understanding is that we were working with Heather Clay and Cecilia and Bill were working with Dean Kris Blair -- Kris with a K -- and that when the Jankowskis came to campus a couple months later that this gift was still going to be discussed with respect to naming rights.**

Q. So, your understanding was although you had signed a statement of charitable intent that clearly stated that the Center for Emerging and Innovative Media would be renamed the [REDACTED] Center for Emerging and Innovative Media upon receipt of documentation of the proposed gift that that name would not have been in effect by the name the

Jankowskis had visited?
THE WITNESS: Could you read that back to me, please.
(Question read.)
A. Yes.
Q. And your testimony is that you had already spoken to Heather Clay about this?
A. Yes.
Q. If she testifies that the first and only meeting that you had with respect to the [REDACTED] gift is July 11th of 2022, which is four days following your signature on this document, would that be incorrect?
**A. That is correct.**
Q. That is correct?
A. Yes.
Q. So you signed this before you actually met with Heather Clay?
A. Yes.
Q. Did you discuss your signature on this document with any other individual at Duquesne other than Mr. Richter and Ms. Hughes?
A. No.
Q. And in the past, you had gone to the gift acceptance committee with respect to the gifts that you

had deemed, quote, unquote, "complicated."
Is that your earlier testimony?
**A. To clarify, I said gifts of tangible property, and in the matter of [REDACTED], it was a complicated trust that she had set up that the issue that was discussed with the gift acceptance committee, and specifically Matt Frist, who is our Senior Vice President for Finance, was how to value an income stream of 25 years.**
Q. So, the answer is yes, you had previously gone to the gift acceptance committee with respect to complicated gifts?
A. Yes.
Q. Other than reviewing the gift, the statement of charitable intent, and the attached statement from Fidelity, had you reviewed any additional documentation before signing this gift?
**A. I don't recall.**
Q. Did you review any of the University's policies with respect to naming rights before you signed it?
**A. I don't recall.**
Q. Did you know that there were policies with respect to naming rights?
A. Yes.
Q. Did you have access to those policies?

A. Yes.
Q. Do you know whether Mr. Richter or you or Ms. Hughes involved President Gormley in the negotiations that named the Center for Emerging and Innovative Media?
**A. I do not know.**
Q. Do you have any reason to believe that President Gormley was involved?
**A. I do not know.**
Q. So you don't have any reason to believe that he was?
A. No.
Q. Do you have any reason to believe that the University's Chairman of the Board was involved in this discussion with the [REDACTED]?
A. No.
Q. Do you have any reason to believe that Jim Miller was involved in these discussions?
A. Yes.
Q. And I believe that you claimed to Mr. Dedrick that there were emails that you had sent or that had been sent to Mr. Miller related to this gift, correct?
A. Yes.
MS. McGROGAN: I'm going to mark as 13 an email that is from November of 2021.

(Dean Deposition Exhibit 13 was marked for identification.)
BY MS. McGROGAN:
Q. Do you recognize this email?
A. Yes.
Q. Anywhere in this email does it state that the gift that the [REDACTED] were contemplating was revocable?
A. No.
Q. Anywhere that it says that it was in exchange for naming rights?
A. No.
Q. Anything that Mr. Miller should have made that assumption, based on what Mr. Richter said?
A. No.
MS. McGROGAN: I'm going to mark as Exhibit 14 an email that you, yourself, provided to Mr. Dedrick as part of the investigation related to the Jankowskis' gift.
(Dean Deposition Exhibit 14 was marked for identification.)
BY MS. McGROGAN:
Q. This is a longer email that starts with Mr. Miller sending a kudos to Mr. Richter in December of 2021, but the portion I wanted to focus on is with

respect to the first page that says "I'll also visit the Jankowskis while in New Mexico; you might recall they've pledged a 1M PG to our media center - and they hope to travel to Pittsburgh in April for a tour."
Do you see where I'm reading?
**A. Yes.**
Q. Does that state anything regarding the revocable nature of their planned gift?
**A. No.**
Q. Does it state anything relating to naming rights?
**A. Can we go back to the prior question before that one, please? I want to be accurate.**
**(Question read.)**
**A. Yes.**
Q. What does it state?
**A. It uses the word "pledge" and it uses the term "planned gift." "Pledge" means that it is revocable. "Planned gift," by nature, tends to be revocable. It's a matter of interpretation.**
Q. Planned gifts are often revocable, but not in every circumstance, correct?
**A. Correct.**
Q. So, there is nothing that he should necessarily assume that this one was one of the revocable ones, as

opposed to an irrevocable one?
**A. The term "pledged" would lead you to -- it's a term of art, "pledged." Pledge means it's a pledge. Pledges are not enforceable.**
Q. At this point, they hadn't signed a statement of charitable intent?
**A. Correct.**
Q. And I had asked you a question that that email states nothing about naming rights being associated with the gift, correct?
**A. Correct.**
Q. You spoke previously about some itineraries that Mr. Richter submitted to you?
**A. Yes.**
MS. McGROGAN: This is going to be marked as Exhibit 15.
(Dean Deposition Exhibit 15 was marked for identification.)
BY MS. McGROGAN:
Q. These are itineraries from May of 2021 and this is sent to Jim Miller, Caleb Pifer, Cecilia Hughes, and yourself related to what Mr. Richter called a "Southwest Safari."
And if you look at page 657 of this document, it states [redacted], Santa Fe, 162K in lifetime

giving. Prior visit was in February of 2019 by Adam Novak, and the goal was to finalize trust.
Do you see that? Or final bequest.
**A. Yes.**
Q. Is there anything in this document that you can point me to that shows that the bequest that they were talking about was with respect to naming rights to the media center?
**A. This was a separate matter.**
Q. This is completely separate from the prior?
**A. Yes.**
Q. So, there is nothing in this that should have given Mr. Miller any indication that there was an anticipated naming gift?
**A. From this document, no.**
Q. How about at this time, May of 2021?
**A. I can't answer that. I don't know.**
Q. From this document, though, nothing would have given him that information?
**A. No.**
Q. In May of 2022, Mr. Richter sent you another itinerary for travel. On this one, he had copied you, Ms. Hughes, Heather Clay, and his wife Virginia?
MS. McGROGAN: And I will mark this as Exhibit 16.

(Dean Deposition Exhibit 16 was marked for identification.)
BY MS. McGROGAN:
Q. Now, this document was not sent to Mr. Miller, but is there anywhere in this document that you can point me to where Mr. Richter indicates that the gift that he was soliciting from the Jankowskis was revocable or in exchange for naming rights? Their name appears on 666.
**A. I apologize. So, I think the only thing I'm looking at is "Meet with [redacted] to discuss PG to name media center." And I'm sorry. Your question is...?**
Q. Is there anything in this document that would have given you, Cecilia Hughes, Heather Clay information that the planned gift was to name the media center?
**A. Yes, "...to name the media center."**
Q. Did you have a conversation with Mr. Richter about his inclusion of that reference?
**A. No.**
Q. Do you know if this document was ever provided to Mr. Miller?
**A. I don't know.**
Q. Do you have any reason to believe that it was?

Mary Frances Dean

----

150

A. **No.**
Q. And does that state anything with respect to the planned gift being revocable?
A. **No.**
Q. How long had Ms. Clay been employed by the University at this period of time? You can be approximate.
A. **I really don't know what year she started. I guess April of 2022. April, the beginning, April 1. Perhaps six weeks prior.**
Q. Approximately six weeks prior. Thank you for that.
A. **Yes.**
MS. McGROGAN: I'm going to mark Exhibit 17. This is a larger document, so I'd like you to review it while we take a break. This is all of the contact reports that Mr. Miller submitted with respect to the Jankowskis.
MR. SANSONE: Mr. Miller?
MS. McGROGAN: Mr. Richter submitted, and some by Mr. Miller, actually.
(Dean Deposition Exhibit 17 was marked for identification.)
BY MS. McGROGAN:
Q. What I'm going to ask you to review this

151

document for is, with respect to Mr. Richter's recorded meetings with the Jankowskis, if there is anything in this that makes it apparent that the gift that he was discussing with the Jankowskis was with respect to the naming rights for the media center or for a revocable gift.
MS. McGROGAN: And we can go off the record while she reviews that.
MR. SANSONE: But I want this counted against the time, because we don't need a break.
MS. McGROGAN: Okay. That's fine. I need to use the restroom.
And we can stay on the record so that anything that is discussed between counsel is on the record.
(Ms. McGrogan leaves deposition room.)
A. **(Witness reviews document.) I don't even see a date.**
**(Ms. McGrogan returns to deposition room.)**
THE WITNESS: Sorry. Now I'm going to request a break.
MS. McGROGAN: We're going to go off the record, and this will be at her requested break.
(Recess.)
BY MS. McGROGAN:

152

Q. Do you recall the question that I asked you?
A. **No.**
THE WITNESS: If you wouldn't mind, please, again.
(Question read.)
A. **And my answer is yes.**
Q. What page are you directing me to?
A. **Page 266, it was a meeting in June of 2022 in which the summary is "Had dinner with [redacted] to finalize 1.454 million planned gift to name our media center. [redacted] reviewed the LCI and provided 401(k) of [redacted] holding in their Family Trust to substantiate the gift."**
Q. So, that states that there was a contemplated gift to name the media center, but it does not say anything related to the planned gift being revocable, correct?
A. **No.**
Q. Anything else?
A. **A matter that is considered in all situations such as this, since the majority of planned gifts are revocable, is the rating assigned to a donor and the likelihood that they will give to the University and the strength of that likelihood. I can't speak to the MG and the EVI on page 265, but they were a 99. The**

153

**highest that you can be is a 100. And in many situations in which there is an issue with revocability, Jim would use his discretion to determine whether or not the gift would be reported based on EVI, the relationship of the donors to the University, the strength of that, were they alums, were they double alums, were they simply friends of the University, and Bill closed with "This is a very solid relationship that will require at least bi-annual stewardship."**
**So, it's to further understand that there were other factors considered relating to the strength of the relationship and any concerns that the donor might revoke down the road prior to death.**
Q. So, "MG EVI," you don't know what that stands for?
A. **I don't remember, truly. I don't think I ever really did. But each donor receives a rating, and what it's based on are -- it's an algorithm that takes into consideration, again, are they alums, are they double Dukers, are they husband and wife alums, do their children go there, and most especially, it's related to their lifetime giving. So, [redacted], I believe, have had a relationship with Duquesne for decades.**
Q. So, you're saying that Bill's inclusion of the sentence "This is a very solid relationship that will

A. No.
Q. Would it surprise you if most institutions of higher education had similar policies that would allow the university president to utilize their discretion in this manner?
A. No.
Q. With respect to the provisions related to naming of schools and departments and institutes and University-wide centers beginning on Duquesne 161, are you aware of any gifts whatsoever that did not follow these requirements? I'm just asking you to refer to 161 and onto 162.
A. Okay. (Witness reviews document.)
Could you please give me the question back?
Q. Are you aware of any naming gifts that did not follow these requirements?
A. I have to read this specifically. (Witness reviews document.)
No.
Q. Going to the policy on naming rights -- or, I'm sorry, the Gift Acceptance Policies -- have you seen this document before?
A. Yes.
Q. And I'm going to refer you to the portion of this document that deals with naming rights, which

begins on page 13 of the document, which is Bates labeled Duquesne 152.
In provision C, it provides several restrictions with respect to how gifts -- how naming rights should be awarded with respect to gifts.
Are you aware of any gifts to the University that do not follow these requirements?
A. (Witness reviews document.) No.
MS. McGROGAN: I'm going to mark as Exhibit 19 --
Q. Is there something that you're highlighting there?
A. Am I not permitted to?
Q. You are. I'm asking what you are highlighting.
A. I am reading.
Q. Did you understand the question that I asked you?
A. Yes.
MS. McGROGAN: I'm going to mark as Exhibit 19 this document that is Bates labeled Duquesne 513.
(Dean Deposition Exhibit 19 was marked for identification.)
BY MS. McGROGAN:
Q. This is an email that copies you from Cecilia

Hughes to Bill Richter.
Do you recognize this document?
A. Yes.
Q. And in this document, she attaches the draft donor statement of charitable intent for the
[redacted]
Do you see that?
A. Yes.
Q. And it states "I didn't think to ask you yesterday whether the naming rights would take effect at the time that the gift is received or at the time the commitment is made. I will need that detail for the Gift Acceptance Committee."
Do you see that?
A. Yes.
Q. How do you understand that sentence to mean?
A. That she was determining whether -- I believe she was going to send a memo to the gift acceptance committee.
Q. Do you know whether that was ever sent?
A. I do not know.
Q. In the next sentence, it says "Once we are all in agreement with the draft, I will prepare a memo from you to the Gift Acceptance Committee for approval."
And you don't know whether that memo was

prepared?
A. I do not.
Q. It says "While we cannot officially approve the Donor Statement of Charitable Intent or sign it on behalf of the University until we get that approval, I don't see a problem with showing it to the Jankowskis if you see them last (sic) week."
See that sentence?
A. Yes. Next week.
MR. SANSONE: You said "last week."
MS. McGROGAN: Next week. Thank you. I was lost as to what that was. Thank you, Joel. I appreciate that.
MR. SANSONE: That's why I'm here, to help.
MS. McGROGAN: Good. I'm glad that you're helpful.
BY MS. McGROGAN:
Q. Did you understand that Ms. Hughes was telling Mr. Richter that she could not approve the donor statement of charitable intent or have it signed on behalf of the University until there was approval from the gift acceptance committee?
A. Yes.
Q. Was that your understanding as well?

162

A. Yes.
Q. Did you ever get that approval from the gift acceptance committee related to the Jankowskis?
A. No.
Q. So, as of May of 2022, you were aware that you had to go to the gift acceptance committee before signing this document?
A. Yes.
Q. Do you know how the University found out that this gift acceptance -- or this donor statement of charitable intent had been signed?
A. To the best of my knowledge, I can tell you.
Q. Okay.
A. After this was signed, Bill, Cecilia, and I met with Heather Clay to discuss the naming rights, specifically. Heather directed Cecilia and Bill to meet with Dean Kris Blair to discuss the Jankowski cultivation and to explain the status of it, to explain that naming rights were a part of this gift, and to determine not just the naming of the media center, CEIM, but any other opportunities that may exist within the college.
They met with Dean Blair because the media center was deemed to be part of the McAnulty College of Liberal Arts and Graduate School. So -- I've lost

163

sight of the question at this point.
Q. That's fair. The meeting that you were just talking about, I understand that you had two meetings with Heather Clay. Was that the meeting that you believe occurred on July 11th?
A. Yes. So, what I understand is that Don Mane, M-a-n-e, was in the meeting and he became aware of the potential naming rights of the media center. I believe, because I was not there, that there was a memorial reception for [REDACTED], and that John had mentioned the naming rights to Ken, and perhaps Jim was also present, and I believe that Heather Clay, C-l-a-y, was present. And that is all I know.
Q. Going back to the July 11th meeting, you stated that the CEIM was deemed to be part of the McAnulty School. Deemed by whom?
A. Heather directed us to speak to Kris Blair -- not me, Bill Richter and Cecilia Hughes -- because she had authority over the media center as part of the McAnulty College.
Q. That was your understanding at the time?
A. Yes.
Q. Are you aware that the Center for Emerging and Innovative Media was created as part of a presidential

164

initiative?
A. No.
Q. When did you learn that this discussion had occurred at the [REDACTED] memorial?
A. I believe the next day.
Q. And who told you?
A. I believe it was Heather Clay.
Q. Do you remember anything else about that conversation?
A. No.
MS. McGROGAN: I'm going to mark as Exhibit 20 this email between you and Cecilia Hughes.
(Dean Deposition Exhibit 20 was marked for identification.)
BY MS. McGROGAN:
Q. In this email, it says "Hi Cele - I hope that you are not looking at your email tonight. This one just got by us. Thanks."
What does "This one just got by us" mean?
A. Heather, as our supervisor, let us know that we were in serious trouble. I was not aware that the actions that we had taken -- that I had taken -- was as serious as it became immediately and, therefore, the use of, after having been informed by my supervisor, "this one got by us."

165

Q. What does it mean?
A. That I'm in trouble.
Q. So "this one got by us" means you're in trouble?
A. According to what occurred when Don Mane informed President Gormley of the agreement and the meeting that had taken place with Dean Blair.
Q. So, did you take any responsibility for the fact that this gift had, quote, gotten by you?
A. I do take responsibility.
Q. Is that what you were referring to by saying "this one got by us"?
A. Yes.
Q. Because you had not received the appropriate approvals referenced in her email from May 13th of 2022?
A. Yes.
Q. Do you believe Cecilia Hughes had any responsibility for this gift?
A. No.
Q. Did you talk to Cecilia Hughes after you sent this email?
A. I speak to Cecilia Hughes every day that we work together, so, yes.
Q. What do you remember from your conversation

MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Up to and including termination depending on the circumstances.
Q. And there is a policy at Duquesne against sexual discrimination, is there not?
A. Yes, sir.
Q. And if an employee of Duquesne commits sexual discrimination against another employee or employees, what should happen to that employee?
MS. McGROGAN: Objection to form.
You can answer to the extent you understand.
BY MR. SANSONE:
A. They should be investigated.
Q. And what penalty should apply?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. In my opinion up to and including termination.
Q. Have you ever been investigated on charges of sexual assault against any Duquesne employee?
A. No.
Q. That includes Ms. Maurer?

A. Correct.
Q. Have you ever been investigated on charges of sexual harassment against any employee?
A. No.
Q. That includes Ms. Maurer?
A. Correct.
Q. Ms. Baldoni?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
A. I don't know Ms. Baldoni.
Q. Ms. Kelly?
A. No.
Q. Ms. Hines?
A. No.
Q. Have you ever been investigated on charges of sex discrimination related to your promotion of Gwyneth Gaul?
A. No.
Q. In your opinion, does Duquesne strictly adhere to its policies related to sexual assault and sexual harassment and sexual discrimination?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. From my perspective, yes.

Q. What's the basis of your making that claim?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Observation over time.
Q. What have you observed?
A. That it's not to be tolerated. We have ongoing education around it. Reminders to the team what the policy is and reminders that there are consequences associated with it.
MR. SANSONE: Let me take a couple minutes. We'll be right back.
MS. McGROGAN: Okay.

- - - -

(Whereupon, there was a recess in the proceedings.)

- - - -

MR. SANSONE: All right. Let's go back on the record.
BY MR. SANSONE:
Q. Sir, did Mary Frances Dean inform you on several occasions about the details of the [redacted] gift?
MS. McGROGAN: Objection to form.
You can answer.

BY MR. SANSONE:
A. No.
Q. Your answer was no I heard?
A. Correct.
Q. So she never advised you that there was a revocable gift?
A. Correct.
Q. She never advised you that it involved naming rights?
A. Correct.
Q. She never advised you about the dollar amount of the donation?
A. Correct.
Q. Did anyone advise you about the dollar amount of the donation?
A. No.
MS. McGROGAN: Objection to form.
Can you be more specific in terms of time period?
BY MR. SANSONE:
Q. Ever, from leaving out any conversation with counsel?
A. Well, certainly once the gift was processed, I saw the amount in the system.
Q. But that was the first time you knew the

amount of the gift?
A. I knew vaguely that conversation was happening regarding a potential gift to the CEIM that was to be a 7 figure gift commitment. I was not aware of revocability. I was not aware of naming rights.
Q. And did you understand that Mr. Richter was attempting to have a potentially substantially larger donation than the $1.4 million that he put on the table?
A. He represented that.
Q. Did you have any reason to believe that wasn't true?
A. No.
Q. Can you think of any good reason why Ms. Dean would not have informed you about this gift?
MS. McGROGAN: Objection to form.
You can answer. Calls for speculation.
BY MR. SANSONE:
A. Yeah, I mean I can't put myself in her head. I can tell you that she didn't communicate very often with me during that period of time.
Q. Didn't you and she have regular meetings to discuss donations?
MS. McGROGAN: Objection to form.

You can answer.
BY MR. SANSONE:
A. We had scheduled meetings which generally she sidestepped.
Q. What do you mean by sidestepped?
A. She feigned donor meetings in my opinion.
Q. She what?
A. Feigned donor meetings in my opinion to avoid having to meet.
Q. What donor meetings -- I'm sorry, go ahead.
A. We had standing meetings scheduled on a particular day of the week and a particular time, and frequently my administrative assistant observed a behavior whereby there was nothing in a time slot when we were scheduled to meet or looking to reschedule to a different day and different time slot until the confirmation request came through from my assistant to her for us to sit down and meet or to meet by phone and mysteriously, magically donor visits, without donors' names associated with them, would appear in those time slots on her calendar.
Q. So can you name any donor meetings that she faked or feigned?

A. I cannot. They were generally entered on her calendar as donor meeting.
Q. Did you ever confront Ms. Dean on this conduct?
A. I did not.
Q. Why not?
A. Diffuse the situation.
Q. Diffuse what situation?
A. She was very combative when we met.
Q. So you didn't confront her because she was combative?
A. Correct.
Q. Is there any writing that evidences your claim that my client was sidestepping meetings with you?
A. No, sir.
Q. And you never disciplined my client for this?
A. No.
Q. Did I understand you never raised this with her ever?
A. Not to my recollection.
Q. I take it you know what a Statement of Charitable Intent is?
A. I certainly do.
Q. And in focusing on the time frame of the

[redacted] of 2022, who in your chain of command was responsible for preparing the Statement of Charitable Intent?
MS. McGROGAN: Objection to the form. You can answer to the extent you understand.
BY MR. SANSONE:
A. Mary Frances Dean and/or Cecilia Hughes.
Q. Either one, is that right?
A. They operated as a team, so generally I believe it was Cecilia who drafted and Mary Frances who reviewed.
Q. And who in your chain of command had the responsibility to bring the proposed donation before the gift committee?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Any gift officer has the ability to bring it to the gift committee, but the operating practice that had been ongoing prior to my appointment is the interim vice president had Mary Frances or Cecilia taking it to the gift committee.
Q. You would not have expected Mr. Richter to

take this to the gift committee?
A. He could have if he had chosen to.
Q. Not what I asked you, sir. Do you understand the question?
A. I do understand the question. I can't put myself in your client's head.
Q. Your answer is you don't know whether you expected Mr. Richter to present this to the gift committee?
A. Any gift officer can take --
Q. I understand that.
A. -- and propose to a gift committee at any time.
Q. Not what I asked you. I asked you if you expected that it would be him that would do that in this case?
MS. McGROGAN: Objection to form. Asked and answered. You can answer it again.
BY MR. SANSONE:
A. I expected somebody to take it to the gift committee.
Q. Who?
A. Either the gift officer involved which would be your client or Mary Frances Dean or Cecilia Hughes.

Q. Can you tell me the name of any gift officer who has presented a naming rights gift to the committee?
A. Not offhand.
Q. Who would you have expected to present this ██████ gift to the president?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. It would be me ultimately after approval by the -- recommendation by the gift acceptance committee.
Q. In 2022, you were a member of the gift acceptance committee, were you not?
A. I still am.
Q. So the answer is yes to my question?
A. Yes.
Q. What role did Mr. Richter's role in the Jankowski gift play in his termination?
MS. McGROGAN: Objection to form. You can answer to the extent you understand.
BY MR. SANSONE:
A. It was one of several factors related to poor behavior, negative behavior and poor judgment.
Q. And would you please describe for me

everything that Mr. Richter did in the Jankowski gift that you believe violated the policy that -- the naming rights policy?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. Representing to the donors in advance of gift acceptance committee approval that we would name the Center for Emerging and Innovative Media in perpetuity for acceptance of a gift well below the standards. He offered that without advance approval by the gift acceptance committee and he offered that without advance approval ultimately by the president.
Q. So it's your testimony that my client promised the donors that they would have these naming rights; is that right?
A. Yes.
Q. Isn't it true that my client warned the donors that their donation and the naming rights for it still has to be accepted by the committee?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:

A. I have no knowledge of that.
MR. SANSONE: Miller 1.

- - - -

(Deposition Exhibit No. 1 was marked for identification.)

- - - -

BY MR. SANSONE:
Q. Showing you what has been marked, looking at what has been marked as Miller Exhibit 1 you will note has also been marked as Dedrick Exhibit 1 as well as Gormley Exhibit 1, ask you to review this email string. Please feel free to review the entire string although I'm only going to be asking you about the first page.
MS. McGROGAN: Please review the entire string.

- - - -

(Whereupon, the witness reviewed the document.)

- - - -

BY MR. SANSONE:
Q. Have you been able to review that?
A. Yes.
Q. If you look at the center, the first page of that exhibit, Duquesne's Bates stamp 406, do you

see the paragraph in the center of the page which begins, one item of business?
**A. Yes, I do.**
Q. And it says, I have assigned Letter of Charitable Intent for you. The next step is for me to go before DU's naming committee and present a formal request to name the Media Center. Have you seen this email before?
**A. I have not.**
Q. You've never seen this email before?
**A. Correct.**
Q. Before this moment?
**A. Correct.**
Q. What message do you believe that paragraph sent to the donor with respect to the guarantee of their donation?
**A. That it would go before the gift acceptance committee, that he would present to the gift acceptance committee.**
Q. Doesn't this imply that it has to be approved by that committee?
**A. It would.**
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
Q. So is it clear from this, and this obviously

happened before -- well, you see it's June 19, 2022 is the date of that email; do you see that?
**A. Yes, sir.**
- - - -
(Deposition Exhibit No. 2 was marked for identification.)
- - - -
BY MR. SANSONE:
Q. I'm showing you what has been marked as Miller Exhibit 2, also Dedrick Exhibit 2, Gormley 2, and Dean Exhibit 20, ask you to review this and let me know when you've done so.
- - - -
(Whereupon, the witness reviewed the document.)
- - - -
BY MR. SANSONE:
**A. I've reviewed it.**
Q. Pardon me?
**A. I reviewed it.**
Q. Okay. Had you ever seen this email before?
**A. No, sir.**
Q. Not before today?
**A. Correct.**
Q. You see that, forgetting the email on the top of

the page for the moment, the email from Cecilia Hughes to Mr. Richter, copy to Ms. Dean, indicates that she was attaching a draft of the donor Statement of Charitable Intent; do you see that?
**A. I do.**
Q. Does this suggest that she prepared that draft?
**A. Yes, based on -- likely based on the details provided by Mr. Richter.**
Q. And it says, I will need that detail, which is with respect to the timing of the naming rights; do you see that?
**A. I do.**
Q. I will need that detail for the gift acceptance committee. So this indicates that Ms. Hughes is intending to bring this before the gift acceptance committee; is that right?
MS. McGROGAN: Objection to form. Calls for speculation. You can answer.
BY MR. SANSONE:
**A. Perhaps.**
Q. I will need that detail for the gift acceptance committee, what else would that mean?

**A. Well, the previous email said, he will take it to the gift acceptance committee.**
Q. Right, I understand that it says that. My point is, I asked you about this email and what it says which is Ms. Hughes is apparently intending to take this to the committee; is that right?
MS. McGROGAN: Objection to form. You can answer it again.
BY MR. SANSONE:
**A. Perhaps.**
Q. Well, let's go to the next paragraph which reads, once we are all in agreement with the draft, I will prepare a memo from you to the gift acceptance committee for approval. Does that clear it up in your mind?
MS. McGROGAN: Objecting to form. You can answer.
BY MR. SANSONE:
**A. The recommendation would be emanating from Mr. Richter, but it would be prepared by Ms. Hughes.**
Q. And it says, while we cannot officially approve the donors' Statement of Charitable Intent or sign it on behalf of the University

until we get that approval, I don't see a problem with showing it to the Jankowskis if you see them next week.

Was it your understanding that Mr. Richter was going to be visiting with the Jankowskis at that point in time in 2022?

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

A. **I was not aware of when he was visiting. This would imply that that is the intent.**

Q. Do you have any reason to believe that wasn't so?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **No.**

Q. Do you agree with Ms. Hughes that there wasn't really a problem showing it to the Jankowskis?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **I would customarily not show it until it had been officially approved, nor would I represent to a donor prior to that approval, that they were going to have -- that the gift**

**would qualify them for overall naming rights of the Center.**

Q. Mr. Richter did not sign the donor Statement of Charitable Intent, did he?

A. **Correct.**

Q. Have you told me everything you believe Mr. Richter did wrong with respect to his solicitation of this donation?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **I believe so.**

Q. In light of evidence I've just shown you, has your opinion changed on whether or not he made a promise to the Jankowskis that they would have this naming rights without approval from the committee?

A. **Yes.**

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

Q. Yes, your opinion has changed?

A. **No -- yes, he in my opinion, he represented to the Jankowskis that they would receive overall naming rights of the CEIM for the gift in question.**

Q. What makes you think that?

A. **Conversation with the [redacted] where they told me well before this date that they were going to have the big glass box on the third floor of the student union filled with state of the art technology perpetually named for them with their names etched in the glass along with a quote of their choosing.**

Q. When did you have that conversation with the [redacted]?

A. **I don't have the date in front of me, sir.**

Q. Was it before or after you fired my client?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **After.**

Q. So at the time you fired my client you didn't know that?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **Correct.**

Q. Why didn't you wait to talk to the Jankowskis before firing my client?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **It was one of several factors as I referenced earlier. His termination was based on a cumulative impact of -- it was the cumulative impact of a variety of negative behaviors and demonstrated poor judgment.**

Q. Well, my question was, why didn't you wait to fire him until you spoke to the Jankowskis?

MS. McGROGAN: Objection to form.

You can answer again.

BY MR. SANSONE:

A. **It would be damaging to the relationship to have that conversation in advance.**

Q. It would damage the relationship --

A. **In my opinion.**

Q. Let me just finish, you have to wait or the record won't be clear if you don't.

You're saying that it would damage the relationship with the Jankowskis if you did not have the conversation until you fired my client?

A. **In my opinion, yes.**

Q. How would that damage the relationship if you had gone to them and said we're looking into

this but haven't fired him yet?
A. **Pitting donors, you know, placing a donor in a personnel decision in the middle of a conversation regarding whether or not somebody's employment is going to continue, I think would be very damaging to a relationship. I would not want a donor to believe that they were responsible for the dismissal of any employee.**
Q. Why would you have to tell the donor that you're thinking about dismissing him? Why couldn't you just ask the donor, hey, what happened here?
A. **You wouldn't tell them -- I wouldn't tell them that you're thinking of dismissing somebody, but after the fact they would see the alignment of those actions. You came, you talked or you called and you talked to us about this circumstance, and then ultimately this person was terminated. They would feel complicit in that termination.**
Q. Well, we're setting up a conversation with the [redacted] right now, I want to make sure I understand what you claim they said to you. Is it your testimony that the [redacted] said

that my client guaranteed that they would get these naming rights?
A. **He represented --**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. He what?
A. **He represented such, yes.**
Q. He represented that there was no impediment whatsoever to getting these naming rights; is that what your testimony is, is that what the Jankowskis told you?
A. **They told me that he represented that they will receive overall naming rights to the Center for Innovative and -- Emerging and Innovative Media.**
Q. Did the [redacted] tell you that they had been told by Mr. Richter that the matter had to go before the naming committee?
A. **They did not.**
Q. Were the [redacted] upset with my client?
A. **They were upset with the situation, whether or not they were upset with your client, I can't speak to.**
Q. So they didn't talk about the relationship

they had with Mr. Richter when you had this conversation?
A. **They did not.**
Q. Let's talk about the other reasons for the termination that were set forth in your letter of termination, shall we. The issue of the text that was sent to Dr. Dausey, the woman wearing a bikini --
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. Do you ever remember seeing that text?
A. **I've never seen the text.**
Q. Do you believe that the text involved any pornography?
A. **I've never seen the text. I would have no idea what it involved.**
Q. Did you discuss this with Dr. Dausey?
A. **No, I did not.**
Q. What was your position at the time that this text was sent?
A. **I was not aware that it was sent -- oh, what was my employment position?**
Q. Right.
A. **I was senior advisor to the president.**

Q. That's the same position you hold now?
A. **No.**
Q. You got the promotion after that?
A. **Yes.**
Q. Okay. Did you have any responsibility to monitor or advise on Mr. Richter's conduct in his employment with the University at that time?
A. **No.**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. **Since you took your current position, have you discussed the issue of this text with anyone?**
MS. McGROGAN: Objection --
BY MR. SANSONE:
Q. -- leaving conversations with counsel out of it?
A. **I believe counsel was a part of those conversations.**
Q. So you didn't have any conversations with Dr. Dausey that did not involve counsel?
A. **Perhaps. I don't recall.**
Q. Do you know what the text contained?
A. **I do not.**

performance should have affected your grade in this performance evaluation?
**A. I don't know.**
Q. You don't know?
**A. Huh-uh.**
MS. McGROGAN: Let's go off the record. It is 11:53.
(A luncheon recess was taken at 11:53 o'clock a.m.)
- - -
AFTERNOON SESSION
(12:34 o'clock p.m.)
MS. McGROGAN: So, we are back on the record and it is 12:34 p.m.
Mr. Richter, I'm going to mark this as Exhibit No. 5.
(Richter Deposition Exhibit 5 was marked for identification.)
BY MS. McGROGAN:
Q. Do you recognize this document? For the record, it is Duquesne 104.
Let me know when you're finished reviewing the document.
**A. (Witness reviews document.) Ready.**
Q. Do you recognize this document?

**A. Yes.**
Q. Was this a document that was presented to you on August 26th of 2019?
**A. I guess.**
Q. That's what it represents?
**A. Yeah.**
Q. Any reason to dispute that's when it was issued?
MR. SANSONE: There is an example of when you talk a little quickly and low. I really couldn't hear that very well.
MS. McGROGAN: Thank you, Joel.
BY MS. McGROGAN:
Q. Was this issued to you by John Plante?
**A. Yes.**
Q. Do you remember what led to the issuance of this letter to you?
**A. I sent David a text message.**
Q. That's David Dausey?
**A. Yes.**
Q. And what position did David Dausey hold?
**A. Provost.**
Q. How long had you known David Dausey when you first sent him this text message?
**A. I don't recall when I first met him.**

Q. Did you know David Dausey well?
**A. No.**
Q. I understand that you went on a trip to California, according to this letter, with the Provost.
Was that the first time that you had traveled with him?
**A. I don't think so, because I don't know if we went to see [REDACTED] before this. I don't recall.**
Q. Was the trip to see [REDACTED] an overnight trip or did you drive to and from Cleveland in the same day?
**A. We drove.**
Q. In the same day?
**A. David drove, yeah.**
Q. Am I correct that the Provost is the second ranking employee at Duquesne below the President?
**A. Yes.**
Q. You had that understanding at the time, too?
**A. Uh-huh.**
Q. And do you remember what the text message you sent him was?
**A. I recall it was a picture of a woman in a bikini.**
Q. Did it have any message related to that?
**A. I don't recall what the message was. Welcome**

**to sunny southern California or something like that. It's a long time. I don't remember.**
Q. You don't remember what the message was?
**A. No.**
Q. But it did have a message; you just don't remember what it was?
**A. Yes. Scroll down. I don't remember.**
Q. "Scroll down"? What does "scroll down" mean?
**A. It was a picture and -- I can't remember. I'm sorry.**
Q. So, it was a woman in a bikini, though?
**A. Uh-huh.**
Q. Why did you send him that picture?
**A. It was poor judgment.**
Q. It was poor judgment?
**A. (Nodding head up and down.)**
Q. Do you disagree with any portion of this letter?
**A. No.**
Q. And did you meet with John Plante about this?
**A. I don't recall.**
Q. He represents in this letter that you met on August 22nd, I believe. Actually, that might be in the next letter. Yeah, it is in the next letter.
Do you agree that you acknowledge your actions

were inappropriate?
A. **It was poor judgment.**
Q. So, inappropriate?
A. **Poor judgment.**
Q. Just poor judgment, not inappropriate?
A. **Poor judgment on my part.**
Q. Is there a distinction that you're trying to make?
A. **Not that I'm aware of.**
Q. So, inappropriate, poor judgment, those are synonymous?
A. **Yes.**
Q. Did you express your regret for that situation?
A. **Absolutely.**
Q. And according to this letter, you were given a formal written warning related to your conduct, told to repeat TAP 31 training, refrain from doing the same thing in the future, and to verbally apologize to Provost Dausey, correct?
A. **Yes.**
Q. Did you apologize to Provost Dausey?
A. **Yes.**
Q. Did you do the training?
A. **I don't recall that. I don't know.**
Q. You don't know whether or not you did the

training?
A. **I don't remember.**
Q. Do you have a copy of this text message?
A. No.
Q. Have you looked for it?
A. **I don't have it.**
Q. Have you looked for it, though, or are you just assuming you don't have it?
A. **I don't have it. I looked for it and I don't have it.**
MS. McGROGAN: I'm going to mark as an exhibit this next document, which is an August 30th, 2019, letter from John Plante to you. This will be Exhibit 6.
(Richter Deposition Exhibit 6 was marked for identification.)
BY MS. McGROGAN:
Q. Do you recognize this document?
A. **(Witness reviews document.) Yes.**
Q. So, according to this document, you had a meeting on August 22nd, 2019, with John Plante.
Do you have any reason to dispute that that --
A. **No, no.**
Q. And do you recall -- you don't recall, like, what happened during that meeting?

A. **No.**
Q. So, you don't know if anyone else was present with you during that meeting?
A. **No.**
Q. And as I understand this, John Plante had made the decision to decide to delay your promotion and pay raise.
Do you know what happened between the date of the last exhibit, August 26th, until August 30th that the decision was made to delay your promotion?
A. **No.**
Q. Do you believe that delaying your promotion had anything to do with your age?
A. **No.**
Q. Do you believe that it had anything to do with the retaliation?
A. **No.**
Q. Was this the first time that you were disciplined at Duquesne?
A. **I think so.**
Q. Is there something else that you're thinking of that might have been disciplinary?
A. **I can't recall anything else.**
Q. In your role -- your various roles, which I'm going to call gift officer in terms of the three

positions -- is that fair?
A. **Sure.**
Q. As a gift officer, is confidentiality important?
A. **Yes.**
Q. Why?
A. **We were dealing with peoples' finances.**
Q. Anything else?
A. **That's the primary reason, as far as I know.**
Q. In your experience, what is the relationship between a university and its donors? Is it important?
A. **I'm not sure what you're asking there.**
Q. Is the relationship between a university and its donors important?
A. **Yes.**
Q. Is that confidentiality an important component of that relationship --
A. **Yes.**
Q. -- between a university and its donors?
A. **Yes.**
Q. How would you describe that relationship?
A. **You'll have to be more --**
Q. Between a university and its donors, how would you refer to it? I've heard it referred to as sacrosanct. Would you agree with that?

242

Q. How many women do you believe were sexually assaulted by Jim Miller?
**A. I know of several myself.**
Q. Tell me who.
**A. I had a comment from Theresa Heinz. The woman that works for Paul Demilio. What the hell is her name? She's from Buffalo. I know Carla felt uncomfortable.**
Q. Carla who?
**A. I'm trying to think of her last name. She got married when I was there.**
Q. Holmquist?
**A. Yes. Sarah Sperry. That's all that comes to mind now.**
Q. Theresa Heinz, is that an employee of Duquesne?
**A. Yes.**
Q. So, it's not Theresa Heinz of the Heinz family, like the Heinz Endowments?
**A. No, no. Different people.**
Q. So, Theresa Heinz, what did she tell you about being sexually assaulted by Jim Miller?
**A. That he was drunk at a Christmas party and asked if he could motorboat her.**
Q. What year was that?
**A. I don't know when it was.**

243

Q. When did she tell you this?
**A. I don't recall.**
Q. Did she tell you in writing?
**A. No.**
Q. Where was the conversation?
**A. I don't recall exactly where the conversation was. We moved offices during some of this. We moved to Chatham.**
Q. So, it was during the work day?
**A. It was probably -- this was at a Christmas party. It was after that party, which probably would have been a Friday.**
Q. When did she tell you that? It was during a work day that she told you?
**A. Yes.**
Q. So, he asked her if he could motorboat her. Did he actually motorboat her?
**A. I don't know.**
Q. Do you know what motorboating is?
**A. I didn't at the time.**
Q. Do you know what it is now?
**A. Yes.**
Q. What is it?
**A. My understanding is you grab a woman's breasts and you blow like you're going in a motorboat or**

244

**something.**
Q. You're not saying he actually did that; he just asked her if he could?
**A. That's what I understood.**
Q. Did she tell you anything else about how Jim Miller acted towards her?
**A. She was uncomfortable.**
Q. Did she tell you anything else about how Jim Miller acted towards her?
**A. That was the bulk of her concern.**
Q. Did you report this to anyone at the University?
**A. No, no, no.**
Q. The woman who reported to Paul Demilio, is she still employed by the University?
**A. I believe she is. For the life of me, I can't come up with her name. Natalie -- no, I'm sorry.**
Q. Natalie Mackey?
**A. No. I can picture her face. That's awful.**
Q. What do you believe that the woman -- how was the woman who reported to Paul Demilio sexually assaulted by Jim Miller?
**A. I was there. This was a Zoom call.**
Q. It was a Zoom call while he sexually assaulted her?

245

**A. He made the comment on a Zoom call -- she had just had an infant and was walking around, and his comment, as I recall it, was something about how well she was taking care of his kids.**
Q. Can you explain that a little bit more? He said that she was taking care of his children?
**A. It was a nasty remark that upset her and insulted her.**
Q. And that remark was that she was taking care of his kids?
**A. Nice to see that she's taking care of his kids and then laughed.**
Q. Did you talk to her about this comment?
**A. No.**
Q. Do you know approximately when that comment occurred?
**A. I don't. I bet she does.**
Q. You do not?
**A. I do not.**
Q. Did you report that comment to anyone at the University?
**A. No.**
Q. Was anyone on the phone other than you and --
**A. I can't remember who else was on --**
MR. SANSONE: You've got to slow down.

WILLIAM RICHTER,

having been duly sworn,

was examined and testified as follows:

- - - -

CONTINUATION OF EXAMINATION

- - - -

BY MS. McGROGAN:

Q. Good morning, Mr. Richter, how are you today?

A. (Nodding head up and down.)

Q. Mr. Richter, we ended Monday's deposition talking about four women, they were Terese Hines, I believe the woman's name was Natalie who works for Paul Demilio and then Carla Holmquist and Sarah Sperry. Do you remember that conversation at the end of your deposition on Monday?

A. I do.

Q. Just to end that line of questioning, did you report to anyone at Duquesne the allegations that Terese, the woman who works for Paul Demilio, Carla Holmquist or Sarah Sperry shared with you?

A. No.

Q. Okay. No one at Duquesne knew about those allegations?

A. I wouldn't say that.

Q. You didn't report them to anyone?

A. No.

Q. Do you have any reason to believe that anyone reported those allegations to Duquesne?

A. I don't recall who would have done that.

Q. Okay. And you don't know which of the individuals you believe reported those allegations -- those allegations were reported about? So you said that you believe that someone had reported them. Which of the allegations, all of them or just --

A. The four are Natalie Mackey -- or Natalie -- I can't think of her last name.

Q. The woman who works for Paul Demilio?

A. I can't think of her last name. Natalie.

Q. Sarah Sperry.

A. Sarah Sperry.

Q. Carla Holmquist.

A. Who's the fourth one?

MS. McGROGAN: What was it, I'm sorry?

MS. WILKINS: Was it Terese Hines?

MS. McGROGAN: Terese Hines, yes. Thank you.

MS. WILKINS: My apologies.

MR. SANSONE: Anything to make this go faster.

BY MS. McGROGAN:

Q. So are you aware of anyone reporting their allegations to someone at Duquesne?

A. Terese Hines, I believe so. Natalie Mackey, I'm not certain.

Q. It's not Natalie Mackey though.

A. I'm sorry, Natalie --

Q. Natalie, whoever reported to Paul Demilio.

A. Yeah. Terese Hines, I'm not certain. Who was the fourth one again?

Q. Carla Holmquist.

A. Carla said that to me, I don't know if she went further.

Q. Sarah Sperry?

A. I don't know where that would have gone.

Q. Okay. So the Terese Hines allegation, do you know who she reported that to other than you?

A. No.

Q. So you're just assuming that she did?

A. I believe that she did.

Q. Is that based on a conversation that you had with her?

A. Uh-huh.

Q. And she told you that she reported it to someone else at the University?

A. No, she told me she was thinking about it.

Q. Okay. What year was the incident involving Terese Hines?

A. I don't remember what year that was.

THE COURT STENOGRAPHER: Can you try to keep your voice up.

THE WITNESS: I'll try to talk louder.

BY MS. McGROGAN:

Q. You don't remember what --

A. I don't recall what exact date, no.

Q. And I forgot, I need to speak louder too, so I will take that under advisement.

Okay. So this document was marked as Exhibit 21 from your last deposition.

MR. SANSONE: What is it? Oh, 21, you just said that.

MS. McGROGAN: Yes.

BY MS. McGROGAN:

Q. And this is the rebuttal that you submitted to Jefferson Dedrick regarding the -- regarding Jim Miller's response to your first complaint. Do you remember this document that we talked about on Monday?

it was filed?
A. **No.**
Q. Did you provide any input into Mr. Richter's complaint?
A. **No.**
Q. You can put that aside.
When were you hired by Duquesne?
A. **August 6th, 2012.**
Q. Where were you working prior to Duquesne?
A. **Baptist Homes.**
Q. What did you do for Baptist Homes?
A. **VP for development.**
Q. And prior to being a VP for development at Baptist Homes, where were you?
A. **Alzheimers Association.**
Q. Was your employment with Duquesne the first time you had worked for a college or university?
A. **Yes.**
Q. How old were you when you were hired by Duquesne?
A. **Fifty-two.**
Q. What role did you hold when you were first hired by Duquesne?
A. **Executive Director, Major and Planned Giving. P-l-a-n-n-e-d, which you will hear a lot today.**

Q. How did you find out about the opportunity at Duquesne?
A. **A prior employee, Carrie -- and I cannot think of Carrie's last name at the moment.**
Q. Is Carrie male or female?
A. **Female. It might be Matesevac, M-a-t-e-s-i-c (sic).**
Q. Who is Carrie Matesevac?
A. **I don't know her exact title.**
Q. Was she in advancement?
A. **Yes, in development. Planned giving.**
Q. So she was in your organization in planned giving?
A. **She was at Duquesne, Director of Planned Giving. I do not know her title.**
Q. Why did Carrie reach out to you about that position?
A. **I believe because she thought I was qualified. She was leaving.**
Q. Did she hire you?
A. **No.**
Q. Were you her replacement?
A. **Yes.**
Q. Who did you interview with at Duquesne?
A. **Jim Miller.**

Q. Anyone else?
A. **John Plante. I believe that's all.**
Q. Do you know who made the decision to hire you?
A. **John Plante.**
Q. Did you know anyone at Duquesne in the advancement division other than Carrie before you were hired?
A. **No.**
Q. You didn't know John Plante prior to your interview with him?
A. **No.**
Q. You didn't know Jim Miller prior to your interview with him?
A. **No.**
Q. At some point, did you become the AVP for Advancement and Donor Relations?
A. **No.**
Q. What titles did you hold during your Duquesne employment?
A. **Executive Director, Major and Planned Giving, Assistant Vice President, and I really -- Major and Planned Giving and Donor Relations.**
Q. Any other titles?
A. **Assistant Vice President, Advancement. There were so many titles. The last title was Senior**

**Assistant VP, Planned Giving. Gift Planning. I'm sorry. It was Gift Planning.**
Q. When did your title become Senior Assistant Vice President?
A. **November '21, 2021.**
Q. And who gave you that title?
A. **Jim Miller.**
Q. How old were you at the time?
A. **Sixty-one.**
Q. Are you familiar with Duquesne's policies related to sexual harassment?
A. **Yes.**
Q. Do you know whether photos -- those policies prohibit sending graphic pictures to others within the University?
A. **Yes.**
Q. Do you think that it would be inappropriate for someone to send a picture of a woman in a bikini to a colleague?
A. **No.**
Q. You do not think that's inappropriate?
A. **No.**
Q. You don't think those are graphic images?
A. **No.**
Q. Would you be comfortable if a male sent you

pictures of a woman in a bikini?
A. Yes.
Q. Can you think of any business reason why you would be receiving pictures of women in bikinis?
A. No.
Q. Has anyone ever sent you a picture of a woman in a bikini?
A. Yes.
Q. Who?
A. Bill Richter.
Q. He sent you a picture of a woman in a bikini?
A. Yes.
Q. When was this?
A. I do not recall.
Q. You don't recall?
A. No.
Q. Did the picture have anything to do with your employment at Duquesne?
A. No.
Q. And you were comfortable with Mr. Richter sending a picture of a woman in a bikini?
A. Yes.
Q. Did the picture have any words associated with it? Was there a caption?
A. No.

Q. Did you ask Mr. Richter why he sent you a picture of a woman in a bikini?
A. No.
Q. Has anyone else ever sent you a picture of a woman in a bikini that you worked with?
A. I don't recall.
Q. The only instance that you remember is Mr. Richter?
A. Yes.
Q. Did you ever talk to Mr. Richter about the fact that he had sent you a picture of a woman in a bikini?
A. Yes.
Q. Tell me about that conversation.
A. My recollection is Bill was coming home from a long trip in California and sent a humorous message about the weekend accompanying the photo of the woman in a bikini.
Q. Do you remember what the message was?
A. No.
Q. Do you still have it on your phone?
A. No.
Q. Have you looked?
A. Yes.
Q. Are you aware that Mr. Richter was disciplined for sending a picture of a woman in a bikini to

Dr. Dausey?
A. Yes.
Q. Did you ever discuss this with Dr. Dausey?
A. No.
Q. Did you ever discuss the discipline with Mr. Richter?
A. No.
Q. Did you ever discuss it with John Plante?
A. No.
Q. When did you last speak to Mr. Plante?
A. I don't recall.
Q. Did you speak to him before the settlement discussions in your case?
A. Yes.
Q. Have you spoken to him since that conversation?
A. No.
Q. Does he know that your lawsuit resolved?
A. Yes.
Q. How does he know that your lawsuit resolved?
A. He texted me and I said my matter is resolved.
Q. That's all you said?
A. Yes.
Q. What did he say that prompted that response?
A. He asked me the question whether my matter -- whether I was still employed at Duquesne.

Q. Did you tell him whether or not you were still employed at Duquesne?
A. Yes.
Q. So, tell me everything you recall, because I asked you everything you said and you didn't tell me that you told him that you were no longer employed at Duquesne.
A. Could you rephrase that question, please?
Q. Sure. What was the entire conversation via text message that you had with Mr. Plante?
A. John asked me if I was still employed at Duquesne. I said that my matter with Duquesne had settled and that I was no longer employed at Duquesne.
Q. Did he respond?
A. No.
Q. He did not respond?
A. Yes.
Q. Yes, he did respond?
A. Yes.
Q. What did he say?
A. I don't recall.
Q. Would it refresh your recollection if you checked your text messages?
A. No.
Q. Do you delete your text messages?

donor relations responsibility?
A. Yes.
Q. Anything else?
A. I had asked Jim Miller when I lost donor relations how I could continue to move forward as a senior member of the advancement team, to which I never received an answer.
Q. Did you continue being a senior member of the advancement team?
A. I have a senior title.
Q. So, yes?
A. Yes.
Q. Anything other than your alleged demotion that impacted your relationship with Mr. Miller?
A. I would say Mr. Miller avoided me.
Q. Okay. What do you mean by that?
A. He would cancel many of our meetings; he would be on the road traveling; he never wanted to meet in person; I would ask questions to which I would not receive responses.
Q. It was part of Mr. Miller's job responsibility to be on the road traveling; is that correct?
A. Say that the again.
Q. It was part of his job responsibilities to travel?

A. Yes, yes.
Q. And how often did he cancel meetings with you?
A. I don't know.
Q. How often did he say that he did not want to meet in person?
A. At least once a month.
Q. Tell me about that.
A. I don't have the records, so I can't tell you about it.
Q. Do you have records in your possession about that?
A. No.
Q. What questions did you ask him that you did not receive answers to?
A. How I could continue to move forward at Duquesne, when we could review the donor reassignments. I'm trying to think. There was also a policy on what constitutes a visit. Gift officers are measured by the number of face-to-face meetings they have, including virtual meetings, and I had written a policy with Adam Viers and presented it to Jim, but we had never gotten a determination.
Q. Is it your contention that Mr. Miller did not want to meet with you because of your age?
A. No.

Q. Why do you believe is the reason that Mr. Miller did not want to meet with you?
A. I don't know.
Q. Do you think it's because of your gender?
A. No.
Q. There has been an allegation in this case that Mr. Miller sexually assaulted multiple women at Duquesne.
Are you aware of that allegation?
A. Yes.
Q. Are you aware of any of those women?
A. Patty Maurer. Patricia, Maurer, M-a-u-r-e-r.
Q. Anyone else?
A. Not that I am aware.
Q. Have you spoken to Patty Maurer?
A. Yes.
Q. When was the last time you spoke to her?
A. It may have been last fall.
Q. Who reached out to who?
A. I reached out to her.
Q. For what reason?
A. She was at Animal Friends and I wanted to make a donation.
Q. Did you know about her allegations involving Mr. Miller before you reached out to Ms. Maurer?

A. Yes.
Q. When did you become aware of Ms. Maurer's allegations?
A. I believe it was September of 2021. And Cecilia and Patty had been colleagues, prior colleagues and friends, and I had simply wanted to meet Patty, who Cecilia had spoken so highly of.
Q. Okay. That's not how you became aware --
A. At that lunch, Patty said that she wanted to confide something in Cecilia and I, and we said, fine, and she proceeded to tell us of the alleged sexual assault by Jim Miller to her.
Q. What did Ms. Maurer tell you?
A. That he had sexually assaulted her at a University event.
Q. Did she tell you how?
A. No.
Q. She just said he sexually assaulted me at a University event?
A. Yes.
Q. Did she tell you what year it was?
A. No.
Q. Did she tell you what University event?
A. No.
Q. Did you ever get any of those details?

Maurer?
A. **Patti Maurer visited my LinkedIn page. I clicked in on hers to review. We had remet via her current employment with Animal Friends after communicating over our participating in -- participation in a golf outing.**
Q. Your testimony is that you communicated with her about this golf outing, and that's why you were on LinkedIn?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. Do I understand that right?
A. **Simply reconnecting, seeing what her career path was at that point, yes. Refreshing my recollection of who she is and what she was doing professionally.**
Q. Is it your testimony that you checked in on her LinkedIn page after she checked on yours first; is that how you remember it?
A. **That's how I remember it, yes.**
Q. On or prior to March 3, 2022, at about that time, did you receive any communication from anyone which indicated that Ms. Maurer was making these allegations against you?

A. **I don't believe so.**
Q. In or about 2008, did you promote a woman named Gwyneth Gaul to the position of senior major gift officer?
A. **I don't recall, but potentially, yes.**
Q. You don't recall whether you --
A. **I did promote her. I don't know the date, sir.**
Q. You don't know the date. Was that the right title for the position?
A. **I don't recall, but likely.**
Q. Was this a newly-created position?
A. **Don't recall.**
Q. Do you recall whether or not it's true that in the previous year Ms. Gall did not make her donation quota?
A. **I don't recall.**
Q. Is it true -- do you know who Melissa Malelestinic is?
A. **Yes.**
Q. Sometimes she goes by Missy?
A. **Yes.**
Q. Do you recall that in 2008 she was pregnant?
A. **I do not.**
Q. Do you recall that in 2007 she made and

exceeded her donation goals?
A. **I do not.**
Q. Do you recall that in 2007, Ms. Maurer also exceeded her donation goals?
A. **I do not.**
Q. Did you have a sexual affair with Ms. Gall?
A. **I did not.**
Q. So that's not why she was selected over the two other successful candidates for this promotion?
A. **No --**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. **No.**
Q. Is it true that Adrenne Baldoni filed a claim against you with Duquesne for sexual harassment?
A. **I don't even know that name, Adrenne Baldoni?**
Q. You don't know that name?
A. **I do not know that name.**
Q. Have you ever had a claim of sexual harassment made against you?
A. **No, sir.**
Q. Has anyone at Duquesne ever interviewed you

about Mr. Baldoni's accusations?
A. **I don't know who she is and the answer is no.**
Q. So I take it that you were never disciplined in any way related to Ms. Baldoni?
A. **No.**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. Do you remember discussing a sexual harassment claim with Bernadette Krueger?
A. **No.**
Q. Do you know who Bernadette Krueger is?
A. **Yes.**
Q. So you did not admit to Ms. Krueger that Ms. Baldoni filed a sexual harassment lawsuit or claim against you, I should say?
A. **No, I don't know who Ms. Baldoni is.**
Q. And you've never told Ms. Krueger that you were afraid because of this filing?
A. **No.**
Q. Do you know who Ms. Krueger may have discussed this with?
A. **No.**
Q. In a Zoom meeting in or around '20 or '21, did you make a remark or remarks that suggested

that you had been intimate with Nicole Kelly?
A. No.
Q. And that as a result, you two had children together?
A. No.
Q. You never made a statement like, how are my kids?
A. No.
Q. I assume that you never were intimate with Ms. Kelly?
A. Correct.
Q. And you don't have children with her therefore?
A. Correct.
Q. Was there any investigation performed by Duquesne regarding these remarks?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. I'm not aware. I never made the remark so it makes no sense for an investigation to be had.
Q. Did anyone at Duquesne, including you, receive any disciplinary action related to Ms. Kelly's claims?
MS. McGROGAN: Objection to form.

You can answer to the extent you know.
BY MR. SANSONE:
A. I'm not aware of any claim.
Q. Do you know what the term motor boating means?
A. Yes, sir.
Q. Explain that to me, please.
A. It's an uncomfortable thing to explain but it's when somebody puts their face between breasts.
Q. And does what?
A. And wiggles their head.
Q. That's an uncomfortable thing to explain?
A. Yeah, I think so.
Q. I think it might be an uncomfortable thing to ask a woman to do that?
A. It certainly would be.
Q. Did you ask Ms. Hines, Teresa Hines if you could motor boat her?
A. No.
Q. Do you know whether any witnesses have indicated that they heard you and saw you do that?
A. No.
MS. McGROGAN: Objection to form.
BY MR. SANSONE:

Q. How long have you been employed by Duquesne?
A. 36 years.
Q. Have you ever held any other significant adult employment?
A. No.
Q. How old are you, sir?
A. Be 59 in April, so 58 currently.
Q. Does Duquesne have a policy related to sexual assault and/or sexual harassment?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
A. Yes.
Q. Do you know the policy?
A. Generally.
Q. Can you generally tell me what the policy says?
A. Prohibits those actions and they are to be reported immediately.
Q. What are the potential penalties under the policy for sexual assault?
A. Up to and including dismissal, termination.
Q. And the policy against sexual harassment, I assume Duquesne has a separate policy related to sexual harassment?

A. Yes.
Q. What are the penalties for engaging of sexual harassment?
A. Up to and including termination.
Q. If a Duquesne employee commits a sexual assault against another Duquesne employee, should that employee that committed the assault be automatically terminated?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Should the employee who committed the assault be automatically terminated?
Q. Yes.
A. It's a matter of opinion, but I believe so.
Q. If a Duquesne employee commits sexual harassment against another Duquesne employee, should the employee committing the harassment be disciplined?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Yes, sir.
Q. What level of discipline ought to apply to that employee in your opinion, sir?

take this to the gift committee?
A. **He could have if he had chosen to.**
Q. Not what I asked you, sir. Do you understand the question?
A. **I do understand the question. I can't put myself in your client's head.**
Q. Your answer is you don't know whether you expected Mr. Richter to present this to the gift committee?
A. **Any gift officer can take --**
Q. I understand that.
A. **-- and propose to a gift committee at any time.**
Q. Not what I asked you. I asked you if you expected that it would be him that would do that in this case?
MS. McGROGAN: Objection to form. Asked and answered. You can answer it again.
BY MR. SANSONE:
A. **I expected somebody to take it to the gift committee.**
Q. Who?
A. **Either the gift officer involved which would be your client or Mary Frances Dean or Cecilia Hughes.**

Q. Can you tell me the name of any gift officer who has presented a naming rights gift to the committee?
A. **Not offhand.**
Q. Who would you have expected to present this Jankowski gift to the president?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. **It would be me ultimately after approval by the -- recommendation by the gift acceptance committee.**
Q. In 2022, you were a member of the gift acceptance committee, were you not?
A. **I still am.**
Q. So the answer is yes to my question?
A. **Yes.**
Q. What role did Mr. Richter's role in the Jankowski gift play in his termination?
MS. McGROGAN: Objection to form. You can answer to the extent you understand.
BY MR. SANSONE:
A. **It was one of several factors related to poor behavior, negative behavior and poor judgment.**
Q. And would you please describe for me

everything that Mr. Richter did in the Jankowski gift that you believe violated the policy that -- the naming rights policy?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. **Representing to the donors in advance of gift acceptance committee approval that we would name the Center for Emerging and Innovative Media in perpetuity for acceptance of a gift well below the standards. He offered that without advance approval by the gift acceptance committee and he offered that without advance approval ultimately by the president.**
Q. So it's your testimony that my client promised the donors that they would have these naming rights; is that right?
A. **Yes.**
Q. Isn't it true that my client warned the donors that their donation and the naming rights for it still has to be accepted by the committee?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:

A. **I have no knowledge of that.**
MR. SANSONE: Miller 1.

\- - - -

(Deposition Exhibit No. 1 was marked for identification.)

\- - - -

BY MR. SANSONE:
Q. Showing you what has been marked, looking at what has been marked as Miller Exhibit 1 you will note has also been marked as Dedrick Exhibit 1 as well as Gormley Exhibit 1, ask you to review this email string. Please feel free to review the entire string although I'm only going to be asking you about the first page.
MS. McGROGAN: Please review the entire string.

\- - - -

(Whereupon, the witness reviewed the document.)

\- - - -

BY MR. SANSONE:
Q. Have you been able to review that?
A. **Yes.**
Q. If you look at the center, the first page of that exhibit, Duquesne's Bates stamp 406, do you

see the paragraph in the center of the page which begins, one item of business?
A. **Yes, I do.**
Q. And it says, I have assigned Letter of Charitable Intent for you. The next step is for me to go before DU's naming committee and present a formal request to name the Media Center. Have you seen this email before?
A. **I have not.**
Q. You've never seen this email before?
A. **Correct.**
Q. Before this moment?
A. **Correct.**
Q. What message do you believe that paragraph sent to the donor with respect to the guarantee of their donation?
A. **That it would go before the gift acceptance committee, that he would present to the gift acceptance committee.**
Q. Doesn't this imply that it has to be approved by that committee?
A. **It would.**
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
Q. So is it clear from this, and this obviously

happened before -- well, you see it's June 19, 2022 is the date of that email; do you see that?
A. **Yes, sir.**

- - - -

(Deposition Exhibit No. 2 was marked for identification.)

- - - -

BY MR. SANSONE:
Q. I'm showing you what has been marked as Miller Exhibit 2, also Dedrick Exhibit 2, Gormley 2, and Dean Exhibit 20, ask you to review this and let me know when you've done so.

- - - -

(Whereupon, the witness reviewed the document.)

- - - -

BY MR. SANSONE:
A. **I've reviewed it.**
Q. Pardon me?
A. **I reviewed it.**
Q. Okay. Had you ever seen this email before?
A. **No, sir.**
Q. Not before today?
A. **Correct.**
Q. You see that, forgetting the email on the top of

the page for the moment, the email from Cecilia Hughes to Mr. Richter, copy to Ms. Dean, indicates that she was attaching a draft of the donor Statement of Charitable Intent; do you see that?
A. **I do.**
Q. Does this suggest that she prepared that draft?
A. **Yes, based on -- likely based on the details provided by Mr. Richter.**
Q. And it says, I will need that detail, which is with respect to the timing of the naming rights; do you see that?
A. **I do.**
Q. I will need that detail for the gift acceptance committee. So this indicates that Ms. Hughes is intending to bring this before the gift acceptance committee; is that right?
MS. McGROGAN: Objection to form. Calls for speculation. You can answer.
BY MR. SANSONE:
A. **Perhaps.**
Q. I will need that detail for the gift acceptance committee, what else would that mean?

A. **Well, the previous email said, he will take it to the gift acceptance committee.**
Q. Right, I understand that it says that. My point is, I asked you about this email and what it says which is Ms. Hughes is apparently intending to take this to the committee; is that right?
MS. McGROGAN: Objection to form. You can answer it again.
BY MR. SANSONE:
A. **Perhaps.**
Q. Well, let's go to the next paragraph which reads, once we are all in agreement with the draft, I will prepare a memo from you to the gift acceptance committee for approval. Does that clear it up in your mind?
MS. McGROGAN: Objecting to form. You can answer.
BY MR. SANSONE:
A. **The recommendation would be emanating from Mr. Richter, but it would be prepared by Ms. Hughes.**
Q. And it says, while we cannot officially approve the donors' Statement of Charitable Intent or sign it on behalf of the University

until we get that approval, I don't see a problem with showing it to the Jankowskis if you see them next week.

Was it your understanding that Mr. Richter was going to be visiting with the Jankowskis at that point in time in 2022?

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

A. I was not aware of when he was visiting. This would imply that that is the intent.

Q. Do you have any reason to believe that wasn't so?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. No.

Q. Do you agree with Ms. Hughes that there wasn't really a problem showing it to the Jankowskis?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. I would customarily not show it until it had been officially approved, nor would I represent to a donor prior to that approval, that they were going to have -- that the gift

would qualify them for overall naming rights of the Center.

Q. Mr. Richter did not sign the donor Statement of Charitable Intent, did he?

A. Correct.

Q. Have you told me everything you believe Mr. Richter did wrong with respect to his solicitation of this donation?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. I believe so.

Q. In light of evidence I've just shown you, has your opinion changed on whether or not he made a promise to the Jankowskis that they would have this naming rights without approval from the committee?

A. Yes.

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

Q. Yes, your opinion has changed?

A. No -- yes, he in my opinion, he represented to the Jankowskis that they would receive overall naming rights of the CEIM for the gift in question.

Q. What makes you think that?

A. Conversation with the [redacted] where they told me well before this date that they were going to have the big glass box on the third floor of the student union filled with state of the art technology perpetually named for them with their names etched in the glass along with a quote of their choosing.

Q. When did you have that conversation with the [redacted]?

A. I don't have the date in front of me, sir.

Q. Was it before or after you fired my client?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. After.

Q. So at the time you fired my client you didn't know that?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. Correct.

Q. Why didn't you wait to talk to the [redacted] before firing my client?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. It was one of several factors as I referenced earlier. His termination was based on a cumulative impact of -- it was the cumulative impact of a variety of negative behaviors and demonstrated poor judgment.

Q. Well, my question was, why didn't you wait to fire him until you spoke to the [redacted]?

MS. McGROGAN: Objection to form.

You can answer again.

BY MR. SANSONE:

A. It would be damaging to the relationship to have that conversation in advance.

Q. It would damage the relationship --

A. In my opinion.

Q. Let me just finish, you have to wait or the record won't be clear if you don't.

You're saying that it would damage the relationship with the [redacted] if you did not have the conversation until you fired my client?

A. In my opinion, yes.

Q. How would that damage the relationship if you had gone to them and said we're looking into

this but haven't fired him yet?
A. **Pitting donors, you know, placing a donor in a personnel decision in the middle of a conversation regarding whether or not somebody's employment is going to continue, I think would be very damaging to a relationship. I would not want a donor to believe that they were responsible for the dismissal of any employee.**
Q. Why would you have to tell the donor that you're thinking about dismissing him? Why couldn't you just ask the donor, hey, what happened here?
A. **You wouldn't tell them -- I wouldn't tell them that you're thinking of dismissing somebody, but after the fact they would see the alignment of those actions. You came, you talked or you called and you talked to us about this circumstance, and then ultimately this person was terminated. They would feel complicit in that termination.**
Q. Well, we're setting up a conversation with the Jankowskis right now, I want to make sure I understand what you claim they said to you. Is it your testimony that the Jankowskis said

that my client guaranteed that they would get these naming rights?
A. **He represented --**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. He what?
A. **He represented such, yes.**
Q. He represented that there was no impediment whatsoever to getting these naming rights; is that what your testimony is, is that what the Jankowskis told you?
A. **They told me that he represented that they will receive overall naming rights to the Center for Innovative and -- Emerging and Innovative Media.**
Q. Did the Jankowskis tell you that they had been told by Mr. Richter that the matter had to go before the naming committee?
A. **They did not.**
Q. Were the Jankowskis upset with my client?
A. **They were upset with the situation, whether or not they were upset with your client, I can't speak to.**
Q. So they didn't talk about the relationship

they had with Mr. Richter when you had this conversation?
A. **They did not.**
Q. Let's talk about the other reasons for the termination that were set forth in your letter of termination, shall we. The issue of the text that was sent to Dr. Dausey, the woman wearing a bikini --
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. Do you ever remember seeing that text?
A. **I've never seen the text.**
Q. Do you believe that the text involved any pornography?
A. **I've never seen the text. I would have no idea what it involved.**
Q. Did you discuss this with Dr. Dausey?
A. **No, I did not.**
Q. What was your position at the time that this text was sent?
A. **I was not aware that it was sent -- oh, what was my employment position?**
Q. Right.
A. **I was senior advisor to the president.**

Q. That's the same position you hold now?
A. **No.**
Q. You got the promotion after that?
A. **Yes.**
Q. Okay. Did you have any responsibility to monitor or advise on Mr. Richter's conduct in his employment with the University at that time?
A. **No.**
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. **Since you took your current position, have you discussed the issue of this text with anyone?**
MS. McGROGAN: Objection --
BY MR. SANSONE:
Q. -- leaving conversations with counsel out of it?
A. **I believe counsel was a part of those conversations.**
Q. So you didn't have any conversations with Dr. Dausey that did not involve counsel?
A. **Perhaps. I don't recall.**
Q. Do you know what the text contained?
A. **I do not.**

Q. Do you know how many such texts there were?
A. **I do not.**
Q. Do you know what was put in the language by Mr. Richter to go along with the text?
A. **I do not.**
Q. Do you know how long ago this occurred?
A. **Not as I sit here, I don't recall.**
Q. But you would have had access to that information, I take that?
A. **Yes. I've seen the references in his personnel folder.**
Q. In the year since this incident, has there been any repeat of any such conduct?
MS. McGROGAN: Objection to form. You can answer to the extent you understand.
BY MR. SANSONE:
A. **Not to my knowledge.**
Q. But you take conduct like this very seriously, I take it?
A. **I do.**
Q. Whenever someone engages in inappropriate conduct when it comes to sexuality and interaction between employees, that's a serious problem, isn't it?
A. **It is.**

MS. McGROGAN: Objection to form. You can answer. Give me a second to put my objections on, Jim.
THE WITNESS: Okay.
BY MR. SANSONE:
Q. You understood that Mr. Richter had already experienced some level of punishment for this conduct, right?
MS. McGROGAN: Objecting to form. You can answer.
BY MR. SANSONE:
A. **Yes. Again, I saw it in the personnel file.**
Q. Right, right. And that after the incident, Mr. Richter still received a promotion and a raise; is that right?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. **It's my understanding.**
Q. Now, did the incident involving Mr. Richter in Texas, in a parking lot in Texas, play a role in his termination?
A. **It did.**
MS. McGROGAN: Objection to form. You can answer.

BY MR. SANSONE:
Q. What role did it play?
A. **A lack of judgment in that situation.**
Q. Okay. What lack of judgment did Mr. Richter show -- what do you understand the facts to be in that case?
A. **I wish I knew more of the facts. Your client was instructed and defied the instruction actually to provide a report to me, a written report containing the specifics of the interaction, but my understanding of the interaction was he opened a car door, bumped a vehicle next to him and an altercation ensued. And that altercation was witnessed by a donor or a prospective donor.**
Q. Who told you that?
A. **I believe it was Mr. Richter.**
Q. You think Mr. Richter told you that the donor witnessed this altercation?
A. **It was either Mr. Richter or Ms. Dean, I don't recall as I sit here if they got the report directly or if I got the report directly through Mary Frances.**
Q. I was going to ask you, do you remember Mr. Richter calling you to inform you about what happened?

A. **That's vaguely my recollection.**
Q. Didn't he tell you that this man attacked him for an accidental bumping of his car?
A. **That was his account.**
Q. Do you have any information to suggest that's not true?
A. **No.**
Q. So when you said that's his account, is there any reason why you don't believe that account?
A. **No.**
Q. And so how is it that he showed bad judgment, by doing what?
A. **Responding in kind.**
Q. What do you mean?
A. **My understanding from what was shared with me was that he engaged in an altercation.**
Q. Didn't he tell you the guy attacked him, do you recall that?
A. **Vaguely I recall that.**
Q. Yeah. So what should he have done, let the guy beat him up or what?
MS. McGROGAN: Objection to form. You an answer.
BY MR. SANSONE:

Q. What would have been good judgment in that circumstance when a man's attacking him?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. Find a way to deescalate rather than engaging.**
Q. So you're assuming there was a way to deescalate a man attacking him because he bumped his car with his door? What's the basis for your making that assumption, sir?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. It's the action I would have taken.**
Q. How do you know, you weren't there?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
Q. You just assume that you would have done better is that it?
MS. McGROGAN: Same objection.
BY MR. SANSONE:
**A. I know what's in my heart. I would not engage if I didn't -- wouldn't need to engage.**
Q. So you made the decision that Mr. Richter did

not need to engage this man who was attacking him; is that your testimony, sir?
**A. Yes.**
Q. And do you have any basis for that other than what's in your heart?
**A. Just proper conduct and sound judgment of a professional when you are about to engage a donor or a prospective donor. I would be mortified to have a donor show up while I'm in the midst of an altercation.**
Q. I got to just check on that again. Are you telling me Mr. Richert told you that the donor witnessed this altercation?
**A. That's my recollection.**
Q. And you understood that the police did not file any kind of report related to this altercation, right?
MS. McGROGAN: Objection to form.
You can answer to the extent you know.
BY MR. SANSONE:
**A. I don't recall a reference to the police as I sit here today.**
Q. Was my client disciplined in any way for what you call a lack of judgment?
**A. No.**

MS. McGROGAN: Objection to form.
BY MR. SANSONE:
Q. How come? If this was a lack of judgment on his part that allowed him to act in a way that he shouldn't in front of a donor, why wouldn't you suggest at least some level of discipline for this?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
**A. At the time I was waiting for him to file the report that he never filed.**
Q. Did you discipline him for failing to file a report?
**A. I did not.**
Q. Did you follow-up on your request that he file a report?
**A. At least twice.**
Q. In writing?
**A. No, sir.**
Q. When?
**A. I can't tell you as we sit here today. I don't know the date of the altercation as we sit here today.**
Q. How did you make this request of him twice?

**A. Through Mary Frances Dean, his supervisor.**
Q. You told Ms. Dean to tell Mr. Richter to file a report?
**A. That's my recollection.**
Q. Did Ms. Dean do so?
**A. I don't know.**
Q. Did you follow-up with Ms. Dean to find out why this hadn't happened?
**A. At least twice.**
Q. Wait, I understand. So did you ever ask my client directly to do so?
**A. Yes, the day he called.**
Q. And you told Ms. Dean to do so twice --
**A. That's my recollection.**
Q. -- you directed Mr. Richter do so twice; is that right?
**A. That's my recollection.**
Q. So on three separate occasions, you directed that you needed a report on this and didn't get it, right?
**A. Correct.**
Q. And yet nobody got disciplined for that failure?
**A. Correct.**
Q. Why is that?

A. I have no answer for that as I sit here.
Q. The Glazener matter I understand played a role in my client's termination; is that right?
A. It did.
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. It did.
Q. And there was a math error involved in the donation; is that right?
A. Yes, sir.
Q. Who made the math error?
A. I think a shared complicity, if you will. Three folks would be involved in that. Mr. Richter who has no responsibility to provide all the salient details necessary for the person drafting the agreement.
Q. Did that happen?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
A. I would have no knowledge of what specifically Mr. Richter would have advised whoever had drafted that agreement.
Q. So you don't know if that was a mistake on his part or someone else's?

A. I don't know if it was his. I don't know if it's the person drafting. I don't know if it is Mary Frances Dean who drafted, Cecilia Hughes who drafted, and/or Mr. Creehan who signed the agreement, but it went before four sets of eyes and had gone unnoticed.
Q. Did anybody receive any type of discipline for this failure?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. We had ongoing conversations prior to termination and he defied directives to address the matter with the donor, specific conversations with Mr. Richter, at least on three occasions, to address the matter with the donors, to let them know the error had occurred and that the University would, unfortunately for us, would own the error costing the University a $40,000 hit, if you will.
Q. I asked you if anyone was disciplined as a result of this?
A. No.
Q. These types of math errors, like the one we

saw here, are they common errors that occur?
A. No.
Q. Uncommon?
A. Uncommon.
Q. What action did you take when you learned of this error to ensure that it didn't occur again?
A. None that I can recall.
Q. You said that this cost the University $40,000?
A. Yes, sir.
Q. So the University's out of pocket $40,000?
A. Yes.
Q. They weren't reimbursed by having the donation altered so that some of the donation was put into the scholarship involved?
A. Correct.
Q. That didn't happen?
A. That's correct.
Q. And your testimony is that the University had a net loss of $40,000 on that?
A. We had to transfer $40,000 from the general endowment fund into the term scholarship fund to cover the shortfall for that given academic year.

Q. And the number wasn't $70,000?
A. I recall it as $40,000. The math error may have been 70. $30,00 of that was to go to the endowment. $40,000 was fully expendable in that particular academic year on the term scholarship.
Q. And so I understand, you're saying the University was not reimbursed?
A. That's correct.
Q. For those monies?
A. That's correct.
Q. Do you have any idea why the president would say the University was in fact reimbursed for all of it?
MS. McGROGAN: Objection to form. Mischaracterizes testimony. You can respond.
BY MR. SANSONE:
A. I have no idea what his testimony was, so I can't answer that.
Q. Was he involved in this issue, Mr. Gormley?
MS. McGROGAN: Objection to form. You can answer.
BY MR. SANSONE:
A. Perhaps tangentially, he may have had awareness of it.

A. I have no answer for that as I sit here.
Q. The Glazener matter I understand played a role in my client's termination; is that right?
A. It did.
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. It did.
Q. And there was a math error involved in the donation; is that right?
A. Yes, sir.
Q. Who made the math error?
A. I think a shared complicity, if you will. Three folks would be involved in that. Mr. Richter who has no responsibility to provide all the salient details necessary for the person drafting the agreement.
Q. Did that happen?
MS. McGROGAN: Objection to form.
BY MR. SANSONE:
A. I would have no knowledge of what specifically Mr. Richter would have advised whoever had drafted that agreement.
Q. So you don't know if that was a mistake on his part or someone else's?

A. I don't know if it was his. I don't know if it's the person drafting. I don't know if it is Mary Frances Dean who drafted, Cecilia Hughes who drafted, and/or Mr. Creehan who signed the agreement, but it went before four sets of eyes and had gone unnoticed.
Q. Did anybody receive any type of discipline for this failure?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. We had ongoing conversations prior to termination and he defied directives to address the matter with the donor, specific conversations with Mr. Richter, at least on three occasions, to address the matter with the donors, to let them know the error had occurred and that the University would, unfortunately for us, would own the error costing the University a $40,000 hit, if you will.
Q. I asked you if anyone was disciplined as a result of this?
A. No.
Q. These types of math errors, like the one we

saw here, are they common errors that occur?
A. No.
Q. Uncommon?
A. Uncommon.
Q. What action did you take when you learned of this error to ensure that it didn't occur again?
A. None that I can recall.
Q. You said that this cost the University $40,000?
A. Yes, sir.
Q. So the University's out of pocket $40,000?
A. Yes.
Q. They weren't reimbursed by having the donation altered so that some of the donation was put into the scholarship involved?
A. Correct.
Q. That didn't happen?
A. That's correct.
Q. And your testimony is that the University had a net loss of $40,000 on that?
A. We had to transfer $40,000 from the general endowment fund into the term scholarship fund to cover the shortfall for that given academic year.

Q. And the number wasn't $70,000?
A. I recall it as $40,000. The math error may have been 70. $30,00 of that was to go to the endowment. $40,000 was fully expendable in that particular academic year on the term scholarship.
Q. And so I understand, you're saying the University was not reimbursed?
A. That's correct.
Q. For those monies?
A. That's correct.
Q. Do you have any idea why the president would say the University was in fact reimbursed for all of it?
MS. McGROGAN: Objection to form.
Mischaracterizes testimony. You can respond.
BY MR. SANSONE:
A. I have no idea what his testimony was, so I can't answer that.
Q. Was he involved in this issue, Mr. Gormley?
MS. McGROGAN: Objection to form.
You can answer.
BY MR. SANSONE:
A. Perhaps tangentially, he may have had awareness of it.

53

Q. Do you know any reasons why the [redacted] or Mr. Richter, how they might explain the delay in meeting them on this question?

MS. McGROGAN: Objection to form.

You can respond.

BY MR. SANSONE:

A. **I can't speculate as to what's in their minds.**

Q. No, I didn't ask you to do that. Do you know of any reasons, for example, do you know that the Glazeners were out of the United States for a great deal of the time involved in their request that Mr. Richter would go meet with them?

MS. McGROGAN: Objection to form.

You can answer.

BY MR. SANSONE:

A. **He was instructed to advise them, it doesn't matter where they are, cell phones work overseas I believe.**

Q. No. Did you understand my question, sir? Did you know that the Glazeners were out of the country for a lot of the period of time involved?

A. **I do not.**

Q. Do not. Do you know whether or not the COVID

54

19 pandemic played a role in the failure to meet the Glazeners any earlier than they did?

A. **I do not.**

Q. Do you know whether or not the [redacted] were in any way upset by what occurred here?

A. **I know that the [redacted] were upset in another issue associated with that gift, but not this particular issue.**

Q. What do you think the [redacted] were upset about?

A. **The [redacted] represented to me when they got their pledge reminder at the end of last year, that the gift was processed at a value in excess of what their intent was, and they asked to see the gift agreement, and they agreed that, yes, indeed that is our signature on that gift agreement, but at the time we signed, we did not sign -- it was not our intent to give it a penny more than $1 million, and they felt misled. Yes.**

Q. And who did they think misled them?

A. **Mr. Richter.**

Q. And the [redacted] told you that?

A. **They expressed that to me, Mrs. [redacted].**

Q. Mrs. [redacted], when did that occur?

55

A. **Either January or February. I believe January of this year.**

Q. Of 2024?

A. **Yes, after receiving their reminder at the end of the year.**

Q. Of course, you didn't know any of that when you terminated my client's employment?

A. **Correct.**

Q. So that couldn't have played a role in the termination?

A. **Correct.**

Q. At the time of the termination, did you know how the [redacted] felt about my client?

A. **No.**

Q. So you hadn't consulted with the [redacted] at the time you terminated my client?

A. **Correct.**

Q. Did my client suffer any kind of discipline as a result of the [redacted] matter?

MS. McGROGAN: Objection to form.

BY MR. SANSONE:

A. **I don't recall.**

Q. Who would have been in charge of handing out that discipline?

MS. McGROGAN: Objection to form.

56

BY MR. SANSONE:

A. **Either myself or Mary Frances Dean.**

Q. Did you?

A. **I don't recall, but I don't believe so.**

MR. SANSONE: This is 3.

- - - -

(Deposition Exhibit No. 3 was marked for identification.)

- - - -

BY MR. SANSONE:

Q. All right. Showing you what's been marked as Miller Exhibit 3. I'm going to ask if you've ever seen this document. Take your time to review it and let me know when you've done so, please.

- - - -

(Whereupon, the witness reviewed the document.)

- - - -

MS. McGROGAN: I'm going to note for the record that this is two different documents. The first 153 through 165, is the second complaint, 166 is the first.

MR. SANSONE: I'm sorry, I missed that what was that?

that meeting?
A. We met at the Chinese restaurant, hadn't seen each other in quite a while, as I recall it. I asked him, you know, what was going on with Melissa Krebs, some general form like that, and he responded that she's done nothing wrong, and that was that.
Q. That's all that you recall of that meeting?
A. Well, Jim became agitated. He didn't like being questioned by me, so I repeated it. I wanted to be sure I was understanding what he was saying that he felt she didn't do anything wrong, which he repeated. And then I said, well, unfortunately, I disagree, and I got up and left the restaurant.
Q. So, you got up and left the restaurant?
A. Uh-huh.
MS. McGROGAN: I'm going to mark as Exhibit 11 these notes that are titled "Recap of March 2023 meeting @ noon with Jim Miller at China Inn to discuss items of concern to me."
(Richter Deposition Exhibit 11 was marked for identification.)
BY MS. McGROGAN:
Q. Are these your notes?
A. Yes.
Q. In these notes, it says "He asked about my

being attacked in Houston."
What was that about?
A. What are you asking me?
Q. When you were attacked in Houston, what happened?
A. I was meeting a donor in Houston for an early breakfast and parked my rental car next to a fellow. It was a big SUV, and as I got out, my door hit his Audi very gently. And he got out of the car, screaming at me and put his hands on me, and I threw him to the ground. And we were spaced such that my door prevented him from getting at me again once we got up. I was threatened and I went into the coffee shop, which was behind us, and it was early morning and the manager said, what's going on? I said, please call the police.
As I said that, he came in just screaming at me, wanting to attack me. He was Mexican. He was screaming stuff in Spanish. I don't know what he was saying. It wasn't pleasant, I'm sure of that.
The manager -- another manager came around the corner and stopped him -- a woman, actually -- and she said, you sit down over there and you get to the back of the restaurant. People are looking at this like, what in the hell is going on here? And the police came and questioned me. I assume they questioned him.

I was outside at a picnic table.
What frightened me was one of the cops was behind me with his hand on his pistol and another cop was in front of me questioning me. I was scared. And the cops finally figured out what was happening, went out to look at his car, and said, I see no mark on your car. He calmed down, this other fellow. This took a few minutes.
People left the restaurant, because two or three cop cars came with sirens blaring. And one of the cops came up to me and said, you were very fortunate to be alive, get the hell out of here. That's what happened.
Q. Were charges pressed?
A. No.
Q. Did you ever get a copy of the police report?
A. There was no police report.
Q. There was no police report?
A. Huh-uh.
Q. Are you sure of that or you didn't receive it?
A. One cop told me to get the hell out of there, I was lucky to be alive.
Q. Who was the donor that you were meeting that morning?
A. I can't recall their name. They were new to

Duquesne, to my portfolio. Honest to God, I don't recall their names. They were panicked, because they came in in the middle of this. I said, I'm sorry to meet you under these conditions. This obviously is not going to work. I recall now that they had a home in Montana. I said, I'll come and see you in Montana soon, and I'm assuming that they left. I don't recall their names.
Q. So, you didn't end up meeting with them?
A. Yeah, I don't recall names.
Q. Did you ever reach out to them again?
A. I did.
Q. Were you injured?
A. No. I was just scared.
Q. So, you and Jim spoke about this incident when you were at this breakfast -- or at this lunch? I'm sorry.
A. I don't recall that, but it's what I wrote. I recall calling him when it happened. I mean, I called Mary Frances and I called Jim because of protocol.
Q. Was your memory of these events on March 23rd better when you took these notes than it is right now?
A. Sure, yeah, yeah.
Q. So, in this set of notes, it says you asked him why Melissa hadn't been fired for her recent meeting

department, right?
A. **Yes, yes, yes.**
Q. And there always had been throughout your employment. 2015 to 2022, there was pretty frequent turnover?
A. **Duquesne was particularly egregious in that regard, as compared to other universities I worked for.**
Q. Throughout the employment, 2015 to 2022, lots of turnover?
A. **Much more than other places I worked.**
Q. Correct. So, we're in agreement that it was not just a period of time; it was 2015 to 2022 there was a lot of turnover?
A. **Yes. The whole staff was almost completely repopulated, I guess you could say.**
Q. And then it says "I'd like to have" -- in the next page there is -- in the paragraph that says "I'd like to have someone please explain to me how this doesn't make a complete mockery of your complaint process."
Did I read that correctly?
A. **You did.**
Q. And you refer to yourself as a "damned fool" in the prior paragraph?
A. **Many people refer to me as a damned fool, but,**

**yes.**
Q. But you're adopting that moniker there?
A. **Yes.**
Q. And then it says -- in the last sentence, it insinuates that the SVP went to extraordinary lengths to reward it.
As I understand that paragraph -- and take a second to review it.
MR. SANSONE: Where are we?
MS. McGROGAN: In the next paragraph.
THE WITNESS: I missed that one, too.
MR. SANSONE: You said last paragraph.
BY MS. McGROGAN:
Q. It says that the SVP went to extraordinary lengths to reward it.
As I understand it, that refers to Melissa Krebs' conduct; is that correct?
A. **Yes.**
Q. Does that refer to Jim Miller?
A. **I would believe so.**
Q. What extraordinary lengths did you believe that he went to?
A. **He allowed an employee to take a donor that another employee had cultivated all the way to the process of obtaining a gift, gave that to another**

**employee so that they could get credit for the gift and work that the other University employee had done. That employee was not disciplined for that and, in fact, repeated the behavior.**
Q. And that's the extraordinary length?
A. **Yes.**
Q. Anything else?
A. **Not that I recall at this point.**
Q. Anything else that you believe he did that would have been an extraordinary length? Do you know if that's all you were referring to?
A. **I believe so.**
Q. And in this last -- going down, it says "Additionally, I'd like to make it clear that once this gift is booked, I'm left with no alternative but to file an age discrimination complaint as clearly Jim, through his actions, is blatantly favoring a much younger underperforming employee - at my expense."
Did I read that correctly?
A. **You did.**
Q. Is this the first time that you alleged to anyone at the University that this involved your age?
A. **I don't know that for a fact.**
Q. Do you believe that you spoke to anyone else about this being related to your age?

A. **I don't know if this had been already communicated to Jefferson as part of the first complaint. I don't know. It may well have been. I don't know.**
Q. We reviewed the first complaint, correct?
A. **When?**
Q. Earlier today. That was the one-page document that we reviewed related to Melissa Krebs and Adam Viers.
A. **There were a multitude of emails back and forth to Jefferson regarding this over a several-month period.**
Q. Do you recall if any of them said anything about age?
A. **I don't know. It would be quite possible that I did, but I can't answer that. I don't know.**
Q. Did you ever communicate with Jefferson on an email address other than your Duquesne email address?
A. **I don't know.**
Q. Did you check to see if you have any emails on your Gmail account with Jefferson Dedrick?
A. **When?**
Q. In the course of this litigation.
A. **In the course of the complaint or the litigation that follows?**

MS. McGROGAN: 153 through 165 are the second complaint form. 166 is the first. These are two separate documents.

MR. SANSONE: Can I see what you have? So you're saying that --

MS. McGROGAN: What do you have as the Bates labels for yours? You handed me the wrong document it looks like.

MR. SANSONE: No, no, I didn't. It's the same document I think, yeah.

MS. McGROGAN: Well, his says PL on the bottom so --

MR. SANSONE: Yeah, right.

MS. McGROGAN: But this one is what I have.

MR. SANSONE: Okay. And then they're the same document as I understand it, yeah. Yeah, they are.

MS. McGROGAN: I think it's in a separate document production so you're looking at Plaintiff's production, I'm looking at Defendant's production.

MR. SANSONE: Right, that's what I said. I think it's the same document, but the question is, what do you mean two different

documents.

MS. McGROGAN: Well, in the exhibit that you handed which is now marked in the record, there is a document at 163, 164 and 165.

MR. SANSONE: I'm sorry, yes.

MS. McGROGAN: And a second document at 166 .

MR. SANSONE: I'm sorry, let me see that, yeah. I don't know how that got attached there, I apologize.

MS. McGROGAN: Did you mean for his to also be marked?

MR. SANSONE: Yeah, I did. Well, let's use the one that you have as you have it.

BY MR. SANSONE:

Q. The question I was going to ask you is were you aware that my client made a claim of age discrimination against the University as a result of -- well, at any point in time?

MS. McGROGAN: Objection to form. You mean prior to his termination?

MR. SANSONE: Yes, prior to his termination, I beg your pardon.

BY MR. SANSONE:

A. Not that I recall.

Q. And had you seen the document before you before today?

A. I have not.

MR. SANSONE: This will be Miller 4.

- - - -

(Deposition Exhibit No. 4 was marked for identification.)

- - - -

BY MR. SANSONE:

Q. Showing you what's been marked as Miller 4. I'm going to ask you if you've ever seen this before so please take your time to review it.

- - - -

(Whereupon, the witness reviewed the document.)

- - - -

BY MR. SANSONE:

Q. Have you been able to review this document; is that right?

A. Yes.

Q. Had you seen this document before today?

A. I have not. I've seen -- there is some references in there that I've seen, but I've not

seen this document in the content and nature of it.

Q. What reference are you referring to?

A. It would take us quite a while to go through, but there are some details that were shared as part of the investigation process.

Q. Let's direct your attention to the second page of the document.

A. Okay.

Q. Plaintiff's Bates 65, directing your attention to the first paragraph, in this paragraph Mr. Richter references interviews of advancement colleagues who have left the University; do you see that?

A. I do.

Q. And the indication here is -- well, I'll read it. There is a striking similarity in the complaints and concerns about the management of advancement under Jim Miller. That is apparently common to the statements made by these colleague who had left the University.

Were you aware that colleagues leaving the University had made negative comments about your leadership of the advancement division?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM RICHTER , | ) | Civil Action No. 2:23-cv-0550 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTY CRISWELL WEIGAND |
| | ) | |
| v. | ) | |
| | ) | |
| DUQUESENE UNIVERSITY OF THE HOLY SPIRIT and JAMES MILLER, as an aider and abettor of discrimination, | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF PATRICIA MAURER

Before me, the undersigned authority, a notary public in and of the Commonwealth and County aforesaid, personally appeared PATRICIA MAURER, duly sworn and according to law, deposes and says that the following statements are true and correct to the best of her personal knowledge, information and belief:

1. I am Patricia Maurer. I am an adult resident of Allegheny County, Pennsylvania, and I am a former employee of Duquesne University. I was employed by the university from in or about 2005 until April of 2008.
2. On or about October 12, 2007, while I was employed by the university, as part of my job duties I attended an annual donor event in the student union ballroom on the university campus. The event was a cocktail party for donors of the university, at which event both I and other Duquesne employees were tasked with networking with and showing hospitality to donors from the previous year.
3. Prior to the arrival of donors that evening, I was standing talking to James Miller, who was my immediate supervisor at the time. Mr. Miller was holding a cocktail in his right hand.

Suddenly, without warning or provocation, Mr. Miller took his right hand, still holding his drink, and rubbed it on my left breast, over my dress. I froze from shock at this act. Mr. Miller said nothing to me, but he had a look on his face that I interpreted to ask, "What are you going to do about it?" Still in shock, I walked away from the encounter. I do not recall if I said anything to Mr. Miller at the time.

4. Even though I was appalled and humiliated by Mr. Miller's assault on my person, I was unable to resign my employment immediately for economic reasons. I did, however, begin almost immediately, to apply for other positions in an attempt to get away from Mr. Miller. I was able to begin networking with potential employers as early as November 7, 2007. Ultimately, I was able to secure a position which suited my economic needs on or about April 2, 2008. I accepted a position with United Way of Allegheny County. I tendered my resignation from Duquesne University after I received the employment offer from United Way. I believe I gave my resignation on or about April 2, 2008.

5. At some point I was very angry about what had occurred at the donor event described above, and I confronted Mr. Miller on a recent personnel decision that he had made. I challenged him to explain why he promoted Ms. X to a highly paid fund raising position when she had not made her goal numbers, while others like myself had done so, and were therefore more deserving of a promotion.[1] I demanded this information because I was aware that it was the common belief among people in the department that Mr. Miller was having a sexual affair with Ms. X. Mr. Miller responded to my comments by threatening to terminate me.

---

[1] I have been asked to keep the identity of Ms. X confidential out of privacy concerns. I can identify Ms. X should I need to do so.

6. Shortly after this encounter, I resigned my employment from the university. I did so because of the sexual assault that I had suffered, as well as because it was clear to me that Mr. Miller was favoring women he slept with for promotion over those that deserved the promotion, and finally because it was clear to me that Mr. Miller would use his power over me to terminate my employment.

7. Many years later, I learned that Mr. Miller was being promoted to the head of the advancement division. On or about October 20, 2021, seven days after the public announcement that Mr. Miller was being promoted to Senior Vice President for University Advancement, I contacted Ms. Pam Connelly, general counsel for the university. At that time, I recounted to Ms. Connelly the details of the sexual assault that I suffered from Mr. Miller. Ms. Connelly promised that the matter would be investigated, and that she would get back to me related to that investigation.

8. I had no further contact with Ms. Connelly from October of 2021 through the first of March, 2022. On or about March 2, 2022, I contacted Ms. Connelly's office to inquire about the progress of the investigation against Mr. Miller. At that time, I spoke with Ms. Connelly's assistant, and inquired about the progress of the investigation against Mr. Miller. I was promised a timely response to my inquiry.

9. On the day after my contact with Ms. Connelly's assistant, Mr. Miller reviewed my Linked In profile. At that time, I had not had contact with Mr. Miller for considerably more than a decade. On that same day, Mr. Plante, who had served as the vice president of my division while I was employed by the university, and requested to join my Linked In network. At that point, I had not spoken to Mr. Plante or Mr. Miller in more than a decade. As a result of those actions by Mssrs. Miller and Plante, on March 3, 2022, I telephoned Ms. Connelly's

office again to inform Ms. Connelly that I had received this contact from both men, and to complain that the actions of both men upset me, and caused me to be fearful for my safety.

10. On or about March 16, 2022, I received a telephone call from Ms. Connelly, who reported to me that the matter involving Mr. Miller had been "taken care of." During that conversation, I again raised the issue of the contact to my social media from Mssrs. Miller and Plante on the day after I contacted her office, and after having no contact with either person in more than 10 years. Ms. Connelly was dismissive of my complaint and the fear that it caused in me. Ms. Connelly suggested that their approach to me was just a coincident. I never received any further information to explain how the matter had been taken care of, and, to this day, I have no idea whether Mr. Miller was subject to any punishment whatsoever regarding the sexual assault that I suffered at his hand.

11. On or about September 22, 2022, I had a conversation with Bernadette Krueger, who was a long-time employee of Duquesne University. This was a telephone conversation which I initiated. The reason that I called Ms. Krueger on that date was two-fold. First, Ms. Krueger was a person who was universally respected for her compassion and wisdom. The second reason that I consulted with Ms. Krueger at that time was that I was attempting to investigate the numerous incidents of sexual misconduct by Mr. James Miller about which I had been informed during the course of my investigation. During that conversation, Ms. Krueger told me that, in or about 2005 to 2008, Mr. Miller approached Ms. Krueger to discuss a problem that had arisen related to an employee named Ms. Y.[2] Ms. Krueger told me at that time that Mr. Miller had approached her to discuss his fears related to a claim that Ms. Y made against

[2] Ms. Y's identity is being protected herein. I can provide the identity of Ms. Y to the Court should the Court deem it necessary.

him related to sexual harassment. Ms. Krueger told me that Mr. Miller had "sworn her to secrecy" regarding his discussions with her about Ms. Y. According to Ms. Krueger, Mr. Miller came to her because he was fearful about the impact on him personally and professionally as a result of her allegation that he had sexually harassed her. While I was not told the specifics of Ms. Y's claim, it was apparently serious enough to cause a worried Miller to approach Ms. Krueger.

12. During that same conversation, Ms. Krueger told me that she had been approached by another female employee of Duquesne, Ms. Z[3], who told Ms. Krueger that she was at a university event with Mr. Miller at which time he made an attempt to touch her breast, which caused Ms. Z to jump up and loudly complain about Mr. Miller's attempted sexual assault.

FURTHER THE AFFIANT SAYETH NOT.

[signature]
Patricia Maurer

Sworn to and subscribed to before me
this 14th day of MAY, 2024.

[signature: Patricia A. Schmidt]
Notary Public

My Commission Expires: Commonwealth of Pennsylvania - Notary Seal
Patricia A. Schmidt, Notary Public
Allegheny County
My commission expires November 23, 2024
Commission number 1146508
Member, Pennsylvania Association of Notaries

[3] Ms. Z's identity is being protected herein. I can provide the identity of Ms. Z to the Court should the Court deem it necessary.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM RICHTER,<br><br>Plaintiff,<br><br>v.<br><br>DUQUESENE UNIVERSITY OF THE HOLY SPIRIT and JAMES MILLER, as an aider and abettor of discrimination,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:23-cv-0550<br><br>JUDGE CHRISTY CRISWELL WEIGAND |

AFFIDAVIT OF DR. RICHARD CREEHAN

Before me, the undersigned authority, a notary public in and of the Commonwealth and County aforesaid, personally appeared DR. RICHARD CREEHAN, duly sworn and according to law, deposes and says that the following statements are true and correct to the best of his personal knowledge, information and belief:

1. I am Richard Creehan. I am an adult resident of Washington County, Pennsylvania, and I am a former employee of Duquesne University. At the time that I applied for the position with the university, I had 14 years of experience in the field of donations to universities, and I became highly conversant with the standard best practices and procedures that apply to the field of donation cultivation. I was employed by the university from on or about August 1, 2016 until December 31, 2020. At the time that I accepted a severance package and retired from the university, my title was Associate Vice President for Development and Director of the university's capital campaign. I reported to Mr. John Plante, who reported directly to Mr. Gormley, the university's president.

2. When I began my employment with Duquesne University, my duties included managing the gift officers for the university. Among those gift officers was the Plaintiff, Bill Richter.

3. When I began my employment with the university, I worked closely with Defendant Miller, who provided me with information about the gift officers that I would be managing. In my initial conversation with Defendant Miller about Mr. Richter, Defendant Miller told me that he thought Mr. Richter was a "moron" and a "buffoon."

4. As a result, I decided to determine for myself how well Mr. Richter performed his functions as a gift officer. To do so, I began to travel with Mr. Richter on cultivation calls. I traveled with him on several trips, and observed him in action. My observations of Mr. Richter led me to conclude that he is an exceptionally talented gift officer, with a strong command of the issues that faced a gift officer in his pursuit of donations for the university. One of the most striking skills repeatedly demonstrated by Mr. Richter was his ability to bond with donors, and make them feel very comfortable with him. His donors really liked Mr. Richter, and, more importantly, they trusted him. Rather than being a moron and a buffoon, I found Mr. Richter to be a talented, hard-working, honest, highly skilled, successful gift officer. I believe that Mr. Richter was one of, if not the best, gift officer who worked for the university during my tenure there. For that reason, in 2019, I named him Gift Officer of the Year.

5. In August of 2019, Mr. Richter received a disciplinary action related to his sending a text to the private cell phone of Dr. Dausey, the university's Provost, which included a picture of a woman in a bikini, and a light-hearted salutation. I did not consider the text to be particularly offensive. Dr. Dausey did not find it particularly offensive either. When I spoke to him about the incident, Dr. Dausey told me that he did not consider the text to be a "big deal" or a serious violation of the university's policies. In fact, he told me that he would not have brought it up at

all, but his administrative assistant, who is female, happened to see the text, and took offense. Dr. Dausey told me that, if it had not been for that fact, he would not have pursued this at all against Mr. Richter, and that he felt terrible that it had gone this far. Both Dr. Dausey and I did not feel that punishment of Mr. Richter was necessary, and I felt that the delay of Mr. Richter's promotion and raise (i.e. his punishment) were completely unnecessary. When I learned that Mr. Richter's conduct was described by the university as "egregious sexual misconduct," I felt that claim was absurd. When I learned that that claim formed part of the basis for Mr. Richter's termination, I felt that claim was even more ridiculous.

6. As part of my duties with the university, I was tasked with overseeing the donations that were secured by my gift officers. The process that was followed by the university throughout my tenure there was for the gift officer to cultivate donations from potential donors, and then turn over the appropriate paperwork to Cecelia Hughes, who was tasked with preparing the various documents necessary to close on the donation. The gift officer was required to provide Ms. Hughes with the details of the gift, as well as financial documents from the donor to support the gift. From time to time, the gift officer was asked to present the donor with a Donor Statement of Charitable Intent (DSCI), which contained the details of the commitment. For the purpose of administering the gift, Ms. Hughes acted as the gift officer's supervisor, and had the authority to direct the actions of the gift officer to accomplish that task.

The gift officer also had the responsibility to communicate with his or her immediate supervisor regarding the details of the gift. That supervisor would then communicate the details of the gift to me. I, in turn, would communicate those details to my immediate supervisor, Mr. John Plante. The gift officer had no other reporting or other duties relative to closing that gift

unless instructed to take some additional action by Ms. Hughes or the officer's immediate supervisor.

7. The DSCI is not a binding contract between the donor and the university. The gift is not complete, and neither party is bound by the terms of the DSCI, until a "fund agreement" is prepared by Ms. Hughes, executed by the donor, then executed by the university. Once that agreement is executed by all parties, and the funds called for in the fund agreement have been received, the gift is complete.

8. I am aware of the university's naming rights policy, which allegedly governs the granting of naming rights to donors under certain conditions. I was integrally involved in virtually every donation to the university during my tenure with the university which involved the gift officers under my supervision, and the following facts are true relative to that policy:

A. Although the policy requires that a gift which comes with naming rights to a donor is supposed to be submitted to the gift acceptance committee, in my entire tenure, I never presented any gift to this supposed committee. In fact, I was unaware that there was such a committee, or who served on it. I was involved in many, many naming rights donations during my tenure, including naming rights for university centers, and I do not know of any gift that was presented to the gift acceptance committee;

B. No gift officer was ever called upon to present any proposed donation to Mr. Gormley. In fact, gift officers did not have access to the university president, and would not have been permitted to make such a presentation to him;

C. Many of the naming rights donations were for amounts less than the minimum amount called for in the policy;

D. Almost every donation which was obtained by the gift officers was revocable. This requirement was not enforced at all, and the fact that a gift was revocable was not an impediment to accepting the donation.

9. Any donation at the six figure level (i.e. over $100,000) was considered a significant donation. Any donation at the seven figure level was both rare and highly sought after. If a gift officer was able to secure a commitment from a donor which exceeded $1,000,000, the naming

rights policy would not have even been considered, and the university would always find a way

to accept that gift. To my knowledge, the vast majority of the seven figure donations obtained

during my tenure were not presented to the university president for approval, and most had no

involvement whatsoever by the university president.

10.     I have been asked to consider the following hypothetical situation and apply the policies

and practices of the university to the propriety of the actions of the gift officer in this

hypothetical situation:

Hypothetical Facts:

     A. A gift officer cultivates a donor, and is able to secure a tentative commitment
        from the donor for a seven figure donation;

     B. As part of the cultivation, the gift officer discusses with the donor a number of
        options which may be available to the donor in exchange for the donation,
        including the possibility that the donation would include naming rights for the
        donor for a university wide center;

     C. The gift officer reports on the progress of the cultivation on multiple
        occasions to his immediate supervisor, and directly to Defendant Miller. These
        reports include the potential dollar amount of the gift, the fact that the gift is
        revocable, and that the gift includes naming rights. The gift officer is told by
        his immediate supervisor that she has reported the details of this gift to Mr.
        Miller, including the above details, on numerous occasions during the
        cultivation;

     D. The gift officer turns over to Cecelia Hughes the details of the gift, including
        that it is revocable, that it includes naming rights to the specific university
        wide center, and the seven figure amount of the gift;

     E. Ms. Hughes prepares the DSCI and gives it to the gift officer with the
        direction to share the document with the donor;

     F. The gift officer's immediate supervisor meets with the gift officer about the
        gift, and directs the gift officer to travel to the donor and obtain the donor's
        signature on the DSCI;

     G. Prior to the gift officer traveling to the donor to obtain the signature on the
        DSCI, the gift officer sends the donor an email reminding the donor that the

       proposed gift, with its naming rights component, must be approved by the university's gift committee.

H. Once the gift officer has obtained the signed DSCI, he turns that document, along with documents supporting the donor's ability to make the gift, to Ms. Hughes.

I. Although the gift officer's immediate supervisor at some point executes the DSCI, the gift officer has no idea that the DSCI has been signed by his supervisor.

My Opinion of the Gift Officer's Actions:

In the above scenario, the gift officer has not violated any practice or procedure of the university. The gift officer's actions as set forth above are fully consistent with best practices at the university, as well as in the general field of gift cultivation. The gift officer's conduct in securing such a significant gift is precisely the type of action that is encouraged by the university, and his methodology in obtaining the gift was perfectly proper. Every gift officer for the university is encouraged to discuss with the donor the range of options available to the donor in exchange for the donation. This includes discussing the option of obtaining naming rights for a donation. This is a conversation that is routine, proper and encouraged during the gift officer's cultivation of the donation. The fact that the gift officer advised the donor that the gift could not be finalized without approval of the gift committee is also proper. The gift officer's following the direction of his supervisors related to sharing the DSCI with the donor, and obtaining the donor's signature on the DSCI was also proper. The fact that the gift officer informed his immediate supervisor, and Defendant Miller of the proposed donation, including the issues of revocability, naming rights and the gift amount, were actions that would be expected of a gift officer. The donation secured by the gift officer in this hypothetical should have been seen as a major accomplishment for the gift officer, and a very

favorable, important gift to the university. Nothing in the above hypothetical should have subjected the gift officer to any discipline whatsoever.

FURTHER THE AFFIANT SAYETH NOT.

Dr. Richard Creehan

Sworn to and subscribed to before me

this 17th day of MAY, 2024.

Patricia A. Schmidt
Notary Public

My Commission Expires:

Commonwealth of Pennsylvania - Notary Seal
Patricia A. Schmidt, Notary Public
Allegheny County
My commission expires November 23, 2024
Commission number 1146508
Member, Pennsylvania Association of Notaries

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM RICHTER, | ) | Civil Action No. 2:23-cv-0550 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTY CRISWELL WEIGAND |
| | ) | |
| v. | ) | |
| | ) | |
| DUQUESENE UNIVERSITY OF THE HOLY SPIRIT and JAMES MILLER, as an aider and abettor of discrimination, | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF WILLIAM RICHTER

Before me, the undersigned authority, a notary public in and of the Commonwealth and County aforesaid, personally appeared WILLIAM RICHTER, duly sworn and according to law, deposes and says that the following statements are true and correct to the best of his personal knowledge, information and belief:

1. I am the Plaintiff in the above-captioned action.

2. I have reviewed the Defendants' brief in support of their motion for summary judgment, as well as the Defendants' statement of material facts. Both documents contain factual claims that are not supported by the record.

3. In Defendants' brief at p. 4, the Defendants claim that I "arranged for . . . (Mary Frances) Dean to sign a donor statement of charitable intent . . ." Apart from the fact that the Defendants' citation to the record in support of this claim does not support this claim, I played no role whatsoever in Ms. Dean's decision to sign the donor statement of charitable intent in the case of Donors D and E (i.e. the Donor Couple). In fact, I had no idea that Ms. Dean had signed the document on July 7, 2022 until at least a week or more after she had done so.

4. When I presented the statement of charitable intent to the Donor Couple, it did not bear Ms. Dean's signature, nor the signature of anyone else representing or purporting to commit the university to the proposed terms of the gift contemplated by Donors D and E.

5. I have further reviewed the Defendants' factual claims in their statement of material facts at paragraph 144. At that place, the Defendants claim that the draft of the statement of charitable intent for the Donor Couple was prepared by Ms. Hughes "at Plaintiff's request." This statement is untrue. I did not request that Ms. Hughes prepare the statement of charitable intent for the Donor Couple. Rather, Ms. Hughes, on her own initiative, prepared the statement of charitable intent for the Donor Couple as part of her regular duties in her role with the university. I did not know that she was preparing such a document, and only became aware that she did so when she sent me the email dated May 13, 2022. (See, Defendants' Exhibit 42)

6. During the course of my employment with the Defendant university, I received training from multiple individuals regarding my role in obtaining approval of any gift, including gifts involving naming rights, from the Defendant's gift approval committee, and approval from the president of the university. These individuals who provided that training included John Plante, Rick Creehan, Defendant Miller, Ms. Dean and Ms. Hughes. I was told that, when I obtained a commitment from a donor for a major gift, including one involving naming rights, my duty was to obtain the commitment from the donor, to obtain documentation demonstrating that the donor(s) had the financial wherewithal to make the donation, and then to turn over all of that information to Ms. Hughes and Ms. Dean (i.e. my immediate supervisor) for further processing. I was trained that it was Ms. Hughes' duty to prepare the documentation for submission to the gift committee (and from there to the president if necessary), and, after approval by the committee to prepare the donation contract that would bind the donor and the university to the

terms of that donation. I was further informed that it was my immediate supervisor's (i.e. Ms. Dean) duty to present the proposed gift, including gifts involving naming rights, to the gift approval committee. I was further informed that, if necessary, the proposed gift would be presented to the president by Ms. Dean's supervisor (i.e. Mr. Creehan and then Defendant Miller). I was specifically told on a number of occasions by one or more of the individuals named herein that, once I obtained the commitment from the donor, and the supporting documentation, and once that information was provided to my supervisors, Ms. Hughes and Ms. Dean, that I had no further responsibility whatsoever in the process by which the gift, including naming rights donations, would be approved by the gift committee and, if necessary, by the president.

7. I was asked in my deposition to identify other donations involving naming rights that did not follow the naming rights procedures. I was unable to identify any such gifts. The reason that I could not identify donations that did not follow policy is because it was not my job to follow the administrative course of the donation after I turned over the documentation to Cecelia Hughes. Therefore I would not necessarily know if any of my own donations had been accepted without following policy. I would have even less knowledge of donations involving naming rights secured by other gift officers, nor how such donations were administratively handled.

8. Based upon my interaction with Ms. Hughes and Ms. Dean related to the Donor Couple, I understood the following:

A. Based upon multiple statements made to me by Ms. Dean, I understood that Defendant Miller had been made completely aware on multiple occasions prior to the signing of the statement of charitable intent, of the nature of the donation from the Donor Couple, including:

1. That the gift involved, at minimum, a $1.5 million dollar donation;

2. That it was likely that the Donors would increase their donation to a figure which would be approximately three times the aforementioned donation;

3. That the gift included naming rights to the CEIM;

4. That the gift was revocable.

B. At no time during the process of cultivating and obtaining commitment on the gift from the Donor Couple was I informed by Defendant Miller, Ms. Dean, Ms. Hughes, or anyone else, that I should handle the proposed donation any differently than I had handled it, nor that I was acting in any way that was inappropriate, or violative of the policies of the Defendant university.

9. I have further reviewed the Defendants' factual claims in their statement of material facts at paragraph 160. At that place, the Defendants claim that, as a result of the discovery by the university's president regarding the donation by the Donor Couple, Ms. Clay, my second level immediate supervisor, informed Ms. Dean that "the Plaintiff, Hughes and (Dean) were in "serious trouble." Apart from the fact that the Defendants' record reference supporting this claim contains no information whatsoever that I was in "serious trouble" regarding this donation, I was never informed by Ms. Clay, Defendant Miller, Ms. Dean or anyone else that I was in any trouble related to this major, seven figure gift that I obtained for the Defendant university.

10. With respect to donations made to the Defendant university, it has been my experience during my tenure with the Defendant university, that any time a donation officer received a commitment from a donor that was at the seven figure level (i.e. $1,000,000 or more), this was a remarkable, rare donation level. While I do not know the exact percentage of donations to the Defendant university that have met or exceeded the seven figure level, I know from my own experience that donations at that level are exceedingly rare, and exceedingly coveted by the university.

11. Despite the written policy on naming rights donations, based upon my experience with the Defendant university, including my experience cultivating numerous seven figure donations,

I had every reason to believe that the Defendant university, by its officials, including Defendant Miller, were anxious to court seven figure donations, even if it meant granting naming rights to a room within the university's campus. I had been told on many occasions by Defendant Miller, Ms. Dean, and others, that a seven figure donation was highly sought after, and highly touted once obtained.

12. While I do not have a specific recollection of discussing with the Donor Couple the need for their request for naming rights to be put before the gift acceptance committee, it would have been my practice to do so during in person meetings with the donors. I would never have introduced the requirement of approval of naming rights in an email to the donors without first having discussed that issue with the donors.

13. With respect to the Defendants' allegation in paragraph 144 of their statement of facts that Ms. Hughes prepared the DSCI for the Donor Couple ***"at (my) request,"*** this allegation is completely untrue. I played no role whatsoever in Ms. Hughes' preparation of the DSCI except to provide her with the documentation necessary to process this gift and submit it to the gift committee. It was Ms. Hughes' job to prepare this document, and she did so with this gift, as with every other donation that I secured, without my having to ask, or to push her to do so, or without me having to take any other action with respect to the donation.

14. With respect to the allegation in the Defendants' brief in support of their motion for summary judgment that I "***arranged for . . . (Mary Frances) Dean to sign the donor statement of charitable intent***," this statement is completely untrue. I played no role whatsoever in the decision by Ms. Dean to execute the DSCI in the Donor Couple donation. In fact, I did not even know that Ms. Dean had signed the DSCI until at least a week or more after she had done so. I never discussed with her the signing of the DSCI, and she never consulted me on that decision. I

have never "arranged" for Ms. Dean to sign anything, and did not do so in this instance. (See Defendants' brief at p. 4)

15. To the extent that the Defendants' brief suggests that I took any steps to "push through" the donation from the Donor Couple, such statement would be completely untrue. With respect to this donation, I fulfilled my duties in every respect, I obtained and submitted the proper paperwork, and I did nothing different than I did in any other donation to obtain the gift commitment. I certainly did nothing designed to "push" this donation through without proper approval, since I had no motivation to take any action that would endanger the donation, and therefore my credit for the donation.

16. With regard to Defendants' "factual claims" related to Donors B and C set forth at Defendants' statement of facts at paragraphs 25 through 35, I have reviewed the memorandum from Dean Glasgow to Dr. Dausey dated June 2, 2019. I do not recall seeing this memorandum, and I do not recall the email from Dr. Dausey which resulted in Dean Glasgow's memorandum. I do have a distinct, present recollection that, in the period January to May of 2019, I informed Dean Glasgow by telephone on at least two, if not more, occasions about the cultivation of the gift from Donors B and C, that the gift was likely to be in excess of $1,000,000, and that Donors B and C were intending to visit the university campus in late spring to finalize this gift. Until I reviewed Dean Glasgow's memorandum in connection with Defendants' summary judgement motion, I was unaware that Dean Glasgow claimed that I failed to inform her of these facts. I was never asked to respond to this accusation while employed with the Defendant university. I was never disciplined about this issue, nor was it ever brought up to me as a problem with my actions.

17. Regarding the claim at defendant's fact paragraph 30 that Dr. Dausey and I met with Donors B and C to discuss a donation to the university's college of medicine, I was asked by Dr. Dausey to attend this meeting. It was Dr. Dausey's intention at that meeting to convince the donors to make some portion of their donation to the college of medicine. I did not care where the donation was directed since I got credit for the donation no matter what school in the university received the funds. I was not asked to assist Dr. Dausey in trying to convince the donors to make a donation to the school of medicine, nor did I do so.

18. With respect to the "math error" associated with the donation from Donors B and C, the donation was structured in such a way that it was a very complex donation for a number of reasons. The gift was a "hybrid" gift, meaning that the donation was coming from several sources, including the sale of stock held by the donor, the donors' 401k account, and some liquid funds. Each of the funding sources had different dates upon which the university would receive the funds. Also, the gift was to be distributed to multiple destinations within the nursing department, making the gift more unusual and complex. Furthermore, the gift included various conditions that related to attempting to maximize the tax benefits to the donors. The tax aspect of the gift required me to meet with the donors' financial advisor. After a three hour meeting with that advisor, I included those tax related stipulations into the gift proposal, making an already complicated and unusual donation even more so. The math error by Cecelia Hughes that occurred was clearly because of the unusual and complex nature of the gift. While it is true that I missed the error after it was made, so did Ms. Hughes, Mary Frances Dean, Rick Creehan and Defendant Miller. I have been told by Ms. Hughes, Ms. Dean and Mr. Creehan that they did not receive any discipline or even any informal counseling on this error. I assume that Mr. Miller similarly received no consequence for missing the error. In any event, the university did not

suffer any out-of-pocket loss related to this error as the money to cover this error was shifted from one of the sources of money offered by the donor to fund this gift. When I spoke to Donors B and C about this issue, they expressed no concern whatsoever with the error or how it was corrected.

19. At some point in the fall of 2021, I was directed by Defendant Miller to meet in person with Donors B and C in California to discuss the math error related to their donation. Initially, Defendant Miller and I discussed a possible zoom meeting with the donors if an in person meeting could not be arranged. Ultimately, Defendant Miller and I decided not to use the zoom option, but rather I was directed to meet with the donors directly as soon as I could. After I was directed to discuss the above-described math error with Donors B and C, I made numerous attempts to schedule a face-to-face meeting with the donors. I was unable to immediately schedule such a meeting because, for much of the time from Fall, 2021 through the spring of 2022, the donors were vacationing out of the country and unavailable for such a meeting. Defendant Miller and I both agreed that the meeting needed to be in person because of the magnitude of the donation. While I traveled to California on multiple occasions during that time period, I was unable to schedule a meeting with the donors despite the fact that I attempted to do so on each such visit. Ultimately I was able to meet with the donors, and to explain the error. Both donors understood the error, and its likely origin in the complexity of the gift. Neither donor showed any concern, anger, frustration or other negative reaction to the error and/or its solution. They did not express any problems with the donation, and seemed content with the outcome. The donor relationship was not damaged in any way, and the gift proceeded without interruption.

20. Once it became clear that Ms. Hughes had made an understandable math error related to the donation by Donors B and C, I was asked by Defendant Miller to meet with, and "smooth over" the donors because I had such a strong relationship with them. I was never tasked with "correcting" the error, but rather I was directed to explain the error and the solution to donors. I did not receive any criticism from Defendant Miller, or anyone else related to this donation or the math error made by someone else. Neither I nor anyone else received any discipline for this error.

21. At some point after the above-described mathematical error was discovered, but prior to my meeting with Donors B and C, I had a conversation with Heather Clay who, at that time, was my second level supervisor about this issue. At that time, Ms. Clay told me that this issue was completely resolved without it having cost the university any out-of-pocket loss. This was accomplished through an internal transfer of funds accrued from the $1,5000,000 gift given by Donors B and C. Ms. Clay did not reprimand me in any way for this error, nor did she seem upset with me and my role in this matter in any way. Rather, Ms. Clay instructed me to go to California and "have a nice dinner with (Donors B and C)" and continue to strengthen the relationship.

22. In my training in the field of donation solicitation, both at the Defendant university, and in my other gift officer positions prior to my employment with the Defendant university, I was taught that a donation is not final and binding until both parties execute a confidential gift agreement. I was also trained that the statement of charitable intent is not a binding agreement between the parties. At the Defendant university, I received the above training from John Plante, Rick Creehan, Mary Frances Dean, Cecelia Hughes and Defendant Miller.

23. I have been advised by Ms. Hughes and Ms. Dean that the Donor Couple never executed a confidential gift agreement.

24. When I was hired by the Defendant university, I was introduced to Cecelia Hughes. I was instructed by both Rick Creehan and Mary Frances Dean that Ms. Hughes was my supervisor with respect to the preparation of documentation related to all donations that I secured, and that I was to follow her direction with regard to the preparation of that documentation and the administrative actions related to finalizing all donations.

25. In November of 2021, I was given a new title, Senior Major and Gift Planning Officer, with no change in pay, responsibilities or performance metrics. This gesture was not done to accommodate or benefit me in any way. Rather, Defendant Miller created a new title for me and a number of other gift officers in the advancement division in order to quell the widespread discontent resulting from Defendant Miller's secret reassignment of productive donors to employees of the advancement division whom Defendant Miller favored.

26. In August of 2019, I was in California to pursue fund raising opportunities on behalf of the Defendant university. At that same time, Dr. Dausey was in California on official business for the Defendant university.

27. When I first began cultivating Donor A as a prospective donor, I learned that he had included a bequest of $50,000 in his will. I did not close on that donation when I discovered it because Donor A and I immediately began discussions about increasing his donation through the sale of certain real estate that he owned. Based upon my numerous discussions with Donor A, it appeared that he was prepared to increase his donation to $250,000 or more.

28. During a meeting on August 5, 2022, with Duquesne's human resources representative related to the investigation of the gift from the Donor Couple, I received an urgent call from my

wife, who was calling me from a local hospital. She had just received some bad news from her physician related to a serious medical condition, and she was extremely upset. She asked me to come and get her immediately and take her home. I explained the situation to the representative and hurriedly excused myself. I went directly to the hospital to comfort my wife. Prior to receiving that telephone call, I was cooperating with the representative, and answering all of his questions to the best of my ability.

29. After Ms. Hughes prepared the DSCI for the Donor Couples' donation, I had a conversation with my supervisor, Ms. Dean. Ms. Dean instructed me to go to meet with the Donor Couple in person and, during a celebratory dinner, have them sign the DSCI. I did as directed.

30. As a part of my training and experience as a gift officer, both with the Defendant university, and in my other gift officer positions, I have come to understand that contact reports should contain pertinent information about the donor or the cultivation that is significant to a potential donation. The exception would be where the potential donor has asked me as the gift officer to keep certain information confidential between me and the donor. I have withheld that information in contact reports with the Defendant university on many occasions, with the knowledge and approval of my immediate supervisor.

31. I have reviewed the affidavit submitted in this matter by Dr. Rick Creehan, and particularly his description of, and opinion about the actions of the hypothetical gift officer, and the policies and practices of the university relative to such a gift. I agree with Dr. Creehan's assessment of those policies and practices. Those policies and practices remained in effect after Dr. Creehan's departure from the Defendant university, and no changes of any kind in those practices and procedures occurred during my employment with the Defendant university.

32. At some point in or about 2021, I was on a zoom meeting with various Duquesne employees, including Defendant Miller, and Paul Demilio, who was then the head of the Defendant university's prospect research department. In addition to the individuals named above, there was also a female employee on the zoom meeting who was named Ms. W.[1] During the meeting, one of Ms. W's very young children appeared in the background of Ms. W's screen. Mr. Miller reacted by making a comment to Ms. W, to the following effect: "How are my children doing." While that may not constitute Mr. Miller's exact words, his comment was clearly designed to insinuate that he and Ms. W had children together. I was able to observe Ms. W's facial reaction to the comment, and it was clear that she was stunned and offended. Ms. W remained silent, but I know from my observation of the other participants that they were also stunned by Defendant Miller's comment.

33. With regard to the incident involving an altercation with a stranger in a Texas parking lot, I did not initiate the altercation, I defended myself against an individual who attacked me in a rage because I accidentally bumped his car with my door, I had no opportunity to de-escalate the incident, I was not charged by the police with any wrongdoing, and the proposed donors did not witness the altercation. I told all of these things to Defendant Miller shortly after the incident.

34. I was never disciplined or reprimanded in any way related to the donation by Donors B and C.

---

[1] Ms. W's identity is being protected herein. I can provide the identity of Ms. W to the Court should the Court deem it necessary.

FURTHER THE AFFIANT SAYETH NOT.

William Richter

Sworn to and subscribed to before me

this 15th day of May, 2024.

Patricia A. Schmidt
Notary Public

My Commission Expires:

Commonwealth of Pennsylvania - Notary Seal
Patricia A. Schmidt, Notary Public
Allegheny County
My commission expires November 23, 2024
Commission number 1146508
Member, Pennsylvania Association of Notaries