# 2018-19 Performance Appraisal

Review Period  7/1/2018 - 6/30/2019

 **REVIEWER**
Richard Creehan (Manager), John Plante (Dean, Director, Senior Department Head)

## William Richter

Major Gifts Officer
Position

Development
Cost Center

University Advancement
Division

Richard Creehan
Manager

CONFIDENTIAL

## Appraisal Kick Off

**Please click submit to kick off the Annual Performance Task**

### Comments

**Richard Creehan ( Manager ) :**
Looking forward to year four of working with Bill

## Self Assessment Questionnaire

**Briefly describe your job-related accomplishments over the past year, inclusive of your strengths and areas for improvement.**

### Comments

**William Richter ( Self ) :**
I've surpassed assigned metrics

**Richard Creehan ( Manager ) :**
Goals of meetings, and dollars raised have been met and exceeded

**Briefly describe your job-related goals for the coming year. Goals should be SMART: Specific, Measurable, Attainable, Relevant and Time-bound**

### Comments

**William Richter ( Self ) :**
Surpass assigned metrics

**Richard Creehan ( Manager ) :**
At least 90 donor meetings and $500,000 dollars raised

**Briefly describe your professional development accomplishments (i.e., training workshops) over the past year.**

### Comments

**William Richter ( Self ) :**
Working with Zagula Financial Services to explore additional fundraising platforms

**Richard Creehan ( Manager ) :**
Bill seeks out a multiple number of resources for continual education, including professionals in Wealth Management, and uses the best practices taught by Plus Delta

2018-19 Performance Appraisal
William Richter

CONFIDENTIAL

Duquesne_00081

Appx144

**Is there anything your Manager or the University could do to help you improve your performance and/or increase your job satisfaction? (i.e. additional training, resources, clearer communication, sharing information/job knowledge, etc.)**

**Comments**

**William Richter** ( Self ) :
Karass Negotiating Seminar

**Richard Creehan** ( Manager ) :
Continue to assist and travel with Bill at his request for additional University assistance

**List any subjects you would like to discuss with your Manager during your performance appraisal.**

**Comments**

**William Richter** ( Self ) :
None

## Employee Performance Factors

### 1. UNDERSTANDING UNIVERSITY AND UNIVERSITY MISSION

Supports the general goals and objectives of the administration and division. Demonstrates and supports understanding of the University Mission and our Spiritan identity through commitment to excellence in liberal and professional education, through a profound concern for moral and spiritual values, through the maintenance of an ecumenical atmosphere open to diversity and through a commitment to the Spiritan tradition of committing to authentic relationships and walking with those on the margins.

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 3 - Successful Performance (SP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

**Comments**

**Richard Creehan** ( Manager ) :
Bill puts the Spiritan mission and values into his work daily

### 2. MOTIVATION AND INITIATIVE

Proactively shows interest, enthusiasm, dedication, flexibility and willingness to propose/seek/undertake projects and bring them to completion.

CONFIDENTIAL

Duquesne_00082

Appx145

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 4 - Excellent Performance (EP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Bill needs no outside help in motivation. He is very competitive vs. the goals established

## 3. COLLABORATION AND TEAMWORK

Ability to work well with others. Exhibits a positive, supportive and cooperative rapport with supervisor, peers and others to achieve desired results. Resolves conflict in a professional manner.

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 4 - Excellent Performance (EP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Bill is well liked within the office, and well liked by the donors in his portfolio

## 4. EFFICIENCY AND EFFECTIVENESS

Demonstrates organizational skills necessary to perform successfully. Accepts responsibility and accountability. Performance reflects attention to detail, thoroughness and accuracy to produce quality results. Exhibits resourcefulness, problem solving and decision-making skills. Uses technology as appropriate. Completes assignments, meets established deadlines, and is reliable and available.

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 3 - Successful Performance (SP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Bill has made significant gains in his organizational skills managing his budget, time efficiency, contact reports, Reeher reports, and required University paperworkl

## 5. CUSTOMER SERVICE ORIENTATION AND COMMUNICATION

Exhibits positive attitude, behavior, interpersonal and problem solving skills required to respond to internal and external customer needs and expectations. Responds promptly and appropriately to internal and external constituent requests. Interacts with people in a supportive, respectful manner. Acknowledges and respects individual and cultural differences. Effectively communicates with manager, co-workers and others. Clearly and concisely conveys information both verbally and in writing.

CONFIDENTIAL

Duquesne_00083

Appx146

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 4 - Excellent Performance (EP) |
| **Richard Creehan** ( Manager ) | 4 - Excellent Performance (EP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Bill is quick to respond to donor requests and always respectful to each individual. He is an outstanding communicator.

## 6. PROFESSIONALISM AND TIME MANAGEMENT

Acts in a way that is an example to others. Maintains discretion and confidentiality; exhibits honesty and integrity; follows policies and procedures in carrying out duties; and expands job knowledge and skills through continuous professional development. Manages time effectively and maximizes productivity. Attends work as scheduled, arriving and leaving work at appropriate times.

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 3 - Successful Performance (SP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Bill works independently, has great integrity, and knows what is expected from him

## 7. ADAPTABILITY

Exhibits flexibility needed to fulfill job responsibilities. Adapts to changes in the work environment, and responds to change in a positive manner. Offers to assist others without being prompted. Accepts feedback including constructive criticism and modifies conduct/actions appropriately.

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 4 - Excellent Performance (EP) |
| **Richard Creehan** ( Manager ) | 4 - Excellent Performance (EP) |

| Comments |
|---|

**Richard Creehan** ( Manager ) :
Handling the California geographical area has demanded someone with the ability to adapt, Bill has filled this role exceptionally well.

## 8. STEWARDSHIP OF UNIVERSITY RESOURCES

Uses resources wisely when performing job duties. Ability to understand and control costs in area(s) of responsibility. Uses monetary, equipment and facility resources effectively. Adheres to established policies and procedures.

2018-19 Performance Appraisal
William Richter

Page | 5 of 6

CONFIDENTIAL

Duquesne_00084

Appx147

| Reviewer | Rating |
|---|---|
| **William Richter** ( Self ) | 3 - Successful Performance (SP) |
| **Richard Creehan** ( Manager ) | 3 - Successful Performance (SP) |

| Comments |
|---|
| **Richard Creehan** ( Manager ) : |

Solid improvement staying in budget and has done well with "stretching" a dollar in order to do the travel he wants to accomplish.

## Review of Prior Year Performance Goals Comments

**Please provide comments on previous year performance goals.**

| Comments |
|---|
| **Richard Creehan** ( Manager ) : |

Gift Officer goals are established and posted on our departments Reeher Platform

## NCAA Compliance

**As appropriate based on position responsibilities, upholds NCAA rules and regulations.**

| Reviewer | Rating |
|---|---|
| **Richard Creehan** ( Manager ) | 3 - Not Applicable to Position |

## Student Employment Signatures and comments

X William Richter
Employee

7/5/2019
Date

X John Plante
Dean, Director, Senior Department Head

8/14/2019
Date

X Richard Creehan
Supervisor

7/5/2019
Date

CONFIDENTIAL

Duquesne_00085

Appx148

# U.S. District Court
# Western District of Pennsylvania (Pittsburgh)
# CIVIL DOCKET FOR CASE #: 2:14-cv-01489-CB

HASCALL v. DUQUESNE UNIVERSITY OF THE HOLY
SPIRIT et al
Assigned to: Judge Cathy Bissoon
Cause: 28:1343 Violation of Civil Rights

Date Filed: 10/31/2014
Date Terminated: 03/02/2017
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**SUSAN HASCALL**                    represented by **Timothy M. Kolman**
                                              Kolman Law, P.C.
                                              414 Hulmeville Avenue
                                              Penndel, PA 19047
                                              (215) 750-3134
                                              Fax: 215-750-3138
                                              Email: TKolman@KolmanLaw.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **W. Charles Sipio**
                                              Karpf, Karpf & Cerutti P.C.
                                              3331 Street Road
                                              Two Greenwood Square
                                              Suite 128
                                              Bensalem, PA 19020
                                              (215) 639-0801
                                              Fax: (215) 639-4970
                                              Email: csipio@karpf-law.com
                                              *ATTORNEY TO BE NOTICED*

                                              **Wayne A. Ely**
                                              Kolman Ely, P.C.
                                              414 Hulmeville Avenue
                                              Penndel, PA 19047
                                              215-750-3134
                                              Fax: 215-750-3138
                                              Email: wayne3236@gmail.com
                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DUQUESNE UNIVERSITY OF THE**       represented by **Martha Hartle Munsch**
**HOLY SPIRIT**                                   Reed Smith

Appx149

*trading and doing business as*
DUQUESNE UNIVERSITY SCHOOL OF
LAW and

225 Fifth Avenue
Pittsburgh, PA 15222
412-288-4118
Fax: 412-288-3063
Email: mmunsch@reedsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard L. Etter**
Ogletree, Deakins, Nash, Smoak &
Stewart, P.C.
1 PPG Place
Suite 1900
Pittsburgh, PA 15219
412-230-8963
Fax: 412-232-1799
Email: rick.etter@ogletree.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEAN KENNETH G. GORMLEY**
*TERMINATED: 03/07/2017*

represented by **Martha Hartle Munsch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard L. Etter**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/2014 | 1 | COMPLAINT against DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY (Filing fee, including Administrative fee, $400, receipt number 0315-3377508), filed by SUSAN HASCALL. (Attachments: # 1 Civil Cover Sheet, # 2 Case Designation Sheet, # 3 Summons Duquesne University, # 4 Summons Dean Kenneth G. Gormley) (jsp) (Entered: 10/31/2014) |
| 10/31/2014 | | Summons Issued as to DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (jsp) (Entered: 10/31/2014) |
| 11/03/2014 | 2 | ORDER OF RECUSAL. Judge Terrence F. McVerry recused. The Clerk is directed to reassign this case to another member of the Court. Signed by Judge Terrence F. McVerry on 11/03/14. (mcp) (Entered: 11/03/2014) |
| 11/03/2014 | | Judge Cathy Bissoon presiding. (sms) (Entered: 11/03/2014) |
| 11/19/2014 | 3 | SUMMONS/Return of Service Returned Executed by SUSAN HASCALL. DUQUESNE UNIVERSITY OF THE HOLY SPIRIT served on 11/11/2014, answer due 12/2/2014. (Kolman, Timothy) (Entered: 11/19/2014) |

| 11/19/2014 | 4 | SUMMONS/Return of Service Returned Executed by SUSAN HASCALL. KENNETH G. GORMLEY served on 11/11/2014, answer due 12/2/2014. (Kolman, Timothy) (Entered: 11/19/2014) |
| --- | --- | --- |
| 12/01/2014 | 5 | ANSWER to 1 Complaint, by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 12/01/2014) |
| 12/02/2014 | 6 | ORDER, Case Management Conference set for 1/14/2015 at 10:30 AM before Judge Cathy Bissoon, more fully stated in said order. Signed by Judge Cathy Bissoon on 12/2/14. (jhi) (Entered: 12/02/2014) |
| 12/02/2014 | 7 | NOTICE of Appearance by Richard L. Etter on behalf of DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Etter, Richard) (Entered: 12/02/2014) |
| 12/03/2014 | 8 | Disclosure Statement identifying None as corporate parent or other affiliate, by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 12/03/2014) |
| 12/17/2014 | 9 | NOTICE of Appearance by W. Charles Sipio on behalf of SUSAN HASCALL. (Sipio, W.) (Entered: 12/17/2014) |
| 12/22/2014 | 10 | First AMENDED COMPLAINT against DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY, filed by SUSAN HASCALL. (Sipio, W.) (Entered: 12/22/2014) |
| 01/05/2015 | 11 | ANSWER to 10 Amended Complaint by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 01/05/2015) |
| 01/05/2015 | | ORDER. The request by Plaintiff's Counsel to participate in the 1/14/15 Case Management Conference by telephone is hereby GRANTED. However, if Plaintiff's Counsel wishes to participate by telephone in any future matters, he must file a motion. Signed by Judge Cathy Bissoon on 1/5/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 01/05/2015) |
| 01/09/2015 | 12 | REPORT of Rule 26(f) Planning Meeting. (Munsch, Martha) (Entered: 01/09/2015) |
| 01/09/2015 | 13 | STIPULATION selecting ADR process by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 01/09/2015) |
| 01/14/2015 | 14 | Minute Entry for proceedings held before Judge Cathy Bissoon: Case Management Conference held on 1/14/2015. (Court Reporter: None) Order to follow. (jhi) (Entered: 01/14/2015) |
| 01/14/2015 | 15 | CASE MANAGEMENT ORDER: Exchange of required Rule 26(a)(1) information due by 1/28/2015. Amended Pleadings due by 2/13/2015. Joinder of Parties due by 2/13/2015. Mediation before Louis Kushner, Esq. will take place on or before 3/16/2015. Fact Discovery due by 6/15/2015. A Post-Discovery Status/Settlement Conference is set for 6/26/2015 at 10:00 AM before Judge Cathy Bissoon. See CMO filed herewith for further details and instructions. Signed by Judge Cathy Bissoon on 1/14/2015. (sje) (Entered: 01/14/2015) |
| 01/14/2015 | | ORDER REFERRING CASE to Mediation. Louis Kushner, Esq. is appointed as mediator. Party LOUIS KUSHNER added. Signed by Judge Cathy Bissoon on 1/14/2015. Text-only entry; no PDF document will issue. This text-only entry |

Appx151

constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 01/14/2015)

| | | |
|---|---|---|
| 01/20/2015 | 16 | Notice of Mediation by LOUIS KUSHNER. Mediation Date February 17, 2015 at 10:00 a.m. (Kushner, Louis) (Entered: 01/20/2015) |
| 02/18/2015 | 17 | REPORT of Mediation: Case has not been resolved. LOUIS KUSHNER terminated. Attorney Louis B. Kushner terminated. **The parties are reminded of their obligation to complete the ADR questionnaire and return same to the Clerk of Court within 5 days of the conclusion of the ADR process. The questionnaire can be accessed at www.pawd.uscourts.gov. Click on the ADR icon.** Mediation session was held on 2/17/2015. (Kushner, Louis) (Entered: 02/18/2015) |
| 04/16/2015 | 18 | ORDER AMENDING 15 Case Management Order. In addition to the other deadlines and requirements in the CMO, the parties further are ORDERED as follows: In advance of the Post-Discovery Status Conference on 6/26/15 at 10:00 a.m., the parties together shall prepare for submission a Joint Proposed Settlement Agreement. The Proposed Agreement shall include all necessary and material terms; however, terms that have not yet been agreed upon shall be indicated by use of a blank line. The Proposed Agreement will not be filed, but rather, shall be faxed to Chambers at least three (3) business days prior to the Conference. Counsel for Defendants shall be responsible for maintaining the Proposed Agreement; faxing it to Chambers; and shall bring to the Conference a laptop that contains a Microsoft Word version of the final Agreement. THIS INSTRUCTION IS IN ADDITION TO THE OTHER REQUIREMENTS LISTED IN THE CMO (Doc. 15 ). Signed by Judge Cathy Bissoon on 4/16/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 04/16/2015) |
| 06/01/2015 | 19 | Joint MOTION for Extension of Time to Complete Discovery by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachments: # 1 Proposed Order) (Munsch, Martha) (Entered: 06/01/2015) |
| 06/01/2015 | 20 | ORDER granting 19 Motion for Extension of Time to Complete Discovery. Discovery is now due by 7/15/2015. In addition, the Post-Discovery Status/Settlement Conference set for 6/26/2015 is now RESCHEDULED for 7/30/2015 at 11:00 AM before Judge Cathy Bissoon. All other deadlines and provisions in the 15 Case Management Order remain in effect. Signed by Judge Cathy Bissoon on 6/1/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 06/01/2015) |
| 06/18/2015 | 21 | MOTION for Extension of Time to Complete Discovery by SUSAN HASCALL. (Attachments: # 1 Proposed Order) (Kolman, Timothy) (Entered: 06/18/2015) |
| 06/18/2015 | 22 | BRIEF in Support re 21 Motion for Extension of Time to Complete Discovery filed by SUSAN HASCALL. (Kolman, Timothy) (Entered: 06/18/2015) |
| 06/18/2015 | 23 | ORDER granting in part and denying in part 21 Motion for Extension of Time to Complete Discovery. Discovery is now due by 9/15/2015. In addition, the Post-Discovery Status/Settlement Conference set for 7/30/2015 is now RESCHEDULED for 9/18/2015 at 11:00 AM before Judge Cathy Bissoon. All other deadlines and provisions in the 15 Case Management Order remain in effect, and no further extensions will be granted. Signed by Judge Cathy Bissoon on 6/18/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 06/18/2015) |

| 06/18/2015 | | Discovery due by 9/15/2015. Settlement Conference is set for 9/18/2015 at 11:00 AM before Judge Cathy Bissoon. (sje) (Entered: 06/18/2015) |
|---|---|---|
| 06/26/2015 | 24 | (Proposed)STIPUATION and PROTECTIVE ORDER by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) Modified on 6/29/2015. (jsp) (Entered: 06/26/2015) |
| 06/29/2015 | 25 | ORDER. The Stipulated Protective Order (filed under Doc. 24 ) is ADOPTED and incorporated herein as if fully restated. Signed by Judge Cathy Bissoon on 6/29/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 06/29/2015) |
| 07/13/2015 | 26 | ORDER, at the request of counsel, a telephone conference re: Discovery is now set for 7/14/2015 at 11:00 AM before Judge Cathy Bissoon. Signed by Judge Cathy Bissoon on 7/13/15. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jhi) (Entered: 07/13/2015) |
| 07/13/2015 | 27 | NOTICE of Appearance by Wayne A. Ely on behalf of SUSAN HASCALL. (Ely, Wayne) (Entered: 07/13/2015) |
| 07/14/2015 | 28 | Minute Entry for proceedings held before Judge Cathy Bissoon: Telephone Conference re Discovery held on 7/14/2015. (Court Reporter: None) Order to follow. (jhi) (Entered: 07/14/2015) |
| 07/14/2015 | 29 | ORDER re: Discovery disputes discussed during the 7/14/2015 Telephone Conference. Signed by Judge Cathy Bissoon on 7/14/2015. (sje) (Entered: 07/14/2015) |
| 07/16/2015 | 30 | ORDER. Following in-camera review of the AALS Special Site Visit Report, the Court finds that the document has no relevance to the issues of this lawsuit. The document will be returned to Ms. Munsch via regular mail. Signed by Judge Cathy Bissoon on 7/16/2015. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (sje) (Entered: 07/16/2015) |
| 09/18/2015 | 31 | Minute Entry for proceedings held before Judge Cathy Bissoon: Settlement Conference held on 9/18/2015. (Court Reporter: None) Order to follow (jhi) (Entered: 09/18/2015) |
| 09/18/2015 | 32 | ORDER. Following the Post-Discovery Status Conference in the above-captioned matter, IT IS ORDERED THAT Defendants' motion for summary judgment is due on or before 10/26/15. Plaintiff's response is due by 12/4/15. Counsel shall comply with the form and timing for briefing outlined in the Practices and Procedures of the undersigned on the Court's website (see web page at http://www.pawd.uscourts.gov/Documents/Judge/bissoon_pp.pdf). IT IS FURTHER ORDERED THAT, on the issue of discoverability of Professor Oliver's tenure materials, unless Plaintiff can demonstrate that said materials were captured by a previous discovery request, the instant discovery request is DENIED as untimely. Additionally, Plaintiff's request to designate an expert for the purposes of Summary Judgment is DENIED. The Court finds that an expert who will speak to the correctness of Duquesne University's decision to deny tenure is not relevant as the ultimate issue in this case is not whether Duquesne University was "wrong or mistaken" or even "wise, shrewd, prudent, or competent" but whether its decision was motivated by discriminatory or retaliatory animus. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Signed by Judge Cathy Bissoon on 9/18/15. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the |

matter. (jwr) (Entered: 09/18/2015)

| 10/26/2015 | 33 | MOTION for Summary Judgment by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachments: # 1 Proposed Order) (Munsch, Martha) (Entered: 10/26/2015) |
|---|---|---|
| 10/26/2015 | 34 | CONCISE STATEMENT OF MATERIAL FACTS re 33 Motion for Summary Judgment by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 10/26/2015) |
| 10/26/2015 | 35 | Appendix to 33 Motion for Summary Judgment by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachments: # 1 Appendix Tab A-1, # 2 Appendix Tab A-2, # 3 Appendix Tab A-3, # 4 Appendix Tab A-4, # 5 Appendix Tab A-5, # 6 Appendix Tab B-1, # 7 Appendix Tab B-2, # 8 Appendix Tab B-3, # 9 Appendix Tab B-4, # 10 Appendix Tab B-5, # 11 Appendix Tab C-1, # 12 Appendix Tab C-2, # 13 Appendix Tab D, # 14 Appendix Tab E, # 15 Appendix Tab F, # 16 Appendix Tab G, # 17 Appendix Tab H) (Munsch, Martha) (Entered: 10/26/2015) |
| 10/26/2015 | 36 | BRIEF in Support re 33 Motion for Summary Judgment filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 10/26/2015) |
| 10/26/2015 | 37 | MOTION for Partial Summary Judgment by SUSAN HASCALL. (Attachments: # 1 Proposed Order, # 2 Exhibit 1-A, # 3 Exhibit 1-B, # 4 Exhibit 1-C, # 5 Exhibit 2-A, # 6 Exhibit 2-B, # 7 Exhibit 2-C, # 8 Exhibit 3-A, # 9 Exhibit 3-B, # 10 Exhibit 3-C, # 11 Exhibit 4, # 12 Exhibit 5, # 13 Exhibit 6, # 14 Exhibit 7, # 15 Exhibit 8, # 16 Exhibit 9, # 17 Exhibit 10, # 18 Exhibit 11) (Kolman, Timothy) (Entered: 10/26/2015) |
| 10/26/2015 | 38 | CONCISE STATEMENT OF MATERIAL FACTS re 37 Motion for Partial Summary Judgment, by SUSAN HASCALL. (Kolman, Timothy) (Entered: 10/26/2015) |
| 10/26/2015 | 39 | BRIEF in Support re 37 Motion for Partial Summary Judgment, filed by SUSAN HASCALL. (Kolman, Timothy) (Entered: 10/26/2015) |
| 12/04/2015 | 40 | Consent MOTION for Brief Extension of Time to File Response as to 33 MOTION for Summary Judgment by SUSAN HASCALL. (Attachment: # 1 Proposed Order) (Sipio, W.) Modified on 12/8/2015. (jsp) (Entered: 12/04/2015) |
| 12/04/2015 | 41 | Proposed Order re 40 Motion for Extension of Time to File Response. (Revised to Reflect Appropriate Consent) by SUSAN HASCALL. (Sipio, W.) Modified on 12/8/2015. (jsp) (Entered: 12/04/2015) |
| 12/04/2015 | 42 | BRIEF in Opposition re 37 Motion for Partial Summary Judgment, filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachments: # 1 Exhibit) (Munsch, Martha) (Entered: 12/04/2015) |
| 12/04/2015 | 43 | RESPONSE to 38 Concise Statement of Material Facts, filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 12/04/2015) |
| 12/04/2015 | 44 | ORDER. Plaintiff's Unopposed Motion for a Brief Extension of Time to File Response to Defendants' Motion for Summary Judgment (Doc. 40 )is GRANTED. The Plaintiff shall file her response to Defendants' motion for summary judgment on or before December 8, 2015. If the Plaintiff desires to file briefs and/or exhibits under seal, she shall move for leave to do so on or before December 7, 2015. Signed by Judge Cathy |

| | | |
|---|---|---|
| | | Bissoon on 12/4/15. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 12/04/2015) |
| 12/07/2015 | 45 | MOTION for Leave to File Documents Under Seal by SUSAN HASCALL. (Attachment: # 1 Proposed Order) (Ely, Wayne) Modified on 12/8/2015. (jsp) (Entered: 12/07/2015) |
| 12/07/2015 | 46 | ORDER denying, without prejudice to refiling, Plaintiff's Motion for Leave to File Documents Under Seal (Doc. 45 ). Plaintiff has not yet alleged sufficient facts to support a finding that her response needs to be filed under seal. Signed by Judge Cathy Bissoon on 12/7/15. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 12/07/2015) |
| 12/08/2015 | 47 | BRIEF in Opposition re 33 Motion for Summary Judgment filed by SUSAN HASCALL. (Attachments: # 1 Proposed Order, # 2 Exhibit 1-A, # 3 Exhibit 1-B, # 4 Exhibit 1-C, # 5 Exhibit 2-A, # 6 Exhibit 2-B, # 7 Exhibit 2-C, # 8 Exhibit 3, # 9 Exhibit 4, # 10 Exhibit 5-A, # 11 Exhibit 5-B, # 12 Exhibit 6, # 13 Exhibit 7, # 14 Exhibit 8, # 15 Exhibit 9, # 16 Exhibit 10, # 17 Exhibit 11, # 18 Exhibit 12-A, # 19 Exhibit 12-B) (Ely, Wayne) (Entered: 12/08/2015) |
| 12/08/2015 | 48 | RESPONSE *AND COUNTERSTATEMENT OF MATERIAL FACTS* to 34 Concise Statement of Material Facts, filed by SUSAN HASCALL. (Ely, Wayne) (Entered: 12/08/2015) |
| 12/08/2015 | | w/ 48 COUNTER STATEMENT OF FACTS to 34 Concise Statement of Material Facts by SUSAN HASCALL. (jsp) (Entered: 12/09/2015) |
| 12/09/2015 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 48 Response. ERROR: Document should have been filed as two separate documents. CORRECTION: Attorney advised in future that documents of that nature are to be filed as separate documents. Clerk of Court docketed Counter Statement of Material Facts. This message is for informational purposes only. (jsp) (Entered: 12/09/2015) |
| 12/15/2015 | 49 | REPLY to 48 Counter Statement of Facts, w/ 48 Response filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) Modified on 12/15/2015. (plh) Modified on 12/16/2015. (jsp) (Entered: 12/15/2015) |
| 12/15/2015 | 50 | REPLY BRIEF in support re 33 Motion for Summary Judgment filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) Modified on 12/16/2015. (jsp) (Entered: 12/15/2015) |
| 12/15/2015 | 51 | Supplemental Appendix to 33 Motion for Summary Judgment by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachments: # 1 Exhibit Tab 1, # 2 Exhibit Tab 2, # 3 Exhibit Tab 3, # 4 Exhibit Tab 4) (Munsch, Martha) Modified on 12/16/2015. (jsp) (Entered: 12/15/2015) |
| 06/28/2016 | 52 | MEMORANDUM ORDER. For the reasons stated in the Memorandum filed herewith, Defendants' Motion for Summary Judgment (Doc. 33 ) is DENIED as to Plaintiff's gender discrimination and retaliation claims (Counts II, IV, V and VI) and GRANTED in all other respects. Plaintiff's Partial Motion for Summary Judgment (Doc. 37 ) is DENIED.Signed by Judge Cathy Bissoon on 6/28/16. (jwr) (Entered: 06/28/2016) |
| 07/12/2016 | 53 | MOTION for Reconsideration re 52 Memorandum Order pertaining to Count IV by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Attachment: # 1 Proposed Order) (Munsch, Martha) Modified on 7/13/2016. (jsp) |

(Entered: 07/12/2016)

| 07/13/2016 | 54 | ORDER. For the reasons stated in the Order filed herewith, Defendants' Motion for Reconsideration (Doc. 53 ) is DENIED. Signed by Judge Cathy Bissoon on 7/13/16. (jwr) (Entered: 07/13/2016) |
| 07/21/2016 | 55 | INITIAL PRETRIAL ORDER. See contents of this filing for detailed instructions and deadlines. Signed by Judge Cathy Bissoon on 7/21/16. (jwr) (Entered: 07/21/2016) |
| 08/22/2016 | 56 | PRETRIAL STATEMENT by SUSAN HASCALL. (Ely, Wayne) (Entered: 08/22/2016) |
| 09/21/2016 | 57 | PRETRIAL STATEMENT by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY. (Munsch, Martha) (Entered: 09/21/2016) |
| 09/29/2016 | 58 | Minute Entry for proceedings held before Judge Cathy Bissoon: Settlement Conference held on 9/29/2016. (Court Reporter: None) (jwr) (Entered: 09/29/2016) |
| 10/04/2016 | 59 | FINAL PRETRIAL ORDER. See contents of this filing for detailed instructions and deadlines. Signed by Judge Cathy Bissoon on 10/4/2016. (jwr) (Entered: 10/04/2016) |
| 10/04/2016 | 60 | ORDER REFERRING CASE to Mediation. Louis Kushner is appointed as mediator. Party LOUIS KUSHNER added. Signed by Judge Cathy Bissoon on 10/4/16. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 10/04/2016) |
| 01/13/2017 | 61 | ORDER. Given that the Court has heard nothing from the parties regarding mediation and that there has been no filing from the mediator, the Court hereby orders the parties to file a joint status report on the progress of mediation no later than 1/18/17. Signed by Judge Cathy Bissoon on 1/13/17. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 01/13/2017) |
| 01/17/2017 | | Joint Status Report due by 1/18/2017 (jsp) (Entered: 01/17/2017) |
| 01/18/2017 | 62 | JOINT STATUS REPORT by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) Modified on 1/20/2017. (jsp) (Entered: 01/18/2017) |
| 02/28/2017 | 63 | Minute Entry for proceedings held before Judge Cathy Bissoon: Telephone Status Conference held on 2/28/2017. (Court Reporter: none) (jhi) (Entered: 02/28/2017) |
| 03/02/2017 | 64 | ORDER FOR STATISTICAL CLOSING: The court has been advised by counsel for the parties that the above captioned action has been settled and that the only matters remaining are the execution of the settlement document and the compliance of the terms set out in the settlement agreement. It appears that there is no further action required by the court at this time. It is, accordingly, hereby ORDERED that the Clerk mark the above captioned case closed; that nothing contained in this Order shall be considered a dismissal or disposition of this action, and that should further proceedings therein become necessary or desirable, either party may initiate the same in the identical manner as if this order had not been entered. FURTHER, the court expressly retains jurisdiction in this matter to consider any issue arising during the period when settlement is being finalized, including, but not limited to, enforcing settlement. Signed by Judge Cathy Bissoon on 3/2/17. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jhi) (Entered: 03/02/2017) |

| 03/03/2017 | 65 | STIPULATION of Dismissal *of Individual Defendant Kenneth Gormley* by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Attachment: # 1 Proposed Order) (Munsch, Martha) Modified on 3/6/2017. (jsp) (Entered: 03/03/2017) |
| --- | --- | --- |
| 03/06/2017 | 66 | SEALED MOTION by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KENNETH G. GORMLEY, SUSAN HASCALL. (Attachment: # 1 Proposed Order) (jsp) (Entered: 03/06/2017) |
| 03/06/2017 | 67 | STIPULATION of Dismissal *With Prejudice* by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Attachments: # 1 Proposed Order) (Munsch, Martha) (Entered: 03/06/2017) |
| 03/07/2017 | 68 | SEALED ORDER. Signed by Judge Cathy Bissoon on 3/7/17. (jwr) (Entered: 03/07/2017) |
| 03/07/2017 | 69 | Order adopting the Stipulation of the parties (Doc. 65 ) dismissing, with prejudice, Defendant Gormley from this action. Party KENNETH G. GORMLEY terminated. Signed by Judge Cathy Bissoon on 3/7/17. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 03/07/2017) |
| 03/07/2017 | 70 | ORDER adopting the parties' Stipulation (Doc. 67 ). Upon Stipulation of the parties, IT HEREBY IS ORDERED that this action is DISMISSED WITH PREJUDICE, with each party to bear its own costs, expenses and attorneys' fees. Signed by Judge Cathy Bissoon on 3/7/17. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jwr) (Entered: 03/07/2017) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 05/13/2024 16:23:13 | | |
| **PACER Login:** | JoelSansone | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:14-cv-01489-CB |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SUSAN HASCALL** 1 Forbes Terrace Pittsburgh, PA 15217 | NO. _____ |
| *Professor Hascall,* | CIVIL ACTION |
| **vs.** | JURY TRIAL DEMANDED |
| **DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, t/d/b/a DUQUESNE UNIVERSITY SCHOOL OF LAW** 600 Forbes Avenue Pittsburgh, PA 15282 | |
| -and- | |
| **DEAN KENNETH G. GORMLEY** 600 Forbes Avenue Pittsburgh, PA 15282 | |
| *Defendants.* | |

## COMPLAINT

Professor Hascall, by and through her undersigned counsel, hereby files the following Complaint against Defendant:

### INTRODUCTION

1. Plaintiff, Professor Susan C. Hascall (hereinafter "Professor Hascall"), brings this lawsuit seeking justice against Duquesne University Law School and its Dean, Kenneth G. Gormley for the systemic and vicious discrimination she has suffered on the basis of her age, gender and religious scholarship as it relates to Islamic Law, along

with other violations of Pennsylvania law. Over time, the Defendants have willfully, purposefully and maliciously sought to destroy and sabotage Professor Hascall's outstanding academic reputation in every way conceivable causing her irreparable professional damage and significant emotional distress.

## JURISDICTION and VENUE

2.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3.     The Court may properly maintain personal jurisdiction over the Defendant because the Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over the Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the Supreme Court of the United States in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.     The United States District Court for the Western District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

5.     The Court may also maintain supplemental jurisdiction over state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

2

6. Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES

7. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

8. Professor Hascall is an adult individual residing at the above address.

9. Defendant Duquesne University School of Law is a private Catholic law school, created and existing pursuant to the laws of the Commonwealth of Pennsylvania with a principal place of business at the above address.

10. Defendant Kenneth G. Gormley (hereinafter "Gormley" or "Dean") is attorney licensed to practice law in the Commonwealth of Pennsylvania who serves as the Dean of Duquesne University School of Law who is individually liable pursuant to the aiding and abetting provisions of the Pennsylvania Human Relations Act 43 P.S. § 955(e).

11. At all times relevant herein, Defendant acted or failed to act through its agents, servants and employees, each of whom was in the scope of their employment at all times relevant herein.

12. Defendant is an "employer" within the meaning of Title VII because it is engaged in an industry affecting interstate commerce and because they maintained or maintain fifteen ("15") or more employees for each working day in each of twenty ("20") or more weeks in the current or preceding calendar year.

3

13. The Defendant is an "employer" within the meaning of the Age Discrimination in Employment Act of 1967 ("ADEA") because it is engaged in an industry affecting interstate commerce and because it maintains or maintained twenty ("20") or more employees for each working day in each of twenty ("20") or more weeks in the current or preceding calendar year.

## PROCEDURAL and ADMINISTRATIVE REMEDIES

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. Professor Hascall has satisfied the procedural and administrative requirements for proceeding under Title VII, ADEA and the Pennsylvania Human Relations Act ("PHRA") as follows:

a) On or about November 1, 2013, Professor Hascall filed timely written charges of discrimination against Defendant (No. 530-2014-00891) with the Equal Employment Opportunity Commission alleging gender, religion and age discrimination;

b) On or about March 4, 2014, Professor Hascall filed timely written charges of discrimination against Defendant (No. 530-2014-02024) with the Equal Employment Opportunity Commission alleging gender, religion and age discrimination along with retaliation;

c) Professor Hascall also filed a timely written charge of discrimination against the Defendant on or about June 13, 2014 alleging retaliation;

4

Appx161

d) The Equal Employment Opportunity Commission issued Notices of Right to Sue on the foregoing charges on or about October 17, 2014;

e) The instant action is timely because it is initiated within ninety (90) days of the receipt of the aforementioned Notice;

16. Professor Hascall has exhausted her federal administrative remedies as to the allegations of this Complaint.

## FACTUAL BACKGROUND

17. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

## *INTRODUCTORY STATEMENTS*

18. Professor Hascall is an assistant professor of law, who received her J.D. *magna cum laude* from Washburn University School of Law.

19. She also holds a master's degree in anthropology from Wichita State University, and received her B.A. in political science from Texas A&M University.

20. Professor Hascall previously clerked for the Honorable Wade Brorby of the United States Court of Appeals for the Tenth Circuit and Chief Judge J. Patrick Brazil of the Kansas Court of Appeals.

21. Before being employed by the Defendant, she practiced commercial litigation and appellate practice in Kansas City.

22. Professor Hascall's scholarship focuses primarily on Islamic law and legal pluralism.

5

23.    She also teaches courses in civil procedure, sales, banking law, Islamic law and emerging legal systems.

### *AGE, GENDER AND RELIGIOUS DISCRIMINATION*

24.    In 2007, Professor Hascall was hired as a research/doctrinal tenure-track professor at Duquesne University School of Law (hereinafter "the law school").

25.    Professor Hascall began teaching in the academic year of 2008 into 2009.

26.    Prior to Professor Hascall's hire, the law school had, for a number of years, not hired any other tenure-track faculty.

27.    In the academic year 2007-2008, two professors were granted tenure by the University; Professors Bruce Antowiak and Kirk Junker.

28.    At that time, Don Guter (hereinafter referred to as "Dean Guter") was still the Dean of the Law School.

29.    Dean Guter made it very clear to Professor Hascall on several occasions that her third year review and tenure evaluation would be conducted according to the Duquesne University Standards contained in the University Faculty Handbook, with an exception regarding the description contained in the University Handbook favoring peer reviewed articles over non-peer reviewed articles for tenure review because law schools generally have student edited journals.

30.    Guter made this clear to both to Professor Hascall and to Professor Joiner who was hired at the same time as the Professor Hascall.

31.    It should be noted that when Professor Hascall was hired, the law school did not have its own faculty handbook.

6

32.     During the academic year of 2010-2011 when both Professor Joiner and Professor Hascall were scheduled to go through their third year reviews for retention, the law school's newly appointed Acting Dean, Ken Gormley, (hereinafter referred to as 'Gormley') invited them to have a lunch meeting with him and the new Associate Dean for Academic Affairs, Nancy Perkins.

33.     Accordingly, Professor Hascall and Professor Joiner met for lunch in or around July of 2010 at the Common Plea Restaurant in Pittsburgh, Pennsylvania.

34.     Professor Hascall brought with her a copy of the Defendant's handbook procedures for tenure and promotion.

35.     During the discussion, Gormley promised he would help Professor Hascall and Professor Joiner "through the process" (of third year review and tenure) and stated that he felt a responsibility to act as a mentor.

36.     It soon became patently obvious that Gormley was unfamiliar with the both the rules and the processes for third year review and tenure because, at that lunch, he made several incorrect statements regarding the procedures.

37.     Both Professor Joiner and Professor Hascall diplomatically indicated that the rules of Duquesne University were directly applicable to their tenure procedures and that any informal law school procedures (*which were in conflict with the University's rules*) should not apply.

38.     Gormley responded by stating, "None of that matters.  The only thing that matters is what I decide because the President will do whatever I tell him."

7

39.     Gormley also reiterated that internal law school long-standing rule that only three law review articles were required to fulfill the scholarship requirement for tenure at the law school.

40.     Over the course of several years, and after much contention, the law school finally produced its own faculty handbook in 2011, which properly incorporated Duquesne University's standards and procedures for both tenure and for third year review.

41.     However, many of the proposed standards and procedures for the law school faculty handbook deviated from the standards and procedures set forth in the University Handbook.

42.     One of the main points of contention was the section of the proposed Law School Faculty Handbook which enabled the Dean of the Law School to hand pick all of the outside (*and therefore independent*) peer reviewers to review the scholarship of the candidates up for tenure.

43.     Professor Hascall objected to the Dean handpicking all of the outside peer reviewers because the language of Duquesne University's procedures allow the candidates themselves to select at least two ("2") of the four ("4") outside peer reviewers.

44.     After speaking to Gormley on numerous occasions over several months about this matter and having gotten nowhere, Professor Hascall finally brought this matter up at a law school faculty meeting.

8

45.     After that faculty meeting, Gormley apparently relented and the proposed language of the law school handbook was changed to correctly correspond with Duquesne University's own rules regarding the selection of outside peer reviewers.

46.     However, the law faculty also later decided at a formal faculty meeting that the rules of this newly produced faculty handbook, which finally corresponded with the safeguards enshrined in Duquesne University's own rules and procedures regarding the selection of outside peer reviewers of scholarship for tenure applicants, but contained additional language in conflict with University procedures and standards regarding, but not limited to, the evaluation of scholarship and teaching for third year review and tenure applications, would not apply retroactively to those of its own faculty hired prior its adoption.

47.     Nevertheless, as set forth in more detail below, Gormley, in his capacity as Dean of the Law School, sent the new [*and inapplicable*] language from the Law School Handbook ('Handbook') (completed in 2011) to Professor Hascall's, peer reviewers.

48.     In sending out this Handbook, which was and had been found to be in clear conflict with Duquesne University's own safeguards regarding tenure, Gormley also deliberately failed to include or indeed make any reference to Duquesne University's "global" standards for promotion and tenure.

49.     In short, the law faculty, through Dean Gormley, willfully violated and ignored Duquesne University' own standards on promotion and tenure by deciding to send the new and inapplicable standards created in 2011 for promotion and tenure

procedures and which it knew and now acknowledged were unauthorized, improper, unethical, unfair and in direct conflict with those of Duquesne University itself.

50.     At the meeting of the tenured faculty on October 25, 2013, Dean Gormley and Professor Bruce Ledewitz, who had been charged with making sure the proper procedures and standards were applied to the applicants for retention and tenure as the Chair of the internal promotion and tenure subcommittee, insisted on evaluating Professor Hascall under the inapplicable 2011 language of the Law School Faculty Handbook. This blatant procedural error was vigorously objected to by members of the law school promotion and tenure committee (all the tenured faculty).

51.     Professor Ledewitz had been assigned as one of three mentors for Professors Hascall and Joiner when they joined the faculty in 2008.

52.     In the wake of the faculty disputes regarding President Dougherty's firing of Dean Guter during Professor Hascall's first year at the law school, Professor Ledewitz initiated a plan to have the faculty vote that they had "no confidence in the President."

53.     Despite intense pressure (and threats) from both sides of this dispute, including direct pressure from Gormley in the form of numerous phone calls after hours, Professor Hascall steadfastly refused to reveal how she voted on this matter.

54.     Soon after the faculty vote on the no confidence resolution, Professor Ledewitz resigned as faculty mentor for both Professor Hascall and Professor Joiner. He stated that we didn't need a mentor to shelter us from the political machinations of the faculty and administration because we had exercised our right as faculty members

10

to vote on the resolution. Professor Ledewitz was under the impression that Professor Hascall had voted no on the resolution.

55.     Gormley was aware that Professor Ledewitz had resigned as Professor Hascall's mentor in the wake of the no confidence resolution, but assigned him as the chair of the internal promotion and tenure committee anyway.

56.     The University website contains a document meant to guide chairs (or Deans) in their responsibilities to tenure candidates. It specifically requires a Dean to take into consideration the political aspects and possible personal animus of those chosen to write internal evaluations for candidates for tenure. Gormley ignored these directives in the selection of the promotion and tenure subcommittee, and selected the members without even consulting Professor Hascall. This was a departure from the process by which the internal reviewers were picked for Professor Hascall's third year review.

57.     During Professor Hascall's third year review, Gormley evinced significant disregard to the University Standards and Procedures as set forth in the University Handbook, which were applicable to Professor Hascall's third year review and existed prior to the 2011 law school faculty handbook.

58.     Gormley, in clear violation of the ethical standards of the University and the University Handbook, allowed public display of confidential information regarding teaching evaluations. Both Professors Joiner and Hascall objected to this violation of their faculty rights and the University Procedures. These objections fell on deaf ears. Then acting Associate Dean Perkins came to Professor Hascall's office and announced that the confidential information would be on public display in the faculty lounge

11

despite the clear violation of ethical standards, procedures and objections by Professors Hascall and Joiner.

59.    In addition, the University Standards and Procedures allow a candidate for tenure or third year review to supplement their portfolios to include notice that a work in progress has been accepted for publication and to include that work in the candidate's portfolio of scholarship.

60.    Although Gormley was informed that Professor Hascall's law review article had been formally accepted for publication in the Berkeley Journal of Middle Eastern and Islamic Law, he refused to pass this information along to the committees evaluating her scholarship.

61.    Although Professor Hascall did not know at which committee level her work was being evaluated at the time, Professor Hascall submitted copies of the article and the notice of acceptance of publishing to the internal review committee and to the Provost.  The Provost at that time was Ralph Pearson.  Without explanation, the Provost's assistant wrote to Professor Hascall and informed her that the Provost would not be taking into consideration the recently accepted article in his evaluation.

62.    Gormley never offered any explanation for his refusal to add the Berkeley article to Professor Hascall's third year review file.  He simply stated, "Let's save that one for tenure."

63.    All internal reviews of Professor Hascall's scholarship at the third year review were positive.

12

64.  After the faculty vote on Professor Hascall's application for retention on third year review, Gormley called Professor Hascall to congratulate her on winning the vote. The vote was one third against and one third in favor of retention. Gormley told Professor Hascall not to be concerned about those faculty members who had voted against her. He said, "A vote against you was a vote against me." This shows that Gormley was aware of the political nature of the faculty votes on such important issues as retention and tenure. He was alluding to the fact that at the time, many faculty members believed that Professor Hascall had voted against the no-confidence resolution, that she was simply another Gormley pawn, and that she had betrayed Dean Guter and Professors McClendon and Brown-Barbour by voting against the no-confidence resolution. These Professors were at that time suing the University for discrimination.

65.  Professor Alice Stewart filed her complaint in federal court alleging sexual harassment and discrimination against Gormley shortly thereafter. Although there was an on-going open case regarding sexual harassment and discrimination against Gormley, Gormley invited the Affirmative Action Officer, Judith Griggs, to attend the study abroad program in Italy, which upon information and belief, Gormley paid for with law school funds.

66.  Ms. Griggs had previously written a report regarding Gormley's sexual harassment of Professor Stewart. Ms. Griggs concluded the Gormley should never be allowed to supervise any female professor and that he had harassed, discriminated against, retaliated against Professor Stewart for her filing of a grievance regarding

13

Gormley's treatment of her. The University hired outside counsel to contradict Ms. Grigg's report.

67. The University was aware of Ms. Grigg's report and Gormley's pattern of discrimination against women, especially unmarried women, when it appointed him interim dean, selected him for the permanent deanship, and willfully, maliciously and callously ignored Professor Hascall's allegations, grievances and requests for help.

68. Even after the trip to Italy, Ms. Griggs continued in her capacity as the Affirmative Action officer and wrote reports favorable to faculty female members who had brought claims of discrimination against the administration and their department chairs and deans. As explained more fully below, Professor Hascall was not allowed to bring her claim before the affirmative action officer in retaliation for exercising her rights under federal law by filing a complaint with the EEOC.

69. Ms. Grigg, an African American woman, was recently replaced as the chief affirmative action officer by a while male.

70. After Professor Hascall's third year review, the law school decided to write its own internal faculty handbook. However, the proposed internal faculty handbook contained conflicts with the University Handbook regarding the evaluation of teaching and scholarship, as stated previously. When Professor Hascall raised the issue of conflict between the procedures of the Law School and those of Duquesne University regarding outside peer reviewers and the Law School's improper refusal to apply the proper procedures that were in place when she was hired, Dean Gormley's treatment of Professor Hascall became increasingly vindictive.

14

71.     Professor Hascall was passed over for a paid administrative appointment, the Director of International Programs, in favor of a younger newly hired male professor.

72.     The Dean also refused to appoint Professor Hascall as the coordinator of the LL.M. program, despite the fact that she had been acting as the *de facto* coordinator for years and three professors urged him to appoint Professor Hascall who was the most highly qualified and experienced.

73.     In 2009, Professor Junker took a leave of absence to teach full time at the University of Köln.

74.     He remained the Director of International Programs during his temporary absence.

75.     Professor Barker and Professor Hascall continued working on the international programs in his absence.

76.     However, Professor Junker resigned his tenured position on the faculty in 2011.

77.     Nonetheless, Dean Gormley kept him on as a paid administrator and paid for several flights a year for him from Germany to Pittsburgh and paid for other international travel.

78.     However, the next academic year, the Law School hired a new professor, Michael Granne.

79.     Prior to beginning his work at Duquesne in 2011, Professor Granne was sent to Italy where the Law School was conducting its study abroad program at the Vatican.

80.     Dean Gormley had also sent Professor Joiner on that program to help manage both the students and the program.

81.     Professor Junker also spent time in Italy during the program.

82.     It is unclear what Professor Granne's role was at the Vatican program, but he was summarily introduced as the new Director of International Programs and as the "new Kirk."

83.     At the Dean's request, Professor Kitchen and Professor Hascall took Professor Granne out to dinner in May of 2011 to welcome him to the faculty.

84.     At that dinner, Professor Granne told Professor Hascall and Professor Kitchen that the Dean had hired him to become the new Director of International Programs.

85.     No public formal announcement had ever been made that Professor Granne was going to take Professor Junker's place as the Director of International Programs.

86.     After the first academic year, which was expected to be a transitional year for the Directorship from Professor Junker to Professor Granne, Professor Granne left the faculty and returned to New York.

87.     Professor Hascall thereafter applied in writing to Dean Gormley and requested that she be considered for the position of Director of International Programs.

88.     Contrary to the direct statements of Professor Granne and the understanding of the faculty, Dean Gormley denied that he had ever intended to appoint Professor Granne to the Director position.

16

89.     Professor Junker inexplicably continued to act as the Director of International Programs from his office in Germany, despite not being on campus while Professors Barker, Liu and Professor Hascall continued to work on the international programs at Duquesne in the absence of the Director.

90.     One of the programs that required on site management was and is the LL.M. for foreign lawyers program.

91.     Professor Hascall had been working with that program since being hired at Duquesne Law School in 2008.

92.     Professor Hascall, among her other duties had screened applicants, advised students and served on thesis committees.

93.     In 2011, the new faculty handbook made reference to a "coordinator of the LL.M. program."

94.     Because Professor Granne was believed, at that time, to be in transition to becoming the new Director, and because Dean Gormley had given him significant responsibility and authority over the LL.M. program, including sending him to a conference for managers of LL.M. for foreign lawyers programs, he was widely believed to be the *de facto* coordinator of the LL.M. program.

95.     After Professor Granne had resigned from his position at Duquesne, he was selected to attend the Ireland study abroad program. Despite the fact that Professor Hascall had once attended that program, had spent countless hours coordinating that program with Professors Junker and Wilkie, had served for many years on the international programs committee, and had an academic interest in international and

17

comparative law, Professor Hascall, who unlike Professor Granne, was still a full time member of the faculy, Gormley did not ask Professor Hascall to attend the Ireland program.

96.     When Professor Granne left, Professors Junker, Barker and Liu all recommended to the Dean that the Professor Hascall be appointed the LL.M. coordinator.

97.     Professor Hascall also applied for that position in writing.

98.     Gormley, in his capacity as Dean, refused for no articulated reason, to make that appointment.  He told Professor Junker that he "wasn't going to give her any titles."

99.     As a consequence, Gormley created considerable confusion with respect to the particular roles of the various members of both the international programs committee and the new administrators Gormley had designated to run the program.

100.    All of the other tenure-stream faculty have been given either paid or unpaid administrative positions and have been made chairs of committees.

101.    Professor Joiner, who is younger than Professor Hascall, was made the Co-Director of the Trial Advocacy Program in 2010.

102.    This was suddenly a paid appointment, even though Joiner had previously been hired to work in the trial advocacy without any additional pay prior to this appointment.

103.    Erin Karsman (hereinafter referred to as 'Karsman'), who is also younger than Professor Hascall, was made the Director of the Moot Court Program.

104. This was also a new, paid, administrative appointment, which was in addition to Karsman's existing duties as a research and writing professor.

105. Professor Hascall was never given the opportunity to even apply for this position despite her many years of experience as an appellate lawyer.

106. Professor Hascall has also requested to teach appellate practice and procedure every year since coming to Duquesne but her requests have been continually denied in favor of adjuncts.

107. It is submitted that these actions by the Law School are in direct violation of the Law School's the well-settled procedures.

108. Karsman recently resigned her tenure-stream position on the faculty and is now an adjunct and administrator but still maintains her paid position as the Director of the Moot Court program.

109. Jacob Rooksby was appointed to be a Co-Director of the China study abroad program last year.

110. He is younger than Professor Hascall and has neither international experience nor training or research interests which have anything to do with China or with any other foreign country.

111. Nevertheless, in 2012, he was recruited to go on the China program the summer before he was hired.

112. He went to China again for the 2013 program.

113. In the fall of 2013, he was made a Co-Director of the program and put on the international programs committee for this this academic year.

19

114. The position of co-director of the China Program is a permanent rather than a rotating position as is the Director of the Köln study abroad program.

115. Upon information and belief, Dean Gormley had been "grooming" Professor Rooksby to take over as the new Director of International Programs after he convinced the President of Duquesne University to deny Professor Hascall's application for tenure.

116. Although the Directors of the China program are paid a small stipend, as are the directors of the other study abroad programs, the Director of International Programs is paid more.

117. An appointment as the permanent director of an international program, such as the LL.M. coordinator position, would be a significant stepping stone to the more important paid directorship.

118. This was an opportunity which, despite Professor Hascall's significant qualifications and experience, she was consistently denied.

119. Professors Karsman, Granne, Rooksby, Wilkie, and Joiner are or were under the age of forty during the time periods referenced above.

120. At the time Professor Hascall filed her administrative complaint with the EEOC, she was forty six years old.

121. It is believed and therefore also averred that Professor Hascall was being paid less than her similarly situated colleagues and further was denied opportunities for advancement due to her age and her gender.

Appx177

122.    Professor Hascall worked as the co-director of the Köln Study Abroad program from 2012-2013.

123.    This included recruiting students, administering aspects of the program, traveling to Germany to stay in the youth hostel with the students and teaching a class to the German students at the University of Köln.

124.    Professor Hascall continued that work as the advisor to the six exchange law students the University had from Germany during the 2013-2014 academic year.

125.    While Professor Hascall was in Germany with her son, Dean Gormley came to visit for the portion of the trip where the students were taken for a few days to Paris and Brussels.

126.    During that visit, there were several dinners and meetings and other events that Gormley, in his capacity as the Dean had arranged for the administrators and coordinators of the program, including a student assistant.

127.    Gormley ensured that the Professor Hascall, despite her significant involvement in the program, was deliberately excluded from all of these meetings, dinners and discussions.

128.    The actions of Gormley in willfully excluding Professor Hascall were deliberately meant to be humiliating, degrading, embarrassing and hurtful to the Professor Hascall especially since even the student assistant to the Program was included in all dinners and meetings.

129.    Further, all of Duquesne students on the Program were well aware that Professor Hascall had been excluded.

21

Appx178

130.   Professor Hascall was able to attend one meeting with professors from the Sorbonne but was told that she could not attend if her son, who was eight years old at the time, came with her.

131.   At first, Professor Hascall had falsely been told that the meeting was to be in an office in the law school building.  The meeting was actually to be in a restaurant.

132.   Fortunately, one of the students offered to watch Professor Hascall's son so Professor Hascall could attend this meeting.

133.   Professor Hascall did not know where the restaurant was and had trouble keeping up with Professor Junker who just walked off towards the restaurant without her.

134.   Professor Hascall had the student and her young son in tow trying to keep up with him.  The student was disabled, in severe pain, and was unable to keep the pace that Professor Junker set as he walked off towards this unknown restaurant in central Paris. Professor Junker was aware that this student was disabled.

135.   Professor Hascall managed to get to the restaurant and took a seat at the table.

136.   Gormley, acting in his capacity as Dean, in an overt act of viciousness and disrespect and in an attempt to publicly humiliate her, occupied her seat at the table while she was in the restroom.

137.   Professor Hascall had no choice but to sit at the end of the table across from Professor Junker's girlfriend and was not included in any discussions at that meeting nor was she introduced to the one remaining professor whom she had wanted to meet.

Appx179

138.   Professor Hascall had previously introduced herself to the other professor from the Sorbonne.

139.   Gormley never treated Professors Rooksby, Junker, Joiner, Oliver or Granne (or any other professor participating in a study abroad program), with disrespect during any study abroad program whereas Professor Hascall was ignored, humiliated, embarrassed, publicly shunned and deliberately excluded from both faculty meetings and from academic social events.

140.   Professor Hascall also requested a university credit card, also referred to as a "P Card", prior to her departure for Germany.

141.   This card is issued by the University for the use of legitimate costs and expenses arising from the Study Program Abroad.

142.   Amy Konop, the office manager for the Law School, informed Professor Hascall that her request for this card had been denied.

143.   Professor Oliver, a male who is younger than Professor Hascall, was offered a "P Card" prior to his departure for Ireland to attend the Ireland study abroad program.

144.   Professor Joiner has had a "P Card" for years.

145.   Professor Wilke, who is younger than Professor Hascall, was offered a "P Card" prior to her traveling to Ireland to attend the study abroad program several years ago.

146.   Upon information and belief, Professor Hascall is the only professor to have been denied a request for a university credit card prior to travel internationally or even domestically.

147. Ms. Konop refused to tell Professor Hascall why she had been denied her request for a "P Card", but articulated that denial publicly in front of other law school staff members while Professor Hascall was furiously trying to complete photocopying for finals (without secretarial help).

148. Although all other tenure-stream faculty had been appointed as chairs of a committee, Professor Hascall was not appointed the chair of any committee until the academic year of 2011-2012.

149. Professor Hascall was then appointed chair of the interdisciplinary committee.

150. Pursuant to that appointment, Professor Hascall began to work on creating a new joint degree program during that year.

151. Although the Dean and the Associate Dean knew Professor Hascall was working on that program Gormley, in his capacity as Dean, summarily and without cause removed Professor Hascall from the committee the next year.

152. This followed Gormley's own request to the faculty that any of the faculty who had an interest in serving on any committee should inform him of same.

153. Following the AALS special site visit in 2010 (I think), the faculty was required to attend a "retreat." This was part of the AALS's requirements for the law school to maintain good standing with the organization following the extremely negative report that followed their visit.

24

154.   At that retreat, a number of issues were raised by the faculty.  One issue was that the appointments to committees should not be made based on favoritism or political allegiance to the dean.

155.   Another issue was raised regarding the political nature of the retention and tenure process.

156.   Following the retreat, Gormley sent an email to all faculty inviting them to request committee assignments each year.

157.   After Professor Hascall was summarily removed from the interdisciplinary committee, she responded in writing that she was still working on the joint degree program and that she wished to remain on the committee.

158.   Professor Hascall was subsequently allowed back on the committee but was, without explanation or justification, replaced as chair person.

159.   Dean Gormley and Assistant Dean Perkins have worked together in a deliberate and malicious manner to create any barrier and obstacle possible to the success of the joint degree program by, among other things, failing to respond to e-mails, creating needless delays and refusing to consider a specific marketing plan for the program.

160.   The malicious, vindictive, discriminatory and disparate behavior of Gormley and Perkins was focused on Professor Hascall and on no other individual and without consideration to its economic and academic effect on the joint degree program.

25

161.   After serving for five years on the University Academic Learning Outcomes Assessment Committee (ALOA), Professor Hascall was gratuitously and without cause replaced by Richard Gaffney, an administrator.

162.   Professor Hascall was also summarily removed from the newly created internal outcomes assessment committee, which is now chaired by Mr. Gaffney and Dean Perkins.

163.   Professor Hascall was excluded from all meetings of the internal outcomes assessment committee and upon information and belief, Gormley, acting in his capacity as Dean, and without any justification or cause but simply out of a discriminatory animus, spoke poorly of Professor Hascall to the chair of the University Committee, thereby damaging Professor Hascall's reputation.

164.   The abrupt replacement of Professor Hascall on the University Committee was designed to be another publicly humiliating and embarrassing blow to the Professor Hascall.

165.   Since the President of Duquesne University appointed Gormley as the interim Dean, Gormley willfully ignored Professor Hascall in public and completely failed to acknowledge any of her accomplishments or support any of her academic work.

166.   In fact, he went further, to deliberately undermine and humiliate Professor Hascall as described herein.

167.   At the Duquesne Club on or about September 2, 2010, during the celebration the President had for the Dean after he was appointed, Gormley announced and

26

introduced every non-tenured faculty member in the room and told the audience what they taught and about their scholarly work.

168.   Although he knew Professor Hascall was in the room, and although Professor Hascall was sitting right in front of him, he willfully failed to either introduce her to the audience or to talk about her work.

169.   This exclusion was patently obvious to all the faculty and to former students in the room who knew Professor Hascall and saw her at the event.

170.   Gormley has also manifested a defined hostile attitude and phobia about Islam and *Shari'ah* law, with which he is reluctant to be associated, despite the fact that this is, from an academic standpoint, a system of law which could properly be reviewed as part of any scholarly comparative law course.

171.   Nonetheless, Gormley has denied Professor Hascall's legitimate requests for travel funds to support her scholarship and her professional development despite the fact that those requests were timely and within the Law School's annual allotment.

172.   Gormley has funded other professors' requests for travel to conferences and other scholarly events that exceeded the annual allotments for travel.

173.   It is submitted and therefore averred that Gormley's denials, as stated, in his capacity as Dean were and are in clear violation of past procedure and the current rules regarding development and travel funds.

174.   Upon information and belief, these denials are also based on discrimination on the basis of age, gender, and an open and intellectually unsupportable prejudice to the Islamic aspects of Professor Hascall's scholarship.

27

175. Gormley, in his capacity as Dean began denigrating Professor Hascall's scholarship, her teaching, her committee work and her attendance at academic symposia around the time she began disagreeing with him about in the inconsistencies regarding the procedures in the Law Faculty handbook.

176. Gormley also told one of Professor Hascall's tenured colleagues that she was a "trouble maker" and that the Law School needed to get rid of her.

177. Upon information and belief, Gormley also shared selected confidential information regarding Professor Hascall's written and numerical student evaluations to share with Professor Moriarty in an attempt to persuade Professor Moriarty (hereinafter referred to as "'Moriarty') that Professor Hascall's teaching was poor.

178. Moriarty brought up Professor Hascall's teaching abilities and specifically the written student comments on her evaluations several times during their meetings to discuss her scholarship, none of which was within her mandate or job description.

179. Moriarty actually told Professor Hascall that she had seen her written evaluations for the Islamic law class "by mistake" and told her how impressed she was with the comments.

180. Gormley also began changing the well-settled rules regarding teaching assignments and travel funds for scholarly symposia and conferences as they applied to Professor Hascall.

181. Gormley told Professor Hascall at the conclusion of one of her annual reviews that he had decided to move her to an office on another floor.

182. This was also against settled policy regarding faculty office space.

183. He later had "second thoughts" and Professor Hascall was not, after all, forced to move into another office.

184. Upon information and belief, the actions of Gormley, acting in his capacity as Dean, were in direct retaliation for speaking up about the procedures in the Law School Handbook, which deprived her of two outside professors of her own choosing to independently determine her academic scholarship and were therefore discriminatory based on Professor Hascall's gender and age and continue to be discriminatory thereafter, pursuant to all of Gormley's unlawful, improper and unethical actions towards her designed to single her out and to create a hostile environment rife with discrimination.

185. Although Duquesne University's Handbook did not contemplate the formation of a review committee, or reviews by that committee, until after the candidate submitted the candidate's dossier in the fall of the tenure review year, Gormley formed a law school committee early in order to allow the members of that committee to sit in on the classes for academics up for tenure prior to their tenure review year.

186. These visits were in addition to the regular peer review visits that the Duquesne University Handbook describes in Appendix B.

187. Visits by members of the internal tenure review committee to classes are not allowed or even contemplated by the University Handbook.

188. Members of the tenure review committee are only allowed to review the materials submitted by the candidate that are contained in the dossier pertaining to

teaching and include previous peer reviews of teaching and other factors outlined in the Faculty Handbook.

189. During the spring semester of 2013, prior to Professor completing and submitting the dossier, which was not due until October of the following academic year, Professor Hascall was asked by members of the review committee to schedule classroom visits with the members who were assigned to evaluate her teaching. This was in clear violation of the University procedures for evaluation of teaching of tenure candidates.

190. Professor Hascall wrote to the administrator tasked with educating tenure candidates about the proper procedures and to Alexandra Gregory, an academic Vice President regarding in-person classroom visits by the internal review committee. They responded by stating that no information outside the dossier is ever to be considered by the review committee, including personal classroom visits for tenure review.

191. Professor Hascall raised this issue with Professor Ledewitz, but was summarily ignored.

192. Professor Hascall was asked to schedule visits to both of her classes that semester, which were "Civil Procedure II" and "Sales and Leased Goods".

193. Although Professor Hascall did not believe that such visits were permitted under the Duquesne University's procedures, Professor Hascall nonetheless scheduled a visit to her Civil Procedure class, and sent several emails to and had conversations with the professor who was assigned to visit her Sales class.

30

194. The week before Professor Hascall received an impromptu visit to her Sales class by Chancellor Murray, she had sent an email to him trying to schedule a specific date for the visit but had received no response.

195. Instead, on or about Thursday the 4th of April, 2013, Professor Hascall walked into her sales class to find Chancellor Murray sitting in the front row.

196. Professor Hascall greeted him, and told him that she was not expecting him to be in her class that day and politely asked him if he would like to return to her class the next week since she had not had a chance to discuss the course coverage with him, the materials for the day or in fact to explain anything about the particular class that day.

197. In fact, that day was a transitional class.

198. The class was finishing a section of the material and moving on to a completely different section.

199. As such, Professor Hascall had review questions drafted for the students, and an in-class exercise for them.

200. As such, it was not a typical class.

201. Upon information and belief, Dr. Murray was sent in deliberately to surprise and "sandbag" Professor Hascall, with express instructions to report back to Gormley with a poor evaluation.

202. Duquesne University's Handbook Appendix B, sets out in detail, strict procedures for peer reviews but these procedures were deliberately not followed in Professor Hascall's case.

31

203. Instead, Professor Hascall was subjected to an improper and unscheduled visit to her class by a member of the committee appointed by Gormley, in his capacity as Dean, to evaluate her teaching and to generate a report for tenure evaluations.

204. The Duquesne University Handbook does permit surprise and impromptu reviews on this basis.

205. It requires instead that the committee evaluate the record compiled by the candidate and this record is to contain four peer review documents.

206. The surprise visit to Professor Hascall's class by a member of the tenure review committee violated the procedures for review of teaching because it allowed a member of the committee to go beyond the record, or "dossier" as it is sometimes called.

207. Academic freedom covers classroom instruction.

208. Because Professor Hascall did not know that Dr. Murray was coming to her class and because she had not spoken to him about the content of the class before he came to Professor Hascall's class to review Professor Hascall's teaching for the tenure evaluation committee, Professor Hascall had to stop and start her lecture several times in order to explain to him what the class was doing and why.

209. This disrupted the flow of the class.

210. It also had a significantly negative effect on the students since it was an unwarranted distraction.

211. Professor Hascall could see that students were uncomfortable with the situation.

32

212.   Professor Hascall also altered some of the materials she was going to present in order to speed the class along so that Chancellor Murray would be able to witness more of her lecturing rather than her spending as long as she would have liked otherwise in having the students participate in the in class exercises (*in which they were to write answers to the questions and hypotheticals*) that were designed and scheduled as a review of the previous materials.

213.   Upon information and belief, no one at the law school has ever had to suffer a surprise and unscheduled visit to their class under any circumstances.

214.   Although Appendix B sets forth a procedure for such visits in the context of peer reviews in the years prior to the tenure year, the Duquesne Law School has deliberately not followed these procedures even for pre-tenure peer reviews.

215.   The last time a professor at the law school went through the tenure review process was in the year prior to Professor Hascall's first year at Duquesne.

216.   Neither Professor Antkowiak nor Professor Junker were subjected to any surprise visits in their classes by a member or members of the law school tenure review committee.

217.   Professors Antkowiak and Junker are both males.

218.   Professor Hascall is a female law professor and this additional scrutiny, in violation of clear University procedures and academic freedom, constitutes discrimination against her based on her gender.

219.   Professor Hascall thereafter filed an internal grievance based on the surprise visit described above.

33

220.     The grievance committee refused to take any substantive action and failed to engage in any type of meaningful investigation of Professor Hascall's claim.

221.     Upon information and belief, Gormley and Chancellor Murray were aware of the grievance.

222.     Chancellor Murray visited another one of Professor Hascall's classes.

223.     Chancellor Murray based his report of Professor Hascall's teaching solely on that classroom visit and the surprise visit that is the subject of an on-going grievance claim.

224.     The subsequent classroom visit was also an atypical class. Professor Hascall was reviewing the mid-term with the students. Professor Hascall handed Chancellor Murray a copy of the complicated fact pattern that had been used as the essay question in the mid-term.

225.     Chancellor Murray was aware that Professor Hascall was discussing how the students could improve their test taking techniques through properly analyzing and outlining the facts set forth in the essay question.

226.     Not surprisingly, and in accordance with Dr. Murray's mandate which, has been discussed in advance by Gormley, it was a negative report and constituted the only negative report of Professor Hascall's teaching among the many peer evaluations of teaching that she has received over the past six years. He criticized Professor Hascall spending too much time talking about "the facts."

34

227.  Dean Emeritus Cafardi was the other professor designated to serve as an internal peer reviewer of Professor Hascall's teaching.  He also attended two of her classes that semester, Civil Procedure II and Sales.

228.  Dean Emeritus Cafardi concluded based on his own observations and the record that Professor Hascall's teaching met the "excellence" standard set forth in the University Handbook.

229.  Professor Hascall requested that Chancellor Murray's report be removed from her dossier.

230.  Gormley, in his capacity as Dean failed to respond to Professor Hascall's request and the report remained with the materials distributed to the rank and tenure committee and has remained in her dossier that was sent to the University Committee, the Provost and the President.

231.  Upon information and belief, the report is the product of discrimination and retaliation for Professor Hascall's filing a formal grievance with the University as well as the other bases for discrimination set forth herein.

232.  As explained above, when Professor Hascall was appointed as an Assistant Professor of Law at Duquesne University in 2008, the Dean of the Law School made it very clear that Professor Hascall's applications for retention and tenure would be governed by the standards and procedures set forth in the University Handbook.

233.  At that time there was no law school faculty handbook.

234. There was a statement from Dean Emeritus Cafardi from 1999 which described the types of scholarship that could reflect meritorious contribution to the discipline.

235. Although the transition from internal unwritten procedures and standards to Duquesne University's procedures and standards took place after 1999, prior to Professor Hascall's appointment and prior to the evaluation of Professors Antkowiak and Junker's applications for tenure, the 1999 statement was delivered to Professor Hascall by current Dean Gormley for inclusion in Professor Hascall's third year review portfolio.

236. In 2011, after Professor Hascall's third year review, the Law Faculty approved a new handbook.

237. The original draft of that handbook departed significantly from Duquesne University standard procedures, particularly in regard to outside peer reviews of scholarship.

238. The version proposed by the committee which drafted the handbook, [*which interestingly was chaired by Chancellor Murray*], included a provision that did not allow for the tenure candidate to select any of the outside peer reviewers of scholarship.

239. At that time, Professor Hascall argued that the new handbook with all of its variations from the University Handbook should apply only prospectively.

240. This argument was accepted and passed by the faculty.

36

241. Nevertheless, the improper 2011-2012 tenure procedures and standards were retroactively applied to Professor Hascall's application despite the clear conflict, as stated, with Duquesne University standards and procedures which took precedence.

242. In addition, the 2011 Law School Handbook contains a statement regarding the standards for determining the quality of scholarship in the discipline that varies from the 1999 statement Professor Hascall was given in 2010 for Professor Hascall's third year review.

243. This was the standard communicated to the outsider reviewers without Professor Hascall's knowledge.

244. There were other serious irregularities in the selection of the peer reviewers and the contents of Professor Hascall's academic file.

245. Both the peer reviews of Professor Hascall's scholarship and the internal reviews of Professor Hascall's scholarship have been significantly and adversely affected by the failure to properly select outside peer reviewers, the improper and unilateral removal of important scholarly works from the outside peer review portfolios, the transmission of inapplicable language describing the internal standards for quality scholarship, the exclusion from the portfolios of the applicable internal standards and the removal from the portfolios of the applicable University standards and indices of excellence and competence in scholarship.

246. These deliberate and willful deviations from the clear and articulated principles established by Duquesne University for outside peer reviews of scholarship

37

was directed to paper the record in such a way that Professor Hascall's peer reviewers only got a limited opportunity to review Professor Hascall's scholarship.

247. It also forced them to review this scholarship in light of language unilaterally developed in 2011 by the Law School Faculty Handbook which is much narrower in scope than the correctly applicable 1999 language.

248. It also deprived them of the opportunity to evaluate the scholarship in light of the proper and applicable university standards which have deliberately been suspended for application to Professor Hascall.

249. If Professor Hascall had not been subjected to this unwarranted unlawful discrimination, Professor Hascall believes that the outside peer reviews of her scholarship, *which are very much in her favor*, would have been even more positive.

250. The internal peer reviewers were tasked to write individual reports regarding Professor Hascall's scholarship and are required to turn them in to the internal law school tenure committee and the Dean prior to the composition of the main and supplemental portfolios which are compiled by the candidates themselves.

251. This procedure has caused considerable confusion and has also resulted in reports which fail to reflect the record as a whole including the narrative that Professor Hascall wrote regarding her scholarly achievements.

252. Once again, Gormley violated University procedures by requiring the internal reviewers of Professor Hascall's scholarship to compile their reports prior to the submission of Professor Hascall's scholarship portfolio to the committee. The portfolios contained Professor Hascall's narrative regarding her scholarly accomplishments, goals

38

and future plans. It was arranged according to the standards specified by the University Handbook that includes a description of scholarly activities that are to be considered in tenure evaluations.

253. But none of the reviewers specifically addressed the Duquesne University's standards and criteria for excellence in scholarship nor did any of the reviewers address Professor Hascall's book proposal on critical jurisprudence which is soon to be published as a monograph by Ashgate Academic Press.

254. One reviewer did however, address very positively a work in progress that relates to a book on Islamic law as it is practiced in the United States, which Professor Hascall plans to write after she completes the Ashgate book on legal pluralism. Distinguished Professor Barker's report was extremely positive. Professor Barker was the only professor on the three person group tasked with the internal review of Professor Hascall's scholarship to have any background in or knowledge of comparative law. As stated previously, the three professors designated to review Professor Hascall's scholarship during her third year review were overwhelmingly positive. This is especially true of Professor Junker's review. Professor Junker was the only other professor on the faculty besides Distinguished Professor Barker at the time to have any expertise in international or comparative law.

255. The book on Islamic law is a work in progress which also was reviewed very positively by Professor Hascall's internal peer reviewers at the time of Professor Hascall's third year review.

Appx196

256. Because the external and internal reviewers overwhelmingly did not review important materials reviewed during Professor Hascall's third year review or reference any of the applicable university standards, Professor Hascall asked to have copies of the internal third year reviews of her scholarship attached to her response to the peer reviews of Professor Hascall's scholarship.

257. Gormley, acting in his capacity as Dean summarily and rudely denied this request.

258. Further, in an attempt to cover up the damage inflicted by Gormley requiring the internal peer reviewers to begin reviewing and submitting their written reports of Professor Hascall's scholarship prior to the submission of the dossier containing all her scholarship and the extensive accompanying narrative, the internal peer reviewers were given an opportunity to supplement reports turned in after the complete record of scholarship has been assembled. Upon information and belief, none of the reports were altered following the submission of Professor Hascall's record.

259. As such, Professor Hascall was given no meaningful opportunity to otherwise demonstrate the overall scholarship of her academic work prior to the internal peer review committee had completed its reports and reached their decisions regarding Professor Hascall's scholarship.

260. There were also significant defects in the procedure regarding the selection of outside peer reviewers, the materials provided to those outside peer reviewers and the standards of excellence in scholarship transmitted to the outside peer reviewers.

40

261.   The Dean summarily and for no good reason disqualified two of Professor Hascall's proposed outside peer reviewers.

262.   The first scholar he disqualified was Dr. Werner Menski, a professor of law at the University of London.

263.   Professor Hascall had included Dr. Menski on Professor Hascall's list of peer reviewers because he is a world renowned expert on legal pluralism in general and on *Shari'ah* councils in the United Kingdom of Great Britain and Northern Ireland ("U.K.").

264.   Professor Hascall's forthcoming book is therefore, squarely in his area of expertise and he, unlike Dean Gormley, is uniquely qualified to evaluate all Professor Hascall's scholarship that deals with Islamic law and legal pluralism.

265.   Although Professor Hascall was publically assured by the former Provost, Ralph Pearson, at a training session for professors that international scholars are regularly called upon to review the works of candidates for tenure and that there was no problem with including international scholars in the list of Professor Hascall's peer reviewers, Gormley, acting in his capacity as Dean excluded Dr. Menski from Professor Hascall's list of peer reviewers because in his words, "He does not and has never taught at an American law school."

266.   Provost Pearson approved Gormley's action in excluding Dr. Menski.

267.   Since this boorish and inept justification made absolutely no academic sense, it should properly be regarded as pretextual and therefore deliberately discriminatory in nature.

41

Appx198

268.    Gormley's actions, in his capacity as Dean clearly demonstrated a willful refusal to appreciate or even consider the international and jurisprudential aspects of Professor Hascall's scholarship.

269.    Gormley also, in his capacity as Dean, unilaterally decided to remove all of Professor Hascall's scholarship, besides two or three law review articles, from the materials sent to the outside peer reviewers.  These materials included a book review, a book chapter, the peer-reviewed legal pluralism book proposal accepted by Ashgate, other works in progress, and other works from the peer review file sent to the outside reviewers.

270.    None of the outside reviewers therefore, who were selected, had any opportunity to comment on Professor Hascall's interdisciplinary or legal pluralism research agenda or other academic achievements.

271.    These actions eviscerated Professor Hascall's ability to have her scholarship fairly analyzed and it also clearly set a tone of derision amongst her academic peers.

272.    The other scholar selected for removal from Professor Hascall's list of peer reviewers was Dr. Intisar Rabb.

273.    The Dean removed Dr. Rabb from Professor Hascall's list of peer reviewers because Dr. Rabb, who had recently been appointed as an Associate Professor at New York University, had not yet been granted tenure at the law school.

274.    He therefore apparently concluded that Dr. Rabb could not be an academic leader in the field qualified to review Professor Hascall's scholarship.

42

275.    There is no rule under the University Procedures or past practices that requires the exclusion of a peer reviewer who has not obtained tenure. Other candidates have been allowed to submit for their review materials to scholars who despite not having technically obtained tenure are in fact, leaders in the field and well situated to provide a formal review of the candidate's scholarship. In fact, such a rule would exclude any international scholar from a country that does not follow the American form of tenure appointment.

276.    The exclusion of Dr. Rabb from the outside reviewers was totally nonsensical and without foundation because Dr. Rabb holds a Doctor of Juridical Science ("S.J.D.") in Islamic law from Harvard University and was appointed as a Carnegie Scholar in 2010 for her research on "Islamic Law and Legal Change; The Internal Critique," which examines criminal law reform in the Muslim world.

277.    Dr. Rabb was also appointed to a tenured position at Harvard Law School, even though Dr. Rabb had not yet technically had her appointment at N.Y.U. converted to tenured.

278.    This was an unusual move for Harvard Law School, and reflected the high regard in which Dr. Rabb is held in her field, regardless of whether she had technically attained the status of tenure at N.Y.U. when Professor Hascall submitted her list of proposed peer reviewers.

279.    As stated, theUniversity Handbook sets forth the instructions to the candidates applying for tenure in Appendix B.

43

280.   Professor Hascall followed those instructions to the letter and compiled five notebooks containing materials for the outside peer reviewers.

281.   This was a very long and painstaking process which occupied many hours of Professor Hascall's time and was completed by her without any secretarial support and during finals.

282.   Professor Hascall turned in the four binders to Gormley's Assistant prior to the deadline and left shortly thereafter to teach a course at the University of Köln on Native American sovereignty and federalism.

283.   After Professor Hascall arrived in Germany, she was informed that Gormley, acting as Dean had removed everything from Professor Hascall's peer review files except for the three (or two) law review articles.

284.   Professor Hascall was also informed that Drs. Menski and Rabb had been removed from consideration as outside peer reviewers and was required to submit more names of peer reviewers to Gormley.

285.   Professor Hascall objected to the removal of all the materials from those files, especially the removal of the book chapter published in the book "Droit, Pouvoir et Religion," dealing with the failure of the American legal system to protect the religious rights of Native Americans, the book review published by the American Journal of Comparative Law, and the peer reviewed book proposal for Professor Hascall's forthcoming book on Legal Pluralism.

44

286. Gormley, acting as Dean, despite being entirely unqualified in the area of jurisprudence, unilaterally and without academic justification dismissed these objections, terming these "minor works."

287. Thus, the peer reviewers were only afforded a glimpse into Professor Hascall's scholarship with no indication of the broader scope of Professor Hascall's scholarship focusing on jurisprudence, Islamic law in the West, legal pluralism and indigenous rights.

288. As stated, Gormley has no legal background in any of these areas of legal scholarship and was unjustified in removing them.

289. He did so solely because of his discriminatory animus on the basis of Professor Hascall's age, gender, and Professor Hascall's studies of Islamic religious law.

290. Duquesne University's standards for promotion and tenure include book chapters as indicators of excellence in scholarship.

291. These standards also indicate that book reviews are indicators of effectiveness in scholarship.

292. These standards also allow works in progress to be submitted to reviewers along with published works, and works accepted for publication but not yet in final published form.

293. By removing these materials from Professor Hascall's file, the Dean implicitly and explicitly downgraded these materials in violation of the Duquesne's clear standards and thereby deprived Professor Hascall of the opportunity to have a neutral,

45

outside peer review of materials accepted and regarded under Duquesne's standards to be significant from the standpoint of evaluations of scholarship for tenure.

294. In addition, this narrow *ad hoc* approach, i.e., including only traditional law review articles in the peer review portfolios has never before - and never should be - the practice at the law school.

295. Both professors Antkowiak and Junker were allowed to include non-law review materials in their peer review portfolios.

296. Upon information and belief, no Dean of the Law School has ever had the temerity or intellectual arrogance to remove any materials from the peer review portfolios.

297. Although it may be unusual for a candidate to produce more than required for tenure at the law school -- three law review articles -- this still in no way justifies the unilateral and gratuitous reduction of Professor Hascall's relevant scholarship to a minimum of three (or two) law review articles.

298. The Dean's other justification for the removal of all materials from Professor Hascall's peer review files was based on his claim that it was apparently the practice at other law schools and that Professor Hascall should be treated in the same manner as the clinical professor who was applying for tenure.

299. This argument was complete and arrant nonsense.

300. Professor Hascall's application for tenure was subject to the Duquesne University Handbook standards and procedures which allow for the candidate to

46

submit a wide range of materials within the zone of academic freedom, and indeed this has been the law school practice for many years.

301.   In addition, Dr. Sheppard, one of the peer reviewers, who was selected by the Dean and is himself a dean of faculty scholarship at a major law school, expressed surprise that the additional materials referenced in Professor Hascall's *curriculum vitae* were not included in the set he was asked to review.

302.   As to the second argument, that clinical professors are evaluated under different, less academically stringent requirements for scholarly production. In this case the clinical professor referred to, unlike the Professor Hascall, had not written any scholarship apart from three law review articles.

303.   Even within the context of compression of Professor Hascall's scholarship to law review articles published by American law reviews, a further reduction of the opportunity for the outsider reviewers to give a full review of Professor Hascall's scholarship occurred.

304.   Two of the four outside peer reviewers selected were given only two out of the three law review articles for review.

305.   They were not sent the most recent law review article on social justice in American companies that claim to be *Shari'ah* compliant.

306.   They were sent only the first two articles which deal with comparative death penalty jurisprudence and the law of *qisas* within the discourse of restorative justice.

47

307.   One of these scholars, Dr. Sheppard, noted the lack of materials, obviously having read Professor Hascall's *curriculum vitae*, and took it upon himself to download a copy of Professor Hascall's recent law review article from SSRN.

308.   He assumed it had been left out of the portfolio by mistake.

309.   The fourth peer reviewer was sent all three articles, and concluded that the article regarding social justice, the most recent article, was the most significant of the three.

310.   Interestingly, and it is submitted not without coincidence, it was the particular Professors selected by Gormley, acting as Dean who were coincidently sent only two out of the three law review articles.

311.   In Professor Hascall's peer review portfolio, she also included Duquesne University's standards for scholarship review.

312.   However, in addition to refusing to decline to submit all the substantive material contained in Professor Hascall's portfolio, upon information and belief, the Dean deliberately failed to send the Duquesne University standards.

313.   Instead, Gormley simply sent truncated language from the inapplicable and improper 2011 Law School Faculty Handbook describing meritorious aspects of law related scholarship.

314.   He also did not transmit the 1999 statement of law school expectations for scholarship, which he had insisted governed the review of tenure and third year retention applicants during Professor Hascall's third year review.   He is therefore

48

estopped from claiming that the 2011 standards rather than the 1999 standards applied to Professor Hascall's tenure application.

315.   There are significant differences in the language of the 2011 handbook and the 1999 statement regarding quality of scholarship.

316.        The 2011 law school handbook states in part:

> Legal scholarship is manifested in published form. The principal vehicle is the law review article, but legal scholarship also appears in books published by university or commercial presses. Scholarship may appear in traditional or electronic form. Genuine scholarship is much more than a mere recitation of recent cases, statutory developments or the scholarship of others.  It is the author's unique treatment of case law, statutes and related material as well as a critical analysis of the extant scholarship that scholars in the field regard as a genuine and substantial contribution to the literature. Genuine scholarship unveils new dimensions to the existing conventional wisdom.  The best evidence of whether scholarship achieves this level is generally determined by the reaction of other scholars. Such reactions constitute the critically important measure of one's work.
>
> Textbooks ("hornbooks") constitute genuine scholarship if they not only describe the current law in the area but contain the author's critical analyses of the case law, statutes and related material including concepts from other disciplines and history as well as the perspectives of other scholars. While modern casebooks often contain considerable text material as well as edited cases, statutory and related provisions, they are typically designed to describe the existing and developing law.
>
> Published CLE materials are similarly designed to assist practitioners to understand current developments and are, therefore, essentially descriptive. While these efforts typically do not present radically new designs, they are important contributions if they provide unique learning dimensions that promote an enhanced understanding of existing law. Published book reviews are necessarily descriptive and often contain a critical analysis by the reviewer. Book reviews, however, are generally insufficient indicators of scholarship for tenure purposes. New faculty pursuing tenured appointments are well advised to focus on the creation of published work that manifests a creative advancement of the existing literature.

317. Professor Hascall is not aware if the entire quoted section above was disseminated to the peer reviewers.

318. It is clear only that the third section was included by Gormley acting as Dean, in the peer review portfolios that Gormley assembled in violation of the Duquesne's procedures.

319. As stated, the language of the 2011 faculty handbook was adopted more than three years after Professor Hascall became a professor at Duquesne University School of Law, and the Law School Faculty unanimously agreed in a formal vote at a faculty meeting that the provisions of the Handbook would not be applied to those who had already begun their academic careers prior to the adoption of the handbook.

320. Nevertheless, rather than transmitting the Duquesne University Standards and the 1999 statement, Gormley transmitted the new handbook language in a deliberate attempt to eviscerate the quantity and quality of Professor Hascall's legal scholarship and deprive the outside professors of the standards they were to apply.

321. The new language was both less explicit regarding the number of law review articles required for tenure and was more restrictive in describing the types of scholarship that would be regarded as "quality" scholarship for promotion and tenure.

322. Professor Hascall and Professor Joiner were told repeatedly by Gormley and other members of the faculty that the internal practice had always only required three law review articles for tenure.

323. In contrast with the Duquesne University Standards, which diminish the importance of teaching related materials, the new 2011 standards embraced not

50

only student-oriented materials but also commercial trade book publications giving them an equal value with the more traditional academic scholarly monographs.

324. The 2011 standards also differentiated between scholarship that was considered sufficient or important for tenured members of the faculty and scholarship that was considered sufficient for tenure stream faculty.

325. In addition, book reviews were included as indicators of effectiveness under the Duquesne University Standards which applied to Professor Hascall's application, but were specifically and improperly designated as not being "indicators of scholarship for tenure purposes" in the 2011 statement.

326. It is also important to note that the 2011 language actually discouraged any type of scholarship beyond the traditional law review format for tenure stream faculty and explicitly removed from consideration any form of book review, regardless of whether it contained analysis and regardless of whether published by invitation in a top peer-reviewed law review.

327. The 2011 standards differentiated the types of scholarship deemed important for tenured members of the faculty from that deemed important for tenure stream members of the faculty. This is in violation of the AAUP standards on tenure and academic freedom which are incorporated into the University Handbook which is in turn incorporated into all the contracts Professors have with the University.

328. The 2011 language was also a departure from both the 1999 law school statement and the university standards.

51

329.   Not only were these aspects of the law school faculty handbook at odds with these standards, they are also at odds with the 1940 American Association of University Professors (AAUP) statement on tenure and academic freedom and brought into question the intellectual integrity of the law school as an academic institution.

330.   The AAUP statement on tenure and academic freedom makes it plain that the standards for tenure and promotion must be clearly defined at the time of the first appointment.

331.   When Professor Joiner and Professor Hascall were appointed in 2008, the standards they were given were those contained in the Duquesne University Handbook.

332.   Professor Hascall and Joiner were told to discuss these standards and procedures with Professors Bruce Antkowiak and Kirk Junker, who had then been recently tenured under the University Standards.

333.   Moreover, Professor Hascall and Joiner were provided with Professors Junker and Antkowiak's third year review portfolios to serve as models in compiling their own portfolios.

334.   Both Professors Junker and Antkowiak resigned from the law school after achieving tenure in 2008.

335.   After taking a medical leave of absence, precipitating her extension of the tenure track for one year, Professor Joiner has resigned from the law school as well.

52

336. There have been numerous departures by tenured and non-tenured faculty members from the law school since Gormley was appointed interim and then permanent Dean of the law school.

337. As stated previously, Professors Antkowiak and Junkers' third year review portfolios and their tenure portfolios contained a number of different types of scholarship recognized under the Duquesne University Standards as indicators of excellence or achievement in scholarship.

338. Obviously, they did not contain the 2011 law school handbook language because it had neither been drafted by the committee nor approved by the faculty at that time.

339. Because Professor Joiner was granted a one-year extension of time to apply for tenure, Professor Hascall was proceeding through the tenure process as the first professor to be considered for tenure following the promotion of Professors Antkowiak and Junker.

340. Professor Hascall was also the first professor to go through this process following the improper adoption of the 2011 Law School Faculty Handbook which, as stated, should not control Professor Hascall's application for tenure.

341. Professor Hascall has been told repeatedly over the past six years that she was only required to have three law review articles prior to tenure, a goal which she met and exceeded with additional publications and other indicators of excellence and effectiveness as outlined in the University Handbook.

53

342. The general requirement for three law review articles is set forth in the 1999 statement regarding tenure expectations.

343. The 1999 statement is, however, quite expansive and states that other works that are significant could count as much as any law review article.

344. Professor Hascall's book proposal that was accepted by Ashgate Academic Press is an example of such a work and should be counted.

345. Professor Hascall exceeded the three law review article goal by producing numerous other publications.

346. In addition, Professor Hascall was invited to give numerous scholarly presentations at international, national and local symposia and conferences.

347. These were indicators of her academic excellence and her effectiveness in scholarship that are, according to Duquesne University Standards should be included and consider in the University's decision to tenure.

348. Although Professor Hascall met the expectations of the 2011 standards, the 1999 statement and Duquesne University's own standards, the 2011 statement of standards not being well defined gave Gormley, as Dean of the Law school, an opportunity to sabotage Professor Hascall's academic portfolio in order to ensure that she never got a fair shot at tenure.

349. By way of example, the 2011 statement discussed treatment of case law, statutory materials and relevant scholarship in the field.

54

350. This description seemed to assume that the only scholarship that would be considered meritorious would be scholarship that is based on the American legal system.

351. It did not contemplate scholarship on the topics of international law, foreign law, or comparative legal scholarship.

352. Moreover, it does not seem, at first blush, to embrace as quality legal scholarship either jurisprudence, critical legal studies, legal history or any other interdisciplinary work.

353. For Professor Hascall, one of the great advantages of becoming a law professor was the opportunity to study more catholic issues.

354. Professor Hascall did so by drawing on prior academic experiences and training.

355. In fact, Professor Hascall was hired with the direct expectation that she would move her academic research and study in this direction, and was in fact encouraged to do so by the previous administration of the law school and by faculty colleagues, many of whom have since resigned under Gormley's regime.

356. Even though some academic colleagues of Professor Hascall may have previously harbored a wariness of *Shari'ah* and Islamic law, Muslims and Islam in general, it was not until after Professor Hascall's third year review that this prejudice became manifest – following Gormley's clear and uninformed academic prejudice for this area of legal study.

55

357.    Professor Hascall has had to suffer numerous statements manifesting prejudice towards Islam, Islamic law, Muslims, and Shari'ah both in public and in private by her colleagues and those designated to review her scholarship in the law school.

358.    Notwithstanding this restrictive and improper anti-intellectual atmosphere, Professor Hascall persisted with her scholarly agenda and added new dimensions to her scholarship which, had she been evaluated fairly, and not being a victim of discrimination, would have positively reflected on her academic prowess.

359.    Professor Hascall strongly believes in academic freedom and the importance of comparative and interdisciplinary work.

360.    Most scholars in the academy share this view.

361.    Although, as explained more fully below, there have been strong indications that a minority of Professor Hascall's colleagues are hostile to this type of scholarship in general and to Islamic law in particular, Professor Hascall nonetheless continued to exercise her academic freedom develop her scholarship along these lines.

362.    The Dean selected three members of the faculty to review Professor Hascall's scholarship; Distinguished Professor Robert Barker, Professor Jan Levine, and Professor Jane Moriarty.

363.    Of this group, only Professor Barker has any background in comparative law, law and religion, international law, foreign law, or jurisprudence.

364.    His review of Professor Hascall's work was very positive.

365.    Professor Levine is well known as a research and writing professor.

56

366.   This is a type of pedagogy that is taught to law students to prepare them for the daily practice of law. He is not, and has never been a doctrinal instructor. Professor Levine knows nothing about comparative law and has demonstrated overt hostility to international law and the international programs at the law school.

367.   Jane Moriarty was hired by the faculty only two years ago and writes about neuroscience, evidence and trial procedure. Professor Moriarty came to Duquesne after serving as a professor at Akron School of Law.  She is a long term friend of Gormley. After she was hired by the faculty as a tenured professor, Gormley created a new title and position for her, "Dean of Faculty Scholarship" and "Chair" of scholarship.

368.   The law school has never had a "Dean of Faculty Scholarship" or "Chair" of scholarship before.

369.   The faculty was not consulted about the addition of this new "Deanship."

370.   Of all the peer and internal reviews penned by the internal committee of peer reviewers, Professor Moriarty's review is so overwhelmingly negative and full of vitriol that it is patently obvious, even to a layperson, that with respect to Professor Hascall, she is nothing more than a partisan and vicious tool of Gormley.

371.   When Professor Moriarty first came to the law school, she expressed her enthusiastic opinion about the excellence of Professor Hascall's scholarship. In fact, she suggested during the first formal meeting between Professor Hascall and herself that the law school should plan and host a symposium on the so-called "Arab Spring." Professor Hascall agreed that this would be a great idea and mentioned that she had been in contact with the Pittsburgh Middle East Institute and that they wanted to

57

support Islamic and Middle Eastern Law programs at Duquesne. In fact, that institute had contacted Professor Hascall the year before about funding a center for the study of Islamic and Middle Eastern law at the law school. However, when Professor Hascall reached out to the institute, she was chastised by Professor Moriarty for doing so, eviscerating any possibility of working with the institute in the future.

372.    When Dean Guter was still the Dean of the law school, he told Professor Hascall that he wanted to form a center for the study of Islamic and Middle Eastern law at Duquesne and that she would be the Chair of the Center. Dean Guter was fired soon after that conversation.

373.    The next year, the Pittsburgh Middle East institute contacted Gormley about funding a Center for the study of Middle Eastern and Islamic law at Duquesne. Gormley told them to talk to Professor Junker who was visiting from Germany. Professor Junker told Professor Hascall to communicate with the Institute about this possibility. However, the opening communications by Professor Hascall, and the very idea of such a Center were met with hostility and contempt by Professor Junker and Gormley, embarrassing Professor Hascall and ruining any possibility of a Center funded by the Institute. They wouldn't even take a meeting to discuss the idea.

374.    Many other tenured and non-tenured professors have been provided law school funds to showcase their scholarship either with or without outside funding through conferences and symposia at the law school. There are now a number of "chairs" and centers recognized by the law school.

58

375. Professor Oliver, a male, was given a title and a "Center" for the study of criminal law.

376. Professor Ledewitz hosted a symposia designed to highlight his book at Duquesne.

377. Professor Levine hosts at least one national seminar each year for research and writing Professors.

378. Professor McCants-Lewis, a tenure stream clinical professor younger than Professor Hascall has had several opportunities to spotlight her chapter in a book on Trayvon Martin.

379. Professor Hascall has been given none of these opportunities. All attempts to highlight Native American law have been subjected to severe criticism, diminished or hijacked in order to spotlight other faculty members. Her academic achievements are regularly not even mentioned at faculty meetings during the "scholarship report" by Moriarty, or downgraded if they are mentioned. This due to the direct interference of Gormley and is motivated by his discriminatory animus towards Professor Hascall.

380. Professor Moriarty also did an about face on her assessment of Professor Hascall's scholarship. Despite several formal reviews of Professor Hascall's scholarship which were extremely positive overall and which included the three law review articles submitted in the tenure dossier and reviewed by Moriarty, she took the opposite position when reviewing Professor Hascall's scholarship for tenure.

381. It is submitted, on information and belief, that Prof. Moriarty is acting on the orders of Gormley, in his capacity as Dean and possibly also, manifesting against

59

Professor Hascall her own irrational fear and bias against the study of Islam and *Shari'ah*.

382. In fact, she has expressed such a bias both privately and publicly on a number of occasions.

383. It is to obviate this kind of bias that a reputable Law School utilizes independent and external peer reviewers to objectively review academic achievement.

384. The external peer reviews of Professor Hascall's work were excellent.

385. This provides further indication that Professor Moriarty's outlying report is not based in any way on the merits of Professor Hascall's work.

386. Professor Hascall requested that Moriarty's report be removed from her file, but Gormley failed to respond to that request.

387. Professor Moriarty repeatedly has taken Professor Hascall to task for not criticizing Islamic law as a legal system in Professor Hascall's work when she knows nothing about it.

388. In particularly, she has brought up the controversial punishment of stoning for the crime of *zina* (adultery) at least four times, which has never been addressed by Professor Hascall and has absolutely nothing to do with Professor Hascall's work.

389. On September 6, 2013, she pointed out again that Professor Hascall does not focus in her writing on the "negative aspects of Islamic law," but stated that she had to go to a meeting before Professor Hascall had a chance to explain some of the fundamental misconceptions about Islamic law.

390.    Professor Levine made similar comments in his review of Professor Hascall's scholarship.    On information and belief, Professor Moriarty met with Levine to influence his opinion of Professor Hascall's scholarship prior to his writing a negative report of Professor Hascall's scholarship, which is in an area completely unfamiliar to him personally or to him as a pedagogical instructor in general.

391.    Many of these misconceptions about Islam and *Shari'ah* are opportunistically promoted by the media, influenced by the cruel and often unjust application by a minority of Islam of a system of law that is over 1400 years old and incorporated to some extent into the law of over 30 nations today.    Academics should be more cautious before judging a fellow scholar's work based on this kind of information.

392.    Professor Hascall has attempted to explain to Professor Moriarty that the great consensus of scholars, legislators, religious leaders, and Muslims do not, in general, endorse such practices.

393.    To understand why stoning is not generally considered an appropriate punishment for *zina*, Moriarty would have to first understand the basics of Islamic jurisprudence instead of inveighing stereotypically against it, against Professor Hascall's work, and against Professor Hascall as an individual.

394.    Indeed, it is Moriarty who has engaged in an intellectual stoning of Professor Hascall, even having the temerity to suggest that Professor Hascall is somehow intellectually biased by asking her twice, during academic review sessions and asking at other times if she had "converted to Islam" (which Professor Hascall has not done) and which, in any event, is none of Moriarty's business.

61

395.   It is submitted that was entirely unprofessional and ostensibly unlawful to ask about Professor Hascall's religion as if that would have some logical bearing on the intellectual rigor of Professor Hascall's academic achievements.

396.   Upon information and belief, Professors Levine and Barker were provided, well in advance of the deadline for writing their reports, Professor Hascall's castrated portfolio.

397.   It is submitted that the submission of any portfolio before the deadline is not in keeping with either the letter or spirit of Duquesne University Procedures. Neither is it in conformity with the general practice in other schools at the University.

398.   There was significant evidence of scholarly excellence and effectiveness contained in Professor Hascall's portfolio before it was cut apart and censored by Gormley.

399.   It is submitted that if Professors Barker and Levine had been able to review the full body of Professor Hascall's work and academic achievement in a timely manner prior to the false and improper deadline for their reports insisted upon by Gormley and later Professor Ledewitz, their analysis would have been more complete and had Professor Levine not been influenced by Gormley and Moriarty his report would not have been so negative.

400.   However, as stated, Gormley, acting as de facto Judge and Jury in scholarly matters he knew nothing about, removed and refused to submit everything from Professor Hascall's external peer review file except for two or three law review articles and then attempted to justify it by inserted the 2011 language from the Law School

62

Handbook taking pains to avoid submission of Duquesne University Standards which conflicted with the improper standards unilaterally and gratuitously imposed on Professor Hascall by Gormley.

401. Additionally, and in clear violation of Duquesne University's rules Gormley, acting confidentiality, also removed items from a binder that contained Professor Hascalls student evaluation and peer review information.

402. It is submitted that Gormley did so as to further prejudice Professor Hascall in the eyes of her peers and to further dilute her record.

403. Duquesne requires the candidates from third year review and tenure to compile two binders which constitute the dossier.

404. The first binder contained scholarly writings, a C.V., and other supporting materials.

405. The packet was supposed to be made easily available to the rank and tenure committee since it did not contain confidential material.

406. The second binder contained student numerical evaluations and peer evaluations of teaching and scholarship.

407. This second binder was supposed to be kept in a secure location and only members of the tenure and promotion committee were entitled to see it *during the time of review only*.

408. However, Gormley, acting as Dean willfully distributed parts of the confidential packet to individual members of the committee in clear violation of the ethical rules of Duquesne.

63

Appx220

409. He similarly violated the confidentiality rules during Professor Hascall's third year review.

410. Professors Antkowiak and Junker were never subjected to these blatant violations of the rules.

411. Gormley violated the rules and procedures for the evaluation of tenure candidates by directly contacting tenured members of the law school promotion and tenure committee to denigrate Professor Hascall and attempt to sway their votes against her. On information and belief, some of these contacts were made through a University owned cell phone.

412. In addition, the night before the Law Faculty was to vote on Professor Hascall's application for tenure, the Dean sent an email to the members of the rank and tenure committee.

413. In that email he announced that he would be departing from well-established past practices and that he would not be informing Professor Hascall whether she had gained a majority of the faculty's support for her application for tenure.

414. In the past, Law School Deans have always congratulated the candidate either in person or on the phone following the faculty vote.

415. Other members of the faculty also call the candidate to offer support and congratulations.

416. In fact, the prior Dean had a party in the faculty lounge to congratulate Professors Antkowiak and Junker following their positive votes.

64

417.    Nevertheless, in that e-mail, the Dean also warned other faculty members not to communicate with Professor Hascall about the vote. In addition to inflicting great distress on Professor Hascall and treating her in a way different from other tenure candidates, this was an attempt to cover-up his communications with faculty members regarding Professor Hascall's application for tenure and hobble any future attempt she might make to claim a grievance should the vote not be in her favor. It also served to isolate her from her colleagues – as they were under threat now of a charge of an ethical violation if they were suspected of communicating with her.

418.    The isolation continues to this day.

419.    Laughably, Gormley claimed that he created this new rule in an attempt to "scrupulously" follow the University rules regarding confidentiality.

420.    Unlike the candidates who have gone before, Professor Hascall was not permitted to know the outcome of the faculty vote. Professor Hascall was not officially informed about the outcome of the vote until the grievance committee submitted its conclusions – only two months ago.

421.    The faculty was divided on the vote. The final tally was 9 to 7. In clear violation of University and Law School procedures, Gormley submitted his vote in the final tally.

422.    Gormley met with Professor Ledewitz in his office for one hour the day before the faculty vote. It is here suggested that this meeting was designed to ensure that the wrong standards (2011) were used during the faculty discussion prior to the vote and to

65

ensure that Professor Ledewitz would vote against Professor Hascall's tenure application.

423. The next step in the tenure process was the submission of the dossier, the faculty vote, the Dean's letter (which of course recommended against tenure) to the University Promotion and Tenure Committee.

424. The University Promotion and Tenure Committee ("P&T Committee") is composed of faculty members from every school at the University. They are charged with taking a fresh look at the materials and recommendations brought to them regarding applicants for tenure and promotion.

425. Although the P&T committee always has a member of the committee that comes from the school or department as the candidate under review, precaution is taken to ensure the independence of the committee by not allowing that member to vote as to that candidate, however, that member may choose to participate in the discussion.

426. The University P&T committee, like the outside peer reviewers, is supposed to be a neutral body, not influenced by internal politics of a department or the threats, bribes and bullying of a chair or dean.

427. The University P&T committee voted to recommend Professor Hascall for tenure despite the divided faculty vote and Gormley's recommendation against Professor Hascall. The vote was 8 to 3.

428. The chair of the P&T committee was Provost Austin. He recommended against granting Professor Hascall tenure in his report to the President.

Appx223

429.    Professor Hascall filed her original EEOC complaint shortly after the faculty vote. She also filed a grievance and asked the process be halted due to the skewed record and many procedural violations and discriminatory actions taken against her.

### *RETALIATION*

430.    After filing her original EEOC complaint, Dean Gormley and Chancellor Murray willfully and deliberately retaliated, setting out to scuttle any chance of tenure that Professor Hascall might have.

431.    First, Gormley, in his capacity as Dean, sent a letter to the entire faculty regarding the confidentiality of the rank and tenure process stating that he wished to scrupulously follow the rules.

432.    All deliberations were to be held in the utmost confidence in accordance with the Duquesne University Faculty Handbook

433.    Instead of adhering to these rules, Gormley had improper private conversations with members of faculty about Professor Hascall in order to solicit negative votes from the faculty against her, prior to any faculty meeting to deliberate her tenure.

434.    This was done in direct violation of the rules and deliberately choreographed to deny Professor Hascall a fair process on the merits.

435.    As a direct consequence of Gormley's retaliation, interference and deliberate disregard of the rules, as stated, Professor Hascall was improperly and illegally denied tenure.

67

436.    Second, Duquesne University deliberately contacted a class Professor Hascall taught, solicited the students, poisoned her reputation, and choreographed thereby a slew of poor student evaluations in order to show that Professor Hascall was "a bad teacher."

437.    Without Duquesne's direct and improper interference, the students would never have written these poor evaluations.

438.    Third, the Indian law panel, which Professor Hascall had taken a great deal of time to put together as a continuing legal education course and which would have given her and the Law School a degree of prestige, was expunged by Gormley for no reason.

439.    It was held the next year (October 2014), but Professor Hascall was continually harassed and intimidated and spoken to in demeaning and hostile terms by the staff person in charge of the CLE programs. This was a direct result of Gormley's interference with the program and pattern of denigration of Professor Hascall not only to faculty members but now also to staff and students. Additionally, Professor Hascall, as the advisor to the Indigenous Law Society (which Professor Hascall presented to the faculty for acceptance and was met with a prepared written statement against the formation of the group) was also involved in the planning of an event involving the attorney representing Native American plaintiffs in a case against the Washington Redskins. She was treated with the same disrespect and hostility by  staff planning this event as she was for the Native American Law panel. In addition to refusing to communicate with Professor Hascall about the event, Professor Hascall was excluded

68

from the dinner after the event with the speaker. Professor Rooksby, a younger male and advisor of the Intellectual Property student organization was asked to take out the speaker. The Indigenous Law Society members and Professor Hascall had decided to ask that group and the Sports Law Society to co-sponsor the event. However, only Jacob Rooksby as the faculty advisor to the Intellectual Property group was invited to the dinner. He took a friend of his who is not a professor or a student at Duquesne. The group also included the students presidents of the three student groups involved. He was also given several minutes to make an "introduction" of the speaker and the intellectual property aspects of the case. Professor Hascall was not invited to participate in any way. Her exclusion was obvious to the speaker, the students and to her son who were present in the hallway after the event to have pictures taken.

440.    Fourth, Professor Hascall was invited to participate in the European Study Abroad program referenced above and was named co-director of the program and as such had the responsibility of promoting the program, teaching a course at the University of Köln, and supervising the visiting students from the University of Köln the following fall.

441.    Although it has always been the practice that faculty members who have participated in such programs also participate in events connected to the promotion of such programs, Professor Hascall was, as stated, deliberately excluded from all such events.

442.    In fact, Professor Hascall is the only member of the Duquesne University School of Law to have participated in the European Study Abroad program.

Appx226

443. Nevertheless, rather than have Professor Hascall present at promotional events to talk to the students or to make public comments, two student assistants who had gone on the program in the past were instead invited to speak at these events.

444. Gormley, in his capacity as Dean, even flew Kirk Junker's assistant in from Germany, an employee of the University of Köln, so that he could discuss the program with him rather than with Professor Hascall.

445. The absence of Professor Hascall at the very program, in which she was so involved and so important, as a matter of surprise and consternation among the students who had been in the program the previous year, and caused Professor Hascall thereby, significant embarrassment and emotional distress.

446. Associate Dean, Nancy Perkins was the co-director of that program for the following year. However, she did not go to Germany and instead, Gormley selected a clinical Professor to attend. That professor has not been excluded from any promotional events this year.

447. Professor Hascall's exclusion from these events was the direct result of her and of Dean Gormley's interference and was in retaliation for Professor Hascall's filing of an EEOC complaint.

448. In addition, Dean Gormley and Nancy Perkins have continually interfered with Professor Hascall's committee assignments, denied her application for leadership and administrative positions, callously allowed abusive behavior towards her in committee meetings, sent harassing and condescending e-mails to her and downgraded her elective courses, all in an attempt to diminish her record and her status as a

70

member of the Duquesne University faculty and later in retaliation for her filing of a complaint with the EEOC.

449. Fifth, Duquesne University was supposed to provide an avenue for internal and ostensibly objective investigation into claims of discrimination.

450. Prior to her denial of tenure, Professor Hascall attempted to utilize this procedure by filing a complaint with the Affirmative Action Office.

451. Judith Griggs, the Affirmative Action Officer, refused to consider her complaint.

452. The reason given she gave was that Duquesne has a "policy" against beginning or continuing any investigation into claims of illegal discrimination once the claimant has filed a complaint with the EEOC or with any outside agency.

453. Professor Hascall asked for a copy of the written policy and it was provided to her.

454. The policy clearly reflected Duquesne University's blanket policy of retaliation by refusing to investigate any allegation of discrimination after it has been filed with any state or federal agency.

455. It is submitted that Duquesne's policy of refusing to independently investigate accusations of discrimination, simply because a victim has filed with an outside agency, is itself a policy of retaliation for engaging in protected activity.

456. As a consequence of this discriminatory policy, Professor Hascall was deprived of any avenue at Duquesne to remedy we even communicate the discrimination and retaliation she had suffered and continue to suffer.

71

457. The internal grievance committee, to which Professor Hascall also asked for assistance prior to the denial of her tenure also had a purported blanket policy of not considering any aspect of a tenure denial in any case involving discrimination.

458. The grievance committee is composed of members from the various schools at Duquesne, much like the P&T committee.

459. The faculty member representing the law school was Joseph Mistick. Professor Hascall suggested that Professor Mistick exercise his discretion to not participate in the discussion of the committee because upon information and belief, Professor Mistick was one of the professors Gormley contacted in advance of the faculty vote and convinced to vote against Professor Hascall.

460. Professor Mistick recused himself from the committee. This was an unusual and unnecessary step considering that he could not vote on the grievance matter and only had the option of participating in the discussion.

461. Unbeknownst to Professor Hascall, the law school's alternate on the grievance committee was Professor Fisfis. Professor Fisfis was also the law school's representative on the P&T committee. Professor Fisfis and others had served simultaneously on both committees in the past with no objection. In fact, the faculty as a whole, including non-tenured faculty with voting rights, have always elected these representative of the law school faculty to these committees in the exercise of their faculty rights to self-governance.

462. In an unprecedented and obviously self-serving move designed to interfere with the composition of the grievance committee and manipulate their decision,

72

Gormley called a special closed-door meeting of the law school's internal promotion and tenure committee after a faculty meeting. The law school's internal promotion and tenure committee consists of all tenured faculty with a right to vote on tenure applications. The subject of the special meeting of the law school's promotion and tenure committee meeting was not made public. Professor Hascall did not know what this meeting was to be about.

463. The special meeting of the law school's promotion and tenure committee was about the eligibility of Professor Fisfis to serve on Professor Hascall's grievance panel.

464. Gormley insisted that Professor Fisfis was unqualified because he had previously served on the University P&T committee which had overwhelmingly endorsed Professor Hascall's application for tenure despite the divided faculty vote and Gormley's recommendation against tenure.

465. Professor Fisfis recused himself from participating in the grievance committee proceedings following (upon information and belief) a faculty vote against his participation in the grievance proceedings.

466. The law school was left with no representative on the grievance committee.

467. Professor Nolfi from the university library staff, with whom Professor Hascall had served on the University Academic Outcome Learning Assessment Committee for many years also recused himself from the grievance committee.

468. Professor Hascall is unaware of the basis for his recusal and was not informed in advance that Professor Nolfi would be recusing himself.

469.   Oddly, even though Professor Mistick had recused himself from the grievance committee, the committee chose to interview Professor Mistick.   Professor Mistick attended and submitted a peer review for Professor Hascall's critical jurisprudence class (Emerging Legal Systems) and it was glowing and outstanding.  Professor Mistick also participated in an international symposium at the law school with Professor Hascall making closing remarks to the audience.  He was extremely complimentary to Professor Hascall both publically and privately about the experience of working with her on the closing remarks.

470.   The grievance committee has few if any procedural guidelines in place to guide a professor seeking redress for anything, including a denial of tenure.

471.   Although Professor Hascall submitted a long list of witnesses for the committee to interview who would verify her assertions, the committee chose to interview only a fraction of those witnesses.

472.   The grievance committee, however, interviewed all of Gormley's witnesses, including all those who had been named in Professor Hascall's EEOC complaints.

473.   Although Professor Hascall asked the committee for a deadline for the submission of the mountains of documents and other evidence to support her claims, the committee assured her that there was no set deadline and to "take her time."

474.   Professor Hascall attempted to supplement the record with hundreds of pages of supporting documents shortly before she left for Europe last summer. This request was denied as not being timely.

74

475.   The President of the University sent Professor Hascall a scant letter telling her that she had been denied tenure in March of 2014.  No reason was given.

476.   The AAUP has sent two letters informing Duquesne and its President that failing to provide a denied candidate for tenure with any reason whatsoever for that denial is out of line with the AAUP standards on tenure and academic freedom.

477.   Duquesne has failed to respond that those letters.

478.   Shortly after the President's denial of her tenure, Professor Hascall received a competitive $6,000 grant to conduct research in Europe for her book on legal pluralism.   The grant is entitled the "President's Scholarship Award Grant." The committee that evaluates the scholarship submitted by faculty members is composed of faculty from across the University.  Professor Hascall's proposal was so highly regarded that there was no discussion of her application. The committee was unanimous in its support for her application for the grant.

479.   The grievance committee is only supposed to consider issues of procedural error.

480.   The grievance committee went far beyond that and interviewed witnesses regarding the teaching, scholarship and service of Professor Hascall.

481.   Professor Hascall asked the committee for a chance to respond to this testimony.

482.   The committee denied Professor Hascall, who still did not know the details of the denial of her tenure application, that chance.

75

483.   The actions of the committee in failing to interview the majority of Professor Hascall's witnesses, their refusal to allow her to submit material evidence to support her claims, and their going beyond their own stated jurisdiction to review the merits of her claims also constitute illegal retaliation for the filing of EEOC complaints, and violated her rights to due process protected by the AAUP statement on academic freedom and tenure as incorporated into every contract the University has with its professors.

484.   The Provost also denied Professor Hascall's request to allow for any objective or neutral investigation into her claim pending a final decision by Duquesne to deny her application for tenure.

485.   Sixth, Provost Austin has retaliated against Professor Hascall for her filing a claim with the EEOC in a number of ways, evincing a callous disregard for Professor Hascall's rights under statutory law in general and her rights as a member of the Law Faculty at Duquesne University, in particular.

486.   One of Provost Austin's duties was to oversee that the proper tenure processes were followed in strict accordance with Duquesne University's handbook regarding applications for retention, promotion and tenure.

487.   The Provost chaired the University Committee which is made up of members from the various schools at Duquesne.

488.   He is also charged with writing a recommendation to the President regarding applications for tenure.

489.    As alluded to previously, at the University, the tenure process begins with the candidate composing a dossier which includes a long narrative written by the candidate explaining the candidate's accomplishments and the progress the candidate has made concerning the goals set forth by the University which are clearly delineated in the University Handbook.

490.    The candidate also compiles information regarding peer reviews of teaching, the numerical scores from the student surveys, other indicators of teaching excellence and effectiveness, all scholarly works and a list of other scholarly activity and service to the University.

491.    The candidate also compiles a list of possible and qualified outside peer reviewers of scholarship and prepares a packet of scholarship for those reviewers to consider.

492.    Professor Hascall made Provost Austin aware of the very serious shortfalls involving the procedures that were followed in respect of Professor Hascall's application for tenure.

493.    As stated, Gormley, acting in his capacity as Dean, deliberately and for the sole purpose of retaliation and discrimination, excluded several scholars from Professor Hascall's list of outside peer reviewers.

494.    Gormley also manifesting the same discriminatory and vicious animus, expunged without justification numerous examples of Professor Hascall's scholarship so that Professor Hascall's outside peers never got to see them.

77

495.   Gormley abused, violated and disregarded the confidentiality standards in the Duquesne University Handbook by copying and then distributing confidential information to members of the Law School Faculty – an act that was also in clear violation of the ethical standards of Duquesne.

496.   In addition, Dean Gormley insisted that the faculty and outside peer reviewers apply the wrong statement of law school standards of scholarship to Professor Hascall's application; a standard that was created long after she was hired and a standard different from the one used during her third year evaluation.

497.   Provost Austin was also aware that the proper procedures for peer evaluation of Professor Hascall's teaching were disregarded.

498.   Upon information and belief, Provost Austin was aware of these problems with Professor Hascall's application because he sent a letter to all faculty and to law school administrators informing them of Professor Hascall's EEOC complaint, and also told Dean Gormley to depart from the well-established practice of informing a candidate of the outcome of the faculty level vote or having any communication whatsoever with Professor Hascall regarding the tenure application process.

499.   Provost Austin was also aware of these problems with Professor Hascall's application process because Professor Hascall wrote to him and asked him to put the process on hold pending the outcome of the internal investigations of the Affirmative Action Office and the Grievance Committee.

500.   Professor Hascall specifically referenced the problems with her academic file as it had been willfully interfered with by Gormley, in his capacity as a Dean, and stated that any decision based on this diluted file would be improper.

501.   Professor Hascall raised many of these issues in her response to the letters written by the internal law school committee, which was detailed with reviewing her application for tenure and reporting to the faculty as a whole at the time of the faculty vote.

502.   Professor Hascall sent a copy of her EEOC complaint to the Provost and to the grievance committee and received the surprising response that Professor Hascall's case was not yet ready for a grievance.

503.   The Provost's refusal to halt the process and deny Professor Hascall an opportunity for an objective internal review of the procedures leading to a skewed record was another direct act of retaliation against Professor Hascall for the filing of her EEOC complaint.

504.   In addition, and most significantly, although the Provost had denied Professor Hascall's request for a neutral, objective internal investigation into her claims, the Provost then, in a transparent attempt to invest Duquesne's conduct against the Professor Hascall with some kind of justification, conducted his own, one-sided investigation into the allegations contained in her complaint.

505.   He allegedly called "decision-makers" to his office one at a time in the administration building to question them about Professor Hascall's allegations.

506. Upon information and belief, these "decision-makers" included Dean Gormley, Nancy Perkins and certain members of the subcommittee charged with making a report regarding Professor Hascall's application for tenure to the law school faculty.

507. Upon information and belief, these "decision-makers" would also have included Jane Moriarty and John Murray.

508. Upon information and belief, the "decision-makers" also included Bruce Ledewitz, who was named as the chair of the subcommittee and charged with making sure the University Procedures were followed.

509. However, the Provost knew which "decision-makers" to avoid; those who supported Professor Hascall's claims and her tenure application were never called to give information.

510. Significantly, Professor Hascall was never contacted to give information regarding her claims.

511. As a result of the tainted investigation, which was one-sided, prejudiced and deliberately designed as a fig leaf to cover the embarrassing and unlawful conduct of Duquesne, the University never took Professor Hascall's claims of discrimination seriously, never manifested or properly enforced their so-called policy against discrimination and continued, by virtue of this whitewash, to retaliate against her depriving her thereby of any further internal vehicle for relief from the ongoing pattern of retaliation and discrimination.

Appx237

512. Professor Hascall ended up in an even worse position then she would have been if she had not filed a grievance or reached out to Provost Austin. Provost Austin was the Chair of the University Tenure and Promotion Committee, and is charged with writing his own recommendation regarding Professor Hascall's tenure application, thereby making him in the process an interested party and an important "decision maker."

513. Professor Ledewitz (hereinafter referred to as 'Ledewitz') also failed to follow the proper procedures under Duquesne University Standards by allowing Gormley, in his capacity as Dean, to improperly influence Professor Hascall's tenure process.

514. Despite having personally observed Professor Hascall's classes and given her excellent reviews of her teaching, Ledewitz at the faculty meeting where Professor Hascall's tenure was discussed, made an "about face" and denied his own observations, deferring to the illegally generated report of Chancellor Murray, who he sycophantically referred to as our "most distinguished colleague."

515. Upon information and belief, after being challenged by Dean Emeritus Cafardi regarding his evaluation of Professor Hascall's teaching, Chancellor Murray stated that "had he had the opportunity to observe more of Professor Hascall's classes, he might have come to a different conclusion. Of course, as a member of the internal peer review sub-committee, Chancellor Murray was not allowed to review in person any of Professor Hascall's classes, was supposed to base his review on the record, which he did not in violation of the University procedures.

Appx238

516.   Upon information and belief, Ledewitz's "about face" can be explained by Gormley's promise to install him as the new Associate Dean of Academic Affairs for the 2014-2015 academic year, a highly compensated and prestigious position.

517.   In sum, this one-sided investigation was done in callous, reckless and malicious disregard for Professor Hascall's rights as a member of the Duquesne University faculty and in clear retaliation for her filing of an EEOC Complaint.

518.   In addition to engaging in an improper one-sided investigation into the claims set forth in her EEOC complaint and in failing to halt the process pending the outcome of the investigation by the EEOC, the grievance committee and the Affirmative Action Office, Provost Austin nonetheless wrote his recommendation against Professor Hascall's tenure application in full knowledge that Professor Hascall's application harbored serious and deeply rooted irregularities both procedurally and substantively. And with full knowledge that the University P&T Committee, which he chaired, had voted overwhelmingly in favor of Professor Hascall's tenure application.

519.   The actions of Provost Austin, as set forth above, are informed and supported by the following facts.

520.   Professor Hascall first met Provost Austin at a meeting of the University Graduate Council.

521.   Professor Hascall has served on that University Committee for a number of years.

Appx239

522. Provost Austin came to a meeting in or around the fall of 2013 to introduce himself to the committee and to discuss his vision for the University and goals for the Committee.

523. As a part of that meeting the participants went around the table introducing themselves.

524. When Professor Hascall introduced herself, Provost Austin showed surprise and recognition when she mentioned her name.

525. He later stated that he had already heard of some of the participants.

526. Upon information and belief, the President and/or Gormley had already briefed Provost Austin about the Professor Hascall and had made negative and defamatory statements besmirching her.

527. Nevertheless, Professor Hascall had a very pleasant exchange with Provost Austin at that meeting regarding her work on another University Committee, the Interdisciplinary Committee.

528. Professor Hascall also mentioned that she had put together a joint degree program for a J.D. and an M.A. in Philosophy, which was in the process of being approved by the University Interdisciplinary Committee.

529. Professor Hascall also introduced him to her son at that meeting and welcomed him to Duquesne.

530. Provost Austin also visited a meeting of the University Interdisciplinary Committee.

531. At that meeting Professor Hascall presented her proposal for a joint J.D. /M.A. in Philosophy.

532. There were pleasant exchanges and conversations at that meeting.

533. Professor Hascall had no further contact with Provost Austin until shortly after Professor Hascall had filed her EEOC complaint.

534. This occurred at the first faculty meeting after the meeting where the faculty voted on Professor Hascall's tenure.

535. At the first faculty meeting following Professor Hascall's filing of the EEOC complaint, the Dean had invited Provost Austin and President Dougherty to attend the meeting to discuss the state of the Law School and the University.

536. As Professor Hascall entered the room where the faculty meeting was to be held, she noticed Provost Austin sitting at the head table.

537. She approached the table to greet Provost Austin.

538. He turned his head away from Professor Hascall and refused to greet her.

539. Professor Hascall sat in the front row directly across from Provost Austin at that meeting.

540. Except for the few times he addressed the group as a whole, Provost Austin unrelentingly glared directly at the Professor Hascall with an expression of extreme rage and hatred.

541. Professor Hascall was intimidated by this experience.

Appx241

542.    Professor Hascall was also scared and experienced anxiety as a result of this unrelenting non-verbal assault by the Provost who, as a University official would be making a recommendation regarding her tenure application.

543.    Other faculty members noticed Provost Austin's behavior toward the Professor Hascall at that meeting.

544.    Provost Austin's attitude towards Professor Hascall was clear retaliation for her protected activity in filing a discrimination complaint with the EEOC.

545.    In addition to the horrible experience of being glared at in an aggressive and intimidating way throughout the meeting, President Dougherty spent much of the meeting praising Gormley.

546.    This made Professor Hascall particularly uncomfortable since she had just filed her EEOC complaint and knew of three other law suits involving Ken Gormley based on sexual harassment and retaliation, gender discrimination and racial discrimination.

547.    The excessive amount of praise these men showed towards each other made Professor Hascall realize that none of her claims would ever be taken seriously, and that they would do whatever was necessary to protect each other.

548.    The next interaction Professor Hascall had with Provost Austin was at the Law School Christmas party.¶

549.    Dean Gormley had invited Provost Austin as well as a new university administrator, Dr. Beaupre.

Appx242

550.    Professor Hascall saw Dr. Beaupre standing by himself and went over to introduce herself.

551.    Professor Hascall and Dr. Beaupre had pleasant conversation and she welcomed him to Duquesne.

552.    Professor Hascall talked to Dr. Beaupre about living in Pittsburgh, his family and other innocuous topics.

553.    Dr. Beaupre then asked if Professor Hascall had the opportunity to meet the new Provost, to which she responded that she had.

554.    At that moment Provost Austin, returning from the bar area which was only a few feet away from Professor Hascall and Dr. Beaupre, looked in their direction.

555.    Professor Hascall and Dr. Beaupre turned towards Provost Austin expecting him to greet them.

556.    However, Provost Austin turned his head away from Professor Hascall and from Dr. Beaupre and walked right past them, less than a foot away.

557.    Professor Hascall and Dr. Beaupre then turned back and looked at each other with surprise.

558.    These interactions made Professor Hascall reluctant to contact the Provost about her case.

559.    The rudeness and hostility shown to Professor Hascall by Provost Austin following the filing of her EEOC complaint, was in stark contrast to his behavior to her prior to that and clearly constitutes retaliation for engaging in protected activity.

Appx243

560. Provost's Austin's change in attitude further supports Professor Hascall's claims of the more egregious retaliation that occurred when he refused to consider halting the tenure process until an objective evaluation of Professor Hascall's claims regarding the discriminatory animus underlying her application could be fairly completed.

561. In addition, following the filing of Professor Hascall's EEOC complaint, Provost Austin deliberately impeded the process for the approval of the joint J.D. / M.A. degree which Professor Hascall had put together after more a year of negotiation, presentations and much effort.

562. After receiving approval from the Interdisciplinary Committee and the Graduate Council for the new program, Provost Austin had been put the proposal on ice for several months without forwarding it to the Academic Council for final approval.

563. At the last meeting of the Graduate Council, the Assistant Provost, Alexandra Gregory, stated that the Provost was holding on to Professor Hascall's proposal so that allegedly he could "carefully scrutinize it prior to giving his recommendation to the Academic Council."

564. It is submitted that this highly unusual and unprecedented additional scrutiny of Professor Hascall's proposal was done solely in retaliation for Professor Hascall's filing her complaint with the EEOC and to further diminish her accomplishments and record of service to the University.

565. Further, Gormley, who has had nothing to do with the process of developing this new program, has refused to supply any funds for the promotion of the program,

Appx244

and has sent e-mails and has had other conversations downgrading the importance of the program and has insisted that he be the one to present the program to the Academic council.

566.    It is submitted that Gormley's intrusive and obstructive conduct was also in direct retaliation for Professor Hascall's filing a complaint with the EEOC.

567.    It is further submitted that this kind of retaliation, on the part of Gormley, is an integral part of his modus operandi.

568.    In 2009, the Association of American Law Schools (the "AALS") issued a report directly criticizing Dean Gormley personally for utilizing Duquesne's assets, in the sense of granting favors and sabbaticals, in order to secure votes for his Deanship on the one hand, while bullying those in opposition to him on the other.

569.    Dean Gormley was required to personally respond to that accusation in the American Association of Law School's report.

570.    Upon information and belief, Dean Gormley continues to improperly utilize the assets of Duquesne Law School to both reinforce his position as Dean and also to create personal income by having the law school finance and underwrite meetings which are solely a vehicle for the selling of his book, the proceeds of which he pockets himself, never reimbursing the Law School for providing and financing these meetings.

571.    In addition, Gormley has hired a number of new staff people and so-called deans to do the job the former Deans have done for themselves.  For instance, he has hired a "Special Assistant" who has worked full time as his ghost editor/writer on his new chapter book about American presidents.  Gormley did not receive any sort of

grant for this support. Rather, he unlawfully has been pilfering the law school's funds to support this position, which only serves to line his own pockets and self-aggrandizement schemes.

572. Finally, with full knowledge of Professor Hascall's filing of the EEOC complaint, and the underlying claims of discrimination, disparate treatment and blatant disregard of the procedural rules and standards of Duquesne University and the Law School, and with full knowledge that Professor Hascall filed a grievance with the University Grievance Committee and with the Affirmative Action Officer requesting an internal objective investigation of her claims prior to any decision regarding tenure, the President of the University denied Professor Hascall's application for tenure.

573. Denial of tenure is a serious blow to an academic career, usually amounting to the end of such career and, in Professor Hascall's case, will likely result in an employment and difficulty in supporting her family. Professor Hascall, like many others in the law school who have been attacked by Gormley is not married (divorced) and is the sole support of her minor child.

574. President Dougherty (hereinafter referred to as 'Dougherty') has also acted in complete disregard of the proper, appropriate and binding procedures of Duquesne, not just in the matter of Professor Hascall but before.

575. Dougherty once promised to "take care" of Professor Amelia Joiner and Professor Hascall at the time of their tenure applications [in other words permit Gormley's tenure to go forward] if they would participate in outing all of Dean

89

Gormley's political enemies, who Dougherty believed had threatened and intimidated them in the year following the termination of former Dean Guter.

576. Professor Hascall and Professor Joiner refused to do so. As did all the other professors who were called to that meeting to congratulate them for standing up to the bullies at the law school by writing a scathing memo outlining the intimidation, threats and harassment they received both before and after the no-confidence vote debacle. These compliments focused on the fact that those professors who wrote the memo were all female.

577. Dougherty's conduct demonstrates a contempt for the process of tenure review based on merits, his awareness of the potential for faculty to vote based on political considerations rather than on merit evaluations, and his willingness to waive academic tenure requirements based on political considerations.

578. It is submitted that Dougherty's willingness to sacrifice Duquesne's academic integrity in order to support a Law School Dean who has been sued for discriminatory practices at least three times, who is also known to bully faculty and staff to get his way, who misuses University resources for his own gain, and who was the subject of two EEOC investigations, including that of the Professor Hascall, arises from his long-term and now irrational support for Gormley.

579. Dougherty's decision to deny Professor Hascall tenure under circumstances where he is himself irretrievably tainted is a direct of his stubborn allegiance to Gormley.

580.     Dougherty's personal animus against Professor Hascall is itself based on Gormley's own illegal and discriminatory decisions to marginalize and destroy the Professor Hascall both as a faculty member and as an academic and as Gormley has correctly pointed out with an uncharacteristic prescience, "the President will do what I tell him," and the President has done just that.

581.     Professor Hascall also filed a timely written charge of discrimination against the Defendant on or about June 13, 2014 alleging additional retaliation.

## COUNT I
### Age Discrimination in Violation of the ADEA
### *Against Duquesne University School of Law*

582.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

583.     By virtue of her age, the Professor Hascall is in the class of persons protected by the ADEA.

584.     The foregoing conduct, in discriminating again Professor Hascall because of her age and otherwise subjecting her to adverse employment actions because of her age, constitutes unlawful age discrimination against the Professor Hascall.

585.     As a result of the Defendant's unlawful age discrimination, the Professor Hascall has suffered damages as set forth herein.

## COUNT II
### Gender Discrimination in Violation of Title VII
### *Against Duquesne University School of Law*

586.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

Appx248

587.   The foregoing conduct by the Defendant constitutes unlawful discrimination against the Professor Hascall on the basis of her gender.

588.   As a result of the Defendant's unlawful discrimination, the Professor Hascall has suffered damages as set forth herein.

## COUNT III
### Religious Discrimination in Violation of Title VII
### *Against Duquesne University School of Law*

589.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

590.   The foregoing conduct by the Defendant constitutes unlawful discrimination against the Professor Hascall on the basis of her religious scholarship.

591.   As a result of the Defendant's unlawful discrimination, the Professor Hascall has suffered damages as set forth herein.

## COUNT IV
### Retaliation in Violation of Title VII
### *Against Duquesne University School of Law*

592.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

593.   The foregoing conduct by the Defendant constitutes unlawful retaliation against the Professor Hascall for engaging in protected activities.

594.   As a result of the Defendant's unlawful retaliation, the Professor Hascall has suffered damages as set forth herein.

92

## COUNT V
### Retaliation in Violation of the ADEA
*Against Duquesne University School of Law*

595.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

596.   By virtue of her age, the Professor Hascall is in the class of persons protected by the ADEA.

597.   The foregoing conduct, in retaliating against Professor Hascall because of her engagement in protected activity constitutes unlawful age discrimination against the Professor Hascall.

598.   As a result of the Defendant's unlawful retaliation, the Professor Hascall has suffered damages as set forth herein.

## COUNT VI
### Pennsylvania Human Relations Act ("PHRA")
*Gender, Religion and Age Discrimination Along with Retaliation
Against All Defendants*

599.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

600.   Defendant violated the PHRA by its discriminatory actions against Professor Hascall on the basis of her age, religious scholarship and gender.

601.   Defendant violated the PHRA by retaliating against Professor Hascall.

602.   As a direct and proximate result of defendants' violation of the PHRA, Professor Hascall has sustained the injuries, damages and losses set forth herein.

Appx250

## COUNT VII
### Equal Pay Act
### *Against Duquesne University School of Law*

603.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

604.    Defendant's employees of the opposite sex were paid differently for performing "equal work" or work of substantially equal skill, effort and responsibility, under similar working conditions.

605.    Defendant's employees of the opposite sex were accorded various benefits that Professor Hascall was not.

606.    The same constitutes a violation of federal law.

607.    As a result of the Defendants' unlawful discrimination as aforesaid, the Professor Hascall has suffered damages as set forth herein.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### *Against All Defendants*

608.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

609.    Professor Hascall has suffered severe physical manifestations of the emotional distress willfully inflicted upon her by the outrageous actions by the University and its agents, particularly Kenneth Gormley.

610.    Defendants are liable as its agents engaged in extreme and outrageous conduct intentionally and/or recklessly causing severe emotional distress to Professor Hascall.

94

Appx251

611.   Defendants are subject to liability for such emotional distress.

## COUNT IX
## Breach of Implied Contract of Employment
### *Against All Defendants*

612.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

613.   Professor Hascall was induced to join Defendant as a law professor based on the contractual promise(s) by the Defendant that she would be evaluated for tenure in a fair manner consistent with policies in place at the time she became employed.

614.   These representations, coupled with Defendant's course of conduct over the span of Professor Hascall's employment, created an implied contract of employment between Defendant and Professor Hascall.

615.   At all times relevant herein, Professor Hascall fulfilled all obligations under her contract of employment.

616.   As a result of Defendant's breach of implied contract, Professor Hascall has suffered lost future employment opportunities, other financial losses, and other non-economic damages, such as damages related to emotional and physical distress, humiliation, embarrassment and damage to her reputation.

## PRAYER FOR RELIEF

**WHEREFORE,** the Professor Hascall prays that the Court enter judgment in her favor and against the Defendant and that it enter an Order as follows:

a. The Defendant is to be permanently enjoined from engaging in discrimination against the Professor Hascall on any other basis prohibited under applicable law;

95

Appx252

b. The Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of permitting discrimination and retaliation in the workplace, and is to be ordered to promulgate an effective policy against such harassment and discrimination and to adhere thereto;

c. The Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of discriminating against employees and is to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

d. The Defendant is to compensate the Professor Hascall, reimburse the Professor Hascall, and to make Professor Hascall whole for any and all pay and benefits the Professor Hascall would have received had it not been for the Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. The Professor Hascall should be accorded those benefits illegally withheld from the date the Professor Hascall first suffered discrimination at the hands of the Defendant or its agents until the date of verdict;

e. The Professor Hascall is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by the Defendant's actions to the extent they are available as a matter of law.

96

f.  Professor Hascall is to be awarded double damages pursuant to 29 U.S.C. 626(b) for willful violations of the ADEA;

g.  Professor Hascall is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or other employers from engaging in such misconduct in the future;

h.  Professor Hascall is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

i.  Professor Hascall is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

j.  Any verdict in favor of Professor Hascall is to be molded by the Court to maximize the financial recovery available to Professor Hascall in light of the caps on certain damages set forth in applicable federal law;

k.  Professor Hascall is to be granted such additional injunctive or other relief as may be requested during the pendency of this action in an effort to ensure Defendant does not engage – or ceases engaging - in illegal retaliation against Professor Hascall or other witnesses to this action; and

l.  The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

m. Professor Hascall demands trial by jury on all issues so triable pursuant to Fed.R.Civ.P. 38(b)(1).

Respectfully submitted,

**KOLMAN ELY, P.C.**

/s/ Timothy M. Kolman
Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
W. Charles Sipio, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138

*Attorneys for Professor Hascall*

Dated: October 31, 2014

98

Appx255

CLOSED

## U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
## CIVIL DOCKET FOR CASE #: 2:10-cv-00981-AJS

STEWART v. DUQUESNE UNIVERSITY OF THE HOLY
SPIRIT
Assigned to: Arthur J. Schwab
Cause: 28:1331 Fed. Question: Employment Discrimination

Date Filed: 07/27/2010
Date Terminated: 11/15/2010
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**ALICE L. STEWART**                     represented by   **Wayne A. Ely**
Kolman Ely, P.C.
414 Hulmeville Avenue
Penndel, PA 19047
215-750-3134
Fax: 215-750-3138
Email: wayne3236@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy M. Kolman**
Kolman Law, P.C.
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134
Fax: 215-750-3138
Email: TKolman@KolmanLaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DUQUESNE UNIVERSITY OF THE
HOLY SPIRIT**
*trading and doing business as*
DUQUESNE UNIVERSITY SCHOOL OF
LAW

represented by   **Kimberly A. Craver**
Westinghouse Electric Company LLC
1000 Westinghouse Drive
Cranberry Twp., PA 16066
412-374-5429
Email: craverka@westinghouse.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martha Hartle Munsch**
Reed Smith
225 Fifth Avenue
Pittsburgh, PA 15222

Appx256

412-288-4118
Fax: 412-288-3063
Email: mmunsch@reedsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jarrod Shaw**
McGuire Woods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
412-667-7907
Email: jshaw@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES J. DOUGHERTY**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LINDA DRAGO**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KEN GORMLEY**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RALPH PEARSON**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NANCY PERKINS**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**CHARLES J. DOUGHERTY**                    represented by **Martha Hartle Munsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**NANCY PERKINS**                    represented by **Martha Hartle Munsch**
(See above for address)

Appx257

*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**RALPH PEARSON**                          represented by **Martha Hartle Munsch**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**DUQUESNE UNIVERSITY OF THE**             represented by **Kimberly A. Craver**
**HOLY SPIRIT**                            (See above for address)
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

                                           **Martha Hartle Munsch**
                                           (See above for address)
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**KEN GORMLEY**                            represented by **Martha Hartle Munsch**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**LINDA DRAGO**                            represented by **Martha Hartle Munsch**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**ALICE L. STEWART**                       represented by **Wayne A. Ely**
                                           (See above for address)
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

                                           **Timothy M. Kolman**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/27/2010 | 1 | COMPLAINT against DUQUESNE UNIVERSITY OF THE HOLY SPIRIT (Filing fee $350, receipt number 0315-1674031) filed by ALICE L. STEWART. (Attachments: # 1 Civil Cover Sheet, # 2 Summons) (ept) (Entered: 07/27/2010) |
| 07/27/2010 | | Summons Issued as to *DUQUESNE UNIVERSITY OF THE HOLY SPIRIT.* (ept) (Entered: 07/27/2010) |
| | | |

Appx258

| 07/28/2010 | 2 | ORDER OF RECUSAL. Judge Joy Flowers Conti recused. The case is returned to the Clerk for reassignment. Signed by Judge Joy Flowers Conti on 7/29/2010. (smc ) (Entered: 07/28/2010) |
|---|---|---|
| 07/28/2010 | | Judge Arthur J. Schwab presiding. (gmp) (Entered: 07/28/2010) |
| 07/29/2010 | 3 | NOTICE that instant civil action has been designated for placement into the United States District Court's Alternative Dispute Resolution program. Parties are directed to fully complete the required 26(f) report, which includes the stipulation of selecting an ADR process. Counsel for plaintiff (or in the case of a removal action, counsel for removing defendant) shall make service of the notice on all parties. (ms) (Entered: 07/29/2010) |
| 08/09/2010 | 4 | ANSWER to 1 Complaint by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 08/09/2010) |
| 08/09/2010 | 5 | MOTION to Dismiss *Time-Barred Claim* re 1 Complaint by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Attachments: # 1 Exhibit No. 1, # 2 Exhibit No. 2, # 3 Proposed Order) (Munsch, Martha) (Entered: 08/09/2010) |
| 08/09/2010 | 6 | BRIEF in Support re 5 Motion to Dismiss *Time-Barred Claim* filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 08/09/2010) |
| 08/09/2010 | 7 | Disclosure Statement identifying None as corporate parent or other affiliate, by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 08/09/2010) |
| 08/10/2010 | | ORDER SETTING DEADLINE FOR RESPONSE to 5 Motion to Dismiss. Response to Motion due by 8/24/2010. Signed by Judge Arthur J. Schwab on 08/10/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 08/10/2010) |
| 08/10/2010 | 8 | ORDER SCHEDULING INITIAL CASE MANAGEMENT CONFERENCE. Rule 26(f) Report, Proposed Case Management Order, and ADR Stipulation due on or before 09/10/10. The Initial Case Management Conference is scheduled for 09/27/10 at 9:30 AM. Signed by Judge Arthur J. Schwab on 08/10/10. (eca) (Entered: 08/10/2010) |
| 08/10/2010 | | AMENDED ORDER SETTING DEADLINE FOR RESPONSE to 5 Motion to Dismiss. Response to Motion due by 8/23/2010. Reply due by 8/27/2010 at NOON. Signed by Judge Arthur J. Schwab on 08/10/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 08/10/2010) |
| 08/12/2010 | 10 | NOTICE of Appearance by Kimberly A. Craver on behalf of DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Craver, Kimberly) (Entered: 08/12/2010) |
| 08/23/2010 | 11 | First AMENDED COMPLAINT against All Defendants filed by ALICE L. STEWART. (Kolman, Timothy) Text modified on 8/24/2010. (ept) (Entered: 08/23/2010) |
| 08/23/2010 | 12 | SUPPLEMENT by ALICE L. STEWART to 11 Amended Complaint. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons) (Kolman, Timothy) (Entered: 08/23/2010) |
| 08/23/2010 | 13 | RESPONSE to Motion re 5 MOTION to Dismiss *Time-Barred Claim* re 1 Complaint filed by ALICE L. STEWART. (Kolman, Timothy) (Entered: 08/23/2010) |

Appx259

| 08/24/2010 | | ORDER denying as moot 5 Motion to Dismiss in light of Plaintiff's filing Amended Complaint. Any Motion to Dismiss Amended Complaint shall be filed on or before September 3, 2010; any response thereto shall be filed on or before September 17, 2010. Signed by Judge Arthur J. Schwab on 8/24/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (mjl) (Entered: 08/24/2010) |
|---|---|---|
| 08/26/2010 | 14 | SUMMONS/Return of Service Returned Executed by ALICE L. STEWART. DUQUESNE UNIVERSITY OF THE HOLY SPIRIT served on 8/13/2010, answer due 9/3/2010. (Kolman, Timothy) (Entered: 08/26/2010) |
| 08/27/2010 | 15 | MOTION for Attorney Fees by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Attachments: # 1 Exhibit, # 2 Proposed Order) (Munsch, Martha) (Entered: 08/27/2010) |
| 08/27/2010 | 16 | BRIEF in Support re 15 Motion for Attorney Fees filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 08/27/2010) |
| 08/30/2010 | | ORDER denying 15 Motion for Attorney Fees without prejudice, as the motion is premature. Signed by Judge Arthur J. Schwab on 08/30/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 08/30/2010) |
| 09/07/2010 | 17 | ANSWER to 11 Amended Complaint, and COUNTERCLAIM against ALICE L. STEWART by CHARLES J. DOUGHERTY, NANCY PERKINS, RALPH PEARSON, DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KEN GORMLEY, LINDA DRAGO. (Munsch, Martha) Text modified on 9/8/2010. (ept) (Entered: 09/07/2010) |
| 09/09/2010 | 18 | NOTICE of Appearance by Jarrod Shaw on behalf of DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Shaw, Jarrod) (Entered: 09/09/2010) |
| 09/10/2010 | 19 | REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Exhibit Proposed Case Management Order) (Munsch, Martha) (Entered: 09/10/2010) |
| 09/10/2010 | 20 | STIPULATION selecting ADR process by CHARLES J. DOUGHERTY, LINDA DRAGO, DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KEN GORMLEY, RALPH PEARSON, NANCY PERKINS, ALICE L. STEWART (Munsch, Martha) (Entered: 09/10/2010) |
| 09/13/2010 | 21 | SUMMONS/Return of Service Returned Executed by ALICE L. STEWART. CHARLES J. DOUGHERTY served on 9/3/2010, answer due 9/24/2010; LINDA DRAGO served on 9/3/2010, answer due 9/24/2010; KEN GORMLEY served on 9/3/2010, answer due 9/24/2010; RALPH PEARSON served on 9/3/2010, answer due 9/24/2010; NANCY PERKINS served on 9/3/2010, answer due 9/24/2010. (Kolman, Timothy) (Entered: 09/13/2010) |
| 09/22/2010 | 22 | Notice of Mediation by LOUIS B. KUSHNER. Mediation Date November 2, 2010 at 10:00 a.m. (Kushner, Louis) (Entered: 09/22/2010) |
| 09/24/2010 | 23 | MOTION to Dismiss re 17 Answer to Amended Complaint, Counterclaim by ALICE L. STEWART. (Attachments: # 1 Proposed Order) (Kolman, Timothy) (Entered: 09/24/2010) |
| 09/24/2010 | 24 | BRIEF in Support re 23 Motion to Dismiss filed by ALICE L. STEWART. (Kolman, Timothy) (Entered: 09/24/2010) |

| 09/24/2010 | 25 | MOTION for attorney Wayne A. Ely to Appear Pro Hac Vice, (Filing fee $40, Receipt # 0315-1732897) by ALICE L. STEWART. (Attachments: # 1 Proposed Order) (Kolman, Timothy) (Entered: 09/24/2010) |
| 09/27/2010 | | ORDER SETTING DEADLINE FOR RESPONSE to 23 Motion to Dismiss. Response to Motion due by 10/8/2010 at NOON. Signed by Judge Arthur J. Schwab on 09/27/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 09/27/2010) |
| 09/27/2010 | | ORDER granting 25 Motion for Wayne A. Ely to Appear Pro Hac Vice. Signed by Judge Arthur J. Schwab on 09/27/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 09/27/2010) |
| 09/27/2010 | | Minute Entry for proceedings held before Judge Arthur J. Schwab: Case Management Conference held on 9/27/2010. Case Management and Pretrial Orders issued. Parties agreed to mediate before Louis B. Kushner. Discussed pre-mediation/ENE discovery. Text-only entry; no PDF document will issue. This text-only entry constitutes the Court's order or notice on the matter. (Court Reporter: J. Kienzle) (ms) (Entered: 09/27/2010) |
| 09/27/2010 | 26 | CASE MANAGEMENT ORDER: Exchange of required Rule 26(a)(1) information due by 10/11/2010; Amended Pleadings due by 10/27/2010; Discovery due by 2/14/2011; Plaintiff Pretrial Statement due by 4/1/2011; Defendant Pretrial Statement due by 4/10/2011; Plaintiff Expert Reports due by 1/25/2011; Defendant Expert Reports due by 2/9/2011; Expert Depositions to be completed by 2/14/2011; Summary Judgment due by 3/1/2011; Response to Summary Judgment due by 3/11/2011; Willingness to proceed before Magistrate Judge due by 10/27/2010. Signed by Judge Arthur J. Schwab on 9/27/10. (ms) (Entered: 09/27/2010) |
| 09/27/2010 | 27 | PRETRIAL ORDER: Plaintiff witness list due by 4/1/2011; Defendant Witness list due by 4/10/2011; Points for Charge due by 4/14/2011; Proposed Verdict Slips due by 4/14/2011; Proposed Voir Dire by 4/14/2011; Stipulation due by 4/14/2011; Motions in Limine due by 4/12/2011; Response to Motions in Limine due by 4/15/2011; Jury Trial set for 5/2/2011 at 9:00 AM in Courtroom 7C before Judge Arthur J. Schwab; Pretrial Conference set for 4/28/2011 at 8:30 AM in Courtroom 7C before Judge Arthur J. Schwab, Preliminary Pretrial Conference with law clerk set for 4/21/2011 at 9:30 AM in Courtroom 7C. Signed by Judge Arthur J. Schwab on 9/27/10. (ms1, ) (Entered: 09/27/2010) |
| 10/08/2010 | 28 | RESPONSE IN OPPOSITION to 23 Motion to Dismiss, filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) (Entered: 10/08/2010) |
| 10/12/2010 | 29 | ORDER granting 23 Motion to Dismiss Counterclaim as Unripe. Signed by Judge Arthur J. Schwab on 10-12-10. (nam) (Entered: 10/12/2010) |
| 10/14/2010 | | ORDER RESCHEDULING PRETRIAL CONFERENCES AND JURY TRIAL. The Preliminary Pretrial Conference with the Court's law clerk previously scheduled for 04/21/11 at 9:30 AM is hereby RESCHEDULED for 06/10/11 at 10:00 AM. The Final Pretrial Conference previously scheduled for 04/28/11 at 8:30 AM is hereby RESCHEDULED for 06/30/11 at 8:30 AM before Arthur J. Schwab. Jury Selection and Trial previously scheduled to begin 05/02/11 at 9:00 AM is hereby RESCHEDULED for 07/11/11 at 9:00 AM before Arthur J. Schwab in Courtroom 7C. Signed by Judge Arthur J. Schwab on 10/14/10. Text-only entry; no PDF document will issue. This text- |

| | | only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 10/14/2010) |
|---|---|---|
| 10/18/2010 | 30 | MOTION for Sanctions *pursuant to Fed.R.Civ.P. 11* by ALICE L. STEWART. (Attachments: # 1 Proposed Order) (Kolman, Timothy) (Entered: 10/18/2010) |
| 10/18/2010 | 31 | BRIEF in Support re 30 Motion for Sanctions filed by ALICE L. STEWART. (Kolman, Timothy) (Entered: 10/18/2010) |
| 10/19/2010 | | TEXT ORDER. 30 Plaintiffs Motion for Sanctions Pursuant to Fed.R.Civ.P.11 is without merit and hereby DENIED. All counsel are directed to immediately proceed with discovery consistent with the timetable set forth in 26 Case Management Order and 27 Pretrial Order, instead of engaging in preliminary activity/filings which fail to move the case forward to trial. Signed by Judge Arthur J. Schwab on 10/19/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 10/19/2010) |
| 10/27/2010 | 32 | DISTRICT JUDGE OPTION by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT to have this case randomly assigned to a U.S. District Judge. (Munsch, Martha) (Entered: 10/27/2010) |
| 10/27/2010 | 33 | MOTION to Re-set (Continue) Trial Date by CHARLES J. DOUGHERTY, LINDA DRAGO, DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KEN GORMLEY, RALPH PEARSON, NANCY PERKINS. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Munsch, Martha) (Entered: 10/27/2010) |
| 10/28/2010 | | ORDER SETTING DEADLINE FOR RESPONSE to 33 Motion to Continue Trial Date. Response to Motion due by 11/2/2010. Signed by Judge Arthur J. Schwab on 10/28/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 10/28/2010) |
| 10/28/2010 | | ORDER SCHEDULING STATUS CONFERENCE. A Status Conference is hereby scheduled for 11/04/10 at 8:30 AM to discuss a new and earlier trial date in February or March, 2011. By 11/03/10 at NOON, counsel shall file a detailed Joint Discovery Statement setting forth the discovery completed through 11/02/10, and the discovery remaining. Signed by Judge Arthur J. Schwab on 10/28/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 10/28/2010) |
| 11/03/2010 | | ORDER RESCHEDULING STATUS CONFERENCE. In light of the possibility of a settlement agreement being reached in this matter, the Status Conference previously scheduled for 11/04/10 at 8:30 AM is RESCHEDULED to 11/22/10 at 8:30 AM. If the settlement agreement is not finalized by 11/18/10, counsel shall file a detailed Joint Discovery Statement setting forth the discovery completed through 11/18/10, and the discovery remaining, by NOON on 11/19/10. Signed by Judge Arthur J. Schwab on 11/03/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 11/03/2010) |
| 11/03/2010 | 34 | REPORT of Mediation: Case has been resolved. LOUIS B. KUSHNER terminated. **The parties are reminded of their obligation to complete the ADR questionnaire and return same to the Clerk of Court within 5 days of the conclusion of the ADR process. The questionnaire can be accessed at www.pawd.uscourts.gov. Click on the ADR icon.** Mediation session was held on 11/2/2010. (Kushner, Louis) (Entered: |

11/03/2010)

| 11/15/2010 | | TEXT ORDER. It appearing to the Court that the parties have agreed to an amicable resolution of this matter, IT IS ORDERED that the Clerk shall remove this case from the docket for administrative purposes. The Status Conference, Trial, and all Trial related deadlines are CANCELLED. IT IS FURTHER ORDERED that, in the event any party fails to execute the settlement agreement, the case shall be reinstated to the docket upon written request of any party for purposes of enforcement of the settlement agreement. IT IS FINALLY ORDERED that the Court shall retain jurisdiction to enforce the terms of the settlement agreement of the parties. Clerk is to mark CASE CLOSED. Signed by Judge Arthur J. Schwab on 11/15/10. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 11/15/2010) |
|---|---|---|
| 11/30/2010 | 35 | STIPULATION of Dismissal *With Prejudice* by CHARLES J. DOUGHERTY, LINDA DRAGO, DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, KEN GORMLEY, RALPH PEARSON, NANCY PERKINS, ALICE L. STEWART. (Munsch, Martha) (Entered: 11/30/2010) |
| 12/01/2010 | 36 | ORDER APPROVING 35 Stipulation of Dismissal. This civil action is DISMISSED WITH PREJUDICE. Signed by Judge Arthur J. Schwab on 12/01/10. (eca) (Entered: 12/01/2010) |
| 03/23/2011 | 37 | MOTION for Permission to File Document Under Seal by ALICE L. STEWART. (Attachments: # 1 Proposed Order) (Kolman, Timothy) (Entered: 03/23/2011) |
| 03/24/2011 | | ORDER SETTING DEADLINE FOR RESPONSE to 37 Motion for Permission to File Document Under Seal. Response to Motion due by 3/29/2011 at NOON. Signed by Judge Arthur J. Schwab on 03/24/11. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 03/24/2011) |
| 03/29/2011 | 38 | RESPONSE IN OPPOSITION to 37 Motion for Permission to File Document Under Seal filed by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT. (Munsch, Martha) Text modified on 3/30/2011. (ept) (Entered: 03/29/2011) |
| 03/29/2011 | 39 | ORDER GRANTING 37 Motion to File Document Under Seal. Signed by Judge Arthur J. Schwab on 03/29/11. (eca) (Entered: 03/29/2011) |
| 04/04/2011 | 40 | SEALED MOTION by ALICE L. STEWART. (Attachments: # 1 Proposed Order) (ept) (Entered: 04/04/2011) |
| 04/04/2011 | 41 | SEALED DOCUMENT (Brief in Support of 40 Sealed Motion) by ALICE L. STEWART (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (ept) (Entered: 04/04/2011) |
| 04/05/2011 | | ORDER SETTING DEADLINE FOR RESPONSE to 40 Sealed Motion. Response to Motion due by 4/12/2011 at NOON. Signed by Judge Arthur J. Schwab on 04/05/11. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (eca) (Entered: 04/05/2011) |
| 04/12/2011 | 42 | SEALED DOCUMENT (Response in Opposition to 40 Sealed Motion) by DUQUESNE UNIVERSITY OF THE HOLY SPIRIT (Attachments: # 1 Exhibit) (ept) (Entered: 04/12/2011) |
| 04/13/2011 | 43 | SEALED MEMORANDUM ORDER DENYING 40 Plaintiff's Sealed Motion. Signed |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/13/2024 16:19:57 | | | |
| **PACER Login:** | JoelSansone | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:10-cv-00981-AJS |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALICE L. STEWART | : | |
| 460 Beverly Road | : | |
| Pittsburgh, PA 15216 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. _____ |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| DUQUESNE UNIVERSITY OF THE | : | |
| HOLY SPIRIT, t/d/b/a | : | |
| DUQUESNE UNIVERSITY | : | |
| SCHOOL OF LAW | : | |
| 600 Forbes Avenue | : | |
| Pittsburgh, PA 15282 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Plaintiff Alice L. Stewart, by and through her undersigned counsel, hereby avers as follows:

### I.     Introduction

1.     Plaintiff has initiated this action to seek redress against Defendant, her employer, for unlawful gender discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and other applicable law.

### II.     Parties

2.     The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3.     Plaintiff Alice Stewart (hereinafter "Plaintiff") is an adult individual currently residing at the above address.

4.      Defendant Duquesne University of the Holy Spirit (hereinafter "Defendant") is a non-profit corporation and coeducational university created and existing pursuant to the laws of the Commonwealth of Pennsylvania, with a principal place of business at the above address.

5.      At all times relevant hereto, Defendant acted by and through its agents, servants, and employees, each of whom acted within the scope of his or her job duties.

6.      Plaintiff anticipates amending the instant Complaint to add additional defendants as aiders and abettors once the investigatory time period set forth in the Pennsylvania Human Relations Act has expired.

7.      Defendant is an "employer" within the meaning of Title VII of the Civil Rights Act because it is engaged in an industry affecting interstate commerce and because it maintained or maintains fifteen (15) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

### III.      Jurisdiction and Venue

8.      The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

9.      The Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

10.      The United States District Court for the Western District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

2

11.     The Court may also maintain supplemental jurisdiction over state law claims set forth herein (or later added) pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction that they form part of the same case or controversy.

12.     Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

13.     Plaintiff was employed in the Western District of Pennsylvania at the time of the unlawful actions set forth herein.

## IV.     **Procedural and Administrative Remedies**

14.     The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

15.     Plaintiff has satisfied the procedural and administrative requirements for proceeding under Title VII of the Civil Rights Act of 1964 as follows:

      a. On or about August 24, 2009, Plaintiff filed a timely written charge of discrimination (PHRC No. 200901463) with the Pennsylvania Human Relations Commission and cross-filed that charge with the Equal Employment Opportunity Commission (EEOC Charge No. 17F-2010-60823);

      b. On or about January 20, 2010, Plaintiff amended the aforesaid charge of discrimination;

      c. The Equal Employment Opportunity Commission issued a Notice of Right to Sue on the foregoing charge on or about April 28, 2010;

      d. The instant action is timely because it is initiated within ninety (90) days of the receipt of the aforementioned Notice;

3

e. Plaintiff will amend the instant Complaint to assert claims under the Pennsylvania Human Relations Act once the applicable investigation period set forth in the Act has expired.

### V. Factual Background

16. The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

17. On December 19, 2003, the Recruitment Committee of the Law Faculty of Defendant reported the unanimous approval of three females, including Plaintiff, for clinical tenure track faculty positions.

18. In March of 2004, Defendant's administration advised that it would deny tenure track positions to the three aforesaid females unless a national search for candidates was conducted.

19. Instead, Defendant instituted five-year rolling faculty agreements for each of the three approved females.

20. The five-year rolling faculty agreements resulted from discussions and negotiations between Defendant's administration and then-Dean Nicholas Cafardi.

21. The agreements in question were intended to comply with American Bar Association accreditation standard, 405(c), for clinical faculty.

22. On June 4, 2004, Plaintiff entered into a five-year rolling faculty agreement as a non-tenured Clinical Professor of Law with Defendant.

23. The American Bar Association (ABA) is the accrediting agencies for Defendant's School of Law.

24. The Defendant is a member of the American Association of Law Schools (AALS), which requires its member schools to be in compliance with the ABA standards.

4

Appx268

25.     Defendant represented to the ABA and the AALS that the five-year rolling faculty agreements were created for its law school clinical faculty in order to provide a form of security of position reasonably similar to tenure.

26.     Since the inception of its five-year rolling faculty agreement with Plaintiff, Defendant has included Plaintiff in its student/faculty ratio, has reported Plaintiff to outside accrediting agencies as a clinical faculty member each year, and has included her in a 2007 Reaccredidation Self-Study Report and Answer.

27.     The five-year rolling faculty agreement was renewed each year for four (4) consecutive years by both Dean Nicholas Cafardi and Dean Donald Guter.

28.     In March of 2004, Defendant's administration requested that the law faculty approve a one-year visiting professor position, with the anticipation of tenure track thereafter, for a specific male without requiring a national search for candidates (as Defendant required before Plaintiff could be considered for tenure).

29.     In March of 2004, and at all times prior and subsequent to that date, the only tenured clinical professor on the faculty of Defendant was a male who earned in excess of $40,000.00 per year more than Plaintiff.

30.     The aforesaid male faculty member was hired without a national search for candidates.

31.     Plaintiff, a female professor, was and is similarly situated to her male counterpart.

32.     On or about September 11th, 2006, Plaintiff filed an internal complaint with Defendant's Compliance Officer alleging sexual harassment and hostile work environment by a male professor, one Kenneth Gormley (who later became Dean of Defendant's law school).

33.     Plaintiff was informed on January 2nd, 2007 by then-Professor Gormley that he met with University General Counsel Linda Drago to discuss Plaintiff's complaint and that his discussions with Drago were allegedly governed by attorney-client privilege.

5

Appx269

34.     It was improper for Drago to meet with Professor Gormley to discuss a pending Complaint against him filed by another employee of Defendant because she was representing Defendant, not Professor Gormley, at the time.

35.     On May 10th, 2007 Plaintiff requested that Ms. Drago advise Professor Gormley that it was improper for an attorney-client privilege to exist between her and Professor Gormley but was not advised that this advice was given.

36.     On or about May 7th, 2007, following a five-month investigation conducted by Defendant's Compliance Officer, Plaintiff was notified that findings had been made in favor of Plaintiff with regard to her claims of sexual harassment and hostile work environment against Professor Gormley.

37.     Plaintiff was also informed of specific recommendations to the University Administration as a result of the finding that Professor Gormley had subjected her to sexual harassment and a hostile work environment.

38.     Shortly thereafter, the University obtained an opinion through outside University Counsel attempting to negate and reject the findings and recommendations of the University Compliance Officer.

39.     It is Plaintiff's understanding and belief that although no prior President of Defendant had ever rejected or failed to act on the findings and recommendations of the University Compliance Officer, University President Charles J. Dougherty has rejected or failed to act on the findings and recommendations of the University Compliance Officer on several occasions during his tenure as President – always in favor of male respondents.

40.     On May 22nd, 2007, Defendant's Provost, Ralph Pearson, advised Plaintiff by letter that, if she believed she was subjected to any retaliation for having complained of the sexual harassment, she was to advise him, as such conduct would not be tolerated.

6

41.     In June of 2007, Plaintiff filed a PHRC Complaint outlining the foregoing sexual harassment and hostile work environment, docketed at PHRC No. 200607723.

42.     In June of 2007, subsequent to the filing of the PHRC Complaint alleging sexual harassment and hostile work environment – and despite the findings of the aforesaid investigation - Professor Gormley was promoted by University President Dougherty to the newly- created position of Vice-President for Interdisciplinary Studies.

43.     On or about December 10th, 2008, University President Dougherty appointed Professor Gormley to the position of Interim Dean of Defendant's law school following the abrupt termination of Dean Donald Guter.

44.     Shortly following the appointment of Kenneth Gormley as Interim Dean to the School of Law he stated to a member of the law faculty that he intended to accomplish three things during his tenure as Interim Dean.  One of those items was to discredit Plaintiff.

45.     Previously, in 2004, Professor Gormley was rejected by the law faculty and the Dean Search Committee in a failed bid to become Dean of the Law School.

46.     Professor Gormley's prior position of "Vice-President for Interdisciplinary Studies" is no longer listed in the organizational chart for Defendant.

47.     In March of 2009, the law faculty was informed by Interim Dean Gormley that Defendant's internal auditors due to the "change of decanal administration" would perform a so-called "internal audit"

48.     There were no protocols or standards governing the so-called "internal audit."

49.     Rather than auditing former Dean Guter's office and budget, consistent with past practice and procedure, the internal auditors were directed to audit certain faculty members and administrative personnel.

7

50. On March 18th, 2009, Plaintiff was asked to meet, and did meet, with two university internal auditors, Aaron Mitcham and Kevin Wolbert, who requested spreadsheets for Plaintiff's grant budgets.

51. The auditors also requested program brochures, including the Vatican City Continuing Legal Education (CLE) brochure.

52. Additionally, the auditors requested all purchase card receipts and expense reports for the current and prior years.

53. During their meeting with Plaintiff, the auditors asked improper and irrelevant questions about Plaintiff's background and how Plaintiff came to be involved in the Vatican City CLE program.

54. It is believed and therefore averred that Interim Dean Gormley directed the audit of Plaintiff and directed the actions of the university internal auditors in retaliation against Plaintiff.

55. Plaintiff received her annual evaluation from Defendant's newly appointed Associate Dean, Nancy D. Perkins, on March 20th, 2009.

56. After less than eight weeks as Associate Dean, Nancy D. Perkins asserted - without foundation - that Plaintiff was inattentive to the maintenance of her grant budgets.

57. In her prior ten years of association with Defendant, the Dean of the School of Law had always directly evaluated Plaintiff.

58. The evaluation of Plaintiff by Associate Dean Perkins and the baseless criticisms leveled by her against Plaintiff were made at the behest of Interim Dean Gormley in retaliation for Plaintiff's prior complaints.

59. Prior to her March 2009 evaluation, Plaintiff had only received positive comments and evaluations during the more than ten years she had been associated with Defendant.

60. Every evaluation conducted by Dean Nicholas Cafardi and Dean Donald Guter affirmed Plaintiffs' exemplary performance.

8

Appx272

61.     On April 16th, 2009, Plaintiff met with university internal auditor Aaron Mitcham, the university controller, and the post-grant accountant.

62.     At that meeting, and contrary to the improper, unlawful and baseless accusations had been made by the university internal auditors that Plaintiff was misusing grant funds, all expenditures were properly accounted for and in compliance with grant terms and requirements.

63.     Plaintiff has successfully and appropriately managed Defendant's Low-Income Tax Clinic (LITC) grants since 1998 and the Pennsylvania Securities Annual Grant award since 2004.

64.     In addition, the Internal Revenue Service-Taxpayer Advocate Office and the Pennsylvania Securities Commission (which confer the foregoing grants) have repeatedly praised the work of Plaintiff.

65.     On May 7th, 2009, the university internal auditors once again contacted Plaintiff and requested additional information relative to her grants as well as information relating to the Vatican City CLE program, including but not limited to the CLE budget.

66.     The internal auditors were directed more than once by Plaintiff to speak with the director of the Vatican City summer program for budget information.

67.     On May 13th, 2009, Plaintiff filed a complaint against Defendant's internal auditors with the University Compliance Officer when she discovered that the auditors had met with a newly hired junior faculty member, allegedly for the purpose of discussing the lack of civility within the law school, but in fact to question the junior faculty member about Plaintiff's qualifications and Plaintiff's involvement in the Vatican City CLE program.

68.     The university internal auditors met with Professor Ronald Ricci on May 13th, 2009 and questioned him regarding Plaintiff's qualifications for the Vatican City CLE program.

69.     At that meeting, the auditors admitted to Professor Ricci that they had made inappropriate and offensive comments to a junior faculty member regarding the Italian ancestry of the Vatican City CLE faculty, including Plaintiff.

9

70.     It is submitted that the university internal auditors were the agents of Interim Dean Gormley and were retaliating against Plaintiff at his behest as a result of her prior complaints against him.

71.     Internal auditor Kevin Wolbert, in his July 29th, 2009 communication to Defendant's compliance officer, stated that "[i]n those discussions with faculty and administrative members of the School, concerns were conveyed to us regarding potential instances of self enrichment by certain individuals in the School, including Ms. Stewart" [sic].

72.     On May 14th, 2009, Plaintiff delivered to Interim Dean Gormley an internal "Principal Investigator" form outlining the Plaintiff's desire to once again apply for the federal grant, which has funded Defendant's Low-Income Tax Practicum (LITC) program since 1998.

73.     The Plaintiff was informed the following week, by the Dean's assistant, that Interim Dean Gormley would not sign the form and would not provide the required letter for matching funds.

74.     During the prior eleven years, Dean Nicholas Cafardi and Dean Donald Guter signed the required forms without reservation or hesitation.

75.     Interim Dean Gormley's action in refusing to sign the required form threatened the future funding of Plaintiff's program and was retaliatory.

76.     On or about May 25th, 2009, the Plaintiff contacted Provost Ralph Pearson, pursuant to his letter dated May 22, 2007, (*see* Paragraph 40), requesting Provost Pearson's intervention on Plaintiff's behalf with regard to Interim Dean Gormley's refusal to sign the required grant forms.

77.     Provost Pearson assured Plaintiff that he would have the required forms signed.

78.     On or about May 28th, 2009, Professor John Rago approached Interim Dean Gormley to discuss the improper behavior of the university internal auditors and their obvious attempts to discredit Plaintiff's work.

10

Appx274

79.     During the aforesaid meeting, Interim Dean Gormley stated to Professor Rago that "Alice isn't doing herself any favors by filing these complaints."

80.     On June 26th, 2009, Interim Dean Gormley again refused to sign the internal "Principal Investigator" forms, stating that he would not sign them unless Plaintiff agreed to submit to a change in her title on the grant proposal from "Clinical Professor of Law" (the title in her contract) to the purely administrative title of "Director of the Low-Income Tax Practicum."

81.     Interim Dean Gormley willfully acted to interfere with Plaintiff's grant funding and threatened to terminate Plaintiff's grant funds.

82.     The foregoing action by Interim Dean Gormley was retaliatory and discriminatory.

83.     On or about June 15th, 2009, less than one month after Plaintiff sought the assistance of Provost Pearson to address the retaliatory conduct of Interim Dean Gormley, Plaintiff received notice from Provost Pearson that her five-year rolling faculty agreement, which had been renewed four consecutive times under two prior Deans, had been terminated and instead, Plaintiff was offered a one-year administrative contract.

84.     Provost Pearson's efforts to terminate Plaintiff's five-year rolling faculty agreement were retaliatory and discriminatory.

85.     On June 23rd, 2009, Plaintiff was informed that Professor Margaret Krasik, a full time member of the law faculty and Defendant's Interim Director of Clinical Education, had declined to be reappointed to her position as Interim Director.

86.     Despite Plaintiff's more than ten years of experience with Defendant's Clinical Programs, Interim Dean Gormley immediately appointed the Assistant Director of Clinical Education to the position of Interim Director of Clinical Education.

87.     At the time of the foregoing appointment, the Assistant Director had only worked in Defendant's clinical programs for two years and had little or no prior clinical teaching experience.

11

Appx275

88.     By way of comparison, Plaintiff had twelve years of clinical teaching, program, and grant administrative experience at Defendant.

89.     The failure to appoint Plaintiff to the Interim Director of Clinical Education position was retaliatory and discriminatory.

90.     On June 22nd, 2009, Plaintiff filed a faculty grievance with the University Grievance Committee for Faculty alleging, *inter alia,* retaliation for the wrongful termination of Plaintiffs five-year rolling faculty agreement, improperly refused to recognize Plaintiff as a member of the law faculty, and improperly created and executed provisions for a salary reduction grant fund contingency in her contract.

91.     Subsequently, University General Counsel Drago sent a letter dated June 30th, 2009 to the University Grievance Committee for Faculty asserting incorrectly that the University Grievance Committee lacked jurisdiction to hear the Complaint.

92.     The University Grievance Committee for Faculty responded by advising General Counsel Drago that the issue of jurisdiction was a matter for the Committee to determine.

93.     Two members of the law faculty, believed to have acted at the behest of Interim Dean Gormley, approached a member of the University Grievance Committee for Faculty during the investigation of Plaintiff's grievance. These faculty members threatened the Committee member that if he didn't find against the Plaintiff he would find himself at the wrong end of a lawsuit.

94.     The Grievance Committee has repeatedly requested Defendant's participation in the grievance process without success with respect to Plaintiff's aforesaid grievance.

95.     The refusal by Defendant's administration to participate in the internal university grievance process is retaliatory and discriminatory.

96.     On September 30th, 2009, the President of the Faculty Senate for Duquesne University sent a letter to Provost Pearson advising that "[t]he Faculty Senate Executive

Committee supports the jurisdiction of the University Grievance Committee for Faculty to hear the case of Professor Stewart."

97.     This aforesaid statement by the Faculty Senate Executive Committee was approved unanimously.

98.     Following the independent investigation by the University Grievance Committee for Faculty they unanimously concluded on May 10, 2010 that the Defendant "violated Professor Stewart's rights as a faculty member by arbitrarily changing the terms of her contract." And "that the University Grievance Committee for Faculty has standing in this matter as Professor Stewart is consistently referred to as a clinical faculty member in her contracts with the University."

99.     The Defendant has refused to acknowledge or act on the findings of the University Grievance Committee for Faculty.

100.    The refusal of Defendant to act upon the findings of the Committee is retaliatory and discriminatory.

101.    On July 9th, 2009 Plaintiff forwarded documents and a request for assistance regarding the retaliatory actions of Interim Dean Gormley to University President Dougherty and to Rev. James P. McCloskey, C.S.Sp., Vice President for Mission and Identity and a member of Defendant's Board of Directors.

102.    The above-mentioned individuals have not contacted Plaintiff nor have they assisted in stopping the retaliatory actions of Interim Dean Gormley.

103.    This failure of Defendant's administration to take action to stop the foregoing retaliation against Plaintiff is itself retaliatory and discriminatory.

104.    On July 23rd, 2009, Interim Dean Gormley called Plaintiff to a meeting under the pretext of discussing the grant budgets for her clinical programs.

105.    In attendance at the meeting were Interim Dean Gormley; Associate Dean Nancy Perkins; Business Manager Marlon Ferguson; Pre-grant Award Coordinator Marian Holden;

13

Associate Vice-President of Finance Dave Grousosky, and University Controller Russ Grunebach.

106. Plaintiff requested the presence at the meeting of Professor Michael Streib (then Chairman of the Faculty Clinical Committee) and Professor Ronald Ricci (the former Law School Budget Director).

107. Both professors were also faculty advisors to the relevant clinical programs.

108. Plaintiff made the foregoing request in writing in anticipation of further retaliatory conduct at the July 23rd meeting.

109. Interim Dean Gormley demanded that Professors Streib and Ricci leave the meeting room and refused to proceed until they complied.

110. Professors Streib and Ricci stated their purpose for attending the meeting and objected to Interim Dean Gormley's demand, but agreed to leave.

111. Interim Dean Gormley refused to permit Professors Streib and Ricci to attend the meeting because he intended to, and did in fact, publicly impugn Plaintiff at the meeting.

112. Interim Dean Gormley asserted at the meeting that Plaintiff was an administrative employee only and not a member of the faculty, and argued that Plaintiff's salary was contingent upon and subject to adequate grant funding.

113. At the meeting, Defendant's Associate Vice President of Finance, Dave Grousosky, agreed with Plaintiff that Plaintiff's budgets were properly funded and accounted for, and that any deficiency in the grant salary line was due to overcharges to those lines precipitated by the previous Dean's Assistant and the University's Human Resources Department.

114. The foregoing overcharges had occurred despite Plaintiff's often-repeated requests for those charges to be rectified.

115. Interim Dean Kenneth Gormley's efforts to impugn Plaintiff publicly were retaliatory and discriminatory.

14

Appx278

116.    On September 10th, 2009, Plaintiff was notified by Defendant's Controller that her salary would now be contingent upon sufficient grant funding and that if grants did not provide sufficient funds, her pay would be reduced or her employment terminated.

117.    The foregoing action was retaliatory and discriminatory.

118.    On September 21st, 2009, Plaintiff was notified by Provost Pearson that she would not receive the university-wide raise of 2.5%, unlike all other non-union university employees would.

119.    Provost Pearson further notified Plaintiff that an increase in the employee share of benefit costs would be deducted from Plaintiff's salary, resulting in a net salary decrease in Plaintiff's pay.

120.    The foregoing actions were also retaliatory and discriminatory.

121.    Shortly thereafter, Plaintiff received a letter from Interim Dean Gormley dated September 14th, 2009 wherein Interim Dean Gormley advised her that not only would she not receive the university-wide raise for 2009, but that Plaintiff's salary would be reduced by $5,690.00 the following fiscal year.

122.    This action was retaliatory and discriminatory.

123.    In May of 2010 University employees were advised of a raise ranging between 2 and 3% would be given for the next fiscal year of 2010.

124.    In May, 2010 Plaintiff was notified she would again not receive the university-wide raise for the upcoming academic year, but again any increase in benefits would be deducted from her pay,

125.    This action was retaliatory and discriminatory.

126.    In or about August of 2009, at the direction of Interim Dean Gormley, Plaintiff's name was removed from the law school web page "Faculty" listing.

15

Appx279

127.     Plaintiff's name has also been omitted from the university web page that identifies "Duquesne University Administration for the School of Law."

128.     This action was retaliatory and discriminatory.

129.     In or about August, 2009, Plaintiff's title, "Clinical Professor of Law", as designated in her contract, was removed from the general law school web page of Plaintiff's clinical programs and the purely administrative title of "Director" was added at the direction of Interim Dean Gormley and Associate Dean Nancy D. Perkins.

130.     This action was retaliatory and discriminatory.

131.     On August 26th, 2009, University General Counsel Drago, through Provost Pearson, informed the law school faculty that seven law librarians, possessing at least a Master's in Library Science (MLS), were now on the law school faculty with full faculty voting rights and the right to vote on law school decanal candidates and new faculty hires.

132.     On December 21st, 2009 Interim Dean Gormley informed Plaintiff and the law school faculty that Provost Pearson had advised him (via a memo dated December 16th, 2009) that Plaintiff would be recognized only as an administrator.

133.     As such, Plaintiff did not have full faculty voting rights and could not participate in the scheduled vote for new faculty hires or for the pending decanal candidates despite the vote of the faculty to permit Professor Stewart full faculty voting rights and the ongoing faculty grievance regarding Plaintiff's contract and faculty status.

134.     These actions by Interim Dean Gormley, with the aid of Provost Pearson, University General Counsel Drago, and Associate Dean Perkins were intended to publicly impugn Plaintiff's work and reputation and were retaliatory and discriminatory.

135.     On or about November 13th, 2009 Interim Dean Gormley demanded that Plaintiff provide him the name and phone number of her contact at the Internal Revenue Service (IRS) for

16

LITC grant funds. This demand was made under the pretext of "cooperating" with an upcoming audit of the LITC.

136.    Prior Deans of Defendant's law school, Nicholas Cafardi and Donald Guter, never took it upon themselves to contact grant sponsors directly.

137.    As the IRS Grant Coordinator advised Interim Dean Gormley, it is customary for the National Taxpayer Advocate Office to deal only with the program director of the sponsored LITC.

138.    The actions of Interim Dean Gormley in contacting the office responsible for providing grant funds for Plaintiff's program directly interfered with the work of Plaintiff and jeopardized future funding of Plaintiff's programs.    This action was retaliatory and discriminatory.

139.    Defendant continues to subject Plaintiff to unlawful retaliation to this day.

140.    Interim Dean Gormley has also ordered Plaintiff's office relocated outside of the Law School building and into offices amounting to less than one half of the office space she currently maintains.    This move is an effort to isolate her from faculty support and to minimize her visibility within the Law School.    This action is in retaliation for her prior complaints of sexual harassment against him.

141.    Defendant's treatment of female clinical faculty (as opposed to its treatment of their male counterparts) is not in compliance with the American Bar Association's 2009-2010 standards for Approval of Law Schools, Standard 405(c).

142.    That standard requires law schools to afford to full-time clinical faculty members a form of security of position reasonably similar to tenure, and non-compensatory perquisites reasonably similar to those provided other full-time faculty members.

143.    Defendant has offered the tenure track status path only once: to a white male.

17

144.    The tenure track status path has been denied to all females ever associated with Defendant's clinical programs.

145.    Since Interim Dean Gormley assumed his position, Defendant has repeatedly taken steps to strip Plaintiff of the position security and limited non-compensatory perquisites reasonably similar to those provided other full-time faculty members, that she previously enjoyed under two prior deans.

146.    Defendant is engaged in an ongoing pattern and practice of disparate treatment in tenure track status and compensation for female professionals employed in its clinical education programs.

### Count I
### Title VII – Sexual Harassment and Gender Discrimination

147.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

148.    The foregoing conduct by Defendants constitutes ongoing and continuous unlawful discrimination against Plaintiff on the basis of her gender (female).

149.    As a result of Defendant's unlawful discrimination as set forth *supra,* Plaintiff has suffered damages as set forth herein.

        ***WHEREFORE***, Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### Count II
### Title VII – Retaliation

150.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

151.    In complaining to Defendant about sexual harassment and gender discrimination as aforesaid, Plaintiff engaged in an activity protected under Title VII.

Appx282

Case 2:19-cv-00550-AJS Document 1 Filed 07/27/18 Page 19 of 22

152.    In subjecting Plaintiff to adverse employment actions foresaid as a result of her protected activity, Defendant violated Title VII of the Civil Rights Act of 1964, as amended.

153.    As a result of Defendant's unlawful retaliation as aforesaid, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### Count III
### Breach of Contract

154.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

155.    In making a valid and binding promise, supported by lawful consideration, to pay Plaintiff's salary, and in failing to do so by reducing Plaintiff's salary, Defendant committed a breach of contract.

156.    In making a valid and binding promise, supported by lawful consideration, to place Plaintiff on tenure track status, and in failing to do so, Defendant committed a breach of contract.

157.    Plaintiff provided valuable consideration to Defendant in the form of the work she performed during her employment with Defendant.

158.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has incurred damages in an amount to be determined.

**WHEREFORE**, the Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### *Ad Damnum Clause/Prayer for Relief*

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant and that it enter an Order as follows:

Appx283

a. Defendant is to be permanently enjoined from permitting sexual harassment, retaliation, or gender discrimination against Plaintiff;

b. Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of permitting sexual harassment, gender discrimination, and retaliation in the workplace, and is to be ordered to promulgate an effective policy against such harassment, discrimination and retaliation and to adhere thereto;

c. Defendant is to be permanently enjoined from retaliating against Plaintiff for exercising her rights under federal and/or state law;

d. Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of retaliating against employees for engaging in protected activity under federal law, and is to be ordered to promulgate an effective policy against such retaliation and to adhere thereto;

e. Defendant is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's unlawful actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority.

f. Plaintiff should be accorded all benefits illegally withheld from the date she first suffered harassment, discrimination, and/or retaliation at the hands of Defendant until the date of verdict;

g. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by Defendant's actions;

Appx284

h.     Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or any other employees from engaging in such misconduct in the future;

i.      Plaintiff is to be awarded all monies due to her as a result of Defendant's breach of contract, plus interest and court costs;

j.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

k.     Plaintiff is to be awarded the costs and expenses of this action;

l.      Plaintiff is to be awarded reasonable legal fees as provided by applicable federal and state law;

m.    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law and to reflect the tax consequences thereof;

n.     Plaintiff is to be granted such additional injunctive or other relief as she may request during the pendency of this action in an effort to ensure Defendant does not engage – or ceases engaging – in unlawful retaliation against Plaintiff or other witnesses to this action;

o.     The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein;

p.     Plaintiff's claims against Defendant are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the

Appx285

caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

TIMOTHY M. KOLMAN AND ASSOCIATES

By:   /s/ Timothy M. Kolman, Esquire

Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
Attorneys for Plaintiff
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134

July 27, 2010

22

**Bcc:**     William Richter[richterw@duq.edu]
**To:**
**From:**    William Richter[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4A91258B73C745AFAD40E1262EBFB45F-WILLIAM RIC]
**Sent:**    Sun 6/19/2022 6:19:15 PM (UTC-04:00)
**Subject:**  Re: [External] Your travel

That will be perfect !!!

Sent from my iPhone

> On Jun 19, 2022, at 3:38 PM, Jill Jankowski <jiljan8@gmail.com> wrote:
>
> Current document specifies 25per cent no $amount. How about a 401k statement?
>
> Itext, imail, Iphone
>
>
>
>> On Jun 19, 2022, at 2:49 PM, William Richter <richterw@duq.edu> wrote:
>>
>> Hi Jill
>>
>> ...looking forward to dining with you and Stanley on 6/22...
>>
>> One item of business to transact, if possible... I have the signed Letter of Charitable Intent for you ... the next step is for me to go before DU's naming committee and present a formal request to name the media center. Can you and Stanley bring an old copy of your trust (even though you plan to modify it) so that I can use it to substantiate the approximate value of your gift?
>>
>> This allows me to move the project forward immediately when I return to campus...
>>
>> See you soon!
>>
>> Thanks
>>
>> Bill
>>
>>
>>
>> -----Original Message-----
>>
>> Sent: Wednesday, June 8, 2022 9:14 AM
>> To: William Richter <richterw@duq.edu>
>> Subject: Re: [External] Your travel
>>
>> We will plan dinner 6/22. Any spots that you have been to that you would like to show your wife or something new?
>>
>> Los Alamos, Taos and Abiquiu/ghost ranch are all easy  day trips from Santa Fe. In Santa Fe there's the Georgia okeefe museum, an Indian art museum and a folk art museum. Good city tour and enough galleries along canyon road to keep you busy for a day.
>>
>> Itext, imail, Iphone
>> Jill Jankowski

EXHIBIT

1 Gormley

2/14/2024

To:       William A. Richter (richterw@duq.edu)[richterw@duq.edu]
Cc:       Mary Frances Dean[/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=574950a93efc438dafc66cd5611e9692-deanm1]
From:     Cecilia Hughes[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0299864ED6F04220BF4CFD829C654AA9-HUGHESC1356]
Sent:     Fri 5/13/2022 9:05:40 AM (UTC-04:00)
Subject:  Jankowski
Jankowski DSCI 05-13-22.doc

Hi Bill:


Attached is a draft of a Donor Statement of Charitable Intent for the Jankowskis.  I didn't think to ask you yesterday whether the naming rights would take effect at the time the gift is received or at the time the commitment is made.  I will need that detail for the Gift Acceptance Committee.

Once we are all in agreement with the draft, I will prepare a memo from you to the Gift Acceptance Committee for approval.  While we cannot officially approve the Donor Statement of Charitable Intent or sign it on behalf of the University until we get that approval, I don't see a problem with showing it to the Jankowskis if you see them next week.

Let me know if you have any questions.



Cecilia A. Hughes
Gift Planning Officer/
Program and Process Manager
Duquesne University
112 Washington Place
Two Chatham Center, Suite 450
Pittsburgh, PA  15219
412-396-4279
412-396-3003 (fax)


CONFIDENTIAL

**EXHIBIT 19**
Dean
3/8/2024
Lisa A. Bauer, RPR, CRR

Duquesne_00513

Appx288

**From:** Mary Frances Dean
**Sent:** Tuesday, August 2, 2022 3:09 PM
**To:** Jefferson Dedrick <dedrickj@duq.edu>
**Cc:** William Richter <richterw@duq.edu>
**Subject:** FW: Kudos to you!

Hi Jefferson—here is the email that Bill and Jim exchanged in which Bill mentions the
███████gift in December of 2021. This was only one of many communications about
this donor prior to and after this email.

thank you, Mary Frances

**From:** William Richter
**Sent:** Tuesday, December 21, 2021 7:39 PM
**To:** James Miller <millerj@duq.edu>
**Cc:** Mary Frances Dean <deanm1@duq.edu>
**Subject:** RE: Kudos to you!

Jim

Thanks for passing this along... I hadn't been feeling too well since returning from
California; this note certainly lifted my spirits...

███████████ are neat folks and fascinating to talk with █████ retires on December
31 and after seeing how this will affect their monthly budget, they said they'd like to
continue our discussion of their support of Duquesne. I plan to see them in Spring '22
and anticipate a significant hybrid gift – some of which will be allocated to COM.

I'll also visit the ███████████ while in New Mexico; you might recall they've pledged a
$1M PG to our media center – and they hope to travel to Pittsburgh in April for a tour.

Also,█████████ and his wife are planning to visit campus on Jan 24; ████plans to
facilitate a "mock murder trial" from one of his actual cases at our law school. ████ is a
retired ADA from Santa Barbara County and has successfully prosecuted several high
profile murder cases in California courts. I've been invited to sit in on the "trial" and look
forward to it; I know ████ is very excited about it... ████ has substantial capacity to support
our law school...

Lastly, I stayed at the home of ████████████ while in California. What a
spectacular place they have! Ed prepared his "homemade pasta" which was
unbelievable! I was NOT allowed to help, but oh my God, was I allowed to eat! What a
feast!

**EXHIBIT 14**
Dean
3/8/2024
Lisa A. Bauer, RPR, CRR

PL 0050

Appx289

We had a delightful afternoon and evening; they are tremendous people. They have agreed to renew their endowed scholarship to pharmacy and we're talking about a PG to continue funding after they've passed away...

Well, that's enough for now...

Enjoy your Holiday break and stay well!

Sincerely,

Bill

**From:** James Miller
**Sent:** Tuesday, December 21, 2021 6:55 PM
**To:** William Richter <richterw@duq.edu>
**Cc:** Mary Frances Dean <deanm1@duq.edu>
**Subject:** Kudos to you!

Bill,

I received a lovely letter from ▇▇▇▇▇▇ and her husband ▇▇▇▇▇ last evening. The gist of her message was to commend you for the outstanding representation that you have demonstrated in your cultivation of your relationship with her and ▇▇▇.

In their message, they highlighted their appreciation for your engagement with them. They have found you to be "warm, outgoing, informed and personable...with a wealth of experience." You have "gained their trust by speaking with conviction and honesty about the opportunities and challenges the University is addressing" and have NOT made them feel pressured to make or increase their donations to us.

They fully credit your professionalism and low-key approach as the reason for their decision to increase their support of the COM beyond the original intent.

Your outstanding and authentic efforts in working with them has helped ▇▇▇ to "realize how much I appreciate the role Duquesne is again playing in my life." Bill, I can think of no greater gift that you could give to a donor than such a high level of joy and satisfaction derived from THEIR support of US!

Terrific work and many thanks for representing the University in such stellar fashion.

Best regards,

Jim

Jim Miller, B'87
Senior Vice President, University Advancement
Duquesne University
506 Administration Building

PL 0051

600 Forbes Avenue
Pittsburgh, PA 15282
412.396.5172 (office)
412.818.1670 (cell)
millerj@duq.edu

PL 0052



**DUQUESNE UNIVERSITY**
OFFICE OF THE PRESIDENT

### Confidential Memo: Personnel Matter

To: Heather Clay, Senior Associate Vice President for Advancement
From: President Ken Gormley   *KG*
Re: Bill Richter/Failure to Follow Policy and General Concerns
Date: August 5, 2022

I am writing this Memo prior to leaving for vacation, to convey my significant concerns regarding the recent conduct of gift officer Bill Richter in completing a purported agreement with two prominent donors (one of whom is an alumna) purportedly to name – by means of a revocable gift -- the university-wide Center for Emerging and Innovative Media, without getting approval from the Gift Committee or the President as required for such important naming gifts. In my view, this violation of established procedures is egregious. It also represents a continued pattern of poor decision-making, bad judgment, refusal to follow the requisite chain of command, and general unacceptable behavior by Bill Richter, to which I have been privy over the past few years.

On Wednesday July 27, 2022 at the ▮▮▮▮▮▮▮▮ event, I learned for the first time of a purported gift to name the Center for Emerging and Innovative Media ("CEIM"). Since the president must ultimately approve all such namings, this was alarming and disturbing on a number of levels. The CEIM is a university-wide center which I conceived, developed, and fostered over a number of years in order to achieve very specific strategic goals that I had identified for the University. In fact, I have actively spoken with at least one prominent alumna/donor about the opportunity to name the Center in conjunction with a major gift, in hopes of gaining a meaningful infusion of funds which would help to carry out my vision for this beautiful Center which is centrally-located on the ground floor of the Student Union. What I have now learned about the purported naming gift orchestrated by Bill Richter is troubling on many levels. Among other things, the longstanding process was not followed of first seeking approval of such naming opportunities from the Gifts Committee (which allows that group of senior officials to determine the appropriate level of an acceptable naming gift) or myself as President. Equally disturbing, the purported gift which Bill Richter negotiated is a planned gift, which is revocable at any time by the donors. As every gift officer knows or should know, significant naming opportunities are never appropriate for revocable planned gifts, because they may never come to pass. (I should note that I am now aware that Mary Frances Dean, Bill Richter's immediate supervisor, signed the gift agreement without following the proper procedures and was involved to some extent, as well. However, I have no knowledge of the level

1

of Mary Frances Dean's involvement). In light of this conduct, we are now faced with the complicated and embarrassing task of unwinding this purported agreement which exceeded Mr. Richter's authority while at the same time seeking to salvage the relationship with these well-intentioned donors.

This is not the first time I have been aware of problematic behavior by Bill Richter in his role as a major gift officer. Around May or June of 2019, I learned of a dispute that occurred involving Mr. Richter and Dean of the School of Nursing, Dr. Mary Ellen Glasgow. Indeed, I received multiple emails and phone calls from Dean Glasgow about this situation. The dispute centered around important School of Nursing donors,                                        in California, a wonderful couple. The Dean was blindsided when                        informed her of Bill Richter's donor outreach; Mr. Richter did not include Dean Glasgow, who had been cultivating a gift from this couple for a lengthy period of time and was on the verge of completing it, in reaching out to the couple.  When                    learned about the lack of communication, he became very concerned and this jeopardized the overall relationship at a crucial time. Specifically, it turned out that as Dean Glasgow was actively seeking to close the gift, Bill Richter arranged a meeting with the donors seeking to shift the gift to a different Duquesne school, and did not advise the Dean that he was doing so. In the course of ironing out this mess, Dean Glasgow documented serious concerns with Mr. Richter's untruthfulness, which based on my review, were persuasive. I brought these to the attention of Richter's then-supervisor, Vice President John Plante, and expressed my serious concerns with his behavior and his lack of truthfulness in handling this matter. John Plante insisted that he would take care of it and that this was simply a misunderstanding. While the dispute was ultimately resolved, and the gift was completed to the School of Nursing, I continued to be troubled by Mr. Richter's conduct as described in detail by Dean Glasgow.

Not long after this incident, later in the summer of 2019, I learned from Provost David Dausey that Mr. Richter had sent inappropriate, sexually-oriented texts and video to him. The Provost immediately reported this transgression to HR and University Counsel and raised concerns as the actions violated university policy, were contrary to personal and institutional values, and reflected exceedingly poor judgment. I once again expressed my serious concerns to John Plante, and told him that I believed this was a potentially terminable offense because of the complete lack of judgment exhibited and the fact that this conduct violated our sexual misconduct policies. John Plante assured me that this was an isolated incident and that Mr. Richter was remorseful for his misbehavior. Our HR office investigated the matter and took the lead in recommending a sanction. Thereafter, the University issued Mr. Richter a formal written reprimand on August 26, 2019 and required him to engage in remedial actions. In addition, because of my concerns and at my express direction, his previously planned promotion and pay raise were delayed indefinitely. (John Plante came to me around Christmas and argued that Mr. Richter had been a good employee and that Ryan Dawson in HR and Provost Dausey favored allowing his promotion and pay raise to go through in early January. I was troubled by this watered-down sanction but deferred to the judgment of others. In hindsight, having spoken to Ryan Dawson later, I have concluded that he, too, opposed allowing the promotion and pay raise

2

to go through so quickly in light of the serious nature of Mr. Richter's misbehavior. Thus, I feel as both of us were misled when John Plante took this action contrary to what each of us believed was appropriate). John Plante repeatedly assured me, moreover, that there would be no future transgressions by Mr. Richter, and that this was understood in granting him a promotion and pay raise.

This did not end the pattern of troublesome conduct, however. In August of 2021, a significant mathematical error was identified in Mr. Richter's gift agreement with the ████████. This placed the University in the very difficult position of being approximately $70,000 short on funding a student scholarship. Mr. Richter was informed and instructed multiple times to follow up with the donors about the error so that it could be remedied. Despite numerous promises to meet with them and correct the matter, he did not do so. Once again, I received calls and emails from Dean Mary Ellen Glasgow about this problem. About five months after the error was discovered, in January 2022, Dean Glasgow followed up asking whether the donor conversation occurred. Mr. Richter responded that that he wanted to have the conversation in person and planned to do so in the coming weeks in California. Unfortunately, Mr. Richter again did not follow through. The Dean followed up again in April 2022 inquiring as to whether the issue was resolved, at which time I became concerned that his dereliction would result in the inability to award the student scholarship due to insufficient funds in the scholarship account. Ultimately, as a result of the clear mathematical error committed by Mr. Richter and his refusal to resolve it with the donors, the University's Senior Vice President for Finance and Business, Matt Frist, was forced to get involved and reallocate University funds to cover the shortfall in scholarship funds caused by Mr. Richter's mistake and refusal to correct it. As with the other incidents above, I found this course of conduct deeply troubling, and informed his new supervisor, Vice President Jim Miller, of these concerns.

Earlier in the past academic year, I was informed that Mr. Richter was involved in a physical altercation while on a trip to visit with donors (I believe it took place in Texas) during which he became involved in a confrontation with another man in a parking lot causing the police to be summoned while the donors arrived and witnessed the scene. I admittedly do not know the details of this altercation, or who did what to whom. I was informed of the situation, as often I am informed when employees are involved in work-related incidents, in case we received outreach by the alumni/donors or the police about the incident. Suffice it to say, however, that this is not the sort of behavior one would expect or hope that one's gift officers would be engaging in while serving as an ambassador to the University. Again, I found it troublesome and indeed disturbing.

I mention these additional incidents only because they underscore the failure to follow expected behaviors as a gift officer, that have reached new levels with Mr. Richter's recent, egregious violation of policy in seeking to name a major university-wide Center without ever consulting with the relevant Vice President, Gift Committee, or myself as President. The breach of well-established procedures was even more startling because it purports to name the Center with a gift that can be revoked, in flat contravention of our longstanding policies.

3

In sum, this pattern of serious misconduct is deeply concerning. Mr. Richter has demonstrated shortcomings in his performance relating to communication as well as compliance with institutional policies, processes, and values. As a result of these incidents, I have additional concerns about his truthfulness, competence, decision-making and judgment. Rather than improve his performance after each incident, he seems to have escalated his misconduct. As a result, I have strong reservations about allowing Mr. Richter to remain in his important donor-facing role. Major gift officers, in a very real way, represent the University as ambassadors vis-à-vis our most prominent alumni and donors. It constitutes a failure to carry out our own duties as stewards of this 144-year-old academic institution to allow behavior such as that exhibited by Mr. Richter on a now-regular basis to be left unchecked. If he does remain, at a minimum, there must be some serious sanctions imposed; there must be retraining about policies and procedures as well as about respectfully and appropriately responding to direction; and additional parameters must be established to make sure that no future transgressions of this nature will be allowed to occur, if he indeed is capable of continuing as a fundraiser in light of this growing list of transgressions.

Since I will be leaving for vacation on Sunday, feel free to contact me today or tomorrow if you have any questions at all about the material set forth in this Memo.

4

**From:** President of Duquesne University
**To:** Heather Clay
**Subject:** Heather, Confidential Memo/Personnel Matter/Bill Richter
**Date:** Friday, August 5, 2022 5:48:44 PM

Heather,

My memo addressed the pattern of serious misconduct by Bill Richter, which I shared with you so that you would possess this information as you move forward in addressing his conduct. To be clear, it would be wholly inappropriate for the you or the University to make any recommendations or decisions concerning Bill Richter until HR completes its investigation, drafts and issues a report, and discusses the outcome with you. While I wanted to provide you information before I left for vacation, I did not intend to suggest that any recommendations or decisions should be made by Sunday. To the contrary, you need to follow through with the process and work with HR to determine the proper way to handle this serious situation. The first step, necessarily, is to get HR's report once they have gathered all of the facts. I know that you are new to the University and some of this background and context in this particular matter is likewise new; however, the professionals in HR are very experienced in these matters, and their expertise will allow you and the University to reach an appropriate decision.

With respect to the attachment, I will not have time to review this in the immediate future, as I am swamped with completing dozens of speeches etc. for the new academic year that must be ready as soon as I return from vacation. I recognize that you have taken on a challenging role and I encourage you to work collaboratively with your Vice President, Jim Miller. He has been at Duquesne for over thirty years and he was appointed by me with the strong support of the Board of Directors to carry out a productive strategic vision for Advancement that aligns with our Spiritan mission and the ambitious Strategic Plan that we adopted early in my presidency.

Thanks for your willingness to serve the University in this new role that you've undertaken. I look forward to seeing you when the new academic year begins in a few weeks.

Ken

**From:** Heather Clay
**Sent:** Friday, August 5, 2022 4:36 PM
**To:** President of Duquesne University <president@duq.edu>
**Subject:** RE: Confidential Memo/Personnel Matter/Bill Richter

Dear Ken,

Thank you for conveying your concerns and this confidential information. You are correct. This information is troubling.

I agree with you; serious sanctions should be issued against Bill Richter for his actions. As a successful fundraising leader, I have thirty years of knowledge and experience at the highest levels of fundraising, and I have managed hundreds of employees. My strong skills in coaching and management work to drive my team's productivity or readily assists them in transitioning to their next role. Further, I know how to make difficult, acute decisions when employees are not benefiting the institution.

In spring 2022, I was hired into my role to assess the advancement team, and develop a plan of action to address concerns about fundraiser productivity, stagnant events and participation, silos within the division, outdated processes and procedures, and a need for strategic planning. All of these issues have caused and continue to cause daily difficulties within the advancement team.

Over the course of seven weeks, I conducted 43 meetings with Advancement and University professionals. I asked open-ended questions about employee engagement, processes, procedures, best practices, fundraising strategies, morale, communication, collaboration, and other topics. All individuals were readily willing to share their experiences and knowledge once they were guaranteed confidentiality. On June 28, 2022, I shared with Jim Miller my 56-page Business Analysis of the DU Advancement team. I detail the information I uncovered during my analysis and my plan for addressing the complicated situation. I have attached that analysis for your review. In addition to this analysis, since my arrival, I have been a part of meetings, conversations, emails, and text exchanges. It is evident that the work environment created by past and current leadership with the Advancement team is very toxic, unproductive, retaliatory, and puts Duquesne University at risk. As SAVP, it is my role to protect the DU brand. The information relayed to me and what I have witnessed and heard since my arrival makes me concerned for the DU brand.

I know interviews are hard to validate. However, individual accounts and other evidence appear to demonstrate a pattern of behavior. In this environment, I cannot be expected to realign a team when the advancement leader is allowed to continue in this manner. I have a strong passion for Duquesne University and want my leadership and strategic efforts to succeed. I am anxious to produce the results that I promised you from the very beginning.

I have detailed my recommendations for actions in the Richter situation below. I welcome your feedback and input. It is my hope to finalize the action I should take before you leave for vacation on Sunday. I also request a time to meet with you upon your return to discuss my analysis and what I need as a leader to help prevent these situations from happening in the future. I hope all of this can be kept in confidence.

Sincerely,
Heather Clay

Actions to address the concerning situation involving Bill Richter:

- An immediate one-on-one meeting between Heather Clay and Bill Richter to review the findings from HR regarding the Jankowski gift. The appropriate details of the investigation will be provided in writing to Bill along with his agreement to receive personal retraining from Heather of the DU Advancement and campus policies and procedures. Further, he must provide his signed acknowledgment of this training and his agreement to comply with all the policies and procedures set forth. Future non-compliance with any policies and procedures will be cause for immediate dismissal.
- Bill Richter must respectfully and appropriately respond to workplace direction provided by Heather Clay and/or his immediate supervisor, in this case, Mary Frances Dean.
- Bill Richter must turn over the assignment, and any related documentation of the ████████ to Heather Clay for her, or her designee's, continued development of them

as major gift donors. Further, he must turn over the Jankowskis in a manner that eases this transition in a professional and collegial manner.

- The gift, fund, and donor agreements process will be immediately changed to reflect best practices in university fundraising. Draft agreements must be approved only by the SAVP or VP of Advancement, with acknowledged approval by President Ken Gormley, or his designee. Draft agreements will not be shared with any donors by any advancement team members until these approvals are secured. The final gift, fund, and donor agreements will only be signed by the SAVP or VP of Advancement. Any final agreements for gifts of $100,000 or more will be signed by President Ken Gormley or his designee.

**From:** President of Duquesne University <president@duq.edu>
**Sent:** Friday, August 5, 2022 2:18 PM
**To:** Heather Clay <clayh@duq.edu>
**Subject:** Confidential Memo/Personnel Matter/Bill Richter

Dear Heather,

Please see the attached Confidential Memo.

Many thanks,

Ken

Ken Gormley
President
Duquesne University
600 Forbes Avenue
Pittsburgh PA, 15282
Tel 412.396.6060
Fax 412.396.5811



UNIVERSITY ADVANCEMENT
James G. Miller, B'87
Senior Vice President

506 Administration Building
600 Forbes Avenue | Pittsburgh, PA 15282
412.396.5172 | 412.818.3670 (cell) | 412.396.4980 (fax)
miller@duq.edu

August 17, 2022

Via email and regular mail

Mr. William Richter

████████████████

**Re: Termination of Employment**

Mr. Richter,

Over the last several weeks, the University's Human Resources Department investigated allegations that you potentially violated two advancement division policies through a recently signed naming agreement. Naming agreements are of critical importance to the University, as clear and precise documents protect the interests of both donors and the University. Naming both celebrates and recognizes donors in a highly public manner, inspiring other donors to step up to similar levels of support, and is a significant tool for our fundraising team which necessarily commits the donor and University to one another.   The investigation concluded that you violated Division policies relating to namings in several ways. In addition, you repeatedly refused to meaningfully participate in the investigation, and engaged in recalcitrant and disrespectful behavior which led to the need to suspend you pending the outcome of the investigation.

Senior gift officers hold an important role at the University, acting as ambassadors with many of our most prominent internal and external constituents. Unfortunately, as you know, your conduct on more than one occasion has caused internal constituents, senior university leaders, to raise serious concerns with your performance and professional judgment.  We are now also in the position of trying to minimize the potential for reputational harm with external constituents as a result of additional significant failures.

As a result, I have lost faith in your professional judgment and effective internal and external engagement abilities. As a result of your pattern of performance, including this most recent violation, the egregious behavior underlying your 2019 formal discipline involving sexual misconduct, and refusals to correct errors with donors in 2021 and 2022, your employment with the University is terminated effective immediately.

Please be advised of the following related to your separation of employment:

- You are completely relieved of all your duties as Senior Major and Gift Planning Officer effective August 17, 2022.

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00013

Appx299



UNIVERSITY ADVANCEMENT
James G. Miller, B'87
Senior Vice President

508 Administration Building
600 Forbes Avenue | Pittsburgh, PA 15282
412.396.5172 | 412.818.1670 (cell) | 412.396.4980 (fax)
millerj@duq.edu

- Your final pay reflecting earnings through August 17, 2022 and any remaining regular vacation days will be August 26, 2022.
- Your DUFLEX benefits will continue through August 31, 2022. You will be eligible for COBRA effective September 1, 2022.
- All University issued items – office key, ID card, phone, computer and related equipment must be returned to our office by August 22, 2022.

Sincerely,

James G. Miller, B'87
Senior Vice President for Advancement

c:     Heather Clay, Senior Associate Vice President for Advancement
       Office of Human Resources

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00014

Appx300

19.     Identify all persons of whom the Defendant has knowledge who may have information which is any way relevant to the allegations made in the Complaint in this case.  This answer should include information regarding individuals who are currently employed by the Defendant, who are former employees of the Defendant, or any other individual who may have any knowledge at all which is relevant and/or discoverable by the Plaintiff in this action. For each such person, please state the following:

     a.     name, address and home telephone number;

     b.     date of birth;

     c.     what information such individual has regarding this case; and

     d.     if such person has knowledge which may form the basis of expert testimony in this case, please state the following:

          (i)     the basis or grounds for such individual's expertise;

          (ii)     the substance of the expert knowledge possessed by such individual; and

          (iii)     whether or not any report has been prepared by such individual, or whether the Defendant have requested such a report in which an expert opinion is sought by the Defendant.

**ANSWER:**

Defendants object to this Discovery Request because it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because it requests information that is in "any way relevant," which does not meet the standard for admissibility or appropriately limit the scope of such Request.

Without waiver of and subject to these objections or the General Objections above, Defendants refer Plaintiff to their Initial Disclosures and Plaintiff's Initial Disclosures and further state the following individuals' ages at the time of Plaintiff's termination:

- Defendant Miller – age 57

22

Appx301

- Heather Clay – age 48

- Kenneth Gormley – age 66

- Adam Viers – age 41

- Melissa Krebs – age 48

- David Dausey – age 47

- Ryan Dawson – age 47

- Jefferson Dedrick – age 27

- Daniel Gilman – age 40

- Mary Frances Dean – age 60

- Cecilia Hughes - age 61

Appx302

## WILLIAM RICHTER

- - - -

166

1  A. No.
2  Q. So, did you reach out to any of those 97
3  donors?
4  A. I don't recall.
5  Q. You don't recall meeting with any of the gift
6  officers who had those assignments previously?
7  A. No.
8  Q. The criteria Mr. Miller lists here in the third
9  paragraph, it starts with "While there were a number of
10  considerations..."
11  Do you see that?
12  A. Uh-huh.
13  Q. Are any of these criteria that are listed here
14  related to your age?
15  A. No.
16  Q. Are they related to any complaints that you had
17  made in the past?
18  A. I don't recall that I would have made a
19  complaint about that.
20  Q. Are you alleging that the reassignments of
21  these donors was discriminatory?
22  A. I don't know.
23  Q. You don't know if you're claiming that it's
24  discriminatory?
25  A. I don't recall, no.

167

1  Q. You don't recall the allegations you're making
2  in this lawsuit?
3  A. I guess I'm not understanding your question.
4  Q. Let me try this again. You understand that
5  donors were removed from your portfolio sometime prior
6  to March of 2022, correct?
7  A. Correct.
8  Q. So, that's what I'm referring to as the
9  reallocation. That's the one that's involved here,
10  correct?
11  A. Uh-huh.
12  Q. Are you claiming that the decision to remove
13  certain donors from your portfolio was made because of
14  your age?
15  A. No.
16  Q. Are you alleging that the decision to remove
17  certain donors from your portfolio was made because of
18  any prior complaints you made?
19  A. No.
20  Q. So, you're not alleging that there was anything
21  discriminatory or retaliatory related to the
22  reassignment?
23  A. Proper protocol was not followed in this
24  instance and other instances as well. Whether that's
25  discriminatory or not, I don't know the definition of

168

1  "discriminatory."
2  Q. What is your understanding of what the
3  definition of "discriminatory" is?
4  A. Favoring one person over another.
5  Q. And do you believe that that happened with
6  respect to the reallocation?
7  A. Yes.
8  Q. Who was favored?
9  A. Well, Melissa was given one of my top
10  prospects, as just one example of that. There are
11  others. I don't recall the numbers.
12  Q. So, it's very important that we get all of that
13  information, so do you recall any others?
14  A. No. Not as I sit here, no.
15  Q. Is there anything you could look to to help you
16  identify any others?
17  A. No.
18  Q. So, as you sit here today in the deposition for
19  your federal court lawsuit related to age
20  discrimination, the only person that you believe was
21  favored was Melissa Krebs?
22  MR. SANSONE: That's not what he said.
23  You're mischaracterizing his testimony. He said he
24  can't recall anyone else as he sits here.
25  BY MS. McGROGAN:

169

1  Q. Do you understand that today is the day that
2  you get to tell me everything that you believe happened
3  in this lawsuit?
4  MR. SANSONE: Today is the day he gets to
5  testify from his memory. That's what you're entitled
6  to and that's what he's giving.
7  MS. McGROGAN: Yeah, I understand.
8  BY MS. McGROGAN:
9  Q. So, you have no other individuals other than
10  Melissa Krebs that you can point to?
11  A. I'm sure there are others. I don't recall who
12  they might be as I sit here.
13  Q. What could you look at that would help you
14  remember them?
15  A. Nothing.
16  Q. So, you're not going to come back in a couple
17  days and say, oh, wait, here's another one, correct?
18  A. I don't have any way to...
19  Q. Do you believe that Melissa Krebs was favored
20  because she is younger than you?
21  A. I don't know why she was favored.
22  Q. You don't know if it was because she was
23  younger than you?
24  A. I don't know.
25  Q. Do you know if any of the donors from Melissa

43 (Pages 166 to 169)



**DUQUESNE UNIVERSITY**

Jefferson Dedrick
Director of Employee and Labor Relations

Koren Building
600 Forbes Avenue | Pittsburgh, PA 15282
412.396.5103 | (fax) 412.396.5507
dedrickj@duq.edu

**To:**   William Richter, Senior Major and Gift Planning Officer

**From:**  Jefferson Dedrick, Director of Employee & Labor Relations

**Date:**  July 20, 2022

**Re:**   HR Complaint Procedure Investigative Report

### SECTION I. BACKGROUND

On April 3, 2022, William "Bill" Richter, a Senior Major and Gift Planning Officer in the Advancement Department, called to discuss a potential HR Complaint against Jim Miller, Senior Vice President for University Advancement; Adam Viers, Assistant Vice President of Advancement; and Melissa Krebs, Director of Leadership Annual Giving. Mr. Richter completed and submitted the formal complaint form on April 5, 2022. He then completed an initial interview and submitted several documents attached as exhibits. Dr. Dausey and the Respondents were provided a copy of the complaint per the HR Complaint Procedure.

On April 10, 2022, Mr. Miller submitted a rebuttal; on April 18, 2022, Mr. Viers submitted a rebuttal; on April 19, 2022, Ms. Krebs submitted a rebuttal. These were shared with Dr. Dausey and Mr. Richter. A formal investigation followed.

The initial complaint alleged that Mr. Miller, Mr. Viers, and Ms. Krebs violated TAP 55 when Ms. Krebs secured a $50,000 gift from a donor previously assigned to Mr. Richter. Mr. Richter characterized the action as follows: "it prevents me from securing a major gift and has resulted in the decimation of my portfolio which renders it impossible for me to succeed. I met with Jim [Miller] on two separate occasions, sent numerous emails, to unsatisfactory results including Jim stating nothing wrong occurred."

On May 15, 2022, Mr. Richter filed a second complaint against Mr. Miller. Because the allegations arose from subsequent actions related to the factual basis of the first investigation, both complaints are submitted for consideration. Mr. Miller declined to submit a formal rebuttal, as he had already provided information regarding the issues in question during his interview for the first complaint.

CONFIDENTIAL



EXHIBIT  Bw
Richter 22
3.6.2024

Duquesne_00229

Appx304

The second complaint alleged that Mr. Miller violated TAP 55 when he permitted Ms. Krebs to book the original $50,000 gift and directed other advancement team members to complete the booking.

**SECTION II. ALLEGED VIOLATION**

The Complaint alleged a violation of TAP No. 55: Ethical, Respectful and Professional Conduct.

**SECTION III. LIST OF INTERVIEWS**

| Interviewee | Date |
|---|---|
| William Richter<br>Senior Major and Gift Planning Officer | April 5, 2022 |
| Mary Frances Dean<br>Senior Assistant Vice President for Gift Planning | April 19, 2022 |
| Adam Viers<br>Assistant Vice President of Advancement | May 4, 2022 |
| Melissa Krebs<br>Director of Leadership Annual Giving | May 9, 2022 |
| Paul Demilio<br>Executive Director of Advancement Research | May 10, 2022 |
| Jim Miller<br>Senior Vice President for University Advancement | May 16, 2022 |
| Cecilia Hughes<br>Planned Giving Officer | May 18, 2022 |
| Carla Holmquist<br>Major Gifts Officer | May 24, 2022 |

Additional follow-up communications occurred between May 24, 2022 and June 15, 2022.

**SECTIONS IV. CONCLUSIONS AND RECOMMENDATIONS**

The first and second complaint filed by Mr. Richter alleged a violation of The Administrative Policy 55. Ethical, Respectful and Professional Conduct. The purpose of this policy is to help to ensure that University employees abide by fundamental principles of respectful behavior, ethics and professionalism, as is consistent with the University's Mission and Identity.

TAP 55 outlines several expectations, which are listed below:

> "All employees are expected to conduct themselves professionally, and demonstrate respect for others, honesty and integrity. Accordingly, employees must:
>
> 1. Cooperate with and treat fellow employees and students with honesty and respect.
>
> 2. Exhibit a commitment to ethical and professional conduct.

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00230

Appx305

3. Strictly refrain from any dishonest, illegal and/or fraudulent actions.

4. Refrain from recording (audio or video) other members of the University community without their full advance knowledge and express and/or written consent.

5. Maintain and respect the privacy and/or confidentiality of information entrusted to them.

6. Manage people and resources responsibly."

There are four components of Mr. Richter's complaint: first, allegations against Ms. Krebs; second, allegations against Mr. Viers; third, three allegations against Mr. Miller from the first complaint; and fourth, allegations against Mr. Miller from the second complaint. These components are taken in turn.

*Complaints against Melissa Krebs*

The Complaint alleged that Ms. Krebs violated TAP 55 when she sent the following email to a donor:

> "I understand that you have met with a colleague of mine in the past, Bill Ritcher [sic]. He has shared some of your thoughts on these subjects with me, but I would be truly grateful to learn this information directly from you."

The investigation determined that Ms. Krebs was assigned the donor through the portfolio rebalancing or "churn" process. As a part of reassignment, gift officers often discuss transition with the previously assigned gift officers to understand the donor, their relationship, and other information or questions related to the normal course of business or from the contact reports. However, there is no requirement to do so in either policy or practice.

In this situation, Ms. Krebs stated she did not have questions about what she read in the contact reports. While others may read prior contact report entries differently based on information they are otherwise privy to, or with the benefit of hindsight, there is no evidence to suggest Ms. Krebs would have believed it necessary to do so. Without a policy or precedent obligation to do so, there is no TAP 55 violation for failure to discuss a specific donor with a prior gift officer.

Ms. Krebs also sent an email to the donor where she stated that Mr. Richter had "shared some of your thoughts on these subjects with me." It was established that Ms. Krebs did not speak to Mr. Richter, and

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00231

Appx306

that such a statement was misleading. Even so, Ms. Krebs could not be expected to know of the ongoing, confidential conversations between the donor and Mr. Richter that Mr. Richter suggests could threaten his credibility as an advancement professional. She can not be held accountable for statements that were neither entered into the contact reports (due to a request and concerns of confidentiality) nor referenced in any manner (i.e., "Met with donor today. We discussed items including confidential information the donor asked me not to share") within the contact reports.

Ms. Krebs and several others contend that the difference between actually speaking to another gift officer and referencing them after reading the contact reports, in order to build a relationship with a donor, is a matter of semantics. While that may be so in most situations, it was not in this case, and Ms. Krebs did in fact make statements that were misleading but do not rise to the level of a TAP No. 55 violation.

### Complaints against Adam Viers

The Complaint alleged that Mr. Viers violated TAP 55 in supporting Ms. Krebs's actions in contacting the donor and soliciting and advancing the gift of $50,000. Mr. Viers followed the directives of his supervisor in providing portfolio reassignments to the employees he supervised and in supporting their solicitation of donations. There is no evidence that Mr. Viers made false statements, engaged in dishonest behavior, or otherwise acted contrary to TAP 55 in relation to the complaint.

### First Complaint against Jim Miller

The first Complaint alleged that Mr. Miller violated TAP 55 when he inappropriately completed portfolio redistribution/churn; when he did not inform Mr. Richter about the donor being reassigned to Ms. Krebs prior to the reassignment taking effect or provide Mr. Richter an opportunity to request to keep the donor; and finally, when Mr. Richter approached Mr. Miller about his concerns related to Ms. Krebs.

First, the Complaint alleged Mr. Miller inappropriately completed the portfolio redistribution/churn. There was clear disagreement within the advancement team about the churn process. It appears that in the past, advancement leadership would partner with Mr. Demilio and the Advancement Research team to determine areas of concern (i.e., these donors are deceased, have not responded after several requests, this officer is only going to this far city for one donor, etc.), create proposed changes, provide these changes to front-line officers, make changes based on front-line officer and supervisory feedback,

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00232

Appx307

and then finalize portfolios. However, churns have operated differently based on advancement leadership and no internal Duquesne policy has been established detailing the process.

In this instance, the evidence established that Mr. Miller was directed by Ken Gormley, Duquesne President, to reassign donors who had not been contacted either in-person or via zoom in the prior two years during COVID-19. Mr. Miller, Mr. Viers, and Mr. Demilio reviewed portfolios based mainly on this directive – and changes were made largely by Mr. Miller redistributing portfolios based on his knowledge of donors and portfolios. Contact reports with donors were not reviewed as a part of this process.

While there may be concerns with Mr. Miller unilaterally red-lining and redistributing portfolios, there was no evidence submitted that established that his doing so violated university policy, including TAP 55. Mr. Richter made arguments that his portfolio was insufficient and incompatible with his metrics, and further that not all contacts were entered into contact reports, but without policy detailing the churning process or clear indicators that his "win and loses" had a disparate impact on his portfolio, there is no policy which would bar Mr. Miller from reassigning work and donors as he deems appropriate. In fact, as Senior Vice President of Advancement, that is his prerogative.

Second, the Complaint alleged Mr. Miller did not properly inform Mr. Richter about the donor being reassigned to Ms. Krebs prior to the reassignment taking effect or provide Mr. Richter the opportunity to request to keep the donor.

The evidence establishes that the portfolio redistribution was completed in early February 2022. On February 2, 2022, Mr. Viers sent the completed portfolio lists to Mr. Miller and Mr. Demilio. Mr. Viers asked if Mr. Miller would share the information with Mr. Richter and his supervisor, and Mr. Miller agreed. Thereafter, Mr. Viers shared the portfolios with his team. At least one individual on Mr. Viers team had the opportunity to review and request to keep several donors, which was granted at least in part. Mr. Miller did not share the changes with Mr. Richter, Ms. Dean, or Ms. Hughes. Mr. Richter became aware of the changes on March 7, 2022, when Ms. Krebs submitted the request to document the donor's $50,000 gift to Ms. Dean, Mr. Richter's supervisor, who approached him about it.

Mr. Richter initially emailed Mr. Miller on March 10, 2022, highlighting his general concerns with Ms. Krebs. They agreed to meet on March 23. After that meeting, on April 1, Mr. Richter followed up the

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00233

Appx308

meeting with an email to Mr. Miller stating additional concerns about Ms. Krebs and how the portfolio realignment process would affect his outcomes. Mr. Miller responded the same day, explaining the realignment process and priorities, as well as making the following offering:

> "As Mary Frances and Cecilia have done recently with the proposed changes to their respective portfolio's [sic], please feel free to send me a list of those prospects/donors you would like to request be retained.  Upon review, in limited instances, those requests may well be accommodated."

In his interview, Mr. Miller indicated he had not provided the portfolio changes to Mr. Richter prior to the reassignments occurring because of travel timelines and difficulty with communicating with Mr. Richter's supervisor. He also initially stated that no gift officers had the opportunity to provide feedback on proposed changes, but when asked about an employee Mr. Viers supervised who had the opportunity to do so, Mr. Miller recognized they may have had an opportunity with Mr. Viers but had not with himself.

That being said, there is no evidence that Mr. Miller took these actions in a manner that was unethical or unprofessional in redistributing portfolios. Mr. Miller was executing a directive from the university by redistributing portfolios according to the last "face-to-face" contact date. Without policy requiring a standardized or more inclusive process, he was well within his authority to redistribute without allowing for input generally, even if Mr. Viers did utilize his authority as a supervisor to allow for some small relief within his team after portfolios were distributed.

Mr. Richter should have been notified of the portfolio changes. The success of a member of the advancement team is defined, in part, by the constitution of these portfolios. It should not be surprising that Mr. Richter would be deeply upset when he not only lacked input into these changes, but that he found out more than a month after everyone else and only after a team member submitted a gift from a donor he believed was his and his to close at a higher dollar amount.

Still, there is no evidence that Mr. Miller's lack of notification was related to a TAP 55 violation. Mr. Miller discussed several explanations for his failure to notify Ms. Dean and Mr. Richter. While some of his explanations are conflicting, there is no evidence that this was anything more than a mistake.

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00234

Appx309

Finally, the Complaint alleged a violation of TAP 55 in Mr. Miller's lack of response to Mr. Richter's concerns regarding Ms. Krebs's actions. The evidence firmly established that Ms. Krebs was assigned the donor prior to reaching out, and Mr. Miller would have known this while Mr. Richter did not. Even so, Ms. Krebs did reference a conversation with Mr. Richter which never occurred. While Mr. Miller may have believed this to be a matter of semantics, in this situation it may have caused damage to Mr. Richter's character with a donor. It would have been appropriate for Mr. Miller to address the use of language and the importance of truthfulness with Ms. Krebs, even if he did not believe it to be the serious infraction and breach that Mr. Richter described it is.

### *Second Complaint Against Jim Miller*

The second Complaint alleged that Mr. Miller violated TAP 55 when he directed that the $50,000 gift from the donor be documented and processed. In this instance, Ms. Krebs was assigned the donor, secured a gift, and told the donor he would be provided the documentation. It was not a violation of TAP 55 for Mr. Miller to direct that the gift be documented.

c:      Ryan Dawson, Associate Vice President/CHRO

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00235

Appx310

**APPENDIX I EVIDENCE**

| Evidence Indicator | Date Received | Description |
|---|---|---|
| E-1 | April 3, 2022 | Email entitled "Please help !" from W. Richter to J. Dedrick. Email includes four documents explaining the incident and that actions Mr. Richter had taken to date. |
| Richter complaint | April 4, 2022 | PDF document from W. Richter to J. Dedrick. Documenting allegations of TAP 55 violations. |
| E-2 | April 10, 2022 | Email entitled "RE: HR Complaint" from J. Miller to J. Dedrick. Mr. Miller's rebuttal to Mr. Richter's original complaint. |
| E-3 | April 18, 2022 | Email entitled "Confidential HR Request—Formal Response" from A. Viers to J. Dedrick. Mr. Viers's rebuttal to Mr. Richter's original complaint. |
| Dean emails | April 19, 2022 | Packet of emails provided by Ms. Dean. Document her interactions with Ms. Krebs regarding the donor and concerns with portfolio redistribution. |
| Ethics statements | April 19, 2022 | Two ethical standards for fundraising professionals provided by Ms. Dean. Provided after interview. |
| E-4 | April 19, 2022 | Email entitled "RE: HR Complaint & Procedure" from M. Krebs to J. Dedrick. Ms. Krebs's rebuttal to Mr. Richter's original complaint. |
| E-5 | April 28, 2022 | Email entitled "RE: Melissa Krebs" from M. Dean to J. Dedrick, C. Hughes cc'ed. Raising concern that Ms. Krebs was requesting documenting donor's gift at issue in this case. |
| E-6 | May 4, 2022 | Email chain entitled "HR Complaint—email reference" between A. Viers, J. Miller, and P. Demilio, provided from A. Viers to J. Dedrick. The emails reference the completed portfolio churn and planned distribution. |
| E-7 | May 9, 2022 | Email from M. Krebs to J. Dedrick, email name not included because of donor's name. Email includes chain between Ms. Krebs, Mr. Miller, Mr. Viers, Ms. Dean, and Ms. Hughes regarding documentation of donor's gift. |
| E-8 | May 9, 2022 | Email entitled "**Donor Name** – Most Recent Contact Reports from Meetings" from M. Krebs to J. Dedrick. Email includes most recent contact reports for donor at issue. |
| E-9 | May 13, 2022 | Email entitled "Are you kidding me?" from W. Richter to J. Dedrick. Mr. Richter raising concern about Ms. Krebs booking the gift from the donor at issue in the original complaint and requesting to file a second complaint. |
| Richter second complaint | May 17, 2022 | Email entitled "Richter 2nd Complaint Form" from W. Richter to J. Dedrick. Mr. Richter includes both a second complaint form and accompanying summary of concerns. |

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00236

Appx311

| E-10 | May 18, 2022 | Email entitled "Interesting Decision" from W. Richter to J. Dedrick. Mr. Richter describes further actions by Ms. Krebs to document the gift from the donor. |
| E-11 | May 23, 2022 | Email entitled "Re: Second Complaint" from J. Miller to J. Dedrick. Documenting his previous rebuttal to this issue. |
| E-12 | May 25, 2022 | Email entitled "Richter Complaint Rebuttal Response" from W. Richter to J. Dedrick. Included a document which documented Mr. Richter's responses to Mr. Miller's rebuttal and several new issues. |
| E-13 | June 15, 2022 | Email entitled "FW: Lets discuss ASAP" from W. Richter to J. Dedrick. Forwarded emails between Mr. Richter and Mr. Miller discussing complaint concerns in March 2022. |
| E-14 | June 15, 2022 | Email entitled "FW: Need clarification" from W. Richter to J. Dedrick. Forwarded emails between Mr. Richter and Mr. Miller discussing complaint concerns on April 1, 2022. |

Education for the Mind, Heart, and Spirit

CONFIDENTIAL

Duquesne_00237

Appx312

41

1  **She could have been clearer in her communication**
2  **with the donor.**
3  Q. That doesn't answer my question.
4          MS. McGROGAN:  It does answer your
5  question.
6          But you can answer it again.
7  BY MR. SANSONE:
8  A. **That's my answer to the question, that she read**
9     **the donor report which Bill had written, which**
10    **she then used in her terms of understanding the**
11    **circumstance and then reached out to the donor.**
12 Q. No, I understand how it happened.  That wasn't
13    the question.  The question was, why is her
14    statement to Mr. Scott not a violation of Number
15    3?
16         MS. McGROGAN:  Objection to form,
17    asked and answered.
18         You can answer it again.
19 BY MR. SANSONE:
20 A. **It's the same answer I gave previously.  It's**
21    **that she could have been more clear and that was**
22    **the recommendation from HR, is to have a**
23    **communication with Ms. Krebs about the**
24    **importance of being clearer in communications**
25    **moving forward to not have misunderstandings.**

42

1  Q. It's my understanding that it was your decision
2     as to whether or not this was a violation of the
3     rules; is that right?  You made the decision
4     that it was not; correct?
5  A. **We have a -- we have an investigation that**
6     **happens, HR provides me with their report and**
7     **their recommendations, and I look at all of**
8     **those things to make a decision and decide**
9     **whether or not to go forth with their**
10    **recommendations or do something else.  I thought**
11    **their recommendations were reasonable and that's**
12    **what I decided to go forth with.**
13 Q. So the answer to my question is yes, it was your
14    decision?
15 A. **Yes.**
16 Q. Let's take a look at the language.
17         MR. SANSONE:  This is 4?
18         - - - -
19         (Deposition Exhibit No. 4 was marked
20    for identification, and the witness reviewed the
21    document.)
22         - - - -
23 BY MR. SANSONE:
24 Q. So I'm showing you what's been marked as Dausey
25    Exhibit 4.  And if you will go to Page 4 of 16,

43

1  Duquesne Bates 216.  You see in the middle of
2  the page there is the language we're talking
3  about; right?
4          MS. McGROGAN:  Objection to form.
5          You can answer.
6  BY MR. SANSONE:
7  A. **Yes.**
8  Q. Okay.  And the language reads -- and this is
9     Ms. Krebs communicating with Mr. Scott; is that
10    correct?
11 A. **As I understand, yes.**
12 Q. It says, I understand that you, Mr. Scott, have
13    met with a colleague of mine in the past, Bill
14    Richter, he shared some of your thoughts on
15    these subjects with me.  Now, can we agree that
16    that's not true?
17 A. **There are contact reports that everyone --**
18 Q. I know there are contact reports.  I'm asking --
19 A. **Everyone shares those contact reports, you work**
20    **on a team in advancement, those reports are --**
21    **the reason we write them is so that everyone**
22    **knows what is happening with donors because it's**
23    **not usually one person who has contacts with**
24    **donors.  So it is misleading, yes.**
25 Q. It is misleading, okay.  Are you aware of any

44

1  reasons why that statement might have upset
2  Mr. Scott?
3          MS. McGROGAN:  Objection to form,
4  calls for speculation.
5          You can answer to the extent you know.
6  BY MR. SANSONE:
7  A. **I don't know.**
8  Q. Did you learn in the course of this
9     investigation that Mr. Scott had asked
10    Mr. Richter to keep his plans for donation and
11    his estate planning confidential until he
12    decided what he wanted to do?
13 A. **That was in the report, yes.**
14 Q. Okay.  Do you not understand why it might upset
15    Mr. Scott that someone else who was not Bill
16    Richter was being given information he asked to
17    keep confidential?  Do you understand that might
18    upset the donor?
19         MS. McGROGAN:  Objection to form.
20         You can answer.
21 BY MR. SANSONE:
22 A. **I don't know what would upset the donor or not.**
23 Q. That's because you don't have any experience in
24    donations; right?
25         MS. McGROGAN:  Objection to form.

89

1 correct?
2 A. I told individuals that -- I reported this, I'm
3 not in the line of decision-making for someone
4 that's not my direct report that does not report
5 into my unit.
6 Q. It must be me. I asked were you consulted about
7 the decision as to what discipline he would get.
8 Is the answer to that yes or is it no?
9 A. I can't remember.
10 Q. Okay. Do you have any knowledge of claims made
11 about Mr. Miller that he has, from time to time,
12 engaged in misconduct involving women employees
13 at Duquesne?
14 MS. McGROGAN: Objection to form.
15 You can answer.
16 BY MR. SANSONE:
17 A. No.
18 Q. So you've never heard any suggestion that
19 Mr. Miller's conduct with women was
20 inappropriate?
21 A. No.
22 Q. This is the first time you're hearing this
23 today?
24 A. Yes.
25 MR. SANSONE: Give us a few minutes.

90

1 - - - -
2 (Whereupon, there was a brief pause in
3 the proceedings.)
4 - - - -
5 BY MR. SANSONE:
6 Q. Let's go back on the record. Dr. Dausey, did
7 you have an opinion about my client and his
8 abilities as a gift officer for Duquesne?
9 MS. McGROGAN: Objection to form.
10 You can answer.
11 BY MR. SANSONE:
12 A. Yes.
13 Q. What was that opinion?
14 A. Following one of my trips I was just really
15 impressed with Bill's rapport with the people we
16 met with. They really seemed to like Bill and I
17 was just really impressed by that.
18 Q. Do you have an opinion as to Mr. Miller's skills
19 and abilities as a gift officer?
20 A. Yes, I think Jim's a good gift officer too. He
21 has a good rapport with the clients as well, at
22 least the interactions that I've seen.
23 Q. Okay. And do you know anything about
24 Mr. Miller's reputation with how he treats
25 employees at Duquesne?

91

1 A. No. Or I don't know.
2 Q. You've not heard anything about whether or not
3 he treats employees well or properly?
4 MS. McGROGAN: Objection to form.
5 You can answer.
6 BY MR. SANSONE:
7 A. No.
8 MR. SANSONE: That's all I have.
9 MS. McGROGAN: I have no questions.
10 We will review and sign.
11 THE COURT STENOGRAPHER: Do you need
12 electronic only?
13 MS. McGROGAN: Yes.
14 - - - -
15 (Whereupon, the proceedings were
16 concluded at 2:59 p.m.)
17 - - - -

92

1 COMMONWEALTH OF PENNSYLVANIA ) CERTIFICATE
2 COUNTY OF ALLEGHENY ) SS:
3 I, Beth E. Welsh, a Court Reporter and
4 Notary Public in and for the Commonwealth of
5 Pennsylvania, do hereby certify that the witness,
6 DAVID DAUSEY, Ph.D., Ed.D., was by me first duly
7 sworn to testify to the truth, the whole truth, and
8 nothing but the truth; that the foregoing deposition
9 was taken at the time and place stated herein; and
10 that the said deposition was recorded
11 stenographically by me and then reduced to printing
12 under my direction, and constitutes a true record of
13 the testimony given by said witness.
14 I further certify that the inspection,
15 reading and signing of said deposition were NOT
16 waived by counsel for the respective parties and by
17 the witness. I further certify that I am not a
18 relative or employee of any of the parties, or a
19 relative or employee of either counsel, and that I am
20 in no way interested in this action.
21 IN WITNESS WHEREOF, I have hereunto set my
22 hand and affixed my seal of office this 18th day of
23 March, 2024.
24
25 Notary Public

53

1  Q. I didn't hear the end.
2  A. **Of advancement, yes.**
3  Q. And if it were true that Ms. Dean had kept
4     Mr. Miller informed about the nature of this
5     gift as it progressed, would that change your
6     opinion about Mr. Richter's conduct here?
7  A. **Well, again, that's speculation, so I can't**
8     **give the answer.  There's so many factors that**
9     **would be involved.  It would depend on what**
10    **Mr. Richter's conduct was along with that, so**
11    **I can't speculate.**
12 Q. What do you mean by that, it would depend on
13    what his conduct was along with that, what
14    conduct are you referring to?
15 A. **Well, whether someone told Mr. Miller or not**
16    **which you're speculating about or**
17    **representing, there could --**
18 Q. I'm just telling you what the testimony was.
19 A. **Well, that's one person's testimony.**
20        MS. McGROGAN:  You're
21    mischaracterizing testimony.
22 BY MR. SANSONE:
23 A. **And so -- but my point is, the investigation**
24    **could have found that someone said,**
25    **Mr. Richter, the president does not approve of**

54

1     **this and yet he went forward and brought it**
2     **to -- there are lots of factors that could go on**
3     **that I'm not privy to here, so that's what an**
4     **investigation is for.**
5        MR. SANSONE:  This is going to take me
6     a moment to sort this out.  Give me a second.
7     Gormley 3.
8            - - - -
9        (Deposition Exhibit No. 3 was marked
10    for identification.)
11           - - - -
12 BY MR. SANSONE:
13 Q. I'm showing you what's been marked as Gormley
14    Exhibit 3, and ask you if you've seen this
15    document before, and I will warn you that it's
16    two documents, as well as the email.
17 A. **Right, yes.  It's two documents.  It's a memo, a**
18    **confidential memo I should note that I -- oh,**
19    **I'm sorry, this is -- yeah, this is the**
20    **confidential memo that I sent to Heather Clay**
21    **before I left on vacation, and then there are**
22    **emails back and forth I believe that same day.**
23 Q. Okay.  So you have seen this is the answer?
24 A. **Yes, I have.**
25 Q. Did you have any assistance in drafting this

55

1     memo?
2        MS. McGROGAN:  Objection to form.
3     I'm going to instruct you not to answer to the
4     extent it involves counsel.
5  BY MR. SANSONE:
6  Q. Other than consulting with counsel, did you
7     have assistance from anyone else --
8  A. **No.**
9  Q. -- to prepare this memo?
10 A. **No.**
11 Q. Did Mr. Miller assist you in preparing this
12    memo?
13 A. **No.**
14 Q. In the first paragraph of the memo, you
15    indicate that you have significant concerns
16    regarding the recent conduct of gift officer
17    Bill Richter in completing a purported
18    agreement with two prominent donors; do you
19    see that?
20 A. **Yes.**
21 Q. What does the word completing mean there?
22 A. **Well, obviously it was my understanding that**
23    **he had represented to these donors that if**
24    **they made this charitable, you know, again,**
25    **tell me the name of it.  Charitable Intent**

56

1     **document, that the University would name the**
2     **Center for Emerging and Innovative Media.**
3  Q. Well, this says completing a purported
4     agreement, what does that mean?
5  A. **Well, again, I hadn't seen the precise**
6     **document but it represented -- he represented**
7     **in the document that the University was**
8     **agreeing to name the Center.**
9  Q. And I think I asked you this but I want to
10    make sure I did, is it your understanding that
11    a Statement of Charitable Intent binds the
12    University?
13 A. **If it says it binds it, yes.  If an official**
14    **of the University signs it, yes.  And I'm not**
15    **even -- I'm not a contract lawyer, but if you**
16    **make oral representations to an individual,**
17    **that could bind the University as well.**
18 Q. So what are you referring to here when you say
19    in completing a purported agreement, are you
20    referring to an oral representation?
21 A. **No, I'm referring --**
22 Q. To the Statement of Charitable Intent?
23 A. **Yes, exactly, that was signed.**
24 Q. And Mr. Richter didn't sign that?
25 A. **That's correct.**

61

1   communication did not happen again.
2   Q. My question was, do you agree that her
3      communication with Mr. Scott violated this
4      policy? Is that a yes or a no?
5         MS. McGROGAN: Objection to form.
6         You can answer.
7   BY MR. SANSONE:
8   A. No, it didn't violate the policy.
9   Q. Can you agree that if it had violated -- if she
10     had violated the policy, she would be subject to
11     formal discipline?
12        MS. McGROGAN: Objection to form.
13        You can answer.
14  BY MR. SANSONE:
15  A. Again, it says subject to formal disciplinary
16     action.
17  Q. And are subject to, not maybe, but are subject
18     to. Do you see that?
19  A. Yeah.
20  Q. So would you agree that if she violated this
21     Part III of the Expectations, that she would be
22     subject to formal discipline, up to and
23     including termination?
24        MS. McGROGAN: Objection to form.
25        You can answer.

62

1   BY MR. SANSONE:
2   A. Yes. Formal disciplinary action can also
3      include something as simple as a letter that
4      goes to the person's file.
5   Q. Sure, there's a whole range of discipline;
6      right?
7   A. Correct.
8   Q. None of which occurred here; right?
9         MS. McGROGAN: Objection to the form.
10        You can answer to the extent you know.
11  BY MR. SANSONE:
12  Q. She wasn't disciplined for this; right?
13        MS. McGROGAN: Objection to form.
14        You can answer to the extent you know.
15  BY MR. SANSONE:
16  A. She was not -- I don't know, but I don't believe
17     so.
18        MR. SANSONE: I need to take a
19     ten-minute break. Let's make it 2:15 we'll come
20     back.
21            - - - -
22        (Whereupon, there was a brief pause in
23     the proceedings.)
24            - - - -
25  BY MR. SANSONE:

63

1   Q. I was asking you about your ambition at Duquesne
2      when we first sat down. Have you interviewed
3      anywhere else since you've come to Duquesne?
4   A. No.
5         MS. WILKINS: Wait.
6         MR. SANSONE: What do you mean wait?
7         MS. WILKINS: I'm sorry, I'm not
8      allowed to speak.
9         MR. SANSONE: There's no time-outs.
10        MS. WILKINS: I apologize.
11  BY MR. SANSONE:
12  Q. The answer is no to my question?
13  A. (Nodding head up and down.)
14  Q. Have you applied for any positions?
15  A. I've contemplated, but I haven't, no.
16  Q. You've contemplated, but have not taken any
17     action in that direction?
18  A. Yeah.
19  Q. Okay. I don't know if we got this answer, but
20     do you know whether or not there was any effort
21     made after this Allan Scott business came to
22     light to go back to Mr. Scott to see if the
23     additional 200,000 could be obtained as a
24     donation?
25        MS. McGROGAN: Objection to form.

64

1         You can answer.
2   BY MR. SANSONE:
3   A. I don't know.
4   Q. And I think you may have answered this, and I
5      apologize if I asked before, but do you know how
6      much he's donated to the University?
7   A. I don't.
8   Q. You don't. And you would not have known as part
9      of what you did --
10  A. No.
11  Q. -- in this investigation?
12  A. No.
13  Q. All right.
14        MR. RICHTER: I left my glasses in
15     there.
16        MR. SANSONE: I'm going to go on
17     without you.
18  BY MR. SANSONE:
19  Q. I think you said that you were familiar with the
20     naming rights policy at the University; is that
21     correct?
22  A. Yes.
23  Q. Were you involved at all in this Jankowski
24     business? Do you know what I'm talking about
25     when I say the Jankowski business?

**Page 5**

1 a professor in 1994, became interim dean I
2 think it was 2008. Became the permanent dean,
3 I think it was in 2009 or '10. And then I was
4 -- I began as president in 2016.
5 　　Oh, and I was mayor of Forest Hills
6 somewhere in there I always say, for reasons
7 still unclear to my wife.
8 Q. Okay. How long are you intending to continue
9 in your position as president of the
10 University?
11 A. I don't know.
12 Q. Are you on a contract at this point?
13 A. I am on a contract. I was hired in an initial
14 five-year contract. I was re-upped actually
15 early for another five years plus, but I mean
16 to make it ten years, that would come to an
17 end in 2026, but I would have the opportunity
18 to seek to continue if I wanted and if the
19 Board wanted me to, that is to be determined.
20 I've always believed that one doesn't decide
21 these things until it is time to make a
22 decision.
23 Q. Okay. Can you tell me whether -- well, first
24 of all, with respect to your private practice
25 with the Mansmann firm, what kind of work did

**Page 6**

1 you do in that practice?
2 A. I did a wide variety of things. I did some,
3 primarily litigation, did some appeals,
4 appellate, work. You know, a variety of
5 things from some corporate work but also
6 employment discrimination, also a little bit
7 of criminal stuff, a little bit of estates and
8 trusts. It was a great experience because the
9 firm did all sorts of different things.
10 Q. Did you have any experience with age
11 discrimination cases in your employment
12 experience?
13 A. I did. I had at least one age discrimination
14 case during my time there.
15 Q. Okay. Have you had any experience, it doesn't
16 sound like it, but have you had any experience
17 as a gift officer for any institution?
18 A. It depends on how you define a term. As
19 president of the University and actually as
20 dean of the Law School, one very important
21 role is to be a fundraiser, but as a gift
22 officer as the job title, no, I have not held
23 that position.
24 Q. Okay. You participate in your roles as Dean
25 and President in some fundraising activities,

**Page 7**

1 but you don't go out and solicit donations in
2 most instances in the first instance?
3 A. Oh, that depends. In some significant gift
4 relationships, I am the principal person who
5 initiates and consummates the gift.
6 Q. Okay. Can you tell me how many donations
7 you've personally solicited?
8 A. I can't tell you. A lot.
9 Q. Well, can you give me some order or magnitude
10 on that?
11 A. I don't know how to describe it. I can say
12 that the gifts that I have brought in, have
13 been some of the biggest gifts in the history
14 of the Law School and the University.
15 However, to say the actual number of gifts, it
16 would be -- I would have been involved
17 personally in securing dozens of them, but I
18 couldn't put a number on it.
19 Q. Well, I wanted to make a distinction between
20 those which you participated on some level and
21 those where you were the person that initiated
22 the solicitation?
23 A. Correct. And it's somewhat hard to parse all
24 of that out because I, unlike a gift officer
25 further down in the organization, I tend to

**Page 8**

1 travel with other individuals when I am
2 meeting with donors, but not always, and in
3 some very prominent cases, I have just myself
4 been the almost sole contact with those
5 people, so it's hard to break those down.
6 　　I can just say that I have personally
7 been involved in not just obtaining gifts but
8 creating ideas that caused the donors to make
9 the gifts.
10 Q. You mentioned a moment ago that there were
11 some cases in which you were almost the sole
12 person involved in the solicitation?
13 A. Yes.
14 Q. Can you give me an idea of how many times
15 that's occurred?
16 A. Probably a sole person, I'd have to go back
17 through my mental Rolodex which is not easy to
18 go back all the time, for instance, in the
19 Dean times, but I'd say a half dozen to a
20 dozen.
21 Q. Can you name some of those?
22 A. Well, certainly, the Tribone Center, I did
23 almost exclusively on my own which was
24 creating the Tribone Clinical Center with Tom
25 Tribone. That was during my time as Dean of

21

1    became the Center for Emerging and Innovative
2    Media, and so I remember distinctly the day I
3    learned that Bill Richter had represented that
4    he was naming this gift with the Jankowskis
5    and I was shocked.
6  Q. So we'll get into this in a little more detail
7    in a little bit, but is your understanding
8    that Mr. Richter promised that this Center
9    would be named the Jankowski Center; is that
10   your testimony?
11 A. Yes, it's my understanding that Mr. Richter
12   met with the donors, entered into an agreement
13   with the donors that it would be named and
14   obtained a commitment from them and
15   represented that the University would name the
16   Center.
17 Q. Okay.  Well, we'll get into that in a little
18   bit.
19        MS. McGROGAN:  Joel, before you go
20   into your next line of questioning, I just
21   want to put on the record what we have put on
22   the record in every case, just that we're
23   going to be designating the portions of the
24   transcript that relate to donor information as
25   confidential, and I'll provide you with pages

22

1    that we're going to designate as confidential
2    once we have the transcript.  Thanks, Joel.
3    Sorry to interrupt your flow.
4        MR. SANSONE:  No, no worry.
5  BY MR. SANSONE:
6  Q. Okay.  I'd like to turn to the decision to
7    terminate Mr. Richter, who made that decision?
8  A. My understanding is that Jim Miller, the VP of
9    advancement made that decision.
10 Q. And did you play a role in the decision?
11 A. I played a role of providing input in the
12   decision.  I was getting ready to leave for
13   vacation.  There was a new person who was an
14   assistant or associate VP, Heather Clay, who
15   was just recently added to the team, and in
16   fact I created the position that she occupied,
17   and it was my understanding that she was going
18   to be interacting with HR because her job was
19   the operational piece because Jim Miller was
20   supposed to be out on the road doing work with
21   major alumni and donors while setting overall
22   policy for the department.  And so I provided
23   input to Heather Clay, but then allowed the
24   process to work out because I knew she would
25   be working with HR.  HR would conduct its own

23

1    investigation as we did these things, and that
2    was my practice in matters like this to allow
3    the process to play out, and then they would
4    present their report and recommendations to
5    Heather Clay and Jim Miller and ultimately as
6    vice president, he would have to make the
7    final decision.  She could make
8    recommendations.
9  Q. You said that you gave input to Ms. Clay, was
10   that in the nature of a memorandum that you
11   wrote?
12 A. Yes, exactly.
13 Q. Did you give any other input to her besides
14   the memo -- we're going to talk about the
15   memo, but was that the only -- did you draft
16   any other documents including emails in which
17   you gave such input?
18        MS. McGROGAN:  Objection to form.
19   You can answer.
20 BY MR. SANSONE:
21 A. To my recollection, no.  The only other input
22   that I -- you know, she was relatively new.  I
23   wasn't dealing with her on a regular basis.
24   Certainly the day I learned of this, I was at
25   a reception in the Student Union for John

24

1        ████████, a prominent donor who was a good
2    friend who had passed away in his 90s, and I
3    remember Don Maue coming up to me and telling
4    me, oh, did you hear about the big gift?
5    There's going to be over a million dollars.
6    We'll be able to buy all this equipment and
7    Bill Richter was in here.  He said he's naming
8    the Center.  And I was floored and I went
9    looking for Jim Miller.  He knew nothing about
10   naming this thing.  You know, they knew that
11   Bill was talking to the Jankowskis but there
12   was no talk of a naming right, and that had
13   never been brought up to me whatsoever for the
14   Center I had created, and I'm just getting to
15   the point so I don't forget, that after I went
16   and found him because I was literally floored,
17   he pulled Heather Clay in and she said she did
18   not know about this either.  And then it
19   wasn't until that night that there were emails
20   where I learned that not only did he make the
21   representations that they would have the
22   naming rights, but that it was a revocable
23   gift which I was just stunned because of
24   course a revocable gift means you may never
25   get anything for this very prominent place

53

1  Q. I didn't hear the end.
2  A. **Of advancement, yes.**
3  Q. And if it were true that Ms. Dean had kept
4     Mr. Miller informed about the nature of this
5     gift as it progressed, would that change your
6     opinion about Mr. Richter's conduct here?
7  A. **Well, again, that's speculation, so I can't**
8     **give the answer.  There's so many factors that**
9     **would be involved.  It would depend on what**
10    **Mr. Richter's conduct was along with that, so**
11    **I can't speculate.**
12 Q. What do you mean by that, it would depend on
13    what his conduct was along with that, what
14    conduct are you referring to?
15 A. **Well, whether someone told Mr. Miller or not**
16    **which you're speculating about or**
17    **representing, there could --**
18 Q. I'm just telling you what the testimony was.
19 A. **Well, that's one person's testimony.**
20        MS. McGROGAN:  You're
21    mischaracterizing testimony.
22 BY MR. SANSONE:
23 A. **And so -- but my point is, the investigation**
24    **could have found that someone said,**
25    **Mr. Richter, the president does not approve of**

54

1     **this and yet he went forward and brought it**
2     **to -- there are lots of factors that could go on**
3     **that I'm not privy to here, so that's what an**
4     **investigation is for.**
5        MR. SANSONE:  This is going to take me
6     a moment to sort this out.  Give me a second.
7     Gormley 3.
8            - - - -
9        (Deposition Exhibit No. 3 was marked
10    for identification.)
11           - - - -
12 BY MR. SANSONE:
13 Q. I'm showing you what's been marked as Gormley
14    Exhibit 3, and ask you if you've seen this
15    document before, and I will warn you that it's
16    two documents, as well as the email.
17 A. **Right, yes.  It's two documents.  It's a memo, a**
18    **confidential memo I should note that I -- oh,**
19    **I'm sorry, this is -- yeah, this is the**
20    **confidential memo that I sent to Heather Clay**
21    **before I left on vacation, and then there are**
22    **emails back and forth I believe that same day.**
23 Q. Okay.  So you have seen this is the answer?
24 A. **Yes, I have.**
25 Q. Did you have any assistance in drafting this

55

1     memo?
2        MS. McGROGAN:  Objection to form.
3     I'm going to instruct you not to answer to the
4     extent it involves counsel.
5  BY MR. SANSONE:
6  Q. Other than consulting with counsel, did you
7     have assistance from anyone else --
8  A. **No.**
9  Q. -- to prepare this memo?
10 A. **No.**
11 Q. Did Mr. Miller assist you in preparing this
12    memo?
13 A. **No.**
14 Q. In the first paragraph of the memo, you
15    indicate that you have significant concerns
16    regarding the recent conduct of gift officer
17    Bill Richter in completing a purported
18    agreement with two prominent donors; do you
19    see that?
20 A. **Yes.**
21 Q. What does the word completing mean there?
22 A. **Well, obviously it was my understanding that**
23    **he had represented to these donors that if**
24    **they made this charitable, you know, again,**
25    **tell me the name of it.  Charitable Intent**

56

1     **document, that the University would name the**
2     **Center for Emerging and Innovative Media.**
3  Q. Well, this says completing a purported
4     agreement, what does that mean?
5  A. **Well, again, I hadn't seen the precise**
6     **document but it represented -- he represented**
7     **in the document that the University was**
8     **agreeing to name the Center.**
9  Q. And I think I asked you this but I want to
10    make sure I did, is it your understanding that
11    a Statement of Charitable Intent binds the
12    University?
13 A. **If it says it binds it, yes.  If an official**
14    **of the University signs it, yes.  And I'm not**
15    **even -- I'm not a contract lawyer, but if you**
16    **make oral representations to an individual,**
17    **that could bind the University as well.**
18 Q. So what are you referring to here when you say
19    in completing a purported agreement, are you
20    referring to an oral representation?
21 A. **No, I'm referring --**
22 Q. To the Statement of Charitable Intent?
23 A. **Yes, exactly, that was signed.**
24 Q. And Mr. Richter didn't sign that?
25 A. **That's correct.**

57

1 he, you know, would handle that through
2 consultation with HR and legal and the president
3 like we all do.
4 Q. So when you made the -- so was it your
5 recommendation that this was not a violation of
6 Tap 55 or your decision I should say, I'm sorry?
7 A. Yes.
8 Q. It was your decision this was not a violation of
9 Tap 55. Tell me all the reasons why you felt
10 that?
11 A. They're all contained in the report.
12 Q. That may be, but I'm asking you.
13 A. So the issue was, I think, a communication one
14 and about being clear in communication and being
15 cautious in your communication with donors. And
16 I think there were some process improvements
17 recommended at the end, including, you know,
18 documentation and standards for protocols
19 relating to how they rebalance or whatever word
20 they use, churn.
21 Q. Churn?
22 A. Change the donors. And so those things could
23 definitely be improved, it was clear through
24 this communication in this investigation that
25 they needed to be improved.

58

1 Q. Well, this report, doesn't it say that
2 Ms. Krebs' conduct in making this communication
3 with Mr. Scott may have been misleading?
4    MS. McGROGAN: Objection to form.
5    You can answer.
6 BY MR. SANSONE:
7 A. That's what the report says.
8 Q. So why doesn't that make it a violation of Tap
9 55? It's a false statement that might have
10 misled a donor. How does that not violate this
11 strict policy?
12    MS. McGROGAN: Objection to form.
13    You can answer.
14 BY MR. SANSONE:
15 A. Tap 55 is about, you know, making sure we have a
16 workplace that, you know, respects individuals
17 where we are all able to work together
18 successfully. It's not meant as a document
19 to -- it's meant as a guidance for us to be able
20 to evaluate and look at issues and concerns. It
21 was used in that instance for this.
22 Q. How?
23 A. Coaching and counseling was recommended
24 following this because of the fact that this
25 sentence or two sentences could have been

59

1 written better, and that's what happened as a
2 consequence of that.
3 Q. This policy reads that dishonesty is strictly
4 prohibited; right?
5 A. It does use the word strictly.
6 Q. Well, is there some reason to think that's not
7 what the policy means? It's what it says;
8 right?
9 A. Yeah, that's what it says, I was answering your
10 question.
11 Q. And is this policy strictly enforced, the
12 dishonesty aspect of this or is this something
13 that just is not strictly enforced?
14    MS. McGROGAN: Objection to form.
15    You can answer.
16 BY MR. SANSONE:
17 A. We do have a number of ways in which we work
18 with employees for that. So you're using the
19 word enforced. In this example we recommended
20 coaching and counseling about communications for
21 this employee.
22 Q. If you go to the second page, which is Duquesne
23 136, under the Roman Number V, Violations.
24 A. Where are we, I'm sorry?
25 Q. The second page of the Tap policy, Tap 55.

60

1 A. Oh.
2          - - - -
3    (Whereupon, the witness reviewed the
4    document.)
5          - - - -
6 BY MR. SANSONE:
7 Q. Under Violations on that second page, do you see
8 that there? Violations of this policy will be
9 reviewed on a case-by-case basis and are subject
10 to formal disciplinary action up to and
11 including termination of employment.
12    Do you see that?
13 A. Uh-huh.
14 Q. You have to say yes.
15 A. Yes. I'm sorry, yes. Yes, I see it.
16 Q. Can we agree that Ms. Krebs' conduct violated
17 this policy?
18    MS. McGROGAN: Objection to form.
19    You can answer.
20 BY MR. SANSONE:
21 A. I think all communications have a gray area, and
22 I think that this communication fell into an
23 area of interpretation and that's why we worked
24 with -- that's why the recommendation was to
25 work with Ms. Krebs to ensure that this type of

97

1  ideal that you have a gift officer and police
2  officers there when the donor is arriving, but
3  as I said here, I don't know exactly what
4  happened here.
5  Q. Your source of information is Mr. Miller?
6  A. Correct.
7  Q. First of all, who told you that the donors
8     witnessed this?
9         MS. McGROGAN:  Objection to form.
10     You can answer.
11 BY MR. SANSONE:
12 A. I was -- I believe my recollection was that
13    the donors arrived at the tail end of this,
14    but the police were still present.  It was in
15    a restaurant.
16 Q. While the donors arrived and witnessed the
17    scene?
18 A. Yeah, the scene.  It was at the tail end of
19    this.  I think maybe the police were taking,
20    finalizing statements or something.  Again, I
21    only got a general picture.
22 Q. Do you believe the police took statements?
23 A. I don't know, they were talking to people,
24    okay.  My understanding was from Mr. Miller
25    was that the police were still there when the

98

1  donors arrived.
2  Q. Okay.  Do you know what happened in this
3     incident?
4  A. No, I do not.
5  Q. Do you not -- were you not told that
6     Mr. Richter was attacked by an individual?
7         MS. McGROGAN:  Objection to form.
8  BY MR. SANSONE:
9  A. I was not.  I know Mr. Miller asked
10    Mr. Richter to write a more detailed report
11    which I never saw, so I don't know if there
12    was a more detailed report of that.
13 Q. So you don't really know a whole lot about
14    this?
15 A. I don't.
16 Q. And but you put it in this memorandum?
17 A. I did because by this point --
18 Q. Well, what did you understand Mr. Richter did
19    wrong that would cause you concern so much
20    that you had to point it out to Ms. Clay?
21        MS. McGROGAN:  Objection, objection
22    to form.  You can answer.
23 BY MR. SANSONE:
24 A. It is not commonplace that employees are
25    involved in altercations.

99

1  Q. I didn't ask you that.  I said what did he do
2     wrong that caused you to include this in
3     something that caused you great concern as you
4     indicated in your memo?
5         MS. McGROGAN:  And Joel, he was
6     answering that question --
7         MR. SANSONE:  No, he wasn't.
8         MS. McGROGAN:  -- so why don't you
9     let him --
10 BY MR. SANSONE:
11 Q. I asked you --
12        MS. McGROGAN:  No, you didn't
13    listen.
14 Q. -- what is it about this incident that you
15    believe Mr. Richter did wrong that would cause
16    you concern?
17 A. You keep using the word wrong.  I didn't -- I
18    said right here, I didn't know exactly what
19    happened but it did cause me concern that a
20    gift officer is getting in an altercation with
21    an individual.  Now --
22 Q. Read the next paragraph, I mention these
23    additional incidents only because they
24    underscore the failure to follow expected
25    behaviors --

100

1  A. Well, that's a cumulative --
2  Q. -- what behavior did he fail to follow in this
3     instance?
4  A. That's a cumulative statement about all of
5     these things about --
6  Q. Yes.  And this incident is included, isn't it?
7  A. It is included because --
8  Q. So tell me what is it, what does the
9     behavior --
10        MS. McGROGAN:  Hey, gentlemen --
11 BY MR. SANSONE:
12 Q. -- that he engaged in that didn't follow the
13    expected behavior?
14        MS. McGROGAN:  Okay.  I'm going to
15    ask that you let Mr. Gormley respond to the
16    question.
17        MR. SANSONE:  Well, I'd like him to
18    answer that question.
19        MS. McGROGAN:  And he's been
20    answering the question --
21        MR. SANSONE:  Oh, no, he hasn't --
22        MS. McGROGAN:  You might not like
23    the response.
24        MR. SANSONE:  I'd like an answer to
25    that question.

105

BY MR. SANSONE:

Q.  Well, how long prior to this memo that you
    wrote did this incident occur?

A.  I don't remember.  Again, this is a fairly
    short paragraph because when I put it in
    there, I recognized I didn't know the details
    but I didn't want to overlook it because it
    was highly unusual when it was brought to me.

Q.  Yeah, well, when it was brought to you, did
    you ask, hey, did you look into this?

A.  Yes, I did and then --

Q.  What were you told?

A.  I was told that Bill Richter was supposed to
    write a fuller report, and I was later told he
    never did so.

Q.  Who told you that?

A.  Jim Miller.

Q.  No disciplinary action took place as a result
    of this?

A.  No.  And that's because I never -- we never
    received information.  Again, I'm not the
    disciplinary officer.

Q.  Right.  How do you know he wasn't disciplined
    then?

        MS. McGROGAN:  Objection to form.

106

    You can answer.

BY MR. SANSONE:

A.  I don't know.  I mean I quite honestly --

Q.  You said --

A.  I just know nothing further came to my
    attention on this, but I did include it, but I
    tried to purposely make clear that I did not
    know.  I said I admittedly do not know the
    details of this altercation or who did what to
    whom, suggesting maybe it was not
    Mr. Richter's fault, maybe it was both of
    their faults, maybe it was entirely
    Mr. Richter's fault.  I didn't know.

Q.  Did you have any information whatsoever from
    any source to suggest that Mr. Richter was in
    any way at fault in this matter?

        MS. McGROGAN:  Objection to form.

    You can answer.

BY MR. SANSONE:

A.  I didn't have information one way or the
    other.  It is not -- it is not ordinary to be
    told that one of your gift officers is in a
    fight and the police come.

Q.  Did the police charge my client with any
    crimes?

107

A.  Not to my knowledge.

Q.  Okay.  You were concerned enough about this to
    put it in this memo, were you not concerned
    enough to find out what really happened?

        MS. McGROGAN:  Objection to form.

    You can answer.

BY MR. SANSONE:

A.  I asked what had happened, and I was told that
    Mr. Richter was supposed to prepare a fuller
    report which he didn't do, that was the extent
    of it.

Q.  Were you told that Mr. Richter claimed to have
    been the victim in this matter?

        MS. McGROGAN:  Objection to form.

BY MR. SANSONE:

Q.  Have you ever been told that?

        MS. McGROGAN:  Objection to form.

    You can answer.

BY MR. SANSONE:

A.  I was told that, my recollection is that he
    was -- opened his car door and it hit against
    another car door, and then there was an
    altercation after that, and, you know, I don't
    know if Mr. Richter said the other person was
    involved.  I would assume anyone would say

108

    that, but I don't know.

Q.  I asked what you were told, not what you know.
    Were you ever told that Mr. Richter claimed to
    be the victim of an attack by this individual?

        MS. McGROGAN:  Objection to form.

BY MR. SANSONE:

A.  No.

Q.  Is this the first time you're hearing that
    today?

A.  Well, I was told that Mr. Richter generally
    blamed it on the other guy.  And beyond that,
    I don't know.

Q.  So the answer is yes to my question, not no?

A.  No, not to your question --

        MS. McGROGAN:  Objection to form.

BY MR. SANSONE:

Q.  My question was --

A.  You said in a physical attack.

Q.  My question was, were you ever told --

        MS. McGROGAN:  Hey, gentlemen --

BY MR. SANSONE:

Q.  Were you ever told that Mr. Richter claimed to
    have been attacked by this individual?

A.  No.

Q.  So today's the first time you're hearing this?