**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM RICHTER, | |
| Plaintiff, | |
| v. | Civil Action No. 2:23-cv-00550-CCW |
| DUQUESNE UNIVERSITY OF THE HOLY SPIRIT, and JAMES MILLER, as an aider and abettor of discrimination, | |
| Defendants. | |

**DEFENDANTS' REPLY TO PLAINTIFF'S
COUNTER STATEMENT OF MATERIAL FACTS**

Defendants Duquesne University of the Holy Spirit ("Duquesne" or the "University") and James Miller, by and through their undersigned counsel, file this Response to Plaintiff's Counter-Statement of Material Facts in support of their Motion for Summary Judgment, filed in conjunction herewith. The below facts are undisputed and material.

**I.      Duquesne's Advancement Division and Defendant James Miller**

1.      Duquesne is a private Catholic institution of higher education. *Exhibit ("Ex.") 1, Declaration of James Miller ("Miller Decl.") ¶ 6.*

**RICHTER'S RESPONSE: Admitted.**

***DEFENDANTS' REPLY: No response required.***

2.      As a private institution, Duquesne relies on donations, in addition to other funding sources, to fund its mission, allowing the University to provide an exemplary education for current and future students and to strengthen and serve its local and global community. *Ex. 1, Miller Decl. ¶ 7.*

**RICHTER'S RESPONSE: Admitted.**

*DEFENDANTS' REPLY: No response required.*

3.      Duquesne's Advancement Division supports the University by supporting its mission, building relationships with its various supporters, and securing critical private philanthropic support. *Ex. 1, Miller Decl. ¶ 8; Ex. 2, Major Gifts Officer Position Summary, Duquesne_00101-03, at Duquesne_00101*

**RICHTER'S RESPONSE: Admitted.**

*DEFENDANTS' REPLY: No response required.*

4.      Among the ways that the Advancement Division secures philanthropic support are efforts to raise funds through donations, including, planned gifts (such as those bequeathed in a donor's will) and major gifts (gifts that are $25,000 and above), including gifts to name major programs, facilities and centers. *Ex. 1, Miller Decl. ¶ 9; see also Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101 (noting major gift threshold and responsibilities for major gifts).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

5.      Since July 2021, Defendant James Miller has led the Advancement Division as its Senior Vice President (initially on an interim basis).  *Ex. 1, Miller Decl. ¶ 3.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

6.      Miller is currently 59 years old and was 57 years old at the time of Plaintiff's termination from employment.  *Ex. 1, Miller Decl. ¶ 5; Ex. 3, Transcript of Deposition of James Miller ("Miller Tr.") 15:6-7.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

**II.      Brief Overview of Plaintiff's Employment**

7.       In September 2015, Duquesne hired Plaintiff William Richter ("Plaintiff" or "Richter") as a Major Gift Officer in the Advancement Division.  *Ex. 4, Transcript of Deposition of Plaintiff William Richter ("Plaintiff Tr.") 36:13-21.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

8.       At the time of his hire, Plaintiff was 55 years old.  *See Ex. 4, Plaintiff Tr. 36:22-25; see also Ex. 4, Plaintiff Tr. 10:2-3 (noting date of birth in 1959 that made him 55 years old when hired).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

9.       In January 2020, when he was 60 years old, Duquesne promoted Plaintiff to Senior Major Gifts Officer.    *Ex. 5, Scheduled Payroll Authorizations, Duquesne_00077-78, at Duquesne_00077 (reflecting promotion); Ex. 6, Aug. 30, 2019 Letter from J. Plante to W. Richter, Duquesne_00105 (prescribing delayed promotion until Jan. 2020); see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

10.      In November 2021, when he was 61 years old, Duquesne created a title for Plaintiff, Senior Major and Gift Planning Officer, and switched his supervisor to Mary Frances Dean at his

request. *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations (reflecting "title and supervisor change"); Ex. 60, Excerpts of Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories, Requests for Production of Documents, and Request for Admissions ("Defendants' Discovery Responses"), at p. 4; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that, in November of 2021 the Plaintiff was given a new title. To the extent that Paragraph 10 suggests that this action was taken for the Plaintiff's benefit, and that it resulted in a benefit to the Plaintiff, the same is denied. The action taken by Defendant Miller to give the Plaintiff a new title was not to provide the Plaintiff with any benefit, but rather to quell the widespread dissatisfaction within the Advancement Division after Defendant Miller secretly changed the donor lists of many donor officers to provide certain employees favored by Defendant Miller with significant advantages. The Plaintiff's "new title" came with no new responsibilities or performance metrics, and no raise in pay, and, therefore, provided no benefit to the Plaintiff. (Plaintiff's Affidavit ("Plaintiff Aft"), para. 25, Appx139).**

*DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact. By way of further response, Paragraph 10 does not, in any way, make a statement regarding whether Plaintiff's title change was taken for his benefit, but the record plainly reflects that Miller's decision to change Plaintiff's title coincided with Miller acquiescing to Plaintiff's request to be reassigned from supervision by Adam Viers to supervision by Mary Frances Dean. See Def'ts' Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Def'ts' Ex. 5, at Duquesne_00078. Notably, Plaintiff does not address this portion of Defendants' Paragraph 10 in his response.*

*Moreover, Miller's reassignment of donors did not take effect – nor did Plaintiff discover such reassignment – until several months later in February and March 2022.* **See infra Paragraph 64.** *In any event, Miller's motives for changing Plaintiff's November 2021 title change are not material to the disposition of Defendants' motion for summary judgment.*

11.     As a gift officer, Plaintiff was responsible for identifying, qualifying, cultivating, soliciting, and stewarding donor relationships to secure major gifts and planned gifts for the University. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

12.     Senior gift officers hold important roles at the University, acting as ambassadors with many prominent internal and external constituents. *Ex. 7, Aug. 17, 2022 Letter from J. Miller to W. Richter ("Termination Letter"), Duquesne_00013-14, at Duquesne_00014.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

13.     Plaintiff acted on the University's behalf to communicate and otherwise maintain the University's relationships with its most prominent alumni and other prospective donors. *Ex. 2, Major Gifts Officer Position Summary at Duquesne_00101.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

14.     After discovering and investigating Plaintiff's actions in 2022 resulting violations of policies relating to naming University assets, and considering Plaintiff's past performance, the

University terminated Plaintiff on August 17, 2022. *See Ex. 7, Termination Letter, at Duquesne_00013-14.*

**RICHTER'S RESPONSE:  Denied. It is specifically denied that the Plaintiff committed any violation of the Defendant University's policies with respect to the donation from the "Donor Couple." It is further specifically denied that any of the "past performance" issues played any role whatsoever in the decision to terminate the Plaintiff. By way of further answer, see Plaintiff's factual allegations at Paragraphs 281-320** *infra.*

*DEFENDANTS' REPLY: Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 14 should be deemed an admitted material fact.* **See Byron v. Columbia Gas of Pa.,** *2:21-CV-01365-CCW, 2022 U.S. Dist. LEXIS 218040, at \*2-3 (W.D. Pa. Dec. 2, 2022) (Wiegand, J.) (noting that courts in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56, and that a "non-moving-party faces severe consequences for not properly responding to a moving party's concise statement, namely that any fact claimed to be undisputed in the moving party's concise statement will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party"),* **aff'd,** *2023 U.S. App. LEXIS 33231 (3d Cir. Dec. 15, 2023) (internal citation and quotations omitted).*

*To the extent that his broad reference to 40 paragraphs of his factual allegations should suffice, Defendants' response thereto make clear that there is no record evidence to refute Duquesne's legitimate, nondiscriminatory reason for Plaintiff's termination.*

III.     **Plaintiff's Conduct and Performance Issues before the 2022 Intervening Event.**

15.     As set forth more fully below, prior to the 2022 policy violations, Plaintiff's conduct on more than one occasion, caused internal constituents, specifically senior university leaders, to raise serious concerns with his performance and professional judgment. *See Ex. 7, Termination Letter, at Duquesne_00013.*

**RICHTER'S RESPONSE:   Denied.** *See* **Plaintiff's response to Paragraph 14** *supra*, **and Paragraphs 281-320** *infra*.

*DEFENDANTS' REPLY: Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 15 should be deemed an admitted material fact.  **See Byron,** 2022 U.S. Dist. LEXIS 218040, at \*2-3.*

*To the extent that his broad reference to 40 paragraphs of his factual allegations should suffice, Defendants' response thereto make clear that there is no record evidence to refute that internal constituents, including Provost David Dausey, former SVP for University Advancement John Plante, and School of Nursing Dean Mary Ellen Glasgow, questioned Plaintiff's performance and professional judgment prior to his termination.*

16.     In August 2019, Plaintiff took a fundraising trip to California with Provost and Vice President of Academic Affairs David Dausey. *Ex. 8, Aug. 26, 2019 Letter from J. Plante to W. Richter, Duquesne_00104.*

**RICHTER'S RESPONSE:   Admitted in part and denied in part. It is admitted that, in August of 2019, the Plaintiff and Dr. Dausey worked together in California on fundraising efforts for the Defendant University. It is denied that the Plaintiff and Dr. Dausey made that**

trip together. **In August of 2019, Plaintiff was in California for various fundraising efforts. At that same time, Dr. Dausey was in California for an unrelated function on behalf of the Defendant University. (Plaintiff Aff, para. 26, Appx139).**

*DEFENDANTS' REPLY:  Undisputed, but not material.*

17.    Following the trip, Plaintiff messaged Dausey a picture of a woman in a bikini with text that neither Dausey nor Plaintiff can now remember.  *Ex. 4, Plaintiff Tr. 72:20-73:10; Transcript of Deposition of Dr. David Dausey ("Dausey Tr.") 85:23-24.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

18.    Dausey reported the message to Duquesne because he was concerned and thought the messages "looked inappropriate." *Ex. 9, Dausey Tr. 85:22-86:5.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

19.    When confronted about these messages to Dausey at the time, Richter admitted to the behavior being "completely inappropriate," "had no justification for his actions, and expressed extreme regret for, and understanding of, the uncomfortable position in which [he] had placed" Dausey.  *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

20.    To this day, Plaintiff admits that his actions showed "poor judgment" and were inappropriate.  *Ex. 4, Plaintiff Tr. 73:13-16 (stating "[i]t was poor judgment" that he sent the message); 73:25-74:12 (acknowledging that "poor judgment" is synonymous with*

*"inappropriate" in this context); see also Ex. 10, Transcript of Deposition of Cecilia Hughes ("Hughes Tr.") 30:1-7.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

21.    After investigating the matter, Plaintiff's then-supervisor, John Plante, issued a "formal written warning" to Plaintiff for "exhibiting fundamentally poor judgement" and acting "in direct violation of the University's policy on sexual misconduct prevention, [The Administrative Policies ("TAP")] No. 31." *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

22.    The formal written warning quoted the relevant parts of TAP No. 31 as it stood at that time, which provided that "[h]ostile work environment sexual harassment is unwelcome conduct of a sexual nature, including transmitting of graphic [images] of a sexual nature" and that "[d]isciplinary sanctions for employee violations of this policy may range from a disciplinary warning to termination from the University." *Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

23.    The formal written warning required certain actions, including Plaintiff apologizing to Dausey and undergoing retraining on sexual misconduct prevention and delaying Plaintiff's planned promotion from September 2019 to January 2020.  *See Ex. 8*, *Aug. 26, 2019 Letter, at Duquesne_00104 (prescribing the apology and retraining); Ex. 6, Aug. 30, 2019 Letter, at Duquesne_00105 (follow-up letter prescribing delayed promotion).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

24.     Plaintiff, who was 59 years old at the time, admits that the delayed promotion had nothing to do with his age and was not taken in retaliation for any action.  *Ex. 4, Plaintiff Tr. 76:12-17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

25.     In early 2019, School of Nursing ("SON") Dean Mary Ellen Glasgow and Plaintiff were working together on a gift from prominent donors to the SON ("Donor B" and "Donor C"). *Ex. 11, June 2, 2019 Memo from M. Glasgow to D. Dausey and Attached Email Compilation, Duquesne_00670-78, at Duquesne_00671.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

26.     Plaintiff and Dean Glasgow exchanged several emails regarding their efforts to obtain a commitment from the Donors B and C. *See Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673-78 (reflecting several emails from January through April 2019 regarding Donors B & C).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

27.     On February 18, 2019, Plaintiff emailed Dean Glasgow and Rick Creehan (former Assistant VP of Advancement) to state that he had been communicating with Donor B "regarding

a gift to the SON to honor [Donor C]." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

28.     In that email, Plaintiff stated, "I will certainly keep you both in the loop." *Ex. 11, June 2, 2019 Memo, at Duquesne_00671; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00676.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

29.     Plaintiff later noted to Dean Glasgow that he would meet with Donor B on May 13, 2019 and to "[s]tay tuned." *Ex. 11, June 2, 2019 Memo, at Duquesne_00672; see also Ex. 11, Email Compilation attached to June 2, 2019 Memo, at Duquesne_00673.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

30.     In May 2019, Plaintiff and Dausey met with Donors B and C to discuss a donation to the University's fledgling College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that the Plaintiff and Dr. Dausey had a meeting with the donors in May of 2019. To the extent that Paragraph 30 implies that the Plaintiff played any role in setting up that meeting, or in deciding what approach would be taken by the University with respect to allocation of this donation to the school of nursing or the school medicine, the same is denied. The Plaintiff**

was asked to attend the meeting by Dr. Dausey, who indicated his intent to convince the donors to make some or all of their donation a gift to the medical school. The Plaintiff was unconcerned as to which school of the University received the donation since he was credited with the entire amount of the donation regardless of its destination. **(Plaintiff Aff, para. 17, Appx136).**

*DEFENDANTS' REPLY:  Disputed, but not material.  By way of further response, Paragraph 10 does not, in any way, make a statement regarding who scheduled the meeting or set the agenda for that meeting – as such details are not material to the disposition of Defendant's Motion for Summary Judgment.  Still, Plaintiff's distinction and record citation has no bearing on the statement made in Paragraph 30.  Regardless of who set up the meeting, set up the purpose of the meeting or whether they intended to divert Donor B and C's potential donation from the School of Nursing to the College of Medicine, Plaintiff still failed to communicate the situation to Dean Mary Ellen Glasgow, as he assured her that he would do and as reflected in Dean Glasgow's memorandum at Def'ts' Ex. 11.*

31.    Plaintiff did not inform Glasgow about the discussion with the donors regarding the College of Medicine either before or after the meeting. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, see the Plaintiff's response to Paragraph 30 above.**

*DEFENDANTS' REPLY: No response required beyond the response to Paragraph 30,* **supra***.*

32.    Dean Glasgow learned about Plaintiff's discussions with the donors for the first time when Donors B and C called her and told her they were concerned she was "out of the loop"

regarding the intention to divert the donation from the SON to its new College of Medicine. *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

**RICHTER'S RESPONSE:   Denied. During the period January through May, 2019, on multiple occasions, the Plaintiff made Dean Glasgow aware of the specifics of the planned donation by Donors B and C, including that the gift was likely to exceed $1,000,000, and that the donors would be visiting the University's campus to finalize the gift. (Plaintiff Aff, para. 16, Appx135).**

*DEFENDANTS' REPLY:   Undisputed that Plaintiff communicated with Dean Glasgow regarding the subjects identified in Paragraph 32.  Notably, Plaintiff's response to Paragraph 32 fails to controvert that he did not communicate with Dean Glasgow that the "intention to divert the donation from the SON to its new College of Medicine," and as such, this portion of Paragraph 32 should be deemed admitted and material.  See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3..*

*By way of further response, Dean Glasgow penned a memorandum with attached email support that detailed how she was left out of the cultivation process.  See Def'ts' Ex. 11 (June 2, 2019 memorandum).*

*The dispute is also not material, as Plaintiff has not articulated any record evidence or basis to refute that that is how Glasgow felt or what the donors communicated to her.  Plaintiff does not, and cannot, assert with record evidence that Glasgow's memorandum was drafted with any "unlawful motive" related to Plaintiff's age or protected activity (which, if it occurred at all, had not occurred in 2019). See Kotakis v. Wesco Distrib., 650 F. Supp. 2d 435, 443 (W.D. Pa. 2009) (holding that, "[a]bsent proof of unlawful motive," courts do not "second-guess" business judgment or decisional processes). Moreover, Plaintiff does not, and cannot, assert with record*

*evidence that Miller's reliance on Glasgow's opinions with respect to Plaintiff's communication failures was due to any unlawful motive.*

33.     Dean Glasgow felt it was "abundantly clear that the relationship with the donor could be in jeopardy." *Ex. 11, June 2, 2019 Memo, at Duquesne_00670.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Dean Glasgow claimed as much in her memorandum to Dr. Dausey. (Defendants' Ex. 11 Duq. 00670). It is denied that this claim accurately reflected the feelings of the donors. The Plaintiff met with the donors and reviewed the donation, the math error and the solution. The donors did not express any dissatisfaction regarding any aspect of the donation. The donor relationship suffered no apparent damage. (Plaintiff Aff, para. 19, Appx137).**

*DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.  Paragraph 19 of Plaintiff's self-serving affidavit does not address the communication issue related to Dean Glasgow's June 2, 2019 memorandum and instead purports to address a mathematical error related to the same donors. See Pl.'s App'x 137.  These are separate issues that impacted Plaintiff's working relationship with Dean Glasgow, which Plaintiff now conflates.  In any event, whether Plaintiff believes the donor relationship suffered no "apparent" damage is not material; indeed, as Plaintiff admits, Dean Glasgow asserted that there was damage, at least in her opinion, in her memorandum, and Plaintiff has no record evidence to refute that Dean Glasgow's statement reflected how she actually felt, which she brought to the attention of senior leadership via her memorandum. See Def'ts' Ex. 11.*

34.     In August 2021, Plaintiff contributed to a mathematical error in a gift agreement for Donors B and C that left a scholarship fund for SON students tens of thousands of dollars short of full funding. *Ex. 3, Miller Tr. 50:12-21; Ex. 1, Miller Decl. ¶¶ 10-11; see also Ex. 12, Details*

related to Donors B & C Gift Agreement Error, Duquesne_00679-86 (email compilation related to error).

**RICHTER'S RESPONSE: Admitted in part and denied in part. It is specifically denied that the Plaintiff committed the mathematical error involved, which error was committed by Cecelia Hughes. The Plaintiff admits that he, and four other executives, missed the mistake. (Plaintiff Aff, para. 18, Appx136). To the extent that Paragraph 34 implies that the Defendant University suffered any financial hardship or loss from this incident, the same is denied. Prior to the Plaintiff's visit with Donors B and C in California, the Plaintiff had a conversation with Heather Clay, his then second level supervisor. Ms. Clay informed the Plaintiff that the University had not suffered any financial loss as a result of the aforementioned error, as the shortfall for the subject scholarships was covered through an internal transfer of funds accrued from the $1,500,000 gift from Donors B and C.2 During that conversation, Ms. Clay did not reprimand the Plaintiff in any way for this error, nor did she seem upset with the Plaintiff and his role in this matter in any way. Rather, Ms. Clay instructed the Plaintiff to go to California and "have a nice dinner with (Donors B and C)" and continue to strengthen the relationship. (Plaintiff Aff, para. 21, Appx138).**

*DEFENDANTS' REPLY: Undisputed that Plaintiff and others missed the error, and that none of the individuals involved – including Plaintiff – received discipline at the time the math error was discovered, and that Plaintiff claims that he had the referenced conversation with Clay. Disputed, but not a material dispute, that Miller was involved in this gift agreement and thereby missed this error. Indeed, Miller was in a different role when the gift agreement was negotiated. See supra Paragraph 5. This dispute, however, is not material, as it is undisputed that when the error was discovered, Plaintiff was tasked with meeting with Plaintiff to discuss.*

*Defendants object to Plaintiff's response to Paragraph 34 to the extent it relies on inadmissible hearsay evidence, namely, purported statements by Heather Clay, who Plaintiff elected not to depose in this litigation.* **See Fed. R. Evid. 801; Bouriez v. Carnegie Mellon Univ., Civil Action No. 02-2104, 2005 U.S. Dist. LEXIS 18324, at \*26-27 (W.D. Pa. Aug. 26, 2005) ("when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. . . . The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage.").**

35.    Plaintiff was made aware of the error and told to correct it with the donors. *Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00682 (Aug. 20, 2021 email from M. Glasgow to J. Miller and D. Dausey stating that it would be "appropriate for [Plaintiff] and/or his supervisor to advise" the donors about the error).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that the Plaintiff met with Donors B and C and explained to the donors the steps being taken to correct the error. Plaintiff was dispatched to smooth over this issue because of his strong relationship with the donor, not because he was seen as responsible for this error. (Plaintiff Aff, para. 20, Appx138).**

***DEFENDANTS' REPLY:  Undisputed, but not material fact.***

36.    Miller discussed remedying the error with Plaintiff in November 2021, at which time they agreed that telling Donors B and C in person would be best, but, if an in-person meeting could not be secured, they would "default to a Zoom or conference call engagement." *Ex. 12,*

*Details related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from J. Miller to M. Glasgow).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Plaintiff and Defendant Miller discussed meeting with Donors B and C by Zoom if an in-person meeting could not be arranged. Ultimately, Plaintiff and Defendant Miller decided to abandon the Zoom option, and Plaintiff was directed to meet with the donors in person as soon as possible. Because the donors were out of the country and, therefore, unavailable for a direct meeting for quite some time, it took the Plaintiff multiple efforts to ultimately have a face-to-face meeting with the donors. (Plaintiff Aff, para. 19, Appx137).**

*DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.  Although Plaintiff notes that he denies this paragraph in part, it is not clear which portion of Paragraph 36 he denies.*

*Plaintiff's cited material does not support the notion that Miller and Plaintiff "decided to abandon the Zoom option" after their initial agreement on meeting by Zoom if an in-person meeting could not be arranged.  Plaintiff states, without saying when the discussion occurred, that he and Miller discussed that the meeting "needed to be in person," which Paragraph 36 states was Miller's and Plaintiff's initial preference.  In any event, Plaintiff did not meet with the donors for many months. Plaintiff has not provided any evidence that would support the notion that Miller considering the delay an example of Plaintiff's failure of communication with external constituent was based on any improper motive.*

37.    In the November 2021 communication, Miller noted that Plaintiff "intend[ed] to take full responsibility for the error and seek resolution to [the donors'] satisfaction." *Ex. 12,*

*Details related to Donors B & C Gift Agreement Error, at Duquesne_00683 (Nov. 10, 2021 email from J. Miller to M. Glasgow).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

38.     Miller again discussed remedying the error with Plaintiff in January 2022, during which Plaintiff stated that he wants to have the communication in person and that "building a trip around this discussion shouldn't be too difficult."

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 36 above.**

***DEFENDANTS' REPLY:  No response required beyond Defendants' reply to Plaintiff's response to Paragraph 36.***

39.     Miller recalls instructing Plaintiff to resolve the error on at least one other occasion. *See Ex. 3, Miller Tr. 50:12-21; see also Ex. 12, Details related to Donors B & C Gift Agreement Error, at Duquesne_00684 (Mar. 18, 2022 email from J. Miller to M. Glasgow stating Miller was scheduled to speak with Plaintiff about this the following Wednesday).*

**RICHTER'S RESPONSE:  Denied. Defendant Miller testified that he directed the Plaintiff to speak to the donors. (Defendants' Exhibit 3, pp. 50-51). There is no evidence in the record that the Plaintiff was directed to remedy the error. By way of further response, see the Plaintiff's response to Paragraph 36 above.**

***DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.  Plaintiff's denial here contradicts his own admissions herein.  See Paragraph 36, supra.  Plaintiff does not deny Miller's recollection that he spoke with Plaintiff about doing so on at least one other***

*occasion, nor that the conversation(s) occurred. Moreover, Plaintiff does not support his denial*

*with record evidence as required by Local Rules 56.B.1. and 56.C.1.b., including in his response*

*to Paragraph 36 above.  Paragraph 39 should be deemed admitted as a material fact.* **See Byron***,*

*2022 U.S. Dist. LEXIS 218040, at \*2-3.*

40.    Plaintiff did not correct the error prior to the scholarship account's funds being insufficient for the next expense. *Ex. 3, Miller Tr. 50:12-21; Ex. 12, Details related to Donors B & C Gift Agreement Error, Duquesne_00685 (April 6, 2022 email from M. Glasgow to J. Miller that notes Donors B & C "will be expecting to award two more scholarships for fall since they are unaware of the error since there has been no communication from [Plaintiff] about the issue" and "there are insufficient funds in the account" for the scholarship).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that the Plaintiff did not "resolve the error." By way of further response, see the Plaintiff's responses to Paragraphs 36 and 39 above. To the extent that Paragraph 40 implies that the Defendant University suffered a financial loss as a result of this error, the same is denied. See the Plaintiff's response to Paragraph 34 above.**

*DEFENDANTS' REPLY:  Paragraph 40 does not state, in any way, that the University "suffered a financial loss as a result of this error."  Instead, it states that the error was not corrected prior to the scholarship account's fund being insufficient for the next expense. Because Plaintiff does not address this fact, this fact should be deemed admitted and material for the purposes of summary judgment.  See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.*

*By way of further response, Defendants incorporate their response to Paragraph 34, as though set forth herein.*

41.     The error and failure to correct it required the University to reallocate $40,000 in University funds to cover the shortfall in scholarship funds. *Ex. 3, Miller Tr. 51:9-25; Ex. 1, Miller Decl. ¶ 11.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. By way of further response, see the Plaintiff's responses to Paragraphs 36, 39 and 40 above. To the extent that Paragraph 41 implies that the Defendant University suffered a financial loss as a result of this error, the same is denied. See the Plaintiff's response to Paragraphs 34 and 41 above.**

*DEFENDANTS' REPLY:  Paragraph 41 does not state, in any way, that the University "suffered a financial loss as a result of this error."  Instead, it states that the University had to reallocate funds as a result of the scholarship shortfall.  Because Plaintiff does not address this fact, this fact should be deemed admitted and material for the purposes of summary judgment. See Byron,* **2022 U.S. Dist. LEXIS 218040, at \*2-3.**

*By way of further response, Defendants incorporate their response to Paragraph 34, as though set forth herein.*

42.     Separately, Plaintiff referred to prospective University donors as "my" (his) donors and demanded that his supervisor "ABSOLUTELY forbid any contact with my prospect pool or donor base without my permission." *Ex. 13, W. Richter 2020-21 Performance Review, Duquesne_00092-100, at Duquesne_00094.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

43.     In mid-2021, Plaintiff argued with two coworkers, Cal Pifer and Adam Viers, escalating to the point of the Plaintiff and Pifer "yell[ing] at each other." *Ex. 4, Plaintiff Tr. 59:25-60:6.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, this factual allegation appears to be irrelevant since nowhere in this record is there any evidence that this incident played any role in the Plaintiff's termination. (*See, e.g.*, Defendants' brief, p. 14).**

*DEFENDANTS' REPLY:  No response required.*

44.    The argument related to Pifer contacting one of the University's donors who had been assigned to Plaintiff. *Ex. 4, Plaintiff Tr. 58:9-59:24.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 43 above.**

*DEFENDANTS' REPLY:  No response required.*

45.    Plaintiff – who was 61 years old at the time – admits that Pifer did not contact his donor due to Plaintiff's age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 58:2-8; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

**RICHTER'S RESPONSE:  Admitted. By way of further response, *see* Plaintiff's response to Paragraph 43 above.**

*DEFENDANTS' REPLY: No response required.*

46.    Plaintiff "felt he had been too forceful" and "could have handled [the disagreement] better." *Ex. 4, Plaintiff Tr. 64:25-65:8.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 43 above.**

*DEFENDANTS' REPLY: No response required.*

**IV.    Miller's Promotion and Reorganization of the Advancement Division.**

47.    After the departure of Duquesne's former Vice President of Advancement John Plante due to dissatisfaction by the Administration and the Board with respect to his leadership and the performance of the Advancement Division, Miller was selected to lead the Advancement Division on an interim basis in July 2021. *Ex. 1, Miller Decl. ¶ 3.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, there does not appear to be any relevance to this factual assertion as there is no record evidence that Mr. Plante played any role in the events of this case.**

***DEFENDANTS' REPLY: No response required.***

48.    In October 2021, Miller was promoted to the role of Senior Vice President on a permanent basis. *Ex. 1, Miller Decl. ¶ 4.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

49.    In the fall of 2021, Plaintiff met with Miller to discuss his "dissatisfaction with having to report to Adam Viers." *See Ex. 14, May 25, 2022 W. Richter Letter to J. Dedrick, PL 0064-73, at PL 0064 (noting meeting with Miller).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

50.    At this meeting, Plaintiff offered to retire if Miller "wanted [him] out." *Ex. 14, May 25, 2022 Letter, at PL 0064; see also Ex. 4, Plaintiff Tr. 183:11-19 ("Q: . . . [D]o you recall offering to retire?" "A: Yes.").*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

51.     Roughly 11 months prior to Plaintiff's termination and while Plaintiff was 61 years old, Miller rejected Plaintiff's retirement offer, as Miller "did not want [Plaintiff] to leave the University." *Ex. 4, Plaintiff Tr. 184:14-24; 186:17; see also Ex. 4, Plaintiff Tr. 10:2-3 (reflecting date of birth for age calculation).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

52.     During this discussion, Plaintiff asked to be assigned to a supervisor other than Viers, and Miller chose to reassign Plaintiff from Viers to Dean, creating a new position for Plaintiff. *See Ex. 4, Plaintiff Tr. 173:24-174:7, 174:20-23; Ex. 5, Scheduled Payroll Authorizations at Duquesne_00078 (reflecting "title and supervisor change"); Ex. 60, Defendants' Discovery Responses at p. 4.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 10 above.**

*DEFENDANTS' REPLY: No response required apart from Defendants' reply to Plaintiff's response to Paragraph 10.*

53.     Prior to selecting Miller for his new role, University President Ken Gormley directed Miller to restructure the Advancement Division, including a review and rebalancing gift officers' donor portfolios. *Ex. 15, Apr. 1, 2022 Email Exchange Between J. Miller & W. Richter, Duquesne_00020-23, at Duquesne_00020; see also Ex. 4, Plaintiff Tr. 159:16-160:10.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

54.     Plaintiff does not claim that the decision to move "certain donors from [his] portfolio" to other gift officers was due to his age or due to prior complaints he made. *Ex. 4, Plaintiff Tr. 167:12-19.*

**RICHTER'S RESPONSE:  Denied. Plaintiff, who is a layperson and not a lawyer, was asked whether or not there was anything discriminatory about the reassignment of donors. The following is the actual exchange with counsel:**

**Q:     So, you're not alleging that there was anything discriminatory or retaliatory related to the reassignment?**

**A:     Proper protocol was not followed in this instance and other instances as well. Whether that's discriminatory or not, I don't know the definition of "discriminatory."**

**Q:     What is your understanding of what the definition of "discriminatory" is?**

**A:     Favoring one person over another.**

**Q:     And do you believe that that happened with respect to the reallocation?**

**A:     Yes**

**Q:     Who was favored?**

**A:     Well, Melissa (Krebs) was given one of my top prospects, as just one example of that. There are others . . .**

**(Deposition of William Richter ("Richter depo"), pp. 167-168, Appx002).**

*DEFENDANTS' REPLY: Disputed, but not a genuine dispute.  Plaintiff addresses two different contentions. Plaintiff was asked whether he claims the decision to remove "certain donors" from his portfolio – i.e., individual, donor-by-donor decisions – was due to his age or due to complaints he made to the University. See Ex. 4 at 168:12-19.  The exchange excerpted by Plaintiff above followed, in which Plaintiff asserts that he felt that, because "[p]roper protocol*

*was not followed," the reassignment as a whole was discriminatory because of assignments Plaintiff claims was favorable to a younger employee, Krebs. Plaintiff stated he did not "know why [Krebs] was favored" in response to being asked if it was "because she is younger than" Plaintiff.  Ex. 4 at 169:19-24. Further, Plaintiff does not articulate, beyond his displeasure with the reassignment of Donor A, how his portfolio was unfavorably changed as compared to Krebs. See Ex. 4 at 168:8-169:*

*In any event, while Defendants maintain that, even as a lay person, Plaintiff can (and should be able to) articulate what actions he claims were and were not taken due to his age and/or complaints he made, as Plaintiff notes, he is a lay person and cannot assess what is discriminatory as a matter of law.*

55.     At the time of the rebalancing, Plaintiff's portfolio had 431 donors. *Ex. 16, Gift Officer Assignment Summary, Duquesne_00694 (produced in native Excel format but filed as a PDF); see also Ex. 4, Plaintiff Tr. 146:21-147:3.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

56.     Plaintiff agreed that 431 prospects is not a reasonable number for a gift officer and that his portfolio was too big. *Ex. 4, Plaintiff Tr. 146:21-147:24.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

**V.     Krebs' Outreach to a Donor Formerly Assigned to Plaintiff.**

57.     In March 2022, Melissa Krebs, another gift officer in Advancement, met with a donor who was reassigned to her portfolio from Plaintiff's portfolio ("Donor A"). *Ex. 17, Mar. 7,*

*2022 Email Exchange Between M. Krebs, C. Hughes, and M. Dean, Duquesne_00622 (highlighting in original).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

58.     Krebs secured a $50,000 planned gift commitment from Donor A, which was confirmation of a bequest already in his will. *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622; see also Ex. 18, Mar. 10-11, 2022 Email Exchange Between J. Miller and W. Richter, Duquesne_00049-52, at Duquesne_00051 (Plaintiff confirming same).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Donor A made a $50,000 donation to the Defendant University. It is denied that Ms. Krebs "secured" this donation. The Plaintiff had been cultivating this donor for many years, and had determined that Donor A's will contained the $50,000 donation before Plaintiff began that cultivation. The reason that Plaintiff did not book the $50,000 donation when he learned about it was because he was working on expanding that donation to an amount of $250,000 or more. Instead, without notice or explanation, and without the Plaintiff having the ability to protest the reassignment, Defendant Miller took this donor away from the Plaintiff and gave it to Ms. Krebs. (Plaintiff Aff, para. 27, Appx 139, Plaintiff depo, pp. 167-168, Appx302-303).**

***DEFENDANTS' REPLY:  Undisputed, but not material.  By way of further response, Miller informed Plaintiff that he could request to retain certain donors – which there is no evidence that Plaintiff did. See infra Paragraphs 63-64; see also Def'ts' Ex. 15 at Duquesne_00021 (Miller noting Plaintiff could "please feel free to send [him] a list of those prospects/donors [Plaintiff] would like to request be retained").***

59.     On March 7, 2022, Krebs informed Cecilia Hughes and Dean of the commitment and asked to have a statement of charitable intent drawn up.  *Ex. 17, Mar. 7, 2022 Email Exchange at Duquesne_00622.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

60.     Hughes was responsible for drafting donor statements of charitable intent.  *Ex. 1, Miller Decl. ¶ 12.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

61.     Dean was responsible for overseeing the process and signing the agreements.  *Ex. 1, Miller Decl. ¶ 13.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

62.     Even where other team members are involved in the process and drafting of agreements, gift officers remain responsible for ensuring that the content of a donor statement of charitable intent ("DSCI") "reflects what [the gift officer] ha[s] discussed with the donor."  *Ex. 19, Transcript of Deposition of Ken Gormley ("Gormley Tr.") 38:12-39:1.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

63.     Dean replied to Krebs that she thought that Donor A was assigned to Plaintiff and later noted that there were issues of "communicat[ion]" regarding reassignments of donors.  *Ex. 17, Mar. 7, 2022 Emails, at Duquesne_00622.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

64.    Miller had not communicated the results of the rebalancing to Plaintiff (either through Plaintiff's supervisor, Dean, or to Plaintiff directly) prior to Plaintiff learning about Krebs' contact with Donor A.  *Ex. 20, Transcript of Mary Frances Dean ("Dean Tr.") 91:16-19.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

65.    Dean believed that Miller did not communicate the results of the rebalancing with her "[b]ecause he chose not to," but she did not believe that it was because of her age or the ages of Plaintiff or Hughes.  *Ex. 20, Dean Tr. 91:20-92:11.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

66.    After learning of the confusion, Krebs reached out to Plaintiff to see if he would meet to discuss.  *Ex. 21, Mar. 15 2022 Emails including M. Krebs, W. Richter & M. Dean, Duquesne_00323-24, at Duquesne_00323-24.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Ms. Krebs reached out to the Plaintiff on or about March 15, 2022. With respect to the claim that Ms. Krebs was motivated to do so after learning of "the confusion," the Defendants' statement in Paragraph 66 does not explain what is meant by the quoted phrase. Furthermore, there is no evidence in the record, including the evidence cited by the Defendants, to support the claim the "confusion" motivated Ms. Krebs actions. Therefore, that claim is denied and strict proof thereof is demanded.**

***DEFENDANTS' REPLY:  Plaintiff does not dispute the material portions of Paragraph 66, but rather quibbles with non-material word choices.  As such, no response is required to Plaintiff's reply.***

67.     Plaintiff did not reply to Krebs' outreach. *See Ex. 21, March 15 2022 Emails, at Duquesne_00323-24; see also Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11 (indicating he never spoke with Krebs about Donor A).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

68.     Plaintiff never spoke to Krebs about Donor A.  *Ex. 4, Plaintiff Tr. 104:13-17, 118:8-11.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

69.     Plaintiff also never spoke to Donor A about Krebs' outreach. *See Ex. 4, Plaintiff Tr. at 170:23-171:6.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

70.     Plaintiff forwarded Krebs' email to Dean and indicated that he had "no intention whatsoever of communicating with Melissa on ANY subject," which Plaintiff admitted did not reflect teamwork. *Ex. 21, March 15 2022 Emails, at Duquesne_00323; see also Ex. 4, Plaintiff Tr. 84:19-21.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

**VI.     Plaintiff's Complaints Regarding Krebs' Contact with a Donor and the Rebalancing as a Whole**

      **A.     Plaintiff's Discussions with Miller**

      71.     On March 10, 2022, Plaintiff reached out to Miller to complain about Krebs' actions with respect to Donor A. *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051-52.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

      72.     Plaintiff complained that Krebs' introductory email to Donor A (as evidenced in her contact report) contained a "lie" when she said that Plaintiff "has shared some of your thoughts . . . with her." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

      73.     Plaintiff asserted that Donor A had asked that "what [Plaintiff and Donor A] discussed [be] completely confidential in the preliminary stages." *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00051.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

      74.     When pressed at his deposition, Plaintiff could only identify as completely confidential that Donor A "was considering at the time selling or donating a parcel of land." *Ex. 4, Plaintiff Tr. 116:21-117:7; see also Ex. 4, Plaintiff Tr. 118:12-14 (noting he did not recall Donor A sharing "other thoughts . . .on what he intended to do").*

**RICHTER'S RESPONSE:  Admitted. By way of further response, the Plaintiff's deposition testimony demonstrates that the Plaintiff did not have a clear recollection of all of the issues**

that Donor A requested be kept confidential. (*See, e.g.*, Richter depo, pp.117-118, Appx 3-4).3 However, the Defendants make no mention of the fact that defense counsel introduced into the record of the Plaintiff's deposition a document prepared by the Plaintiff and submitted to the Defendant University's human resources department which gives a clearer picture of the information that Donor A asked to be kept confidential. In the Plaintiff's submission, dated May 25, 2022, he states the following:

In this instance, (Donor A) discussed matters related to his estate plan including personal assets and retirement portfolios which he requested remain CONFIDENTIAL ... Following (Donor A)'s direction, I did not enter this information in a contact report . .. Please note that (Donor A) was consistent with Melissa Krebs — he chose not to reveal the information that he asked me to keep in confidence . . .

(Defendants' Exhibit 14, p. 3, Pl. Bates number PL0066).

A:      (Donor A) was considering at the time the selling or donating a parcel of land ...

…

Q:      Is there anything else that you were referring to that was completely confidential?

A:      Not that I can recall at this moment . . .

…

Q:      Had (Donor A) shared other thoughts with you on what he intended to do?

A:      I don't recall at that time, at the time.

(Richter depo, pp. 117-118, Appx003-004).

*DEFENDANTS' REPLY:  Undisputed, but not material*

75.     Plaintiff stated he did not recall whether Donor A asked him to keep the information confidential.  *Ex. 4, Plaintiff Tr. 118:21-23.*

**RICHTER'S RESPONSE:  Admitted. By way of further response,** *see* **Plaintiff's response to Paragraph 74 above.**

***DEFENDANTS' REPLY: No response required.***

76.     He stated in his March 10, 2022 email that information was "completely confidential in the preliminary stages" because "[i]t usually is." *Ex. 4, Plaintiff Tr. 118:24-119:3.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 74 above.**

***DEFENDANTS' REPLY: No response required.***

77.     That "usual[]" confidentiality would not preclude Plaintiff from sharing the details with others in the Advancement Division. *Ex. 4, Plaintiff Tr. 119:4-17.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraph 74 above.**

***DEFENDANTS' REPLY: No response required.***

78.     When she said Plaintiff had "shared some of [Donor A's] thoughts," Krebs asserts that she was referring to her reading of Plaintiff's notes in contact reports about Donor A.  *Ex. 22, Transcript of Deposition of Melissa Krebs ("Krebs Tr.") 29:25-30:8.*

**RICHTER'S RESPONSE:  Admitted. It is admitted that Ms. Krebs testified as indicated.**

***DEFENDANTS' REPLY:  No response required.***

79.     Krebs' practice was to contact the prior-assigned gift officer for more information about a donor "[i]f something wasn't clear in the Contact Management System" (*i.e.*, from the contact reports on the donor).  *Ex. 22*, *Krebs Tr. 17:9-12.*

**RICHTER'S RESPONSE:  It is admitted that Ms. Krebs testified as indicated.**

*DEFENDANTS' REPLY: No response required.*

80.     Plaintiff does not believe that Krebs told Donor A that Plaintiff "has shared some of your thoughts . . . with her" due to his age or in retaliation for any action. *Ex. 4, Plaintiff Tr. 111:7-15.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

81.     Miller and Plaintiff scheduled a lunch to discuss Plaintiff's concerns about Krebs. *Ex. 18, Mar. 10-11, 2022 Email Exchange, at Duquesne_00049-50; Ex. 4, Plaintiff Tr. 122:10-21.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

82.     At the March 23, 2022 lunch, Miller informed Plaintiff of the Donor A reassignment and stated that Krebs had done nothing wrong. *Ex. 4, Plaintiff Tr. 133:22-134:15; Ex. 23, Plaintiff's Mar. 23, 2022 notes of meeting with J. Miller, Duquesne_00321-22, at Duquesne_00321.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

83.     Plaintiff stated his disagreement but noted that as the "boss," Miller had the right to take the course of action he chose. *Ex. 4, Plaintiff Tr. 138:21-139:2; see also Ex. 23, Mar. 23, 2022 notes, at Duquesne_00321.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

84.     Plaintiff sent Miller an email on April 1, 2022 that stated his concerns regarding the situation regarding Krebs and Donor A. *See Ex. 15, Apr. 1, 2022 Email Exchange at Duquesne_00021-23.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

85.     There is no reference to Plaintiff's age or age discrimination in the email. *See Ex. 4, Plaintiff Tr. 159:4-12 (admitting same).*

**RICHTER'S RESPONSE:   Admitted. By way of further response, Plaintiff's email to Defendant University's human resources representative does, however, make the allegation that Defendant Miller's actions in "blatantly favoring a much younger underperforming employee" constituted age discrimination. (Richter depo, Exhibit 20, at Defendants' Bates number 00164, Appx006).**

***DEFENDANTS' REPLY:  Undisputed, but not material. Plaintiff's citation to Appx006 is to a May 15, 2022 complaint – which was made approximately 6 weeks after the email referenced in Paragraph 85.  Plaintiff's efforts to mischaracterize record evidence do not create a genuine issue of material fact.***

***By way of further response, Plaintiff's statement about age discrimination is a prospective statement that, if a certain action occurred – the booking of Donor A's commitment – he would be "left with no alternative but file an age discrimination complaint," rather than a contemporaneous complaint of age discrimination.  See Appx006.  Miller testified – and Plaintiff has no record evidence to rebut or in any way cast doubt upon – that he never saw or heard about Plaintiff's reference to age discrimination prior to Plaintiff's termination.  See Def'ts' Ex. 67, 58:18-59:5 (referencing Def'ts' Ex. 30).***

### B.     Plaintiff's First Complaint to Human Resources

86.     In April 2022, Plaintiff reached out to Human Resources to file a complaint regarding Krebs' conduct with respect to Donor A. *Ex. 24, Apr. 1, 2022 Email Exchange between W. Richter, R. Dawson, & J. Dedrick, Duquesne_00167.*

**RICHTER'S RESPONSE:  Admitted. Plaintiff's April 1, 2022, initial email does not mention age discrimination. Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later. *See* Plaintiff's response to Paragraph 85 above.**

***DEFENDANTS' REPLY: Disputed, but not a genuine dispute of material fact.  Plaintiff's statement about age discrimination occurred one month and 14 days later on May 15, 2022.  See Appx006; see also Defendants' reply to Plaintiff's response to Paragraph 85.***

87.     In his email to Human Resources, Plaintiff does not reference his age or age discrimination. *Ex. 4, Plaintiff Tr. 188:15-24.*

**RICHTER'S RESPONSE:  Admitted. Plaintiff's April 1, 2022, initial email does not mention age discrimination. Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later. See Plaintiff's response to Paragraph 85 above.**

***DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.  Plaintiff's statement about age discrimination occurred one month and 14 days later on May 15, 2022.  See Appx006; see also Defendants' reply to Plaintiff's response to Paragraph 85.***

88.     Plaintiff filed a complaint with Jefferson Dedrick, Human Resources Director of Employee and Labor Relations, alleging violations of "TAP 55 and ancillary issues." *Ex. 25, Plaintiff's Employee Complaint Procedure Form, Duquesne_00177.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

89.     This is the first Human Resources complaint Plaintiff filed of any type. *Ex. 4, Plaintiff Tr. 187:24-188:2.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

90.     Plaintiff notes that the "ancillary issues" are "probably" the "portfolio rebalancing issues." *Ex. 4, Plaintiff Tr. 194:18-21.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

91.     Plaintiff asserted that Krebs' actions "prevent[ed] [him] from securing a major gift and has resulted in the decimation of [his] portfolio which renders it impossible for [him] to succeed." *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

92.     Plaintiff stated that the only actions Krebs took with respect to decimating his portfolio were her interactions with Donor A. *Ex. 4, Plaintiff Tr. 196:13-197:2.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

93.     Plaintiff stated that those interactions and the resultant $50,000 gift prevented him from soliciting a larger $250,000 gift on which he claimed he was working. *Ex. 4, Plaintiff Tr. 197:8-23.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

94.     Plaintiff does not believe that Krebs' actions in booking the $50,000 gift were due to Plaintiff's age. *Ex. 4, Plaintiff Tr. 121:4-6.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, Plaintiff alleges that the act by Defendant Miller of reassigning major donors like Donor A to younger, less experienced, less qualified gift officers without following the proper protocols and existing procedures, was part of a plan by Defendant Miller to discriminate against the Plaintiff because of his age. (See Complaint, paras. 12 through 17).**

*DEFENDANTS' REPLY: Plaintiff's statement relying on nothing more than Complaint allegations does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 94 should be deemed an admitted material fact.* **See Byron,** *2022 U.S. Dist. LEXIS 218040, at \*2-3. In any event, Plaintiff has not established that Miller reassigned "major donors" – much less in a discriminatory way – aside from Donor A, nor has he established how any purported illegal reassignment scheme was part of a broader plan connected to his termination.*

95.     Plaintiff asserts he was unable to attempt to cultivate a larger gift because Donor A was reassigned to Krebs but "assume[s]" that it would be possible for someone from the University to reach out to Donor A to attempt to solicit the remaining $200,000. *Ex. 4, Plaintiff Tr. 197:8-23.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

96.     Plaintiff also faulted Viers for supervising Krebs' actions and Miller for condoning Krebs' actions. *Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

97.    Plaintiff's complaint does not mention his age or discrimination related to his age. *See Ex. 25, Employee Complaint Procedure Form, at Duquesne_00177.*

**RICHTER'S RESPONSE:  Admitted. Plaintiff's April 1, 2022 initial email does not mention age discrimination. Plaintiff's direct, specific claim of age discrimination occurred fourteen (14) days later.** *See* **Plaintiff's response to Paragraph 85 above.**

*DEFENDANTS' REPLY: Plaintiff's statement about age discrimination occurred one month and 14 days later on May 15, 2022.  See Appx006; see also Defendants' reply to Plaintiff's response to Paragraph 85.*

98.    Dedrick, a trained investigator with a law degree, was responsible for investigating the complaint. *Ex. 24, Apr. 1 Email Exchange, at Duquesne_00167 (forwarding Plaintiff to Dedrick to handle complaint); Ex. 26, Transcript of Deposition of Jefferson Dedrick ("Dedrick Tr.") 14:12-15:21 (stating he worked three jobs prior to Duquesne and did human resources functions and investigations "of the type we're talking about" in this case at all three); 19:14-23 (stating he is a lawyer with a law degree from Syracuse University).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

99.    Because Miller was referenced in the complaint, Dedrick chose Dausey as the decisionmaker regarding the investigation pursuant to Human Resources policy. *Ex. 27, Apr. 11, 2022 Email Exchange Between J. Dedrick & W. Richter, Duquesne_00170-71, at Duquesne_00171.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, the record does not contain any evidence that a junior human resources representative had the authority to dictate to the Provost of the Defendant University, an executive vice-president who is "first among equals," what the Provost's role would be in an important investigation such as this one. The record is clear, however, that whether or not this subaltern did or did not direct the actions of the person second to the top of the organization chart, Provost Dausey had no responsibility with respect to the Advancement Division, and was not familiar with the procedures related to the Krebs issues. (Deposition of David Dausey ("Dausey depo"), pp. 6, 14, 31-32, Appx008-010).**

*DEFENDANTS' REPLY:  Undisputed that Dausey is the Executive Vice President and Provost who is the "first among equals."  Disputed, but not a genuine dispute of material fact, that Dedrick did not have the requisite authority to task Dausey as the decisionmaker in this case. Indeed, the record cited by Plaintiff does not support this statement.   The material cited by Defendants in this paragraph evidences the authority that the "junior human resources representative" had – namely, the HR Complaint Procedure stating that the appropriate decisionmaker is a "Senior Department Head" – in this case, Miller – "or other appropriate department supervisor."  Def'ts' Ex. 27 at Duquesne_00171. Dedrick went on to explain he chose Dausey because Miller was involved in Plaintiff's complaint. See id. There is no record evidence that Dausey had any issue with being tasked with this "important" role – indeed, he did not and noted that he "frequently review[s] complaints and grievances," see Appx009 at 14:3-4 – so it is bizarre and immaterial that Plaintiff is questioning why the situation played out the way it did. Moreover, while Dausey did not have experience with the procedures at issue with respect to reassignment, he did have a full, thorough investigative report and*

*recommendations from Dedrick to consider when making his decision. See Def'ts' Ex. 31*

*(Dedrick investigative report). He also had experience with the policy that Plaintiff claimed was*

*violated by Krebs, Viers, and Miller. Def'ts' Ex. 64, Excerpts of Transcript of David Dausey,*

*36:6-13. Dedrick's report took into account all evidence provided by Plaintiff and others as well*

*as interviews of numerous individuals. See id. at Duquesne_00214, 00227-28. In any event,*

*Plaintiff never complained about the fact that Dausey was reviewing his complaint, and to do*

*so now is merely to quibble with the results of an investigation that did not go his way. Indeed,*

*although Plaintiff filed an appeal with respect to a "material procedural error" the selection of*

*Dausey of decisionmaker was not identified at that time. Def'ts' Ex. 33 at Duquesne_00206-07.*

### C.   Krebs' Follow-Up and Plaintiff's Second Complaint to Human Resources

100.    On March 30, 2022, Krebs followed up with Hughes and Dean to have the

paperwork drawn up for the Donor A commitment and again followed up on April 8, 2022 and

April 27, 2022. *Ex. 28, Email Exchange Between M. Krebs, C. Hughes, and M. Dean dated Mar.*

*7, 2022 to Apr. 27, 2022, Duquesne_00614-17, at Duquesne_00615-16.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

101.    Hughes responded for the first time on April 27, 2022 stating the gift would not be

processed while it was "under dispute with HR." *Ex. 28, Mar.-Apr. 2022 Email Exchange, at*

*Duquesne_00615.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering**

**appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

***DEFENDANTS' REPLY: No response required.***

102.     Krebs replied that the internal HR issue did not "preclude us from servicing the donor's wishes or doing what is best for the [U]niversity." *Ex. 28, Mar.-Apr. 2022 Email Exchange*, at *Duquesne_00615*.

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

*DEFENDANTS' REPLY: No response required.*

103.     Dean agreed that it is not in a donor's best interest to delay memorializing the donor's wishes due to an internal dispute and that it could cause issues. *Ex. 20, Dean Tr. 119:10-120:2.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

*DEFENDANTS' REPLY: No response required.*

104.     Dean responded that she would "not move forward until this matter is resolved." *Ex. 28, Mar.-Apr. 2022 Email Exchange*, at *Duquesne_00615-16*.

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

*DEFENDANTS' REPLY: No response required.*

105.     Dean and Hughes did not have instructions or authority from Human Resources, Miller, or anyone at the University to hold up the memorialization of Donor A's gift. *Ex. 20, Dean Tr. 118:14-119:9, 120:6-18.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**

*DEFENDANTS' REPLY: No response required.*

106.   Hughes did not speak with Miller, Human Resources or anyone other than Dean about holding up the memorialization of Donor A's gift. *Ex. 10, Hughes Tr. 118:13-120:10.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, this factual offering appears to be irrelevant, as it does not pertain in any way to the Plaintiff or his actions.**
*DEFENDANTS' REPLY: No response required.*

107.   After learning Krebs sought to memorialize the gift, Plaintiff emailed Dedrick to convey, using bold language in all capital letters, that he was upset that Donor A's gift was moving forward, as he "assum[ed] that it would be put on hold and reviewed." *Ex. 4, Plaintiff Tr. 204:2-205:19; Ex. 29, May 13, 2022 Email Exchange Between W. Richter & J. Dedrick, Duquesne_00189-90, at Duquesne_00190 ("It's come to my attention that Melissa is insisting that the University 'book the gift of $50k from [Donor A]'. . . **ARE YOU KIDDING ME?** . . .UNTIL SHE STOLE HIM, **AND LIED ABOUT IT**, [Donor A] was my prospect – any 'gift credit' should go to me!  I WISH TO FILE AN IMMEDIATE COMPLAINT REGARDING THIS – OR AMEND MY ORIGINAL COMPLAINT TO INCLUDE THIS!" . . . (emphasis in original)).*

**RICHTER'S RESPONSE:  Admitted.**
*DEFENDANTS' REPLY:  No response required.*

108.   Plaintiff stated that "credit should go to [him]" for the Donor A gift, because Krebs "stole him and lied about him." *Ex. 4, Plaintiff Tr. 205:20-206:2; Ex. 29, May 13,2022 Email Exchange, at Duquesne_00190*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

109.     Dedrick explained that there was a difference between moving forward with memorializing the gift to service the donor and determining who received credit for the gift. *Ex. 29, May 13,2022 Email Exchange, at Duquesne_189.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

110.     Plaintiff filed a second complaint with respect to the issue of Krebs seeking to book the gift. *See Ex. 30, May 15, 2022 Email from W. Richter to J. Dedrick and A. Berestecky, Duquesne_00163-66.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, the Defendant's factual offering regarding the Plaintiff's second Complaint makes no mention of the fact that the Plaintiff's second complaint specifically accuses Defendant Miller of age discrimination. (Richter depo, Exhibit 20, Defendant's Bates number 00164, Appx006).**

*DEFENDANTS' REPLY:  Undisputed.*

**VII.    Dedrick's Thorough Investigation of Both Complaints**

111.     Dedrick interviewed eight employees as part of his investigation from April 5, 2022 through May 24, 2022. *Ex. 31, HR Complaint Procedure Investigative Report dated July 11, 2022, Duquesne_00213-28, at Duquesne_00214.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

112.     Dedrick engaged in "[a]dditional follow-up communications" between May 24, 2022 and June 15, 2022. *Ex. 31, Report dated July 11, 2022, at Duquesne_00214.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

113.    He obtained rebuttal statements from Krebs, Viers, and Miller, including a second rebuttal from Miller regarding the second complaint. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

114.    Dedrick considered numerous documents and communications provided by Plaintiff and Dean. *See Ex. 31, Report dated July 11, 2022, at Duquesne_00227-28.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

115.    He recommended to Dausey that there be a finding of no policy violation as to Krebs, Viers, or Miller. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-27.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

116.    Specifically, he found that Krebs' statement to Donor A that Plaintiff had "shared his thoughts" was misleading but did not rise to the level of a TAP 55 violation for unethical conduct. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

117.    He found that, because Donor A was assigned to Krebs at the time of her outreach and gift solicitation, and Krebs had reviewed Plaintiff's contact report notes, she was not in violation of any policy. *Ex. 31, Report dated July 11, 2022, at Duquesne_00222-23.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

118.    He noted that Plaintiff made no specific allegation as to Viers and, as a result, Viers committed no policy violation. *Ex. 31, Report dated July 11, 2022, at Duquesne_00223.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

119.    He found that Miller was within his authority to reorganize portfolios and to allow Krebs to book a gift she solicited from Donor A, who was at that time assigned to her portfolio. *Ex. 31, Report dated July 11, 2022, at Duquesne_00224-26.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

120.    Dausey agreed with Dedrick's conclusions and recommendations. *Ex. 9, Dausey Tr. 41:12-42:15.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

**VIII.   Plaintiff Appeals the Complaint Findings.**

121.    Dedrick explained to Plaintiff the procedure to appeal the decision as to his complaint. *Ex. 32, July 20, 2022 Email Exchange Between W. Richter and J. Dedrick, Duquesne_00204-05, at Duquesne_00204.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

122.    Plaintiff submitted an appeal, claiming material procedural error in the form of Dedrick not focusing on the specific fact that Krebs had "lied" to a donor. *Ex. 33, Aug. 2, 2022 Email from W. Richter to J. Dedrick, Duquesne_00206-07.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

123.    Plaintiff's appeal does not reference his age or age discrimination at all. *See Ex. 33, Aug. 2, 2022 Email, at Duquesne_00206-07; see also Ex. 4, Plaintiff Tr. 284:21-24 (admitting same).*

**RICHTER'S RESPONSE:  Admitted. Plaintiff's August 2, 2022, email does not mention age discrimination. Plaintiff's direct, specific claim of age discrimination is contained in his email to the Defendant's human resources representative dated May 15, 2022. See Plaintiff's response to Paragraph 85 above. (Richter depo, Exhibit 20, Defendant's Bates number 164, Appx006).**

***DEFENDANTS' REPLY:  Undisputed.***

124.    Daniel Gilman, Chief of Staff to the University President, reviewed the appeal and found no material procedural error. *Ex. 34, Aug. 23, 2022 Letter from D. Gilman to W. Richter, PL 0027-28.*

**RICHTER'S RESPONSE:  Admitted. It is admitted that Mr. Gilman's letter to the Plaintiff says the same.**

***DEFENDANTS' REPLY: No response required.***

IX.     **The Intervening Event:  Plaintiff's Solicitation of a Deferred, Revocable Gift in Exchange for Immediate Naming Rights of a University-Wide Center**

      A.     **Cultivation of the Gift**

125.    Starting in mid-2021, Plaintiff began to cultivate a gift from a married couple (the "Donor Couple" or, individually, "Donor D" and "Donor E").  *Ex. 35, Contact Reports Regarding Donor Couple, Duquesne_00259-75, at Duquesne_00263-64 (June 15, 2021 contact), Duquesne_00267-68 (Aug. 10, 2021 contact); see Ex. 4, Plaintiff Tr. 316:14-21 (stipulating that contact reports were made by him).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

126.    A gift officer cannot make representations to a donor that they can name an entity without it going to the Gift Acceptance Committee and the President. *Ex. 19, Gormley Tr. 20:14-17; see infra Section IX.B (describing policies gift officers must follow for gifts to name an entity which require approvals prior to any promise to a donor).*

**RICHTER'S RESPONSE:  Admitted. By way of further response, the practice applicable to gift officers of the Defendant University at the time of the incident in question permitted the gift officers to discuss with a potential donor the possibility of the donor receiving naming rights in connection with a donor as long as the gift officer informed the donor that naming rights for a donation can only be granted after approval of the donation and naming rights by the Defendant's Gift Acceptance Committee, and so long as the gift officer has kept his immediate supervisor(s) informed of the potential gift and the details of that gift during the course of the cultivation.[1]**

---

[1]    **Plaintiff's Footnote:**  During the subject period, the practice of requiring approval from the gift acceptance committee for all gifts involving naming rights was not absolute. As part of the investigation into the donation by the Donor Couple, Ms. Hughes provided

**DEFENDANTS' REPLY: Plaintiff was not found to be in violation of policy for merely discussing naming rights with a donor, so Plaintiff's reference this purported "practice" is not material.  Moreover, Plaintiff fails to support Paragraph 126 with a citation to any record evidence.  As such, Plaintiff's unsupported "facts" should be disregarded for the purposes of summary judgment.  See L.Cv.R. 56.C.1.c.; Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.**

**Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  See L.Cv.R. 56.C.1.c.; see Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.**

**To the extent a response to footnote 3 is necessary, the facts contained therein are undisputed, but not material.  Hughes' examples are not comparable to the situation with the Donor Couple, see Def'ts' Ex. 45, at Duquesne_00011, none of her examples occurred under Miller's leadership, and it was Miller's prerogative as a manager on how strictly to adhere to policies, even if prior managers had not.  Nevertheless, Hughes's contention that other gifts had not followed the required protocols was included in Dedrick's investigatory report, which was provided to the decisionmaker – Dausey. Id.**

127.    In March and April 2022, Plaintiff secured an agreement for a deferred, revocable gift in exchange for naming rights to the Center for Emerging and Innovative Media ("CEIM").

---

Defendant University's human resources representative with multiple examples of recent instances in which the grant of naming rights for a donation did not require, and did not obtain approval from the gift acceptance committee. At that time, Ms. Hughes had the responsibility to prepare and review all new gift and fund agreements, to act as a liaison between her Development Office and the Gift Acceptance Committee, and to submit donation proposals to the Gift Acceptance Committee as necessary. (Email from Cecelia Hughes to Jefferson Dedrick dated August 4, 2022, Appx011-012). These facts do not appear anywhere in the Defendants' fact offering.

*Ex. 36, Mar. 8, 2022 Email from W. Richter to C. Hughes and M. Dean, Duquesne_00340; Ex. 37,*

*Apr. 12, 2022 Email Exchange between Donor D and W. Richter, Duquesne_00333-35.*

**RICHTER'S RESPONSE:   Denied as stated. It is admitted that, in the March/April 2022 timeframe, Plaintiff secured a commitment from the Donor Couple for a significant seven figure donation for which the couple requested naming rights to the CEIM. Plaintiff indicated that the donors would receive those naming rights, but only if the donation with that stipulation was accepted by the gift acceptance committee. "the next step is for me to go before DU's naming committee and present a formal request to name the media center." (See Email from the Plaintiff to Donor D dated June 19, 2022, Appx013).[2] At no time did Plaintiff promise the donors that they would enjoy these naming rights without the approval of the Defendant University's gift acceptance committee. To the contrary, the Plaintiff specifically advised the Donor couple, both in writing and orally, that the naming rights for this donation had to be accepted by the naming committee. (Plaintiff Aff, para. 12, Appx134; Plaintiff's Fact para. 262). Therefore, the Plaintiff did not "secure an agreement" for these naming rights that would bind the Defendant University.**

**The Defendants cite as authority to the Court to support these claims their Exhibits 36 and 37. Whether by cursory or searching review of these two documents, it is clear that neither of these documents, taken separately or together, supports in any way the claim of the Defendants that the Plaintiff's actions were improper in any way, or that the Plaintiff somehow acted to bind the Defendant University in contract with the Donor Couple.**

---

[2]       **Plaintiff's Footnote:**  As the record reflects, the Donor Couple signed off on the statement of charitable intent three (3) days after being advised of the restriction on their naming rights.

*DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.  Exhibits 36 and 37 reflect that Plaintiff obtained initial agreement with the Donor Couple for the seven-figure donation, which as is clear from the record, is the donation Plaintiff negotiated in exchange for naming rights to the CEIM.  Paragraph 127 does not state that in March and April 2022, the agreement was binding.*

*Plaintiff correctly notes that he evidenced his awareness of the requirement that the potential naming rights be presented to the Gift Acceptance Committee and that it was Plaintiff who would present as much.  See Appx013. That does not demonstrate that Plaintiff did not make an egregious error when he allowed the Donor Couple to sign the Donor Statement of Charitable Intent (DSCI) three days later, directly against Hughes' statement to Plaintiff that the DSCI could not be signed until they obtained approval from the Gift Acceptance Committee. See Def'ts' Ex. 42 at Duquesne_00513.*

*This was particularly important because, as is clear from the plain language of the DSCI, the agreement unequivocally stated that, upon proof to substantiate the gift, the naming rights would attach. See Def'ts' Ex. 44 at Duquesne_00559. As such, contractually, the Donor Couple, would "enjoy naming rights" as soon as the document was signed.  Notably, the contractual terms of the agreement do not guarantee that the University would receive a "seven figure" donation at the time of signature – but at some point in the future, assuming that such funds remained in their possession – which is speculative.  See id.*

128.    President Ken Gormley created the CEIM and was "deeply involved in every facet" of the CEIM. *Ex. 19, Gormley Tr. 20:18-21:5.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

129.    CEIM is University-wide center. *See Ex. 38, Centers and Institutes, Duquesne.Edu,* *Duquesne_00353-59, also available at* [https://www.duq.edu/research/centers-and-](https://www.duq.edu/research/centers-and-institutes/index.php) [institutes/index.php](https://www.duq.edu/research/centers-and-institutes/index.php) *(listing CEIM as an "Interdisciplinary Center"); Ex. 39, Center for Emerging and Innovative Media, Duquesne.Edu, Duquesne_00360-71, also available at* [https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-](https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php) [media/index.php](https://www.duq.edu/research/centers-and-institutes/center-for-emerging-and-innovative-media/index.php) *(noting "[a]ny student from any program across campus can take advantage of these convenient, cutting edge studios"); see also Ex. 4, Plaintiff Tr. 296:20-25 (stating he cannot "speak directly to what [CEIM's] broad intent" was and that he has no reason to dispute that the CEIM is a university-wide center).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

### B.    Policies on Gift Acceptance and Naming Rights

130.    Naming agreements are of critical importance to the University as naming rights celebrate and recognize and celebrate donors in a highly visible way.  *Ex. 7, Termination Letter, at Duquesne_00013.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

131.    The University President must approve naming rights because they are "very valuable" rights and there are many factors that contribute to the decision as to whether to grant naming rights.  *Ex. 19, Gormley Tr. 78:4-11.*

**RICHTER'S RESPONSE:  Denied. Multiple examples exist in the record showing that the President of the Defendant University does not necessarily approve every donation involving**

**naming rights. (*See* email dated August 4, 2022, from Cecelia Hughes to Jefferson Dedrick at Appx011-012, and Plaintiff's response to Paragraph 126 above).**

*DEFENDANTS' REPLY:  Undisputed, but not material.*

*There are various levels of naming rights in the Gift Policies (as defined* **infra** *Paragraph 132). President Gormley's cited testimony refers to naming rights in the context of the gift at issue in this case (i.e. a donation made in exchange for naming rights to a university-wide center).  The examples provided by Hughes are not comparable to the situation involving the Donor Couple, because none of the examples involved the naming of a university-wide center. Def'ts' Ex. 45, at Duquesne_00008, 00011. Instances as significant as naming rights to a University-wide center unequivocally require approval by the President, Def'ts' Ex. 40, Gift Acceptance Policies, at Duquesne_00153, and Plaintiff has provided no comparable example where Presidential approval was not required.  Importantly, Dedrick considered the examples that Hughes offered and found that that they were not comparable for various reasons.  Def'ts' Ex. 45, at Duquesne_00011.*

132.    Duquesne has policies related to the acceptance of large gifts and the issuance of naming rights to donors.  *See Ex. 40, Gift Acceptance Policies, Duquesne_00137-59; Ex. 41, Policy on Gift Related Naming Opportunities ("Naming Policy," and, collectively with Ex. 40, the "Gift Policies"), Duquesne_00160-62.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, the policy at issue here that governs naming rights for significant donations was not strictly adhered to. Most of the large, seven (7) figure donations were approved without the knowledge of, or even the participation of, the University President. (Affidavit of Richard Creehan ("Creehan Aft"), paras. 8-9, Appx0126-0127).**

*DEFENDANTS' REPLY:  Undisputed that "most of the large, seven (7) figure donation" were approved without the knowledge of President Gormley.  Indeed, as set forth in the applicable policy, it is not the monetary value of the gift that triggers the need to approve the gift.*

*Disputed, but not material, that the policies were not strictly adhered to.  Plaintiff relies on the testimony of Rick Creehan, an employee who was no longer employed by Duquesne when Miller took over the Advancement Division. See infra Paragraph 206. As such, even if Creehan were correct that the policy was not "strictly adhered to" (Duquesne disputes this), his firsthand knowledge would not extend to the consistency of the application of the relevant policies under Miller's leadership, which is the relevant inquiry. See Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important.");accord Maiorini v. Farmers Ins. Exch., No. 14-1613, 2017 U.S. Dist. LEXIS 47471, \*125-26 (E.D. Pa. Mar. 30, 2017). Notably, Creehan's affidavit fails to identify a university-wide center that was named without presidential approval.*

133.    Duquesne has these policies to ensure the University President has the ultimate decision-making authority when it comes to entering into certain gift agreements to protect these "very valuable naming rights." *Ex. 19, Gormley Tr. 77:24-78:15; see also Ex. 40, Gift Acceptance Policies, at Duquesne_00153 (stating that "[v]ariations from these fulfillment guidelines [regarding timing of funding for agreements involving naming rights] may be considered . . . upon . . . approval by the Gift Committee and the President"); Ex. 41, Naming Policy, at Duquesne_00161 (stating "[t]he President . . . will have final approval in any decision to name a college, school, department, institute, or university-wide center").*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that the University President is given ultimate decision making authority with respect to naming rights for donation. It is denied that the University President participates in and/or approves every donation that involves naming rights. See Plaintiff's response to Paragraph 132 above.**

***DEFENDANTS' REPLY: Undisputed, but not material.  By way of further answer, the policies applicable to naming only require presidential approval where certain university property is at issue.  See Def'ts' Ex. 41 at Duquesne_00161 (requiring presidential approval for naming schools, departments, institutes, and university-wide centers) For instance, President Gormley does not need to approve a scholarship that is named for a particular donor. See id. (not referencing required approval). It is undisputed, however, that the CEIM gift at issue was for a university-wide center.  Therefore, the portions of the policies applicable to university-wide centers are the only relevant policies and procedures.***

134.    The Gift Acceptance Policies provide that a "naming will generally not be recognized as official and final until at least sixty percent (60%) of the total commitment has been paid, with an irrevocable agreement and time frame executed in writing for the remainder." *Ex. 40, Gift Acceptance Policies, at Duquesne_00152-53.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

135.    The Gift Acceptance Policies further provide that, "[i]f a deferred gift is part of the naming commitment, it is recommended that its maximum value be no more than forty percent (40%) of the total package (as calculated based on the donor's age at the time of the commitment). *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

136.    Ensuring a significant portion of a gift is paid up front is important to serve the goal of funding, developing, and growing the University center or other recipient. *Ex. 1, Miller Decl. ¶ 14.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

137.    The Gift Acceptance Policies provide for "[v]ariations from these fulfillment guidelines[,]" which "may be considered on a case-by-case basis upon referral by the Vice President for University Advancement and approval by the Gift Committee and the President." *Ex. 40, Gift Acceptance Policies, at Duquesne_00153.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see Plaintiff's response to Paragraphs 132 and 133 above.**

*DEFENDANTS' REPLY: No response required.*

138.    Gifts that involve naming university programs, facilities, and university-wide centers raise unique issues that, per University Policy, require the direct involvement and final approval of the Gift Acceptance Committee and the President. *Ex. 41, Naming Policy, at Duquesne_00161.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that the naming rights policy provides for direct participation of the committee and the President. It is denied that this participation occurs with every gift that involves naming. See Plaintiff's response to Paragraphs 126, 131-133 above.**

*DEFENDANTS' REPLY: Undisputed, but not material.  See Defendants' reply to Plaintiff's*

*response to Paragraphs 126, 131-33.*

139.   Plaintiff could not identify any instance during his time at Duquesne where the Gift

Acceptance Policies were not followed or where he saw a gift agreement that violated the policies

other than claiming that the Gift Policies were not followed in a scenario this Court has already

ruled is not relevant to Plaintiff's claims.[3] *Ex. 4, Plaintiff Tr. 324:20-325:10, 325:23-20.*

**RICHTER'S RESPONSE:   Admitted. By way of further answer, because the Plaintiff's**

**responsibility for the administrative aspects of the filing ended when he provided**

**documentation to Ms. Hughes, Plaintiff does not necessarily know how various of his naming**

**rights donations were handled relative to the naming rights policy. For that reason, he would**

**know even less about how naming rights donations obtained by other gift officers were**

**handled. (Plaintiff Aff, para. 7, Appx132). By way of further response, see the Plaintiff's**

**response to Paragraphs 126 and 131 above.**

*DEFENDANTS' REPLY:  Plaintiff's and other gift officers' responsibilities extended through*

*the life cycle of their assigned donors' gifts to the University. See Def'ts' Ex. 2 at*

*Duquesne_00101 (noting that gift officers are responsible for "stewarding" major gifts,*

*including drafting "gift and fund agreements" and "process[ing] gift commitments*

*expeditiously"); see also Def'ts' Ex. 62, Excerpts of Transcript of Deposition of Ken Gormley,*

*at 38:15-25 (noting that, regardless of who actually drafts it, "the gift officer is going to have to*

*make sure the document reflects what they have discussed with the donor").  Indeed, Plaintiff's*

*admission that he took the paperwork prepared by Hughes and presented it to the donors*

---

[3]     The Court determined the commitment identified to be irrelevant and not subject to discovery at the parties'
March 13, 2024 conference. For the avoidance of doubt, Defendants continue to assert that the commitment
identified is not relevant for the reasons stated in their submission to the Court.

*undercuts that his "responsibility for the administrative aspects of the filing ended when he provided documentation to Ms. Hughes." In any event, Plaintiff could not name a single naming gift he executed for a University-wide center, much less during Miller's time as head of the Advancement Division, so his statement about "how various of his naming rights donations were handled" rings hollow. At bottom, Plaintiff, Dean, and Hughes did not present a single example of inconsistent application of the policy under Miller's leadership to Dedrick as part of his investigation, see Def'ts' Ex. 45 at Duquesne_00011, nor has he unearthed one during this litigation.*

140.    Plaintiff has never seen the agreement related to the irrelevant commitment. *Ex. 4, Plaintiff Tr. 325:11-12.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

141.    The Policy on Gift Related Naming Opportunities described above (the "Naming Policy") states that the President's approval is required for naming-rights opportunities for university-wide centers. *Ex. 41, Naming Policy, at Duquesne_00161.*

**RICHTER'S RESPONSE:   By way of further response, see the Plaintiff's response to Paragraphs 126, 131-133, 138 above.**

***DEFENDANTS' REPLY: Plaintiff does not specifically admit or deny Paragraph 141, so it should be deemed admitted.  In any event, Plaintiff's responses to Paragraphs 126, 131-33, and 138 do not refute the plain language of the Naming Policy.  To the extent that Plaintiff's responses to Paragraphs 126, 131-33, and 138 are relevant, Defendants refer to their replies to Plaintiff's responses to Paragraphs 126, 131-33, and 138.***

142.    The Naming Policy generally requires that the funding requirement to name a university-wide center is $3.5 million. *Ex. 41, Naming Policy, at Duquesne_00162.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see the Plaintiff's response to Paragraphs 126, 131-133 and 138 above.**

***DEFENDANTS' REPLY: No response required.***

143.    The Naming Policy provides that, "in special situations, with approval of the Vice President for University Advancement and the President, unrestricted gifts or irrevocable deferred gifts may be recognized with a naming opportunity." *Ex. 41, Naming Policy, at Duquesne_00162.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, see the Plaintiff's response to Paragraphs 126, 131-133 and 138 above.**

***DEFENDANTS' REPLY: No response required.***

### C.    Entry into a Donor Statement of Charitable Intent

144.    On May 13, 2022, at Plaintiff's request, Hughes provided Plaintiff a draft DSCI but noted that she needed a "detail for the Gift Acceptance Committee." *Ex. 42, May 13, 2022 Email from C. Hughes to W. Richter, Duquesne_00513.*

**RICHTER'S RESPONSE:  Denied emphatically. There is no truth whatsoever to the claim that Ms. Hughes prepared the DSCI "at Plaintiff's request." There is no support for this claim anywhere in the record. The record reference offered by the Defendants does not support this claim in any way. The email that is associated with the Defendants' false claim that Ms. Hughes acted at the Plaintiff's behest contains no language of any kind that would support the Defendants' factual claim here. Because defense counsel chose not to question the Plaintiff on this claim, the Plaintiff's affidavit provides the Plaintiff's denial of this claim. (Plaintiff Aff, para. 13, Appx134).**

*DEFENDANTS' REPLY: Disputed, but not material.  In an email dated April 12, 2022, Plaintiff made clear that he was pursuing the DSCI to Donor D by stating he "ha[d] a meeting scheduled after Easter Break to craft verbiage on your agreement[.]" Def'ts' Ex. 37 at Duquesne_00334. Indeed, to prepare the DSCI, Hughes needed – and had – all the details related to Plaintiff's solicitation of the gift.  See Def'ts' Ex. 44, at Duquesne_00559-60 (DSCI inclusive of all details Plaintiff negotiated about gift).*

*Whether Plaintiff affirmatively requested that Hughes prepare the DSCI is not material. She did so and told Plaintiff it could not be signed prior to approval by the Gift Acceptance Committee.  See Ex. 42, at Duquesne_00513. Plaintiff provided the DSCI to the donors for signature. See infra Paragraph 152. Dedrick investigated Plaintiff's involvement and concluded he was in violation of the relevant policies. See Def'ts' Ex. 45. Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs.*

145.    In an email to Donor D, Plaintiff noted he needed a statement of the Donor Couple's finances to take to Duquesne's "naming committee." *Ex. 43, June 19, 2022 Email from Plaintiff to Donor D, Duquesne_00406.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

146.    Plaintiff never brought the gift and naming rights before the Gift Acceptance Committee or any committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, it was not the Plaintiff's responsibility to take the proposed gift to the Gift Approval Committee. That was the**

responsibility of Ms. Hughes and Ms. Dean, not the Plaintiff. (Creehan Aff, para. 6, Appx125, Plaintiff Aff, para. 6, Appx131-132).

*DEFENDANTS' REPLY:  Disputed, but not material.  Plaintiff acknowledged in an email to the Donor Couple that it was his responsibility to take the donation before the Gift Acceptance Committee. Def'ts' Ex. 43 at Duquesne_00406. Moreover, Plaintiff was aware, from Hughes, that he could not have the DSCI executed prior to the DSCI being approved by the Gift Acceptance Committee. Def'ts' Ex. 42 at Duquesne_00513. Plaintiff's assertion that he was not involved in the Gift Acceptance Committee process whatsoever is plainly untrue, but, in any event, it is not material, because Dedrick investigated Plaintiff's involvement in the Donor Couple gift cultivation and found that he violated the Gift Policies. Plaintiff offers no evidence to suggest that Dedrick's decision was based on unlawful motive.*

*Moreover, Plaintiff was advised by Ms. Hughes that he needed Gift Acceptance Committee approval before having the donors sign the DSCI, but had the donors sign just three days later, Def'ts' Ex. 44 at Duquesne_00560, and there is no record evidence that Plaintiff received confirmation from Hughes that the appropriate approvals were received, which they were not.*

147.    Plaintiff is not aware of whether anyone brought the gift and naming rights before the Gift Acceptance Committee. *Ex. 4, Plaintiff Tr. 310:7-311:9.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, the Plaintiff had no responsibility to take any gift, including the donation from the Donor Couple, to the Gift Approval Committee. (See the Plaintiff's response to Paragraphs 139 and 146 above.)**

*DEFENDANTS' REPLY: Disputed, but not material.  By way of further response, Defendants' restate their response to this allegation, as set forth in Paragraph 146, as though set forth in full herein.*

148.     Plaintiff did not have any discussions with President Gormley about the gift and naming rights, nor did he ask Vice President Miller to do so. *Ex. 4, Plaintiff Tr. 311:15-20*; *Ex. 1, Miller Decl. ¶16.*

**RICHTER'S RESPONSE:  Admitted. The record is clear that the Plaintiff had no access to the Defendant University's President. Mr. Gormley testified that he had never met with a gift officer about approval of a naming rights gift, and that he barely knows the Plaintiff, having only met him once. (Deposition of Kenneth Gormley ("Gormley depo"), pp. 25-26, 80-81, Appx014-016).**

*DEFENDANTS' REPLY: Disputed, but not material. Plaintiff's record citation does not make "clear" that Plaintiff had "no access" to the President. It states what it states, which is that they did not interact "much." Appx014, 25:22-23. Moreover, the President clarified that the reason he had not worked with a gift officer directly on naming rights was because "the only naming rights that [the President was] involved with ha[d] largely involved projects that [the President had] worked on which includes CEIM . . . and so no gift officer would ever think to try to name it without talking to the President who created that Center." Appx016, 81:1-6.*

149.     On June 22, 2022, the Donor Couple signed the DSCI. *Ex. 44, Paperwork regarding DSCI and Executed DSCI, Duquesne_00558-60.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

150.     On July 7, 2022, Dean signed the DSCI. *Ex. 44, Executed DSCI, Duquesne_00560.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

151.    The DSCI provided that the gift was revocable at any time by the donors but did not provide the University revocation rights. *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 3).*

**RICHTER'S RESPONSE:  Denied as stated. To the extent that Paragraph 151 suggests that the Defendant University entered into a binding contract with the Donor Couple, and that the DSCI constituted that contract, the same is denied. The DSCI serves as a statement of understanding only. The agreement is not final until the parties execute a "fund agreement." No fund agreement was executed by the Donor Couple for this gift, so no binding contract existed as a result of the DSCI. (Creehan Aff, para 7, Appx126; Email from Ms. Hughes to Defendant's human resources representative dated August 4, 2022, Appx011-012).**

*DEFENDANTS' REPLY: Try as he might, Plaintiff's response does not change the plain language of an agreement signed by the Donor Couple and a representative of Duquesne. The executed DSCI states: "We understand that this gift is revocable during our lifetimes.  We may, at any time and in our sole discretion, revoke or modify this gift. Upon distribution of this gift, we understand that this commitment shall become an irrevocable gift to the University." Def'ts' Ex. 44 at Duquesne_00559. There is no corresponding language allowing Duquesne to revoke naming rights.  See generally id.*

*In any event, Plaintiff's June 2022 contact report indicates that Plaintiff thought that his June 2022 dinner served to "finalize $1.454M PG to name [Duquesne's] media center," which included Donor E reviewing the DSCI and providing documentation to "substantiate the gift." Def'ts' Ex. 35, Duquesne_00265-66.*

*Plaintiff's claim about the need for a "fund agreement" to bind the parties is not material to the disposition of summary judgment.  Dedrick investigated the Donor Couple gift solicitation and*

*agreement and found that Plaintiff violated the Gift Policies for the reasons in the report. See*
*Def'ts' Ex. 45, at Duquesne_00008-13.*

152.    Revocable meant that the donors could withdraw their commitment at any time
during their lifetimes. *Ex. 1, Miller Decl. ¶ 15; see also Ex. 44, Executed DSCI, Duquesne_00559*
*(¶ 3).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

153.    The DSCI did not require any payment up front and provided only for a "revocable
bequest" of 20% of the Donor Couple's Trust estate. *Ex. 44, Executed DSCI, Duquesne_00558-*
*59.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

154.    The fact that it was a "revocable bequest" meant that that the gift was entirely
deferred until the death of the Donor Couple. *Ex. 1, Miller Decl. ¶ 15.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

155.    The DSCI provided the donors with the right to name the CEIM in perpetuity. *Ex.*
*44, Executed DSCI, Duquesne_00559 (¶ 5).*

**RICHTER'S RESPONSE:  Denied as stated. The DSCI did not create a contract between**
**the parties, and, therefore, it did not provide the Donor Couple with anything but a statement**
**of intent. (See the Plaintiff's response to Paragraph 151 above.)**

*DEFENDANTS' REPLY: For the same reasons in Defendants' reply to Plaintiff's response to Paragraph 151, Plaintiff's denial is not appropriate. The DSCI is a document that speaks for itself, and the DSCI's plain language provided the donors the right to name the CEIM in perpetuity. Whether the DSCI was a binding contract is another question, but it is clear that Plaintiff felt the agreement was "finalized" per his June 2022 contact report. See Defendants' reply to Plaintiff's response to Paragraph 151. In any event, Plaintiff's denial is not material for purposes of summary judgment, as it does not change the fact that Plaintiff was found in violation of the Gift Policies after investigation by Dedrick. Def'ts' Ex. 45, at Duquesne_00008-13.*

156.   The CEIM would be renamed "[u]pon receipt of documentation of the proposed gift." *Ex. 44, Executed DSCI, Duquesne_00559 (¶ 5).*

**RICHTER'S RESPONSE:  Denied. (See the Plaintiff's responses to Paragraphs 151 and 155 above.)**

*DEFENDANTS' REPLY: For the same reasons in Defendants' reply to Plaintiff's response to Paragraph 151, Plaintiff's denial is not appropriate. The DSCI is a document that speaks for itself, and the DSCI's plain language provided for naming rights to attach upon receipt of the documentation of the proposed gift. Whether the DSCI was a binding contract is another question, but it is clear that Plaintiff felt the agreement was "finalized" per his June 2022 contact report. See Defendants' reply to Plaintiff's response to Paragraph 151. In any event, Plaintiff's denial is not material for purposes of summary judgment, as it does not change the fact that Plaintiff was found in violation of the Gift Policies after investigation by Dedrick. Def'ts' Ex. 45, at Duquesne_00008-13.*

157.   The Donor Couple provided that documentation the same day they signed the DSCI. *See Ex. 35, Donor Couple Contact Report by W. Richter (dated June 26, 2022), Duquesne_00265-66 (noting the Donor Couple provided their financial information "to substantiate the gift"); see also Ex. 44, Paperwork Submitted with DSCI, at Duquesne_00561 (donor 401(k) Information with annotations).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

158.   The DSCI does not provide that the naming rights are revoked in the event of a revocation of the Donor Couple's commitment or for any circumstance. *See generally Ex. 44, Executed DSCI, Duquesne_00559-60.*

**RICHTER'S RESPONSE:  Admitted. By way of further answer, the DSCI did not provide the Donor Couple with anything but a statement of intent. (See Plaintiff's responses to Paragraphs 151, 155 and 156 above.)**

***DEFENDANTS' REPLY: For the same reasons in Defendants' reply to Plaintiff's response to Paragraph 151, Plaintiff's additional statement is not appropriate. The DSCI is a document that speaks for itself, and the DSCI's plain language did not provide for revocation of naming rights as stated in Paragraph 158. Whether the DSCI was a binding contract is another question, but it is clear that Plaintiff felt the agreement was "finalized" per his June 2022 contact report. See Defendants' reply to Plaintiff's response to Paragraph 151. In any event, Plaintiff's additional statement is not material for purposes of summary judgment, as it does not change the fact that Plaintiff was found in violation of the Gift Policies after investigation by Dedrick. Def'ts' Ex. 45, at Duquesne_00008-13.***

### D.   Investigation into the Purported Naming Agreement

159.   After the DCSI was executed without the University President's knowledge or approval, President Gormley was shocked to learn of the agreement. *Ex. 19, Gormley Tr. 20:18-21:5.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

160.   On July 28, 2022, Heather Clay, Dean's then-supervisor and Richter's and Hughes' second-level manager, informed Dean that Plaintiff, Hughes, and she were in "serious trouble" for the Donor Couple's DSCI, after which Dean stated to Hughes that "[t]his one just got by us," meaning that they bore responsibility for the errors made with respect to the gift.  *Ex. 20, Dean Tr. 164:16-165:17.*

**RICHTER'S RESPONSE:  Denied emphatically. There is no truth whatsoever to the claim that Ms. Clay informed Ms. Dean that "Plaintiff . . (was) in 'serious trouble.'" There is no support for this claim anywhere in the record. The record reference offered by the Defendants does not support this claim in any way. The email that is associated with the Defendants' false claim that Ms. Clay indicated that the Plaintiff was in trouble for this gift contains no language of any kind that would support the Defendants' factual claim here.**

***DEFENDANTS' REPLY:  Plaintiff's "emphatic[]" denial does not provide the necessary record support and, accordingly, Paragraph 160 should be deemed admitted.  Dean plainly states in her deposition that Clay "let us know that we were in serious trouble" and that the trouble was related to the Donor Couple agreement.  Def'ts' Ex. 20, 164:19-25, 165:3-9.***

***In any event, while Clay's statement to Dean previewed that there was an issue with the Donor Couple's DSCI, the dispute Plaintiff creates is not genuine or material to summary judgment.***

*At bottom, what is material is that, soon after the July 28 message, Dedrick investigated the Donor Couple's gift agreement and found that Plaintiff violated the Gift Policies. Def'ts' Ex. 45, at Duquesne_00008-13.*

161.     Dedrick investigated the gift and circumstances surrounding it.  *See Ex. 45, Aug. 10, 2022 Report on CEIM Naming Investigation, Duquesne_00001-11.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

162.     Dedrick interviewed five individuals as part of his investigation.  *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00003-4.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

163.     Dedrick and Plaintiff initially agreed to meet regarding the investigation on August 3, 2022 at 3:30 p.m. *Ex. 46, Aug. 2, 2022 Email from J. Dedrick to W. Richter, PL 0049.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

164.     Plaintiff canceled the August 3 meeting, stating he was not available to meet until August 8, 2022. *Ex. 47, Aug. 2, 2022 Email from W. Richter to J. Dedrick, PL 0056.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

165.     After multiple calls, emails, and voicemails from Dedrick to Plaintiff with no response, Dedrick informed Plaintiff via email that, if he did not show up for an interview on

August 4, 2022, he may be placed on unpaid leave due to insubordination. *Ex. 48, Aug. 3, 2022 Email from J. Dedrick to W. Richter, PL 0048.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

166.    Plaintiff canceled an August 4, 2022 meeting due to being "advised not to attend" by counsel. *Ex. 49, Aug. 4, 2022 Email Exchange between W. Richter and J. Dedrick, Duquesne_00475-76, at Duquesne_00476.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

167.    Dedrick replied that Plaintiff's attorney should contact the general counsel's office but noted that the investigation must move forward and, per his prior email, he would be placed on unpaid suspension. *Ex. 49, Aug. 4, 2022 Email Exchange, at Duquesne_00475.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

168.    On August 5, 2022, Richter met with Dedrick. *Ex. 50, Aug. 5, 2022 Email from J. Dedrick to W. Richter, Duquesne_00336-39.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

169.    Following the meeting, Dedrick emailed Plaintiff and noted that Plaintiff "refused to answer several of [his] questions" and, "only a few minutes into the interview, [Plaintiff] stated [he was] excusing [him]self and abruptly left prior to fully discussing the issues." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, the Defendant University's human resources representative failed to include in the subject email that the Plaintiff was suddenly called away from the meeting because he got an urgent call from his wife, who had just received bad news related to a health condition from which she then suffered. The Plaintiff briefly explained the situation to the representative, then hurriedly left the meeting and went directly to his wife, who was waiting for him at a local hospital. (Plaintiff Aff, para. 28, Appx139-140).**

*DEFENDANTS' REPLY: Disputed, but not material.   Defendants' dispute that Plaintiff explained the situation, but whether Plaintiff did so and the fact that such explanation is not in Dedrick's email to Plaintiff are not relevant to disposition of summary judgment.*

*It is worth noting that Plaintiff chose not to respond to Dedrick's email when he could have done so to explain himself and request a follow-up discussion.  Indeed, when Plaintiff forwarded this communication to numerous friends, colleagues, mentors, and his therapist – none of those forwards included language about how he was suspended for tending to his wife, Def'ts' Ex. 50 at Duquesne_00336-37, and Duquesne found no replies in its review of the relevant ESI that said anything about that, either. Additionally, this was not the first meeting that had been scheduled between Plaintiff and Dedrick.  Plaintiff had failed to attend and/or canceled the other meetings.* **See** *Def'ts' Exs. 47-50.*

170.   Dedrick informed Plaintiff that the investigation would be "completed without [Plaintiff's] full input." *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

171.    Plaintiff was placed on paid administrative leave pending the outcome of the investigation. *Ex. 50, Aug. 5, 2022 Email, at Duquesne_00338.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

172.    On August 10, 2022, Dedrick found violations of the Gift Acceptance Policies and the Naming Policy because the gift was a 100% deferred, revocable gift that promised naming rights to a university-wide center in perpetuity without obtaining the necessary approvals from the Gift Acceptance Committee and the President. *Ex. 45, Aug. 10, 2022 Report, at Duquesne_00009.*

**RICHTER'S RESPONSE:  Admitted. It is admitted that the findings of the human resources representative are accurately reflected in Paragraph 172. For all of the reasons set forth herein, it is denied that the Plaintiff violated any policy of the Defendant University related to the Donor Couple's $1,500,000 gift to the University, or that he did anything improper or inappropriate related to that gift.**

***DEFENDANTS' REPLY: Plaintiff's denial should be disregarded, as it does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 172 should be deemed an admitted material fact.  See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.***

***Moreover, despite Plaintiff's insistence, the Donor Couple's donation was not a $1,500,000 gift to the University and Plaintiff's efforts to mischaracterize the revocable, planned gift should be disregarded by the Court in light of the plain language set forth in the DSCI.  See Def'ts' Ex. 44 at Duquesne_00559..***

173.    Donor D was "absolutely devastated" by the news that the CEIM would not be named after the Donor Couple and that the gift could not proceed as Richter had erroneously represented. *Ex. 51, Oct. 20, 2022 Letter from D. Dausey to J. Miller, Duquesne_00252-53 (summarizing meeting with Donor Couple).*

**RICHTER'S RESPONSE:  It is admitted that the letter from Dr. Dausey makes the claims set forth in Paragraph 173 related to Donor D's reaction to the fact that the Defendant University was withdrawing any possibility of naming rights to the CEIM. However, there is nothing in the record from the Donor Couple, or Donor D, specifically, to substantiate Dr. Dausey's claim.**

*DEFENDANTS' REPLY: Undisputed.*

X.    **Miller's Termination of Plaintiff due to a Loss of Faith in Plaintiff's Abilities**

174.    On August 17, 2022, Miller informed Plaintiff via letter that he was terminated effective immediately.  *See Ex 7, Termination Letter, at Duquesne_00013-14.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

175.    The letter states that Plaintiff was being terminated because Miller "lost faith in [Plaintiff's] professional judgment and effective internal and external engagement abilities" and that violations of policy related to the Donor Couple were the final straw in a "pattern of performance" that caused the loss of faith and warranted termination.  *Ex 7, Termination Letter, Duquesne_00013-14. Donors B & C*

**RICHTER'S RESPONSE:  It is admitted that the letter reads as indicated.**

*DEFENDANTS' REPLY: No response required.*

176.    Duquesne did not fill Plaintiff's role with another employee or hire anyone to fill the role. *Ex. 60, Defendants' Discovery Responses at p. 10; see also Ex. 61, Excerpts of Defendants' Supplemental Responses to Plaintiff's First Set of Interrogatories, at pp. 6-7 (listing positions added in year prior to and after Plaintiff's termination, none of which replace his role).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

177.    Plaintiff has never heard Miller make comments related to his age. *Ex. 4, Plaintiff Tr. 345:23-25.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

178.    Dean has never heard Miller, Gormley, or anyone in University Advancement make negative comments related to anyone's age. *Ex. 20, Dean Tr. 115:22-116:12.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

179.    Dean, who filed an internal age discrimination complaint (which did not include Richter) and her own, independent lawsuit against the University alleging age discrimination, has no reason to believe that Plaintiff was terminated due to his age. *Ex. 20, Dean Tr. 177:1-3; see also Dean Tr. 184:3-8 (noting Hughes and she made a complaint in July 2921 that was internally mediated); Complaint, Dkt. No. 1,* Mary Frances Dean v. Duquesne University of the Holy Spirit, et al., *No. 2:23-cv-1265-CB (July 11, 2023) (alleging age discrimination,* inter alia).

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Ms. Dean answered "No." to the question, "Do you have any reason to believe that (the Plaintiff) was**

terminated because of his age?" The Defendants do not mention Ms. Dean's testimony immediately prior to the quoted exchange:

> Q:    Do you believe that Mr. Richter was terminated because of his age?
>
> A:    I don't know.

(Deposition of Mary Frances Dean ("Dean depo"), p. 176, Appx017).

Notably, there is no follow up questioning from defense counsel designed to elicit an explanation as to this apparent contradiction. Furthermore, it does not appear that Ms. Dean's opinion on this question has any relevance since there is no dispute that she was not a decisionmaker in the Plaintiff's termination.

*DEFENDANTS' REPLY: There is no contradiction.  Dean stated that she did not know whether Plaintiff was terminated due to his age, as Plaintiff correctly states.  She also stated that she had no reason to believe was terminated on that basis, which is not in contradiction to her being unsure.  Notably, there is no statement from Dean disavowing this testimony.*

180.    Plaintiff has never heard Miller make comments about his TAP 55 complaint. *Ex. 4, Plaintiff Tr. 346:7-16.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

181.    Dean was also disciplined for her role in the Donor Couple's DSCI, but due to her lesser involvement in the donor cultivation and lack of prior issues, she was issued only a formal written warning. *Ex. 1, Miller Decl. ¶ 17; see Ex. 20, Dean Tr. 175:24-176:22 (noting her discipline and that she had not been subject to discipline or writeup before the Donor Couple DSCI incident).*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that Ms. Dean was disciplined for her role in the Donor Couple's donation. It is specifically denied that Ms. Dean's role in the Donor Couple's donation was somehow "lesser" than that of the Plaintiff. The Plaintiff violated no policy, took no action that was not specifically authorized by his supervisors, and did nothing wrong related to this donation. It is undisputed between the parties that Ms. Dean executed the DSCI on behalf of the Defendant University. To the extent that such action even arguably binds the University, it is a fact question as to whether or not her actions were less egregious than the completely proper conduct of the Plaintiff.**

*DEFENDANTS' REPLY: Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 15 should be deemed an admitted material fact.*  **See Byron,** *2022 U.S. Dist. LEXIS 218040, at \*2-3.*

*After review of Dedrick's thorough investigation, Miller determined appropriate punishments based on his assessment of their involvement alongside their performance history and conduct, resulting in the assigned punishments. See Def'ts' Ex. 7 at Duquesne_00013-14; Def'ts' Ex. 1 at ¶ 17. In any event, there is no fact question that needs to be resolved by a jury.  Dean is Plaintiff's age and engaged in her own protected activity as well as participating in Plaintiff's complaint in support of him.* **See supra** *Paragraph 179 (admitting to/failing to deny Dean's protected activity); Paragraph 182 (admitting to Dean's age being the same as Plaintiff's). The material point of Dean's discipline being lesser than termination is that some factor other than age or protected activity was the reason for Plaintiff's termination, or else Dean would have been terminated, too.*

182.     Dean was 62 years old at the time of her discipline.  *See Ex. 20, Dean Tr. 9:16-17 (noting her date of birth is 1960, making her 62 in August 2022).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

**XI.     Richter Confidentiality Violations and Discovery**

183.     As part of his job responsibilities, Plaintiff was required to maintain records of his contacts with University donors in "contact reports" in the University's contact management system. *Ex. 4, Plaintiff Tr. 39:7-9.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

184.     Gift officers have access to contact reports for all Duquesne donors, not just those assigned to them. *Ex. 20, Dean Tr. 77:23-78:4.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

185.     Contact reports are supposed to be entered into the system when a gift officer meets with a donor or discusses "something of significance" with them. *Ex. 4, Plaintiff Tr. 39:10-16.*

**RICHTER'S RESPONSE:  Admitted in part and denied in part. It is admitted that, in most instances, the gift officer must report significant information in the contact report. The exception to that rule is when a donor specifically requests that certain information be kept confidential. Under those circumstances, a gift officer is permitted to exclude such information from a contact report. (Plaintiff Aff, para. 30, Appx140).**

***DEFENDANTS' REPLY: Plaintiff's affidavit statement contradicts his deposition testimony and, accordingly, should not be considered. See [Plaintiff Tr. 41:12-20] (agreeing that "anything that related to moving the relationship forward you would put in a contact report," listing examples of things he would not put in a contact report, and never mentioning an exception permitting exclusion); see Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (holding that "sham affidavits" that contradict the record or materially alter the record told by discovery should not be considered at summary judgment because "no reasonable jury could rely on [them] to find for the nonmovant"); see also Robinson v. UPMC Presbyterian Shadyside, Civil Action No. 22-29, 2023 U.S. Dist. LEXIS 160981, at \*3 (W.D. Pa. Sep. 12, 2023) ("When a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists.") (internal citations omitted). Accordingly, Plaintiff's denial should be disregarded for lack of record evidence.***

***In any event, Plaintiff's denial is not material to the disposition of summary judgment, as he does not identify how his use of this exception demonstrates that his termination was based on his age or protected activity.***

186.    Examples of "something of significance" include "an important phone conversation," making a "call[] to say thank you" or note the gift officer will meet the donor to play golf, or receiving or presenting something that impacts a gift the donor may or has made to the University. *Ex. 4, Plaintiff Tr. 40:4-24; see also Ex. 20, Dean Tr. 78:15-19 (stating information helpful to include in a contact report is "[e]verything that you could possibly learn about a donor").*

**RICHTER'S RESPONSE:   Admitted. By way of further response, see the Plaintiff's response to Paragraph 185 above.**

***DEFENDANTS' REPLY: No response required.***

187.    Plaintiff and his supervisor at the time of his termination, Mary Frances Dean, view the University's relationship with donors as "sacrosanct." *Ex. 4, Plaintiff Tr. 77:21-78:4; Ex. 20, Dean Tr. 33:24-34:14.*

**RICHTER'S RESPONSE:   Admitted. It is admitted that, at the repeated urging of defense counsel in their depositions to agree to the use of the word "sacrosanct," both the Plaintiff and Ms. Dean ultimately agreed to use defense counsel's term.**

***DEFENDANTS' REPLY: Undisputed, but not material.***

188.    A key part of maintaining donor relationships is maintaining the confidentiality of donor information. *Ex. 4, Plaintiff Tr. 77:3-20.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

189.    Third-party organizations have codes of ethics for fundraising professionals, highlighting the importance of, among other things, "safeguard[ing] privacy rights and confidential information," "protect[ing] the confidentiality of all privileged information relating to the provider/client relationships," and "not disclos[ing] privileged or confidential information to unauthorized parties." *Ex. 52, CASE Statement of Ethics (published Mar. 12, 2020), Duquesne_00632; Ex. 53 Association of Fundraising Professionals Code of Ethical Standards (adopted 1964 and amended Oct. 2014), Duquesne_00633.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

190.    Plaintiff agrees that the Ethics Standards accurately reflect their duties with respect to confidentiality. *Ex. 4, Plaintiff Tr. 82:14-23; see also Ex. 20, Dean Tr. 35:5-7 (stating she takes the Ethics Standards seriously).*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

191.    In addition to the general expectation of confidentiality, Advancement Division employees are expected to comply with TAP No. 55, which requires that employees "must[] . . . [m]aintain and respect the privacy and/or confidentiality of information entrusted to them." *Ex. 54, TAP 55, Duquesne_00135-36.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

192.    During discovery, Defendants discovered emails that Plaintiff forwarded to individuals named Jack Gaylord, Rocky Bleier, and Rick Creehan, after Creehan's separation from Duquesne employment.  *See Ex. 55, Compilation of W. Richter Emails Sharing Confidential Information, Duquesne_00254-55, 296-99, 323-28.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

193.    The emails forwarded confidential donor information regarding Donor A and the Donor Couple. *See Ex. 55, Compilation of Emails, Duquesne_00254-55, 296-99, 323-28.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

194.    On or about February 24, 2024, Defendants discovered the emails forwarding confidential donor information. *See Ex. 56, Declaration of Mariah H. McGrogan ¶¶ 4-5.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

195.    Plaintiff admitted to the confidential nature of the donor information in these emails. *Ex. 4, Plaintiff Tr. 127:23-128:6; 133:3-6; see also Ex. 55, Compilation of Emails, at Duquesne_00296 (noting "CONFIDENTIAL" in forward to Creehan).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

196.    Dean believed that Plaintiff violated confidentiality obligations owed to donors through the sharing of these emails. *Ex. 20, Dean Tr. 41:14-17, 43:8-10.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, it appears that the facts set forth in this paragraph are irrelevant to the issues in this case because Ms. Dean did not participate in the decision to terminate the Plaintiff's employment.**

***DEFENDANTS' REPLY: No response required.***

197.    The only other instance of Duquesne discovering an Advancement employee improperly disclosing confidential donor information during Miller's time as head of Advancement involved Hughes. *Ex. 1, Miller Decl. ¶ 18; see Ex. 57, October 3, 2022 Letter from H. Clay to C. Hughes, Duquesne_00788-89.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

198.    In October 2022, Duquesne terminated Hughes for breaching her confidentiality obligations to and speaking negatively about a donor by posting donor information (albeit incorrect) on social media. *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89 (terminating Hughes' employment for violations of TAP 55, TAP 57 (on Social Media use), and basic expectations and standards for confidentiality required in [her] field as an Advancement team member).*

**RICHTER'S RESPONSE:  Denied. See Paragraph 325,** *infra.* **By way of further response, the Defendants have not proffered any evidence of the termination of any employee for similar reasons to that alleged by the Defendant as the reason for the termination of Ms. Hughes. It is noteworthy that the only two (2) examples of terminations of employees for policy violations related to the disclosure of donor information relate to two (2) individuals, the Plaintiff and Ms. Hughes, who have sued the Defendants for discrimination related to their unlawful termination from employment. (See Cecilia Hughes' Complaint against the Defendants alleging age discrimination in her termination at Western District of Pennsylvania Civil Action Number 2:23-cv-01775-RJC at Appx018-031).**

*DEFENDANTS' REPLY: Plaintiff does not refute Paragraph 198 with record evidence and thus his response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 14 should be deemed an admitted material fact. See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2- 3. Plaintiff's general reference to a federal court complaint in another action does not meaningfully refute that Duquesne terminated Hughes for her confidentiality obligation violations, to which Plaintiff admits. See supra Paragraph 195.*

199.     Duquesne promptly terminated Hughes upon the conclusion of the investigation. *See Ex. 57, Oct. 3, 2022 Letter, Duquesne_00788-89.*

**RICHTER'S RESPONSE:   Admitted. By way of further response, see the Plaintiff's response to Paragraph 198 above.**

***DEFENDANTS' REPLY: No response required.***

200.     Duquesne would have terminated Plaintiff if Plaintiff were still employed when these emails were discovered.  *Ex. 1, Miller Decl. ¶ 19.*

**RICHTER'S RESPONSE:   Denied. By offering the only examples of termination for University policy violations by former employees alleging age discrimination in their termination, the Defendant has not met its burden to prove, by a preponderance of the evidence, that the Defendant University would have terminated the Plaintiff upon discovery of the subject disclosures.**

***DEFENDANTS' REPLY: Plaintiff does not refute Paragraph 200 with record evidence and thus his response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 14 should be deemed an admitted material fact. See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3. Plaintiff's response is nothing more than legal argument.***

## XII.     Plaintiff's Limited Allegations Related to Age Discrimination

201.     Miller is the only person Plaintiff claims terminated his employment due to his age. *Ex. 4, Plaintiff Tr. 345:17-22.*

**RICHTER'S RESPONSE:  Admitted. It is admitted that the Plaintiff, in the fifth or sixth hour of his testimony, agreed with counsel that Mr. Miller was the only person involved in**

the discrimination against him. Plaintiff respectfully represents that the evidence put forth to this point in the record reveals evidence from which a jury could conclude that others, including Mr. Gormley, Ms. Connelly, and possibly others, played a role in the discrimination against the Plaintiff.

*DEFENDANTS' REPLY: Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 15 should be deemed an admitted material fact.  See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.*

*That aside, Plaintiff provided the cited testimony on the second day of his deposition and was not nearly five or six hours into testimony for the day (given that Plaintiff's testimony – in total for both days – lasted approximately 8 hours.*

*By way of further response, Plaintiff has provided no evidence that Ms. Connelly or "possibly others" played a role in Plaintiff's termination, that any of the identified (or unidentified "possibl[e] others") harbored any discriminatory or retaliatory intent, and Plaintiff's proffer with respect to Gormley is a memorandum that he provided to Clay along with a statement that the human resources investigation process must play out. Appx296 ("It would be wholly inappropriate for you or the University to make any recommendations or decisions concerning Bill Richter until HR completes its investigation, drafts and issues a report, and discusses the outcome with you").*

202.    Plaintiff asserts only that Viers and Krebs were given better treatment than him due to their respective ages. *Ex. 4, Plaintiff Tr. 265:16-266:1; Ex. 58, Excerpts of Plaintiff's Response*

*to Defendant's First Set of Interrogatories and Requests for Production of Documents ("Plaintiff's Discovery Responses") at pp. 17-18.*

**RICHTER'S RESPONSE:  Admitted. It is admitted that the Plaintiff's early responses to discovery indicated that only Viers and Krebs were given preferential treatment. Since the revelations of discovery, it appears that Defendant Miller is a fair comparator to the Plaintiff. Defendant Miller, who is six (6) years younger than the Plaintiff, stands accused directly of the sexual assault of a female employee of the Defendant University. The evidence of record strongly suggests that the Defendant University sat on this claim, took no meaningful action about this claim for over five (5) months, and, then, upon the insistent call of former employee, Patricia Maurer, alerted Defendant Miller and Mr. Plante about Ms. Maurer's claim that Defendant Miller sexually assaulting Ms. Maurer, and then buried the issue. Defendant Miller testified that he has never been investigated by anyone at the Defendant University for allegations of sexual harassment made by any current or former female Duquesne University employee. (Deposition of James Miller ("Miller depo"), p. 18, Appx032).**

*DEFENDANTS' REPLY:  Disputed, but not a genuine dispute of material fact.*

*As an initial matter, Plaintiff has an ongoing obligation to supplement his discovery responses throughout the course of discovery, which he failed to do.  Fed. R. Civ. P. 26(e).*

*The only factual support that Plaintiff provides for this allegation is a single page of Plaintiff's deposition where, Miller testified that he has not been investigated for sexual harassment of any employee. The remaining "factual statements" contained in Paragraph 202 are unsupported by record evidence.  Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer*

*to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 15 should be deemed an admitted material fact.  See Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.*

*Finally, for the reasons in Defendants' Reply Brief, Miller is not an appropriate comparator, and even if he were, Plaintiff's belated assertion precludes consideration of Miller as a comparator. Reply Br. 2-3.*

203.    Plaintiff asserts that the "entire environment was toxic" in the Advancement Division. *Ex. 4, Plaintiff Tr. 350:1-2.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

204.    This was due to "[e]mployees . . . leaving in droves and [being] frustrated with the management policies." *Ex. 4, Plaintiff Tr. 235:23-236:5.*

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

205.    David Jakielo, Lisa Sciullo, Natalie Taylor, Lauren Wiater, Rick Creehan, and John Plante were the employees that Plaintiff recalled "leaving in droves."

**RICHTER'S RESPONSE:  Admitted.**

*DEFENDANTS' REPLY: No response required.*

206.    The individuals named were the following ages when they left the University (date of separation from employment in parentheses):

     a.  Natalie Taylor – 39 years old (May 14, 2019) – 23 years younger than Plaintiff at separation from employment;

    b.   Lisa Sciullo – 53 years old (Dec. 2, 2019) – 9 years younger than Plaintiff;

    c.   Rick Creehan – 66 years old (Dec. 31, 2020) – 4 years older than Plaintiff;

    d.   John Plante – 59 years old (Apr. 26, 2021) – 3 years younger than Plaintiff;

    e.   Lauren Wiater – 31 years old (May 13, 2022) – 31 years younger than Plaintiff;

    f.   David Jakielo – 39 years old (June 7, 2022) – 23 years younger than Plaintiff.

*Ex. 59, Declaration of Ryan Dawson ("Dawson Decl.") ¶¶ 3-4.*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

207.    Taylor, Sciullo, Creehan, and Plante left the University before Miller's appointment to the Vice President role and did not report to him. *See Ex. 1, Miller Decl. ¶ 3 (noting interim appointment in July 2021); Ex. 59, Dawson Decl. ¶ 4 (noting dates of separation from employment prior to Miller's interim appointment in July 2021).*

**RICHTER'S RESPONSE:  Admitted.**

***DEFENDANTS' REPLY: No response required.***

208.    Krebs, who Plaintiff asserts is a younger employee who received better treatment, has also left the University, stating that she was looking for "additional responsibilities" elsewhere. *Ex. 22, Krebs Tr. 9:2-11:1; see also Ex. 58, Plaintiff's Discovery Responses at pp. 17-18.*

**RICHTER'S RESPONSE:  Admitted. By way of further response, the Defendants have offered no evidence to suggest why Ms. Krebs' decision to leave her employment at the Defendant University is relevant to the any claims in this action.**

***DEFENDANTS' REPLY: No response required.***

## PLANTIFF'S COUNTER-STATEMENT OF FACTS[4]

209.    The Plaintiff was named Gift Officer of the Year in 2019/2020. (Plaintiff dep, p. 68, Appx035).

**DEFENDANTS' RESPONSE: Undisputed but not material.**

210.    The Plaintiff received special training while employed by the Defendant University in order to work closely with planned giving prospects. (Plaintiff depo, pp. 37-38, Appx033-034).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

211.    The president of the Defendant University believed that the Plaintiff was a good, successful fundraiser. (Gormley depo, pp. 26-27, Appx014).

**DEFENDANTS' RESPONSE:  Disputed in part and undisputed in part.  Defendants' denial, however, does not create a genuine dispute of material fact because it reflects Plaintiff's mischaracterization of record evidence.  *See Dicuio v. Brother Int'l Corp.*, 653 F. App'x 109, 113 (3d Cir. 2016) (holding that a plaintiff's conclusory, unsupported assertion did not create a genuine dispute of fact); *Winfield v. Mazurkiewicz*, Civil Action No. 11 - 584, 2012 U.S. Dist. LEXIS 135422, at \*6 (W.D. Pa. Sep. 21, 2012) ("Although Plaintiff's filings are entitled to liberal construction, he still must set forth facts sufficient to survive summary judgment. However, Plaintiff's allegations and denials, unsupported by facts of record, do not create an issue of material fact sufficient to defeat a properly supported motion for summary judgment."). President Gormley testified that he had a "general sense" that Plaintiff was a**

---

[4]      Defendants' reproduction of Plaintiff's counter-statement of facts does not reproduce his editorialized headers or footnotes attached thereto, as Local Rules plainly state that Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  See L.Cv.R. 56.C.1.c.; see Byron, 2022 U.S. Dist. LEXIS 218040, at \*2-3.

"good fundraiser," which he had through conversations with prior head of the Advancement Division John Plante.  President Gormley did not testify that Plaintiff was "successful," and, in fact, testified that his only direct exposure to Plaintiff's work was related to the Donor Couple policy violations. *See* **Pl. App'x 014 at 26:17-25.**

212.    The provost of the Defendant University was very impressed with the Plaintiff's rapport with donors, and was well liked by them. (Dausey depo, p. 90, Appx314).

**DEFENDANTS' RESPONSE:  Undisputed but not material.  By way of further response, Dausey served as the decisionmaker with respect to the investigation of Plaintiff's internal complaint.  *See supra* Paragraph 99.**

213.    The Plaintiff was a "exceptionally talented, hard-working, honest, highly skilled, successful gift officer" who was well liked by his donors. He had a strong command of the issues that face a gift officer in pursuit of donations. (Creehan Aff, para. 4, Appx124).

**DEFENDANTS' RESPONSE:  Undisputed that Dr. Creehan so stated in his affidavit, but not material.  The opinion of Rick Creehan, Plaintiff's mentor (*see* Ex. 65, Excerpts of Transcript of Deposition of William Richter, 88:25-89:4) and a prior Advancement Division employee who was no longer with the University at the time of Plaintiff's termination, *see supra* ¶ 206 (citing Def'ts.' Ex. 59, Dawson Decl. ¶¶ 3-4), about Plaintiff's abilities is not material to Plaintiff's performance and conduct at the time and leading up to his termination.**

214.    Donor A was a long-time cultivation prospect of the Plaintiff from whom the Plaintiff was attempting to cultivate a donation of $250,000 or more. (Plaintiff depo, pp. 101-102, Appx037-038; Plaintiff Aff, para. 27, Appx139).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

215.    Defendant Miller undertook a portfolio reorganization in 2022. Defendant Miller failed to communicate the reassignments that resulted from the reorganization to the advancement team, including to the Plaintiff, Ms. Dean and Mr. Demilio, who was not consulted about the reassignments, despite the fact that he was routinely consulted about reassignments. (Dean depo, pp. 74, 75, 91, 98-99, Appx054-056, Plaintiff depo, pp. 148-149, Appx046).

**DEFENDANTS' RESPONSE:   Undisputed that Miller did not communicate the reassignment of donors to certain members of the advancement team, including Plaintiff and Dean.**

**The remainder of Paragraph 215 is unsupported by Plaintiff's record citations in part and disputed, but dispute not material. The record citations do not support – and in fact, directly contradict – the notion that Paul Demilio was not consulted about the reassignments. In Appx046 (Plaintiff Tr. 148:17-22), Plaintiff responds to the question "Do you know whether Paul Demilio was involved?" with "My understanding is that he was. I don't know, I don't know." Plaintiff goes on to waffle back and forth regarding whether Demilio said he was involved, ultimately responding to "You're telling me that Paul Demilio's position was that he was never consulted on these portfolios?" with "That's not what I said."  In Appx054-56, Dean does not at all address Paul Demilio. Demilio was involved. *See* Def't's Ex. 15 at Duquesne_00020-21 (Miller explaining Demilio's involvement to Plaintiff).**

**Ultimately, the distinction is not material. Whether Demilio was involved in the portfolio rebalancing is a matter of business judgment. And, in any event, Plaintiff does not at all connect Demilio's claimed lack of involvement to how his termination was related to his age or his protected activity, also rendering this fact immaterial.**

216.    The donors that Defendant Miller reassigned to the Plaintiff were mostly "dead, demented," or did not respond to multiple previous attempts at solicitation. The Plaintiff did not gain any new, viable prospects as a result of the reassignments made by Defendant Miller. (Plaintiff depo, p. 146, Appx046, Dean depo, p. 54, Appx051).

**DEFENDANTS' RESPONSE:  Unsupported by Plaintiff's record citations and disputed, but dispute not material.  Plaintiff's testimony confirms that Defendants' counsel correctly read his statement in an email to Miller (email at Def't's Ex. 15, Duquesne_00022).**

**Even assuming Plaintiff's claims in that email were true, it does not support the notion that the "majority" of the prospects were "'dead, demented' or did not respond to multiple previous attempts at solicitation," nor does it state that Plaintiff did not "gain any new, viable prospects."  Firstly, Plaintiff's use of quotation marks around "dead, demented" is inappropriate, as that specific language is not found anywhere in the record citations. Second, the language states that "several" prospects were purportedly deceased, "one" purportedly had dementia, and a "handful" were nonresponsive.  Further, Plaintiff's cited material does not establish that his newly assigned group did not contain "any" viable prospects – nowhere in Plaintiff's cited material does Plaintiff or Dean state as much.  The record citation to Dean's testimony reflects that she was not aware of any donors being added to Plaintiff's portfolio, which is not a firm statement that there were no donors added (which would be verifiably incorrect).**

**In any event, at his deposition, Plaintiff admitted he did not know from where he got the 48-donor figure and admitted that he could not dispute the figures in a spreadsheet that reflected his donors post-reassignment, which reflected 97 additions to his portfolio, not 48. *See* Def't's Ex. 16 (spreadsheet reflecting donor changes). The record also reflects Miller**

**informing Plaintiff that, because the prospect pool involved more than 6,000 potential donors, those working on the reassignment could not look closely at every donor and donor-gift officer relationship and that, any concerns regarding deceased, infirmed, and "truly lost" prospects could be communicated to Demilio for review.** *See* **Def't's Ex. 15 at Duquesne_00021. Finally, it is notable that Plaintiff touted his ability to secure donations from previously non-responsive donors in his performance review, giving as an example turning a "disgruntled alum" who "curse[d] [him] out" into a guest lecturer at Duquesne's law school and a legitimate donor prospect.** *See* **Def'ts' Ex. 13 at Duquesne_00096. Ultimately, the distinction is not material. Plaintiff introduces no evidence or even allegation to connect how inadvertently being assigned some deceased or otherwise unavailable donors to his assertion that his termination was based on his age or protected activity.**

217.   Plaintiff protested to Defendant Miller that Donor A was taken away from him after the Plaintiff was in the process of obtaining a large donation from him. (Plaintiff depo, pp. 144-145. 223, Appx045).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.  Plaintiff admitted it was within Miller's prerogative to reassign donors and, in any event, Plaintiff does not assert that Miller's reassignment of Donor A has anything to do with his termination or that it supports any allegation regarding his termination being due to his age or in retaliation for protected activity.** *See generally* **Pl.'s Opp. (referring to Donor A only with respect to Krebs' misleading contact to him).**

218.   Ms. Dean believes that Ms. Krebs was treated more favorably than the Plaintiff through the reassignments made by Defendant Miller. (Dean depo, p. 113, Appx058).

**DEFENDANTS' RESPONSE:  Undisputed.  By way of further response, Dean's opinion and belief are supported by a single donor's reassignment from Krebs, and her testimony makes clear that she was not even aware of the full scope of Plaintiff's reassignments, claiming she was "not aware" of any donors being added to Plaintiff's portfolio when 97 donors were added.  *See* Def'ts' Ex. 16 (demonstrating addition of 97 donors).**

**In any event, Dean's opinion is immaterial because, *inter alia*, Plaintiff does not assert at any point in his Opposition that supposed favorable treatment with respect to donors has any bearing on whether Duquesne and Miller discriminated against Plaintiff with respect to his age or protected activity. *See generally* Pl. Opp.**

219.    Ms. Krebs made false, misleading statements to Donor A during her solicitation of him. Ms. Krebs told the donor that the Plaintiff had "shared some of Donor A's thoughts" on his donation intentions with Ms. Krebs. This statement was untrue, and constituted a falsification of records of the Defendant University. (Plaintiff depo, pp. 105-106, 110, 119, Appx038-040, 042).

**DEFENDANTS' RESPONSE: Disputed as stated but dispute not material. After a thorough investigation into the statement at issue, Duquesne found that Krebs' statement was "misleading." Def'ts' Ex. 31, at Duquesne_00223. Plaintiff's characterization of the statement as "false," "untrue," and a "falsification of records" is just that, his characterization.  Further, disputed that the record citation reflects that Krebs told Donor A that Plaintiff had shared some of Donor A's thoughts "on his donation intentions." In fact, the language reflects that Krebs stated that Plaintiff "shared some of your thoughts on these subjects with me," with a prior sentence reflecting that Krebs said she would like to discuss the donor's "experiences with Duquesne and learn about your current thoughts of the**

**university," implying that** *those* **are the subjects on which Plaintiff shared his thoughts – not his donation intentions.** *See* **Def''ts' Ex. 18 at Duquesne_00052.**

**The dispute is not material, however. Duquesne thoroughly investigated Plaintiff's complaints regarding Krebs' statement to Donor A and concluded that Krebs did not violate Duquesne policies. Plaintiff's different characterization is nothing more than quibbling with the results of the investigation, which is not permissible on disposition of summary judgment absent evidence of unlawful motive.**

220.    The Plaintiff filed a complaint with the Defendant University's human resources department regarding the false statements and falsification of records. (See Defendant's Exhibit 14).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.**

221.    During his cultivation of Donor A, the Plaintiff was provided with confidential information from the donor regarding his personal assets, his retirement portfolios and his desire to donate the proceeds of a real estate sale, which the donor asked the Plaintiff to keep confidential. Because of the donor's request for confidentiality, the Plaintiff withheld that request for confidentiality from his contact reports. Notably, the donor refused to share that confidential information with Ms. Krebs. (See Defendant's Exhibit 14 at p. 3, Pl. Bates number PL 0066. See also, Plaintiff's response to Defendant's factual allegations at Paragraph 74, supra, and Plaintiff depo, p. 117, Appx041, and Plaintiff Aff, para. 30, Appx140).

**DEFENDANTS' RESPONSE: Disputed but not material. Plaintiff's statement in Defendants' Exhibit 14 is contradicted by his deposition testimony in which Plaintiff said that the confidential information shared by Donor A was confidential because it "usually is" and that the "usual[]" confidentiality permitted that other gift officers could be privy to the**

information. *See supra* Paragraphs 76-77. Plaintiff's statement in Exhibit 14 only vaguely asserts that there were confidential "matters related to his estate plan including personal assets and retirement portfolios," information that must be kept confidential by gift officers as a matter of course. Plaintiff provides no additional detail about what these "matters" were or why they were confidential beyond the "usua[]" course. Moreover, Plaintiff has introduced no record evidence that Donor A was bothered in any way by Krebs' outreach, that Donor A "chose not to reveal the information that he asked me to keep in confidence," that Donor A felt that Krebs or Plaintiff violated any confidentiality he requested of either, or that Donor A refused to provide information to Krebs. The record only reflects that Donor A was pleased enough with Krebs as his assigned gift officer that he permitted Krebs to book the $50,000 bequest to Duquesne provided in his will. *See supra* Paragraph 58.

In any event, Plaintiff's assertions regarding confidential information are not material to the disposition of summary judgment. Plaintiff provided these assertions to Dedrick, *see* Def'ts' Ex. 14, who considered Plaintiff's claims along with numerous other documents and witness interviews and concluded that Krebs did not violate Duquesne policies. *See supra* Paragraphs 115-16.

222.    Plaintiff asserted that Ms. Krebs claim that she and Plaintiff discussed Donor A's information violated the confidentiality that the Plaintiff had promised to Donor A. (Plaintiff depo, p. 118, Appx042).

**DEFENDANTS' RESPONSE:  Undisputed.**

223.    The Plaintiff's immediate supervisor believed that Ms. Krebs' claims to Donor A were "misleading." Ms. Dean had a "genuine concern" that Ms. Krebs' conduct deceived the donor. (Dean depo, pp. 51-52, 121, Appx050, 059).

**DEFENDANTS' RESPONSE:  Undisputed.**

224.    Defendant Miller became angry with the Plaintiff over the Plaintiff's concerns over Ms. Krebs' conduct with Donor A, and told the Plaintiff that Ms. Krebs had done nothing wrong. (Plaintiff depo, p. 134, Appx043).

**DEFENDANTS' RESPONSE: Disputed in part, but not material. While in Plaintiff's deposition he states that Miller became "agitated" (not angry), Plaintiff's contemporaneous notes reflect that Miller was "firm[]" in his response that Krebs had done nothing wrong but expressly state that "[a]t no time during this interaction were there harsh tones or raised voices from either party."  Def'ts' Ex. 23 at Duquesne_00321.**

**The dispute is not material because this meeting occurred on March 23, 2022,** *see* **Def'ts' Ex. 23 at Duquesne_00321, and, afterward, Plaintiff lodged his complaints about Krebs', Viers', and Miller's conduct, which Dedrick investigated.  After Dedrick's thorough investigation, Dedrick recommended, and Dausey adopted, that Krebs be informed that her statement to Donor A was "misleading" but that her statement did not rise to the level of a policy violation. Def'ts' Ex. 31 at Duquesne_00223.**

225.    Ms. Krebs was credited with a $50,000 gift from this donor. Her actions likely cost the Defendant University $200,000 or more. (Plaintiff depo, pp. 101-102, 120, Appx037-038, 042).

**DEFENDANTS' RESPONSE:  Undisputed that Krebs was credited with documenting the $50,000 bequest from Donor A.  Disputed in part that the cited material supports the proposition stated, but not material as to the remaining "facts" in Paragraph 225.  In Plaintiff's cited material, he asserts that he was working on a "quarter of a million dollar donation," but nowhere in the cited material does he demonstrate that it is "likely" that her**

actions cost Duquesne $200,000 or more.  In fact, Plaintiff admitted it was possible for someone to follow up with Donor A and secure another gift. *See supra* Paragraph 95

The dispute is not material because, firstly, in his own words, Plaintiff's complaint against Krebs was not about her failure to maximize Donor A's commitment to Duquesne but rather about her purported "false" statements and "falsification" of documents. *See supra* Paragraph 220.  In any event, Dedrick fully investigated Krebs' actions related to Donor A and concluded there was no policy violation.

226.    The Defendant University assigned the decision on the Plaintiff's grievance to a person who had no responsibility in the advancement division, and had no significant experience in advancement. This decisionmaker was unaware of the procedures and best practices related to donor reassignments. (Dausey depo, pp. 6, 13, 31, Appx008-010).

**DEFENDANTS' RESPONSE:  Undisputed.  By way of further response, pursuant to the University's HR Complaint Procedure, which states that the appropriate decisionmaker is a "Senior Department Head" – in this case, Miller – "or other appropriate department supervisor," Def'ts' Ex. 27 at Duquesne_00171, Dedrick chose Dausey because Miller was involved in Plaintiff's complaint. *See id.* While Dausey did not have experience with the procedures at issue with respect to reassignment, he did have a full, thorough investigative report and recommendations from Dedrick to consider when making his decision. *See* Def'ts' Ex. 31 (Dedrick investigative report). Dedrick's report took into account all evidence provided by Plaintiff and others as well as interviews of numerous individuals. *See* id. at Duquesne_00214, 00227-28. Moreover, Dausey had experience with TAP 55, the policy Plaintiff complained was violated. Def'ts' Ex. 64 at 36:6-13. In any event, Plaintiff never**

complained about the fact that Dausey was reviewing his complaint, and to do so now is merely to quibble with the results of an investigation that did not go his way.

227.    This decisionmaker found that Ms. Krebs conduct toward the donor was "misleading." (Dausey depo, pp. 43, 58-59, Appx313).

**DEFENDANTS' RESPONSE:  Disputed that the cited material supports the proposition stated, but not material. The cited material, Appx313, reflects only that Krebs' language that stated Plaintiff "shared some of your thoughts on these subjects with me" was misleading, not broadly that her "conduct" was misleading.  *See* Appx 313.  This is confirmed by Dedrick's report, which Dausey adopted. *See* Def'ts' Ex. 31 at Duquesne_00223; *supra* Paragraph 120.**

**The dispute is not material because, all that is relevant for disposition of summary judgment is that, after a thorough investigation, Krebs was found not in violation of any policy, rendering her an inappropriate comparator to Plaintiff.**

228.    Notwithstanding that Ms. Dean and Provost Dausey found Ms. Krebs' actions to have been misleading to the Donor, and notwithstanding that Ms. Krebs had likely left $200,000 or more "on the table," and, therefore, not available to the Defendant University; Ms. Krebs received no discipline whatsoever. (Dausey depo, pp. 55-56, 62, Appx315-316).

**DEFENDANTS' RESPONSE:  Defendants dispute Plaintiffs' "notwithstanding" clauses related to Krebs "likely" leaving "$200,000 or more 'on the table'" for the reasons in their response to Paragraph 225, which are incorporated herein by reference.**

**Undisputed that Krebs did not receive formal "discipline," as she was not found to have violated any University policy.  Nevertheless, Dedrick recommended informal counseling,**

which Krebs received.   Ex. 31 at Duquesne_00226; Ex. 66, Excerpts of Transcript of Deposition of Melissa Krebs, 42:21-43:22.

229.    On or about October 12, 2007, Defendant Miller sexually assaulted an employee of the Defendant University, Patricia Maurer, at a University function, by rubbing his hand along her breast, without Ms. Maurer's consent. Defendant Miller's sexual assault of this employee shocked and humiliated her. (Affidavit of Patricia Maurer ("Maurer Aff"), paras. 1-3, Appx118-119).

**DEFENDANTS' RESPONSE:   Pursuant to Federal Rule of Civil Procedure 56(c)(2), Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 229.  Plaintiff did not disclose Ms. Maurer in his initial Federal Rule of Civil Procedure 26(a) disclosures, *see generally* Def'ts' Ex. 63, Plaintiff's Initial Disclosures, nor did he supplement those disclosures if his discovery of Ms. Maurer as a witness came after the disclosures were served. Such nondisclosure warrants that the affidavit be disregarded. *See Scalia v. Elder Res. Mgmt.*, No. 2:19-cv-546, 2020 U.S. Dist. LEXIS 236207, at \*6 (W.D. Pa. Dec. 16, 2020) (Wiegand, J.) (stating that Rule 26(a) "obligates parties to disclose the identities of individuals whose testimony they intend to use in support of their case, including the identities of non-expert affiants in support of summary judgment").  *Compare Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1384 n.6 (N.D. Ga. 2019) (refusing to accept declaration in support of summary judgment where the declarant's identity was not disclosed in the rule 26(a) initial disclosures), *with Wintjen v. Denny's Inc.*, No. 2:19-cv-69, 2024 U.S. Dist. LEXIS 30164, at \*4 n.2 (W.D. Pa. Feb. 22, 2024) (Wiegand, J.) (allowing declaration over objection that declaration itself had not been provided in discovery because courts consider post-discovery declarations "when the declarant has been previously disclosed as a witness").**

**By way of further response, disputed but not material.  Miller unequivocally denied sexually assaulting Maurer. Def'ts' Ex. 67, Excerpts of Transcript of Deposition of James Miller, 6:6-10. The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

230.    Because of economic hardship, Ms. Maurer was unable to immediately resign her position. She did, however, begin attempting to secure another position within a short time after she was sexually assaulted by Defendant Miller. (Maurer Aff, para. 3, Appx118-119).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 230, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**By way of further response, Defendants admit only that Paragraph 230 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, and state that the averment is not material.  Miller unequivocally denied sexually assaulting Maurer. Def'ts' Ex. 67, 6:6-10. The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

231.    While Ms. Maurer was attempting to obtain employment that would meet her economic needs, Defendant Miller promoted a woman in the advancement division to a position that she did not deserve. (Maurer Aff, para. 4, Appx119).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 231, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**By way of further response, Defendants admit only that Paragraph 231 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, and state that the averment is not material. Defendants deny that Miller promoted a woman to a position "she did not deserve," and the cited material does not support that statement.  The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

232.    It was a common belief among employees of the advancement division that Defendant Miller was having a sexual relationship with the woman that he promoted. At the time that Defendant Miller promoted the aforementioned female employee, Ms. Maurer and other female employees of the Defendant University had made their donation goals, while the woman who was rumored to be having the affair with Defendant Miller had not. (Maurer Aff, para. 4, Appx119).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 232, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**By way of further response, Defendants admit only that Paragraph 232 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, dispute the veracity of the statement, but the dispute is not material. Defendants dispute that Miller was having a sexual**

**relationship with the woman referenced, that other employees had met their goals, and that the woman referenced was not meeting her goals, and the cited material does not support those statements. The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

233. Because Ms. Maurer suffered a sexual assault from Defendant Miller, and because she was passed over for a promotion given to a woman who was commonly believed to be having a sexual affair with Defendant Miller, Ms. Maurer resigned her employment with the Defendant University on or about April 2, 2008. (Maurer Aff, paras. 3-5, Appx118-119).

**DEFENDANTS' RESPONSE: Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 233, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**By way of further response, Defendants admit only that Paragraph 233 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures and dispute the veracity of the statement, but the dispute is not material.**

**The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

234. On or about October 12, 2021, some thirteen (13) years after she left the employment of the Defendant University, Ms. Maurer learned that Defendant Miller was to be promoted to a senior position in the Defendant University's advancement division. As a result, Ms. Maurer contacted the Defendant University's general counsel, Pamela Connelly, and reported

Defendant Miller's sexual assault. Ms. Connelly promised Ms. Maurer that she would take prompt action on her report. (Maurer Aff, para. 6, Appx120).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 234, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**By way of further response, Defendants admit only that Paragraph 234 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.**

**The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.**

235.    After almost five (5) months with no word from Ms. Connelly, Ms. Maurer attempted to contact her. On or about March 2, 2022, Ms. Maurer spoke with Ms. Connelly's assistant and inquired about the progress of the investigation. Ms. Maurer was promised a timely response to her inquiry. (Maurer Aff, para. 7, Appx120).

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as Paragraph 7 of Ms. Maurer's affidavit does not discuss the factual contention at Paragraph 235.  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 235, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**The dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply**

**Brief. An allegation that a single former employee's report, 14 years after the alleged incident, was handled differently does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

236.     On the day after Ms. Maurer contacted Ms. Connelly's office, Defendant Miller reviewed Ms. Maurer's LinkedIn profile. At that time, Ms. Maurer had had no contact with Mr. Miller for almost thirteen (13) years. Defendant Miller claimed, untruthfully, that he was on Ms. Maurer's LinkedIn page because she visited his page first. Defendant Miller also claimed, untruthfully, that he and Ms. Maurer had a connection related to Ms. Maurer's employment at Animal Friends, and that he was checking in to see what Ms. Maurer's career path was at that point. Thus, Defendant Miller would maintain that it was a coincidence that he looked at her social media.

**DEFENDANTS' RESPONSE:  Disputed for failure to cite to record evidence as required by Local Rule 56.B.1. & 56.C.1.b., and Defendants request that Paragraph 236 be stricken for that reason.  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 236, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**In any event, whether Miller reviewed Maurer's LinkedIn profile is not material, as Plaintiff does not allege any sort of University policy violation associated with such conduct.**

**Moreover, the dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.  An allegation that a single former employee's report, 14 years after the alleged incident, was handled differently does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

237. On the same day, March 3, 2022, by way of a second coincidence, John Plante, a former senior vice president for the Defendant University, requested to join Ms. Maurer's LinkedIn page. At that time, Ms. Maurer had had no contact with either Mr. Plante or Defendant Miller for thirteen (13) years. (Maurer Aff, para. 8, Appx120).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 235, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.  By way of further response, Defendants admit only that Paragraph 237 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.  Notably, John Plante was not employed with the University in May 2022. *See supra* Paragraph 206.**

**The dispute is not material, however, because Plaintiff does not at all connect how John Plante's actions are connected to Plaintiff's termination, age discrimination, or retaliation. Moreover, the dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.  An allegation that a single former employee's report, 14 years after the alleged incident, was handled differently does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

238. On March 3, 2022, after both men had sought her out through social media, and being fearful for her safety, Ms. Maurer again contacted Ms. Connelly's office to inform her of these contacts. (Maurer Aff, para. 9, Appx120-121).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 235, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.  By way of further response, Defendants admit only that Paragraph 238 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.**

**The dispute is not material, however, because Plaintiff does not at all connect how Miller's and John Plante's alleged actions with respect to LinkedIn contact are connected to Plaintiff's termination, age discrimination, or retaliation.  Moreover, the dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.  An allegation that a single former employee's report, 14 years after the alleged incident, was handled differently does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

239.   On March 16, 2022, over twenty-two (22) weeks after Ms. Maurer reported Defendant Miller's sexual assault, Ms. Connelly finally contacted Ms. Maurer and told her that the matter involving Defendant Miller had been "taken care of" Ms. Connelly was dismissive of Ms. Maurer's complaint that Defendant Miller and Mr. Plante had made contact with her through social media. Ms. Connelly, like Defendant Miller, suggested that those two (2) contacts, occurring thirteen (13) years after the last contact between the three (3) persons, and occurring within twenty-four (24) hours of Ms. Maurer's call to Ms. Connelly, were two (2) coincidences that happened to occur on the same day. (Maurer Aff, para. 10, Appx121).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 239, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.  By way of further response, Defendants admit only that Paragraph 239 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.**

**The dispute is not material, however, because Plaintiff does not at all connect how Miller's and John Plante's alleged actions with respect to LinkedIn contact are connected to Plaintiff's termination, age discrimination, or retaliation.  Moreover, the dispute is not material, however, because as a matter of fact and law, Miller is not a legally relevant comparator to Plaintiff for all the reasons set forth in Defendants' Reply Brief.  An allegation that a single former employee's report, 14 years after the alleged incident, was handled differently does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

240.    On or about September 22, 2022, Ms. Maurer initiated a telephone conversation with Bernadette Krueger, to inquire of her about the numerous incidents of sexual misconduct by Defendant Miller about which Ms. Maurer had been informed as she investigated Defendant Miller. Ms. Maurer turned to Ms. Krueger for information because Ms. Krueger was a long time employee of the Defendant University who was universally respected at the Defendant University for her wisdom and compassion. During that conversation, Ms. Krueger told Ms. Maurer that, sometime in 2005 to 2008, Defendant Miller approached Ms. Krueger and told her that a female employee of the Defendant University, Ms. Y, had filed a claim of sexual harassment against him.

Defendant Miller told Ms. Krueger that, because Ms. Y had accused him of sexually harassing her, he was fearful of the impact that such a claim would have on him, both personally and professionally. Ms. Krueger also told Ms. Maurer that Defendant Miller had sworn her to secrecy about Ms. Y's claim. (Maurer Aff, para. 11, Appx121-122).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 240, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference. Defendants further object to Paragraph 240 to the extent that it contains inadmissible hearsay evidence, as anything that Ms. Krueger stated to Plaintiff is inadmissible hearsay without an exception, and anything Ms. Y stated to Ms. Krueger is hearsay within hearsay. *See* Fed. R. Evid. 801; *see also Bouriez,* 2005 U.S. Dist. LEXIS 18324, at \*26-27.  By way of further response, Defendants admit only that Paragraph 240 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.**

**Paragraph 240 is not material to the disposition because Plaintiff does not – and cannot – state that Ms. Y's allegation was reported to Duquesne, meaning that Duquesne did not have the opportunity to investigate any such claim, defeating the notion that it evidences better treatment of Miller as Plaintiff's comparator or pretext as to Miller's decision about Plaintiff's termination. In any event, Paragraph 240 is not material because Miller is not Plaintiff's comparator as a matter of law, and the notion that a single employee's report, 14 years after the alleged incident, about Miller was not appropriately handled – and there is**

no record evidence that that is the case – it does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.

241.    During that same conversation, Ms. Krueger told Ms. Maurer that she had been approached by another female employee of the Defendant University, Ms. Z, who said that she was attending a University event with Defendant Miller, at which time he made an attempt to touch her breast, causing Ms. Z to jump up and loudly complain about Defendant Miller's attempted sexual assault. (Maurer Aff, para. 12, Appx122).

**DEFENDANTS' RESPONSE:  Defendants object to the consideration of the Affidavit of Patricia Maurer and any factual averments relying thereon, including Paragraph 241, for the reasons set forth fully in Paragraph 229, which are incorporated here by reference.**

**Defendants further object to Paragraph 241 to the extent that it contains inadmissible hearsay evidence, as anything that Ms. Krueger stated to Plaintiff is inadmissible hearsay without an exception, and anything Ms. Z stated to Ms. Krueger is hearsay within hearsay. *See* Fed. R. Evid. 801; *see also Bouriez*, 2005 U.S. Dist. LEXIS 18324, at \*26-27.  By way of further response, Defendants admit only that Paragraph 240 accurately states Maurer's contention in her affidavit, which was not subject to scrutiny due to Plaintiff's omission of Maurer from his Rule 26(a) disclosures, but state that the averment is not material for disposition of summary judgment.**

**Paragraph 241 is not material to the disposition because Plaintiff does not – and cannot – state that Ms. Z's allegation was reported to Duquesne, meaning that Duquesne did not have the opportunity to investigate any such claim, defeating the notion that it evidences better treatment of Miller as Plaintiff's comparator or pretext as to Miller's decision about Plaintiff's termination. In any event, Paragraph 241 is not material because Miller is not**

Plaintiff's comparator as a matter of law, and the notion that a single employee's report, 14 years after the alleged incident, about Miller was not appropriately handled – and there is no record evidence that that is the case – it does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.

242.   Defendant Miller testified that he never sexually assaulted Ms. Maurer. (Miller depo, p. 6, Appx061).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

243.   Defendant Miller testified that he does not know why Ms. Maurer resigned from employment with the Defendant University. She was his direct report. (Miller depo, p. 6, Appx061).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

244.   Defendant Miller claims that he was never told about Ms. Maurer's complaint against him for sexual assault. (Miller depo, p. 9, Appx062).

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as page 9 of Miller's deposition does not evidence the factual contention at Paragraph 244.  The dispute is not material, however, because Plaintiff does not identify why or how Miller's knowledge about Maurer's purported complaint bears on his claims of age discrimination and retaliation related to his termination. Miller is not Plaintiff's comparator as a matter of law, and the notion that a single employee's report, 14 years after the alleged incident, about Miller was not appropriately handled – and there is no record evidence that that is the case – it does not demonstrate pretext, as the report necessarily would have been handled by someone *other* than Miller.**

245.    Defendant Miller denied being charged with sexual harassment by Ms. Y. He further denied discussing Ms. Y's charges against him with Ms. Krueger. (Miller depo, pp. 11-12, Appx062).

**DEFENDANTS' RESPONSE:  Undisputed but not material.  By way of further response, there is no record evidence that suggests that Ms. Y or  Ms. Krueger reported Miller's alleged conduct to the University.**

246.    Defendant Miller testified that he has never been investigated by the Defendant University for any claims involving sexual harassment, including those of Ms. Maurer, Ms. Y or Ms. Z. (Miller depo, p. 18, Appx064).

**DEFENDANTS' RESPONSE:  Undisputed but not material. By way of further response, there is no record evidence suggesting that Ms. Y or Ms. Z reported their allegations to the University, nor is there record evidence regarding the investigatory steps the University's General Counsel took in response to Ms. Maurer's call.**

247.    Defendant Miller testified that the Defendant University has a policy prohibiting sexual assault and sexual harassment which applies to all university employees. (Miller depo, pp. 15¬16, Appx063).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

248.    Defendant Miller testified that the Defendant University's policy against assault and harassment calls for discipline up to and including termination. (Miller depo, pp. 15-16, Appx063).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

249.     Defendant Miller testified that the Defendant University has a zero tolerance policy for sexual assault and sexual harassment, and that the policy is strictly adhered to. (Miller depo, pp. 18-19, Appx064).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

250.     Defendant Miller testified that any university employee who engages in sexual assault should be terminated. (Miller depo, pp. 16-17, Appx063-064).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

251.     Defendant Miller testified that he has never been disciplined as a result of charges of sexual assault being made against him by Ms. Maurer. (Miller depo, p. 8, Appx061).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

252.     Plaintiff's termination letter, dated August 17, 2022, signed by Defendant Miller, indicated that the principle reason for Plaintiff's termination is the seven (7) figure donation that the Plaintiff obtained from the Donor Couple.[5] The letter also alleged that "(the Plaintiff's) conduct on more than one occasion has caused internal constituents, senior University leaders, to raise serious concerns with (the Plaintiff's) performance and professional judgment" causing Defendant Miller to "(lose) faith in (the Plaintiff's) professional judgment and . . . abilities." Defendant Miller listed those incidents which were also considered in the decision to terminate the Plaintiff, and included:

     *      "egregious" behavior underlying the Plaintiff's 2019 formal discipline; and
     *      refusal to correct errors with "donors" in 2021 and 2022.
(Duquesne Bates numbers 00013-00014, Appx299-300).

---

[5] It is undisputed that Defendant Miller made the decision to terminate the Plaintiff. (Gormley depo, p. 22, Appx318).

**DEFENDANTS' RESPONSE:  Plaintiff's recitation of a written document, which speaks for itself is correct and is thus undisputed.**

**To the extent that Plaintiff characterizes the document – namely, the reason for Plaintiff's termination being the "seven (7) figure donation that the Plaintiff obtained from the Donor Couple – disputed.  Plaintiff was terminated for Miller's decision that he lost trust in Plaintiff's ability to perform the duties of his job, which his supported by, *inter alia*, policy violations related to Plaintiff's solicitation of a donation from the Donor Couple.  *See* Appx299-300.**

**As noted above, Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Defendants maintain that, pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  To the extent a response to footnote 5 is required, Defendants do not dispute that Miller was the sole decisionmaker as to Plaintiff's termination from employment.**

253.    The above-described termination letter followed a memorandum prepared by the Defendant University's president, Kenneth Gormley regarding the Plaintiff's alleged failure to follow University policy, as well as general concerns that Mr. Gormley claimed to have regarding the Plaintiff's performance.[6] In addition to commenting on the alleged policy violations by the Plaintiff involving the significant seven (7) figure donation by the Donor Couple, Mr. Gormley mentioned the Plaintiff's 2019 discipline for what Mr. Gormley believed was a "terminable

---

[6]    **Plaintiff's Footnote:**  Mr. Gormley admitted that he played a role in the decision to terminate the Plaintiff by preparing the memorandum described in this paragraph and delivering it to Ms. Clay, who presumably shared it with Defendant Miller. (Gormley depo, pp. 22-23, Appx318).

offense," as well the incident briefly mentioned in the termination letter related to "alleged" errors by the Plaintiff in 2021 and 2022. Mr. Gormley also mentioned an incident which had occurred in early 2022 involving the Plaintiff being a victim of a random attack while cultivating a donation in Texas. (Plaintiff's Bates numbers 0357-0363, Appx292-298).

**DEFENDANTS' RESPONSE:  Plaintiff's recitation of a written document, which speaks for itself, is thus undisputed.**

**As noted above, Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Defendants maintain that, pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  To the extent a response to footnote 7 is required, disputed for insufficient support in the record citation, as page 22 of Gormley's deposition does not evidence the factual contention at Paragraph 254.  Rather than admitting that he "played a role in the decision to terminate the Plaintiff," Gormley stated that he "played a role of providing input in the decision," which is a distinction with a difference. Gormley, at no point, suggests that his "input" was a material (or any) factor in the decision and, in fact, notes that he insisted to Clay that the investigation process "play out" and that Miller would make the decision based on the report and recommendations of the human resources department.  *See* Appx318 at 22:10-23:8. The dispute is not material, however, because Plaintiff admits that Miller was the decisionmaker as to Plaintiff's termination.  *See supra* footnote 6.**

254.    Dr. Richard Creehan is a former employee of the Defendant University, who, prior to his retirement, had the responsibility to manage gift officers of the Defendant University,

including the Plaintiff. In 2016[7], shortly after beginning his employment with the Defendant University, Dr. Creehan had a conversation with Defendant Miller about the Plaintiff. At that time, Defendant Miller described the Plaintiff as a "moron" and a "buffoon." Deciding to see for himself, Dr. Creehan began working directly with the Plaintiff. Contrary to Defendant Miller's claims, Dr. Creehan determined that the Plaintiff was a "talented gift officer with a strong command of the issues that faced a gift officer" pursuing donations. Dr. Creehan also found that the Plaintiff's donors liked and trusted the Plaintiff, and that the Plaintiff was "talented, hard-working, honest, highly skilled and successful." For those reasons, Dr. Creehan named the Plaintiff Gift Officer of the Year for 2019/2020. (Creehan Aff, paras. 1-4, Appx123-124).

**DEFENDANTS' RESPONSE:  Defendants object to Paragraph 254 to the extent that it contains inadmissible hearsay evidence, namely, Miller's purported "description" of Plaintiff.** *See* **Fed. R. Evid. 801;** *see also Bouriez***, 2005 U.S. Dist. LEXIS 18324, at \*26-27. Defendants do not dispute that Paragraph 254 accurately represents the content of Creehan's affidavit, but his opinions are not material.  Miller's thoughts in 2016 about Plaintiff's abilities and intelligence, and any comparison to Creehan's thoughts on Plaintiff's abilities in 2016 or at any time, has no bearing on whether Plaintiff was terminated based on his age or for engaging in protected activity.  Notably, Creehan was not employed when Plaintiff was terminated and cannot speak with firsthand knowledge as to his performance and conduct at that time.** *See supra* **Paragraph 206.**

255.    Heather Clay, who was two steps above the Plaintiff in his chain of command, told the Plaintiff that he was an outstanding gift officer. She also told the Plaintiff that she would not

---

[7]      **Plaintiff's Footnote:** I.e., six (6) years before Defendant Miller fired the Plaintiff.

personally agree to fire him, and that, if the Plaintiff were to be fired, he would have a legal claim against the Defendant University. (Plaintiff depo, p. 343, Appx078).

**DEFENDANTS' RESPONSE:  Defendants do not dispute that Clay was two levels above Plaintiff in his chain of command at the time of his termination.  Defendants object to Paragraph 255 to the extent that it contains inadmissible hearsay evidence, namely, any statement made by Heather Clay, who Plaintiff chose not to depose in this litigation, regarding his abilities as a gift officer, whether she would agree to terminate him, and that he would have a legal claim.  *See* Fed. R. Evid. 801; *see also Bouriez*, 2005 U.S. Dist. LEXIS 18324, at \*26-27.  Defendants do not dispute that Plaintiff claimed that Clay made those statements in his deposition.  By way of further response, it is undisputed that Clay was not a decisionmaker with respect to Plaintiff's termination from employment, and was not deposed in this litigation.  *See supra* Defendants' Response to Paragraph 252.**

**There is no record evidence to support that Clay was involved in the decision to terminate Plaintiff's employment or knew the applicable details regarding Plaintiff's violations of the naming rights policies.  Clay, who joined the University roughly five months prior to Plaintiff's termination, is not an attorney, and her opinions regarding what "legal claim" Plaintiff had or has should carry no weight.**

256.    During the Plaintiff's employment with the Defendant University, the Plaintiff received training on his role in the donation acceptance process. The Plaintiff received that training from Mr. Plante, Dr. Creehan, Defendant Miller, Ms. Dean and Ms. Hughes. (Plaintiff Aff, para. 6, Appx131-132)

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

257.    The Plaintiff's duty in a planned gift donation was to:

- obtain a commitment from the donor;
- obtain documentation from the donor evidencing the ability to make the gift; and
- turn over all documentation to Ms. Hughes and Ms. Dean for further processing.

Once the Plaintiff had accomplished these tasks, he had no further duty whatsoever related to the processing of the donation or its submission for approval to the gift committee or the President. (Plaintiff, Aff, para. 6, Appx131-132). As the gift officer, Plaintiff had no duty to determine whether or when his supervisors would take the matter to the gift committee. (Plaintiff depo, 308, Appx072).

**DEFENDANTS' RESPONSE: Disputed in part, but dispute not material. Plaintiff's statement that "he had no further duty whatsoever related to the processing of the donation or its submission for approval to the gift committee or the President" is not correct.  A gift officer has the duty of ensuring all aspects of the donor relationship are appropriately handled. _See Def'ts' Ex. 2 at Duquesne_00101 (noting that gift officers are responsible for "stewarding" major gifts, including drafting "gift and fund agreements" and "process[ing] gift commitments expeditiously"); see also Def'ts' Ex. 62, Excerpts of Transcript of Deposition of Ken Gormley, at 38:15-25 (noting that, regardless of who actually drafts it, "the gift officer is going to have to make sure the document reflects what they have discussed with the donor")._ Plaintiff knew that this responsibility lay on him, as evidenced by his email to Donor D in which he says that the "next step is for me to go before [Duquesne's] naming committee and present a formal request to name the media center." Def'ts' Ex. 43; _see supra_ Paragraph 145 (Plaintiff admitting to this communication).  Moreover, in the case at issue, Plaintiff took steps beyond those listed above, including meeting with the Donor Couple to secure their signatures on the DSCI and returning this document for signature by Dean.**

In any event, the dispute is not material. Dedrick investigated Plaintiff's (and Dean's) involvement in the solicitation of the Donor Couple's gift to the University and found that Plaintiff was in violation of the relevant policies. *See* Def'ts' Ex. 45, Duquesne_00009-11 (finding policy violations by both Plaintiff and Dean). Plaintiff admits as much, and he introduces no evidence to suggest that Dedrick's investigation was tainted by unlawful motive. Even if Dedrick were incorrect that Plaintiff should be responsible, absent that unlawful motive, Dedrick's findings (and Miller's reliance thereon) should not be questioned or contribute to a pretext finding for purposes of summary judgment.

258.    Plaintiff cultivated a seven (7) figure donation from the Donor Couple. He began discussing possible naming rights with the Donor Couple by the second visit, because it was completely appropriate for him to discuss all possible options with the donors, including possible naming options. (Plaintiff depo, pp. 293, 302, Appx070-071).

**DEFENDANTS' RESPONSE:  Undisputed. By way of further response, Plaintiff cultivated a fully deferred, revocable bequest based on a percentage of the Donor Couple's retirement account upon their deaths, which, at the time of the parties' execution of the DSCI, was worth a seven-figure amount. *See* Ex. 45, at Duquesne_00009. Moreover, Duquesne has never claimed that the timing of Plaintiff's discussion of naming rights with the Donor Couple was improper; it was his failure to follow requirements of the relevant policies or to secure Gift Acceptance Committee or President approval prior to execution of the DSCI, which contractually entitled the donors to naming rights for the CEIM. *See id.* at Duquesne_00009-11.**

259.    The Plaintiff reported to his supervisors Ms. Hughes and Ms. Dean about the details of the proposed gift as the gift cultivation proceeded. The Plaintiff told Ms. Dean about the

proposed naming rights the first time he discussed the proposed donation with her. (Plaintiff depo, pp. 312, 333, Appx075, Dean depo, p. 129, Appx082). As the cultivation proceeded, the Plaintiff also reported to Defendant Miller that the Donor Couple was contemplating a "Pledge" which means a revocable gift. The Plaintiff also informed Defendant Miller that the gift was a "planned gift," which tends to mean that the gift is revocable. (Dean depo, pp. 145-146, Appx086-087).

**DEFENDANTS' RESPONSE:  Disputed in part, but not material. Cecilia Hughes was not Plaintiff's supervisor, *see supra* Paragraphs 10, 52, but it is not material to the disposition of summary judgment whether Hughes was Plaintiff's supervisor. As Plaintiff admitted in his email to the Donor Couple, he was responsible for going before the Gift Acceptance Committee, *see* Def'ts' Ex. 43 at Duquesne_00406, and, in any event, Dedrick concluded after a thorough investigation that Plaintiff violated the relevant policies. *See* Def'ts' Ex. 45, at Duqeuesne_00011-13. Notably, Paragraph 259 does not state that Plaintiff informed Miller that the revocable gift was in exchange for naming rights to the CEIM.  This piece of information was crucial for Miller to determine that the naming policies required were triggered by the proposed gift. *See supra* Paragraphs 132-138 (discussing provisions of gift policies, all of which are only relevant if naming rights are at issue); Def'ts' Ex. 45, at Duquesne_00008-11 (Dedrick finding policy violations because the gift was for naming rights to a University-wide center).**

260.    Once Ms. Hughes prepared the DSCI for this donation, Ms. Hughes indicated to the Plaintiff that he should show the DSCI to the Donor Couple. (Dean depo Exhibit 19, Defendants' Bates number 00513, Appx288).

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as the cited email does not evidence the factual contention at Paragraph 260.  Namely, in the**

email, Hughes attaches a draft DSCI, but she does not tell Plaintiff he "should" show the Donor Couple, she merely says she did not "see a problem" showing it to them, with the clear advice that they could not "officially approve the [DSCI] or sign it on behalf of the University until [they] g[ot] that approval." Appx288.

261.     After Ms. Hughes prepared the DSCI, Ms. Dean directed the Plaintiff to meet with the Donor Couple, have a celebratory dinner, and have the Donor Couple sign the DSCI. (Plaintiff Aff, para. 29, Appx140).

**DEFENDANTS' RESPONSE: Undisputed but not material. By way of further response, in a June 2022 contact report, Plaintiff noted he had dinner with the Donor Couple to "finalize $1.454M PG to name our media center," during which Donor E reviewed the "LCI" (presumably the "Letter of Charitable Intent," another way of referring to a DSCI) and provided the financial details necessary to "substantiate the gift."** *See* **Def'ts' Ex. 35 at Duquesne_00265-66. Regardless of whether he did so on his own or under the direction of Dean, he did so with a direct statement from Hughes that they could not do so prior to going to the Gift Committee.** *See supra* **Defendants' Response to Paragraph 260.**

262.     Prior to traveling to the Donor Couple to obtain their signature on the DSCI, the Plaintiff sent an email dated June 19, 2022, to the Donor Couple reminding them that their proposed gift had to be approved by gift committee. "The next step is for me to go before DU's naming committee and present a formal request to name the media center."[8] (Defendants' Exhibit

---

[8]     **Plaintiff's Footnote:** While the Plaintiff does not have a specific recollection that he told the Donor Couple orally that the gift had to be approved by the committee, it would have been the Plaintiff's normal practice to do so, as he would never have introduced the approval requirement in an email without first having discussed it with them. (Plaintiff Aff, para. 12, Appx134).

43, Bates number 00406)(Emphasis supplied). Notwithstanding this email, and its language, Defendant Miller contended that the Plaintiff offered naming rights for this donation without approval of the committee. Defendant Miller claimed no knowledge of the above email. (Miller depo, pp. 27-28, Appx106).

**DEFENDANTS' RESPONSE: Undisputed. By way of further response and as stated above, the referenced email demonstrates that Plaintiff knew it was his responsibility to go before the Gift Acceptance Committee to obtain approval. Miller was not on this email, and there is no record evidence that he knew of this email. Lastly, Plaintiff admits that he offered naming rights and had the Donor Couple sign as DSCI that granted naming rights without going to the Gift Acceptance Committee or otherwise ensuring that someone did on his behalf. Importantly, three days after this email, Plaintiff presented the DSCI to the Donor Couple, who signed it, and thereby contractually bound the University to provide naming rights, negating the statements Plaintiff made in the email.   *See* Def'ts' Ex. 44, Duquesne_00568-60.**

**Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity. Pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered. See L.Cv.R. 56.C.1.c.; *see Harris v. Astellas Pharm.*, No. 13-1663, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (W.D. Pa. Sep. 24, 2015) (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded"); *see also Schultz v. United States*, No. 15-454, 2017 U.S. Dist. LEXIS 21856, at \*8 (W.D. Pa. Feb. 16, 2017) ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the**

allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)). To the extent a response to footnote 10 is necessary, disputed, but not a genuine dispute of material fact. Plaintiff admits that he has "no recollection" as to whether he spoke orally about the Gift Acceptance Committee with the Donor Couple and merely speculates on whether he would have, which is not sufficient to create a genuine dispute of material fact. In any event, Plaintiff's suggestion that he had a standard practice for this situation rings hollow given he could not recall a single naming gift for a University-wide center. *See* Def'ts' Ex. 65, 293:21-295:1 (listing only one other example that involved only the naming of a room rather than an entire school or a University-wide center).

263.    When the Plaintiff presented the DSCI to the Donor Couple, it did not bear Ms. Dean's signature or any other signature on behalf of the Defendant university. (Plaintiff Aff, para. 4, Appx131).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

264.    Notwithstanding the Defendants' unsupported claim in their brief that the Donor's Couple's gift was "pushed through" without approval from the committee (Defendants' Brief at p. 4), the Plaintiff took no steps to push the donation through without proper approval. The Plaintiff had no motive to take any action that would endanger his receiving credit for this very large donation. (Plaintiff Aff, para. 15, Appx135).

**DEFENDANTS' RESPONSE:  Disputed but not material. As Plaintiff notes in his affidavit, he did "nothing different than [he] did in any other donation to obtain the gift commitment," meaning he did not follow the relevant policies that required approval for gifts involving naming rights to a University-wide center.  Plaintiff has not presented record evidence that he had solicited gifts to name University-wide centers previously, and he in fact had not. *See***

**Def'ts' Ex. 65, 293:21-295:1 (listing only one other example that involved only the naming of a room rather than an entire school or a University-wide center). The undisputed facts are that Plaintiff had the Donor Couple sign a DSCI that unambiguously granted the Donor Couple naming rights to a University-wide center in exchange for a revocable, deferred gift and that Dedrick found, after a thorough investigation, that Plaintiff's involvement therein was a violation of the relevant policies.  *See* Def'ts' Exs. 44-45. Plaintiff has presented no reason to doubt that Dedrick's investigation and conclusion was based on his honest beliefs.**

265.    Notwithstanding the Defendants' unsupported claim at paragraph 160 that Ms. Clay said that the Plaintiff was in serious trouble, the Plaintiff was never told by anyone that he was in any trouble for this significant seven figure gift. (Plaintiff Aff, para. 9, Appx133).

**DEFENDANTS' RESPONSE:  Undisputed. Clay said as much in a conversation with Dean, as reflected by the material cited in Paragraph 160.  In any event, Plaintiff knew he was under investigation for the circumstances surrounding the gift agreement, as he and Dedrick emailed about meeting to discuss the Donor Couple on multiple occasions, and Plaintiff showed up for a meeting before abruptly leaving.  *See* Def'ts' Exs. 47-50.**

266.    For the purposes of administering the Donor Couples' gift, Ms. Hughes acted as the Plaintiff's supervisor. (Plaintiff depo, pp. 99, 200-201, 312, Appx065, 067, 073, Plaintiff Aff, para. 24, Appx139).

**DEFENDANTS' RESPONSE:  Undisputed that Plaintiff in this Paragraph alleges that he believed Hughes was his supervisor for purposes of summary judgment. Disputed that Hughes was, in any way, Plaintiff's supervisor. *See supra* Paragraphs 10, 52.  That dispute is not material, as it does not change that Plaintiff knew he needed Gift Acceptance Committee approval for the gift he solicited and that Dedrick found policy violations by Plaintiff with**

respect to the gift solicitation.  *See Def'ts' Ex. 43 at Duquesne_00406; Def'ts' Ex. 45 at Duquesne_00008-13.*

267.   The Plaintiff was trained that Ms. Hughes was responsible to prepare the documentation for submission to the gift committee (i.e. the DSCI), and, after approval by the committee, to prepare the final gift agreement for signature by the parties. The Plaintiff had no role in the preparation of the gift documentation. (Plaintiff Aff, para. 6, Appx131-132, Plaintiff depo p. 99, Appx065, Miller Depo. p. 31, Appx107).

**DEFENDANTS' RESPONSE:  Undisputed that standard practice is as stated, disputed that Plaintiff had "no role in the preparation of the gift documentation," but not material.**

**Record evidence demonstrates that, whether standard practice was as Plaintiff states or not, Hughes informed him that he needed to have Gift Acceptance Committee approval before the DSCI was signed. Moreover, it is patently false that Plaintiff had "no role" in the preparation of the gift documentation. While Hughes was the employee charged with drafting the agreements, she could not do so without input on all relevant details regarding the gift from the gift officer.  In an email dated April 12, 2022, Plaintiff made clear that he was involved in the preparation of the gift documentation for the Donor Couple when he stated he "ha[d] a meeting scheduled after Easter Break to craft verbiage on your agreement[.]" Def'ts' Ex. 37 at Duquesne_00334.**

**The preparation of the documentation is not material. What is material is that Hughes told Plaintiff it could not be signed prior to approval by the Gift Acceptance Committee. *See supra* Defendants' Response to Paragraph 260. Plaintiff provided the DSCI to the donors for signature. *See supra* Paragraph 261. Dedrick investigated Plaintiff's involvement and concluded he was in violation of the relevant policies. *See* Def'ts' Ex. 45. Plaintiff has**

provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs.

268.    Ms. Hughes prepared the DSCI.[9] (Dean Depo. pp. 136-137, 159-160, Appx084, 089). The Plaintiff never requested Ms. Hughes to prepare the DSCI[10]. (Plaintiff Aff, paras. 5, 13, Appx131,134). She also reminded the Plaintiff that the donation had to be approved by the committee. (Dean depo, pp. 159-160, Appx089).

**DEFENDANTS' RESPONSE:   Disputed that Plaintiff "never requested Ms. Hughes to prepare the DSCI," but not material.  In an email dated April 12, 2022, Plaintiff made clear that he was pursuing the DSCI to Donor D by stating he "ha[d] a meeting scheduled after Easter Break to craft verbiage on your agreement[.]" Def'ts' Ex. 37 at Duquesne_00334. Indeed, to prepare the DSCI, Hughes needed – and had – all the details related to Plaintiff's solicitation of the gift.  *See* Def'ts' Ex. 44, at Duquesne_00559-60  (DSCI inclusive of all details Plaintiff negotiated about gift).**

**Whether Plaintiff affirmatively requested that Hughes prepare the DSCI is not material. She did so and told Plaintiff it could not be signed prior to approval by the Gift Acceptance Committee.  *See supra* Defendants' Response to Paragraph 260. Plaintiff provided the DSCI to the donors for signature. *See supra* Paragraph 261. Dedrick investigated Plaintiff's involvement and concluded he was in violation of the relevant policies.  *See* Def'ts' Ex. 45. Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs.**

---

[9]     **Plaintiff's Footnote:**   The University President erroneously believed that Plaintiff prepared the DSCI for this donor. (Gormley Depo. p. 56, Appx319).

[10]    **Plaintiff's Footnote:**  Plaintiff was completely unaware that Ms. Hughes was preparing the DSCI until he received the email dated May 13, 2022. (See Defendants' Exhibit 42).

Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity. Pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  See L.Cv.R. 56.C.1.c.; *see Harris*, 2015 U.S. Dist. LEXIS 134750, at *2-5 n.1 (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded"); *see also Schultz*, 2017 U.S. Dist. LEXIS 21856, at *8 ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)).

To the extent a response to footnotes 11 and 12 is necessary, disputed, but not a genuine dispute of material fact. Neither footnote is supported by the record citation.

For footnote 11, page 56 of the Gormley deposition does not at all contemplate who drafted the DSCI.

For footnote 12, Plaintiff cites to Hughes' email to Plaintiff attaching the draft DSCI, but nowhere in the email does it suggest that Plaintiff was "completely unaware" that Hughes was drafting the DSCI, and as a matter of fact, Plaintiff indicated in an April 2022 email to Donor D that he had a meeting scheduled to work on the agreement. *See* Def'ts' Ex. 37 at Duquesne_00334.

269.    The Plaintiff was trained that Ms. Dean had the responsibility to present the proposed gift, including gifts involving naming rights, to the gift committee and, if necessary, to the President of the Defendant University. The Plaintiff had no role in presenting the proposed gift to either the Gift Acceptance Committee or the President. (Plaintiff, Aff, para. 6, Appx131-132).

**DEFENDANTS' RESPONSE:  Disputed, but not material. Plaintiff knew he was responsible for presenting the gift to the Gift Acceptance Committee based on the June 19, 2022 email to Donor D as well as Hughes' email attaching the DSCI, which stated that the memo to the Gift Acceptance Committee would be coming from Plaintiff.** *See* **Def'ts' Ex. 43 (email from Plaintiff to Donor D); Def'ts' Ex. 42 (email from Hughes to Plaintiff).**

**In any event, the dispute is not material to the disposition of summary judgment.  Plaintiff's actions were found to be violative of Duquesne policies after Dedrick's thorough investigation, and Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs.**

270.     The Plaintiff played no role in the decision by Ms. Dean to sign the DSCI. The Plaintiff certainly never "arranged" for Ms. Dean to sign the DSCL In fact, the Plaintiff did not know that the DSCI had been signed until long after Ms. Dean had done so. (Plaintiff, Aff, paras. 3, 14, Appx130, 134-135).

**DEFENDANTS' RESPONSE:  Undisputed for purposes of summary judgment.**

**By way of further response, Plaintiff's assertion is immaterial for disposition of summary judgment, because Plaintiff's actions were found to be violative of Duquesne policies after Dedrick's thorough investigation, and Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs.**

271.     Ms. Dean informed Defendant Miller on numerous occasions between July and November of 2021 about the proposed revocable naming rights gift by the Donor Couple. (Dean depo, pp. 129-130, Appx082-083). Ms. Dean specifically told Defendant Miller that the Donor

Couple was seeking naming rights for the media center in exchange for a revocable seven (7) figure donation.[11] (Dean depo, p. 131-134, Appx084).

**DEFENDANTS' RESPONSE:  Disputed but not material.**

**While Miller was generally aware of Plaintiff's efforts to solicit a large gift from the Donor Couple, he was not aware of key details regarding the solicitation, including the fully deferred, revocable nature of the gift and that the gift was in exchange for naming rights to a University-wide center. *See supra* Defendants' Response to Paragraph 259.**

**In any event, the scope of Miller's knowledge is not material for disposition of summary judgment. Even if Miller were made aware of the salient details, he would have expected that the proper protocol would be followed before any agreement was finalized. There is no record evidence that Miller was aware the agreement was finalized without Gift Acceptance Committee approval until late-July 2022, when the University initiated the investigation, nor is there record evidence that Miller was aware that Richter and Hughes had drafted the DSCI and that it had been presented to the donors. Indeed, even based on the very testimony that that Plaintiff cites, Dean had not provided Miller with an update on the status of the Donor Couple cultivation for approximately eight months prior to the University's investigation (*i.e.*, from November 2021 to July 2022). *See Appx082-83.***

**Plaintiff's assertion is immaterial for disposition of summary judgment, because Plaintiff's actions were found to be violative of Duquesne policies after Dedrick's thorough investigation, and Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs. Moreover, although**

---

[11]     **Plaintiff's Footnote:**  Ms. Dean testified that 90 percent of all gifts are revocable. (Dean depo, p. 132, Appx083).

**Plaintiff was invited to participate in the investigation, he ultimately refused to meaningfully do so.**

272.    With respect to the donation by the Donor Couple, Defendant Miller was made fully aware of all relevant aspects of the donation as the gift was being cultivated. Defendant Miller knew:

- That the gift involved at least a $1.5 million dollar donation;
- That the donors would likely increase their donation to more than three (3) times the original amount;
- That the gift included naming rights for the CEIM; and
- That the gift was revocable.

(Plaintiff Aff, para. 8, Appx132-133).

**DEFENDANTS' RESPONSE:  Disputed but not material. While Miller was generally aware of Plaintiff's efforts to solicit a large gift from the Donor Couple, he was not aware of key details regarding the solicitation, including the fully deferred, revocable nature of the gift and that the gift was in exchange for naming rights to a University-wide center. *See supra* Defendants' Response to Paragraph 259.**

**In any event, the scope of Miller's knowledge is not material for disposition of summary judgment. Even if Miller were made aware of the salient details, he would have expected that the proper protocol would be followed before any agreement was finalized. There is no record evidence that Miller was aware the agreement was finalized without Gift Acceptance Committee approval until late-July 2022, when the University initiated the investigation.**

**Plaintiff's assertion is immaterial for disposition of summary judgment, because Plaintiff's actions were found to be violative of Duquesne policies after Dedrick's thorough investigation, and Plaintiff has provided nothing to evidence that the investigation and recommendations were not the result of Dedrick's honest beliefs. Moreover, although**

**Plaintiff was invited to participate in the investigation, he ultimately refused to meaningfully do so.**

273.    Defendant Miller was a member of the Gift Acceptance Committee when Ms. Dean informed him about the nature of the donation from the Donor Couple. (Miller depo, p. 26, Appx106).

**DEFENDANTS' RESPONSE:  Undisputed.**

**To the extent that Paragraph 273 asserts that Miller was aware of all relevant details of the Donor Couple's donation, disputed but not material. *See* Defendants' Responses to Paragraphs 271-72.  By way of further response, there is no record evidence to support that notifying one member of the Gift Acceptance Committee about the status of a cultivation constituted receiving approval from the Committee, which, by nature of being a committee, is made up of multiple individuals.**

274.    At no time during the solicitation of this gift was the Plaintiff informed that he should handle the donation any differently than he had been handling it. (Plaintiff Aff, para. 8, Appx132-133).

**DEFENDANTS' RESPONSE:  Undisputed.**

275.    Despite the existence of the naming rights policy, when a seven (7) figure donation is contemplated, that level of donation is exceedingly rare, sought after and coveted. (Plaintiff Aff, paras. 10-11, Appx133-134).

**DEFENDANTS' RESPONSE:  Disputed but not material. While Plaintiff may assert that it is rare, he introduces no facts to support his claim that seven-figure donations are "exceedingly rare," and, as evidenced by the Gift Policies contemplating gifts in the seven-**

and eight-figure range, Duquesne handles such gifts as a matter of routine. In any event, whether a seven-figure gift is rare is not material, as the rarity of seven-figure donations does not cancel out the existence of a policy – one which contemplates thresholds for donations in the seven figures – nor does it excuse the failure to comply with the policy.

276.    Dr. Creehan was highly experienced in the field of donation cultivation, and was highly conversant with best practices in the cultivation field. (Creehan Aff, para. 1, Appx123).

**DEFENDANTS' RESPONSE:  Undisputed for purposes of summary judgment.**

**By way of further response, Creehan's experience and conversational abilities with respect to "best practices" is not material to what Duquesne's policies were leading up to and at the time of Plaintiff's termination.  Creehan was no longer employed when Miller took over the Advancement Division and has no firsthand experience with respect to those policies up to and at the time of Plaintiff's termination.  *See supra* Paragraph 206.**

277.    In Dr. Creehan's experience at the Defendant university, Dr. Creehan observed that:

- Although the naming rights policy requires that a naming rights gift is supposed to be submitted to the gift committee, Dr. Creehan has never presented a proposed gift to the gift committee. In fact, Dr. Creehan did not even know that the gift committee existed, or who was on it. (Creehan Aff, para. 8, Appx126).
- No gift officer has ever been called upon to present a proposed gift to gift committee or the President of the Defendant University. (Miller depo, pp. 25-26, Appx106; Creehan Aff, para. 8, Appx126).
- Many of the naming rights gifts that were approved were for significantly less than the policy called for. (Miller depo, pp. 25-26, Appx106; Creehan Aff, para. 8, Appx126).
- Almost every donation obtained by a gift officer under him was revocable. The revocability portion of the naming rights policy was not enforced at all. (Creehan Aff, para. 8, Appx126).

**DEFENDANTS' RESPONSE:   Disputed, but not material, that the Miller transcript citations support the propositions for which they are listed.  Miller never stated that "no gift**

officer" was called upon to present a proposed gift; he simply said "[n]ot offhand" when pressed to name an example.  *See* **Appx106 at 26:1-4. Moreover, in the cited pages, Miller did not state that "[m]any" naming rights gifts were approved below the policy requirements (or at all discuss that concept). *See generally* Appx106. Otherwise, undisputed for purposes of summary judgment. By way of further response, Creehan's statements are not material, as he was no longer employed when Miller took over the Advancement Division and has no firsthand experience with respect the application of the relevant policies up to and at the time of Plaintiff's termination.  *See supra* Paragraph 206.**

278.    Dr. Creehan was presented with a hypothetical situation that exactly matched the facts related to the Donor Couple's donation. (Creehan Aff, para. 10, Appx127-128).

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as Creehan does not (and cannot) say that the "hypothetical" "exactly matched" the Donor Couple's donation. Plaintiff does not provide the record support necessary to make that claim. Undisputed that Creehan opines on a "hypothetical." By way of further response, Creehan's opinion is not material, as he was no longer employed when Miller took over the Advancement Division and has no firsthand experience with respect with the application of the relevant policies up to and at the time of Plaintiff's termination.  *See supra* Paragraph 206.**

279.    As a result of reviewing a hypothetical which is virtually identical to the facts of this case, with respect to the Plaintiff's conduct in this solicitation, Dr. Creehan reached the following conclusions:

- The gift officer's actions did not violate any practice or procedure of the university;

- The gift officer's conduct in securing such a significant gift is precisely the kind of action encouraged by the Defendant University;
- The gift officer's following the directions of his supervisors was entirely proper;
- The fact that the gift officer advised the donors that the gift could not be finalized until it was approved by the committee was entirely proper; and
- The fact that the gift officer kept his supervisors advised about the details of the gift as the cultivation proceeded was entirely proper;
- Nothing in the hypothetical that tracked the facts in this case should have subjected the Plaintiff to any discipline whatsoever. (Creehan Aff, para. 10, Appx127-128).[12]

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as Creehan does not (and cannot) say that the "hypothetical" was "virtually identical" to the facts of this case. Plaintiff does not provide the record support necessary to make that claim. Undisputed that Creehan opines on a hypothetical. By way of further response, Creehan's opinion is not material, as he was no longer employed when Miller took over the Advancement Division and has no firsthand experience with respect to the application of the relevant policies up to and at the time of Plaintiff's termination.  *See supra* Paragraph 206.**

**As noted above, Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Defendants maintain that, pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  To the extent a response to footnote 13 is required, Defendants do not dispute that the language of the policies is the same as when Creehan was employed, but that fact is not material. Whether the policies and procedures were applied differently during Creehan's employment and after Miller took over as lead of the Advancement Division is not relevant for purposes of summary judgment. *See Rojas v.***

---

[12] The Plaintiff has indicated that, after reviewing the policies and procedures upon which Dr. Creehan relied in giving his opinion about the actions of the gift officer in the hypothetical, those policies and procedures remained the same after Dr. Creehan's departure from the Defendant university. (Plaintiff Aff, para. 31, Appx140-141).

***Florida***, 285 F.3d 1339, 1343 (11th Cir. 2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."). *Accord Maiorini v. Farmers Ins. Exch.*, No. 14-1613, 2017 U.S. Dist. LEXIS 47471, *125-26 (E.D. Pa. Mar. 30, 2017). Plaintiff has not adduced any evidence that Miller has applied the policies inconsistently or that Dedrick's investigation findings are inconsistent with another investigation regarding the policies as applied under Miller's tenure, because no such policy violation exists.

280.     The Plaintiff cooperated in the investigation into the Donor Couple's gift to the best of his ability. In the interview that he gave to the Defendant University's human resources representative, the Plaintiff cooperated to the best of his ability. During the interview, the Plaintiff's wife called him from the hospital with very difficult health news. Because she was distraught and asked the Plaintiff to come to take her home, the Plaintiff hastily explained the situation and excused himself from the interview to hurry to be with his wife. (Plaintiff Aff, para. 28, Appx139-140).

**DEFENDANTS' RESPONSE:  Undisputed that Plaintiff met with Dedrick and left abruptly. Disputed that Plaintiff "explained the situation" and that he "cooperated . . . to the best of his ability." Dedrick followed up on Plaintiff leaving the meeting to let Plaintiff know he was suspended pending the results of the investigation.** *See* **Def'ts' Ex. 50, at Duquesne_00337-38. Plaintiff could have responded to that email to let Dedrick know he would make himself available at another time or taken any number of actions to make sure that his voice was fully heard. He did not do so. There is no evidence to suggest that Plaintiff's level of cooperation was "to the best of his ability," so the same should be disregarded.**

**Plaintiff's involvement level in the investigation is not material, as all that is relevant for purposes of summary judgment is whether the investigator and decisionmaker had an "honest belief" with respect to their actions. Plaintiff has presented no evidence that Dedrick's investigation and recommendation were not the result of his "honest belief" with respect to the facts and policies presented to him.**

281.   Three (3) years before the Plaintiff was fired, he was disciplined for sending an inappropriate text to the Defendant University's Provost showing a woman in a bikini accompanied by a light hearted salutation. (Plaintiff depo, pp. 70-76, Appx097-098).

**DEFENDANTS' RESPONSE:  Undisputed, except as to Plaintiff's characterization of the salutation as "light-hearted."  The dispute is not material, however, as all that is material is that an investigation into the text messages was conducted and Plaintiff was disciplined for policy violations that he does not dispute.  Moreover, Plaintiff has repeatedly admitted that his conduct reflected poor judgment and was inappropriate.  *See supra* Paragraphs 19-20 (citing Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104; Ex. 4, Plaintiff Tr. 73:13-16 (stating "[i]t was poor judgment" that he sent the message); 73:25-74:12 (acknowledging that "poor judgment" is synonymous with "inappropriate" in this context)).**

282.   Dr. Creehan did not consider the text to be offensive. (Creehan Aff, para. 5, Appx124-125).

**DEFENDANTS' RESPONSE:  Undisputed, but not material. By way of further response, Creehan's subjective beliefs with respect to the photo and accompanying message are not relevant. What is material and undisputed:  Duquesne received a complaint by an individual who believed the message was inappropriate, it investigated that complaint, and found**

Plaintiff was in violation of policies, which he accepted at that time and admits in his Opposition. *See supra* Paragraphs 17-20.

283.    Ms. Dean did not find the text offensive. (Dean depo, pp. 21-24, Appx101-102).

**DEFENDANTS' RESPONSE: Undisputed, but not material. By way of further response, Dean's subjective beliefs with respect to the photo and accompanying message are not relevant. What is material and undisputed:  Duquesne received a complaint by an individual who believed the message was inappropriate, it investigated that complaint, and found Plaintiff was in violation of policies, which he accepted at that time and admits in his Opposition. *See supra* Paragraphs 17-20.**

284.    The Provost who received the text did not find it particularly offensive. (Creehan Aff, para. 5, Appx124-125). In fact, the Provost would not have even reported the matter except that his administrative assistant, who is female, saw the text and was offended. (Creehan Aff, para. 5, Appx124-125).

**DEFENDANTS' RESPONSE:  Defendants' object to Paragraph 284 to the extent that it contains or relies on inadmissible hearsay evidence, namely, what Dausey allegedly stated to Creehan.  *See* Fed. R. Evid. 801; *see also Bouriez*, 2005 U.S. Dist. LEXIS 18324, at \*26-27. In any event, disputed, but not material. Creehan's secondhand recollection does not comport with Dausey's testimony in this case. *See supra* Paragraph 18 (citing Ex. 9, Dausey Tr. 85:22-86:5) (Plaintiff admitting Paragraph 18, which states that Dausey reported the message because it "looked inappropriate").**

**The dispute is not material, because even if the Provost did not find the message "particularly offensive," he still chose to report the messages, for whatever reason.  That report led to an investigation that resulted in a finding that Plaintiff violated policies, which Plaintiff**

accepted.  As a matter of fact, Plaintiff admitted the messages were inappropriate and stated his behavior reflected "poor judgment." *See supra* Paragraphs 19-20 (citing Ex. 8, Aug. 26, 2019 Letter, at Duquesne_00104; Ex. 4, Plaintiff Tr. 73:13-16 (stating "[i]t was poor judgment" that he sent the message); 73:25-74:12 (acknowledging that "poor judgment" is synonymous with "inappropriate" in this context)).

285.    The Provost felt terrible that the matter had gone as far as the Plaintiff being punished. (Creehan Aft para. 5, Appx124-125).

**DEFENDANTS' RESPONSE:  Defendants' object to Paragraph 285 to the extent that it contains or relies on inadmissible hearsay evidence, namely, what Dausey allegedly stated to Creehan.  *See* Fed. R. Evid. 801; *see also* Bouriez, 2005 U.S. Dist. LEXIS 18324, at \*26-27. Disputed, but not material. Dausey stated he had no recollection of making such a statement and indicated that he "believe[d] that some discipline should have been in order."  Def'ts' Ex. 64, 86:18-87:24.**

**The dispute is not material, because even if Dausey later felt bad that Plaintiff was punished, Dausey reported Plaintiff's conduct, which was in violation of Duquesne policies, and Plaintiff received the punishment that the decisionmakers involved felt was warranted.  *See supra* Paragraphs 17-23.**

286.    Both the Provost and Dr. Creehan felt that there was no need to punish the Plaintiff over this incident. (Creehan Aff, para. 5, Appx124-125). Dr. Creehan described the allegation that this conduct was "egregious" as "absurd" and "ridiculous." (Creehan Aff, para. 5, Appx124-125).

**DEFENDANTS' RESPONSE:  Defendants' object to Paragraph 285 to the extent that it contains or relies on inadmissible hearsay evidence, namely, what Dausey allegedly stated to Creehan.  *See* Fed. R. Evid. 801; *see also Bouriez*, 2005 U.S. Dist. LEXIS 18324, at \*26-27.**

**In any event, disputed by not material.  Dausey stated at his deposition that he felt it was not his role to determine punishment in a matter that directly involved him. Def'ts' Ex. 64, 86:18-87:24**

287.    By contrast, in his memorandum condemning the Plaintiff and his actions, the Defendant university's president described this incident as a "potentially terminable offense." (Plaintiff's Bates numbers 0357-0363, Appx292-298).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.**

288.    The President's memorandum went on to say that this incident "violated university policy, (was) contrary to personal and institutional values, and reflected exceedingly poor judgment. (Plaintiff's Bates number 0358, Appx293).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.**

289.    There is nothing in the record of this case that demonstrates the University President decrying the sexual assault of Ms. Maurer by Defendant Miller.

**DEFENDANTS' RESPONSE:  Disputed for failure to cite to record evidence as required by Local Rule 56.B.1. & 56.C.1.b., and Defendants request that Paragraph 289 be stricken for that reason. *See Harris*, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded"); *see also Schultz*, 2017 U.S. Dist. LEXIS 21856, at \*8 ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)). Disputed that Maurer was sexually assaulted by Miller, but not relevant.  *See supra* Defendants' Response**

to Paragraph 229.  By way of further response, there is nothing in the record of this case that demonstrates that Gormley was aware of any allegation by Maurer.  Further, this fact is not material to whether Plaintiff's punishment for his sexual misconduct was appropriate, much less whether his subsequent termination had anything to do with his age or protected activity.

290.   There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. W by Defendant Miller.

**DEFENDANTS' RESPONSE:  Disputed for failure to cite to record evidence as required by Local Rule 56.B.1. & 56.C.1.b., and Defendants request that Paragraph 290 be stricken for that reason.** *See Harris***, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded");** *see also Schultz***, 2017 U.S. Dist. LEXIS 21856, at \*8 ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)). Disputed that Ms. W was sexually harassed by Miller, but not material.** *See infra*  **Defendants' Response to Paragraph 303.  By way of further response, Plaintiff's facts has not yet referenced a "Ms. W," who is first mentioned in Paragraph 303 below. Moreover, there is nothing in the record of this case that demonstrates that Ms. W reported her allegations to anyone at Duquesne or that Gormley was aware of any allegation by Ms. W.  Further, this fact is not material to whether Plaintiff's punishment for his sexual misconduct was appropriate, much less whether his subsequent termination had anything to do with his age or protected activity.**

291.   There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. Y by Defendant Miller.

**DEFENDANTS' RESPONSE:  Disputed for failure to cite to record evidence as required by Local Rule 56.B.1. & 56.C.1.b., and Defendants request that Paragraph 291 be stricken for that reason.** *See Harris***, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded");** *see also Schultz***, 2017 U.S. Dist. LEXIS 21856, at \*8 ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)). Disputed that Ms. Y was sexually harassed by Miller, but not relevant, and Defendants renew their objection to the inclusion of any allegation related to Ms. Y on the grounds that any such allegation is supported by inadmissible hearsay evidence.** *See supra* **Defendants' Response to Paragraph 240.  By way of further response, there is nothing in the record of this case that demonstrates that Ms. Y reported her allegations to anyone at Duquesne or that Gormley was aware of any allegation by Ms. Y.  Further, this fact is not material to whether Plaintiff's punishment for his sexual misconduct was appropriate, much less whether his subsequent termination had anything to do with his age or protected activity.**

292.    There is nothing in the record of this case that demonstrates the University President decrying the sexual harassment of Ms. Z by Defendant Miller.

**DEFENDANTS' RESPONSE:  Disputed for failure to cite to record evidence as required by Local Rule 56.B.1. & 56.C.1.b., and Defendants request that Paragraph 292 be stricken for that reason.** *See Harris***, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded");** *see also Schultz***, 2017 U.S. Dist. LEXIS 21856, at \*8 ("Plaintiff**

did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)). Disputed that Ms. Z was sexually harassed by Miller, but not relevant, and Defendants renew their objection to the inclusion of any allegation related to Ms. Z on the grounds that any such allegation is supported by inadmissible hearsay evidence. *See supra* Defendants' Response to Paragraph 241.  By way of further response, there is nothing in the record of this case that demonstrates that Ms. Z reported her allegations to anyone at Duquesne or that Gormley was aware of any allegation by Ms. Z.  Further, this fact is not material to whether Plaintiff's punishment for his sexual misconduct was appropriate, much less whether his subsequent termination had anything to do with his age or protected activity.

293.    In July of 2010, the Defendant University's President was the object of a civil lawsuit filed in the United States District Court for the Western District of Pennsylvania. (See Complaint filed at CA no. 2:10-cv-00981-AJS. ("Stewart Complaint"), Appx265-286).

**DEFENDANTS' RESPONSE:  Disputed, but not a genuine dispute of material fact and irrelevant.   By way of further response, Duquesne's President in July 2010 was Dr. Charles Dougherty.** *See* ***Duquesne    University    History***, **D**UQUESNE   **UNIVERSITY,** <u>**https://www.duq.edu/about/history/index.php**</u>   **(last  visited  May  23,  2024).  The  record evidence does not support that Dr. Dougherty was "the object of a civil lawsuit."  It appears that Plaintiff includes these spurious allegations in support of an argument that President Gormley is his comparator, but such an argument fails as a matter of law.  During President Gormley's career with Duquesne, he has not worked as a Gift Officer in the Advancement Office, but rather as a School of Law professor, then Interim Dean for the School of Law,**

then Dean for the School of Law, and then President of the University. *Gormley Depo. 4:25-5:5:4, 7:15-23.*  The allegations referenced in the Stewart Complaint occurred prior to July 2010, approximately a decade prior to the allegations raised against Plaintiff and are not factually analogous to the misconduct that Plaintiff admitted to with respect to this case. *Appx 265-286; contra* Paragraphs 17-23.  Moreover, the record evidence cited by Plaintiff does not identify a decision-maker with respect to the allegations involving President Gormley – yet another necessary factual element for a comparator analysis.  Accordingly, as a matter of law, President Gormley is not an appropriate comparator to Plaintiff, rendering the "facts" alleged in Paragraphs 293 through 298 immaterial. *See* Reply Br. 2-3.

294.    In that action, the Defendant University's now President was accused of sexual harassment of a female employee. (Stewart Complaint, Appx265-286).

**DEFENDANTS' RESPONSE:  Undisputed that the plaintiff's federal court complaint so alleged, but not material and irrelevant.  By way of further response, Defendants incorporate their response to Paragraph 293.**

295.    After an internal investigation, the finding was "that Professor Gormley had subjected (the Plaintiff) to sexual harassment and a hostile work environment." (Stewart Complaint, p. 6, para. 37, Appx270).

**DEFENDANTS' RESPONSE:  Undisputed that the plaintiff's federal court complaint so alleged, but not material and irrelevant.  By way of further response, Defendants incorporate their response to Paragraph 293.**

296.     Shortly after the filing of a state agency claim of discrimination by the plaintiff in that case, Mr. Gormley was promoted to Vice President of Interdisciplinary Studies. (Stewart Complaint, p. 7, para. 44, Appx271).

**DEFENDANTS' RESPONSE:  Undisputed that the plaintiff's federal court complaint so alleged, but not material and irrelevant.  By way of further response, Defendants incorporate their response to Paragraph 293.**

297.     The Stewart Complaint is replete with accusations against the Defendant University's president of retaliatory. (Stewart Complaint, paras. 44, 54, 115, Appx271, 272, 278).

**DEFENDANTS' RESPONSE:  Undisputed that the plaintiff's federal court complaint so alleged, but not material and irrelevant.  By way of further response, Defendants incorporate their response to Paragraph 293.**

298.     The docket in the Stewart case shows that the matter was resolved by an out-of-court settlement. (Appx256-264).

**DEFENDANTS' RESPONSE:  Disputed, but not a genuine dispute of material fact and irrelevant.  Indeed, the docket merely shows that "the parties [ ] agreed to an amicable resolution of this matter" resulting in the dismissal of the case.  *Appx263*.  By way of further response, Defendants incorporate their response to Paragraph 293.**

299.     In late 2014, the Defendant University's President was again named in a lawsuit filed against the Defendant university and Mr. Gormley in a 100 page, 616 paragraph, 9 count complaint alleging that Mr. Gormley engaged in "systemic and vicious discrimination" against that plaintiff "on the basis of her age, gender and religious scholarship. (See Complaint filed at CA 2:14-cv-01489-CB ("Haskell Complaint"), Appx158-255).

**DEFENDANTS' RESPONSE:  Disputed, but not a genuine dispute of material fact and irrelevant.  By way of further response, Duquesne's President in late 2014 was Dr. Charles Dougherty. *See Duquesne University History*, D**UQUESNE **U**NIVERSITY, https://www.duq.edu/about/history/index.php  (last visited May 23, 2024). It appears that Plaintiff includes these spurious allegations in support of an argument that President Gormley is his comparator, but such an argument fails as a matter of law.  During President Gormley's career with Duquesne, he has not worked as a Gift Officer in the Advancement Office, but rather as a School of Law professor, then Interim Dean for the School of Law, then Dean for the School of Law, and then President of the University.  *Gormley Depo. 4:25-5:5:5:4, 7:15-23.*  The allegations referenced in the Hascall Complaint occurred prior to late 2014, approximately five years prior to the allegations raised against Plaintiff and are not factually analogous to the misconduct that Plaintiff admitted to with respect to this case. *Appx 265-286; contra* Paragraphs 17-23.  Moreover, the record evidence cited by Plaintiff does not identify a decision-maker with respect to the allegations involving President Gormley – yet another necessary factual element for a comparator analysis.  Accordingly, as a matter of law, President Gormley is not an appropriate comparator to Plaintiff, rendering the "facts" alleged in Paragraphs 299 through 301 immaterial.  Reply Br. 2-3**

300.    While the Haskell case was still pending, Mr. Gormley was promoted to President of the Defendant University. (Gormley depo, p. 5, Appx317).

**DEFENDANTS' RESPONSE:  Undisputed, but not material and irrelevant. By way of further response, Defendants incorporate their response to Paragraph 299.**

301.    Like the Stewart case, the Haskell Complaint was settled out-of-court in the year following Mr. Gormley's promotion to president of the Defendant University. (Haskell docket entries, Appx149-157).

**DEFENDANTS' RESPONSE:  Undisputed, but not material and irrelevant.  By way of further response, Defendants incorporate their response to Paragraph 299.**

302.    There is no record of discipline against Mr. Gormley for either of the above discrimination claims.

**DEFENDANTS' RESPONSE:  Plaintiff's response does not comply with Local Rule 56.B.1 & 56.C.1.b., which require "appropriate reference to the record," such as particular pleading, deposition, answer to interrogatory, admission on file or other part of the record, and, on that basis, Paragraph 302 should not be considered for the purposes of deciding Defendant's Motion for Summary Judgment.  *See Harris v. Astellas Pharm.*, No. 13-1663, 2015 U.S. Dist. LEXIS 134750, at \*2-5 n.1 (W.D. Pa. Sep. 24, 2015) (stating that "averments of fact contained in Plaintiff's Response which cite no record evidence in support will, likewise, be disregarded"); *see also Schultz v. United States*, No. 15-454, 2017 U.S. Dist. LEXIS 21856, at \*8 (W.D. Pa. Feb. 16, 2017) ("Plaintiff did submit ten additional facts as contemplated by Local Rule 56.C.1.c. Plaintiff's counsel failed to cite any evidence for three of those facts; Plaintiff cited only to the allegations in the complaint. These 'facts' will be disregarded." (internal citations omitted)).**

303.    There is no record of any investigation or discipline of Defendant Miller related to Ms. Maurer, Ms. W[13], Ms. Y or Ms. Z. The only record of any investigation or discipline in this

---

[13]    **Plaintiff's Footnote:**  In 2021, Plaintiff was on a Zoom meeting with various employees of the Defendant university, including Defendant Miller and Ms. W. During that meeting,

case is against the Plaintiff for his "egregious sexual misconduct," which Mr. Gormley said were "contrary to personal and institutional values." Mr. Gormley did not say whose personal values he was referring to. (Plaintiff's Bates numbers 0357-0363, Appx292-298).

**DEFENDANTS' RESPONSE:  Undisputed that Plaintiff has not endeavored to establish a record that reflects whether there was an investigation into Miller related to any of the allegations referenced. Plaintiff bears the burden of establishing his comparators, and he has not established through record evidence that there *was not* an investigation. It is not incumbent on Defendants to produce materials that Plaintiff has not requested or asked any witness about.**

**In any event, for the reasons stated, any allegations relying on Ms. Maurer's affidavit should be stricken from the record because she was not properly disclosed as a witness to the case, and no reason for Plaintiff's failure to disclose her has been given.  *See supra* Paragraph 229. Moreover, any allegations related to Ms. Y or Ms. Z should be stricken from the record, as they are supported by inadmissible hearsay evidence. *See supra* Paragraph 240-41.  Disputed that, at any point, a Duquesne official referred to Plaintiff's sexual misconduct as "egregious sexual misconduct." It is not so stated in Gormley's memorandum nor in Miller's letter to Plaintiff terminating his employment. *See* Def'ts' Ex. 7 at Duquesne_00013; Appx292-95. Rather, Miller considered Plaintiff's actions surrounding the misconduct were, in totality, egregious, including poor judgment involved in sending a lewd photograph to the Provost of a Catholic institution.  *See* Reply Br. 5 n.10.**

---

Defendant Miller intimated that he had fathered children with Ms. W. Both Ms. W and other participants in the meeting were shocked. (Plaintiff, Aff, para. 32, Appx140-141). See, also, Footnote 11, *supra*.

As noted above, Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Defendants maintain that, pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  To the extent a response to footnote 14 is required, Defendants dispute Plaintiff's assertions regarding Ms. W, as Miller unequivocally denies this exchange having occurred. *See* Appx062-63. The dispute is not material, however, because Plaintiff's claims do not bear on summary judgment.

Specifically, Plaintiff interpreted Miller's purported comment, which he admits he does not recall verbatim, to mean that he had "fathered" Ms. W's children and that Ms. W's facial reaction and silence meant she was "stunned and offended." Plaintiff does not assert that he asked Miller what he meant, that he spoke with Ms. W to assess whether that was her true reaction, or that he spoke with others on the call to determine whether they also were offended. Plaintiff also does not assert that Ms. W complained of this comment to anyone at Duquesne, nor that *he* made such a report, such that Duquesne would have been able to investigate the purported interaction.

At bottom, none of the foregoing is material to the disposition of summary judgment, however, because Plaintiff cannot establish disparate treatment in investigating and punishing alleged misconduct if there was no report in the first place, much less that *Miller*, the alleged perpetrator, treated Plaintiff differently based on his age or in retaliation for any protected activity.

304.    In 2019, Plaintiff cultivated a significant seven (7) figure donation from Donors B and C. (Plaintiff Aff, para. 16, Appx135-136).

**DEFENDANTS' RESPONSE:  Undisputed.**

305.    Plaintiff kept the nursing school Dean apprised of the cultivation throughout the period January to May, 2019. (Plaintiff Aff, para. 16, Appx135-136).

**DEFENDANTS' RESPONSE:  Disputed, but not material.  Dean Mary Ellen Glasgow penned a memorandum with attached email support that detailed how she was left out of the cultivation process.  *See* Def'ts' Ex. 11 (June 2, 2019 memorandum).**

**The dispute is not material, as Plaintiff admits that Glasgow's memorandum asserts that she felt was left out of the cultivation process at a key point, *see supra* Paragraph 31, and he has not articulated any record evidence or basis to refute that that is how Glasgow actually felt. Plaintiff does not, and cannot, assert with record evidence that Glasgow's memorandum was drafted with any unlawful motive related to Plaintiff's age or protected activity (which had not occurred in 2019). Moreover, Plaintiff does not, and cannot, assert with record evidence that Miller's reliance on Glasgow's opinions with respect to Plaintiff's communication failures was due to any unlawful motive.**

306.    The donation was a hybrid gift, and was exceedingly complex, with funds coming from various sources on different dates, and with intricate tax considerations. The complexity of the donation led to a math error being committed by Ms. Hughes. (Plaintiff Aff, para. 18, Appx136-137). The error was missed by Ms. Hughes, Ms. Dean, Dr. Creehan, Defendant Miller and Plaintiff. (Plaintiff Aff, para. 18, Appx136-137).

**DEFENDANTS' RESPONSE:  As an initial matter of clarification, Plaintiff conflates two separate issues with respect to the same donors: (1) 2019 communication issues articulated by Dean Glasgow in her memorandum and (2) a 2021-22 mathematical error related to a separate donation and Plaintiff's subsequent failure to apprise the donors of the error after**

**many months. *See supra* Paragraphs 25-33 (discussing 2019 communication issues); Paragraphs 34-41 (discussing mathematical error).**

**Undisputed for purposes of summary judgment that the donation was complex and that the complexity led to the math error and that the math error was committed, initially, by Hughes. By way of further response, as the math error occurred with respect to a gift from Plaintiff's assigned donors, he was responsible for stewarding their gift in the manner agreed by the donors and the University, meaning he bore responsibility. *See Def'ts' Ex. 2 at Duquesne_00101 (noting that gift officers are responsible for "stewarding" major gifts, including drafting "gift and fund agreements" and "process[ing] gift commitments expeditiously"); see also Def'ts' Ex. 62, at 38:15-25 (noting that, regardless of who actually drafts it, "the gift officer is going to have to make sure the document reflects what they have discussed with the donor").* In any event, Miller was in a different role when this occurred. See supra *Paragraph 5.* Undisputed for purposes of summary judgment that other members of the Advancement division did not initially notice the mathematical error.**

307.    Plaintiff was tasked by Defendant Miller with traveling to California to meet face to face with the donors to explain the error, and to "smooth over" the donors, because of the Plaintiff's strong relationship with the donors. (Plaintiff Aff, paras. 19-20, Appx137-138).

**DEFENDANTS' RESPONSE:  Defendants' object to Paragraph 307 to the extent that it relies on inadmissible hearsay evidence, namely, Miller's purported statement that Plaintiff needed to "smooth over" the donors.  *See* Fed. R. Evid. 801; *see also Bouriez*, 2005 U.S. Dist. LEXIS 18324, at \*26-27.**

**Undisputed that Miller asked Plaintiff to discuss the error with the donors, and Plaintiff and Miller agreed that face-to-face discussion would be best.  By way of further response, Miller**

did indicate to Plaintiff that, should face-to-face discussion not be available, a Zoom or conference call would be appropriate. Def'ts' Ex. 12, at Duquesne_00683.

308. The Plaintiff was never tasked with "correcting" the math error, but rather with explaining the error to the donors and discussing the solution to the problem. (Plaintiff Aff, para. 20, Appx138).

**DEFENDANTS' RESPONSE: Disputed, but not material. Plaintiff's distinction is one without a difference. The "correction" for the mathematical error *was* communicating the error to the donors and discussing the solution, and, as Plaintiff admits, Miller tasked him with doing so. *See supra* Paragraph 35.**

**In any event, Plaintiff's quibbling with the phrasing is not material to the disposition of summary judgment. At bottom, Plaintiff was tasked with communicating the error to the donors, and, despite many months to do so, he did not. *See* Def'ts' Ex. 12 (demonstrating emails from August 2021 through April 2022 in which issue was not resolved). Plaintiff does not provide record evidence to suggest that Miller did not honestly believe that Plaintiff's delay supported his opinion that he was unable to appropriately communicate in a manner required to perform his job duties.**

309. Prior to the Plaintiff's meeting with the donors, the Plaintiff met with Ms. Clay. Ms. Clay told the Plaintiff that the University did not suffer any financial loss from the error, which was corrected by shifting various monies from one donation destination to another. Ms. Clay did not reprimand the Plaintiff in any way for the error, and did not seem upset by it, nor by the Plaintiff's role in the error. Ms. Clay instructed the Plaintiff to go to California and "have a nice dinner with Donors B and C," and continue to strengthen the relationship with the donors. (Plaintiff Aff, para. 21, Appx138).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.**

310.    The Plaintiff made multiple attempts to schedule a face to face meeting with the donors[14], but was unable to for a considerable period of time due to the donors being out of the country for an extended period. (Plaintiff Aff, para. 19, Appx137).

**DEFENDANTS' RESPONSE:  Undisputed for purposes of summary judgment that Plaintiff attempted to meet with the donors face to face.**

**As noted above, Defendants have reproduced footnotes included in Plaintiff's submission for inclusivity.  Defendants maintain that, pursuant to Local Rule 56, Plaintiff is required to put any allegation in separately numbered paragraphs such that his allegations made in footnotes should not be considered.  To the extent a response to footnote 16 is required, Defendants do not dispute that Miller and Plaintiff determined that an in-person meeting with the "best" course of action, but to the extent that Plaintiff suggests that Miller instructed him to wait for an in-person meeting no matter how long it took, disputed.  The only record evidence on this point is Miller's statement in a November 2021 email to Glasgow, which contemporaneously reflects that Miller told Plaintiff that, if he could not meet with the donors in the next month, that he should schedule a "Zoom or conference call engagement" with them.  *See* Def'ts' Ex. 12 at Duquesne_00683.**

**The dispute is not material, however, because Plaintiff has introduced no evidence (nor made no assertion) that Miller's consideration of this issue was due to unlawful motive or not based**

---

[14]     **Plaintiff's Footnote:**  While the Plaintiff and Defendant Miller discussed the possibility of the Plaintiff meeting the donors in a Zoom meeting, they decided that an in-person meeting was best course of action. (Plaintiff Aff, para. 19, Appx137).

**on Miller's honestly held belief that the situation was reflective of Plaintiff's poor judgment and communication skills.**

311.    When the Plaintiff was finally able to meet with the donors, neither donor showed any anger, frustration or other negative reaction to the error. They did not express any problems with the donation, and seemed content with the solution to the error. The donor relationship was not damaged in any way, and the gift proceeded without interruption. (Plaintiff Aff, para. 19, Appx137).

**DEFENDANTS' RESPONSE:  Defendants dispute that Plaintiff met with the donors and discussed the error prior to them being informed by others, as there is no evidence aside from Plaintiff's self-serving affidavit suggesting that such a meeting ever occurred.  By way of further response, while the gift proceeded without interruption, Duquesne was subject to financial loss due to the delay in discussing the error with the donors.  *See* Ex. 3, 50:12-21; Ex. 1, ¶ 11. In any event, the dispute is not material, because the undisputed record is that Plaintiff took several months to meet with the donors on what was a time-sensitive issue.**

312.    The Plaintiff did not receive any discipline for the error by Ms. Hughes, nor for the delay in obtaining a meeting with the donors. In fact, no one, including Ms. Hughes, Ms. Dean, Dr. Creehan or Defendant Miller were disciplined in any way for any aspect of the donation from Donors B and C. (Plaintiff Aff, paras. 18, 34, Appx136-137, 141).

**DEFENDANTS' RESPONSE:  Undisputed but not material.**

313.    No mention of this donation appeared in any performance evaluation of the Plaintiff. In the Plaintiff's performance review given to him shortly after the donation from Donors B and C closed, the following notations appear:

- "Bill is well liked within the office, and well liked by the donors in his portfolio"
- "Handling the California geographical area has demanded someone with the ability to adapt. Bill has filled that role exceptionally well."

(Defendants' Bates numbers 0080 to 0085, at pp. 0083 and 0084, Appx146-147) (Emphasis supplied).

**DEFENDANTS' RESPONSE:  Undisputed but not material. By way of further response, Plaintiff refers to a performance review well before the issue with the mathematical error, for the fiscal year 2018-19.  Plaintiff was terminated prior to receiving a performance review for 2021-22, which is the timeframe during which Plaintiff failed to communicate with Donors B and C.  Moreover, the 2018-19 performance review was conducted by Rick Creehan and John Plante, who were not privy to the discussions regarding Plaintiff's failure to communicate with Glasgow in early 2019, so, even if it were material that Plaintiff's performance issue was not included in the review (it is not), there is no record evidence to suggest that the issue was raised with Creehan or Plante.**

314.    Shortly after the donation from Donors B and C concluded, the Plaintiff was named Gift Officer of the Year. (Creehan Aff, para. 4, Appx124).

**DEFENDANTS' RESPONSE:  Undisputed that Plaintiff was named Gift Officer of the Year but immaterial. By way of further response, Plaintiff was given that award prior to the issue with the mathematical error and failure to communicate with Donors B and C.**

315.    At some point in 2022, while in Texas on a donor cultivation, the Plaintiff was the victim of random violence by an individual whose car the Plaintiff accidentally bumped with his car door in a parking lot where the Plaintiff was scheduled to meet a prospective donor couple. The individual physically attacked the Plaintiff, who had no opportunity to deescalate the conflict. The police did not charge the Plaintiff with any wrongdoing, and the donors did not

witness the altercation. The Plaintiff reported these facts to Defendant Miller shortly after the incident. (Plaintiff Aff, para. 33, Appx141).

**DEFENDANTS' RESPONSE: Undisputed, except disputed that "the donors did not witness the altercation," though not material. Plaintiff's deposition testimony contradicts his affidavit. In his deposition, Plaintiff stated that the donors "were panicked, because they came in in the middle of this," to which Plaintiff apologized and said he would meet them another time (which he never did). Ex. 65, 136:23-137:8; *see also id.* 134:25-137:10. Accordingly, his affidavit statement should not be considered. In his deposition, Plaintiff plainly stated *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (holding that "sham affidavits" that contradict the record or materially alter the record told by discovery should not be considered at summary judgment because "no reasonable jury could rely on [them] to find for the nonmovant"); *see also Robinson v. UPMC Presbyterian Shadyside*, Civil Action No. 22-29, 2023 U.S. Dist. LEXIS 160981, at \*3 (W.D. Pa. Sep. 12, 2023) ("When a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists.") (internal citations omitted). Specifically, Plaintiff Accordingly, Plaintiff's denial should be disregarded for lack of record evidence.**

316.    The Plaintiff was not disciplined as a result of this incident. (Miller depo, pp. 46-47, Appx111).

**DEFENDANTS' RESPONSE: Undisputed, but not material.**

317.    Nevertheless, in his deposition, Defendant Miller claimed that the Plaintiff's being victimized by this violence somehow showed a "lack of judgment." Defendant Miller also

claimed that the Plaintiff should have "deescalated" the situation, but did not explain how the Plaintiff could have deescalated the situation. (Miller depo, p. 44, App110).

**DEFENDANTS' RESPONSE:  Disputed, as the fact as to whether Plaintiff was a victim are unknown, but not material.**

**By way of further response, Miller went on to state that he expected Plaintiff to "[f]ind a way to deescalate rather than engaging" and that his judgment of the situation as presented to him was that he would not have engaged in an altercation the way Plaintiff did and that he views it to be "proper conduct and sound judgment of a professional when [the professional] is about to engage a donor or a prospective donor."  Appx110.  Plaintiff introduced no evidence, nor makes no argument, that Miller's opinion on this matter was not his honestly held belief or was born out unlawful motive.**

318.   Mr. Gormley described the Plaintiff's conduct in the parking lot incident as part of a "pattern of misconduct" by the Plaintiff, although:

- He did not know what happened in the incident, and did not know much about it. (Gormley depo, p. 98, Appx321);
- He did not know that the Plaintiff was attacked. (Id.);
- He had no information on whether or not the Plaintiff was at fault in the incident. (Gormley depo, p. 106, Appx322); and
- He did not know that the Plaintiff was the victim in the incident. (Gormley depo, pp. 107-108, Appx322).

**DEFENDANTS' RESPONSE: Disputed, as the facts concerning the actual events are unknown, but not material. Notably, questions by counsel which embed unsupported facts do not create evidence. By way of further response, in the memorandum itself, Gormley indicates that he "admittedly d[id] not know the details of this altercation," but notes that he had details reported to him that he found "troublesome." Appx294. In any event, Gormley's reference to this specific incident has no bearing on whether *Miller*, the decisionmaker as to**

Plaintiff's termination, improperly considered this incident in deciding to terminate Plaintiff. As stated above, Plaintiff has introduced no such evidence. *See supra* Defendants' Response to Paragraph 317.

319.    On May 15, 2022, the Plaintiff made a written claim to the Defendant University's human resources representative that the actions of Defendant Miller in pursuing the claim that the Plaintiff violated University policy in the Donor Couple gift constituted age discrimination. (Richter depo, Exhibit 20, at Appx006).

**DEFENDANTS' RESPONSE:  Disputed for insufficient support in the record citation, as Plaintiff conflates issues in the case. Plaintiff's May 15, 2022 written complaint was the second in a set of two complaints Plaintiff made to human resources regarding Krebs' outreach to Donor A and Viers' and Miller's involvement. *See* Appx005-06. In any event, Plaintiff's complaint does not actively assert age discrimination and instead, in closing, states that if and when the relevant "gift is booked," Plaintiff would have been "left with no alternative but to file an age discrimination complaint[.]" Appx006.  Plaintiff never followed up by filing an age discrimination complaint with the appropriate Duquesne office, despite being provided with instructions on how to do so.**

**Moreover, there is no record evidence that Plaintiff ever submitted a complaint about age discrimination with respect to the Donor Couple incident (which was not brought to the University's attention until July 2022) – two months after Plaintiff now claims that he raised an age discrimination claim about it.**

**In any event, this fact is not material. Plaintiff has adduced no record evidence that Miller was shown or aware of the specific language of Plaintiff's complaint or that he used the words**

"age discrimination," because he was not.  Def'ts' Ex. 67, 58:18-59:5 (referencing Def'ts' Ex. 30).

320.    Defendant Miller denied knowing that he was accused of age discrimination, despite the fact that the Plaintiff made that written complaint to the Defendant University's human resources representative. (Miller depo, pp. 58-59, Appx117).

**DEFENDANTS' RESPONSE:  Undisputed.**

321.    On July 20, 2022, the Defendant University's human resources representative had a meeting with Defendant Miller regarding the Plaintiff's allegations after the Plaintiff accused Defendant Miller of age discrimination. According to the representative, Mr. Miller declined to submit a formal rebuttal to the charges leveled by the Plaintiff on May 15, 2022. (Correspondence from Jefferson Dedrick to the Plaintiff dated July 20, 2022, Defendants' Bates numbers 00229 to 00237, Appx304-312).

**DEFENDANTS' RESPONSE:  Disputed as stated but not material.  Plaintiff's record citation does not support the assertion that a meeting occurred on July 20, 2022. Indeed, the record citation is to Dedrick's July 20, 2022 report of his investigation that was provided to Plaintiff.  *See* Appx304-312. The record citation reflects only that Dedrick and Miller met to discuss the complaint on May 16, 2022.**

**Undisputed that Dedrick's report reflects that Miller declined to submit a "formal rebuttal" to the May 15, 2022 complaint, the reason for which Dedrick notes was that Miller had already provided "information regarding the issues in question during his interview for the first complaint." *See* Appx304. To the extent that Plaintiff implies that Miller was shown the specific language of Plaintiff's complaint or informed that the complaint was a complaint of "age discrimination," disputed for lack of record evidence, as the report does not in any way**

**indicate as much, and, in fact, Miller testified he had never seen it and was not aware.  Def'ts'**

**Ex. 67, 58:18-59:5 (referencing Def'ts' Ex. 30).**

322.    By letter dated August 17, 2022, the Plaintiff was fired twenty-seven (27) days after

Defendant Miller met with the Defendant University's human resources department. (Defendants'

Bates numbers 00013-00014, Appx299-300).

**DEFENDANTS' RESPONSE:  Undisputed that Plaintiff was terminated on August 17, 2022.**

**Disputed for lack of record evidence that Miller met with the University's Human Resources**

**department 27 days prior; indeed, Plaintiff's record evidence supports only that Miller met**

**with Dedrick on May 16, 2022, more than three months prior to Plaintiff's termination.  *See***

**Defendants' Response to Paragraph 321.**

323.    Ms. Hughes filed suit against these Defendants on October 13, 2023 alleging age

discrimination in her termination. It is undisputed between the parties that that case is currently

in the process of resolution by out-of-court settlement. (See Hughes' Complaint at Appx018-

031).

**DEFENDANTS' RESPONSE:  Undisputed, but not material.**

Respectfully submitted,

/s/ Joshua R. Sallmen
Mariah H. McGrogan (PA 318488)
Joshua R. Sallmen (PA 325948)
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Phone:  (412) 288-3131
Email:  mmcgrogan@reedsmith.com
          jsallmen@reedsmith.com

Dated:  May 24, 2024                                 Attorney for Defendants